UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---

THE FAIRCHILD CORPORATION,

                  Petitioner,

      -against-

ALCOA INC.,

                  Respondent.

07-CV-6185 (VM)

---

## PETITION TO VACATE ARBITRATION AWARD

The Fairchild Corporation ("Fairchild") submits this Petition pursuant to the Federal Arbitration Act, 9 U.S.C. § 10, to vacate the June 21, 2007 award issued in an arbitration between Fairchild and Alcoa Inc. ("Alcoa") arising out of the July 16, 2002 Acquisition Agreement between Alcoa Inc., The Fairchild Corporation, Fairchild Holding Corp. and Sheepdog, Inc., as amended on December 3, 2002 (the "Agreement").

### THE PARTIES AND JURISDICTION

1.      Fairchild is a Delaware corporation with its principal place of business in McLean, Virginia.

2.      Alcoa is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania.

3.      This Court has jurisdiction over this Petition pursuant to 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

**THE AGREEMENT**

4.      Pursuant to the terms of the Agreement, Fairchild agreed to sell to Alcoa its Fastener Business for approximately $657 million in cash and the assumption of certain liabilities (the "Acquisition").   Fairchild also agreed, subject to certain conditions, to indemnify Alcoa for certain "Fastener Environmental Liabilities" (as defined in the Agreement) incurred by Alcoa following the Acquisition in excess of a negotiated $8.45 million reserve.  A copy of the Agreement is attached hereto as Exhibit A.

5.      From 2003 through December 19, 2006, Alcoa submitted over 200 claims for indemnification to Fairchild totaling $16,385,463.92.   For reasons set forth in written correspondence to Alcoa, Fairchild disputes the validity and amount of each of these claims.

6.      Section 11.7 of the Agreement provides in relevant part that "[i]f a dispute arises in connection with determining the validity or amount of a claim for indemnification" and the dispute is not settled through direct discussions between the parties or in mediation, the dispute "will be settled finally by arbitration under the CPR Rules for Non-Administered Arbitration (the 'Rules'), then in effect, by a sole arbitrator, chosen by agreement of the parties . . . . [and] will be governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq."

7.      In accordance with the terms of the Agreement, following an unsuccessful mediation, an arbitration was commenced by Fairchild on July 20, 2005.  The arbitration hearing was conducted before a single arbitrator (the "Arbitrator") chosen by agreement of the parties and was held in New York, New York from January 8 through January 12, 2007 and February 26 through March 1, 2007.  Thereafter, the parties submitted post-hearing memoranda and proposed findings of facts and conclusions of law on April 16, 2007 and submitted reply memoranda on April 30, 2007.

8.      The Arbitrator rendered an award on June 21, 2007 (the "Award"), a copy of which is attached hereto as Exhibit B.  In that Award, the Arbitrator found that "Alcoa has sus-

tained its burden of proof that the expenditures were in fact made in the amounts claimed." (Award at 21).

9.      For the reasons set forth in the accompanying Memorandum of Law, this finding by the Arbitrator is fundamentally flawed because the Arbitrator refused to receive and consider material evidence that Alcoa claimed existed on this issue, *i.e.*, invoices it asserts verifies its over $16 million of alleged expenses, and allow Fairchild the opportunity to cross-examine a competent Alcoa witness (if one exists) with respect thereto.   This evidence was pertinent and material to the controversy.  Accordingly, the Arbitrator engaged in misconduct under 9 U.S.C. § 10(a)(3) and the Award should be vacated.

10.     The Award has not been confirmed, modified, or corrected as prescribed in 9 U.S.C. §§ 9 and 11.  This Petition is brought within three months after the issuance of the Award.  No previous application has been made to vacate or confirm the Award.

WHEREFORE, Fairchild respectfully requests the Court to vacate the Award and to grant such other relief as the Court deems proper.

Dated:   New York, New York
         July 2, 2007

Respectfully submitted,

CAHILL GORDON & REINDEL LLP

By: *Tammy T. Roy*
     Adam Zurofsky
     Tammy L. Roy
     Andrew Madar
80 Pine Street
New York, New York  10005
(212) 701-3000

*Attorneys for Petitioner*

# Exhibit A

CONFORMED COPY

ACQUISITION AGREEMENT

AMONG

ALCOA INC.,

THE FAIRCHILD CORPORATION,

FAIRCHILD HOLDING CORP.

AND

SHEEPDOG, INC.

Dated as of July 16, 2002

CONFIDENTIAL

FC 02717

# TABLE OF CONTENTS

| | Page |
|---|---|
| ARTICLE I DEFINITIONS | 2 |
| SECTION 1.1 "Actual Transferred Subsidiary Debt" | 2 |
| SECTION 1.2 "Advisor" | 2 |
| SECTION 1.3 "Affiliates" | 2 |
| SECTION 1.4 "After Tax Amount" | 2 |
| SECTION 1.5 "Agreement" | 2 |
| SECTION 1.6 "Airbus" | 2 |
| SECTION 1.7 "Allocation" | 2 |
| SECTION 1.8 "Ancillary Agreements" | 2 |
| SECTION 1.9 "Assigned Receivables" | 3 |
| SECTION 1.10 "Assumed Fastener Business Liabilities" | 3 |
| SECTION 1.11 "Authorizations" | 3 |
| SECTION 1.12 "Base Claim" | 3 |
| SECTION 1.13 "Bill of Sale" | 4 |
| SECTION 1.14 "Boeing" | 4 |
| SECTION 1.15 "business day" | 4 |
| SECTION 1.16 "Buyer" | 4 |
| SECTION 1.17 "Buyer DB Plans" | 4 |
| SECTION 1.18 "Buyer Closing Receivables Notice" | 4 |
| SECTION 1.19 "Buyer DC Plans" | 4 |
| SECTION 1.20 "Buyer Indemnified Parties" | 4 |
| SECTION 1.21 "CERCLA" | 4 |
| SECTION 1.22 "Class A Common Stock" | 4 |
| SECTION 1.23 "Class B Common Stock" | 4 |
| SECTION 1.24 "Closing" | 4 |
| SECTION 1.25 "Closing Date" | 4 |
| SECTION 1.26 "Closing Date Balance Sheet" | 5 |
| SECTION 1.27 "Code" | 5 |
| SECTION 1.28 "Commercial Aircraft" | 5 |
| SECTION 1.29 "Confidentiality Agreement" | 5 |
| SECTION 1.30 "Consideration" | 5 |
| SECTION 1.31 "Covenant Period" | 5 |
| SECTION 1.32 "CPR" | 5 |
| SECTION 1.33 "Damages" | 5 |
| SECTION 1.34 "Debt Tender Offer" | 5 |
| SECTION 1.35 "Department of Justice" | 5 |
| SECTION 1.36 "DGCL" | 5 |
| SECTION 1.37 "Direct Claim" | 6 |
| SECTION 1.38 "Discontinued Operations" | 6 |
| SECTION 1.39 "Dispute" | 6 |
| SECTION 1.40 "Draft Schedule 2.9" | 6 |
| SECTION 1.41 "Earn-Out" | 6 |
| SECTION 1.42 "Effective Time" | 6 |
| SECTION 1.43 "Environmental Action" | 6 |

i

SECTION 1.44  "Environmental Contamination"............................................6
SECTION 1.45  "Environmental Claim"........................................................6
SECTION 1.46  "Environmental Law"..........................................................6
SECTION 1.47  "Environmental Permits".....................................................6
SECTION 1.48  "ERISA"...........................................................................6
SECTION 1.49  "ERISA Affiliate"...............................................................6
SECTION 1.50  "Escrow Agreement"..........................................................6
SECTION 1.51  "Escrow Amount"..............................................................6
SECTION 1.52  "Estimated Transferred Fastener Subsidiary Debt"....................7
SECTION 1.53  "Exchange Act".................................................................7
SECTION 1.54  "Excluded Assets".............................................................7
SECTION 1.55  "Excluded Fastener Business Liabilities".................................7
SECTION 1.56  "Fastener Business"...........................................................7
SECTION 1.57  "Fastener Business Acquisition Proposal"...............................8
SECTION 1.58  "Fastener Business Assets"..................................................8
SECTION 1.59  "Fastener Business Bank Accounts".......................................8
SECTION 1.60  "Fastener Business Books and Records"..................................8
SECTION 1.61  "Fastener Business Contracts".............................................9
SECTION 1.62  "Fastener Business Employees"............................................9
SECTION 1.63  "Fastener Business Financial Statements"...............................9
SECTION 1.64  "Fastener Business Intellectual Property"................................9
SECTION 1.65  "Fastener Business Intellectual Property Licenses"....................10
SECTION 1.66  "Fastener Business Inventory".............................................10
SECTION 1.67  "Fastener Business Leases".................................................10
SECTION 1.68  "Fastener Business Product Liability Insurance".......................10
SECTION 1.69  "Fastener Business Real Properties".....................................11
SECTION 1.70  "Fastener Environmental Condition".....................................11
SECTION 1.71  "Fastener Environmental Liability"........................................11
SECTION 1.72  "Final Allocation".............................................................11
SECTION 1.73  "FTC".............................................................................11
SECTION 1.74  "Fullerton Property"..........................................................11
SECTION 1.75  "GAAP"..........................................................................11
SECTION 1.76  "Government"..................................................................11
SECTION 1.77  "Greenslet Report"...........................................................11
SECTION 1.78  "Hazardous Materials".......................................................11
SECTION 1.79  "HSR Act".......................................................................11
SECTION 1.80  "Indemnifiable Losses".......................................................11
SECTION 1.81  "Indemnifying Party".........................................................11
SECTION 1.82  "Indemnitee"...................................................................11
SECTION 1.83  "Indemnity Payment"........................................................12
SECTION 1.84  "Independent Accountants".................................................12
SECTION 1.85  "Intercompany Accounts"...................................................12
SECTION 1.86  "IRS".............................................................................12
SECTION 1.87  "best knowledge of the Sellers"...........................................12
SECTION 1.88  "Law".............................................................................12
SECTION 1.89  "Licenses and Permits"......................................................12

ii

SECTION 1.90   "Lien"...................................................................................12
SECTION 1.91   "March Pro Forma Balance Sheet" ...................................12
SECTION 1.92   "Material Adverse Effect"..............................................12
SECTION 1.93   "Net Working Capital"...................................................13
SECTION 1.94   "Newco California"........................................................13
SECTION 1.95   "Noncompetition Agreement".........................................13
SECTION 1.96   "Noncompetition and Consulting Agreement" ...............13
SECTION 1.97   "Non-Conveyed Contracts".............................................13
SECTION 1.98   "Overdue Closing Receivables"......................................13
SECTION 1.99   "Parent".........................................................................13
SECTION 1.100   "Parent Affiliates" ......................................................13
SECTION 1.101   "Parent Common Stock"..............................................13
SECTION 1.102   "Parent DB Plans".......................................................13
SECTION 1.103   "Parent DC Plans".......................................................13
SECTION 1.104   "Parent Pension Plans"................................................13
SECTION 1.105   "Parent SEC Filings"...................................................13
SECTION 1.106   "Permitted Exceptions" ...............................................14
SECTION 1.107   "Person" ......................................................................14
SECTION 1.108   "Fairchild Holding".....................................................14
SECTION 1.109   "Plans".........................................................................14
SECTION 1.110   "Pre-Closing Off-Site Disposal Locations"...................14
SECTION 1.111   "Preliminary Closing Date Balance Sheet"...................14
SECTION 1.112   "Product Claim"...........................................................14
SECTION 1.113   "Proxy Statement".......................................................15
SECTION 1.114   "Receivables"..............................................................15
SECTION 1.115   "Receivables Certificate".............................................15
SECTION 1.116   "Release"......................................................................15
SECTION 1.117   "Remedial Action".......................................................15
SECTION 1.118   "Remediation Standards" .............................................15
SECTION 1.119   "Representative"...........................................................15
SECTION 1.120   "Remaining Cash".......................................................15
SECTION 1.121   "Rules" ........................................................................15
SECTION 1.122   "SDI"...........................................................................15
SECTION 1.123   "SEC"..........................................................................15
SECTION 1.124   "Securities Act"...........................................................1.
SECTION 1.125   "Sellers".......................................................................1.
SECTION 1.126   "Shareholder Approval" ..............................................1
SECTION 1.127   "Special Shareholders Meeting" ..................................1
SECTION 1.128   "Stockholder"...............................................................1
SECTION 1.129   "Straddle Period" .........................................................1
SECTION 1.130   "subsidiary"..................................................................1
SECTION 1.131   "Taxes".........................................................................1
SECTION 1.132   "Tax Benefit"................................................................
SECTION 1.133   "Tax Indemnitee"..........................................................
SECTION 1.134   "Tax Indemnitor"..........................................................
SECTION 1.135   "Tax Returns"...............................................................

iii

SECTION 1.136 "10 3/4% Indenture" .................................................16
SECTION 1.137 "Third Party Claim" ..................................................16
SECTION 1.138 "Title IV Plans" .......................................................16
SECTION 1.139 "Transferred Employees" ..........................................17
SECTION 1.140 "Transferred Fastener Subsidiaries" .........................17
SECTION 1.141 "Transferred U.S. Employees" ..................................17
SECTION 1.142 "Undertaking and Indemnity Agreement" .................17
SECTION 1.143 "Voting Agreement" .................................................17
SECTION 1.144 "WARN" .................................................................17
SECTION 1.145 "WARN Obligations" ...............................................17
ARTICLE II THE CLOSING................................................................17
SECTION 2.1 Time and Place of Closing...........................................17
SECTION 2.2 Purchase and Sale of the Fastener Business Assets ......17
SECTION 2.3 Consideration Payable for the Fastener Business Assets and the
              Stock and Membership Interests of the Transferred Fastener
              Subsidiaries ................................................................18
SECTION 2.4 Escrow Fund ..............................................................18
SECTION 2.5 Deliveries by the Sellers .............................................18
SECTION 2.6 Delivery by the Buyer .................................................20
SECTION 2.7 Post-Closing Adjustments............................................21
SECTION 2.8 Earn-Out....................................................................24
SECTION 2.9 Allocation of Consideration.........................................25
SECTION 2.10   Treatment of Accounts Receivable At the Closing.......26
ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLER...........26
SECTION 3.1 Organization; Qualification .........................................26
SECTION 3.2 Capital Stock and Membership Interests of the Transferred
              Fastener Subsidiaries ...................................................27
SECTION 3.3 Equity Investments......................................................28
SECTION 3.4 Authority Relative to this Agreement ...........................29
SECTION 3.5 Consents and Approval; No Violation...........................29
SECTION 3.6 Financial Statements & Parent SEC Filings ..................30
SECTION 3.7 Absence of Undisclosed Liabilities ..............................30
SECTION 3.8 Absence of Certain Changes or Events.........................30
SECTION 3.9 Title and Related Matters.............................................30
SECTION 3.10   Contracts .................................................................31
SECTION 3.11   Leases......................................................................31
SECTION 3.12   Intellectual Property..................................................32
SECTION 3.13   Employee Benefit Plans; ERISA ...............................34
SECTION 3.14   Government and Third Party Authorizations and Regulations........36
SECTION 3.15   Assets Necessary to Business ...................................37
SECTION 3.16   Litigation..................................................................37
SECTION 3.17   Intentionally Omitted................................................37
SECTION 3.18   State Takeover Statutes.............................................37
SECTION 3.19   Voting Requirement..................................................37
SECTION 3.20   Intentionally Omitted................................................37
SECTION 3.21   Accounts Receivable.................................................37

