SECTION 3.15     Assets Necessary to Business.  Except as set forth on Schedule 3.15 and except for the Excluded Assets, the Fastener Business Assets, together with the assets of the Transferred Fastener Subsidiaries, constitute all the assets and properties used or held for use in connection with, necessary for, or material to the business and operations of the Fastener Business as presently conducted.

SECTION 3.16     Litigation.  Except as set forth on Schedule 3.16, there are no material claims, actions, suits, proceedings or investigations pending or, to the best knowledge of the Sellers, threatened against the Transferred Fastener Subsidiaries, the Fastener Business or the Fastener Business Assets.  Except as set forth on Schedule 3.16, there are no Government legal proceedings pending which challenge the legality of this Agreement or the transactions contemplated hereby.  None of the Sellers, the Transferred Fastener Subsidiaries, the Fastener Business or the Fastener Business Assets are subject to any outstanding order, writ, injunction or decree which has had or would reasonably be expected to have a Material Adverse Effect.

SECTION 3.17     Intentionally Omitted.

SECTION 3.18     State Takeover Statutes.  The Board of Directors of each of the Sellers has approved the terms of this Agreement, the Ancillary Agreements to which such Seller is to be a party and the consummation of the transactions contemplated hereby or thereby, and such approval represents all the action necessary to render inapplicable to this Agreement and the transactions contemplated hereby, the provisions of Section 203 of the DGCL.  No other state takeover statute or similar statute or regulation applies to or purports to apply to this Agreement or the transactions contemplated hereby.

SECTION 3.19     Voting Requirement.  The affirmative vote of a majority of outstanding shares of the Parent's Class A common stock, par value $.10 per share (the "Class A Common Stock"), and Class B common stock, par value $.10 per share (the "Class B Common Stock", and together with the Class A common stock, the "Parent Common Stock"), voting together as a single class, at a stockholder meeting (the "Shareholder Approval") is the only vote of the Parent's capital stock necessary to approve and adopt the transactions contemplated by this Agreement under any applicable Law or pursuant to the requirements of the Parent's Certificate of Incorporation and Bylaws.

SECTION 3.20     Intentionally Omitted.

SECTION 3.21     Accounts Receivable.  All accounts receivable of the Fastener Business that are reflected on the March Pro Forma Balance Sheet or are or will be generated between the date hereof and the Closing Date (i) represent or will represent valid obligations, free and clear of any Liens (other than Permitted Exceptions), arising from bona fide transactions entered into in the ordinary course of business and (ii) are valued and carried on the March Pro Forma Balance Sheet or will be carried on the Closing Date Balance Sheet, as the case may be, in accordance with GAAP except as set forth on Schedule 3.6.

37

CONFIDENTIAL

FC 02763

SECTION 3.22    Taxes.  Except as set forth in Schedule 3.22:

(a) Each of the Sellers and each of the Transferred Fastener Subsidiaries have duly filed all Tax Returns and the Sellers and each of the Transferred Fastener Subsidiaries have duly paid or caused to be duly paid all Taxes shown due on such Tax Returns.  All such Tax Returns are correct and complete in all material respects.  To the best knowledge of the Sellers, none of the Sellers nor any of the Transferred Fastener Subsidiaries has received written notice of any claim made by an authority in a jurisdiction where none of the Sellers or any of the Transferred Fastener Subsidiaries file Tax Returns, that the Sellers or any of the Transferred Fastener Subsidiaries are or may be subject to Taxation by that jurisdiction.

(b) Each of the Sellers and each of the Transferred Fastener Subsidiaries has withheld and timely paid all material amounts of Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party.

(c) The U.S. Federal income Tax Returns of the Sellers have been examined by the Internal Revenue Service ("IRS") (or the applicable statutes of limitation for the assessment of U.S. Federal income Taxes for such periods have expired) for all periods, and no material deficiencies were asserted as a result of such examinations that have not been resolved or fully paid.

(d) No Federal, state, local or foreign audits, examinations or other administrative proceedings have been commenced or, to the best knowledge of the Sellers, are pending with regard to any Taxes or Tax Returns of any of the Sellers or of any of the Transferred Fastener Subsidiaries.  To the best knowledge of the Sellers, no written notification has been received by the Sellers or by any of the Transferred Fastener Subsidiaries that such an audit, examination or other proceeding is pending or threatened with respect to any Taxes due from or with respect to or attributable to any of the Sellers or any of the Transferred Fastener Subsidiaries or any Tax Return filed by or with respect to the Sellers or any Transferred Fastener Subsidiary.  There is no dispute or claim concerning any Tax liability of the Sellers, or any of its Transferred Fastener Subsidiaries either claimed in writing or raised by any taxing authority in writing.

(e) None of the Sellers or any of the Transferred Fastener Subsidiaries has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(f) None of the Sellers or any of the Transferred Fastener Subsidiaries has filed a consent pursuant to Section 341(f) of the Code (or any predecessor provision) concerning collapsible corporations, or agreed to have Section 341(f)(2) of the Code apply to any disposition of a "subsection (f) asset" (as such term is defined in Section 341(f)(4) of the Code) owned by the Sellers or any Transferred Fastener Subsidiary.

(g) None of the Sellers or any of the Transferred Fastener Subsidiaries has agreed to make, or has been notified in writing of a requirement to make, any adjustment

38

CONFIDENTIAL

FC 02764

under Section 481 of the Code (or comparable provision under other Laws) by reason of a change in accounting method or otherwise.

(h) None of the Sellers or any of the Transferred Fastener Subsidiaries is a party to any Tax sharing, Tax indemnity or other agreement or arrangement with any entity not included in the Parent's consolidated financial statements most recently filed by the Parent with the SEC.

(i) Since January 1, 1996, none of the Sellers, or any of the Transferred Fastener Subsidiaries has been a member of any affiliated group within the meaning of Section 1504(a) of the Code, or any similar affiliated or consolidated group for Tax purposes under state, local or foreign Law (other than a group the common parent of which is the Parent).

(j) To the best knowledge of the Sellers, there are no Liens (other than Permitted Exceptions) for Taxes (other than for current Taxes not yet due and payable) on any assets of the Sellers or any of the Transferred Fastener Subsidiaries.

(k) None of the Sellers or any of the Transferred Fastener Subsidiaries has constituted either a "distributing corporation" or a "controlled corporation" in a distribution of stock to any Person qualifying for tax-free treatment under Section 355 of the Code (x) in the two years prior to the date of this Agreement or (y) in a distribution which could otherwise constitute part of a "plan" or "series of related transactions" (within the meaning of Section 355(e) of the Code) in conjunction with the transaction contemplated under this Agreement.

SECTION 3.23    Insurance.  Schedule 3.23 contains a complete and correct description of all policies of property, fire, casualty, product liability, workers' compensation and other forms of insurance owned or held by any of the Sellers or any of their respective subsidiaries covering the Fastener Business or the Fastener Business Assets.

SECTION 3.24    Environmental Matters.  Except as set forth on Schedule 3.24:

(a) Each of the Sellers and the Transferred Fastener Subsidiaries has obtained all licenses, permits, authorizations, approvals and consents from Government entities which are required under any applicable Environmental Law and necessary for it to carry on the Fastener Business as now conducted ("Environmental Permits"), except for such failures to have Environmental Permits which, individually or in the aggregate, are not reasonably expected to have a Material Adverse Effect.  Each of such Environmental Permits is in full force and effect, and each of the Sellers and the Transferred Fastener Subsidiaries is in compliance with the terms and conditions of all such Environmental Permits and with all applicable Environmental Laws, except for such failures to be in full force and effect or to be in compliance which, individually or in the aggregate, are not reasonably expected to have a Material Adverse Effect.  None of the

39

CONFIDENTIAL

FC 02765

Sellers or any of their subsidiaries is currently or, to the best knowledge of the Sellers, has in the past manufactured, sold or distributed any product containing asbestos.

(b) There are no Environmental Claims with respect to the Fastener Business pending, or to the best knowledge of the Sellers, threatened, against any of the Sellers or the Transferred Fastener Subsidiaries, or, to the best knowledge of the Sellers, any Person whose liability for any such Environmental Claim the Sellers or any of the Transferred Fastener Subsidiaries have or may have retained or assumed, either contractually or by operation of Law, except for Environmental Claims identified on Schedule 3.24(b) or that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(c) There are no past or present actions, activities, conditions or events including, without limitation, the Release or threatened Release of any Hazardous Material, that would form the basis of any Environmental Claim relating to the Transferred Fastener Business against the Sellers or their respective subsidiaries, except for such liabilities which, individually or in the aggregate, are not reasonably expected to have a Material Adverse Effect.

(d) To the best knowledge of the Sellers, no site or facility now or previously owned, operated or leased by the Sellers or any of the Transferred Fastener Subsidiaries is listed or proposed for listing on the National Priorities List promulgated pursuant to CERCLA or equivalent state statutes.

(e) No Liens (other than Permitted Exceptions) have been recorded under or pursuant to any Environmental Law on any site or facility now owned, operated or leased by the Sellers or any of their respective subsidiaries for use by the Fastener Business, except for such Liens which are not reasonably likely to have, individually or in the aggregate, a Material Adverse Effect, and no action of any Government entity has been taken or, to the best knowledge of the Sellers, is in process which would reasonably be expected to subject any of such properties to such Liens, except for any such action which, individually or in the aggregate, is not reasonably expected to have a Material Adverse Effect.

(f) To the best knowledge of the Sellers, each of the Sellers has made available to the Buyer copies of all material environmental site assessment reports and environmental audits in their possession prepared by or on behalf of the Seller or any of its subsidiaries relating to environmental matters of the Fastener Business or the Fastener Business Real Properties.

(g) As used in this Agreement:

(i) "Environmental Claim" means any claim, action, lawsuit or proceeding by any Person which seeks to impose liability (including, without limitation, liability for investigatory costs, cleanup costs, Government response costs, natural resources damages, property

40

damages, personal injuries or penalties) pursuant to any Environmental Law.

(ii)    "Environmental Law" means any Law of any Government entity, or any binding agreement with any Government entity, relating to (a) pollution or protection of the environment or natural resources, including, without limitation, those relating to cleanup, preservation or reclamation thereof, any Release or threatened Release of Hazardous Materials; or the presence, handling, use, manufacture, distribution, treatment, storage, disposal, or recycling of or exposure to Hazardous Materials, (b) workplace health or safety or (c) exposure of persons or property to Hazardous Materials.

(iii)    "Hazardous Materials" means any pollutant, contaminant, waste, substance, chemical or material, including, without limitation, petroleum or petroleum products, radioactive materials or friable asbestos, regulated or which can give rise to liability under applicable Environmental Law.

SECTION 3.25    Fastener Business Inventory.  The Fastener Business Inventory is reflected on the March Pro Forma Balance Sheet and will be reflected on the Preliminary Closing Date Balance Sheet, and such Fastener Business Inventory has been and will be accounted for in accordance with GAAP consistently applied as described in the Parent's inventory accounting policies and procedures on Schedule 2.7(a). Obsolete inventory has been fully reserved for or is recorded in accordance with GAAP consistently applied as described in Parent's inventory accounting policies and procedures on Schedule 2.7(a). No changes to these policies and procedures will be recorded in the Fastener Business Books and Records between March 2002 and the Closing Date.  For external reporting purposes, the Parent may record additional entries at the Parent company level in order to reflect a change in accounting policy from LIFO to FIFO but these entries shall not impact the calculation of Net Working Capital.

SECTION 3.26    Product Warranty.  Except as set forth on Schedule 3.26 and except for returns of products by customers in the ordinary course of the Fastener Business consistent with past practice, each Fastener Business product manufactured, sold, leased, or delivered by the Sellers has been in conformity in all material respects with all applicable contractual commitments, regulatory requirements and all express and implied warranties, and the Sellers have no material liability (and to the best knowledge of the Sellers, there is no reasonable basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim or demand against any of them giving rise to any liability) for replacement or repair thereof or other damages in connection therewith.  Except as set forth on Schedule 3.26, no Fastener Business product manufactured, sold, leased or delivered by any of the Sellers is subject to any guaranty, warranty, or other indemnity beyond the applicable standard terms and conditions of sale and lease.  Schedule 3.26 includes copies of the standard terms and conditions of sale or lease for the products of the Fastener Business (containing applicable guaranty warranty and indemnity provisions).

41

CONFIDENTIAL

FC 02767

SECTION 3.27     Product Liability.  Except as set forth on Schedule 3.27, each of the Sellers has no material liability (and to the best knowledge of the Sellers, there is no reasonable basis for, and each of the Sellers is not aware of, any present or future suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against any of them giving rise to any liability) arising out of any injury to any individuals or property as a result of the ownership, possession, or use of any Fastener Business product manufactured, sold, leased or delivered by the Sellers or any of their subsidiaries.

SECTION 3.28     No Conflict of Interest.  Except as set forth on Schedule 3.28, no officer or director of the Parent and no immediate family member of such officer or director (collectively, the "Parent Affiliates"), and no enterprise, firm, corporation or trust of which any of the Parent Affiliates is an officer, trustee, director, employee, agent, or 5% stockholder, has any ownership interest in or contract, agreement or other similar arrangement with the Fastener Business, any Fastener Business Assets or Transferred Fastener Subsidiary, except as a stockholder of the Parent, or, has any contract, agreement or arrangement with the Parent or any of its subsidiaries relating to the Fastener Business.  None of the Parent Affiliates has 5% or more ownership or stock interest in any Person which is engaged in a business that directly competes with the Fastener Business as currently conducted.

SECTION 3.29     Accounting Controls.  None of the Sellers nor any of their respective subsidiaries, nor, to the best knowledge of the Sellers, any of their respective directors, officers or employees, or any other Person acting on behalf of any of them, has:  (i) made any unlawful contributions, payments, gifts, entertainment or other unlawful expenses, or provided unlawful services or other unlawful favors in order to obtain preferential treatment or consideration by any Government entity or any other Person with respect to any aspect of the Fastener Business or (ii) made any political contributions that would not be lawful under the Laws of the United States, any foreign country or any jurisdiction within the United States or any foreign country.  None of the Sellers nor any of their respective subsidiaries nor, to the best knowledge of the Sellers, any or their respective directors, officers or employees, or any other Person, acting on behalf of any of them has been, or is the subject of, any investigation by any Government entity in connection with any such unlawful contributions, payments, gifts, entertainment or other unlawful expenses, or provided unlawful services or other unlawful favors in order to obtain preferential treatment or consideration by any Government entity or any other Person, with respect to any aspect of the Fastener Business.  No unrecorded fund or asset of the Fastener Business has been established for any such purpose, and no accumulation or use of corporate funds of the Fastener Business has been made without being properly accounted for in the books and records of the Fastener Business.

SECTION 3.30     Indebtedness To and From Officers, Directors, Stockholders and Others.  Except as set forth on Schedule 3.30 and except for intercompany debt which will be settled prior to the Closing in accordance with the terms of this Agreement, neither the Fastener Business nor any of the Transferred Fastener Subsidiaries is indebted to any stockholder, director, officer, employee or agent of the Parent or any subsidiary of the Parent, except for reimbursement obligations with respect

42

CONFIDENTIAL                                                                        FC 02768

to travel and similar business expenses incurred in the ordinary course of the Fastener Business consistent with past practice; and no stockholder, director, officer, employee or agent of the Parent or any subsidiary of the Parent is indebted to the Fastener Business or any Transferred Fastener Subsidiary, except for personal charges with respect to telephone and similar business expenses incurred in the ordinary course of the Fastener Business consistent with past practice.

SECTION 3.31    Brokers.  Except for Lane, Berry & Co. International and Morgan Lewins & Co., Inc., no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of any of the Sellers, that is or will be payable by any of the Sellers.  The Parent is solely responsible for all fees and expenses of any broker, finder, investment banker or agent payable in connection with the transactions contemplated by this Agreement.