CONFIDENTIAL

FC 02721

SECTION 1.90   "Lien" .................................................................................12
SECTION 1.91   "March Pro Forma Balance Sheet" ..........................................12
SECTION 1.92   "Material Adverse Effect"........................................................12
SECTION 1.93   "Net Working Capital" .............................................................13
SECTION 1.94   "Newco California" ..................................................................13
SECTION 1.95   "Noncompetition Agreement" ..................................................13
SECTION 1.96   "Noncompetition and Consulting Agreement" ........................13
SECTION 1.97   "Non-Conveyed Contracts" .....................................................13
SECTION 1.98   "Overdue Closing Receivables" ..............................................13
SECTION 1.99   "Parent" ..................................................................................13
SECTION 1.100  "Parent Affiliates" ...................................................................13
SECTION 1.101  "Parent Common Stock" .........................................................13
SECTION 1.102  "Parent DB Plans" ...................................................................13
SECTION 1.103  "Parent DC Plans" ...................................................................13
SECTION 1.104  "Parent Pension Plans" ...........................................................13
SECTION 1.105  "Parent SEC Filings" ..............................................................13
SECTION 1.106  "Permitted Exceptions" ..........................................................14
SECTION 1.107  "Person" ..................................................................................14
SECTION 1.108  "Fairchild Holding" .................................................................14
SECTION 1.109  "Plans" ....................................................................................14
SECTION 1.110  "Pre-Closing Off-Site Disposal Locations" ............................14
SECTION 1.111  "Preliminary Closing Date Balance Sheet" .............................14
SECTION 1.112  "Product Claim" ......................................................................14
SECTION 1.113  "Proxy Statement" ..................................................................14
SECTION 1.114  "Receivables" ..........................................................................15
SECTION 1.115  "Receivables Certificate" ........................................................15
SECTION 1.116  "Release" ................................................................................15
SECTION 1.117  "Remedial Action" ..................................................................15
SECTION 1.118  "Remediation Standards" ........................................................15
SECTION 1.119  "Representative" ......................................................................15
SECTION 1.120  "Remaining Cash" ..................................................................15
SECTION 1.121  "Rules" ...................................................................................15
SECTION 1.122  "SDI" ......................................................................................15
SECTION 1.123  "SEC" .....................................................................................15
SECTION 1.124  "Securities Act" ......................................................................15
SECTION 1.125  "Sellers" .................................................................................15
SECTION 1.126  "Shareholder Approval" ..........................................................15
SECTION 1.127  "Special Shareholders Meeting" .............................................15
SECTION 1.128  "Stockholder" .........................................................................15
SECTION 1.129  "Straddle Period" ....................................................................15
SECTION 1.130  "subsidiary" ............................................................................16
SECTION 1.131  "Taxes" ...................................................................................16
SECTION 1.132  "Tax Benefit" ..........................................................................16
SECTION 1.133  "Tax Indemnitee" ....................................................................16
SECTION 1.134  "Tax Indemnitor" ....................................................................16
SECTION 1.135  "Tax Returns"..........................................................................16

iii

CONFIDENTIAL

FC 02722

SECTION 1.136 "10 3/4% Indenture" ....................................................16
SECTION 1.137 "Third Party Claim" ....................................................16
SECTION 1.138 "Title IV Plans" ....................................................17
SECTION 1.139 "Transferred Employees" ....................................................17
SECTION 1.140 "Transferred Fastener Subsidiaries" ....................................................17
SECTION 1.141 "Transferred U.S. Employees" ....................................................17
SECTION 1.142 "Undertaking and Indemnity Agreement" ....................................................17
SECTION 1.143 "Voting Agreement" ....................................................17
SECTION 1.144 "WARN" ....................................................17
SECTION 1.145 "WARN Obligations" ....................................................17
ARTICLE II THE CLOSING ....................................................17
SECTION 2.1 Time and Place of Closing ....................................................17
SECTION 2.2 Purchase and Sale of the Fastener Business Assets ....................................................17
SECTION 2.3 Consideration Payable for the Fastener Business Assets and the
          Stock and Membership Interests of the Transferred Fastener
          Subsidiaries ....................................................18
SECTION 2.4 Escrow Fund ....................................................18
SECTION 2.5 Deliveries by the Sellers ....................................................18
SECTION 2.6 Delivery by the Buyer ....................................................20
SECTION 2.7 Post-Closing Adjustments ....................................................21
SECTION 2.8 Earn-Out ....................................................24
SECTION 2.9 Allocation of Consideration ....................................................25
SECTION 2.10 Treatment of Accounts Receivable At the Closing ....................................................26
ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLER ....................................................26
SECTION 3.1 Organization; Qualification ....................................................26
SECTION 3.2 Capital Stock and Membership Interests of the Transferred
          Fastener Subsidiaries ....................................................27
SECTION 3.3 Equity Investments ....................................................28
SECTION 3.4 Authority Relative to this Agreement ....................................................29
SECTION 3.5 Consents and Approval; No Violation ....................................................29
SECTION 3.6 Financial Statements & Parent SEC Filings ....................................................30
SECTION 3.7 Absence of Undisclosed Liabilities ....................................................30
SECTION 3.8 Absence of Certain Changes or Events ....................................................30
SECTION 3.9 Title and Related Matters ....................................................30
SECTION 3.10 Contracts ....................................................31
SECTION 3.11 Leases ....................................................31
SECTION 3.12 Intellectual Property ....................................................32
SECTION 3.13 Employee Benefit Plans; ERISA ....................................................34
SECTION 3.14 Government and Third Party Authorizations and Regulations ....................................................36
SECTION 3.15 Assets Necessary to Business ....................................................37
SECTION 3.16 Litigation ....................................................37
SECTION 3.17 Intentionally Omitted ....................................................37
SECTION 3.18 State Takeover Statutes ....................................................37
SECTION 3.19 Voting Requirement ....................................................37
SECTION 3.20 Intentionally Omitted ....................................................37
SECTION 3.21 Accounts Receivable ....................................................37

iv

SECTION 3.22    Taxes ........................................................................................38
SECTION 3.23    Insurance ...................................................................................39
SECTION 3.24    Environmental Matters ..............................................................39
SECTION 3.25    Fastener Business Inventory .....................................................41
SECTION 3.26    Product Warranty ......................................................................41
SECTION 3.27    Product Liability .......................................................................42
SECTION 3.28    No Conflict of Interest ..............................................................42
SECTION 3.29    Accounting Controls .................................................................42
SECTION 3.30    Indebtedness To and From Officers, Directors, Stockholders
                and Others .................................................................................42
SECTION 3.31    Brokers ......................................................................................43
SECTION 3.32    Newco California Property ........................................................43
ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE BUYER ............43
SECTION 4.1    Organization ..............................................................................43
SECTION 4.2    Ownership of the Parent Common Stock ...................................43
SECTION 4.3    Authority Relative to this Agreement ........................................43
SECTION 4.4    Consents and Approvals; No Violation ......................................44
SECTION 4.5    Financing ...................................................................................44
SECTION 4.6    Brokers ......................................................................................44
ARTICLE V COVENANTS OF THE PARTIES ...................................................45
SECTION 5.1    Conduct of Business of the Sellers ...........................................45
SECTION 5.2    Transfer of Excluded Assets .....................................................47
SECTION 5.3    Access and Cooperation ...........................................................47
SECTION 5.4    Expenses ...................................................................................49
SECTION 5.5    Commercially Reasonable Efforts .............................................49
SECTION 5.6    Further Assurances ...................................................................50
SECTION 5.7    Disclosure Supplements; Schedules and Exhibits ...................50
SECTION 5.8    Public Announcements ..............................................................51
SECTION 5.9    Sales, Use and Transfer Taxes and Fees ................................51
SECTION 5.10    Noncompetition .........................................................................51
SECTION 5.11    No Solicitation ..........................................................................53
SECTION 5.12    Special Shareholders Meeting ..................................................54
SECTION 5.13    Proxy Statement .......................................................................54
SECTION 5.14    Repayment of Debt ...................................................................55
SECTION 5.15    Use of Fairchild Fastener Name ...............................................55
SECTION 5.16    Transfers Not Effected at the Closing ......................................55
SECTION 5.17    June 30, 2002 Audited Financial Statements ...........................56
SECTION 5.18    Takeover Statutes .....................................................................56
SECTION 5.19    Product Liability Insurance ........................................................56
SECTION 5.20    Post-Closing Treatment of Accounts Receivables ...................57
SECTION 5.21    Continued Existence .................................................................57
SECTION 5.22    Fairchild Fasteners Europe Simmonds .....................................58
SECTION 5.23    Environmental Permits ..............................................................58
SECTION 5.24    United Kingdom Subsidiaries ....................................................58
SECTION 5.25    Transfer of Fastener Business Real Property ...........................58
SECTION 5.26    Accrued Expenses ....................................................................58

v

SECTION 5.27  Fullerton Property ................................................................59
SECTION 5.28  Intellectual Property ............................................................59
ARTICLE VI SELLER EMPLOYEES .............................................................. 59
SECTION 6.1 Employment ..........................................................................59
SECTION 6.2 Assumption of Plans ..............................................................60
ARTICLE VII CLOSING CONDITIONS ........................................................ 64
SECTION 7.1 Conditions to Each Party's Obligations to Effect the
Transactions Contemplated Hereby ..........................................64
SECTION 7.2 Conditions to the Obligations of the Sellers to Effect the
Transactions Contemplated Hereby ..........................................65
SECTION 7.3 Conditions to the Obligations of the Buyer to Effect the
Transactions Contemplated Hereby ..........................................65
SECTION 7.4 Certificates ............................................................................66
ARTICLE VIII CERTAIN TAX MATTERS ..................................................... 66
SECTION 8.1 Tax Returns ............................................................................66
SECTION 8.2 Payment of Taxes ...................................................................66
SECTION 8.3 Allocation of Straddle Period Taxes .......................................67
SECTION 8.4 Refunds ..................................................................................67
SECTION 8.5 Tax Indemnification ...............................................................68
SECTION 8.6 Certain Post-Closing Settlement Payments .............................68
SECTION 8.7 Cooperation ...........................................................................69
SECTION 8.8 Contests .................................................................................70
SECTION 8.9 French SAS ............................................................................70
ARTICLE IX TERMINATION AND ABANDONMENT .................................. 72
SECTION 9.1 Termination ...........................................................................72
SECTION 9.2 Procedure and Effect of Termination ......................................72
ARTICLE X MISCELLANEOUS PROVISIONS .............................................. 73
SECTION 10.1  Delivery of Schedules ...........................................................74
SECTION 10.2  Amendment and Modification .............................................74
SECTION 10.3  Waiver of Compliance; Consents .........................................74
SECTION 10.4  No Third Party Beneficiary Rights ........................................74
SECTION 10.5  Notices .................................................................................74
SECTION 10.6  Assignment ..........................................................................74
SECTION 10.7  Designated Subsidiary ..........................................................75
SECTION 10.8  Governing Law .....................................................................75
SECTION 10.9  Counterparts .........................................................................76
SECTION 10.10 Interpretation .......................................................................76
SECTION 10.11 Entire Agreement ................................................................76
SECTION 10.12 Severability ...........................................................................76
ARTICLE XI INDEMNIFICATION ................................................................. 76
SECTION 11.1  Survival of Representations and Warranties ..........................76
SECTION 11.2  Indemnification ....................................................................77
SECTION 11.3  Limitations on Liability ........................................................79
SECTION 11.4  Defense of Claims .................................................................80
SECTION 11.5  Exclusive Remedies ..............................................................81
SECTION 11.6  Seller Environmental Indemnity ..........................................82

vi

SECTION 11.7  Resolution of Indemnification Disputes ................................85
SECTION 11.8  Indemnity Tax Credit Amount................................................86


Exhibit A    Bill of Sale ..........................................................................A-1
Exhibit B    Undertaking and Indemnity Agreement................................B-1
Exhibit C    Escrow Agreement...........................................................C-1

vii

CONFIDENTIAL

## ACQUISITION AGREEMENT

ACQUISITION AGREEMENT, dated as of July 16, 2002 (the "Agreement"), among Alcoa Inc., a Pennsylvania corporation (the "Buyer"), The Fairchild Corporation, a Delaware corporation (the "Parent"), Fairchild Holding Corp., a Delaware corporation and an indirect, wholly owned subsidiary of the Parent ("Fairchild Holding"), and Sheepdog, Inc., a Delaware corporation and an indirect, wholly owned subsidiary of the Parent ("SDI" and, together with the Parent, Fairchild Holding and the subsidiaries of the Parent set forth on Schedule 1.125, collectively, the "Sellers").