SECTION 3.32    Newco California Property.  Newco California has or, prior to the Closing will have, (i) good and valid, legal, marketable and beneficial title to, or a valid leasehold or contractual interest in, free and clear of all Liens, all of the Fastener Business Assets set forth on Schedule 3.32 and (ii) obtained all necessary consents, permits, authorizations and approvals from any third party relating to the transfer or assignment to Newco California of the Fastener Business Assets that consist of fixed assets (other than any Fastener Business Lease) set forth on Schedule 3.32.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to each of the Sellers as follows:

SECTION 4.1    Organization.  (a)  The Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

(b) The Buyer is duly qualified or licensed and in good standing to do business in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary, except in those jurisdictions where the failure to be so duly qualified or licensed and in good standing would not adversely affect the ability of the Buyer to consummate the transactions contemplated by this Agreement or perform its obligations hereunder.

SECTION 4.2    Ownership of the Parent Common Stock.  Immediately prior to entering into this Agreement, neither the Buyer nor any of its subsidiaries owned any shares of the Parent Common Stock.

SECTION 4.3    Authority Relative to this Agreement.  The Buyer has the corporate power and authority to enter into this Agreement and the Ancillary

43

CONFIDENTIAL

FC 02769

Agreements to which the Buyer is to be a party and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Ancillary Agreements to which the Buyer is to be a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by the Board of Directors of the Buyer and no other corporate proceedings on the part of the Buyer are necessary to authorize this Agreement and the Ancillary Agreements or to consummate the transactions contemplated hereby and thereby. This Agreement has been, and the Ancillary Agreements to which the Buyer is to be a party will be at the Closing, duly and validly executed and delivered by the Buyer and constitute, or will constitute at the Closing, assuming this Agreement constitutes, and the Ancillary Agreements to which the Buyer is to be a party will constitute at the Closing legal, valid, binding and enforceable agreements of each of the Sellers, legal, valid and binding agreements of the Buyer, enforceable against it in accordance with its terms.

SECTION 4.4    Consents and Approvals; No Violation.  Subject to the filings, permits, authorizations, consents and approvals set forth on Schedule 4.4 or as may be required under the applicable requirements of the HSR Act or the competition Laws or regulations of the European Union or any foreign supranational authority in any jurisdiction in which the Sellers or the Buyer (directly or through subsidiaries, in each case) has assets or conducts operations, none of execution, delivery or performance of this Agreement or the Ancillary Agreements to which the Buyer is to be a party by the Buyer, the consummation by the Buyer of the transactions contemplated hereby and thereby or compliance by the Buyer with any of the provisions hereof or thereof will (i) conflict with or result in any breach of any provision of the articles of incorporation, bylaws or similar organization documents of the Buyer, (ii) require any filing with, or permit, authorization, consent or approval of, any Government entity or its regulatory authorities and agencies or any other Person, (iii) result in the violation or breach of, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, amendment, cancellation or acceleration) under, pursuant to any of the terms, conditions, or provisions of any note, bond, mortgage, indenture, lease, license, contract, agreement or other instrument or obligation to which the Buyer or any of its subsidiaries is a party or by which any of their properties or assets may be bound, or (iv) violate any Law applicable to the Buyer, with such exceptions in the case of the foregoing clauses (ii), (iii) and (iv) as would not adversely affect the ability of the Buyer to consummate the transactions contemplated by this Agreement or perform its obligations hereunder.

SECTION 4.5    Financing.  The Buyer will have sufficient financial resources available to pay the Consideration at the Closing Date and the Earn-Out when due.

SECTION 4.6    Brokers.  Except for Salomon Smith Barney Inc., no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement. The Buyer is solely responsible for all fees and expenses of Salomon Smith Barney Inc. payable in connection with the transactions contemplated in this Agreement.

44

CONFIDENTIAL

## ARTICLE V

## COVENANTS OF THE PARTIES

SECTION 5.1    Conduct of Business of the Sellers.  Except as otherwise contemplated by this Agreement or as disclosed on Schedule 5.1, during the period from the date of this Agreement to the Effective Time, the Sellers will, and will cause the Transferred Fastener Subsidiaries to, (1) conduct the Fastener Business only in the ordinary and usual course of the Fastener Business consistent with past practice, (2) use commercially reasonable efforts to preserve intact all rights, privileges, franchises and other authority adequate for the conduct of the Fastener Business as currently conducted, (3) use commercially reasonable efforts to keep available the services of the Fastener Business Employees, and (4) use commercially reasonable efforts to maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, customers and others having significant business relationships with the Fastener Business.  Without limiting the generality of the foregoing and, except as otherwise expressly provided in this Agreement, prior to the Effective Time without the prior written consent of the Buyer which will not be unreasonably withheld or delayed the Sellers will not permit either the Fastener Business or any Transferred Fastener Subsidiary to:

(a)  create, incur or assume any long-term debt (including obligations in respect of capital leases), or, except in the ordinary course consistent with past practice of the Fastener Business under existing lines of credit, create, incur or assume any short-term debt; assume, guarantee, endorse or otherwise become liable or responsible (whether directly, contingently or otherwise) for the obligations of any other Person if such assumption, guarantee, endorsement or other liability would constitute a liability of the Fastener Business (other than the guarantee of product warranties in the ordinary course of the Fastener Business consistent with past practice); *provided* that (i) the Fastener Business may create, incur, assume, guarantee, endorse or otherwise become liable or responsible for any such debt or obligations that will be repaid or otherwise released on or before the Closing and (ii) the Transferred Fastener Subsidiaries may endorse negotiable instruments in the ordinary course of the Fastener Business consistent with past practice;

(b)  (i) increase in any manner the compensation of any of the Fastener Business Employees, except such increases as are granted in the ordinary course of the Fastener Business in accordance with its customary practices (which shall include normal periodic performance reviews and related compensation and benefit increases but not any general across-the-board increases); (ii) declare, pay or make any commitment or obligation for the payment of additional salary or similar compensation to any of the Fastener Business Employees (except in accordance with current written policies in effect on the date hereof and consistent with past practice); (iii) pay bonuses to the Fastener Business Employees except in an amount not to exceed $1,700,000 in the aggregate and which are paid prior to the Closing; (iv) pay or agree to pay any pension, retirement allowance or other employee benefit not required by any existing Plan or modify or agree to modify any benefits provided under the Plans; or (v) commit itself to adopt any

45

CONFIDENTIAL

additional Plans or, except as otherwise expressly required or permitted by Article VI, to amend or terminate any of such Plans in existence on the date hereof;

(c) subject to Section 5.19, permit any of its current insurance (or reinsurance) policies to be cancelled or terminated or any of the coverage thereunder to lapse if such policy covers Fastener Business Assets or insures risks, contingencies or liabilities which could result in a liability of the Fastener Business, unless simultaneously with such termination, cancellation or lapse, replacement policies providing coverage equal to or greater than the coverage remaining under those cancelled, terminated or lapsed are in full force and effect; *provided* that (i) in no event will the Sellers be required to enter into any replacement policy the premiums of which exceed 200% of the premiums of its current policies, and (ii) the refusal of any insurer to renew any such policy will not constitute a breach of this paragraph.  Notwithstanding the foregoing, in the event replacement policies providing coverage equal to or greater than the cancelled, terminated or lapsed policies are not available at premiums less than 200% of the premiums of the current policies in effect as of the Closing Date, the Parent shall be required to enter into replacement policies providing the maximum coverage available for premiums equal to 200% of the premiums of the current policies in effect on the Closing Date;

(d) except in the ordinary course of the Fastener Business consistent with past practice, (i) sell, transfer, or otherwise dispose of or agree to sell, transfer, or otherwise dispose of, any Fastener Business Assets which have a sales price in excess of $5,000,000, individually or in the aggregate, or (ii) mortgage, pledge or otherwise encumber any Fastener Business Assets except for such mortgages or encumbrances which constitute Permitted Exceptions;

(e) (i) sell, transfer, out-license (whereby the Sellers or any of their respective subsidiaries license intellectual property to third parties) or otherwise dispose of, or agree to sell, transfer or otherwise dispose of any of the Fastener Business Intellectual Property or (ii) in-licensing (whereby third parties license intellectual property to any of the Sellers or any of their respective subsidiaries) any of the Fastener Business Intellectual Property except in the ordinary course of the Fastener Business consistent with past practice;

(f) (i) enter into any agreements, commitments or contracts relating to the Fastener Business except agreements, commitments or contracts made in the ordinary course of the Fastener Business consistent with past practice; *provided*, *however*, neither the Fastener Business nor any Transferred Fastener Subsidiary will (x) enter into any hedging contract or derivative arrangement or (y) any joint venture arrangements, including those set forth on Schedule 5.1, or (ii) amend any agreements, commitments or contracts relating to the debt of any Transferred Fastener Subsidiary;

(g) voluntarily consent to the termination of any material Fastener Business Contract, material Fastener Business Lease or material Fastener Business Intellectual Property License by any other party thereto; or voluntarily terminate by its own actions any material Fastener Business Contract, material Fastener Business Lease

46

CONFIDENTIAL

or material Fastener Business Intellectual Property License; or voluntarily withdraw any application for any material Fastener Business Intellectual Property;

(h) make any capital expenditures in excess of (i) $1,000,000 for any single project or (ii) $5,000,000 in the aggregate; *provided, however,* the Sellers shall be able to make commitments in respect of maintaining the Fastener Business Assets in the ordinary course of business in amounts not to exceed $500,000 in the aggregate;

(i) amend its charter documents in a manner that adversely affects the transactions contemplated hereby;

(j) waive or release any rights of material value of or with respect to the Fastener Business or any Fastener Business Asset;

(k) change the accounting principles used in connection with the Fastener Business unless required by GAAP;

(l) sell or offer for sale the size 5 threaded version of the drive nut used in connection with the Accu-Lok fastener; and

(m) enter into any agreement, contract, commitment, understanding, undertaking or arrangement to do any of the foregoing.

Notwithstanding the provisions of this Section 5.1, nothing in this Agreement shall be construed or interpreted to prevent the Sellers or any subsidiary of the Sellers from (i) paying or making regular or special dividends or other distributions consisting of cash, marketable securities or property that is not a Fastener Business Asset or any combination thereof (other than pursuant to Section 5.21); (ii) making, accepting or settling intercompany loans or advances, or (iii) engaging in any other transaction incident to the normal cash management procedures of the Sellers and their respective subsidiaries, including short-term investments in time-deposits, certificates or deposit and banker's acceptances made in the ordinary course of the Fastener Business.

SECTION 5.2    Transfer of Excluded Assets. During the period between the date of this Agreement and the Closing Date, the Parent shall transfer or cause to be transferred all of the Excluded Assets that are owned by a Transferred Fastener Subsidiary to the Parent or any of the Parent's subsidiaries other than a Transferred Fastener Subsidiary. The transfer of the Excluded Assets will not create, give rise to or result in any liability or obligation to the Buyer. The Parent will, on or prior to the Closing Date with respect to any transfer of Excluded Assets that occurs and is consummated on or prior to the Closing Date, pay or cause to be paid or satisfy or cause to be satisfied all liabilities and obligations arising from or otherwise attributable to the transfer of the Excluded Assets.

SECTION 5.3    Access and Cooperation.

(a) During the period from the date of this Agreement until the Closing Date, the Sellers will permit the Buyer and its representatives reasonable access on

47

reasonable notice during normal business hours to the business and operations, properties, personal property, personnel, books and records, contracts and commitments of the Fastener Business, the Fastener Business Assets and the Assumed Fastener Business Liabilities (including the access to customers of the Fastener Business, *provided* that such access is strictly to facilitate the obtaining of any Government approvals), including the right to make copies of such Fastener Business Books and Records, Fastener Business Contracts, Fastener Business Leases and Fastener Business Intellectual Property Licenses. During such period the Parent will cause its representatives and those of the Fastener Business to consult as reasonably requested by the Buyer on a regular basis with such representatives of the Buyer and to discuss the ongoing operations of the Fastener Business including with respect to environmental matters. The Parent will promptly notify the Buyer of any significant change in the normal course of the Fastener Business and of any complaints, investigations or hearings (or communications indicating that the same may be contemplated) by or of any Government entity, or the institution or threat of any significant litigation, in each case involving the Fastener Business, and will keep the Buyer fully informed of such events and permit the Buyer's representatives access to all material prepared in connection therewith. In the event that any record or other information requested by the Buyer is subject to a confidentiality agreement with a third party, attorney-client privilege, or other legal restriction or privilege, the Sellers and the Buyer will endeavor to find means of disclosing as much information as practicable that is needed by the Buyer to prepare for the transfer of the Fastener Business, but the Sellers will not be obligated to breach such restriction or privilege. All information given or obtained by the Buyer and its representatives pursuant to this Section 5.3 shall be subject to the terms of the Confidentiality Agreement, dated December 17, 2001, between the Buyer and the Parent (the "Confidentiality Agreement"). The Buyer shall return all copies of such Fastener Business Books and Records, Fastener Business Contracts, Fastener Business Leases and Fastener Intellectual Property Licenses and commitments promptly upon the request of any Seller if for any reason the Closing does not occur and this obligation shall survive the termination of this Agreement. The access provided by the Sellers to the Buyer pursuant to this Section 5.3(a) shall include the right of the Buyer to conduct any environmental investigation that the Buyer deems prudent, *provided* that the Buyer shall not undertake any environmental testing or sampling prior to the Closing Date. Representatives of the Buyer and the Sellers shall meet prior to the performance of any additional environmental inspection to discuss the schedule and scope of such work.

(b) Except for Taxes covered in Section 8.7, for a period of seven years after the Closing, the Buyer and the Sellers shall provide the other with reasonable access during normal business hours, upon reasonable notice, to all Fastener Business Books and Records to the extent they relate to the condition or operation of the Fastener Business Assets, the Transferred Fastener Subsidiaries or the Assumed Fastener Business Liabilities prior to the Closing (including, but not limited to, any accounts receivable that the Sellers retain pursuant to Section 2.10 or that are transferred and assigned to the Parent pursuant to Section 5.20), to respond to Third Party Claims or for any other legitimate purpose specified in writing. Each of the Sellers and the Buyer shall have the right, at its own expense, to make copies of any such books and records. No party hereto shall destroy any books or records to the extent that they relate to the condition or

48

operation of the Fastener Business Assets, the Transferred Fastener Subsidiaries or the Assumed Fastener Business Liabilities prior to the seventh anniversary of the Closing without first offering to turn over possession to the other parties by written notice at least ninety days prior to the proposed date of destruction.

SECTION 5.4    Expenses.  Except as otherwise provided by this Agreement, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby will be paid by the party incurring such costs and expenses. Notwithstanding the provisions of this Section 5.4, the Parent and the Buyer agree that any costs, including, without limitation, filing fees and attorneys' fees and expenses, incurred in connection with curing any defect in the chain-of-title of the Fastener Business Intellectual Property shall be shared equally by the parties.

SECTION 5.5    Commercially Reasonable Efforts.

(a)  Subject to the terms and conditions of this Agreement and applicable Law, each of the parties shall act in good faith and use commercially reasonable efforts to take, or cause to be taken, all appropriate actions, and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement as soon as practicable.  Without limiting the foregoing, the parties shall, and shall cause their respective subsidiaries, and use commercially reasonable efforts to cause their directors, officers, employees, agents, attorneys, accountants and representatives (and their respective subsidiaries' directors, officers, employees, agents, attorneys, accountants and representatives), to (i) obtain all consents, approvals, waivers, licenses, permits, authorizations, registrations, qualifications or other permissions or actions by, and give all necessary notices to, and make all filings with and applications and submissions to, any Government entity (including promptly filing with the United States Federal Trade Commission (the "FTC") and the Antitrust Division of the United States Department of Justice (the "Department of Justice") pursuant to the HSR Act all requisite documents and notifications in connection with the transactions contemplated by this Agreement) or other Person necessary in connection with the consummation of the transactions contemplated by this Agreement as soon as reasonably practicable; (ii) provide all such information concerning such party, its subsidiaries and its officers, directors, employees, partners and Affiliates as may be necessary or reasonably requested in connection with any of the foregoing including clause (i) above; (iii) avoid the entry of, or have vacated or terminated, any injunction, decree, order, or judgment that would restrain, prevent, or delay the consummation of the transactions contemplated hereby.  Notwithstanding anything to the contrary in this Agreement, the Buyer shall not be required to agree to any divestiture by the Buyer or any of the Sellers or any of their respective subsidiaries (A) of shares of capital stock or membership interests, or (B) of any of their respective businesses, assets, properties or product lines, or the imposition of any material limitation on the ability of any of them to conduct their respective businesses (including the Fastener Business) or to own or exercise control of such business, assets, properties, product lines or stock.