### W I T N E S S E T H:

WHEREAS, the Sellers are in the business of manufacturing, distributing, selling, importing and exporting (i) fasteners and fastening systems, including, without limitation, automatic fastening systems, blind bolts, special bolts, fluid fittings, inserts, installation tooling, latches, clamps, nuts, panel fasteners, pins, collars, rivets, screws, specials and studs, (ii) fastener components, and (iii) latching devices, in each case for use in the construction and maintenance of military and commercial aircraft, as well as in applications for other industries, including, without limitation, the automotive industry, the electronics industry, the installation-tooling industry and other non-aerospace industries (such business being conducted by the Sellers being referred to herein as the "Fastener Business");

WHEREAS, the Buyer wishes to acquire from the Sellers the Fastener Business Assets;

WHEREAS, the Sellers are willing to transfer (i) the Fastener Business Assets (other than the Fastener Business Assets owned or held by the Transferred Fastener Subsidiaries, the capital stock and membership interests, as the case may be, of which are being transferred directly or indirectly by Fairchild Holding to the Buyer) and (ii) the capital stock and membership interests, as the case may be, of the Transferred Fastener Subsidiaries to the Buyer in exchange for (A) the assumption by the Buyer of the Assumed Fastener Business Liabilities and (B) the payment to the Parent of (x) the Consideration and (y) the Earn-Out;

WHEREAS, as a condition and inducement to the Buyer for entering into this Agreement and incurring the obligations set forth herein, concurrently with the execution and delivery of this Agreement, the Buyer is entering into a Voting Agreement, dated as of the date hereof (the "Voting Agreement"), with certain stockholders of the Parent (each, a "Stockholder"), pursuant to which, among other things, each Stockholder has agreed to vote the shares of Parent Common Stock then owned by such Stockholder in favor of the transactions contemplated by this Agreement; and

WHEREAS, as a condition and inducement to the Buyer for entering into this Agreement and incurring the obligations set forth herein, the Buyer is requiring that certain executive officers of the Fastener Business enter into a Noncompetition and Consulting Agreement with the Buyer, to be effective as of the Closing, pursuant to

CONFIDENTIAL

which, among other things, such executive officers agree for a period of four years (a) to provide consulting services to the Fastener Business, and (b) to restrict their ability to compete with the Buyer in the Fastener Business (the "Noncompetition and Consulting Agreement").

NOW, THEREFORE, in consideration of the foregoing premises and the respective representations, warranties, covenants, agreements and conditions hereinafter set forth, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I

### DEFINITIONS

As used in this Agreement, each of the following terms shall have the following meaning:

SECTION 1.1    "**Actual Transferred Subsidiary Debt**" shall have the meaning set forth in Section 2.7(a)(iii).

SECTION 1.2    "**Advisor**" shall have the meaning set forth in Section 8.8(b).

SECTION 1.3    "**Affiliates**" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with such Person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person, whether through the ownership of securities or partnership interests, control of the board or other governing body of the Person, or other ownership interests, by operation of Law, operation of by-laws or articles or certificate of incorporation, contract or otherwise.

SECTION 1.4    "**After Tax Amount**" shall have the meaning set forth in Section 8.5(d).

SECTION 1.5    "**Agreement**" shall have the meaning ascribed thereto in the Introduction.

SECTION 1.6    "**Airbus**" shall mean Airbus S.A.S., a company governed according to the laws of France, and its successors.

SECTION 1.7    "**Allocation**" shall have the meaning set forth in Section 2.9(a).

SECTION 1.8    "**Ancillary Agreements**" shall mean the Bill of Sale, the Undertaking and Indemnity Agreement, the Voting Agreement and the Escrow Agreement, collectively.

2

CONFIDENTIAL

FC 02728

SECTION 1.9     **"Assigned Receivables"** shall have the meaning set forth in Section 5.20.

SECTION 1.10     **"Assumed Fastener Business Liabilities"** shall mean and include only the following liabilities:

(a) The dollar amount of all liabilities of the Fastener Business reflected on the Closing Date Balance Sheet.

(b) Fastener Environmental Liabilities and all litigation matters affecting the Fastener Business, including the litigation matters set forth on Schedule 3.16, in an amount in all cases not to exceed $8,450,000, which shall be the amount of the reserve for environmental, health, safety and litigation on the Closing Date Balance Sheet. Notwithstanding the foregoing, the Buyer shall not have assumed and shall have no responsibility, directly or indirectly, for any Damages, past, present or future, of the Parent, the Sellers' or any of their respective Affiliates, in respect of (i) any Discontinued Operations, (ii) any Pre-Closing Off-Site Disposal Locations, (iii) any Third Party Claims to the extent arising from or related to activities of the Fastener Business prior to the Closing for asbestos-related illness, injuries or other harms, which Third Party Claims are not set forth on Schedule 3.16 or, (iv) any Third Party Claims by any Person (other than a Government agency) to the extent arising from or related to activities of the Fastener Business prior to the Closing for personal injury or property damage arising out of exposure to Hazardous Materials.

(c) Liabilities with respect to the Fastener Business Employees expressly assumed by the Buyer pursuant to Article VI.

(d) Liabilities for Taxes expressly assumed by the Buyer pursuant to Section 5.9 and Article VIII.

(e) All obligations and liabilities attributable to periods after the Closing Date pursuant to the Fastener Business Contracts, the Fastener Business Leases and the Fastener Business Intellectual Property Licenses.

(f) All obligations and liabilities arising from, or relating to, the Buyer's ownership of the Fastener Business Assets after the Closing Date, subject to the Parent's obligations to indemnify the Buyer pursuant to Article XI of this Agreement.

(g) All other obligations and liabilities expressly assumed by the Buyer pursuant to this Agreement.

SECTION 1.11     **"Authorizations"** shall have the meaning set forth in Section 3.14(a).

SECTION 1.12     **"Base Claim"** shall have the meaning set forth in Section 11.3(a).

3

CONFIDENTIAL

FC 02729

SECTION 1.13    "Bill of Sale" shall mean the bill of sale substantially in the form of Exhibit A attached hereto.

SECTION 1.14    "Boeing" shall mean The Boeing Company, a Delaware corporation, and its successors.

SECTION 1.15    "business day" shall mean any day other than Saturday, Sunday and any day which is a legal holiday or a day on which banking institutions in New York City are authorized by Law or other Government action to close.

SECTION 1.16    "Buyer" shall have the meaning ascribed thereto in the Introduction.

SECTION 1.17    "Buyer DB Plans" shall have the meaning set forth in Section 6.2(h).

SECTION 1.18    "Buyer Closing Receivables Notice" shall have the meaning set forth in Section 2.10.

SECTION 1.19    "Buyer DC Plans" shall have the meaning set forth in Section 6.2(g).

SECTION 1.20    "Buyer Indemnified Parties" shall have the meaning set forth in Section 11.6(a).

SECTION 1.21    "CERCLA" shall mean the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended.

SECTION 1.22    "Class A Common Stock" shall have the meaning set forth in Section 3.19.

SECTION 1.23    "Class B Common Stock" shall have the meaning set forth in Section 3.19.

SECTION 1.24    "Closing" shall mean the consummation of the transactions contemplated by Article II of this Agreement in accordance with the terms and upon the conditions set forth in Article VII.

SECTION 1.25    "Closing Date" shall mean the fifth business day following the later to occur of (i) expiration or termination of all waiting periods, including any extensions thereof, if any, which are applicable to the transactions contemplated by this Agreement pursuant to the HSR Act and (ii) the satisfaction of all of the conditions to each party's obligations hereunder (other than the condition set forth in Section 7.1(e) which shall be satisfied on the Closing Date) or the waiver thereof by the party entitled to the benefit thereof; or such other date as the parties hereto agree upon in writing.

4

FC 02730

SECTION 1.26    **"Closing Date Balance Sheet"** is the Preliminary Closing Date Balance Sheet after the acceptance thereof by the Parent or the resolution of all disputes with respect thereto in accordance with Section 2.7(c).

SECTION 1.27    **"Code"** shall mean the Internal Revenue Code of 1986, as amended.

SECTION 1.28    **"Commercial Aircraft"** shall mean non-regional, commercial airplanes manufactured by (i) Boeing with a make/model number of 717-200, 737-300, 737-400, 737-500, 737-600, 737-700, 737-800, 737-900, 747-400, 757-200, 757-300, 767-2/300, 767-400, 777-200, 777-300, MD-80, MD-90 and MD-11, and (ii) Airbus with a make/model number of A-300, A-310, A-318, A-319, A-320, A-321, A-330/200, A-330/300, A-340/2/300, A-340/500, A-340/600 and A-380/800, and such other non-regional, commercial airplanes manufactured by Boeing or Airbus, subject to the limitations set forth in Section 2.8(d), in each case as reported in the Commercial Market Forecast by "The Airline Monitor."

SECTION 1.29    **"Confidentiality Agreement"** shall have the meaning set forth in Section 5.3(a).

SECTION 1.30    **"Consideration"** shall mean an amount in cash equal to $657,050,000.

SECTION 1.31    **"Covenant Period"** shall have the meaning set forth in Section 5.10(a).

SECTION 1.32    **"CPR"** shall have the meaning set forth in Section 11.7.

SECTION 1.33    **"Damages"** shall mean all losses, amounts paid in settlement, claims, damages, liabilities, judgments and reasonable out-of-pocket costs (including costs of investigation and enforcement) and expenses (including, without limitation, reasonable attorneys' fees and expenses); *provided* that Damages shall not include (i) any consequential, special or punitive damages, except in the case of fraud or to the extent actually awarded to a third party by a court or Government entity in connection with a Third Party Claim or (ii) any internal fees and expenses of the indemnified party (including, without limitation, in-house counsel's fees and expenses).

SECTION 1.34    **"Debt Tender Offer"** shall have the meaning set forth in Section 5.14(a).

SECTION 1.35    **"Department of Justice"** shall have the meaning set forth in Section 5.5(a).

SECTION 1.36    **"DGCL"** shall mean the Delaware General Corporation Law.

5

CONFIDENTIAL

FC 02731

SECTION 1.37    **"Direct Claim"** shall have the meaning set forth in Section 11.4(c).

SECTION 1.38    **"Discontinued Operations"** shall have the meaning set forth in Section 1.54.

SECTION 1.39    **"Dispute"** shall have the meaning set forth in Section 11.7.

SECTION 1.40    **"Draft Schedule 2.9"** shall have the meaning set forth in Section 2.9(a).

SECTION 1.41    **"Earn-Out"** shall mean the payments required to be made by the Buyer to the Parent pursuant to Section 2.8.

SECTION 1.42    **"Effective Time"** shall mean the close of business on the Closing Date at which time the Closing and all transactions contemplated thereby shall be deemed to have occurred simultaneously; *provided*, the Closing has actually occurred.

SECTION 1.43    **"Environmental Action"** shall have the meaning set forth in Section 11.6(e)(i).

SECTION 1.44    **"Environmental Contamination"** shall have the meaning set forth in Section 11.6(e)(ii).

SECTION 1.45    **"Environmental Claim"** shall have the meaning set forth in Section 3.24(g)(i).

SECTION 1.46    **"Environmental Law"** shall have the meaning set forth in Section 3.24(g)(ii).

SECTION 1.47    **"Environmental Permits"** shall have the meaning set forth in Section 3.24(a).

SECTION 1.48    **"ERISA"** shall mean the Employee Retirement Income Security Act of 1974, as amended.

SECTION 1.49    **"ERISA Affiliate"** shall have the meaning set forth in Section 3.13(a).

SECTION 1.50    **"Escrow Agreement"** shall mean the Escrow Agreement to be entered into among the Buyer, the Parent and the Escrow Agent substantially in the form of Exhibit C attached hereto.

SECTION 1.51    **"Escrow Amount"** shall have the meaning set forth in Section 2.4.

6

**CONFIDENTIAL**

FC 02732

SECTION 1.52    **"Estimated Transferred Fastener Subsidiary Debt"** shall have the meaning set forth in Section 2.3(b) and all agreements relating to such Estimated Fastener Subsidiary Debt shall be set forth on Schedule 2.3(b).

SECTION 1.53    **"Exchange Act"** shall have the meaning set forth in Section 3.6(b).

SECTION 1.54    **"Excluded Assets"** shall mean (i) all cash and cash equivalents (except for the Remaining Cash, if any); (ii) all contracts of insurance insuring the Fastener Business, the Fastener Business Assets, the Assumed Fastener Business Liabilities or the employees of the Fastener Business, including, without limitation, the contracts of insurance listed on Schedule 3.23 (except with respect to insurance proceeds or rights to insurance coverage under all insurance policies to the extent they relate to the Fastener Business, the Fastener Business Assets, the Assumed Fastener Business Liabilities or the Transferred Employees which are in effect prior to the Effective Time, including, without limitation, the Fastener Business Product Liability Insurance Policies); (iii) all rights to all refunds or credits of Taxes levied or imposed upon, or in connection with, the Fastener Business Assets or the Fastener Business with respect to any taxable period or portion thereof that ends on or before the Effective Time, except to the extent that any such refunds or credits are taken into account in preparing the Closing Date Balance Sheet; (iv) all owned or leased real property and all the assets related thereto comprising the discontinued operations and facilities of the Fastener Business that do not manufacture goods for the Fastener Business or facilities that formerly manufactured or held for use or resale goods for the Fastener Business or were otherwise owned or held by the Fastener Business that have been abandoned, closed, sold, transferred or otherwise disposed of by any of the Sellers or any of their respective subsidiaries, including, without limitation, the facilities set forth on Schedule 1.54 (the "Discontinued Operations") which Discontinued Operations shall not be deemed to be part of the Fastener Business; (v) all rights, claims and privileges of the Sellers and their respective subsidiaries (including rights to recover under all insurance policies of any of the Sellers to the extent they do not relate to the Fastener Business, the Fastener Business Assets or the Assumed Fastener Business Liabilities or the employees of the Fastener Business), except to the extent they relate to the Fastener Business, the Fastener Business Assets, the Assumed Fastener Business Liabilities or the Transferred Employees; (vi) Fairchild Aerostructures Company; (vii) the APS division of Fairchild Holding; (viii) the Overdue Closing Receivables identified in the Buyer Closing Receivables Notice; and (ix) those contracts, agreement, leases and other assets listed on Schedule 1.54 or on Schedule 1.61(b).

SECTION 1.55    **"Excluded Fastener Business Liabilities"** shall mean all liabilities of the Parent and its Affiliates relating to or arising out of the Fastener Business or the Fastener Business Assets and any claims in respect thereof, other than the Assumed Fastener Business Liabilities.

SECTION 1.56    **"Fastener Business"** shall have the meaning set forth in the first preamble.

7

CONFIDENTIAL

FC 02733

SECTION 1.57    **"Fastener Business Acquisition Proposal"** shall have the meaning set forth in Section 5.11(a).