49

CONFIDENTIAL                                                           FC 02775

(b) The Parent and the Buyer shall keep the other reasonably apprised of the status of matters relating to the completion of the transactions contemplated hereby, including promptly furnishing the other with copies of notices or other communications received by either of them or by any of their respective subsidiaries, from any third party and/or any Government entity with respect to the transactions contemplated by this Agreement.

(c) In the case of any Fastener Business Contracts, Fastener Business Intellectual Property Licenses or Fastener Business Leases, or any other contracts to which a Transferred Fastener Subsidiary is a party at the Effective Time which are not by their terms assignable or which require the consent of a third party in connection with the transactions contemplated by this Agreement, each of the Sellers agrees to use its commercially reasonable efforts to cause such assignment or to procure such consent. In those cases where consents have not been obtained prior to Closing Date (collectively, the "Non-Conveyed Contracts"), each of the Sellers shall, at the Buyer's request, provide the Buyer with the benefit of such Non-Conveyed Contracts, including, but not limited to, (i) enforcing, at the request and expense of the Buyer, any rights of the Seller, arising with respect thereto (including, without limitation, the right to terminate a Non-Conveyed Contract in accordance with the terms thereof upon the advice of the Buyer) or (ii) permitting the Buyer to enforce any rights arising with respect thereto as if such Non-Conveyed Contracts had been sold, conveyed, assigned and delivered to the Buyer. The provisions of this Section 5.5(c) shall not affect the right of the Buyer not to consummate the transactions contemplated by this Agreement if the condition to its obligations hereunder contained in Section 7.3(d) have not otherwise been fulfilled.

SECTION 5.6    Further Assurances. From time to time, without further consideration, each of the Sellers will, at the Buyer's expense, execute and deliver such documents to the Buyer as the Buyer may reasonably request in order more effectively to consummate the transactions contemplated hereby and to vest in the Buyer or a Transferred Fastener Subsidiary title to the Fastener Business Assets (including, without limitation, assistance in the reduction to possession of any thereof). From time to time, without further consideration, the Buyer will, at the Seller's expense, execute and deliver such documents as the Sellers may reasonably request in order more effectively to consummate the transactions contemplated hereby and to perfect the assumption by the Buyer of the Assumed Fastener Business Liabilities.

SECTION 5.7    Disclosure Supplements; Schedules and Exhibits. From time to time after the date of this Agreement and prior to the Effective Time, the Sellers will promptly supplement or amend the schedules referred to in Article III (other than Schedule 3.16 with respect to asbestos claims or personal injury or property damage arising from exposure to Hazardous Materials) and Article VI with respect to any matter hereafter arising which, if existing or occurring at or prior to the date of this Agreement, would have been required to be set forth or described in a schedule or which is necessary to correct any information in a schedule or in any representation and warranty of the Sellers that has been rendered inaccurate thereby. From time to time after the date of this Agreement and prior to the Effective Time, the Buyer will promptly supplement or amend the schedules referred to in Article IV with respect to any matter hereafter arising

50

CONFIDENTIAL

FC 02776

which, if existing or occurring at or prior to the date of this Agreement, would have been required to be set forth or described in a schedule or which is necessary to correct any information so previously disclosed or in any representation and warranty of the Buyer which has been rendered inaccurate thereby. For purposes of determining the accuracy of the representations and warranties of each of the Sellers contained in Article III and the accuracy of the representations and warranties of the Buyer contained in Article IV in order to determine the fulfillment of the conditions set forth in Sections 7.3(a) and 7.2(a), respectively, the schedules delivered by the Sellers and the schedules delivered by the Buyer shall be deemed to include only that information contained therein on the date of this Agreement and shall be deemed to exclude any information contained in any subsequent supplement or amendment thereto.

SECTION 5.8    Public Announcements. The Buyer and the Sellers agree that none of them will issue any press release or otherwise make any public statement or respond to any press inquiry with respect to this Agreement or the transactions contemplated hereby without the other party's prior written consent, except for such press releases or public statements as may be required by applicable Law or the rules of any stock exchange on which such party's securities are listed, in which case the other party shall nonetheless be consulted prior to the issuance of any such press release or public statement.

SECTION 5.9    Sales, Use and Transfer Taxes and Fees. The parties agree that all sales, use and transfer Taxes and related fees (including real estate, transfer Taxes, stamp or other Taxes of the same or similar nature, and patent and trademark transfer Taxes and recording fees but excluding, without limitation, any Taxes arising from the failure of the German spin-off to qualify as tax-free which shall solely be the responsibility of the Sellers) incurred in connection with this Agreement and transactions contemplated hereby will be borne equally by the Sellers and the Buyer. The Buyer and the Sellers shall file all necessary Tax Returns and other documentation with respect to all such sales, use and transfer Taxes and fees. The Sellers shall obtain any other documentation (including, without limitation, reseller or other certificates) requested by the Buyer.

SECTION 5.10    Noncompetition.

(a) From and after the Effective Time, until the fourth anniversary of the Closing Date (the "Covenant Period"), each of the Sellers agree that neither it nor any of its respective subsidiaries will anywhere in the world (i) directly or indirectly engage in the Fastener Business, or (ii) directly or indirectly invest in, manage, consult with, operate, participate in or control as a partner, stockholder or consultant, or otherwise have an equity interest exceeding five percent in, any Person that competes with the Fastener Business (the "Noncompetition Agreement"). Without limiting the foregoing, during the Covenant Period, none of the Sellers or any of their respective subsidiaries shall (i) directly or indirectly serve as a consultant to any of the Sellers', the Buyer's or any of their then subsidiaries competitors that compete with the Fastener Business, or (ii) engage or participate in any effort or act to induce any of the customers, suppliers, associates or independent contractors of the Fastener Business, the Buyer or any of the Buyer's

51

CONFIDENTIAL

FC 02777

subsidiaries to take any action or refrain from taking any action or inaction that could be reasonably be foreseen to be disadvantageous to the Fastener Business, the Buyer or the Buyer's subsidiaries, including without limitation, the solicitation of any of such parties to cease doing business with the Fastener Business, the Buyer or the Buyer's subsidiaries. Notwithstanding the foregoing, during the Covenant Period, none of the Sellers or any of their subsidiaries shall be prohibited from (i)(x) acquiring a business if no more than 10% of its revenues are derived from activities that are competitive with the Fastener Business or (y) acquiring a business if more than 10% of its revenues are derived from activities that are competitive with the Fastener Business so long as the Sellers or their subsidiaries use commercially reasonable efforts to sell, discontinue or otherwise dispose of such business within a reasonable period of time after it is acquired (but no later than 12 months after such acquisition) or (ii) engaging in the businesses operated by Fairchild Aerostructure Company and the APS division of Fairchild Holding as such businesses are operated as of the Closing Date.

(b) For a period of four years after the Effective Time, neither the Parent nor any of its subsidiaries shall solicit or rehire (other than as a result of a public advertisement or general solicitation not specifically targeted at Fastener Business Employees) any Fastener Business Employees, unless the Buyer consents in writing to such solicitation or rehire, *provided* that the foregoing will not (i) prevent the Parent from soliciting or rehiring any such Fastener Business Employees after the termination of such employee's employment by the Buyer or any of its subsidiaries, (ii) prohibit the Parent from placing public advertisements or conducting any other form of general solicitation which is not specifically targeted at Fastener Business Employees or (iii) prohibit the Parent from soliciting or rehiring any Fastener Business Employee if such employee has not been employed by the Buyer for 12 consecutive months. For a period of four years after the Effective Time, neither the Buyer nor any of its subsidiaries shall solicit or hire any employee of the Parent or any of its subsidiaries, unless the Parent consents in writing to such solicitation or hire, *provided* that the foregoing will not (i) prevent the Buyer from soliciting or hiring any such employee of the Parent after the termination of such employee's employment by the Parent or any of its subsidiaries, (ii) prohibit the Buyer from placing public advertisements or conducting any other form of general solicitation which is not specifically targeted at employees of the Parent, (iii) prohibit the Buyer from soliciting or hiring any employee of the Parent if such employee has not been employed by the Parent for 12 consecutive months or (iv) prohibit the Buyer from hiring any Transferred Employees in accordance with Section 6.1(a).

(c) It is the intention of the parties to this Agreement that the provisions of this Section 5.10 shall be enforced to the fullest extent permissible under the Laws and public policies applied in each jurisdiction in which enforcement is sought. If any particular provisions or portion of this Section 5.10 shall be adjudicated to be invalid or unenforceable, this Section shall be deemed amended to delete therefrom such provision or portion adjudicated to be invalid or unenforceable; such amendment to apply only with respect to the operation of such Section in the particular jurisdiction in which such adjudication is made.

52

CONFIDENTIAL

FC 02778

(d) Each of the Sellers acknowledges that the Buyer would be irreparably harmed by any breach of this Section 5.10 and that there would be no adequate remedy at Law or in damages to compensate the Buyer for any such breach. Each of the Sellers agrees that the Buyer shall be entitled to injunctive relief requiring specific performance by each of the Sellers of this Section 5.10, and such Sellers consent to the entry thereof.

SECTION 5.11    No Solicitation.

(a) Each of the Sellers agrees that it will not, directly or indirectly through any officer, subsidiary, Affiliate, director, employee, stockholder, representative, agent or other Person, (i) seek, initiate, solicit or encourage any Person to make an inquiry or proposal with respect to the purchase or other acquisition (including by way of a merger, consolidation, stock purchase, asset purchase or share exchange) of a significant portion of the Fastener Business Assets or any substantially similar transaction, in each case other than the transactions contemplated by this Agreement (a "Fastener Business Acquisition Proposal"), (ii) engage in negotiations or discussions concerning a Fastener Business Acquisition Proposal with any Person or group, (iii) disclose any non-public information relating to the Sellers or give access to the properties, employees, books or records of the Sellers or any of its subsidiaries to any Person or group in connection with any Fastener Business Acquisition Proposal or (iv) approve or recommend or agree to approve or recommend any Fastener Business Acquisition Proposal; *provided* that nothing herein shall prevent the Board of Directors of the Parent from (a) furnishing information to any Person that has made a Fastener Business Acquisition Proposal not solicited in violation of this Section 5.11 or (b) subject to the other provisions of this Section 5.11, entering into or participating in discussions or negotiations concerning a Fastener Business Acquisition Proposal not solicited in violation of this Section 5.11 so long as, in each case, (x) the Board of Directors of the Parent shall have concluded in good faith, after receiving and considering the advice of its outside legal counsel, that failing to participate in such discussions or negotiations or furnishing such information would cause the Board of Directors of the Parent to be in breach of its fiduciary responsibilities to its stockholders under applicable Law, and (y) prior to participating in such discussions or negotiations or furnishing any such information, such Seller and the party making such offer agrees to a confidentiality agreement that is no more favorable to the party receiving information than the Confidentiality Agreement and the Buyer is given concurrent or advance written notice thereof.  The Board of Directors of the Parent may (A) fail to make, withdraw, or modify in a manner adverse to the Parent its recommendation to its stockholders referred to in Section 5.12 hereof, (B) take and disclose to its stockholders a position contemplated by Rule 14e-2 under the Exchange Act or otherwise complying with its disclosure obligations and/or (C) take any non-appealable, final action ordered to be taken by the Parent by any court of competent jurisdiction, but in each case only if the Board of Directors of the Parent shall have concluded in good faith, after consultation with its outside legal counsel, that such action is required in the exercise of its fiduciary duties under applicable Law.

(b) The Parent shall notify the Buyer in writing no later than the end of the next business day after receipt thereof of the receipt of any Fastener Business Acquisition Proposal (including providing a copy thereof if in writing), the terms and conditions of

53

CONFIDENTIAL

FC 02779

such Fastener Business Acquisition Proposal and the identity of the Person making it. The Parent also shall promptly notify the Buyer no later than the end of the next business day of any change to or modification of such Fastener Business Acquisition Proposal.

(c) Subject to the provisions of Section 5.11(a), the Sellers shall, and shall cause each of their respective subsidiaries and their respective advisors, employees and other agents to, cease immediately and cause to be terminated any and all existing activities, discussions or negotiations, if any, with any third party conducted prior to the date hereof with respect to any Fastener Business Acquisition Proposal.

SECTION 5.12    Special Shareholders Meeting. The Parent shall take all action necessary in accordance with applicable Law and its certificate of incorporation and bylaws to convene a special meeting of its shareholders as promptly as possible for the purpose of obtaining the Shareholder Approval of the transactions contemplated by this Agreement (the "Special Shareholders Meeting"). The Proxy Statement shall contain the recommendation of the Board of Directors of the Parent that the shareholders of the Parent vote to adopt a resolution embodying the transactions contemplated by this Agreement pursuant to Section 271 of the DGCL, subject to clause (A) of the last sentence of Section 5.11(a). The Board of Directors of the Parent shall at all times recommend such adoption and shall take all reasonable action necessary or appropriate to solicit such adoption, subject to clause (A) of the last sentence of Section 5.11(a).

SECTION 5.13    Proxy Statement.

(a) Promptly after the execution of this Agreement, the Parent shall use reasonable best efforts to prepare and, as soon as is reasonably practicable, file with the SEC the Proxy Statement, together with appropriate forms of proxy, with respect to the Special Shareholders Meeting. The Buyer and its outside counsel shall be given the opportunity to review and comment on the Proxy Statement before it is filed with the SEC. The Parent shall use its reasonable best efforts to have the Proxy Statement cleared by the SEC as promptly as practicable after filing and, as promptly after the Proxy Statement has been so cleared, shall mail the Proxy Statement to the stockholders of the Parent as of the record date for the Special Shareholders Meeting. The Buyer and the Parent each agree to correct any information provided by it for use in the Proxy Statement which shall have become false or misleading in any material respect and shall take all steps necessary to cause the Proxy Statement as so corrected to be filed with the SEC, and to be disseminated to the stockholders of the Parent Common Stock to the extent required by applicable Law.

(b) The Parent shall notify the Buyer promptly of the receipt by it of any comments of the SEC and of any request by the SEC for amendments or supplements to the Proxy Statement and will supply the Buyer with copies of all correspondence between the Parent and its representatives, on the one hand, and the SEC or the members of its staff or any other Government official, on the other hand, with respect to the Proxy Statement. The Buyer and the Parent shall use all reasonable efforts to respond promptly to any comments made by the SEC or any other Government official with respect to the Proxy Statement.

54

CONFIDENTIAL                                                                                    FC 02780

SECTION 5.14   Repayment of Debt.

(a) Sufficiently in advance of the Closing, the Parent will commence a cash tender offer for all of the outstanding principal amount of the Parent's 10 3/4% Senior Subordinated Notes due 2009 in accordance with the terms of the Indenture, dated as of April 20, 1999 pursuant to which such Notes were issued (the "10 3/4% Indenture"), (the "Debt Tender Offer") on terms and conditions which shall be reasonably satisfactory to the Buyer. In addition, the Parent will purchase all Notes validly tendered in the Debt Tender Offer.

(b) Concurrently with the Closing, the Parent shall repay in full all outstanding indebtedness under the Credit Agreement, dated as of April 20, 1999, as amended.

SECTION 5.15    Use of Fairchild Fastener Name.   From and after the Closing, the Sellers and their respective subsidiaries shall (i) not operate any business under or otherwise use the Fairchild Fastener name or any trademark or Internet domain name set forth on Schedule 3.12(a), (ii) adopt new trade names, trademarks, service marks, logos, slogans, designs and Internet domain names, as appropriate, which are not confusingly similar to the Fairchild name or any trademark or Internet domain name set forth on Schedule 3.12(a) and (iii) not use the Fairchild name in any fastener business.

SECTION 5.16    Transfers Not Effected at the Closing.