SECTION 1.58    **"Fastener Business Assets"** shall mean all of the property and assets (other than the Excluded Assets) owned by or used primarily in the Fastener Business whether or not reflected in the March Pro Forma Balance Sheet, including, without limitation the Fastener Business Real Properties, the Fastener Business Intellectual Property, the Fastener Business Intellectual Property Licenses, the Fastener Business Inventory, the Remaining Cash, if any, plants, machinery, equipment, tools, supplies, spare parts, furniture, fixtures, leasehold improvements, motor vehicles, accounts and notes receivable and prepaid expenses (and including all items which would be included on the March Pro Forma Balance Sheet except for the fact that such items are fully depreciated or expensed), plus all items of a nature customarily carried as assets in the accounts of the Fastener Business which have been or will be acquired in accordance with the terms of this Agreement between the date of the March Pro Forma Balance Sheet and the Effective Time, less any items which have been or will be disposed of or consumed in accordance with the terms of this Agreement between the date of the March Pro Forma Balance Sheet and the Effective Time, and the Fastener Business Assets shall also include:

(a) the Fastener Business Bank Accounts;

(b) the Fastener Business Books and Records;

(c) the Fastener Business Contracts;

(d) the Fastener Business Leases;

(e) the outstanding capital stock and membership interests, as the case may be, of the Transferred Fastener Subsidiaries; and

(f) all rights, claims and privileges of the Sellers and their respective subsidiaries to the extent they relate to the Fastener Business, the Fastener Business Assets, the Assumed Fastener Business Liabilities or the Transferred Employees (including rights to insurance coverage, insurance proceeds and rights to recovery under all insurance policies to the extent they relate to the Fastener Business, the Fastener Business Assets, the Assumed Fastener Business Liabilities or the Transferred Employees which are in effect prior to the Effective Time, including without limitation, rights to recovery under the Fastener Business Product Liability Insurance).

SECTION 1.59    **"Fastener Business Bank Accounts"** shall mean all of the bank accounts of the Sellers and their respective subsidiaries utilized for the Fastener Business, including the bank accounts and lock boxes of Fairchild Finance Ireland, all of which are listed on Schedule 1.59.

SECTION 1.60    **"Fastener Business Books and Records"** shall mean all of the books and records of the Sellers and their respective subsidiaries primarily relating to the operations of the Fastener Business, as well as copies of those books and

8

**FC 02734**

records of the Sellers and their respective subsidiaries that are necessary to the operation of the Fastener Business, including, without limitation, all books and records relating to the Fastener Business Employees, the purchase of materials, supplies and services, financial, Tax, legal, environmental, software licenses, operating keys for any proprietary software or source codes, accounting and operations matters, product engineering, research and development, manufacture and sale of products and dealings with vendors, suppliers, Government entities, third parties and customers of the Fastener Business. As used herein, books and records shall include but not be limited to all computerized books and records and other computerized storage media and the software used in connection therewith.

SECTION 1.61    "Fastener Business Contracts" shall mean all right, title and interest of the Sellers or any of their respective subsidiaries to all contracts, agreements and commitments of the Sellers and their respective subsidiaries only to the extent any relate to the Fastener Business, including, without limitation, the contracts, agreements and commitments listed on Schedule 1.61(a) and all contracts, agreements and commitments of each of the Sellers relating to the Fastener Business which are entered into between the date of this Agreement and the Effective Time and expressly permitted by this Agreement, excluding, however, all contracts, agreements and commitments which (i) expire in accordance with their terms prior to the Effective Time without extension or renewal in the ordinary course of business or are terminated in the ordinary course of the Fastener Business; (ii) are listed in Schedule 1.61(b); or (iii) are Excluded Assets.

SECTION 1.62    "Fastener Business Employees" shall have the meaning set forth in Section 6.1(a).

SECTION 1.63    "Fastener Business Financial Statements" shall mean (i) the Fairchild Fasteners Fiscal 2001 — Analysis of Fiscal 2001 Results — As Reported and Businesses Not Divested included as Schedule 1.63(a), (ii) the Fairchild Fasteners Trailing 12 Months Ended December 30, 2001 — As Reported and Businesses Not Divested included as Schedule 1.63(b), (iii) the March Pro Forma Balance Sheet — As Reported and As Adjusted included as Schedule 1.90, (iv) the Fairchild Fasteners Nine Months Ended March 2002 — As Reported and Businesses Not Divested included as Schedule 1.63(c), and (v) the Fairchild Fastener Twelve Months Ended June 30, 2002 — As Reported and Businesses Not Divested included as Schedule 1.63(d).

SECTION 1.64    "Fastener Business Intellectual Property" shall mean all (a) inventions (whether patentable or unpatentable and whether or not reduced to practice), improvements thereto, and patents, patent applications, inventor's certificates and patent disclosures, together with reissuances, continuations, continuations-in-part, revisions, extensions and reexaminations thereof; (b) trademarks, service marks, brand names, certification marks, trade dress, logos, trade names, assumed names, corporate names, Internet domain names and other indications of origin, including, without limitation, translations, adaptations, derivations, and combinations thereof; (c) original works of authorship, copyrights and moral rights; (d) trade secrets and confidential business information (including, without limitation, ideas, research and development,

9

CONFIDENTIAL

know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, discoveries, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals); (e) computer software, including, without limitation, programs, applications, source and object codes, databases, data, models, algorithms, tables and documentation related to the foregoing; (f) rights in confidentiality and licensing agreements with regard to any of the foregoing; (g) legal claims and defenses related to any of the foregoing; (h) other similar intangible property or proprietary rights, information and technology and copies and tangible embodiments thereof (in whatever form or medium); (i) applications to register, registrations and renewals or extensions of the foregoing; and (j) goodwill associated with each of the foregoing, in each case that are used or held for use in the operation of the Fastener Business including, without limitation, (x) all items listed on Schedules 3.12(a) and 3.12(b) referred to in Sections 3.12(a) and 3.12(b), and (y) all such items which are acquired or developed for use in the business of the Fastener Business between the date of this Agreement and the Effective Time, excluding, however, all such items which prior to the Effective Time expire in the ordinary course of the Fastener Business consistent with past practice or are terminated in accordance with the terms of this Agreement, unless such items are subject to extension or renewal in the ordinary course of the Fastener Business consistent with past practice.

SECTION 1.65    "Fastener Business Intellectual Property Licenses" shall have the meaning set forth in Section 3.12(b).

SECTION 1.66    "Fastener Business Inventory" shall mean all inventories owned by the Sellers or their respective subsidiaries primarily relating to the Fastener Business or the Fastener Business Assets, wherever located, including all packaging, finished goods, raw materials, supplies, work in process, spare parts and other miscellaneous items of tangible property normally considered part of "inventory" under GAAP, consistently applied, which inventories shall be included on the March Pro Forma Balance Sheet along with such other inventories which are manufactured, produced, purchased or otherwise acquired by the Sellers in connection with the Fastener Business between the date hereof and the Effective Time.

SECTION 1.67    "Fastener Business Leases" shall mean all leases of the Sellers and their respective subsidiaries primarily relating to the Fastener Business (whether entered into as lessor or lessee), including, without limitation, (a) the leases listed on Schedule 1.67 which list shall also contain the names of the landlord and tenant entities pursuant to each Fastener Business Lease, and (b) all leases of the Sellers and their respective subsidiaries relating to the Fastener Business that are entered into between the date of this Agreement and the Effective Time and expressly permitted by this Agreement, excluding, however, all leases which (i) will expire in accordance with their terms prior to the Effective Time, (ii) are set forth on Schedule 1.54 or (iii) are Excluded Assets.

SECTION 1.68    "Fastener Business Product Liability Insurance" shall have the meaning set forth in Section 5.19.

10

CONFIDENTIAL

FC 02736

SECTION 1.69    "**Fastener Business Real Properties**" shall mean all of the real properties owned by the Sellers or their respective subsidiaries which are listed on Schedule 3.9, which list shall also contain the name of the entity which owns record title to each such Fastener Business Real Properties excluding, however, all owned and leased real property set forth on Schedule 1.54.

SECTION 1.70    "**Fastener Environmental Condition**" shall have the meaning set forth in Section 11.6(e)(iii).

SECTION 1.71    "**Fastener Environmental Liability**" shall have the meaning set forth in Section 11.6(e)(iv).

SECTION 1.72    "**Final Allocation**" shall have the meaning set forth in Section 2.9(a).

SECTION 1.73    "**FTC**" shall have the meaning set forth in Section 5.5(a).

SECTION 1.74    "**Fullerton Property**" shall have the meaning set forth in Section 5.27.

SECTION 1.75    "**GAAP**" shall mean United States generally accepted accounting principles.

SECTION 1.76    "**Government**" shall mean any agency, division, subdivision, audit group or procuring office of the government of the United States, any state or territory thereof, or any city, county or municipality thereof or any foreign government, including the employees or agents thereof.

SECTION 1.77    "**Greenslet Report**" shall mean the report published by Edmund Greenslet in The Airline Monitor which sets forth the number of deliveries of Commercial Aircraft by manufacturers of such Commercial Aircraft, or such successor publication or report which is commonly accepted as being comparable thereto.

SECTION 1.78    "**Hazardous Materials**" shall have the meaning set forth in Section 3.24(g)(iii).

SECTION 1.79    "**HSR Act**" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations thereunder.

SECTION 1.80    "**Indemnifiable Losses**" shall have the meaning set forth in Section 11.1(b).

SECTION 1.81    "**Indemnifying Party**" shall have the meaning set forth in Section 11.1(b).

SECTION 1.82    "**Indemnitee**" shall have the meaning set forth in Section 11.1(b).

11

**CONFIDENTIAL**

**FC 02737**

SECTION 1.83    **"Indemnity Payment"** shall have the meaning set forth in Section 11.1(b).

SECTION 1.84    **"Independent Accountants"** shall mean an impartial internationally recognized independent certified public accounting firm.

SECTION 1.85    **"Intercompany Accounts"** shall mean all amounts, regardless of their nature, that are (a) owed by any of the Transferred Fastener Subsidiaries or the Fastener Business to the Sellers or any subsidiaries of the Sellers, other than a Transferred Fastener Subsidiary, or (b) owed by the Sellers or any subsidiaries of the Sellers, other than the Transferred Fastener Subsidiaries, to any of the Transferred Fastener Subsidiaries or the Fastener Business.

SECTION 1.86    **"IRS"** shall have the meaning set forth in Section 3.22(c).

SECTION 1.87    **"best knowledge of the Sellers"** shall mean the actual knowledge of any of Jeffrey Steiner, Eric Steiner, Donald Miller, John Flynn, Eugene Juris, Olivier Jarrault, Michael Hodge, Roger Peterson, Edward Johnson, Martin Ryan, Daniel Weber, Craig Brown, Bruce Finkenhagen, Gregory Harwell, Claude Lurati, Ernest Marhenke and Fran Lampman, in all cases, after due inquiry.

SECTION 1.88    **"Law"** shall have the meaning set forth in Section 3.5.

SECTION 1.89    **"Licenses and Permits"** shall mean the permits, authorizations and licenses issued by any Government in connection with the Fastener Business.

SECTION 1.90    **"Lien"** shall mean any mortgage, pledge, security interest, encumbrance, lien (statutory or other), conditional sale agreement, option or right of refusal, first offer, termination, participation or purchase.

SECTION 1.91    **"March Pro Forma Balance Sheet"** shall mean the pro forma balance sheet of the Fastener Business as of March 31, 2002 included as Schedule 1.91.

SECTION 1.92    **"Material Adverse Effect"** shall mean any event, change or effect having a material adverse effect on the condition (financial or otherwise), business, results of operations, properties, assets or liabilities of the Fastener Business, taken as a whole, except for such events, changes or effects resulting from (a) conditions affecting the United States economy or the world economy or financial or capital markets generally, (b) conditions affecting the industry of the Fastener Business generally, except to the extent that such conditions affect the Fastener Business in a disproportionate manner, (c) the announcement or pendency of this Agreement, the Voting Agreement or the transactions contemplated hereby or thereby, or (d) changes in GAAP attributable to new accounting pronouncements issued by the Financial Accounting Standards Board, the Emerging Issues Task Force or the SEC.

12

**CONFIDENTIAL**

**FC 02738**

SECTION 1.93    "**Net Working Capital**" shall mean (i) the amount of "current assets" which shall include only "accounts receivable" plus "inventory, net" plus "other current assets" minus (ii) the amount of "current liabilities" which shall include only "accounts payable" plus "accrued expenses," in each case as such amounts are reflected on the Closing Date Balance Sheet. The items to be included in "other current assets" are set forth on Schedule 1.93(a). The items to be included in "accounts payable" are set forth on Schedule 1.93(b). The items to be included in "accrued expenses" are set forth on Schedule 1.93(c). For avoidance of doubt, the calculation of "Net Working Capital" shall not include either the line item entitled "Allowance for Doubtful Accounts" or any amounts associated with such reserve.

SECTION 1.94    "**Newco California**" shall mean CST LLC, a limited liability company existing under the laws of California.

SECTION 1.95    "**Noncompetition Agreement**" shall have the meaning set forth in Section 5.10(a).

SECTION 1.96    "**Noncompetition and Consulting Agreement**" shall have the meaning set forth in the fifth preamble.

SECTION 1.97    "**Non-Conveyed Contracts**" shall have the meaning set forth in Section 5.5(c).

SECTION 1.98    "**Overdue Closing Receivables**" shall have the meaning set forth in Section 2.10.

SECTION 1.99    "**Parent**" shall have the meaning ascribed thereto in the Introduction.

SECTION 1.100    "**Parent Affiliates**" shall have the meaning set forth in Section 3.28.

SECTION 1.101    "**Parent Common Stock**" shall have the meaning set forth in Section 3.19.

SECTION 1.102    "**Parent DB Plans**" shall have the meaning set forth in Section 6.2(h).

SECTION 1.103    "**Parent DC Plans**" shall have the meaning set forth in Section 6.2(g).

SECTION 1.104    "**Parent Pension Plans**" shall have the meaning set forth in Section 6.2(b).

SECTION 1.105    "**Parent SEC Filings**" shall have the meaning set forth in Section 3.6(b).