(a) In the event that record or beneficial ownership or possession of any Excluded Asset has been transferred to the Buyer on the Closing Date, the Buyer shall use its commercially reasonable efforts to transfer, or cause to be transferred, to the Sellers such Excluded Asset, and pending such transfer to the Sellers, the Buyer shall hold such Excluded Asset and provide to the Sellers all of the benefits and liabilities associated with the ownership and operation of such Excluded Asset and, accordingly, the Buyer shall cause such Excluded Asset to be operated or retained as may reasonably be instructed by the Sellers and the Sellers shall indemnify the Buyer for the Damages resulting from such operation or retention so long as such operation or retention are in accordance with the Sellers' instructions; *provided, however*, that the Sellers shall not indemnify the Buyer for any Damages arising from such operation or retention which are judicially determined to have resulted primarily from willful misconduct or gross negligence on the part of the Buyer.

(b) In the event that record or beneficial ownership or possession of any Fastener Business Assets has not been transferred to the Buyer on the Closing Date, the Sellers shall use their commercially reasonable efforts to transfer, or cause to be transferred, to the Buyer such Fastener Business Assets, and pending such transfer to the Buyer, the Sellers shall hold such Fastener Business Assets and provide to the Buyer all of the benefits and liabilities associated with the ownership and operation of such Fastener Business Assets and, accordingly, the Sellers shall cause such Fastener Business Assets to be operated or retained as may reasonably be instructed by the Buyer and the Buyer shall indemnify the Sellers for the Damages resulting from such operation or

55

CONFIDENTIAL

FC 02781

retention so long as such operation or retention are in accordance with the Buyer's instructions; *provided, however*, that the Buyer shall not indemnify the Sellers for any Damages arising from such operation or retention which are finally judicially determined to have resulted primarily from willful misconduct or gross negligence on the part of the Sellers.

SECTION 5.17    <u>June 30, 2002 Audited Financial Statements</u>. The Parent will communicate as promptly as possible to the Buyer all proposed audit adjustments related to the Fastener Business which are over $1,000,000 individually or $5,000,000 in the aggregate that are identified as part of the June 30, 2002 audit of the Parent. In addition, the Parent will provide to the Buyer any sworn statements filed by the Parent with the SEC from the date of this Agreement through the Closing Date.

SECTION 5.18    <u>Takeover Statutes</u>. If any "fair price," "moratorium," "control share acquisition" or other form of anti-takeover statute or regulation shall become applicable to the transactions contemplated hereby, the Parent and the Buyer and the members of their respective Boards of Directors shall grant such approvals and take such actions as are reasonably necessary so that the transactions contemplated hereby may be consummated as promptly as practicable on the terms contemplated hereby and otherwise act to eliminate or minimize the effects of such statute or regulation on the transactions contemplated hereby.

SECTION 5.19    <u>Product Liability Insurance</u>. Beginning on the Closing Date until at least the fifth anniversary of the Closing Date, the Parent agrees to maintain noncancelable run-off policies in a form reasonably satisfactory to the Buyer covering product liability for aviation products and non-aviation products of the Fastener Business, subject to the next sentence. The product run-off policies covering product liability for aviation products shall be written annually with limits of not less than $100,000,000 and the product run-off policies covering product liability for non-aviation products shall annually be written with limits of not less than $50,000,000; *provided*, that (i) in no event will the Parent be required to enter into any replacement policy the premiums of which exceed 200% of the premiums of the run-off policies in effect on the Closing Date, and (ii) the refusal of any insurer to provide quotes or write coverage for renewals of any such run-off policy or replacement policy will not constitute a breach of this Section 5.19. Notwithstanding the foregoing, in the event that, during such five year period, replacement policies providing the minimum coverage required by this Section 5.19 are not available at premiums less than 200% of the premiums of the run-off policies in effect on the Closing Date, the Parent shall be required to enter into replacement policies providing the maximum coverage available at premiums equal to 200% of the premiums of the run-off policies in effect on the Closing Date. The Parent and all Transferred Fastener Subsidiaries shall be named insureds, and the Buyer shall be named as an additional insured on the Parent's run-off product liability policies. The Parent shall provide the Buyer with copies of the policies and any renewals thereof. At the Closing and annually thereafter, the Parent shall provide the Buyer with evidence of compliance with this obligation under this Section 5.19. The product run-off policies maintained by the Parent pursuant to this Section 5.19 shall be written on an occurrence policy form and shall be referred to herein as the "Fastener Business Product Liability Insurance."

56

CONFIDENTIAL

SECTION 5.20     Post-Closing Treatment of Accounts Receivables.
Following the Closing, the Buyer shall, or shall cause each of its Affiliates to, use its
commercially reasonable efforts to collect the accounts receivable outstanding as of the
Closing Date, which shall represent all the account receivables of the Fastener Business
included on the Closing Date Balance Sheet (the "Receivables"). Upon the earlier of the
completion of the Closing Date Balance Sheet by the Buyer or ninety days following the
Closing Date, the Buyer shall have the right to transfer and assign any or all of the
uncollected portion of any Receivable which is at least ninety days past due as of such
date to the Parent by delivering an executed assignment agreement together with a
certificate of an officer of the Buyer that sets forth the amount of each such Receivable,
the date of invoice and the invoice number for each such Receivable being so assigned
(the "Assigned Receivable") and certifies that no portion of the Receivables being
transferred and assigned to the Parent has been collected by the Buyer or its Affiliates
and that the Buyer and its Affiliates have otherwise complied with this Section 5.20 (the
"Receivables Certificate"). Within five business days after receipt of the Receivables
Certificate, the Parent agrees to remit to the Buyer an amount equal to (x) the dollar
amount of such Assigned Receivable as set forth in the Receivables Certificate minus (y)
$3,832,000 by wire transfer of immediately available funds to a bank account designated
by the Buyer for such purpose. On the 180th day following the Closing Date, the Buyer
shall have the right to transfer and assign to the Parent any or all of the uncollected
portion of any and all other Receivables that remain uncollected together with a
Receivables Certificate with respect to any or all other Receivables that remain
uncollected as of such date. To the extent that the aggregate amount of the Assigned
Receivables transferred and assigned to the Parent pursuant to this Section 5.20 is less
than $3,832,000, the Buyer shall promptly remit to the Parent the difference between the
aggregate amount of the Assigned Receivables transferred to the Parent and $3,832,000
by wire transfer of immediately available funds to a bank account designated by the
Parent for such purpose. If the customer pays the Buyer in respect of an Assigned
Receivable, the Buyer shall promptly remit such payment to the Parent by wire transfer
of immediately available funds to a bank account designated by the Parent for such
purpose. The Buyer hereby agrees that it shall not, and shall cause its Affiliates not to,
take any action or omit to take any action that would (i) waive the Parent's right to
collect, release or otherwise forgive any Assigned Receivables or (ii) result in any legal
restrictions on the Parent's ability to pursue and collect any Assigned Receivables. The
Buyer hereby acknowledges that the Parent shall have the exclusive right to pursue and
collect any Assigned Receivables. Subject to Section 5.3, the Buyer will provide access
to all documentation and personnel necessary for the Parent to pursue collection of the
Assigned Receivables. The Parent will have the right to make copies of any
documentation necessary for such collection.

SECTION 5.21     Continued Existence. For a period of five years after
the Closing Date, the Parent shall (i) maintain its corporate existence, (ii) not authorize or
take any other action to implement or effect a voluntary or involuntary, liquidation,
dissolution or winding up of the Parent, and (iii) not authorize or take any action to
declare or pay any dividends on the Parent Common Stock, whether in cash, property or
securities; provided, however, that nothing in this Section 5.21 shall prevent the Parent
from engaging in a merger, sale of substantially all its assets or other business

57

CONFIDENTIAL

FC 02783

combination after the Closing Date if prior to the consummation of such transaction, the successor in interest to the Parent (or the purchaser of such assets, as the case may be) in such transaction agrees in writing (for the benefit of the Buyer Indemnified Parties) to assume and become fully responsible for, pursuant to an agreement reasonably satisfactory in form and substance to Buyer, all of the Parent's obligations under this Agreement (including, without limitation, the Parent's obligations under Articles VI, VIII and XI). Notwithstanding the foregoing, nothing in this Section 5.21 shall prevent the Board of Directors of the Parent from taking any action that, after receiving and considering the advice of its outside legal counsel, is required in order for the Board to properly exercise its fiduciary responsibilities to the stockholders of the Parent under applicable Law.

SECTION 5.22    Fairchild Fasteners Europe Simmonds.  Prior to the Closing Date, the Sellers shall convert, or shall cause to be converted, Fairchild Fasteners Europe Simmonds S.A.R.L. into an SAS for French corporate purposes.

SECTION 5.23    Environmental Permits.  In cooperation with the Buyer, the Sellers shall take all reasonable commercial actions to transfer to the Buyer all Environmental Permits effective as of the Effective Time, or, if such Environmental Permits are not transferable, have such Environmental Permits reissued to the Buyer effective as of the Effective Time, *provided* that the Sellers shall have no obligation hereunder to the extent that applicable Environmental Law would allow the Buyer to own and operate the Fastener Business after the Closing Date without the transfer or reissuance of such Environmental Permits prior to the Closing Date.

SECTION 5.24    United Kingdom Subsidiaries.  Prior to the Closing, the Sellers and the Buyer shall cause their respective subsidiaries to execute all documents that are reasonably necessary to transfer all shares of Fairchild Fasteners UK Ltd., a wholly owned indirect subsidiary of the Parent, to a subsidiary of the Buyer organized under the laws of the United Kingdom. There shall be no additional consideration payable by the Buyer to the Sellers in connection with the transfer contemplated by this Section 5.25.

SECTION 5.25    Transfer of Fastener Business Real Property.  Prior to the Closing, the Sellers shall, or shall cause their respective subsidiaries to, cause any Plan with any right, title or interest in any Fastener Business Real Properties or Fastener Business Leases to sell, convey, assign, transfer and deliver such right, title and interest in such Fastener Business Real Properties or Fastener Business Leases to the Sellers, free and clear of all Liens.

SECTION 5.26    Accrued Expenses.  The parties agree that within 30 days of the date of this Agreement each party shall agree on the items set forth on Schedule 5.26 to be included in "Accrued Expenses" for purposes of calculating of Net Working Capital for purposes of the Closing Date Balance Sheet as set forth on Schedule 1.93(c).

58

CONFIDENTIAL

FC 02784

SECTION 5.27    Fullerton Property.  Effective as of the Effective Time, (a) the Parent shall have exercised its option to purchase the real property located at 800 S. State College Boulevard, Fullerton, California 92831 (the "Fullerton Property"), and shall have closed on the purchase of the Fullerton Property; and (b) the Buyer shall have entered into a lease agreement with the Parent pursuant to which the Buyer shall lease the Fullerton Property from the Parent upon the same terms and conditions set forth in the Parent's present lease with respect to the Fullerton Property (lease dated December 31, 1979, as amended dated July 1, 1997 and June 28, 1985 with 800 State College Partners c/o Black Equities other than (i) the renewal options, (ii) the purchase option and (iii) the right of first offer to purchase).  Prior to the end of the term of the Parent's lease with the Buyer for the Fullerton Property, the Buyer and the Parent shall enter into good faith negotiations with respect to a new lease on commercially reasonable terms.

SECTION 5.28    Intellectual Property.  The Sellers will continue to develop and test the size 5 non-threaded version of the drive nut used in connection with the Accu-Lok fastener.  The Sellers have filed or will file promptly, but in no event later than the Closing Date, applications for patent for the Accu-Lok fastener using the non-threaded version of the drive nut in the European Patent Office, Canada, France, Germany, Spain and the United Kingdom.

## ARTICLE VI

### SELLER EMPLOYEES

SECTION 6.1    Employment.

(a) Effective as of the Effective Time, each employee of the Sellers actively employed in the Fastener Business immediately prior to the Effective Time and listed on Schedule 6.1 (which Schedule may be updated as of the Closing Date to reflect new employees of the Fastener Business, if any) (the "Fastener Business Employees") shall cease to be an employee of the Sellers and the Buyer shall offer or cause to be offered employment, on an at-will basis, to all Fastener Business Employees.  Effective as of the Effective Time and until December 31, 2003, and subject to Section 6.2(a), the Buyer shall cause the Fastener Business Employees, as a group, who accept and commence employment with the Buyer or a subsidiary of the Buyer as of the Effective Time (the "Transferred Employees") to be provided with employee benefit arrangements that shall, in the aggregate, be no less favorable than as provided by the Sellers to such Transferred Employees, as a group, immediately prior to the Effective Time, *provided* that in no event shall the Buyer be required to continue any of the Sellers' Plans and benefits; *provided, further*, that this provision shall not apply to those Fastener Business Employees who are based outside the United States.

(b) The Buyer shall cause the Transferred Employees to be given full credit for all service with the Parent or any subsidiary of the Parent prior to the Effective Time for purposes of eligibility and vesting (but not for purposes of benefit accrual) under any employee benefit plans or arrangements of the Buyer or any subsidiary of the

59

CONFIDENTIAL

FC 02785

Buyer in which such Transferred Employees participate from and after the Effective Time to the same extent such service was recognized by the Parent or any subsidiary of the Parent under a corresponding Plan of the Parent or, if applicable, of a subsidiary of the Parent immediately prior to the Effective Time. The Buyer shall, or shall cause a subsidiary of the Buyer to, (i) waive all limitations as to preexisting conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to Transferred Employees under the medical and life insurance plans in which such employees may be eligible to participate after the Effective Time in connection with the transfer of employment to Buyer, other than limitations or waiting periods that are already in effect with respect to such employees and that have not been satisfied as of the Effective Time under any welfare plan of the Parent or any subsidiary of the Parent in which Transferred Employees participate immediately prior to the Effective Time, and (ii) provide each Transferred Employee with credit for any co-payments and deductibles paid prior to the Effective Time in satisfying any applicable deductible or out-of-pocket requirements for the year in which the Effective Time occurs under any welfare plans in which such employees are eligible to participate after the Effective Time, as if those deductibles or co-payments had been paid under the welfare plans in which such employees are eligible to participate after the Effective Time.

(c) Subject to Section 6.2, the Sellers shall remain responsible for, and shall indemnify and hold harmless the Buyer against, any and all Damages relating to or arising out of any of the Sellers' Plans, programs, agreements or arrangements or obligations thereunder accrued or related to circumstances existing on, or prior to, the Effective Time. Subject to Section 6.2, the Buyer shall be responsible for, and shall indemnify and hold harmless the Sellers against, any and all Damages relating to or arising out of any of the Buyer's employee benefit arrangements or obligations thereunder, as well as employee benefit arrangements that are assumed by the Buyer pursuant to Section 6.2 hereof, which Damages relate to events that occur after the Effective Time.

SECTION 6.2  Assumption of Plans.

(a) Effective as of the Closing Date, the Buyer shall assume the Sellers' post-retirement welfare benefit plans solely with respect to Transferred Employees and the former employees of the Fastener Business (which former employees are listed on Schedule 6.2(a)). The Sellers shall continue to provide all administrative services, at the Buyer's expense, with respect to the benefit obligations assumed by the Buyer pursuant to this Section 6.2(a) through December 31, 2003. With respect to the Sellers' provision of administrative services pursuant to this Section 6.2(a), the Sellers shall deliver to the Buyer on a monthly basis, an invoice reflecting the costs actually incurred by the Sellers with respect to their provisions of such services. The Buyer shall pay the Sellers the amount indicated in such invoice within ten business days following receipt of such invoice. Nothing herein shall limit the right of the Buyer, following the Closing Date, to amend or terminate the programs under which such benefits are provided, subject to applicable Law.

60

CONFIDENTIAL

(b) The Parent shall retain each of its pension plans (whether or not qualified) ("Parent Pension Plans") and shall retain and be responsible for, and the Sellers shall indemnify and hold harmless the Buyer against, any and all Damages with respect to, any Parent Pension Plan and any benefits under such plan to which any Transferred Employee or any former employee of the Fastener Business is currently entitled or may become entitled after the Effective Time. The Buyer shall provide such information as the Sellers or their designee may reasonably request, from time to time, in connection with the administration of the Parent Pension Plans.