13

SECTION 1.106  **"Permitted Exceptions"** shall mean (i) those exceptions to title to the Fastener Business Assets listed on Schedule 3.9 referred to in Section 3.9; (ii) secured debt on the March Pro Forma Balance Sheet or which are Liens securing all or a portion of the purchase price of a Fastener Business Asset which arose in connection with the purchase of such Fastener Business Asset after the date of the March Pro Forma Balance Sheet and which purchase price remains owing; (iii) statutory Liens for Taxes not yet due or delinquent or the validity of which is being contested in good faith by appropriate proceedings; (iv) carriers', warehousemen's, mechanics' and materialmen's and other similar Liens arising in the ordinary course of the Fastener Business consistent with past practice for sums not yet due and payable or delinquent or the validity of which is being contested in good faith by appropriate proceedings; (v) all exceptions, restrictions, easements, rights of way and encumbrances set forth in the title insurance policies listed on Schedule 3.23 referred to in Section 3.23; and (vi) other Liens that are not material in amount or do not materially detract from the value of or materially impair the use of the property affected by such Lien for the Fastener Business.

SECTION 1.107  **"Person"** shall mean any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization or Government.

SECTION 1.108  **"Fairchild Holding"** shall have the meaning ascribed thereto in the Introduction.

SECTION 1.109  **"Plans"** shall have the meaning set forth in Section 3.13(a).

SECTION 1.110  **"Pre-Closing Off-Site Disposal Locations"** shall mean any location, other than the Fastener Business Real Properties or property leased pursuant to the Fastener Business Leases, to where the Parent, the Sellers or any of their respective Affiliates, or the Fastener Business, transported or arranged for the transport of Hazardous Materials prior to the Closing Date, for any purpose other than the sale of products manufactured by any of such Persons. Without limiting the foregoing, the term Pre-Closing Off-Site Disposal Locations also includes, to the extent that the involvement of the Fastener Business relates to the Release of Hazardous Materials at or from Fastener Business Real Properties or property leased pursuant to the Fastener Business Leases, or the San Gabriel Valley Superfund Site.

SECTION 1.111  **"Preliminary Closing Date Balance Sheet"** shall mean the pro forma consolidated balance sheet for the Fastener Business as of the Effective Time prepared in accordance with Section 2.7.

SECTION 1.112  **"Product Claim"** shall have the meaning set forth in Section 11.2(b).

SECTION 1.113  **"Proxy Statement"** shall mean the proxy statement relating to the Special Shareholders Meeting.

14

CONFIDENTIAL

FC 02740

SECTION 1.114  **"Receivables"** shall have the meaning set forth in Section 5.20.

SECTION 1.115  **"Receivables Certificate"** shall have the meaning set forth in Section 5.20.

SECTION 1.116  **"Release"** shall have the meaning set forth in Section 11.6(e)(v).

SECTION 1.117  **"Remedial Action"** shall have the meaning set forth in Section 11.6(e)(vi).

SECTION 1.118  **"Remediation Standards"** shall have the meaning set forth in Section 11.6(e)(vii).

SECTION 1.119  **"Representative"** shall have the meaning set forth in Section 11.6(c).

SECTION 1.120  **"Remaining Cash"** shall have the meaning set forth in Section 2.7(a)(iv).

SECTION 1.121  **"Rules"** shall have the meaning set forth in Section 11.7.

SECTION 1.122  **"SDI"** shall have the meaning ascribed thereto in the Introduction.

SECTION 1.123  **"SEC"** shall mean the United States Securities and Exchange Commission.

SECTION 1.124  **"Securities Act"** shall have the meaning set forth in Section 3.6(b).

SECTION 1.125  **"Sellers"** shall mean the Parent, Fairchild Holding, SDI and each of the subsidiaries of the Parent listed on Schedule 1.125, collectively.

SECTION 1.126  **"Shareholder Approval"** shall have the meaning set forth in Section 3.19.

SECTION 1.127  **"Special Shareholders Meeting"** shall have the meaning set forth in Section 5.12.

SECTION 1.128  **"Stockholder"** shall have the meaning set forth in the fourth preamble.

SECTION 1.129  **"Straddle Period"** shall have the meaning set forth in Section 8.1(b).

15

**CONFIDENTIAL**

FC 02741

SECTION 1.130  **"subsidiary"** shall mean, with respect to any Person, another Person under the control of such Person (where "control" means the direct or indirect possession of the power to elect at least a majority of the board of directors or other governing body or appoint the managing member of a Person through the ownership of voting securities, ownership, membership or partnership interests, by contract or otherwise, or if no such governing body or managing member exists, the direct or indirect ownership of 50% or more of the equity interests of a Person).

SECTION 1.131  **"Taxes"** shall mean all taxes, however denominated, including any interest, penalties or additions to tax (including under Chapter 68 of the Code) that may become payable in respect thereof, imposed by any Government, which taxes shall include, without limitation, all income taxes, payroll and employee withholding taxes, unemployment, insurance, social security, sales and use taxes, excise taxes, franchise taxes, gross receipt taxes, occupation taxes, real and personal property taxes, stamp taxes, transfer taxes, workmen's compensation taxes and other obligations of the same or a similar nature, whether arising before, on or after the Effective Time; and "Tax" shall mean any one of the foregoing.

SECTION 1.132  **"Tax Benefit"** shall mean the Tax savings attributable to any deduction, expense, loss, credit or refund to the indemnified party or its affiliates, when incurred or received; *provided, however,* that if such benefit is reasonably expected to arise or be utilized after the year in which indemnification occurs pursuant to this Agreement, then it means the present value of such Tax savings (discounted using one year LIBOR (as published in *The Wall Street Journal*) and a Tax rate equal to the sum of the highest marginal U.S. federal corporate income Tax rate or rates applicable to ordinary income or capital gain, as the case may be, in effect for the taxable period in issue plus five percent (or, in the case of a Transferred Fastener Subsidiary, the highest marginal corporate income Tax rate or rates in the country of organization of such Transferred Fastener Subsidiary applicable to ordinary income or capital gain, as the case may be, in effect for the taxable period in issue)).

SECTION 1.133  **"Tax Indemnitee"** shall have the meaning set forth in Section 8.8(a).

SECTION 1.134  **"Tax Indemnitor"** shall have the meaning set forth in Section 8.8(a).

SECTION 1.135  **"Tax Returns"** shall mean all returns, reports, schedules and other information filed or required to be filed with any taxing authority with respect to Taxes.

SECTION 1.136  **"10 3/4% Indenture"** shall have the meaning set forth in Section 5.14(a).

SECTION 1.137  **"Third Party Claim"** shall have the meaning set forth in Section 11.1(b).

16

CONFIDENTIAL

FC 02742

SECTION 1.138   "Title IV Plans" shall have the meaning set forth in Section 3.13(c).

SECTION 1.139   "Transferred Employees" shall have the meaning set forth in Section 6.1(a).

SECTION 1.140   "Transferred Fastener Subsidiaries" shall mean those subsidiaries of the Parent (including Newco California) the capital stock or membership interests, as the case may be, of which are being transferred directly or indirectly by the Sellers to the Buyer, each of which is listed on Schedule 1.140.

SECTION 1.141   "Transferred U.S. Employees" shall have the meaning set forth in Section 6.2(e).

SECTION 1.142   "Undertaking and Indemnity Agreement" shall have the meaning set forth in Section 2.5(i).

SECTION 1.143   "Voting Agreement" shall have the meaning set forth in the fourth preamble.

SECTION 1.144   "WARN" shall mean the Worker Adjustment and Retraining Notification Act.

SECTION 1.145   "WARN Obligations" shall have the meaning set forth in Section 6.2(f).

## ARTICLE II

### THE CLOSING

SECTION 2.1   Time and Place of Closing.  Subject to the terms and conditions of this Article II, the Closing will take place at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York, at 9:30 A.M. (local time) on the Closing Date or at such other place or time or both as the parties may agree.

SECTION 2.2   Purchase and Sale of the Fastener Business Assets.  Subject to the terms and conditions of this Agreement (including, without limitation, Section 10.7) (or, with respect to any condition not satisfied, the waiver thereof by the party for whose benefit the condition exists) at the Closing, the Sellers will sell, convey, assign, transfer and deliver, or cause to be sold, conveyed, assigned, transferred and delivered to the Buyer or one of its wholly owned subsidiaries, all of their direct and indirect right, title and interest at the Effective Time in and to the Fastener Business Assets (other than the Fastener Business Assets owned or held by the Transferred Fastener Subsidiaries), in all cases free and clear of all Liens (other than Permitted Exceptions), and the outstanding capital stock and membership interests, as the case may be, of each of the Transferred Fastener Subsidiaries, and the Buyer will, directly or

17

CONFIDENTIAL                    FC 02743

indirectly, purchase, acquire, accept and pay for, as hereinafter provided, the Fastener Business Assets, free and clear of all Liens (other than Permitted Exceptions), and the outstanding capital stock and membership interests, as the case may be, of each of the Transferred Fastener Subsidiaries and will assume the Assumed Fastener Business Liabilities. Notwithstanding anything to the contrary contained herein, neither the Buyer nor any of its Affiliates shall purchase, assume or be bound by, or be obligated or responsible for, any Excluded Fastener Business Liabilities or Excluded Assets.

SECTION 2.3    Consideration Payable for the Fastener Business Assets and the Stock and Membership Interests of the Transferred Fastener Subsidiaries.

(a) The Buyer shall: (i) pay to the Parent an amount in cash equal to the Consideration minus the amount of the Actual Transferred Fastener Subsidiary Debt assumed by the Buyer pursuant to Sections 2.3(b) and 2.7(a)(iii), if any, minus the amount of the Overdue Closing Receivables identified in the Buyer Closing Receivables Notice pursuant to Section 2.10 plus the payments made pursuant to the Earn-Out, plus the Remaining Cash, if any, for (A) the Fastener Business Assets (other than the Fastener Business Assets owned or held by the Transferred Fastener Subsidiaries) and (B) the capital stock and membership interests, as the case may be, of the Transferred Fastener Subsidiaries and (ii) assume the Assumed Fastener Business Liabilities attributable to the Fastener Business Assets.

(b) At least five business days prior to the Closing Date, the Parent shall notify the Buyer in writing whether it intends for the Buyer to assume the outstanding debt as of the Closing Date of the Transferred Fastener Subsidiaries incorporated in jurisdictions located outside of the United States as set forth on Schedule 2.3(b) (the "Estimated Transferred Fastener Subsidiary Debt"). The Parent's written notification shall include a good faith estimate of the amount of the Estimated Transferred Fastener Subsidiary Debt to be reflected on the Fastener Business Books and Records as of the Closing Date. In the event the Parent notifies the Buyer that it intends for the Buyer to assume the Estimated Transferred Fastener Subsidiary Debt, at the Closing the Buyer shall deliver to the Parent an amount in cash equal to the Consideration calculated in accordance with Section 2.3(a).

SECTION 2.4    Escrow Fund.  On or prior to the Effective Time, the Buyer and the Parent shall enter into the Escrow Agreement. At the Closing, the Buyer shall deposit with the Escrow Agent, as defined in the Escrow Agreement, $25,000,000 of the Consideration (the "Escrow Amount"). The Escrow Agent shall hold, invest, reinvest and disburse the Escrow Fund in accordance with the terms of the Escrow Agreement.

SECTION 2.5    Deliveries by the Sellers.  At the Closing, the Parent, Fairchild Holding or SDI shall deliver, or cause the subsidiaries of the Parent set forth on Schedule 1.125 to deliver, the following to the Buyer:

(a) Stock certificates representing all of the shares of capital stock and membership interests representing all of the membership interests, as the case may be, of

18

each of the Transferred Fastener Subsidiaries, in each case accompanied by stock powers duly executed in blank or duly executed instruments of transfer;

(b) Special warranty deeds, in recordable form, with respect to the Fastener Business Real Properties owned by the Sellers or any of their respective subsidiaries (other than the Transferred Fastener Subsidiaries);

(c) Duly executed Bill of Sale together with such other appropriate instruments of transfer as the Buyer may reasonably request, transferring to the Buyer all of the personal and intangible property owned or held by the Sellers as of the Effective Time which is included in the Fastener Business Assets (other than the Fastener Business Assets owned or held by the Transferred Fastener Subsidiaries).

(d) Duly executed instruments of assignment of the Fastener Business Leases to which certain of the Sellers or their respective subsidiaries (other than the Transferred Fastener Subsidiaries) are a party, in recordable form, if and to the extent necessary, with respect to those relating to real property or interests therein;

(e) Duly executed instruments of assignment of the Fastener Business Contracts to which the Sellers or any of their respective subsidiaries (other than the Transferred Fastener Subsidiaries) are a party;

(f) (i) Duly executed general instruments of assignment or transfer of the Fastener Business Intellectual Property to the Buyer from any of the Sellers or any of their respective subsidiaries (other than the Transferred Fastener Subsidiaries), (ii) with respect to the Fastener Business Intellectual Property registered or applied for with offices in the United States, instruments of assignment or transfer to Buyer from any of the Sellers or any of their respective subsidiaries in form suitable for recording in such offices (it being understood that Sellers will use their best efforts to deliver to the Buyer all other instruments of assignment or transfer promptly after Closing, including, without limitation, instruments of assignment or transfer for the Fastener Business Intellectual Property registered or applied for with offices outside the United States in form suitable for recording in the appropriate offices and bureaus outside of the United States), (iii) the original certificates, if available, of such Fastener Business Intellectual Property, (iv) any powers of attorney, in each case as necessary to make the conveyances contemplated herein effective in the United States (it being understood that the Sellers will use their best efforts to deliver to the Buyer all other powers of attorney after the Closing, including, without limitation, powers of attorney as necessary to make conveyance contemplated herein effective outside the United States), and (v) any other documents reasonably requested by the Buyer to protect the Buyer's right, title and interest in and to the Fastener Business Intellectual Property, including, without limitation, to cure any defect in the chain-of-title of the Fastener Business Intellectual Property;

(g) Duly executed instruments of assignment of the Fastener Business Bank Accounts of any of the Sellers or any of their respective subsidiaries (other than the Transferred Fastener Subsidiaries);

19

CONFIDENTIAL

FC 02745

(h) Copies of any consents obtained as contemplated by Section 5.5(a)(i) or set forth on Schedule 7.3(d) and obtained as contemplated by Section 7.3(d);

(i) The Undertaking and Indemnity Agreement substantially in the form of Exhibit B attached hereto (the "Undertaking and Indemnity Agreement") duly executed by Parent, Fairchild Holding and SDI;

(j) The Escrow Agreement duly executed by the Parent;

(k) Duly executed lease agreement between the Buyer and the Parent with respect to the Fullerton Property as contemplated by Section 5.27;

(l) Such other and further instruments of conveyance, assignment and transfer as the Buyer may reasonably request for the more effective conveyance and transfer of any of the Fastener Business Assets and the outstanding capital stock or membership interests, as the case may be, of each of the Transferred Fastener Subsidiaries; and

(m) The certificates contemplated by Sections 7.3 and 7.4.