(c) (i) The Sellers shall retain and be responsible for all liabilities and obligations, and the Sellers shall indemnify and hold harmless the Buyer against any and all Damages, arising or related to any employment, change of control or severance contract (including all payments thereunder) between the Sellers and any Fastener Business Employee including, but not limited to, those set forth on Schedule 6.2(c)(i). Following the Closing, the Buyer agrees to make available an aggregate amount equal to $5,000,000 for payments to a group of Fastener Business Employees identified on Schedule 6.2(c)(ii) (the "Payment Pool"). As promptly as possible following the date of this Agreement, representatives of the Buyer and representatives of the Seller shall enter into good faith discussions regarding the allocation of the Payment Pool among the individuals identified on Schedule 6.2(c)(ii); *provided, however,* the Buyer shall have the right in its sole discretion to determine the specific Fastener Business Employees to receive any such payment and the amount of such payment; and *provided, further,* that any Fastener Business Employee who does not receive a payment from the Buyer pursuant to this Section 6.2(c) may be retained as an employee of the Sellers following the Closing. The Sellers must provide the Buyer with written notice of those Fastener Business Employees the Sellers intend to retain pursuant to this Section 6.2(c) at least five business days prior to the Closing Date. (ii) In the event the amount of money allocated from the Payment Pool to any Fastener Business Employee set forth on Schedule 6.2(c)(ii) is less than the aggregate amount of the change of control, stay pay and other retention payments payable to such employee under his contract with the Fastener Business, the Parent shall pay such difference to the Fastener Business Employee in accordance with the terms of such person's contract, and the Buyer shall have no obligation with respect to any such change of control, stay pay and other retention payments. In the event that any Fastener Business Employee set forth on Schedule 6.2(c)(i) becomes a Transferred Employee and such Transferred Employee remains employed with the Buyer for a period of six months following the Closing Date, the Buyer agrees to pay such employee the amount of the severance obligations in accordance with the terms of such Employee's employment agreement. In the event that any Fastener Business Employee set forth on Schedule 6.2(e)(i) becomes a Transferred Employee and such Transferred Employee is terminated by the Buyer prior to the sixth month anniversary of the Closing Date, (a) the Sellers shall remain fully liable for payment of the full amount of such employee's severance payments under his employment agreement and (b) the Buyer shall not rehire such terminated Transferred Employee as an employee or a consultant for a two year period following such employee's date of termination.

61

FC 02787

(d) The Sellers shall be fully responsible for the payment of any benefits due any Transferred Employee under any Plan of the Sellers or their respective Affiliates and each Individual Agreement to which the Sellers or their respective Affiliates are a party in the nature of interim benefits to motivate the Fastener Business Employees to become Transferred Employees, including any payments made pursuant to a retention contract or other retention bonus arrangement but the Seller may use the Payment Pool to satisfy its obligations to pay such benefits due to the Transferred Employees.

(e) The Sellers shall be fully responsible for any benefits in the nature of severance pay due to any Fastener Business Employee under any Plan or Individual Agreement who does not accept an offer of employment described in Section 6.1(a) hereof. The severance benefits provided by the Buyer to any Transferred Employee who is based in the United States (each, a "Transferred U.S. Employee") whose employment with the Buyer is involuntarily terminated (other than for cause) by the Buyer or a Buyer subsidiary within twelve months following the Effective Time shall not be less favorable than the severance benefits set forth on Schedule 6.2(e) (which are the benefits that a Fastener Business Employee would have been entitled to had his or her employment been terminated by the Sellers or any subsidiaries of the Sellers (as the case may be) immediately prior to the Effective Time).

(f) To the extent that any obligations might arise under WARN, 29 U.S.C. Section 2101 *et seq.*, or under any similar provision of any Law (hereinafter referred to collectively as "WARN Obligations") as a consequence of the transactions contemplated by this Agreement, the Sellers shall be responsible for any WARN Obligations arising as a result of any employment losses occurring prior to the Effective Time, and the Buyer shall be responsible for any WARN Obligations arising as a result of any employment losses occurring on or after the Effective Time. At the Closing Date, the Sellers will deliver to the Buyer a list reflecting the number of Fastener Business Employees who suffered an employment loss during the ninety day period prior to the Closing.

(g) Effective as of the Effective Time, each Transferred Employee shall not be eligible to make contributions (or have contributions made on his behalf) to the Sellers' defined contribution plans (the "Parent DC Plans"), other than contributions payable for periods prior to the Closing Date which have not been remitted as of the Closing Date. The Sellers shall cause each Transferred Employee to be fully vested in such Transferred Employees account balance in the Parent DC Plan in which such Transferred Employee participates as of the Closing Date. The Buyer shall establish or designate one or more defined contribution plans in which Transferred U.S. Employees shall be eligible to participate as soon as practicable after the Closing Date (the "Buyer DC Plans"). Each Transferred Employee shall be permitted to receive a distribution of such Transferred Employee's full account balance from the Parent DC Plans or have such distribution "rolled over" in cash to an eligible retirement plan (including the Buyer DC Plan), as soon as practicable after the Closing Date.

(h) Effective as of the Effective Time, each Transferred U.S. Employee shall cease to accrue additional benefits under Sellers' defined benefit pension plans listed on Schedule 6.2(h) (the "Parent DB Plans"). Each Transferred U.S. Employee shall be

62

FC 02788

permitted to receive a distribution of such Transferred U.S. Employee's accrued benefit, actuarially adjusted for commencement before normal retirement age, in accordance with the terms of the applicable Plan from the Parent DB Plan in which such Transferred U.S. Employee participates as of the Closing Date, as soon as practicable after the Closing Date. As soon as practicable (but not later than six months) after the Closing Date, the Buyer shall establish or designate one or more defined benefit pension plans to cover those Transferred U.S. Employees who, immediately prior to the Effective Time, participated in any Parent DB Plan, effective as of the Closing Date (the "Buyer DB Plans").

 (i) The Sellers shall be responsible for and pay any and all workers' compensation and other similar statutory claims asserted by or with respect to any Transferred Employees in respect of any injury or other compensable event or occupational illness or disease which occurred or is attributable to any event, state of facts or condition which existed or occurred in whole on or before the Closing Date. The Buyer shall be responsible for and pay any and all workers' compensation and other similar statutory claims asserted by or with respect to any Transferred Employees hired by the Buyer in respect of any injury or other compensable event or occupational illness or disease which occurred or is attributable to any event, state of facts or condition which existed or occurred in whole after the Closing Date. If any such injury or other compensable event or occupational illness or disease of a Transferred Employee who is employed by the Sellers before the Closing Date and by the Buyer after the Closing Date is attributable in part to causes occurring before the Closing Date and in part to causes after the Closing Date and is the basis of a workers' compensation or other similar statutory claim, the liability for any such claims shall be shared by the Sellers and the Buyer in the proportion of the periods of exposure in respect of the occupational illness or disease of such Transferred Employee which occurred before the Closing Date and that which occurred after the Closing Date except for California employees. For Transferred Employees working in California, if any such injury or other comparable event or occupational illness or disease of a Transferred Employee who is employed by the Sellers before the Closing Date and by the Buyer after the Closing Date is attributable in part to causes occurring before the Closing Date and in part to causes occurring after the Closing Date and is the basis of a workers' compensation or other similar statutory claim, the liability for any such claims shall be shared by the Sellers and the Buyer in the proportion of the periods of exposure as would be taken into account under the applicable provisions of the California Labor Code in respect of the occupational illness or disease of such Transferred Employee which occurred before the Closing Date and that which occurred after the Closing Date. If the Buyer pays or is otherwise held responsible for the Sellers' allocated portion of any workers' compensation or other similar statutory claim, the Sellers will reimburse the Buyer for such portion paid by the Buyer. The Buyer's obligations under this Section 6.2(i) shall not preclude the Buyer's right to indemnification under Article XI for any breach of any representation or warranty made by the Sellers in this Agreement.

 (j) Treatment of Foreign Plans and Employees. Effective as of the Closing Date, the Buyer shall assume Sellers' liabilities and obligations, and shall receive

63

CONFIDENTIAL

the assets, under each of the Plans that are based outside of the United States and cover exclusively Transferred Employees who are based outside of the United States.

(k) <u>Administrative Services</u>. The Sellers shall continue to provide all administrative services at the Buyer's expense with respect to the Buyer's provision of health, dental and disability benefits to the Transferred U.S. Employees through December 31, 2003. With respect to the Sellers' provision of administrative services pursuant to this Section 6.2(k), the Sellers shall deliver to the Buyer, on a monthly basis, an invoice reflecting the costs actually incurred by the Sellers with respect to their provision of such services. The Buyer shall pay the Sellers the amount indicated in such invoice within ten business days following its receipt of such invoice.

## ARTICLE VII

## CLOSING CONDITIONS

SECTION 7.1   <u>Conditions to Each Party's Obligations to Effect the Transactions Contemplated Hereby</u>.  The respective obligations of each party to effect the transactions contemplated hereby shall be subject to the fulfillment at or prior to the Effective Time of the following conditions:

(a) To the extent required by applicable Law, each of the Sellers and the Buyer and any other Person (as defined in the HSR Act) required in connection with the transactions contemplated hereby to file a Notification and Report Form for Certain Mergers and Acquisitions with the Department of Justice and the FTC pursuant to the HSR Act shall have made such filing and all applicable waiting periods with respect to each such filing (including any extensions thereof) shall have expired or been terminated;

(b) To the extent required by applicable Law, each of the Sellers and the Buyer and any other Person required in connection with the transactions contemplated hereby to file any filings with any Government entity outside the U.S. shall have made such filings and such Government entities outside the U.S. shall have approved or cleared all such filings;

(c) No statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or enforced by any court or Government entity which prohibits the consummation of the transactions contemplated hereby substantially  on the terms contemplated hereby or has the effect of making the acquisition of the Fastener Business by the Buyer or any of its Affiliates illegal;

(d) The transactions contemplated by this Agreement shall have received the requisite vote required for the Shareholder Approval; and

(e) The Parent shall have repaid that certain indebtedness described in Section 5.14(b) in the manner set forth and in accordance with the provisions of Section 5.14(b).

64

CONFIDENTIAL

SECTION 7.2    Conditions to the Obligations of the Sellers to Effect the Transactions Contemplated Hereby. The obligations of the Sellers to effect the transactions contemplated hereby shall be further subject to the fulfillment at or prior to the Effective Time of the following conditions, any one or more of which may be waived by the Sellers:

(a) All of the representations or warranties of the Buyer set forth in the Agreement that are qualified by materiality or material adverse effect shall be true and correct, and all of the representations and warranties of the Buyer set forth in the Agreement that are not so qualified shall be true and correct in all material respects, in each case, as if such representations or warranties were made on and as of the date hereof and as of the Effective Time (except to the extent such representations and warranties speak as of a specific date or as of the date hereof, in which case such representations and warranties shall be so true and correct or true and correct in all material respects, as the case may be, as of such specific date or as of the date hereof, respectively);

(b) The Buyer shall have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed and complied with by it on or prior to the Closing Date; and

(c) The Buyer shall have furnished a certificate of an executive officer of the Buyer to evidence compliance with the conditions set forth in Sections 7.2(a) and (b) of this Agreement.

SECTION 7.3    Conditions to the Obligations of the Buyer to Effect the Transactions Contemplated Hereby. The obligations of the Buyer to effect the transactions contemplated hereby shall be further subject to the fulfillment at or prior to the Effective Time of the following conditions, any one or more of which may be waived by the Buyer:

(a) All of the representations or warranties of the Sellers set forth in the Agreement that are qualified by materiality or Material Adverse Effect shall be true and correct in all respects, and all of the representations and warranties of the Sellers set forth in the Agreement that are not so qualified shall be true and correct in all material respects, in each case, as if such representations or warranties were made on and as of the date hereof and as of the Effective Time (except to the extent such representations and warranties speak as of a specific date or as of the date hereof, in which case such representations and warranties shall be so true and correct or so true and correct in all material respects, as the case may be, as of such specific date or as of the date hereof, respectively);

(b) The Sellers shall have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed and complied with by it on or prior to the Closing Date; *provided, however,* that the Sellers shall have performed and complied with its obligations pursuant to Section 5.14(a) in all respects;

65

FC 02791

(c) The Sellers shall have furnished a certificate of an executive officer of the Sellers to evidence compliance with the conditions set forth in Sections 7.3(a) and (b) of this Agreement;

(d) Each of the consents listed on Schedule 7.3(d) shall have been obtained; and

(e) The Sellers shall have completed the transfer of all Excluded Assets as contemplated by Section 5.2.

SECTION 7.4    Certificates. Each of the parties hereto will furnish to the other party such certificates of such party's officers or others and such other documents to evidence fulfillment of the conditions set forth in this Article VII as the other party may reasonably request.

## ARTICLE VIII

## CERTAIN TAX MATTERS

SECTION 8.1    Tax Returns.

(a) The Sellers shall timely prepare and file (or cause to be filed) when due (taking into account extensions) (i) all Tax Returns that are required to be filed on or before the Closing Date by or with respect to the Fastener Business Assets and each of the Transferred Fastener Subsidiaries for taxable years or periods ending on or before the Closing Date, and (ii) all consolidated, combined, unitary and similar Tax Returns that include one or more of the Transferred Fastener Subsidiaries as members of the "affiliated group" (within the meaning of Section 1504(a) of the Code or similar provision of state, local or non-U.S. law) of which the Parent (or any predecessor or successor) is the common parent. The Sellers shall timely prepare, or cause to be timely prepared, any such Tax Returns due after the Closing Date (taking into account extensions) for a taxable period ending on or prior to the Closing Date and deliver such Tax Returns to the Buyer for filing.

(b) The Buyer shall timely prepare and file (or cause to be filed) when due (taking into account extensions) all Tax Returns that are required to be filed by or with respect to the Fastener Business Assets and each of the Transferred Fastener Subsidiaries (other than returns that include one or more of the Transferred Fastener Subsidiaries as members of the "affiliated group" (within the meaning of Section 1504(a) of the Code or similar provision of state, local or non-U.S. law) of which the Parent (or any predecessor or successor) is the common parent) for taxable years or periods beginning after the Closing Date and any taxable period that includes (but does not end on) the Closing Date (a "Straddle Period").

(c) The Buyer shall make available to the Sellers for review and approval any Tax Returns required to be prepared by the Buyer for any taxable year or period that includes a Straddle Period. The Buyer shall use its reasonable best efforts to make such

66

FC 02792

Tax Returns available for review and approval as required under this paragraph sufficiently in advance of the due date for filing such Tax Returns (but in no event less than 30 days prior to their due dates) to provide the Sellers with a meaningful opportunity to review and approve such Tax Returns and have such Tax Returns modified before filing, provided that such approval shall not be unreasonably withheld. The Buyer and the Sellers shall attempt in good faith to resolve any issues arising out of the review of such Tax Returns. If a Tax Return is due before the date a disputed item is resolved hereunder, it shall be filed as prepared and resolved items shall be reflected on an amended Tax Return or other applicable Tax adjustment request.

SECTION 8.2    Payment of Taxes.  Except as otherwise provided in this Agreement and except to the extent any such Taxes are taken into account in preparing the Closing Date Balance Sheet, the Sellers shall pay or cause to be paid, on a timely basis, all Taxes due with respect to the Tax liability of the Fastener Business Assets and the Transferred Fastener Subsidiaries for taxable periods ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date. The Sellers shall pay directly to or at the direction of the Buyer, at least ten days prior to the date payment thereof is due, the portion of such Taxes for that portion of any Straddle Period which ends on the Closing Date (calculated pursuant to Section 8.3). The Buyer shall pay or cause to be paid, on a timely basis, all Taxes due with respect to the Tax liability of the Fastener Business Assets and the Transferred Fastener Subsidiaries for taxable periods beginning after the Closing Date and the portion of any Straddle Period beginning on the day after the Closing Date.

SECTION 8.3    Allocation of Straddle Period Taxes.  In the case of any Straddle Period:

(a) Periodic Taxes.  (i) The periodic Taxes of the Fastener Business Assets and the Transferred Fastener Subsidiaries that are not based on income or receipts (e.g., property Taxes) for the portion of any Straddle Period which ends on the Closing Date shall be computed based on the ratio of the number of days in such portion of the Straddle Period and the number of days in the entire taxable period, and (ii) the periodic Taxes of the Fastener Business Assets and the Transferred Fastener Subsidiaries that are not based on income or receipts for the portion of any Straddle Period beginning on the day after the Closing Date shall be computed based on the ratio of the number of days in such portion of the Straddle Period and the number of days in the entire taxable period.