SECTION 2.6    Delivery by the Buyer.  At the Closing,

(a) the Buyer shall deliver, or cause to be delivered, the following to the Parent:

(i) An amount in cash equal to the Consideration minus the Escrow Amount minus the Estimated Transferred Fastener Subsidiary Debt pursuant to the Parent's written notification delivered to the Buyer in accordance with Section 2.3(b), if any, and minus the amount of the Overdue Closing Receivables identified in the Buyer Closing Receivables Notice pursuant to Section 2.10, if any, by wire transfer of immediately available funds to a bank account designated in writing by the Parent at least two business days prior to the Closing Date in any bank in the continental United States or by such other means as are agreed to in writing by the Buyer and the Parent;

(ii) Copies of any consents obtained as contemplated by Sections 5.5(a)(i);

(iii) The Undertaking and Indemnity Agreement duly executed by the Buyer;

(iv) The Escrow Agreement duly executed by the Buyer;

(v) Duly executed lease agreement between the Buyer and the Parent with respect to the Fullerton Property as contemplated by Section 5.27; and

20

CONFIDENTIAL

FC 02746

(vi) . The certificates contemplated by Sections 7.2 and 7.4.

(b) the Buyer shall deliver to the Escrow Agent the Escrow Amount pursuant to the terms of the Escrow Agreement.

SECTION 2.7    Post-Closing Adjustments.

(a) Within 60 days following the Effective Time, the Buyer shall at its expense prepare or cause to be prepared and delivered to the Parent the Preliminary Closing Date Balance Sheet and the calculation of Net Working Capital. The Preliminary Closing Date Balance Sheet (1) will present fairly the consolidated financial position of the Fastener Business as of the Closing Date, (2) will be in conformity with GAAP, and (3) will be prepared in a manner consistent with and using the same principles and line items as those set forth on the March Pro Forma Balance Sheet — As Adjusted, including those principles set forth on Schedule 2.7(a), and no categories of assets or liabilities shall be included on or excluded from the Preliminary Closing Date Balance Sheet that were not included on or excluded from the March Pro Forma Balance Sheet — As Adjusted except as provided in Sections 2.7(a)(iii), (iv), (v), (vi), (vii), (viii) and (ix) and Schedules 1.93(a), (b) and (c); provided, however, that the following additional principles shall in any event govern the preparation of the Preliminary Closing Date Balance Sheet:

(i) All intradivisional account balances, including receivables and payables, among the Fastener Businesses shall be in balance (i.e., net to zero when consolidated within the Fastener Business) and all Intercompany Accounts payable or receivable shall be settled prior to the Closing Date and no such amounts shall be reflected on the Preliminary Closing Date Balance Sheet.

(ii) All inventory shall be valued in a manner consistent with the principles set forth on Schedule 2.7(a). On, or immediately following the Closing Date, the Buyer shall have the right to have physical inventories conducted and observed by its representatives and representatives of the Sellers as well as audit testing of physical inventory cycle counts at the Buyer's expense. The results of this activity will be reflected on the Preliminary Closing Date Balance Sheet.

(iii) In the event the Parent notifies the Buyer that it intends for the Buyer to assume the Estimated Transferred Fastener Subsidiary Debt pursuant to Section 2.3(b), there shall be included on the Preliminary Closing Date Balance Sheet an amount equal to the actual amount of the debt of the Transferred Fastener Subsidiaries as of the Closing Date, plus the amount of all costs associated with the Buyer assuming the debt of the Transferred Fastener Subsidiaries, including, without limitation, interest rate step ups, make whole payments, prepayment penalties and any other payment required to be made upon a "change of control" (the "Actual Transferred Subsidiary Debt"). None of

21

the Actual Transferred Subsidiary Debt shall be recorded on the Preliminary Closing Date Balance Sheet as a "Current Liability" or otherwise included in the calculation of Net Working Capital.

(iv)     There shall be no cash or cash equivalents recorded on the Preliminary Closing Date Balance Sheet in respect of the United States Fastener Business. In the event there is any cash or cash equivalents on the Fastener Business Books and Records that has not been distributed as of the Closing Date out of the Transferred Fastener Subsidiaries organized in jurisdictions outside of the United States there shall be recorded on the Closing Date Balance Sheet under "Current Assets" the amount of such cash and cash equivalents (the "Remaining Cash"); *provided, however,* the amount of such cash and cash equivalents shall not be included in the calculation of Net Working Capital.

(v)     The dollar amount of the Overdue Closing Receivables retained by the Sellers at the Closing pursuant to the Buyer Closing Receivables Notice shall be recorded as a separate line item to be part of "current assets" on the Preliminary Closing Date Balance Sheet solely for purposes of ensuring that the Parent does not pay twice for the Overdue Closing Receivables and not for purposes of including such Overdue Closing Receivables in the Fastener Business Assets or Assumed Fastener Business Liabilities. In addition, there shall be no "Allowance for Doubtful Accounts" reserve recorded on the Preliminary Closing Date Balance Sheet.

(vi)     The amount of the reserve for environmental, health, safety and litigation on the Preliminary Closing Date Balance Sheet shall be equal to $8,450,000 but shall not be included in the calculation of Net Working Capital.

(vii)     The Multivision Investment, the Other Asset – Purchase Accounting/Restructuring Account and the Other Asset – Cash Clearing Account at Aichach, in each case as set forth on Schedule 1.54, shall not be included on the Preliminary Closing Date Balance Sheet.

(viii)     "Other Liabilities" recorded on the Preliminary Closing Date Balance Sheet shall include only long-term liabilities recorded on the Fastener Business Books and Records of the Transferred Fastener Subsidiaries incorporated outside of the United States as shown on Schedule 2.7(a)(viii).

(ix)     There shall be no amount recorded on the Preliminary Closing Date Balance Sheet for any Excluded Fastener Business Liabilities.

22

CONFIDENTIAL

(b) Upon receipt of the Preliminary Closing Date Balance Sheet, the Parent and the Parent's independent public accountants shall have the right during the succeeding 45-day period to review, at the Parent's expense, the Preliminary Closing Date Balance Sheet and to examine and review all records and work papers and other supporting documents used to prepare such Preliminary Closing Date Balance Sheet. The Parent shall notify the Buyer, in writing (including, but not limited to, by fax or e-mail), on or before the last day of the 45-day period, of any objections to the Preliminary Closing Date Balance Sheet, setting forth a reasonably specific description of the Parent's objections and the dollar amount of each objection. If the Parent does not deliver such notice within such 45-day period, the Preliminary Closing Date Balance Sheet shall be deemed to have been accepted by the Parent.

(c) If the Parent objects to the Preliminary Closing Date Balance Sheet, the Buyer and the Parent shall attempt to resolve any such objections by applying the principles set forth in Section 2.7(a) within 20 business days following the Buyer's receipt of the Parent's objections. If the Buyer and the Parent are unable to resolve the matter within such 20 business day period, they shall jointly appoint Independent Accountants mutually acceptable to the Parent and the Buyer (or, if they cannot agree on a mutually acceptable firm, they shall cause their respective accounting firms to select such firm) within two business days following the end of such 20 business day period to resolve all disputed matters. The Buyer and the Parent shall provide to the Independent Accountants full cooperation. The Independent Accountants shall be instructed to reach their conclusion regarding the dispute within 20 business days. The conclusion reached by the Independent Accountants shall be conclusive and binding on the Parent and the Buyer. All fees payable to the Independent Accountants in connection with the resolution of any objections raised to the Preliminary Closing Date Balance Sheet shall be divided equally between the Parent and the Buyer.

(d) If the amount of Net Working Capital is less than $212,301,000, the amount of the Consideration shall be reduced by the amount of such deficit. Any adjustments in the Consideration pursuant to this Section 2.7(d) shall be paid by the Parent to the Buyer by wire transfer of immediately available funds to a bank account designated by the Buyer. Any payment required to be paid pursuant to this Section 2.7(d) shall be made within five business days after the Closing Date Balance Sheet becomes final and binding on the parties.

(e) If the amount of Net Working Capital exceeds $216,301,000, the amount of the Consideration shall be increased by such excess. Any adjustments in the Consideration pursuant to this Section 2.7(e) shall be paid by the Buyer to the Parent by wire transfer of immediately available funds to a bank account designated by the Sellers. Any payment required to be paid pursuant to this Section 2.7(e) shall be made within five business days after the Closing Date Balance Sheet becomes final and binding on the parties.

(f) If the amount of Net Working Capital is between $212,301,000 and $216,301,000 there shall be no adjustment to the Consideration pursuant to this Section 2.7.

23

CONFIDENTIAL

FC 02749

(g) In addition to the adjustment to Net Working Capital provided in Sections 2.7(d) and (e), the Buyer shall pay to the Parent as additional Consideration the amount of the Remaining Cash, if any, reflected on the Closing Date Balance Sheet.

(h) If the amount of the Estimated Transferred Subsidiary Debt is less than the amount of the Actual Transferred Subsidiary Debt then the Parent shall remit to the Buyer the difference between such amounts. If the amount of the Estimated Transferred Subsidiary Debt is greater than the amount of the Actual Transferred Subsidiary Debt then the Buyer shall remit to the Parent the difference between such amounts.

(i) Unless otherwise required by Law, the parties shall treat any adjustment made pursuant to Sections 2.7(d), 2.7(e), 2.7(g) and 2.7(h) as an adjustment to the Consideration for federal, state and local income Tax purposes.

SECTION 2.8    Earn-Out.

(a) Beginning with calendar year 2003, the Parent shall be entitled to receive from the Buyer additional cash payments for Commercial Aircraft actually delivered by Boeing and Airbus in calendar years 2003, 2004, 2005 and 2006 in excess of the Threshold Level set forth below in Section 2.8(b). Should the Greenslet Report cease publishing its Airline Monitor Report, the parties will use their best efforts to mutually agree on another third party reporting service to verify deliveries made by Boeing and Airbus each year. If the parties cannot agree, the Buyer and the Parent will have the joint right to seek verification directly from Boeing and Airbus of their deliveries of Commercial Aircraft for the prior year.

(b) For purposes of this Section 2.8, the Threshold Level for each calendar year is set forth in the chart below:

| Calendar Year | Threshold Level |
|---|---|
| 2003 | 505 |
| 2004 | 515 |
| 2005 | 570 |
| 2006 | 650 |

(c) To the extent that the aggregate number of Commercial Aircraft actually delivered by Boeing and Airbus in each calendar year as reported in the Greenslet Report during the four year Earn-Out period exceeds the Threshold Level for such calendar year, the Buyer shall pay $400,000 to the Parent for each Commercial Aircraft actually delivered by Boeing and Airbus in such calendar year in excess of the Threshold Level for such calendar year; *provided, however,* in respect of each calendar year the Buyer shall only be obligated to pay a maximum amount of $12,500,000 regardless of the number of Commercial Aircraft actually delivered in any calendar year or during the four year Earn-Out period; *provided, further, however,* that all or a portion of any amount to be paid by the Buyer to the Parent pursuant to the terms of this Section 2.8(c) shall be deposited in escrow if required pursuant to the terms of the Escrow Agreement. In the event the number of Commercial Aircraft delivered in any calendar

24

CONFIDENTIAL

year included in the Earn-Out period exceeds the Threshold Level such excess number may not be carried over or back to any calendar year included in the Earn-Out period in which the applicable Threshold Level is not met. Any Earn-Out payment required to be made by the Buyer to the Parent shall be made by wire transfer to an account designated by the Parent within ten business days after publication of the first Greenslet Report containing actual deliveries of Boeing and Airbus Commercial Aircraft for the prior calendar year except to the extent all or a portion of such Earn-Out payment is deposited in escrow as required pursuant to the terms of the Escrow Agreement. For avoidance of doubt, a hypothetical calculation of the Earn-Out is set forth on Schedule 2.8 together with a copy of the Greenslet Report (Table 3) published for January/February 2002.

(d) If Boeing or Airbus acquire, merge or combine with any other producer of Commercial Aircraft, the total amount of Commercial Aircraft that shall be calculated as having been delivered by Boeing and Airbus for purposes of this Section 2.8 shall not include the make/model numbers of Commercial Aircraft of any producer of Commercial Aircraft acquired, merged or combined with Boeing or Airbus following the date of this Agreement; *provided, however*, that each of Boeing and Airbus may acquire production facilities or transfer production to production facilities owned by Boeing or Airbus, as the case may be, to manufacture Boeing or Airbus Commercial Aircraft, and any Commercial Aircraft manufactured at such facilities will count for purposes of this Section 2.8.

SECTION 2.9     Allocation of Consideration.

(a) Within the 160 day period following the Closing, the Buyer shall deliver to the Parent a draft Schedule 2.9 (the "Draft Schedule 2.9") for the Parent's review and approval which shall not be unreasonably withheld. The Draft Schedule 2.9 shall allocate the Consideration among the Fastener Business Assets in accordance with Section 1060 of the Code and Treasury Regulations promulgated thereunder (the "Allocation"). Within the 10 day period following receipt of the Draft Schedule 2.9, the Parent shall notify the Buyer in writing of its approval or of any objections that it may have. If the Parent approves the Draft Schedule 2.9, such schedule shall become the final Schedule 2.9 (the "Final Allocation"). If the Parent objects to the Draft Schedule 2.9, the Buyer and the Parent shall use their good faith efforts to resolve the matter within the 10 day period following receipt by the Buyer of the Parent's objection to the Draft Schedule 2.9. If the Buyer and the Parent are unable to resolve the matter within such period each party shall use their own allocation and there shall be no Final Allocation.

(b) If the parties agree on a Final Allocation: (i) the Buyer and the Parent shall each report the transactions contemplated under this Agreement and any related agreements for all Tax purposes consistent with the Final Allocation; (ii) the Buyer and the Parent shall (A) file Form 8594 in accordance with the requirements (including permitted extensions) of Section 1060 of the Code (or state or local Tax law, as the case may be), (B) be bound by the Final Allocation for purposes of determining Taxes, (C) prepare and file, and cause its affiliates to prepare and file, its Tax Returns on a basis consistent with the Final Allocation, and (D) take no position, and cause its affiliates to take no position, inconsistent with the Final Allocation on any applicable Tax Return, in

25

any audit or proceeding before any Taxing Authority, or in any report made for Tax purposes, except as required by a final determination or resolution of any dispute with any taxing authority concerning the Final Allocation; and (iii) in the event the Final Allocation is disputed by any Taxing Authority, the party receiving notice of the dispute shall promptly notify the other parties hereto of (x) the assertion of a dispute and (y) the resolution of such dispute.