(b) Non-Periodic Taxes.  (i) The Taxes of the Fastener Business Assets and the Transferred Fastener Subsidiaries for that portion of any Straddle Period ending on the Closing Date (other than Taxes described in Section 8.3(a) above), shall be computed on a "closing-of-the-books" basis as if such taxable period ended as of the close of business on the Closing Date, and (ii) the Taxes of the Fastener Business Assets and the Transferred Fastener Subsidiaries for that portion of any Straddle Period beginning after the Closing Date (other than Taxes described in Section 8.3(a) above), shall be computed on a "closing-of-the-books" basis as if such taxable period began on the day after the Closing Date.

67

CONFIDENTIAL

SECTION 8.4    Refunds.

(a) Any Tax refund (including any interest in respect thereof) received by the Buyer, any of its Affiliates or any of the Transferred Fastener Subsidiaries, and any amounts credited against Tax to which the Buyer, any of its Affiliates or any of the Transferred Fastener Subsidiaries becomes entitled (including by way of any amended Tax Returns or any carryback filing), that relate to any taxable period, or portion thereof, for which the Sellers are liable pursuant to Section 8.2, except to the extent that such refund or credit against Tax relates to Taxes for which the liability is assumed by the Buyer, shall be for the account of the Sellers, and the Buyer shall pay over to the Sellers any such refund or the amount of any such credit within ten days after receipt of such credit or entitlement thereto. The Buyer shall pay the Sellers interest at the rate prescribed under Section 6621(a)(1) of the Code, compounded daily, on any amount not paid when due under this Section 8.4.

(b) Any Tax refund (including any interest in respect thereof) received by the Sellers or any of their Affiliates, and any amounts credited against Tax to which the Sellers or any of their Affiliates becomes entitled (including by way of any amended Tax Returns or any carryback filing), that relate to any taxable period, or portion thereof, for which the Buyer is liable pursuant to Section 8.2, or that relate to any Tax for which the liability is assumed by the Buyer shall be for the account of the Buyer, and the Sellers shall pay over to the Buyer any such refund or the amount of any such credit within ten days after receipt of such credit or entitlement thereto. The Sellers shall pay the Buyer interest at the rate prescribed under Section 6621(a)(1) of the Code, compounded daily, on any amount not paid when due under this Section 8.4.

(c) Each of the Sellers and the Buyer shall cooperate, and cause each of its Affiliates to cooperate, in obtaining any Tax refund that the other party reasonably believes should be available, including through filing appropriate forms with the applicable Tax authority.

SECTION 8.5    Tax Indemnification.

(a) Notwithstanding any other provision of this Agreement or any Ancillary Agreement, each of the Sellers will jointly and severally indemnify, defend and hold harmless the Buyer, the Transferred Fastener Subsidiaries, the Buyer's other subsidiaries and their respective directors, officers, employees, agents and representatives (including, without limitation, any predecessor or successor to any of the foregoing) from and against any and all Indemnifiable Losses relating to, resulting from or arising out of (i) Taxes levied or imposed upon, or in connection with, the Fastener Business Assets or the Fastener Business with respect to any taxable period or portion thereof ending on or before the Closing Date, (ii) Taxes imposed on or payable by the Sellers, any Seller Affiliate or the Transferred Fastener Subsidiaries with respect to any taxable period or portion thereof ending on or before the Closing Date, (iii) Taxes of the Sellers or its Transferred Fastener Subsidiaries imposed on the Sellers or any of the Transferred Fastener Subsidiaries as members of the "affiliated group" (within the meaning of Section 1504(a) of the Code) of which Parent (or any predecessor or successor) is the common

68

FC 02794

parent that arises under Treasury Regulation Section 1.1502-6(a) or comparable provisions of foreign, state or local law, and (iv) Taxes for which Sellers are responsible for in Section 5.9, in each case except to the extent any such Taxes are taken into account in preparing the Closing Date Balance Sheet.

(b) Notwithstanding any other provision of this Agreement or any Ancillary Agreement, the Buyer will indemnify and hold harmless the Parent and its subsidiaries other than the Transferred Fastener Subsidiaries and their respective directors, officers, employees, agents and representatives (including, without limitation, any predecessor or successor to any of the foregoing) from and against any and all Indemnifiable Losses relating to, resulting from or arising out of (i) Taxes described in Section 8.5(a)(i) and (ii) to the extent such Taxes are taken into account in preparing the Closing Date Balance Sheet, (ii) Taxes for which Buyer is responsible for in Section 5.9, and (iii) Taxes described in the last sentence of Section 8.2.

(c) The Sellers agree to indemnify the Buyer against and hold it harmless from all income Taxes, expenses or other losses arising out of the failure of the Sellers to perform any of the agreements it is required to perform under this Article VIII, and the Buyer agrees to indemnify the Sellers and hold them harmless from all Taxes, expenses or other losses arising out of the failure by the Buyer to perform any of the agreements it is required to perform under this Article VIII.

(d) Any indemnification obligation of the Buyer or the Sellers pursuant to this Section 8.5 shall be net of any Tax Benefit realized by the indemnified party or its Affiliates and increased by the relevant After Tax Amount. For purposes of this Agreement, "After Tax Amount" means any additional amount necessary to reflect the Tax consequences of the receipt or accrual of such reimbursement payment (including the payment of an additional amount or amounts hereunder) determined by using the actual marginal federal, state, foreign or local rates for the relevant taxable period.

(e) The Buyer and the Sellers agree to treat any payment under this Section 8.5 as an adjustment to the Consideration.

SECTION 8.6    Certain Post-Closing Settlement Payments.

(a) If the examination of any federal, state, local or other Tax Return of the Buyer under Section 8.1(b) shall result (by settlement or otherwise) in any adjustment which permits the Sellers or its Affiliates to increase deductions, losses or Tax credits or decrease the income, gains or recapture of Tax credits which would otherwise (but for such adjustments) have been reported or taken into account (including by way of any increase in basis) by the Sellers or its Affiliates for one or more periods for which it is required to file a Tax Return, the Buyer shall notify the Sellers and provide it with adequate information so that the Sellers can reflect on its or the appropriate Affiliate's Tax Returns such increases in deductions, losses or Tax credits or decreases in income, gains or recapture of Tax credits. The Sellers shall pay to the Buyer, within 30 days of the receipt of such information, the amount of any resulting Tax Benefits.

69

CONFIDENTIAL                                                          FC 02795

(b) If the examination of any federal, state, local or other Tax Return of the Sellers under Section 8.1(a) shall result (by settlement or otherwise) in any adjustment which permits the Buyer or its Affiliates to increase deductions, losses or Tax credits or decrease the income, gains or recapture of Tax credits which would otherwise (but for such adjustments) have been reported or taken into account (including by way of any increase in basis) by the Buyer or its Affiliates for one or more periods for which it is required to file a Tax Return, the Sellers shall notify the Buyer and provide it with adequate information so that the Buyer can reflect on its or the appropriate Affiliate's Tax Returns such increases in deductions, losses or Tax credits or decreases in income, gains or recapture of Tax credits. The Buyer shall pay to the Sellers, within 30 days of the receipt of such information, the amount of any resulting Tax Benefits.

SECTION 8.7    Cooperation. After the Closing Date, each of the Sellers and the Buyer shall (and shall cause their respective Affiliates to) (i) assist the other party in preparing any Tax Returns which such other party is responsible for preparing and filing in accordance with Section 8.1(a), (ii) cooperate fully in preparing for any audits of, or disputes with Tax authority regarding, any Tax Returns of any of the Fastener Business Assets and Transferred Fastener Subsidiaries and (iii) as requested by the Buyer, the Parent shall make, or cause to be made, elections under Section 754 of the Code for the taxable years of Transferred Fastener Subsidiaries ending on or including the Closing Date. In connection therewith, the Buyer shall not dispose of any Tax work papers, books or records relating to any of the Fastener Business Assets and Transferred Fastener Subsidiaries during the six-year period following the Closing Date, and thereafter shall give the Sellers reasonable written notice, and the opportunity to make copies of any such items, before disposing of such items.

SECTION 8.8    Contests.

(a) Notice. After the Closing Date, the Buyer and the Sellers each shall notify the other party in writing within 10 days of the commencement of any Tax audit or administrative or judicial proceeding affecting the Taxes of any of the Fastener Business Assets or Transferred Fastener Subsidiaries, which, if determined adversely to the Taxpayer ("Tax Indemnitee") or after the lapse of time would be grounds for indemnification under Section 8.5 of this Agreement by the other party ("Tax Indemnitor"). Such notice shall contain factual information describing any asserted Tax liability in reasonable detail and shall include copies of any notice or other document received from any Tax authority in respect of any such asserted Tax liability. If either the Buyer or the Sellers fails to give the other party prompt notice of an asserted Tax liability as required under this Agreement, then (i) if the Tax Indemnitor is precluded by the failure to give prompt notice from contesting the asserted Tax liability in any administrative or judicial forums, then such party shall not have any obligation to indemnify the other party for any losses arising out of such asserted Tax liability, and (ii) if the Tax Indemnitor is not so precluded from contesting, if such failure to give prompt notice results in a detriment to the Tax Indemnitor, then any amount which the Tax Indemnitor is otherwise required to pay pursuant to Section 8.5 of this Agreement with respect to such liability shall be reduced by the amount of such detriment.

70

CONFIDENTIAL

FC 02796

(b) <u>Control of Contests Involving Pre-Closing Periods</u>. (i) In the case of an audit or administrative or judicial proceeding involving any asserted liability for (A) Taxes of the Sellers or their Affiliates with respect to the Fastener Business Assets or (B) the U.S. federal, state or local Tax liability of or with respect to the Transferred Fastener Subsidiaries relating to any taxable years or periods ending on or before the Closing Date, the Sellers shall have the right, at their expense, to control the conduct of such audit or proceeding; *provided, however*, that if such audit or proceeding would be reasonably expected to result in a material increase in Tax liability of or with respect to the Transferred Fastener Subsidiaries for taxable periods ending after the Closing Date or with respect to the Fastener Business Assets for which the Buyer (or its Affiliates) would be liable, the Sellers shall not settle any such audit or proceeding without the consent of the Buyer, which consent shall not be unreasonably withheld, conditioned or delayed and (ii) in the case of an audit or administrative or judicial proceeding involving any asserted liability for Taxes addressed in Section 5.9 or with respect to the foreign Tax liability of the Transferred Fastener Subsidiaries relating to any taxable years or periods ending on or before the Closing Date or any Straddle Period, the Buyer and the Parent shall have joint control of and shall cooperate in the conduct of such audit or proceeding; such joint control shall include strategic decision-making regarding audits, selection of an appropriate spokesperson to interface with the applicable Tax authority, and selection of advisors with respect to such periods. If the Buyer and the Parent cannot agree with respect to any matter relating to the conduct of an audit or administrative or judicial proceeding described in Section 8.8(b)(ii), they shall jointly appoint an impartial nationally recognized Tax lawyer (the "Advisor") mutually acceptable to the Parent and the Buyer (or, if they cannot agree on a mutually acceptable Tax lawyer, they shall cause their respective law firms to select such lawyer). The Buyer and the Parent shall provide to the Advisor full cooperation. The Advisor shall be instructed to reach its conclusion regarding the dispute within 15 business days. The conclusion reached by the Advisor shall be conclusive and binding on the Parent and the Buyer. All fees payable to the Advisor in connection with the resolution of such disagreements shall be divided equally between the Parent and the Buyer.

(c) <u>Control of Contests Involving Post-Closing Periods or Straddle Periods</u>. In the case of an audit or administrative or judicial proceeding involving any asserted liability for Taxes (A) of the Buyer or its Affiliates with respect to the Fastener Business Assets, (B) of the Transferred Fastener Subsidiaries relating to any taxable years or periods beginning after the Closing Date or (C) for any Straddle Period (other than a foreign Tax Straddle Period which is governed by Section 8.8(b)(ii)), the Buyer shall have the right to control the conduct of such audit or proceeding; *provided, however*, that if such audit or proceeding would be reasonably expected to result in a material increase in Tax liability of any Fastener Business Assets or Transferred Fastener Subsidiaries for which the Sellers would be liable, in the case of any Straddle Period (other than a foreign Tax Straddle Period, which is governed by Section 8.8(b)(ii)) the Sellers may participate in the conduct of such audit or proceeding at their own expense and in each case the Buyer shall not settle any such audit or proceeding without the consent of the Parent which consent shall not be unreasonably withheld, conditioned or delayed.

71

FC 02797

SECTION 8.9    <u>French SAS</u>. The Buyer hereby agrees that it will not, and will not permit any of its subsidiaries or Affiliates to, convert Fairchild Fasteners Europe-Simmonds S.A.S. into a French S.A.R.L. prior to the second anniversary of the Closing Date.

# ARTICLE IX

# TERMINATION AND ABANDONMENT

SECTION 9.1    <u>Termination</u>. Subject to the parties' obligations as provided in Section 5.5, this Agreement may be terminated at any time prior to the Effective Time:

(a) by mutual consent of the Parent and the Buyer;

(b) by the Parent or the Buyer, (i) at any time after January 31, 2003 if the conditions set forth in Article VII shall not have been satisfied or waived, *provided* that the right to terminate this Agreement pursuant to this Section 9.1(b)(i) shall not be available to any party whose breach of any provision of this Agreement results in the Closing Date not occurring by January 31, 2003; (ii) a statute, rule, regulation or executive order shall have been enacted, entered or promulgated prohibiting the consummation of the transactions contemplated by this Agreement substantially on the terms contemplated hereby or having the effect of making the acquisition of the Fastener Business by the Buyer and its Affiliates illegal; or (iii) an order, decree, ruling or injunction shall have been entered permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement substantially on the terms contemplated hereby or having the effect of making the acquisition of the Fastener Business by the Buyer and its Affiliates illegal and such order, decree, ruling or injunction shall have become final and non-appealable; *provided*, that the party seeking to terminate this Agreement pursuant to this Section 9.1(b)(iii) shall have used its reasonable best efforts to remove such order, decree, ruling or injunction subject to the provisions of Section 5.5;

(c) by the Buyer, if there has been a material violation or breach by the Sellers of any agreement, representation or warranty contained in this Agreement that has rendered the satisfaction of any condition to the obligations of the Buyer impossible and such violation or breach has not been waived by the Buyer;

(d) by the Parent, if there has been a material violation or breach by the Buyer of any agreement, representation or warranty contained in this Agreement that has rendered the satisfaction of any condition to the obligations of the Sellers impossible and such violation or breach has not been waived by the Parent;

(e) by the Parent or the Buyer, if at the Special Shareholders Meeting, the transactions contemplated by this Agreement and any other transactions contemplated hereby that are required to be approved or adopted by the stockholders of the Parent shall fail to receive the vote required by the Shareholder Approval;

72

CONFIDENTIAL                                    FC 02798

(f) by the Buyer, if the Parent shall (i) withdraw, modify or amend in any respect its approval or recommendation of the transactions contemplated by this Agreement that are required to be approved or adopted by the stockholders of the Parent, (ii) failed to included in the Proxy Statement such recommendation (including the recommendation that the stockholders of the Parent vote in favor of the transactions contemplated by this Agreement), (iii) taken any public position inconsistent with such recommendation, or (iv) if the Board of Directors of the Parent shall have resolved to do any of the foregoing; or

(g) by the Parent, if (i) the Parent shall have received a Fastener Business Acquisition Proposal not solicited in violation of Section 5.11 and (ii) the Board of Directors of the Parent shall have concluded in good faith, after receiving and considering the advice of its outside legal counsel, that such Fastener Business Acquisition Proposal is more favorable to its stockholders than the transactions contemplated by Article II of this Agreement.

SECTION 9.2    Procedure and Effect of Termination.