SECTION 2.10    Treatment of Accounts Receivable At the Closing.  At least five business days prior to the Closing Date, the Parent shall deliver to the Buyer Schedule 2.10 which shall set forth for each receivable of the Fastener Business as of the close of business on the immediately preceding Friday, the name of the payor, the date the receivable was booked by the Fastener Business, the original amount of the receivable, the date the receivable was or is due and the amount of the receivable on such Friday.  Schedule 2.10 shall also indicate each receivable which, as of such Friday, is more than ninety days past due and the obligor of which is subject to bankruptcy or similar insolvency proceedings (the "Overdue Closing Receivables").  The Buyer shall have the option to require that at the Closing the Sellers retain and not transfer to the Buyer any or all of the Overdue Closing Receivables, and the Buyer shall reduce the amount of the Consideration payable to the Sellers pursuant to Section 2.6(a)(i) by the aggregate amount of the Overdue Closing Receivables that the Sellers retain.  The Buyer shall notify the Sellers in writing at least two business days prior to the Closing Date which Overdue Closing Receivables on Schedule 2.10 the Sellers shall retain (the "Buyer Closing Receivables Notice").  After the Closing, the Buyer will provide reasonable access to all documentation and personnel necessary for the Parent to pursue collection of the Overdue Closing Receivables retained by the Sellers.  The Parent will have the right to make copies of any documentation necessary for such collection at the Parent's expense.  If the customer pays the Buyer in respect of an Overdue Closing Receivable retained by the Sellers, the Buyer shall promptly remit such payment to the Parent by wire transfer of immediately available funds to a bank account designated by the Parent for such purpose.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Each of the Sellers, jointly and severally, represents and warrants to the Buyer as follows:

SECTION 3.1    Organization; Qualification.

(a) Each of the Sellers and the Transferred Fastener Subsidiaries (other than Newco California) is a legal entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted.  Upon its formation and as of the Effective Time, Newco California will be duly organized, validly existing and in good standing under the

26

CONFIDENTIAL

FC 02752

Laws of California, respectively, and will have all requisite corporate power and authority to own, lease and operate its properties.

(b) Each of the Sellers and the Transferred Fastener Subsidiaries is, or upon the creation of and as of the Effective Time in the case of Newco California will be, duly qualified or licensed and in good standing to do business in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary, except in those jurisdictions where the failure to be so duly qualified or licensed and in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c) Each of the Sellers has heretofore made available to the Buyer complete and correct copies of the certificate of incorporation and by-laws (or other similar charter, by-law or organizational documents), as currently in effect, of such Sellers and each of the Transferred Fastener Subsidiaries or, in the case of Newco California, the Sellers will make available the organizational documents of Newco California immediately following such entity's formation in its jurisdiction of formation.

SECTION 3.2    Capital Stock and Membership Interests of the Transferred Fastener Subsidiaries.

(a) The authorized, issued and outstanding capital stock of each of the Transferred Fastener Subsidiaries (excluding Newco California for the purposes of this Section 3.2(a)) is set forth on Schedule 3.2(a). Except as set forth on Schedule 3.2(a), all of the outstanding shares of capital stock of each of the Transferred Fastener Subsidiaries are duly authorized, validly issued, fully paid and non-assessable and owned of record and beneficially directly or indirectly by the Sellers. Except for the transactions contemplated by this Agreement and as set forth on Schedule 3.2(a), (i) there are no shares of capital stock of any of the Transferred Fastener Subsidiaries authorized or as of the date of this Agreement issued or outstanding, (ii) there are no authorized or outstanding options, warrants, calls, preemptive rights, subscriptions or other rights, agreements, arrangements or commitments of any character relating to the issued or unissued capital stock of the Transferred Fastener Subsidiaries obligating any Transferred Fastener Subsidiary to issue, transfer or sell or cause to be issued, transferred or sold any shares of capital stock or other equity interest in it or any other Transferred Fastener Subsidiary or securities convertible into or exchangeable for such shares or equity interests, or obligating any Transferred Fastener Subsidiary to grant, extend or enter into any such option, warrant, call, subscription or other right, agreement, arrangement or commitment, and (iii) there are no outstanding contractual obligations of any Transferred Fastener Subsidiary to repurchase, redeem or otherwise acquire any capital stock of any of the Transferred Fastener Subsidiaries or to provide funds to make any investment (in the form of a loan, capital contribution or otherwise) in any other entity.

(b) Except as set forth on Schedule 3.2(b), upon the formation of Newco California, all of the membership interests of such entity shall be duly authorized, validly issued, fully paid and non-assessable and owned directly or indirectly by the Sellers.

27

CONFIDENTIAL

FC 02753

Except for the transactions contemplated by this Agreement and as set forth on Schedule 3.2(b), upon the formation of Newco California, (i) there will be no authorized or outstanding options, warrants, calls, preemptive rights, subscriptions or other rights, agreements, arrangements or commitments of any character relating to the issued or unissued membership interests of Newco California obligating any Transferred Fastener Subsidiary to issue, transfer or sell or cause to be issued, transferred or sold any membership interests in Newco California or securities convertible into or exchangeable for such membership interests, or obligating any Transferred Fastener Subsidiary to grant, extend or enter into any such option, warrant, call, subscription or other right, agreement, arrangement or commitment, and (ii) there are no outstanding contractual obligations of any Transferred Fastener Subsidiary to repurchase, redeem or otherwise acquire any membership interests of Newco California or to provide funds to make any investment (in the form of a loan, capital contribution or otherwise) in any other entity. At the Closing the Sellers will be transferring to the Buyer, good, valid, and marketable title in the membership interests of Newco California free and clear of any Liens (other than Permitted Exceptions). At the Closing Date the Sellers shall not have assigned, transferred, or otherwise disposed of the interests of Newco California or any of its respective rights. The membership interests in Newco California being transferred to the Buyer pursuant to this Agreement constitute all the outstanding membership interests in Newco California. Newco California shall be formed by the Sellers as soon as practicable following the date of this Agreement. Prior to the Closing Date, Newco California shall not conduct any business other than with respect to the assets currently listed on Schedule 3.32.

SECTION 3.3    Equity Investments.

(a)  Schedule 3.3(a) sets forth: (i) the name of each corporation, partnership, joint venture or other entity (other than the Transferred Fastener Subsidiaries) in which each of the Sellers or any subsidiary of such Sellers has, or pursuant to any agreement has, the right to acquire by any means, directly or indirectly, an equity interest or investment and which, in each case, is a Fastener Business Asset; and (ii) in the case of each of such Person described in the foregoing clause (i), either (x) a listing of the relevant agreement or agreements pursuant to which such Seller or their respective subsidiary has acquired such right or such interest or investment or (y) (A) the jurisdiction of incorporation and (B) the authorized and outstanding capitalization thereof and the number and the percentage of each class of voting capital stock owned by such Seller or their respective subsidiaries.

(b)  Except as set forth on Schedule 3.3(b), each Seller's interest in each of the Persons listed on Schedule 3.3(a) which are stated to be owned directly or indirectly by such Seller (except for the directors' qualifying shares set forth on Schedule 3.3(b), if any, which such Seller will cause to be transferred at the Effective Time to nominees of the Buyer), will, after giving effect to the transactions contemplated hereby, be owned by the Buyer, directly or indirectly, in each case free and clear of all Liens (other than Permitted Exceptions).

28

CONFIDENTIAL                                    FC 02754

SECTION 3.4    Authority Relative to this Agreement.  Other than the Shareholder Approval, each of the Sellers has the corporate power and authority to enter into this Agreement and the Ancillary Agreements to which such Seller is to be party and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Ancillary Agreements to which such Seller is to be party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by the Board of Directors of each of the Sellers and, other than the Shareholder Approval, no other corporate proceedings on the part of the Sellers are necessary to authorize this Agreement or the Ancillary Agreements or to consummate the transactions contemplated hereby and thereby.  This Agreement has been, and the Ancillary Agreements to which such Seller is to be a party will be at the Closing, duly and validly executed and delivered by each of the Sellers and constitute, or will constitute at the Closing, assuming this Agreement constitutes, and the Ancillary Agreements to which such Seller is to be party will constitute at the Closing, legal, valid, binding and enforceable agreements of the Buyer, legal, valid and binding agreements of each of the Sellers, enforceable against them in accordance with their terms, except as limited, (a) by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting creditors' rights generally and (b) by general principles of equity (regardless of whether enforcement is sought in equity or at law).

SECTION 3.5    Consents and Approval; No Violation.  Subject to obtaining the Shareholder Approval and the filings, permits, authorizations, consents and approvals set forth on Schedule 3.5 or as may be required under the applicable requirements of the HSR Act or the competition Laws or regulations of the European Union or any foreign supranational authority in any jurisdiction in which the Sellers or the Buyer (directly or through subsidiaries, in each case) has assets or conducts operations, none of the execution, delivery or performance of this Agreement or the Ancillary Agreements to which such Seller is to be a party by each of the Sellers, the consummation by each of the Sellers of the transactions contemplated hereby and thereby, or compliance by the Sellers with any of the provisions hereof or thereof will (i) conflict with or result in any breach of any provision of the certificate of incorporation, bylaws or similar organizational documents of any of the Sellers or their respective subsidiaries, (ii) require any filing with, or permit, authorization, consent or approval of, any Government entity or its regulatory authorities and agencies or any other Person, (iii) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, amendment, cancellation or acceleration) under, or result in the creation of a Lien (other than Permitted Exceptions) on any Fastener Business Asset pursuant to, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, lease, license, contract, agreement or other instrument or obligation to which any of the Sellers or their respective subsidiaries is a party or by which any of them or any of their properties or assets may be bound, or (iv) violate any order, writ, injunction, decree, judgment, permit, license, ordinance, law, common law, statute, code, standard, requirement, rule or regulation ("Law") applicable to any of the Sellers, any of the Transferred Fastener Subsidiaries, any of the Fastener Business Assets or the Fastener Business, with such exceptions in the case of the foregoing clauses (ii), (iii) and (iv) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

29

CONFIDENTIAL

FC 02755

SECTION 3.6    Financial Statements & Parent SEC Filings.

(a) The Parent has previously furnished to the Buyer the Fastener Business Financial Statements.  Except as set forth on Schedule 3.6, the Fastener Business Financial Statements have been prepared from the Fastener Business Books and Records in accordance with GAAP and each balance sheet included therein presents fairly, in all material respects, the financial position of the Fastener Business as of the date thereof, and each statement of income included therein presents fairly, in all material respects, the results of operations of the Fastener Business for the respective periods therein set forth.  The March Pro Forma Balance Sheet was prepared pursuant to the principles and policies set forth in Section 2.7 and on Schedule 2.7(a).

(b) Since June 30, 2000, the Parent has filed with the SEC all forms, reports and documents required to be filed by it pursuant to the Securities Act of 1933, as amended (the "Securities Act"), and the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations promulgated under each such Act (the "Parent SEC Filings"), all of which, as of respective filing dates, complied in all material respects with all applicable requirements of the Securities Act and the Exchange Act.  None of the Parent SEC Filings as of the respective dates on which they were filed with the SEC contained any untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of circumstances under which they were made, not misleading.

SECTION 3.7    Absence of Undisclosed Liabilities.  Except as set forth in Schedule 3.7, none of the Sellers or any of their respective subsidiaries has any liability or obligation (whether absolute, accrued, contingent or otherwise) that is a liability or obligation of the Fastener Business and in each case is of a nature required by GAAP to be reflected or reserved against in a balance sheet or disclosed in the notes thereto, except such liabilities, obligations or contingencies (a) that are accrued or reserved against in the March Pro Forma Balance Sheet, or (b) which were incurred after the date of the March Pro Forma Balance Sheet in the ordinary course of the Fastener Business consistent with past practice and which individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.8    Absence of Certain Changes or Events.  Except as set forth in Schedule 3.8, since June 30, 2001, there has not been: (a) any Material Adverse Effect; or (b) any state of facts, event, change or condition which would reasonably be expected to cause a Material Adverse Effect.

SECTION 3.9    Title and Related Matters.  Except as set forth in Schedule 3.9 and subject to other Permitted Exceptions: (a) each of the Sellers has, or one of its subsidiaries has, and immediately after the Effective Time, the Buyer or one of its subsidiaries will have, good and valid, legal and beneficial title to, or a valid leasehold or contractual interest in, free and clear of all Liens, all of the Fastener Business Assets (other than the Fastener Business Real Properties); and (b) each of the Sellers has, or one of its subsidiaries has, and immediately after the Effective Time, the Buyer or one of its subsidiaries will have, good and marketable, legal and beneficial title (such as any

30

CONFIDENTIAL                                                                    FC 02756

licensed title insurance company licensed to do business in the jurisdiction in which such Fastener Business Real Property is located will approve and insure subject only to Permitted Exceptions) to all of the Fastener Business Real Properties. Schedule 3.9 contains (x) a complete and correct list of all Fastener Business Real Properties and (y) a complete and correct list of each title insurance policy insuring title to any of the Fastener Business Real Properties.

SECTION 3.10    Contracts.

(a) Schedule 3.10(a) sets forth a complete and correct list with respect to the Fastener Business of each (i) collective bargaining agreement; (ii) employment, termination, severance or consulting agreement or contract with an employee or individual consultant or a consulting agreement or contract with a consulting firm or other organization (other than employment agreements that are created as a matter of Law or do not provide for any severance, termination, change of control or retention payments or benefits) to any individual in an amount in excess of $100,000; (iii) agreement or contract containing any covenant limiting the freedom of any Seller or any of their subsidiaries to engage in any line of business or compete with any Person; (iv) agreement or contract providing for aggregate future payments of more than $1,000,000, except for any agreement or contract with a customer or supplier that relates to the purchase or delivery of Fastener Business product unless such customer or supplier purchased or delivered, or committed to purchase or deliver, at least $1,000,000 of products produced by the Fastener Business in the preceding fiscal year pursuant to such agreement or contract; (v) loan agreement, credit agreement, promissory note, guarantee, subordination agreement, letter of credit or other similar types of contract; or (vi) other agreement or contract material to the business, operations or financial condition of the Fastener Business, taken as a whole.