(a) In the event of termination of this Agreement and abandonment of the transactions contemplated hereby by either or both of the parties pursuant to Section 9.1, written notice thereof shall forthwith be given to the other party and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by either of the parties hereto. If this Agreement is terminated as provided herein:

(i)    upon request therefor, each party will redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether obtained before or after the execution hereof, to the party furnishing the same;

(ii)    each party hereto will use its best efforts to prevent disclosure to third Persons of all information received by either party with respect to the business of the other party or its subsidiaries (other than information which is a matter of public knowledge or which has heretofore been or is hereafter published in any publication for public distribution or filed as public information with any Government entity) except (i) as may be required by Law; and (ii) as is permitted by this Agreement; and

(iii)    neither party hereto shall have any liability or further obligation to the other party to this Agreement pursuant to this Agreement except as stated in this Section 9.2, *provided* that nothing herein shall relieve any party from liability for its willful breach of this Agreement (including, but not limited to, Section 5.4 and Section 5.5) or of the Confidentiality Agreement.

(b) In addition, in the event of termination of this Agreement and abandonment of the transactions contemplated hereby by the Parent or any Seller

73

CONFIDENTIAL

FC 02799

pursuant to Section 9.1(g), then simultaneously with any such termination, the Parent shall deliver, or shall cause to be delivered, to the Buyer an amount of cash equal to $25,000,000 by wire transfer of immediately available funds to a bank account designated in writing by the Buyer in any bank in the continental United States or by such other means as are agreed in writing by the Parent and the Buyer.

## ARTICLE X

## MISCELLANEOUS PROVISIONS

SECTION 10.1    Delivery of Schedules.  The schedules required to be delivered pursuant to this Agreement are being delivered simultaneously with the execution and delivery of this Agreement.

SECTION 10.2    Amendment and Modification.  Subject to applicable Law, this Agreement may be amended, modified or supplemented only by written agreement of each of the Sellers and the Buyer at any time prior to the Effective Time with respect to any of the terms contained herein.

SECTION 10.3    Waiver of Compliance; Consents.  Except as otherwise provided in this Agreement, any failure of either of the parties to comply with any obligation, covenant, agreement or condition herein may be waived by the party entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.  Whenever this Agreement requires or permits consent by or on behalf of a party, such consent shall be given in writing in a manner consistent with the requirements for a waiver of compliance as set forth in this Section 10.3.

SECTION 10.4    No Third Party Beneficiary Rights.  This Agreement is not intended to and shall not be construed to give any Person (other than the parties to this Agreement) any interest or rights (including, without limitation, any third party beneficiary rights) with respect to or in connection with any agreement or provision contained herein or contemplated hereby.

SECTION 10.5    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or mailed by registered or certified mail (return receipt requested), postage prepaid, telecopied (and which is confirmed) or sent by reputable courier (providing proof of delivery) to the parties at the following addresses (or at such other address for a party as shall be specified by like notice, *provided* that notices of a change of address shall be effective only upon receipt thereof):

(a)  if to the Sellers, to

The Fairchild Corporation

74

CONFIDENTIAL

FC 02800

45025 Aviation Drive, Suite 400
Dulles, Virginia 20166-7516
Telecopy:      (703) 478-5775
Attention:     General Counsel

with a copy to

Cahill Gordon & Reindel
80 Pine Street
New York, New York 10005
Telecopy:      (212) 269-5420
Attention:     James J. Clark, Esq.
               Luis R. Penalver, Esq.

    (b) if to the Buyer, to

Alcoa Inc.
390 Park Avenue
New York, New York 10022-4608
Telecopy:      (212) 836-2809
Attention:     General Counsel

with a copy to

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036-6522
Telecopy:      (212) 735-2000
Attention:     J. Michael Schell, Esq.
               Margaret L. Wolff, Esq.

    SECTION 10.6    Assignment.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other parties, nor is this Agreement intended to confer upon any other Person except the parties hereto any rights or remedies hereunder; *provided, however*, that the Buyer may assign its rights to purchase the Fastener Business Assets to one or more of its wholly owned subsidiaries (including a single member limited liability company of the Buyer), as provided in Section 10.7.

    SECTION 10.7    Designated Subsidiary.  Anything in this Agreement to the contrary notwithstanding, the Parent agrees that the Buyer may cause one or more of its direct or indirect, wholly owned subsidiaries (including corporations or single member limited liability companies) designated by the Buyer to carry out all or part of the transactions contemplated by this Agreement; *provided, however*, that no such designation shall affect or diminish the liability of the Buyer under this Agreement.

75

CONFIDENTIAL

SECTION 10.8    Governing Law.  This Agreement shall be governed by the laws of the State of Delaware (regardless of the laws that might otherwise govern under applicable principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies.

SECTION 10.9    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

SECTION 10.10    Interpretation.  The article and section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement.

SECTION 10.11    Entire Agreement.  This Agreement, including the exhibits hereto, the Ancillary Agreements, the Confidentiality Agreement, and the Noncompetition and Consulting Agreement and the documents, schedules, certificates and instruments referred to herein, embody the entire agreement and understanding of the parties hereto in respect of the transactions contemplated by this Agreement.  There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein or therein.  This Agreement supersedes all prior agreements and understandings between the parties with respect to such transactions.

SECTION 10.12    Severability.  If for any reason any term or provision of this Agreement is held to be invalid or unenforceable, all other valid terms and provisions hereof shall remain in full force and effect, and all of the terms and provisions of this Agreement shall be deemed to be severable in nature.  If for any reason any term or provision containing a restriction set forth herein is held to cover an area or to be for a length of time which is unreasonable, or in any other way is construed to be too broad or to any extent invalid, such term or provision shall not be determined to be null, void and of no effect, but to the extent the same is or would be valid or enforceable under applicable Law, any court of competent jurisdiction shall construe and interpret or reform this Agreement to provide for a restriction having the maximum enforceable area, time period and other provisions (not greater than those contained herein) as shall be valid and enforceable under applicable Law.

## ARTICLE XI

## INDEMNIFICATION

SECTION 11.1    Survival of Representations and Warranties.

(a)  Subject to Section 11.5 hereof, each of the representations and warranties contained in Articles III and IV will survive the Closing and remain in full force and effect until December 31, 2003; *provided, however*, that the representations and warranties set forth in Sections 3.1, 3.2, 4.1 and 4.2 will survive the Closing and remain

CONFIDENTIAL

FC 02802

in full force and effect until the expiration of the applicable statute of limitations, and the representations and warranties set forth in Section 3.27 will survive the Closing and remain in full force and effect until the fifth anniversary of the Closing Date. Notwithstanding the foregoing, the representations and warranties set forth in Sections 3.12 (but only to the extent they relate to the Accu-Lok fastener), 3.22 and 3.24 shall not survive the Closing but the Buyer shall be entitled instead to indemnification pursuant to Section 11.2(a)(iii) and Article VII and Section 11.6, respectively.

(b) For purposes of this Agreement, (i) "Indemnity Payment" means Indemnifiable Losses required to be paid pursuant to this Agreement, (ii) "Indemnitee" means any Person entitled to indemnification under this Agreement, (iii) "Indemnifying Party" means any Person required to provide indemnification under this Agreement, (iv) "Indemnifiable Losses" means any and all losses, damages, charges, deficiencies, penalties, claims, demands, actions, suits or proceedings, settlements and compromises relating thereto and reasonable attorneys' fees and expenses in connection therewith; *provided* that, Indemnifiable Losses shall not include (A) any consequential, special or punitive damages, except in the case of fraud or to the extent actually awarded by a court or Government entity in connection with a Third Party Claim, (B) any internal fees and expenses of the indemnified party (including, without limitation, in-house counsel's fees and expenses) or (C) any adjustments made pursuant to Section 2.7, to the extent paid in accordance therewith, and (v) "Third Party Claim" means any claim, demand, action, suit or proceeding made or brought by any Person or entity who or which is not a party to this Agreement or an Affiliate of a party to this Agreement.

SECTION 11.2    Indemnification.

(a) Subject to Sections 11.1, 11.3, 11.4 and 11.5, each of the Sellers will jointly and severally indemnify, defend and hold harmless the Buyer, the Transferred Fastener Subsidiaries, the Buyer's other Affiliates and their respective directors, officers, employees, agents and representatives (including, without limitation, any predecessor or successor to any of the foregoing) from and against any and all Indemnifiable Losses relating to, resulting from or arising out of:

(i) any breach by any of the Sellers of any of the representations, warranties or covenants of any of the Sellers contained in this Agreement and the Ancillary Agreements (other than the Voting Agreement) or any certificate delivered by any of such Persons pursuant to this Agreement;

(ii) any Third Party Claim to the extent arising from or related to activities of the Fastener Business prior to the Closing (other than the Assumed Fastener Business Liabilities), including, without limitation, any Third Party Claims for (A) asbestos claims other than those set forth on Schedule 3.16 and (B) claims of personal injury or property damage arising out of exposure to Hazardous Materials;

77

CONFIDENTIAL

FC 02803

(iii)    any claim by Monogram Industries Inc. or any of its Affiliates or any of their successors of infringement of U.S. patent numbers 4,659,271, 4,747,202, 4,772,167, 4,967,463, 5,066,179, and any foreign patents corresponding and/or claiming priority to such U.S. patents, arising from (A) Sellers' or any of their respective subsidiaries' use, manufacture, offering for sale, sale or importing of the Accu-Lok fastener (the different version of which are described in U.S. patent application numbers 09/825,711, 09/849,184 and 09/997,500) and (B) Buyer's or any of their respective subsidiaries' use, manufacture, offering for sale, sale or importing of the non-threaded version of the drive nut used in connection with the Accu-Lok fastener in accordance with Sellers' specifications for the Accu-Lok fastener;

(iv)    (A) subject to Section 11.6, the Fastener Environmental Liabilities and (B) all litigation matters arising out of or resulting from the conduct of the Fastener Business prior to the Effective Time, including the litigation matters set forth on Schedule 3.16, in all cases for purposes of both clause (A) and (B) to the extent the amount of Damages thereof exceeds the amount of the reserve for environment, health, safety and litigation on the Closing Date Balance Sheet;

(v)    the ownership, use and possession of the Excluded Assets prior to, on or after the Closing Date;

(vi)    the Excluded Fastener Business Liabilities other than Third Party Claims for which indemnification is provided pursuant to Section 11.2(a)(ii); or

(vii)    any Third Party Claim arising from or related to any current or former business, activities or operations of the Sellers, their respective current and former subsidiaries and any predecessors of such companies, including without limitation, any (A) Discontinued Operations, (B) Pre-Closing Off-Site Disposal Locations, but not including the business activities and operations of the Fastener Business Assets and the Assumed Fastener Business Liabilities.

(b) Subject to Section 11.4, each of the Sellers will jointly and severally indemnify, defend and hold harmless the Buyer, the Transferred Fastener Subsidiaries, the Buyer's other subsidiaries and their respective directors, officers, employees, agents and representatives (including, without limitation, any predecessor or successor to any of the foregoing) from and against any and all Indemnifiable Losses relating to, resulting from or arising out of any Third Party Claim for product liability or product warranty with respect to any Fastener Business products manufactured by the Sellers or any of their respective subsidiaries prior to the Closing (a "Product Claim").  The indemnification obligations of the Sellers under this Section 11.2(b) shall terminate on the fifth anniversary of the Closing Date, except with respect to any Indemnifiable Losses relating to a Product Claim for which the Buyer has provided written notice to the Parent

78

CONFIDENTIAL

FC 02804

prior to the fifth anniversary of the Closing Date of the facts underlying such Indemnifiable Losses with reasonable specificity. For purposes of this Section 11.2(b), any Indemnifiable Losses relating to a Product Claim shall include all costs actually incurred by the Indemnitee due to recalls of products including, without limitation, all costs associated with the removal and replacement of installed products manufactured and sold by the Sellers prior to the Effective Time. For purposes of this Section 11.2(b), a Product Claim shall not include any Damages in respect of customer returns of Fastener Business products manufactured by the Sellers or any of their respective subsidiaries prior to the Closing which returns are made in the ordinary course of the Fastener Business until the customer returns the same such completed product with an aggregate purchase price of $500,000 during the five-year indemnification period following the Closing Date. Once such customer has returned $500,000 of the same such completed product, the Buyer shall be entitled to make a Product Claim in respect of the full amount of all the same such product returns by such customer.

(c) Subject to Sections 11.1, 11.3, 11.4 and 11.5, the Buyer will indemnify, defend and hold harmless the Parent and its subsidiaries other than the Transferred Fastener Subsidiaries and their respective directors, officers, employees, agents and representatives (including, without limitation, any predecessor or successor to any of the foregoing) from and against any and all Indemnifiable Losses relating to, resulting from or arising out of (i) any breach by the Buyer of any of the representations, warranties or covenants of the Buyer contained in this Agreement or the Ancillary Agreements (other than the Voting Agreement) or in any certificate delivered by the Buyer pursuant to this Agreement, (ii) the Assumed Fastener Business Liabilities or (iii) any changes to or termination of or other action effecting, or any attempt to change or terminate or otherwise effect, any benefit plans assumed by the Buyer hereunder.

SECTION 11.3    Limitations on Liability.

(a) Notwithstanding any other provision in this Agreement or of any applicable Law, no Indemnitee will be entitled to make a claim against an Indemnifying Party under Sections 11.2(a)(i) or 11.2(c)(i), as applicable, unless (x) such claim is made within the applicable survival period set forth in Section 11.1(a) and (y) until the aggregate amount of Indemnifiable Losses incurred by the Indemnitee with respect to an event or occurrence and all other events or occurrences caused by the same circumstances exceeds $50,000 (a "Base Claim"), in which event (subject to the following provisions of this Section 11.3) such Indemnitee may assert its right to indemnification hereunder to the full extent of its Indemnifiable Losses in respect thereof.

(b) No Indemnitee will be entitled to make a claim against an Indemnifying Party under Sections 11.2(a)(i) or 11.2(c)(i), as applicable, unless (x) such claim is made within the applicable survival period set forth in Section 11.1(a) and (y) until the aggregate amount of all of its Base Claims which may be asserted for Indemnifiable Losses under Sections 11.2(a)(i) or 11.2(c)(i), as applicable, exceeds $5,000,000, in which event (subject to the following provisions of Section 11.3), such Indemnitee may assert its right to indemnification hereunder to the full extent of all such Indemnifiable Losses.

79

CONFIDENTIAL

FC 02805

(c) Notwithstanding any other provision of this Agreement, the indemnification obligations of the Sellers, under Section 11.2(a)(i), on the one hand, and of the Buyer, under Section 11.2(b)(i), on the other hand, will not exceed $250,000,000.

(d) Notwithstanding any other provision of this Agreement or of any applicable Law, the Buyer will be entitled to make a claim against any of the Sellers under Section 11.2(a)(ii), (iii) or (iv) until the fifth anniversary of the Closing Date.

(e) Notwithstanding any other provision of this Agreement, the amount of any Indemnifiable Loss for which indemnification is provided under this Article XI shall be net of (i) any amount actually received by the Indemnitee or paid to Third Parties on behalf of the Indemnitee under insurance policies of the Indemnifying Party with respect to such Indemnifiable Loss (and the Indemnitee shall be required to submit a claim under such insurance policies with respect to such Indemnifiable Loss) and (ii) any Tax Benefit actually realized as a result of such Indemnifiable Loss.

(f) The Indemnifying Party shall be subrogated to the rights of the Indemnified Party in respect of any insurance relating to the Indemnifiable Losses to the extent of any indemnification payments made hereunder.

SECTION 11.4    Defense of Claims.

(a) If any Indemnitee receives notice of the assertion or commencement of any Third Party Claim against such Indemnitee with respect to which an Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnitee will give such Indemnifying Party reasonably prompt written notice thereof, but in any event not later than 30 calendar days after receipt of such notice of such Third Party Claim. Such notice by the Indemnitee will describe the Third Party Claim in reasonable detail, will include copies of all material written evidence thereof and will indicate the estimated amount, if reasonably practicable, of the Indemnifiable Loss that has been or may be sustained by the Indemnitee. The Indemnifying Party will have the right to participate in, or, by giving written notice to the Indemnitee, to assume, the defense of any Third Party Claim (other than Product Claims which only the Sellers shall have the right to participate in) at such Indemnifying Party's own expense and by such Indemnifying Party's own counsel (reasonably satisfactory to the Indemnitee), and the Indemnitee will cooperate in good faith in such defense.