(b) Except as set forth in Schedule 3.10(b), (i) each Fastener Business Contract is in full force and effect, and (ii) there is not, with respect to the Fastener Business Contracts, any existing default, or event of default, or event which with or without due notice or lapse of time or both would constitute a default or event of default, on the part of any of the Sellers or their respective subsidiaries or, to the best knowledge of the Sellers, any other party thereto, except where the failure to be in full force and effect or where such default or event of default would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 3.11    Leases.  Schedule 3.11 sets forth a complete and correct list of each Fastener Business Lease which (i) relates to real property or (ii) is material to the business, operations or financial condition of the Fastener Business, taken as a whole. Except as set forth on Schedule 3.11, there is not, with respect to the Fastener Business Leases, any existing default, or event of default, or event which with or without due notice or lapse of time or both would constitute a default or an event of default, on the part of any of the Sellers or any of their respective subsidiaries or, to the best knowledge of the Sellers, any other party thereto, which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect. At the Effective Time, the Fastener Business Leases will be valid, binding and enforceable by the Buyer, one of its

31

FC 02757

subsidiaries designated pursuant to Section 10.7 as the assignee thereof or a Transferred Fastener Subsidiary in accordance with their respective terms, except for those Fastener Business Leases as to which the failure to be valid, binding and enforceable would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.12    Intellectual Property.

(a) Schedule 3.12(a) sets forth a complete and accurate list of all applications to secure issuance or registration of patents, trademarks, trade names, service marks, or copyrights, Internet domain names, issued patents, registered trademarks, trade names, and service marks, copyright registrations and Internet domain names throughout the world, as well as all material unregistered trademarks and copyrights, and any software and applications (other than software held under commercially available shrink-wrap licenses) that are included in the Fastener Business Intellectual Property. Schedule 3.12(a) shall include the identity of the agent, attorney and/or law firm that is or was, of record, responsible for prosecuting each item of the Fastener Business Intellectual Property set forth on Schedule 3.12(a).

(b) Schedule 3.12(b) sets forth a complete and accurate list of all agreements under which any Fastener Business Intellectual Property is licensed to any of the Sellers or any of their respective subsidiaries (other than licenses for commercially available shrink-wrap software), or licensed by any of the Sellers or any of their respective subsidiaries to a third party (collectively, the "Fastener Business Intellectual Property Licenses"), indicating the parties to such agreement. The Fastener Business Intellectual Property Licenses are valid and binding obligations of all parties thereto, enforceable in accordance with their terms, and there exists no event or condition which will result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default by any party under any such Fastener Business Intellectual Property License except where such violation, breach or default would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. No royalties, honoraria or other fees are payable by the Sellers or any of their respective subsidiaries to any third parties for the use of or right to use any Fastener Business Intellectual Property except pursuant to the Fastener Business Intellectual Property Licenses.

(c) Except as set forth on Schedules 3.12(a) and 3.12(b), (i) with respect to the Fastener Business Intellectual Property owned by any of the Sellers or any of their respective subsidiaries, such Seller or its subsidiary has good and valid title free and clear of all Liens (other than Permitted Exceptions), and (ii) with respect to all Fastener Business Intellectual Property held by any of the Sellers or any of their respective subsidiaries under license, such Seller or its subsidiary has the right to use such Fastener Business Intellectual Property, subject to any restrictions imposed pursuant to the terms of such license, free from any Lien (other than Permitted Exceptions).

(d) Except as set forth on Schedule 3.12(d), the Sellers or their respective subsidiaries are listed in the records of the appropriate United States, state, or foreign registry as the sole current owner of record for the Fastener Business Intellectual Property

32

CONFIDENTIAL

listed on Schedule 3.12(a). The Fastener Business Intellectual Property owned by the Sellers or any of their respective subsidiaries and, to the best knowledge of Sellers, any Fastener Business Intellectual Property used by the Sellers or any of their respective subsidiaries, is subsisting, in full force and effect, and has not been cancelled, expired, or abandoned, and, to the best knowledge of the Sellers, is valid and enforceable. Except as set forth on Schedule 3.12(d), with respect to any Fastener Business Intellectual Property, each of the Sellers has a policy to secure, and has secured, from all consultants, contractors and employees who contribute or have contributed to the creation or the development of the Fastener Business Intellectual Property, valid written assignments by such Persons to the Sellers of the rights to such contribution, except, with respect to consultants and contractors, where the failure to secure such valid written assignments would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. Except as set forth on Schedule 3.12(d), each of the Sellers has taken reasonable steps to protect and preserve the confidentiality of all of its trade secrets. Except as set forth on Schedule 3.12(d), to the best knowledge of the Sellers, (i) there are no unauthorized uses, disclosures or infringements of any part of the Fastener Business Intellectual Property, (ii) all use by or disclosure to any Person of trade secrets that comprise any part of the Fastener Business Intellectual Property has been made pursuant to the terms of a written agreement with such Person, and (iii) all use by the Sellers of trade secrets owned by another Person has been made pursuant to the terms of a written non-disclosure agreement with such Person or is otherwise lawful.

(e) Except as disclosed in Schedule 3.12(e), to the best knowledge of the Sellers: (i) the activities, products and services of each of the Sellers or any of their respective subsidiaries in connection with the Fastener Business, including, without limitation, the Fastener Business Intellectual Property, do not infringe upon or otherwise violate, the intellectual property of any other Person; (ii) there are no claims or suits pending, nor has there been notice provided or any claims threatened, alleging that the Sellers or any of their respective subsidiaries or any of their respective activities, products or services in connection with Fastener Business infringe upon, violate or constitute the unauthorized use of any other Person's intellectual property, or challenging the Sellers' ownership of, or right to use the Fastener Business Intellectual Property, the validity, enforceability or registerability of the Fastener Business Intellectual Property, or the validity or enforceability or effectiveness of any Fastener Business Intellectual Property License; (iii) none of the Fastener Business Intellectual Property is being infringed or violated or otherwise used or available for use by any other Person (except pursuant to Fastener Business Intellectual Property Licenses); and (iv) the consummation of the transactions contemplated by this Agreement will not result in the loss of any Fastener Business Intellectual Property and, following the consummation of this Agreement, no party will have any rights to any of the Fastener Business Intellectual Property except pursuant to Fastener Business Intellectual Property Licenses.

(f) The non-threaded version of the drive nut used in connection with the Accu-Lok fastener (other than the size 5 version) has been tested, made and offered for sale to customers of the Fastener Business. The size 5 non-threaded version of the drive nut used in connection with the Accu-Lok fastener has been made and is being tested. The threaded version of the drive nut used in connection with the Accu-Lok fastener

33

CONFIDENTIAL

(other than the size 5 version) has not been and is not intended to be offered for sale to customers of the Fastener Business. The different versions of the Accu-Lok fastener are described in U.S. patent applications numbers 09/825,711, 09/849,184 and 09/997,500.

SECTION 3.13    Employee Benefit Plans; ERISA.

(a) Schedule 3.13(a) contains a complete and correct list of each deferred compensation, incentive compensation or equity compensation plan; "welfare plan," fund or program (within the meaning of Section 3(1) of ERISA); "pension plan," fund or program (within the meaning of Section 3(2) of ERISA); and each other material employee benefit plan, fund, program, agreement or arrangement, in each case, that is sponsored, maintained or contributed to or required to be contributed to by the Sellers or by any trade or business (other than plans of the foreign subsidiaries of the Parent maintained under or required by applicable Law), whether or not incorporated (an "ERISA Affiliate"), that together with the Sellers would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA, for the benefit of any employee or former employee employed in the Fastener Business (the "Plans"). With respect to each Plan, the Sellers have heretofore delivered or made available to Buyer true and complete copies of each Plan and any amendments thereto (or if such Plan is not a written Plan, a description thereof), any related trust or other funding vehicle, the most recently filed reports or summaries required under ERISA or the Code and the most recent determination letter received from the Internal Revenue Service with respect to each Plan intended to qualify under Section 401 of the Code. Schedule 3.13(a) also contains a complete and correct list of each employment, termination or severance agreement for the Fastener Business Employees (other than employment agreements that (i) are created as a matter of Law or (ii) do not provide for any severance, termination, change in control or retention payments or benefits) (each, an "Individual Agreement").

(b) Except as disclosed on Schedule 3.13(b), no Plan is or has been subject to Title IV or Section 302 of ERISA or Section 412 of the Code. None of the Sellers or any ERISA Affiliate has incurred any unsatisfied liability under Title IV of ERISA or Section 412 of the Code, and, to the best knowledge of the Sellers, no condition exists that presents a material risk to the Buyer of incurring any such liability, other than liability for premiums due the Pension Benefit Guaranty Corporation (which premiums have been paid when due).

(c) Except as set forth on Schedule 3.13(c), no Plan that is subject to Section 412 of the Code or Title IV of ERISA (each, a "Title IV Plan") is a "multiemployer pension plan," as defined in Section 3(37) of ERISA, nor is any Title IV Plan a plan described in Section 4063(a) of ERISA.

(d) Except as set forth on Schedule 3.13(d), no Plan or Individual Agreement provides medical, surgical, hospitalization, death or similar benefits (whether or not insured) for employees or former employees of the Sellers or Parent any Subsidiary for periods extending beyond their retirement or other termination of service, other than (i) coverage mandated by applicable Law, (ii) death benefits under any

34

CONFIDENTIAL

"pension plan," or (iii) benefits the full cost of which is borne by the current or former Fastener Business Employee (or his beneficiary).

(e)  Except as set forth on Schedule 3.13(e), no amounts payable under the Plans or Individual Agreement will fail to be deductible for federal income tax purposes by virtue of Section 280G of the Code.

(f)  Except as would not reasonably be expected to have a Material Adverse Effect, each Plan and Individual Agreement has been operated and administered in accordance with its terms and applicable Law in all material respects, including but not limited to ERISA and the Code, and each Plan intended to be "qualified" within the meaning of Section 401(a) of the Code has received or timely applied for an IRS determination that it is so qualified and that the trusts maintained thereunder are exempt from taxation under Section 501(a) of the Code.

(g)  Schedule 3.13(g) sets forth each Plan and Individual Agreement under which as a result of the consummation of the transactions contemplated by this Agreement, either alone or in combination with another event, (i) any current or former Fastener Business Employee may become entitled to severance pay or any other payment, except as expressly provided in this Agreement, or (ii) any compensation due any such employee or officer from the Fastener Business may be increased or the time of payment or vesting may become accelerated.

(h)  Except as disclosed in Schedule 3.13(h), there are no pending, or to the best knowledge of the Sellers, threatened claims by or on behalf of any Plan or under an Individual Agreement, by any Fastener Business Employee or beneficiary covered under any such Plan or Individual Agreement, or otherwise involving any such Plan or Individual Agreement (other than routine claims for benefits). With respect to each Plan and Individual Agreement, all payments due from any of the Sellers or any of their respective subsidiaries have been timely made and all amounts which become due and payable under such Plans and Individual Agreements will be paid in full by the Sellers in accordance with the terms of such Plans or such Individual Agreement, as applicable.

(i)  Except as set forth on Schedule 3.13(i), none of the Sellers have disseminated in writing or otherwise broadly or generally notified current or former employees of the Fastener Business of any intent or commitment (whether or not legally binding) to create or implement any additional plans, funds, programs, agreements or arrangements for the benefit of any current or former employees of the Fastener Business or to materially amend, modify or terminate any existing Plan or Individual Agreement.

(j)  Except as set forth on Schedule 3.13(j), none of the Sellers are party to any collective bargaining agreements. Except as set forth on Schedule 3.13(j), to the best knowledge of the Sellers, there are no labor unions, groups, associations, works councils or other organizations representing, purporting to represent or attempting to represent, any Fastener Business Employee. There is not pending, or to the best knowledge of the Sellers, threatened, any labor dispute, strike, work stoppage or other concerted labor activity against any of the Sellers or any of their respective subsidiaries involving any

35

CONFIDENTIAL

FC 02761

Fastener Business Employees. During the three year period preceding the date hereof, to the best knowledge of the Sellers, there have been no organizing activities conducted by any labor unions, groups, associations, works councils or other organizations with respect to any Fastener Business Employee. None of the Sellers or any of their respective subsidiaries has committed any unfair labor practices or violated in any material respect any applicable employment Laws in connection with the operation of the Fastener Business and, except as disclosed on Schedule 3.13(j), there is not pending or, to the best knowledge of the Sellers, threatened, any charge, complaint, investigation or proceeding against the Sellers by or before the National Labor Relations Board, the Department of Labor, the Equal Employment Opportunity Commission, the Occupational Health and Safety Administration or any comparable foreign, state or municipal agency by or on behalf of any Fastener Business Employee or class of employees or by or before any Government entity relating to a purported violation of any applicable employment Laws.

(k) With respect to all of the employee benefit plans which are subject to Laws other than those of the United States, except as would not reasonably be expected to have a Material Adverse Effect, such plans are in compliance with any applicable Laws, including relevant Tax Laws, and the requirements of any trust deed under which they are established, (i) all employer and employee contributions to each such plan required by Law or by the terms of such plan have been made, or, if applicable, accrued, in accordance with normal accounting practices; and (ii) the fair market value of the assets of each funded plan, the liability of each insurer for any plan funded through insurance or the book reserve established for any plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations, as of the Effective Time, with respect to all current and former participants in such plan.

(l) Schedule 3.13(l) lists each Fastener Business Employee employed in the Fastener Business who has an annual base salary in excess of $100,000.

SECTION 3.14    Government and Third Party Authorizations and Regulations.

(a) All Government and other third party permits (including occupancy permits), licenses, franchises, permits, registrations, approvals and other authorizations or consents held by any of the Sellers and their respective subsidiaries to operate the Fastener Business (herein collectively called "Authorizations") are valid and sufficient to conduct the Fastener Business conducted by them in the manner presently being conducted, except where the failure to hold such Authorizations would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (*provided* that no representation or warranty is made in this Section 3.14(a) with respect to Environmental Laws).

(b) Except as set forth on Schedule 3.14(b), the Fastener Business is being, and since June 30, 2001 has been, conducted in material compliance with all applicable Laws of all Government entities relating to the operation, conduct or ownership of the Fastener Business (*provided* that no representation or warranty is made in this Section 3.14(b) with respect to Environmental Laws).

36

CONFIDENTIAL