(b) If, within ten calendar days after giving notice of a Third Party Claim to an Indemnifying Party pursuant to Section 11.4(a), an Indemnitee receives written notice from the Indemnifying Party that the Indemnifying Party has elected to assume the defense of such Third Party Claim (other than Product Claims) as provided in the last sentence of Section 11.4(a), the Indemnifying Party will not be liable for any legal expenses subsequently incurred by the Indemnitee in connection with the defense thereof; *provided, however,* that if the Indemnifying Party fails to take reasonable steps necessary to defend diligently such Third Party Claim within ten calendar days after receiving written notice from the Indemnitee that the Indemnitee believes the Indemnifying Party has failed to take such steps, the Indemnitee may assume its own defense, and the

80

CONFIDENTIAL

Indemnifying Party will be liable for all reasonable costs or expenses paid or incurred in connection therewith. Without the prior written consent of the Indemnitee, the Indemnifying Party will not enter into any settlement of any Third Party Claim. If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party will give written notice to the Indemnitee to that effect. If the Indemnitee fails to consent to such firm offer within ten calendar days after its receipt of such notice, the Indemnitee may continue to contest or defend such Third Party Claim and, in such event, the maximum liability of the Indemnifying Party as to such Third Party Claim will not exceed the amount of such settlement offer.

(c) Any claim by an Indemnitee on account of an Indemnifiable Loss which does not result from a Third Party Claim (a "Direct Claim") will be asserted by giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than 30 calendar days after the Indemnitee becomes aware of such Direct Claim. Such notice by the Indemnitee will describe the Direct Claim in reasonable detail, will include copies of all material written evidence thereof and will indicate the estimated amount, if reasonably practicable, of the Indemnifiable Loss that has been or may be sustained by the Indemnitee. The Indemnifying Party will have a period of 30 calendar days within which to respond in writing to such Direct Claim. If the Indemnifying Party does not so respond within such 30 calendar day period, the Indemnifying Party will be deemed to have rejected such claim, in which event the Indemnitee will be free to pursue such remedies as may be available to the Indemnitee on the terms and subject to the provisions of this Agreement.

(d) A failure to give timely notice or to include any specified information in any notice as provided in Sections 11.4(a), 11.4(b) or 11.4(c) will not affect the rights or obligations of any party hereunder except and only to the extent that, as a result of such failure, any party which was entitled to receive such notice was deprived of its right to recover any payment under its applicable insurance coverage or was otherwise prejudiced as a result of such failure.

SECTION 11.5   Exclusive Remedies.  If the Closing occurs, then the remedies provided in this Article XI shall constitute the sole and exclusive remedies with respect to all Indemnifiable Losses contemplated by Section 11.2 and all claims for breach of any representation or warranty or covenant or agreement to be performed on or prior to the Closing Date contained in this Agreement, except for fraud or other willful dishonesty. Notwithstanding the foregoing, with respect to any matter, liability or obligation as to which the Buyer has neither expressly assumed liability pursuant to this Agreement nor has agreed to provide indemnification to the Sellers (or, where the Buyer has assumed liability or agreed to provide indemnification, any matters, liabilities or obligations that fall outside of the scope of such assumed or indemnified liabilities), the Buyer expressly retains all rights it may possess under any applicable Law. Furthermore, the provisions of this Article XI shall not affect the rights of any party hereto against any third party (including a third party whose claim against a party hereto is the basis of a claim for indemnification hereunder) and shall not inure to the benefit of any third party.

81

CONFIDENTIAL

FC 02807

Notwithstanding anything in Article XI, Article VIII will be the exclusive agreement among the parties with respect to indemnification, procedures and remedies with respect to Tax matters.

SECTION 11.6    Seller Environmental Indemnity.

(a) Subject to the provisions of Sections 11.5 and 11.6, from and after the Closing Date, each of the Sellers will jointly and severally indemnify, defend and hold harmless the Buyer, the Transferred Fastener Subsidiaries, the Buyer's other subsidiaries and their respective directors, officers, employees, agents and representatives (including, without limitation, any predecessor or successor to any of the foregoing) (collectively, the "Buyer Indemnified Parties") from and against any and all Fastener Environmental Liabilities in excess of the amount of the reserve for environmental, health, safety and litigation on the Closing Date Balance Sheet, *provided*, that any claims for indemnification related to Discontinued Operations or Pre-Closing Off-Site Disposal Locations shall not be subject to any deductible for the amounts in the reserve for environmental, health, safety and litigation.

(b) The indemnification obligations of the Sellers under this Section 11.6 shall terminate on the fifth anniversary of the Closing Date, except with respect to (i) any Fastener Environmental Liability for which the Buyer has provided written notice to any of the Sellers prior to the fifth anniversary of the Closing Date of the facts underlying such Fastener Environmental Liability with reasonable specificity, (ii) any claim related to a Pre-Closing Off-Site Disposal Location and (iii) any claim related to Discontinued Operations.

(c) Prior to the Closing, the Sellers and the Buyer will each designate a representative (each, a "Representative") to receive information and consult with the other with respect to Fastener Environmental Liabilities (in accordance with the terms of Section 5.3). From and after the Closing, the Buyer will conduct and control all Remedial Action and negotiations with any Government entity in respect of all Fastener Environmental Conditions that are subject to indemnification pursuant to Section 11.6. Such Remedial Actions shall be performed in a commercially reasonable manner consistent with the use of the Fastener Business Assets as of the Closing Date, including, to the extent allowed or authorized by applicable Environmental Law or the Government agency with jurisdiction over a Remedial Action, the use of Remediation Standards that are applicable to such properties based on the use and location of such properties as of the Closing Date. The Buyer will make its environmental personnel and consultants reasonably available to the Sellers and the Sellers' Representative to discuss Fastener Environmental Conditions. The Buyer will provide the Sellers' Representative and the Sellers' environmental consultants with reasonable access to the properties of the Fastener Business and copies of all non-privileged information with respect to the Remedial Actions to be taken in respect of such Environmental Actions. The Buyer will select consultants and contractors to implement such Remedial Actions (who shall be reasonably acceptable to Parent) and will also provide the Sellers' Representative and its environmental consultants with copies of all reports, analytical data, correspondence, directives, orders and documents submitted to or received by the Buyer from any

82

CONFIDENTIAL

FC 02808

Government entity in connection with the Remedial Action and other non-privileged documents created or received by or on behalf of the Buyer in connection with the Remedial Action. The Buyer shall afford the Sellers a reasonable opportunity to comment on the Buyer's proposed response to a Fastener Environmental Condition, and the Buyer shall not unreasonably refuse to incorporate the Sellers' comments.

(d) The Buyer shall inform any of the Sellers promptly in writing of any Fastener Environmental Condition or Environmental Action in respect of which the Sellers may have an indemnification obligation under this Section 11.6, provided, that the failure of the Buyer to so promptly inform any of the Sellers shall not affect the rights of the Buyer except to the extent that such failure to give prompt notice adversely affects the rights and obligations of any of the Sellers under this Section 11.6.

(e) For purposes of this Agreement, the following terms will have the following meanings:

(i) "Environmental Action" means any notice of any violation of any Environmental Law or any claim, citation, summons or any investigation, action, lawsuit or proceeding by any Person which seeks to impose liability (including, without limitation, liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries or penalties) pursuant to any Environmental Law.

(ii) "Environmental Contamination" means the presence, whether known or unknown, of any Hazardous Materials in soils, surface water, groundwater, sediments or other environmental media, including the movement or migration of said Hazardous Materials in such media.

(iii) "Fastener Environmental Condition" means any (A) Environmental Contamination or threatened Environmental Contamination arising out of any Release or threatened Release of Hazardous Materials arising out of the Fastener Business (which includes the Fastener Business Real Properties listed on Schedule 3.9), on-site (owned or leased) or at off-site, non-owned or non-leased locations that occurred on or prior to the Effective Time including, without limitation, at Pre-Closing Off-Site Disposal Locations; (B) Environmental Contamination at or migrating from the Fastener Business Assets prior to the Closing Date, whether or not such Environmental Contamination came into existence as a result of the Fastener Business or any other Person (including a predecessor owner or operator of the Fastener Business Assets); (C) any violation or alleged violation of, or noncompliance or alleged noncompliance with, applicable Environmental Law with respect to the Fastener Business that commenced prior to the Effective Time; or (D) any other circumstance or condition that occurred on or prior to the Effective Time that forms the basis for any Environmental Action against

83

CONFIDENTIAL

FC 02809

the Fastener Business or any Transferred Fastener Subsidiary (or any of their respective predecessors or successors).

(iv)    **"Fastener Environmental Liability"** means all losses, damages, charges, liabilities, costs, expenses, deficiencies, fines, penalties, claims, demands, actions, suits or proceedings, including reasonable attorneys' and consultants' fees and expenses in connection therewith, and expenses of investigation incurred by a Buyer Indemnified Party after the Effective Time based on any applicable Environmental Laws existing on the Closing Date in respect of any Fastener Environmental Condition; *provided* that with respect to Environmental Contamination at a Fastener Business Asset, applicable Environmental Law shall include the Remediation Standards in each relevant jurisdiction that would be applicable or acceptable to properties such as the Fastener Business Real Properties or the properties leased pursuant to the Fastener Business Leases, based on the use and location of such properties as of the Closing Date, such that the performance of Remedial Action on such properties if Environmental Contamination is discovered above such standards shall be subject to indemnification under this Section 11.6 (subject to any other limitations in this Agreement). Fastener Environmental Liability shall not include (i) any consequential, special or punitive damages, except in the case of fraud or to the extent actually awarded to a third party by a court in connection with a Third Party Claim, or (ii) any internal fees and expenses (including, without limitation, in-house counsel's fees and expenses). In addition, to the extent that the Buyer contributes to or exacerbates a Fastener Environmental Condition as a result of its actions or omissions, including, without limitation, its unreasonable failure to mitigate any violation or noncompliance with applicable Environmental Law, any material increase in losses, damages, charges, liabilities, costs or expenses resulting from said exacerbation or failure to mitigate shall not be a Fastener Environmental Liability. For purposes of this Agreement, Third Party Claims to the extent arising from or related to activities of the Fastener Business prior to the Closing Date for asbestos-related illnesses, injuries or other harm or personal injury or property damage arising from exposure to Hazardous Materials, are not deemed to be within the scope of the term "Fastener Environmental Liability." Such claims are subject to indemnification pursuant to Section 11.2(a)(ii) of this Agreement.

(v)    **"Release"** means any releasing, spilling, seeping, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of any Hazardous Materials into the environment (including the abandonment or discarding of barrels, containers, tanks or other receptacles containing Hazardous Materials).

(vi)    **"Remedial Action"** means (a) 'remedial action' as such term is defined in CERCLA and its analogous state Laws, and (b) all

84

CONFIDENTIAL

FC 02810

other actions required by any Government entity: (i) to clean up, remove, treat, abate or in any other way address any Hazardous Materials in the environment; (ii) to prevent the Release or threat of Release or minimize the further Release of any Hazardous Materials so that it does not migrate or endanger or threaten to endanger public health, welfare or the environment, and (iii) to perform studies and investigations in connection with, or as a precondition to, clause (i) or (ii) above.

(vii)    "Remediation Standards" means numerical or narrative standards ((A) resulting from an enacted statute, promulgated rule or regulation issued by a Government regulatory agency, in each case existing on the Closing Date, or (B) developed on a case-by-case basis through a risk assessment or other methodology (and taking into account any relevant guidance issued by a Government regulatory agency), which are commercially reasonable for companies in the fastener industry and which are commercially reasonable for the use and given the location of the properties as of the Closing Date) that define the concentrations of Hazardous Materials that are acceptable for any environmental media, including, without limitation, standards that are based on the use and location of a particular property.

(f)  Except for certain Fastener Environmental Liabilities assumed pursuant to Section 1.10(b), the Buyer expressly retains all rights it may possess under any applicable Law with respect to Fastener Environmental Liabilities.  Notwithstanding the foregoing, the provisions of this Section 11.6 shall not affect the rights of any party hereto against any third party (including a third party whose claim against a party hereto is the basis for indemnification hereunder) and shall not inure to the benefit of any third party.

SECTION 11.7    Resolution of Indemnification Disputes.  If a dispute arises in connection with determining the validity or amount of a claim for indemnification for an Indemnifiable Loss under this Agreement ("Dispute"), and if the Dispute cannot be settled through direct discussions between representatives of the Parent and representatives of the Buyer within thirty days following receipt of notice of a Dispute, the parties agree first to endeavor to settle the dispute in an amicable manner by mediation administered under the CPR Mediation Procedure established by the CPR Institute for Dispute Resolution ("CPR") before resorting to arbitration.  If a Dispute cannot be resolved through such mediation process within thirty days following the appointment of the mediator, the Dispute will be settled finally by arbitration under the CPR Rules for Non-Administered Arbitration (the "Rules"), then in effect, by a sole arbitrator, chosen by agreement of the parties within twenty days of the receipt by the respondent of a copy of the Notice of arbitration.  Any arbitrator appointed by CPR shall be a retired judge or a practicing attorney with no less than fifteen years of experience with large commercial cases and an experienced arbitrator. The arbitration will be governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. The hearing on the merits shall be held no later than six months after the appointment of the arbitrator unless the parties otherwise agree or the arbitrator extends such time period for good cause shown.

85

CONFIDENTIAL

FC 02811

The award shall be in writing and shall state the findings of fact and conclusions of law on which it is based. The award of the arbitrator shall be final and binding on the parties and judgment upon the award may be entered and enforced in any court having jurisdiction. Unless the parties otherwise agree in writing, the mediation and arbitration will be held in New York, New York. Each party shall bear its own costs and expenses (including fees and disbursements of counsel) and the Buyer and the Parent shall each bear one-half of the costs and expenses payable to the mediator and arbitrator.

SECTION 11.8    Indemnity Tax Credit Amount. The Sellers' indemnification obligations under Section 8.5 and this Article XI shall be credited by the net cumulative amount of (i) any Tax Benefits recognized by the Buyer (or its Affiliates) resulting from the actual utilization in any Tax period beginning after the Closing Date by the Buyer (or its Affiliates) of any French or German net operating loss of a Transferred Fastener Subsidiary organized in France or Germany (as the case may be) that the Buyer or its Affiliates carry forward from a Tax period ending on or before the Closing Date and that may no longer be subject to possible disallowance by any French or German Taxing authority minus (ii) any such Tax Benefit amounts that have previously been used to reduce any of the Sellers' indemnification obligations.

86

CONFIDENTIAL

IN WITNESS WHEREOF, the Buyer and each of the Sellers have caused this Agreement to be signed by their respective duly authorized officers as of the date first above written.

ALCOA INC.

By:  /s/ Barbara Jeremiah
     Name: Barbara Jeremiah
     Title: Executive Vice President

THE FAIRCHILD CORPORATION

By:  /s/ Jeffrey Steiner
     Name: Jeffrey Steiner
     Title: Chief Executive Officer

FAIRCHILD HOLDING CORP.

By:  /s/ Eric Steiner
     Name: Eric Steiner
     Title: President

SHEEPDOG, INC.

By:  /s/ Donald E. Miller
     Name: Donald E. Miller
     Title: Vice President

FAIRCHILD DATA CORP.

By:  /s/ John Flynn
     Name: John Flynn
     Title: Vice President

87

CONFIDENTIAL                                        FC 02813

FAIRCHILD TRADING CORP.

By:  /s/ John Flynn
    Name: John Flynn
    Title: Vice President

MARSON CREATIVE FASTENER, INC.

By:  /s/ John Flynn
    Name: John Flynn
    Title: Vice President

RHI HOLDINGS, INC.

By:  /s/ Donald E. Miller
    Name: Donald E. Miller
    Title: Vice President

SUCHOMIMOUS TERENSIS, INC.

By:  /s/ John Flynn
    Name: John Flynn
    Title: Vice President

FAIRCHILD FINANCE COMPANY

By:  /s/ John Flynn
    Name: John Flynn
    Title: Director

FAIRCHILD FASTENERS GROUP LTD.

By:  /s/ John Flynn
    Name: John Flynn
    Title: Director

CONFIDENTIAL                                                    FC 02814

FAIRCHILD FASTENER CORP.

By: /s/ John Flynn
     Name: John Flynn
     Title: Vice President

89

376497.12-New York Server 3A - MSW

CONFIDENTIAL

FC 02815