# Exhibit B

CPR INSTITUTE FOR DISPUTE RESOLUTION

```
-------------------------------------------x
THE FAIRCHILD CORPORATION,         :        CPR File No. G-06-22H

                  Claimant,        :

- against -                        :        Arbitrator: James F. Stapleton

ALCOA INC.,                        :

                  Respondent.      :        June 21, 2007
-------------------------------------------x
```

## ARBITRATION DECISION AND AWARD

### I.    BACKGROUND AND PARTIES

Claimant, The Fairchild Corporation, ("Fairchild") and Respondent, Alcoa, Inc.,

("Alcoa") entered into an agreement ("Acquisition Agreement" or "Agreement") on July 16,

2002.  Fairchild agreed to sell its fastener business ("Fastener Business") to Alcoa for

approximately $657,000,000 in cash and the assumption of certain liabilities.  The parties to the

Acquisition Agreement were Alcoa, Inc., The Fairchild Corporation, Fairchild Holding Corp.

and Sheepdog, Inc.  The Agreement was amended on December 3, 2002.  The sale included most

of Fairchild's fastener assets in the United States, as well as the capital stock of its subsidiaries

engaged in the Fastener Business outside the United States.  Under Section 11.6 of the

Agreement, Fairchild agreed to indemnify Alcoa for "Fastener Environmental Liability" ("FEL")

incurred by Alcoa following the acquisition in excess of a negotiated reserve in the amount of

$8.45 million dollars.

The transaction closed on December 3, 2002. As of December 19, 2006, Alcoa has submitted over two hundred claims for indemnification to Fairchild totaling $16,385,463.92. This included all claims alleged to have been incurred through September, 2006.

Fairchild disputed almost all of these claims and, after an unsuccessful mediation, filed a claim for arbitration under Section 11.7 of the Agreement. The undersigned was appointed the sole arbitrator and hearings were held in New York City on January 8 through 12, February 26 through 28 and March 1, 2007. Subsequently the parties filed post-hearing memoranda and reply memoranda as well as proposed findings of facts and conclusions of law and many volumes of exhibits, transcripts, deposition designations and similar materials.

This Decision and Award includes findings of fact and conclusions of law. Additional and some more specific findings and conclusions are set forth in Appendix A attached hereto and made a part hereof.

## II.    WORKPLACE HEALTH AND SAFETY

Under Section 11.6 (a) Fairchild agreed to indemnify Alcoa from and against any and all "Fastener Environmental Liabilities" in excess of the amount of "the reserve for environmental, health, safety and litigation on the Closing Date Balance Sheet." Fastener Environmental Liability was defined to mean "all losses, damages, charges, liabilities, costs, expenses, deficiencies, fines, penalties, claims, demands, actions, suits or proceedings, including reasonable attorneys' fees and consultants' fees and expenses in connection therewith, and expenses of investigation incurred by a Buyer Indemnified Party commencing after the Effective Time based on any applicable Environmental Laws existing on the Closing Date in respect of any Fastener Environmental Condition...". Section 11.6(e)(iv).

"Fastener Environmental Condition" is defined in Section 11.6 (e) (iii) to include any Environmental Contamination or threatened Environmental Contamination arising out of any Release or threatened Release of Hazardous Materials arising out of the Fastener Business; Environmental Contamination at or migrating from the Fastener Business Assets prior to the closing; and "…any violation or alleged violation of, or non-compliance or alleged non-compliance with, applicable Environmental Law with respect to the Fastener Business that commenced prior to the Effective Time…".

Environmental Law is defined under Section 3.24 (g) (ii) to mean "…any Law of any Government entity, or any binding agreement with any Government entity, relating to (a) pollution or protection of the environment or natural resources, including, without limitation, those relating to cleanup, preservation or reclamation thereof, any Release or threatened Release of Hazardous Materials; or the presence, handling, use, manufacture, distribution, treatment, storage, disposal, or recycling of or exposure to Hazardous Materials, (b) workplace health or safety or (c) exposure of persons or property to Hazardous Materials."

A major issue has arisen between the parties as to the meaning of the phrase "workplace health or safety". The phrase, if used in its usual meaning and as that term is ordinarily understood under OSHA and similar laws here and abroad, would include machine guarding, equipment safety, fall protection and similar issues. On the other hand, the phrase appears under a definition of "Environmental Law" and under a section dealing with "Seller Environmental Indemnity", and is referred to under definitions of "Fastener Environmental Liability" and "Fastener Environmental Condition". Fairchild argues that the phrase should be taken in a much more restricted and narrow sense limited to workplace health and safety issues arising out of environmental conditions or contamination of some sort. The issue is not an academic one since

a major portion of the expenses incurred to date by Alcoa relate to workplace health and safety rather than to purely environmental issues involving air, water and ground. In the context of the overall Agreement the undersigned, in a Interim Decision on a Motion for Partial Summary Judgment dated December 28, 2006, concluded that the language in question was ambiguous and its precise meaning could not be determined without hearing evidence as to the surrounding circumstances and the intent and understanding of the parties with respect to that language at the time of the execution of the Agreement.

Fairchild argues that the party's understanding and intent is clear from reading Schedules 3.24 (a) and 3.16 to the Agreement. Schedule 3.16 refers to general "litigation matters" and specifically includes "OSHA investigation/cases", while Schedule 3.24 (b) relates only to environmental claims and had no reference to non-environmental workplace health or safety claims such as machine guarding. On the other hand, the schedules were disclosure matters submitted solely by Fairchild. Alcoa was under no obligation to point out the failure to disclose workplace safety matters on Schedule 3.24 (b). Furthermore, Fairchild's attempt at the hearing to give an illustration of "an environmental" workplace health and safety issue that would not have otherwise been covered by the general environmental language, was unconvincing.

More relevant, however, to the party's understanding and intent was the effort by Fairchild's lawyer on two occasions to rewrite the definition of Environmental Law to eliminate the language on workplace health or safety in the first case and to expressly limit it to environmental workplace health and safety claims in the second instance. Both of these written proposed revisions by the Fairchild attorneys were rejected and the language remained as we find it today. This is persuasive evidence as to what the parties' intent was at the time of the execution of the Agreement.

Finally, on this issue, the several Alcoa witnesses who participated in the negotiations testified that it was their clear understanding that the phrase "workplace health and safety" was used in its ordinary meaning, and was not limited to claims of an environmental nature. It is noted that, the two principal negotiators for Fairchild, its CEO, Jeffrey Steiner, and its Chief Operating Officer, Eric Steiner, who would be expected to testify about their understanding of the phrase were not produced for examination at the hearing. There was no claim as to their unavailability. There was testimony from an Alcoa witness that Jeffrey Steiner on several occasions said that any "EHS issues" (Environmental, Health and Safety) in existence at the time would be covered by the reserve. Under the circumstances the failure to produce either of the Steiners warrants the drawing of an inference that their testimony would not be helpful to Fairchild's argument on this issue.

Another indication that the parties understood the phrase "workplace health and safety" was used in its usual meaning was the conduct of the parties post-closing. Within a few months after the closing Alcoa began to submit indemnification claims for workplace health and safety matters, including machine guarding. If Fairchild, in fact, had understood that these matters were not included within the indemnification provisions of the Agreement, one would have thought they would have promptly denied liability on the ground that such matters were not covered. In fact, the response from Fairchild was a series of letters asking for more information and more details about machine guarding and related workplace safety items. For two years they continued to ask for more information without ever suggesting that the indemnity provision did not include these matters. It was only when a new in-house counsel came to Fairchild that for the very first time, by letter dated January 31, 2005, counsel for Fairchild informed Alcoa that machine guarding and other workplace safety items were not indemnifiable. Susan Hall, the new

41783616.1 186445-000360

-5-

counsel, testified that upon reading the Agreement for the first time, she reached that conclusion. She was not a party to the negotiations and could not have known what occurred at that time. While her analysis may give rise to a reasonable argument for non-coverage, it is of no assistance in shedding light upon the parties intent and understanding at the time they entered into the Agreement.

The undersigned concludes that, based upon a consideration of all of the evidence surrounding the execution of this Agreement, the phrase "workplace health and safety" was used in its usual sense and meaning which included machine guarding, equipment safety, fall protection and similar issues.

## III.    INVESTIGATIONS

The Phase I investigations were conducted prior to the closing and were part of the buyer's due diligence for which reimbursement is not sought. The pending claims are for the cost of the Phase II investigations in the amount of $983,894, and a number of follow-up investigations for which Alcoa has submitted claims totaling $2,144,641. There were fourteen Phase II investigations. With notable exceptions to be discussed hereinafter, Alcoa pursued Phase II investigations and post-Phase II investigations only at those facilities where the earlier investigations provided a basis for further review.

The term "Fastener Environmental Liability" is defined in Section 11.6 (e) (iv) to include "...expenses of investigation incurred by a Buyer Indemnified Party after the Effective Time based on any applicable Environmental Laws existing on the Closing Date in respect of any Fastener Environmental Condition...". The Agreement uses the phrase "based upon" applicable Environmental Law. The Agreement does not use the phrase "required by". The use of the phrase "based upon" means only that the applicable Environmental Law must provide a "basis

for" Alcoa's actions. Furthermore, the Agreement provides that "…with respect to Environmental Contamination…applicable Environmental Law shall include the Remediation Standards in each relevant jurisdiction…". Section 11.6(e)(iv). The Agreement then defines Remediation Standards to include "…numerical or narrative standards…developed on a case by case basis through a risk assessment or other methodology…which are commercially reasonable for companies in the fastener industry and which are commercially reasonable for the use and given the location of the properties…". Section 11.6(e)(vii).

The Agreement further provides that a "Fastener Environmental Condition" includes not just actual "Environmental Contamination" but also "threatened Environmental Contamination". Section 11.6 (e) (iii)(A). Therefore, investigations into Environmental Contamination – whether actual or threatened – are indemnifiable so long as those investigations are "based on" "commercially reasonable" standards "in respect of" such contamination. Finally on this issue, "Remedial Action" is defined to include the definitions in CERCLA. Section 11.6(e)(vi). That statute defines "remedial action" to include "those actions consistent with permanent remedy…in the event of a release or threatened release of a hazardous substance into the environment…". 42 U.S.C. §9601(24). Investigations into actual or threatened environmental contamination are "actions consistent with permanent remedy".

Accordingly, the undersigned concludes that, with the significant exceptions hereinafter discussed, the Phase II and post-Phase II investigations for which Alcoa seeks indemnification are indemnifiable. The exceptions are as follows:

(a) City of Industry – Temple Avenue. At the time of the sale Fairchild's consultant was Envirosolve. A process known as SVE was utilized to remove contaminants from the soil and a "pump and treat" system was in place with respect to groundwater

contamination. Alcoa's expert, ERM, had noted in its Phase I investigation that, as a result, the concentration of solvents in the groundwater had been reduced by 98%. In June of 2003 Envirosolve proposed a plan to Alcoa to proceed to case closure with the regulators for an estimated cost of $33,700. Alcoa did not pursue that plan, but accepted a proposal by its new consultants, Mission Geoscience ("Mission"), for extensive additional characterization of the site. The extensive reinvestigation resulted in no materially different findings at the Temple facility. After a detailed and costly study, Mission concluded that the same system employed by Fairchild was the best method to use at the facility. The undersigned concludes that Mission's groundwater investigations at Temple were unnecessary and that the localized pockets of residual contamination which were found were addressed by Envirosole's plan for case closure at significantly less cost. The cost incurred by Alcoa for reinvestigating and developing remedial action plans was commercially unreasonable since the facility had already been appropriately characterized and had plans in place. The claim in the amount of $546,133.18 is denied.

(b) Closure of Temple Avenue facility. The Temple Avenue facility was in compliance with its permit as of the date of the closing. Alcoa decided to close the plant shortly after the closing of the transaction for its own business reasons. As a result, Alcoa could no longer discharge nitrates into the sewer because the applicable permit required the facility to be in operation. Alcoa undertook a study to look at alternative solutions for the discharge of nitrates and seeks indemnification of $55,871.76 for that study. Since those costs were caused by the decision to close the plant and did

not relate to any non-compliance by the facility at the time of acquisition, they do not qualify as FELs and are not indemnifiable.

(c) <u>Supplemental Investigation at Unruh Facility</u>. Alcoa requested $90,620.48 for a supplemental investigation at the Unruh facilities. The Phase I investigation at Unruh found that there was no history of solvent use at the facility and there had been no filing by the facility with any regulatory body documenting solvent use. Nevertheless, ERM, and then Mission, conducted invasive investigations into the soil and groundwater after the Phase I investigations. Mission concluded there was no need for remediation, and that any contamination at the facility was likely from outside sources. Therefore, these investigations were neither necessary or reasonable under the circumstances. This claim for indemnification is denied.

(d) <u>Fullerton</u>. Alcoa is seeking $380,688 indemnification for supplemental investigations at the Fullerton facility. That site was fully characterized both laterally and vertically to the satisfaction of the California authorities prior to the closing. None of the subsequent soil sampling information refuted or added to that conclusion. Alcoa itself determined that SVE was the appropriate approach regarding the soil at the facility. This was the same remedy proposed by SCS Engineers and approved by the regulators prior to the acquisition.

With respect to the groundwater investigation under Alcoa by Mission, it was concluded that these were regional ground water problems associated with nearby properties. This was consistent with the facts already known that other properties "upgradient" to the Fullerton facility were the cause of the problem. In

short, none of the investigations at the Fullerton facility were commercially reasonable. Indemnification for this claim is denied.

(e) <u>Periodic Assessments</u>. Alcoa claims $139,101 for expenses relating to the performance of required periodic assessments at the French facilities after the closing in 2002. These periodic assessment were not required to be taken until after the closing date. These assessments were required to be taken by Alcoa even though the facilities were in full compliance with all applicable regulations on the Closing Date. They are, therefore, not expenses incurred "in respect of a Fastener Environmental Condition". Indemnification for these expenses is denied.

(f) <u>Voluntary Compliance Assessments</u>. Alcoa seeks indemnification for $132,439 relating to voluntary compliance assessments at its European facilities. Admittedly these assessments were not required by law and were undertaken voluntarily by Alcoa as "good management practice". Indemnification for these assessments is, therefore, denied.

## IV.   COMPLIANCE AND REMEDIATION WORK

With the specific exceptions hereinafter discussed all of the compliance and remediation work performed by Alcoa and for which it seeks indemnification are found to have been necessary, commercially reasonable and performed at reasonable cost. The exceptions are as follow:

(a) <u>Toulouse Parking Lot</u>. Alcoa spent $583,733.78 in upgrading the parking lot in its Toulouse, France, facility. The operating permit required the addition of a second entrance to the parking lot. Alcoa had estimated the cost of the work to be between $42,000 and $60,000. Final work included adding a number of parking spaces,

installing heavy and light traffic pavement, planting trees and engaging in other landscaping, and constructing gates, fences, new curbs and gutters. These improvements were not made pursuant to an environmental law or as part of a Remedial Action. With the possible exception of the second entrance, the expansion of the parking lot was not an environmental or worker health and safety issue. The operating permit did not require the facility to add additional parking places or landscaping, nor was the expansion a requirement of the French labor code, which addresses worker health and safety. To the extent that it was required by any regulation it would have fallen under the Urban Code which is not an environmental law. Indemnification is approved for the maximum original estimate of $60,000, largely for the second entrance, and the balance of the request in the amount of $523,733.78 is denied.

(b) <u>Segregation of Storm Water/Waste Water at the Montbrison.</u> Alcoa spent $97,000 segregating the storm water and waste water networks at its Montbrison facility. The town itself does not have segregated networks and, at the time of the acquisition, the Montbrison facility sent its storm water and waste water through one network pipe into the communities. There was testimony that Alcoa could have obtained a waiver from the DRIRE to postpone the segregation work until the town had similar facilities. While the town might ultimately segregate its network and require the plant to comply in the future, it was unnecessary to do so at this time at Fairchild's expense. If it is required in the future it should be at Alcoa's expense. This claim is denied.

(c) <u>Degreaser at Montbrison</u>. Alcoa replaced the degreaser at the Montbrison facility for a cost of $243,424.95. In the Phase I assessment, Alcoa's expert, ERM, recommended that they monitor air emissions from the degreaser. If regulatory limits were exceeded, ERM recommended installing a treatment or repair directly onto the existing machine. There was no specific directive from the French government requiring this action, and the facility does not require an operating permit. Nevertheless, Alcoa opted to replace the degreaser rather than to fix it. This decision should be at Alcoa's expense. This claim is denied.

(d) <u>Replacement of the Septic Tank at St. Cosme</u>. Alcoa spent $84,259.80 replacing the septic tank at the St. Cosme facility. There was no operating permit in place in 2002 which required replacement. ERM in its reports did not identify a need or a legal basis for replacing it. The reports noted that septic tanks are permissible in France. This was, therefore, a voluntary decision by Alcoa and it is responsible to pay for it. This claim is denied.

(e) <u>Replacement of the Degreaser at St. Cosme</u>. Alcoa spent $315,517.53 replacing the degreaser at the St. Cosme facility. Under a "Ministerial Order" issued in February 1998, sites subject to "authorization" were required to replace TCE-containing equipment by October 31, 2005, or to submit a proposal demonstrating why replacement was not feasible. Alcoa, however, made a business decision to promptly replace the degreaser before there was any requirement for it to do so. Moreover, there is no evidence that Alcoa considered any potential options to replacing the degreaser. This claim is denied.

(f) <u>Soil Clean Up at Temple Avenue</u>.  Alcoa seeks $663,020 for the clean up of soil contamination at the Temple Avenue facility.  As set forth in greater detail in Section III (a) herein, the soil clean up was being successfully handled by Envirosolve prior to the closing.  The testimony indicated that the entire project could have been brought to successful closure with the regulators at a cost that would likely not have exceeded $67,400.  Alcoa fired Envirosolve and hired a new consultant without notice or consultation with Fairchild.  The new consultant engaged in an unnecessarily expansive investigation and remediation which was commercially unreasonable and cannot be charged to Fairchild.  The cost of this remediation would not have exceeded $67,400 had Envirosolve been retained to finish the job.  The claim for indemnification of $663,020 is denied, and a reduced claim of $67,400 is allowed.

(g) <u>Projects That Exceeded Legal Requirements</u>.  Alcoa conceded that with respect to three claims for remedial actions at the St. Cosme facility, they went beyond the requirements of applicable law.  These projects were the pedestrian and forklift traffic organization, the smoking area and a traffic compliance project.  The total expenses for these projects were $73,383.  These claims are denied.

(h) <u>Alcoa Standards</u>.  Alcoa expended $25,891 for a project at the Vougy facility.  Alcoa's expert conceded that expenditure was at least "partly" due to the application of "Alcoa standards".  Alcoa offered no evidence to prove which portion, if any, of this expenditure was required apart from Alcoa's own standards.  Therefore this claim is denied.

## V.    FAIRCHILD'S RIGHT TO NOTICE AND PARTICIPATION REGARDING INDEMNIFICATION

Under Section 11.6(d) Alcoa had an obligation to inform Fairchild promptly, in writing, of any "...Fastener Environmental Condition or Environmental Action in respect of which...[Fairchild] may have an indemnification obligation...". Under Section 11.6(c) Fairchild had certain "participation" rights with respect to the indemnification provisions. Those participation rights included the duty of each party to designate a representative to receive information and consult with the other with respect to Fastener Environmental Liabilities. Although Alcoa retained the right to "...conduct and control all Remedial Action and negotiations with any Government entity in respect of all Fastener Environmental Conditions that are subject to indemnification...", Alcoa was obligated to make its personnel and consultants "reasonably available" to Fairchild in order to discuss Fastener Environmental Conditions and to provide Fairchild's representatives and consultants with "reasonable access to the properties" and "...copies of all non-privileged information with respect to the Remedial Actions to be taken...". While Alcoa also had the right to select consultants and contractors, they were to be "reasonably acceptable" to Fairchild. Alcoa was required to provide to Fairchild and its consultants "...copies of all reports, analytical data, correspondence, directives, orders and documents submitted to or received by the Buyer from any Government agent entity in connection with the Remedial Action and other non-privileged documents created or received on behalf of the Buyer in connection with the Remedial Action." Finally, Alcoa was to "afford" Fairchild a "...reasonable opportunity to comment on the Buyer's proposed response to a Fastener Environmental Condition, and...[Alcoa] shall not unreasonably refuse to incorporate...[Fairchild's] comments." Section 11.6(c).

With respect to the prior notice requirement, Alcoa submitted documents (hearing Exhibit #168 and two letters dated July 6, 2005 and February 22, 2006) to Fairchild which indicated that there were a total of ninety-three items involving total expenditures of $3,619,062 for which Alcoa did not give specific prior notice to Fairchild before the work was completed. However, Section 11.6(d) provides, with respect to the prior notice, that the failure of Alcoa to so promptly inform Fairchild shall not affect the rights of Alcoa "...except to the extent that such failure to give prompt notice adversely affects the rights and obligations..." of Fairchild under Section 11.6. Alcoa argues that, while it could not point to a specific piece of paper providing notice of every particular issue at every facility, that in "virtually every case" these were claims that were either identical in nature to the claims about which Alcoa had previously notified Fairchild or that they concerned issues about which Fairchild was on notice through its own actions. More importantly, however, Fairchild has introduced no evidence to establish that the lack of a specific notice adversely affected its rights or obligations. The absence of such proof suggests that the work was necessary and performed at a reasonable cost. The failure of such proof is fatal to its claim in this regard.

With respect to the other "participation" obligations, it is clear that Alcoa made its consultants, and access to the property, reasonably available to Fairchild and its representatives. With respect to the documentation, Alcoa made available to Fairchild its Phase I reports before the closing. These reports identified numerous problems facility by facility. Scopes of work for the Phase II investigations, along with the Phase II reports themselves were also made available to Fairchild. In addition, there were numerous volumes of documents containing additional correspondence and follow-up reports sent to Fairchild by Alcoa after the closing to the present. Finally, Mr. Hodge, Fairchild's environmental counsel and dedicated representative, met with

Alcoa's representatives, went over the scopes of work for the Phase II investigations that Alcoa intended to conduct after the closing, and discussed those scopes of work. Shortly after the closing, Alcoa sent a series of letters to Fairchild providing additional notice of environmental health and safety claims at four of the largest fastener facilities. These letters provided notice of the conditions and proposed responses to those conditions. Fairchild's response to these various letters and reports was not to visit the facilities or investigate further, but to deny all liability and demand more detailed information. It seems clear from the evidence that Fairchild was going to deny liability and dispute all claims in arbitration no matter how many volumes of documents it received.

Based upon all of the evidence, it appears that Fairchild made a calculated decision to deny all liability on these indemnification claims and fight the battle in the arbitration hearing rather than to make any attempt to stop, modify or reduce the scope of the investigations or the work that Alcoa proposed to perform. Therefore, Fairchild has failed to produce evidence that, except as otherwise noted in this Award, any technical violation of its participation rights has resulted in adverse consequences or caused it any specific damage. Neither Fairchild nor its representatives made any visits to the facilities to inspect the work that was being done or proposed to be done, never objected to the hiring of any new consultants by Alcoa, and never made any recommendations which would have resulted in less work, less expensive work or no work on the part of Alcoa to remedy the environmental or workplace problems found at the facilities.

To the extent that there are technical violations of Fairchild's right to notice and participation under the environmental indemnity provisions of the Agreement, Fairchild suffered

no harm or damage as a result. These failures in themselves are no bar to Alcoa recovering on the claims made with the exceptions set forth herein.

It is worth noting, however, that for any indemnification claims to be made by Alcoa under the Agreement for post September 2006 work, Alcoa would be well advised to meticulously comply with all aspects of its obligations under the Agreement. In light of this Award, Fairchild will doubtless be mindful of the need to closely follow the proposed work and to establish a damage claim where it can do so. Furthermore, Fairchild's right to contest all claims on all legal grounds will no longer be available and it will obviously be intent on enforcing the letter of the law with respect to its contractual rights to notice and participation. Alcoa will proceed at its peril if it does not comply with the letter and spirit of the notice and participation requirements of the Agreement. As set forth in greater detail at Section IX herein, nothing that has occurred or will occur after September 2006 is before the undersigned for decision in this Award.

## VI.    TAX CREDITS

Fairchild is entitled to a tax credit under Section 11.8 of the Agreement against any indemnification obligation in an amount equal to the Tax Benefits obtained by Alcoa arising out of the French or German net operating losses transferred to Alcoa at the time of the closing that are no longer subject to disallowance. Alcoa received usable French tax losses in the amount of €5,812,170 that were incurred by two French companies, AFSA and Technico. Fairchild's former French subsidiaries were audited at the level of the individual subsidiaries for most of the tax years for which the losses available for Alcoa to carry forward were incurred. However, the consolidated tax group for which Fairchild's former French subsidiaries were members was not audited for any of the tax years in question.

For fiscal years 2003-2005, Alcoa has utilized net operating losses of €2,605,000 and based on those losses it has obtained a tax benefit of €200,081 for the fiscal 2003 tax year, €545,802 for the fiscal 2004 tax year and €146,336 in the fiscal 2005 tax year. This is a total tax benefit of €892,219. Alcoa has conceded, through its expert, that the losses obtained for the fiscal year 2003 were no longer subject to audit or possible disallowance as of January 1, 2007. As of that date, the value of Alcoa's benefit in U.S. dollars was $264,106.92. Alcoa argues that is the only tax credit allowable to Fairchild. That amount is ordered to be currently deducted from the indemnification obligation of Fairchild to Alcoa pursuant to this Award.

Fairchild's former chief financial officer, John Flynn, and Alcoa's French tax law expert, Yves Rutschmann, testified at the hearing regarding the tax losses. With respect to the years when those losses were incurred prior to the closing, all statutes of limitations for further audits had expired for all the losses recognized as of December 31, 2003. With respect to the tax benefits obtained by Alcoa for the tax years 2004 and 2005, Mr. Flynn testified that to his knowledge there existed no basis on which these losses could be disallowed in the future. Alcoa's expert also testified that he was aware of no basis for any disallowance of these tax losses. Furthermore, he conceded that a future audit of the consolidated tax group for those years was "unlikely". As a technical matter, disallowance of those losses is still "possible". Therefore, no final credit can be given to Alcoa at this time for 2004 and 2005, even though any further audits are unlikely and the witnesses could not identify any basis for a disallowance of those tax benefits.

The parties clearly intended that Fairchild should get a credit against its indemnification obligations for the tax benefits that Alcoa received from Fairchild's prior losses. Under all the circumstances, the undersigned finds that the appropriate remedy for this issue is to grant

Fairchild a conditional tax benefit in U.S. dollar equivalents as of the date of this Award for the amount of €545,802 for the fiscal 2004 tax year and the amount of €146,336 for the fiscal 2005 tax year. If, as of January 1, 2008, there has been no disallowance for tax year 2004, the credit to Fairchild of €545,802 shall become final. If, as of January 1, 2009, there has been no disallowance for the tax year 2005, the tax credit to Fairchild of €146,336 shall become final. To the extent that the tax benefits to Alcoa for either or both of those years are reduced or disallowed on or before January 1, 2009, that amount in U.S. dollar equivalents as of the date of this Award shall become due and owing from Fairchild to Alcoa and shall be payable within thirty days of the final action constituting the disallowance.

There is no evidence as to whether, and to what extent, any tax benefits were utilized by Alcoa for the fiscal 2006 tax year, or whether any additional tax benefits will be utilized thereafter. Therefore, no Award can be made with respect to those tax years or those additional potential tax benefits.

## VII.    ESCROW FUND

Under Section 2.4 of the Agreement and an Escrow Agreement between the parties dated December 3, 2002, an escrow account of $25 million dollars was set up out of the proceeds of the sale to reimburse Alcoa for environmental indemnification payments due from Fairchild in excess of the $8.45 million dollar reserve. Section 5 of the Escrow Agreement also provides for an escrow account shortfall in some circumstances. That section provides that, within five business days after December 31 of each calendar year, prior to the escrow termination date of December 3, 2007, Alcoa shall have the right to replenish the escrow account up to the amount of $25 million dollars by delivering to the escrow agent an amount in cash equal to the amount of the escrow shortfall from the Earn-Out payment, if any, payable by Alcoa to Fairchild with

respect to the prior calendar year. Section 2.8 of the Agreement provides for Earn-Out payments for the years 2003 to 2006 from Alcoa to Fairchild as additional compensation for the sale. However, the last such payment has already been made by Alcoa and no future Earn-Out payments are due and payable. Therefore, to the extent that the escrow account is reduced from $25 million dollars by the terms of this Award, there will be no further Earn-Out payments from which Alcoa could replenish that shortfall. That is the only provision which permits or requires the replenishment of the Escrow Fund. Accordingly, this request by Alcoa is denied.

## VIII.  PREJUDGMENT INTEREST

Alcoa requests prejudgment interest on the Award, although it cites no authority for that position.

As a general rule, prejudgment interest can only run on an obligation which is due and payable. The precise amount of the obligation, if any, from Fairchild to Alcoa was not determined or determinable until this Award was entered. There is no basis upon which to Award interest. Alcoa's request for interest is denied.

## IX.  FUTURE ENVIRONMENTAL LIABILITY COST

Alcoa represents that work to address Fastener Environmental Conditions is ongoing and that it continues to incur Fastener Environmental Liabilities. It requests a blanket order that it be indemnified by Fairchild for the cost of that work without further proceedings under Section 11.7 of the Agreement.

This Award addresses only those matters which are in evidence before the undersigned arbitrator. Alcoa's expense claims for Fastener Environmental Liabilities were made only through September 2006. Additional cost and expenses incurred after that time which Alcoa argues are necessary to address Fastener Environmental Conditions are not before the

41783616.1 186445-000360

undersigned and an Award cannot be entered with respect to those expenses. Furthermore, those expenditures will have to meet the conditions and requirements of the Agreement between the parties, including reasonable notice and compliance with the "participation" rights of Fairchild. There is no evidence in this arbitration on those issues post September, 2006. This request is therefore denied.

## X.    LITIGATION EXPENSE

On March 19, 2007 Alcoa notified Fairchild that it had settled a lawsuit that was identified in Schedule 3.16 of the Agreement for a payment in the amount of $564,477.49. Section 11.2 (a)(iv) of the Agreement provides that such payments may be deducted by Alcoa from the reserve, and to the extent the amount exceeds the reserve Fairchild would be liable for the difference. This claim by Alcoa is granted in the amount requested.

## XI.    COMPUTATION OF DAMAGES

A. Alcoa submitted claims for Fastener Environmental Liabilities through September, 2006, net of subsidies received from the French authorities, in the total amount of $16,385,463.92. Alcoa has sustained its burden of proof that the expenditures were in fact made in the amounts claimed.

B. In addition, Alcoa submitted a claim on March 19, 2007 for the settlement of a lawsuit identified in Schedule 3.16 of the Agreement in the amount of $564,477.49 and is entitled to additional indemnification in that amount.

C. Alcoa's Fastener Environmental Liability claim is reduced by the total of the claims disallowed in this Award in the amount of $3,303,683.48.

D. Fairchild is entitled to an indemnity tax credit in the amount of $264,106.92 for the 2003 tax year, plus the current U.S. dollar equivalent as of the date of this Award of

$730,665.13 (€545,802) for the 2004 tax year, plus the current U.S. dollar equivalent as of the date of this Award of $195,900 (€146,336) for the 2005 tax year. The latter two amounts are conditional credits as hereinabove set forth. The total tax credit is therefore $1,190,672.05.

E. As a result of the above, the Reserve Account is reduced by $8,450,000 to zero.

F. As a further result, Alcoa is entitled to receive the amount of $4,005,585.88 from the Escrow Account payable in full within thirty days of the date of this Award.

**XIV     COSTS**

The Parties will each bear their own respective legal costs and expenses. The Arbitrator's fees and expenses shall be borne equally by the Parties and shall be due and payable within thirty days from the date of any statement or statements rendered therefore.

**XV      ALL OTHER CLAIMS**

All claims and counterclaims not expressly awarded or referred to herein are hereby denied. This Award is in full settlement of all claims and counterclaims submitted in this arbitration.

IT IS SO ORDERED.

The undersigned Arbitrator having accepted appointment in this matter and being duly sworn and having agreed to fairly and honestly decide this matter in accordance with the parties' arbitration agreement and the CPR Institute for Dispute Resolution Rules for Non-Administered Arbitration, has made this Award to the best of his ability and understanding.

DATED:      June 21, 2007

James F. Stapleton, Arbitrator
Day Pitney LLP
One Audubon Street
New Haven, CT 0651

CPR INSTITUTE FOR DISPUTE RESOLUTION

-----------------------------------------------------------x

| | | |
|---|---|---|
| THE FAIRCHILD CORPORATION, | : | CPR File No. G-06-22H |
| Claimant, | : | |
| - against - | : | Arbitrator: James F. Stapleton |
| ALCOA INC., | : | |
| Respondent. | : | June 21, 2007 |

-----------------------------------------------------------x

## APPENDIX A
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I.    BACKGROUND AND PARTIES

1.    On July 16, 2002, Fairchild and Respondent Alcoa Inc. ("Alcoa") entered into an agreement by which Fairchild agreed to sell to Alcoa its Fastener Business for approximately $657 million in cash and the assumption of certain liabilities (the "Acquisition"), pursuant to an Acquisition Agreement among Alcoa Inc., The Fairchild Corporation, Fairchild Holding Corp. and Sheepdog, Inc., as amended on December 3, 2002 (the "Agreement").

2.    Pursuant to the terms of the Agreement, Fairchild agreed to sell to Alcoa the vast majority of Fairchild's Fastener assets in the United States, as well as the capital stock of its subsidiaries engaged in the Fastener Business outside the United States.

3.    Fairchild also agreed (subject to certain conditions) to indemnify Alcoa for "Fastener Environmental Liabilities" ("FELs") incurred by Alcoa following the Acquisition in excess of a negotiated reserve (the "Reserve").

4.    The amount of the Reserve is $8.45 million.

5.     The transaction closed on December 3, 2002.  As of December 19, 2006, Alcoa has submitted over 200 claims for indemnification to Fairchild totaling $16,385,463.92.

## II. WORKPLACE HEALTH AND SAFETY

6.     The Agreement was the product of extensive negotiations between sophisticated parties, both of whom were represented by counsel.

7.     Environmental, Health and Safety ("EHS") professionals from both Alcoa and Fairchild were involved in the transaction.

8.     The lead negotiators for Fairchild were Jeffrey Steiner, Chairman and Chief Executive Officer, and Eric Steiner, President and Chief Operating Officer, neither of whom testified at the evidentiary hearing.

9.     Donald Miller, Fairchild's General Counsel, testified that there were negotiation sessions with Alcoa that he did not attend either in person or by phone.

10.     As part of its due diligence for the acquisition, Alcoa engaged a consultant, Environmental Resources Management ("ERM"), to review documents concerning the Fastener Business that Fairchild made available in a data room.  ERM was instructed to look for documents that raised environmental, health and safety concerns about the Fastener facilities.

11.     The Phase I Investigations and Limited Compliance Reviews identified numerous environmental, health and safety concerns at the Fastener facilities ranging from amputations due to a lack of required machine guarding, to failure to conduct required air monitoring, to contamination of the soil and groundwater by known carcinogens.

12.    The parties agreed that Fairchild would indemnify Alcoa for the cost of investigating and remedying environmental contamination and bringing the Fastener Facilities into compliance with environmental and workplace health and safety laws.

13.    Specifically, the parties agreed that Fairchild would indemnify Alcoa for any such costs in excess of an $8.45 million reserve for "environmental, health, safety and litigation" that existed on Fairchild's books at the time of the acquisition and that Alcoa agreed to assume.

14.    To ensure that funds would be available for Fairchild to honor its indemnification obligation, Alcoa requested, *inter alia*, the creation of an escrow account into which ten percent of the purchase price, or approximately $65 million, would be placed.

15.    The parties agreed upon an escrow of $25 million.

16.    The parties agreed that if the escrow balance were to fall below $25 million at the end of any calendar year during the first five years after the closing, and Alcoa were to owe an Earn-Out payment to Fairchild for that calendar year pursuant to § 2.8 of the Agreement, then Alcoa would deposit into the escrow account the amount of the escrow shortfall from that Earn-Out payment.

17.    The parties agreed that Fairchild is obligated to pay Alcoa directly for any §11.6 indemnification claims in excess of the funds available in the escrow account.

18.    Section 1.46 defines "Environmental Law" to have the meaning set forth in Section 3.24(g)(ii).

19.    Section 3.24(g)(ii) defines "Environmental Law" as "any Law of any Government entity, or any binding agreement with any Government entity, relating to (a) pollution or protection of the environment or natural resources, including, without limitation, those

relating to cleanup, preservation or reclamation thereof, any Release or threatened Release of Hazardous Materials; or the presence, handling, use, manufacture, distribution, treatment, storage, disposal, or recycling of or exposure to Hazardous Materials, (b) workplace health or safety or (c) exposure of persons or property to Hazardous Materials".

20.    "Workplace Health or Safety" has a generally accepted meaning that includes matters such as machine guarding, lockout tagout, confined space, and fall protection.

21.    Fairchild and Alcoa negotiated extensively over the definition of "Environmental Law" that was included in the Acquisition Agreement.

22.    On May 6, 2002, Fairchild's transaction counsel proposed rewriting the definition of "Environmental Law" to strike subsection 3.24(g)(ii)(b).

23.    Under Fairchild's May 6, 2002, proposal, "workplace health or safety" would have been excluded from the definition of "Environmental Law" which would have been limited to laws relating to "pollution or protection of the environment or natural resources, including without limitation, any Release or threatened Release, handling, use, manufacture, distribution, treatment, storage, disposal, or recycling of or exposure to, Hazardous Materials".

24.    Alcoa rejected Fairchild's proposal to exclude "workplace health or safety" from the definition of "Environmental Law".

25.    On May 24, 2002, Fairchild proposed rewording the definition of "Environmental Law" as a single sentence, without separately lettered subsections separated by commas and the disjunctive "or".

26.    Fairchild's proposal would have defined "Environmental Law" to include laws "relating to the pollution or protection of the environment or natural resources, including

without limitation, workplace health or safety; or any Release or threatened Release of Hazardous Materials, or the presence, handling, use, manufacture, distribution, treatment, storage, disposal, or recycling of or exposure to Hazardous Materials".

27.    Under Fairchild's May 24, 2002, proposal the scope of the "workplace health or safety" laws included in the definition of "Environmental Law" would have been limited to those "workplace health or safety" laws related to "pollution or protection of the environment or natural resources".

28.    Alcoa rejected Fairchild's second proposal to limit the scope of the "workplace health or safety" laws included in the Agreement's definition of "Environmental Law".

29.    Prior to the closing, Fairchild and Alcoa both had corporate EHS organizations that handled environmental as well as workplace health and safety issues, such as machine guarding.

30.    In September 2002, prior to the closing, Fairchild's EHS Director for the United States, Anthony Miremadi, delivered an "EHS Integration" presentation to several Alcoa representatives outlining Fairchild's "EHS Management Approach" and what Fairchild described as "Key EHS Initiatives and Issues".

31.    Mr. Miremadi was known as Fairchild's U.S. "Environmental, Health & Safety Director" well before the acquisition.

32.    Alcoa presented contemporaneous documentary evidence demonstrating that its personnel understood that the indemnity provision was to cover workplace health and safety issues such as machine guarding.

33.    Fairchild did not present any contemporaneous documentary evidence showing that its personnel considered items like machine guarding to be excluded from the indemnity.

34.    Shortly after the closing, Alcoa's Designated Representative to Fairchild, John Lease, sent Fairchild five letters identifying "EHS Non-Compliance Issues and Estimated Corrective Action Costs" at the St. Cosme, Toulouse, Torrance and Fullerton facilities.

35.    Those letters listed a variety of workplace health and safety issues for which Alcoa sought indemnification, including machine guarding, lockout tagout, fall protection and mobile equipment safety. The letters also included regulatory citations and descriptions of each item, along with a description of Alcoa's proposed response to the condition identified.

36.    Mr. Miller responded to each of Alcoa's letters by requesting more information, including "background documentation supporting the items and estimated costs summarized in the table".

37.    Mr. Miller did not respond that these workplace health and safety issues were not indemnifiable.

38.    Not until January 2005, did Fairchild reject Alcoa's machine guarding claims on the basis that its indemnification obligation was purportedly limited to claims that were somehow "environmental" in nature.

39.    The Acquisition Agreement provides that Fairchild will indemnify Alcoa for the cost of bringing the Fastener facilities into compliance with laws relating to "workplace health or safety" which is not limited to environmentally related claims and includes machine guarding, equipment safety, fall protection and similar issues.

## III. INVESTIGATIONS

40.    § 11.6(e)(iv) defines Fastener Environmental Liabilities to include "expenses of investigation incurred by a Buyer Indemnified Party after the Effective Time based on any

applicable Environmental Laws existing on the Closing Date in respect of any Fastener Environmental Condition".

41.    Investigations are indemnifiable under § 11.6 if there was a "reasonable basis" to conduct the investigation and they are commercially reasonable.

42.    In response to Alcoa's claims for indemnification of the Phase II investigation costs, Ernesto Beckford, Fairchild's Deputy General Counsel at the time of the transaction, sent a letter to Alcoa on December 1, 2003, stating that it "may be appropriate for Alcoa to seek reimbursement" for certain Phase II investigation costs.

43.    In order to address contamination, environmental professionals must first engage in investigations to identify and delineate the contamination.

44.    Investigations, including compliance and risk assessments, are a necessary part of the process of bringing machine safety measures into compliance.

45.    With the exceptions noted in the Award, the Phase II investigations and the post-Phase II investigations were performed in a commercially reasonable manner.

46.    With the exceptions noted in the Award, the Phase II results warranted further investigation at ten facilities, and those investigations were performed in a commercially reasonable manner.

(a)    Temple Avenue

47.    Prior to its sale to Alcoa, the Temple Avenue facility had already been the subject of extensive soil and groundwater investigations.  In light of those investigations, Fairchild began remediation of soil and groundwater at this facility.  With respect to soil contamination, Fairchild's consultant, Envirosolve, utilized SVE to remove contaminants. With respect to groundwater contamination, Envirosolve employed a "pump-and-treat"

system. These remedial steps were successful, which ERM noted in its Phase I when they "commented that the [SVE] system was essentially complete and the groundwater cleanup had reduced the highest concentrations of solvents in groundwater by 98 percent."

48.    In light of the success of the SVE system, in June of 2003, Envirosolve, the consultants who had worked with the facility for years, proposed to Alcoa a plan for proceeding to case closure with the regulators for an estimated cost of $33,700.

49.    Rather than pursue the Envirosolve plan, Alcoa accepted a proposal by its new consultants, Mission Geoscience, for extensive additional characterization of the site.

50.    Mission Geoscience's extensive re-investigations have resulted in no materially new findings at the Temple facility. As Mike Wolff testified, the Mission investigations "have added nothing to the basic knowledge of these sites from what was known prior to the investigations." For instance, one issue re-examined by Mission was the appropriate strategy for treating soil contamination at the facility. After a detailed and costly study, Mission concluded that SVE (the same system successfully employed by Fairchild) was the best method to use at the facility. At this point, Alcoa is engaged in a SVE and has not yet reached case closure with the regulators.

51.    Similarly, while Mission found localized "pockets" of residual soil contamination, Envirosolve's plan for case closure would have addressed this type of residual contamination at a significantly less cost.

52.    Mission's groundwater investigations at Temple were also unnecessary. The groundwater at Temple was fully characterized and undergoing remediation at the time of the Acquisition. Although Fairchild had not yet completed the remediation, the system in place had removed the vast majority of the contamination.

53.    Despite this, Alcoa had Mission re-investigate the condition of the groundwater. During these investigations, "Mission made some technical mistakes, that . . . led to incorrect conclusions about the groundwater condition which led to substantial cost being incurred." Mission obtained samples of groundwater using a technique known as "grab sampling," a technique that has been rejected by the Regional Water Quality Control Board for its lack of reliability. Mission also drilled a well to excessive depth in the aquifer, incurring additional costs as they encountered different geologic conditions. When Mission later sampled the groundwater "using proper protocols," "they found that the well was clean." Mission, however, continued pumping the clean well. In doing so, they risked spreading the contamination. In short, "all of these activities, . . . were the result of faulty sampling technique that led to erroneous conclusions regarding the depth of contamination within the groundwater and unnecessary expense."

54.    In all, Alcoa has incurred $546,133.18 in re-investigating and developing remedial action plans at the Temple Avenue site, a facility that had already been appropriately characterized and had plans in place. These re-investigations were unnecessary and done solely to characterize the sites more fully in connection with Alcoa's information-gathering efforts. As such, the are not subject to indemnification.

(b)    Closure of Temple Avenue Facility

55.    Alcoa is not entitled to indemnification for costs incurred relating to its post-Acquisition decision to close the Temple Avenue facility. The Agreement expressly provides that only non-compliances as of the closing can qualify as Fastener Environmental Conditions ("FECs"). Non-compliance situations arising post-Closing are solely Alcoa's responsibility.

56.    Prior to the Acquisition, Fairchild encountered an issue relating to the discharge of nitrates through its storm drain at Temple Avenue. Envirosolve, on Fairchild's behalf, re-routed the water through the plant so that it could be discharged through the sanitary sewer, the permit for which contained no limit on nitrates.

57.    The facility was in compliance with its permit on the date of the transfer of the facility to Alcoa in December 2002. Alcoa has introduced no evidence to the contrary.

58.    Alcoa decided to close the Temple Avenue plant shortly after the Acquisition.

59.    Upon the close of the plant, Alcoa could no longer discharge nitrates through the sewer since the applicable permit required the facility to be operational. Alcoa commissioned a study to look at alternative solutions for the discharge of nitrates and now seeks indemnification of $55,871.76 for that study. These costs, however, relate to Alcoa's post-Closing decision to shut the plant and do not relate to a non-compliance by the facility at the time of the Acquisition. Accordingly, these costs do not qualify as FELs.

(c)    Unruh

60.    Alcoa also seeks $90,620.48 for supplemental investigations at the Unruh facility. These investigations, however, were unnecessary.

61.    Alcoa's Phase I investigation at Unruh found that there was no history of solvent use at the facility. This conclusion is further supported by the absence of any filing by the facility with any regulatory body documenting solvent use, as is required.

62.    Nevertheless, ERM and then Mission Geoscience conducted invasive investigations into the soil and groundwater at the Unruh site after the Phase I investigation. ERM's Phase II investigation concluded that "the soil above the water table has not been

adversely impacted by [chlorinated solvents], petroleum hydrocarbons, or metals to levels that exceed regulatory soil cleanup goals."

63.    Despite this conclusion, Alcoa commissioned Mission Geoscience to investigate further the soil and groundwater conditions at the facility. Mission has since concluded that there is no need for remediation at the facility and that any contamination at the facility is likely from off-site sources.

64.    These investigations were neither necessary nor reasonable.

65.    Indeed, these investigations actually put the facility at risk for additional future expenses. The Unruh facility is located within what is known as the San Gabriel Superfund Site. Facilities in this area have been named as responsible parties for cleaning up the significant contamination in the region. The Unruh facility had not been named.

66.    By investigating the groundwater conditions at Unruh, Alcoa risked finding contamination that was not reasonably attributable to the site. It is difficult and expensive to extricate oneself from such a situation. Michael Hodge expressed this very concern regarding the Unruh facility to Alcoa prior to the Phase IIs.

67.    Alcoa ultimately concluded that there are no issues at the Unruh facility.

(d)    Fullerton

68.    Alcoa is also not entitled to indemnification for the $380,688 it spent on unnecessary investigations and related work at the Fullerton facility.

69.    In 1996 prior to Fairchild's acquisition of the Fullerton facility, SCS Engineers had characterized the soil at the plant and discovered contamination by chlorinated solvents. Kaynar Technologies, Inc., which then owned the site, reported this to the Orange County Health Care Association ("OCHCA"). SCS and Kaynar then developed a plan to use SVE to

remediate the soil. SVE is "one of the presumptive remedies that [the] EPA uses" to address chlorinated solvents.

70.    This plan was approved by the OCHCA in 1998. While the approval was conditioned upon successful "pilot testing," agencies regularly attach such conditions to approved remediation plans as a normal step in the remediation process.

71.    Fairchild was not aware of the proposed plan during its short ownership of the facility. In May of 2002, upon discovering the plan, Fairchild notified Alcoa of the plan. Fairchild also began the process of addressing the soil contamination. The documents associated with the plan were on file with the OCHCA. ERM's Phase I report, however, made no mention of the plan.

72.    Upon taking over the Fullerton facility, Alcoa elected to delay implementation of the approved remedial plan in order to complete its Phase II investigations. Alcoa made this decision in part so that it could delineate clearly which conditions were its own responsibility and which it would try to ascribe to Fairchild.

73.    Initially Fairchild was to manage the remediation efforts at Fullerton post-Acquisition. Despite ERM's recommendation, Alcoa never requested that Fairchild delay its remediation efforts at the facility. Instead, in January of 2003, Alcoa notified Fairchild that it would like to take over the project (as was Alcoa's right) but never informed Fairchild that it intended to delay the SVE system until after the Phase II investigations.

74.    Following the Phase II investigations, Alcoa engaged Mission Geoscience to conduct further soil investigations at the facility.

75.    The investigations conducted by Alcoa were essentially re-investigations of the work done by SCS. Mr. Wolff explained: "the site had been fully characterized both

laterally and vertically to the satisfaction of the agency in 1998. None of the subsequent soil sampling information refuted that or added to it." After its re-investigation, Alcoa determined that SVE is the appropriate approach for the soil at the facility. This is the same remedy proposed by SCS and approved by the regulators prior to the Acquisition.

76.     In addition to these soil investigations, ERM and Mission Geoscience also investigated the groundwater at the Fullerton facility. These investigations were also unnecessary.

77.     As part of its investigations in the late 1990's, SCS conducted a vadose zone leaching study to explore the possibility that solvent contamination had traveled through the soil into the groundwater. Using a "conservative" EPA-accepted model, SCS determined that the soil contamination could not have reached the groundwater. These conclusions are supported by the fact that the groundwater at Fullerton is deep, nearly 130 feet below the surface, and the discovery of soil contamination was no deeper than 80 feet.

78.     Nonetheless, Alcoa directed Mission to perform an expensive series of groundwater investigations. While these investigations did find some chlorinated solvents in the groundwater below the Fullerton site, Mission has concluded, as SCS did years before, that "these chemicals are likely to be part of a regional groundwater problem associated with nearby properties." This conclusion is consistent with the fact that, as has been well known for years, other properties "upgradient" to the Fullerton facility have had known spills into the groundwater of the same contaminants that Mission found beneath the Fullerton facility.

79.     In short, none of the investigations at the Fullerton facility were necessary. Moreover, by voluntarily digging into the groundwater, Alcoa increased the likelihood that the Fullerton facility will be dragged into regional problems in the area. The facility has, in

fact, been named in a regional lawsuit filed by regulators related to contamination by chlorinated solvents. Fairchild alone is funding the defense of that case.

(e)    Periodic Assessments

80.    Alcoa also seeks reimbursement for actions taken post-Closing that are required by regulation on a periodic basis.

81.    For example, Mr. Nugteren testified that French regulations require a noise survey at least once every five years. Alcoa conducted noise surveys at St. Cosme (Noise Emissions Analysis; $16,896.39 and Noise & Air IH Survey; $4,615.34); Montbrison (Noise Survey Corrective Action; $12,689.13); and Vougy (Noise Survey Corrective Action; $4,575.52).

82.    Mr. Nugteren also testified that the St. Cosme facility had to perform an air emissions analysis every year, and a sewer inspection at least once every five years. Alcoa incurred $13,789.74 in connection with an air emission analysis at the facility, and $10,915.93 in connection with a sewer inspection.

83.    Mr. Nugteren also testified that, under German law, electrical tools were required to be inspected yearly. Alcoa incurred $23,806 in connection with a third-party inspection of electrical equipment at Hildesheim, and $35,247 in connection with an electrical safety survey at Kelkheim.

84.    Similarly, the expenses associated with the employment at St. Cosme of a Hazardous Substances Transportation Advisor in 2004 ($4,971.10) would have been incurred regardless if such an advisor was employed in 2002. The same is true of the expenses incurred for the "Burden & Loading Tests for Lifts & Cranes" at St. Cosme ($11,594), which "must be performed every 6 months."

85.    Accordingly, Alcoa has incurred at least $139,101 in expenses that would have been borne by Alcoa irrespective of whether the facilities were in compliance with applicable regulations on the Closing Date or not.  These are not expenses incurred "in respect of a Fastener Environmental Condition."

(f)    Voluntary Compliance Assessments

86.    Alcoa has incurred at least $132,439 in connection with "compliance assessments" it voluntarily undertook at its European facilities that were not required by law. These voluntary assessments include:  Third-party Compliance Assessment at St. Cosme ($29,504.92); Complete Compliance Assessment at Montbrison ($60,464.59); Complete Compliance Assessment at Vougy ($4,575.52); and Third-party Risk Assessment at Hildesheim ($37,893.70).  Alcoa has not cited any law that would provide a basis for these voluntary assessments.

IV. COMPLIANCE AND REMEDIATION WORK

87.    Alcoa instructed its employees to address indemnifiable liabilities as though Alcoa would bear the costs.

88.    With the exceptions noted in the Award, Alcoa's experts systematically determined that Alcoa's corrective actions were performed in a commercially reasonable manner.

89.    With the exceptions noted in the Award, the environmental, health and safety compliance actions taken by Alcoa were performed to bring the facilities into compliance with applicable regulations at commercially reasonable costs.

(a)    Toulouse Parking Lot

90.    Upon completing its Phase I assessment at the Toulouse facility, ERM noted that the facility's operating permit required the addition of a second entrance to the parking lot. ERM also noted a plan for the expansion of the parking lot itself and landscaping. ERM described the addition of parking spaces as "not a strict EHS issue." The site had received a quote for the work at an estimated cost of $42,000. Alcoa estimated that the cost for this work would fall somewhere between $42,000 and $60,000.

91.    In addition to adding a number of parking spaces to the lot, Alcoa also installed both heavy and light traffic pavement, planted trees and engaged in other landscaping, and constructed gates, fences, new curbs and gutters. Ultimately Alcoa spent $583,733.78 (over ten times the original estimate) in upgrading the parking lot.

92.    None of the improvements to the parking lot were made pursuant to an Environmental Law or as part of a Remedial Action. The expansion of the parking lot was not an environmental issue. Further, the operating permit for Toulouse did not require the facility to add additional parking places or landscaping. Similarly, the expansion of the parking lot was not a requirement of the French Labor Code, which addresses worker health and safety.

93.    Rather, the expansion of the parking lot likely comes from the Urban Code. For administrative purposes, an operating permit integrates into a single document the legal requirements from the various different legal codes that are applicable to a particular facility. The Toulouse operating permit references the Urban Code. The Urban Code sets forth various land use and zoning requirements; local urban codes would include parking requirements for industrial sites to avoid traffic congestion in public areas and transfers the

cost of employee parking from the government to industry. The Urban Code itself is not an Environmental Law.

94.    Because the parking lot project was not done to comply with "Environmental Law," its costs do not qualify as FELs.

(b)    <u>Montbrison: Water Segregation</u>

95.    Alcoa unnecessarily spent $97,000 creating segregated stormwater and wastewater networks at Montbrison.

96.    The town of Montbrison does not have segregated networks for stormwater and wastewater. At the time of the Acquisition, the Montbrison facility, like the town in which it sits, expelled storm water and waste water through one network of pipes. Both types of water flowed from the facility into the community pipes.

97.    Following the Acquisition, Alcoa installed a segregated network at the facility. Because the town itself still does not have a segregated network, after the facility separates stormwater and wastewater, they are mixed together once discharged into the town's network.

98.    Rather than construct separate networks that serve no purpose, Alcoa could have obtained a waiver from the DRIRE.

(c)    <u>Degreaser at Montbrison</u>

99.    Similarly, Alcoa unnecessarily incurred $243,424.95 replacing the degreaser at the Montbrison facility.

100.    At the conclusion of its Phase I assessment, ERM recommended that Alcoa monitor the air emissions from the degreaser to ensure the machine was not emitting vapors

at a rate that exceeded the regulatory limits. If limits were exceeded, ERM recommended installing a treatment directly into the existing machine.

101. Alcoa nonetheless opted to replace the degreaser.

102. The Montbrison facility is not required under French law to have an operating permit; therefore no specific directive from the French government forced this action.

103. Moreover, Alcoa's actions were not necessary or reasonable as Alcoa could have followed ERM's recommendations and achieved an equally safe result.

104. John Lease made clear Alcoa's desire to cease using the TCE degreaser was not based on any desire to do the right thing, but to ensure that Alcoa was not pinned with a share of any cleanup costs.

(d)    Septic Tank at St. Cosme

105. Alcoa seeks indemnification for the $84,259.80 that it spent replacing the septic tank at the St. Cosme facility.

106. Alcoa's experts, Environ, cited the 2004 Operating Permit for the facility as the basis for this project. That permit was not in place at the time the facility was transferred and thus the requirements contained therein cannot lead to indemnifiable obligations for Fairchild.

(e)    Degreaser at St. Cosme

107. Alcoa incurred $315,517.53 replacing the degreaser at the St. Cosme facility.

108. Under a Ministerial Order, issued in February 1998, sites subject to "authorization" were required to replace TCE-containing equipment by October 31, 2005, or to submit a proposal demonstrating why replacement was not feasible. The Ministerial Order was incorporated into the facility's operating permit.

109.    The degreaser, however, was replaced as a result of a business decision made by Alcoa. Indeed, by the time the new operating permit, which incorporated the 1988 Ministerial Order, was issued to St. Cosme, the degreaser had already been replaced by Alcoa.

110.    Moreover, there is no evidence that Alcoa considered potential options to replacing the degreaser. For example, there was no evidence that Alcoa considered including replacing TCE with PCE, a substance that is not being phased out.

(f)    Soil Cleanup at Temple Avenue

111.    Fairchild could have pushed for a significantly less expensive approach to the soil issues at the Temple Avenue facility. Prior to the Closing, Fairchild and its consultant Envirosolve had been operating a soil vapor extraction system ("SVE") at Temple to address contamination in the soil there. The system had been highly successful. Accordingly, in 2003, Envirosolve developed a proposal to achieve case closure for these soil issues and submitted it to Alcoa. Envirosolve estimated the cost for this project at $33,700. Alcoa drafted a Project Approval Form for this proposal. However, without any notice to Fairchild, Alcoa rejected the proposal, fired Envirosolve, and turned to a new consultant, Mission Geoscience.

112.    Rather than pursue the Envirosolve plan, Mission submitted a proposal for extensive additional characterization of the site, a proposal Alcoa accepted. Alcoa now seeks $663,020, or approximately twenty times the cost of Envirosolve's proposal, for the additional work relating to soil contamination performed by Mission at the Temple Avenue site. Had Envirosolve's proposal been accepted and successful, the cost for closing out the soil issues at the Temple Avenue facility would have been significantly less – at most,

Fairchild's expert, Mr. Wolff, testified that the original $33,700 estimate would have doubled. The Environsolve proposal could have been successful, and, in fact, Mr. Wolff testified that he would have implemented it.

    (g)    <u>Projects That Exceeded Legal Requirements</u>

113.    Alcoa's expert, Environ, also identified three "whole projects" at St. Cosme that it concluded are not Fastener Environmental Liabilities because they exceed legal requirements. These projects for "Pedestrian and Forklifts Traffic Organization" ($25,541), "Smoking Area" ($7,359) and "Traffic Compliance" ($40,483) were approved by Alcoa for submission to Fairchild using its "Project Approval Form" process, but representatives from Environ testified that such projects went "beyond the strict requirements of the law" and, thus, are not FELs. Alcoa continues to seek reimbursement for such expenses and additional expenses incurred on these projects since Environ's report.

    (h)    <u>Vougy</u>

114.    Alcoa's own expert report notes that the "basis for action" for at least one project at the Vougy facility ($25,891) was "[p]artly applicable regulations" and "[p]artly application of Alcoa standards." There was no evidence to prove that was required apart from Alcoa standards.

## V. <u>FAIRCHILD'S RIGHT TO NOTICE AND PARTICIPATION</u>

115.    Fairchild owned and operated the Fastener facilities prior to their sale and had advance notice of many of the contamination and compliance issues in dispute.

116.    Alcoa provided Fairchild with the Phase I reports, Phase II Reports and other specific correspondence regarding the pre-acquisition condition of the former Fairchild

facilities. Those reports listed numerous problems, many of which Fairchild was already aware of.

117.    Through the provision of the Phase I reports, the original and revised Scopes of Work for the Phase II investigations, the Phase II reports and other correspondence, Alcoa provided Fairchild with specific advance notice of claims accounting for approximately 90 percent of the total expenditures for which Alcoa now seeks reimbursement.

118.    The original and revised Scopes of Work for the Phase II investigations set forth the plans for conducting investigations at the Fastener Facilities.

119.    Fairchild had the opportunity to comment on the Phase II Scopes of Work and met with Alcoa to discuss them.

120.    Subsequent to that meeting, Alcoa developed revised scopes of work, which it sent to Mr. Hodge at Fairchild. Alcoa's Mr. Lease informed Mr. Hodge: "Feel free to contact me with any questions regarding these revisions". Mr. Hodge received those revised scopes of work, but did not provide Alcoa with any comments.

121.    Fairchild had the opportunity to comment on the Phase II reports.

122.    Fairchild agreed that the Phase II reports identified the need for further action to address actual or threatened contamination at several of the Fastener facilities.

123.    In addition to the claims for which Alcoa provided Fairchild with specific advance notice in writing, the remaining approximately 10% of the expenditures for which Alcoa seeks indemnification consist largely of projects that Fairchild either itself initiated or was ordered by regulators to perform, or that were identical in nature to projects at other facilities for which Fairchild was given specific notice in writing.

124.   Fairchild rejected every single indemnification claim that Alcoa made against the reserve for environmental, health, safety and litigation under § 11.6(a).

125.   Fairchild has had every relevant document in Alcoa's possession concerning ongoing and future projects subject to the § 11.6(a) indemnity for more than six months, yet to this day Fairchild has provided no substantive comments on any of the projects Alcoa has conducted or plans to conduct.

126.   After the closing, Fairchild never sought to visit any of the Fastener facilities to evaluate what corrective actions should be taken, never sought to access documents maintained at the plant level, and never sought to speak with Alcoa personnel familiar with conditions at the facilities.

127.   Fairchild presented no evidence of quantifiable adverse effect due to any purported lack of opportunity to comment on Alcoa's proposed responses.

128.   Fairchild offered no evidence that Alcoa's consultants were not "reasonably acceptable", but rather attested to their good reputations.

## VI.   TAX CREDITS

129.   Alcoa offered no evidence to suggest that any basis existed for the disallowance of the transferred losses that were still subject to possible audit.

## VII.   ESCROW FUND

130.   Under the Agreement the only basis for "topping up" the escrow is from the Earn-Out payments due from Alcoa. No further Earn-Out payments are to be made. Therefore there is no basis for "topping up" the escrow.

## VIII.  PREJUDGMENT

131.  The request for prejudgment interest is denied as a matter of law and in the discretion of the arbitrator.

## IX.  FUTURE ENVIRONMENTAL LIABILITY COSTS

132.  The terms and effect of this Award relates only to the specific claims for Fastener Environmental Liabilities made by Alcoa in this proceeding through September 2006.

## X.  LITIGATION EXPENSE

133.  On March 19, 2007, Alcoa notified Fairchild that it had resolved a lawsuit, (36 Former Employees v. Mecaero) for € 424,483. The value of the claim in U.S. dollars as of March 19, 2007 was $564,477.49. The claim was identified in Schedule 3.16 of the Acquisition Agreement. Pursuant to §11.2(a)(iv) of the Agreement, it is applicable against the reserve for environmental, health, safety and litigation.

## XI.  DAMAGES

134.  Alcoa's spending on Fastener Environmental Liabilities totaled $16,732,416.92 through September 30, 2006.

135.  Alcoa has received subsidies of $346,953.00 from the French government.

136.  Alcoa's out-of-pocket expenditures on Fastener Environmental Liabilities total $16,385,463.92 through September 30, 2006.

137.    The Reserve Account is reduced to zero and Fairchild shall pay Alcoa from the Escrow Account the net total sum of $4,005,585.88 within thirty days of the date of this Award.

James F. Stapleton, Arbitrator
Day Pitney LLP
One Audubon Street
New Haven, CT 06511
Tele: (203) 752-5019
Fax:  (203) 752-5001

No.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

THE FAIRCHILD CORPORATION

Petitioner,

- against -

ALCOA, INC.

Respondent.

PETITION TO VACATE
ARBITRATION AWARD

CAHILL GORDON & REINDEL LLP

Attorneys for   Petitioner

Eighty Pine Street, New York, N. Y. 10005-1702
(212) 701-3000

All communications should be referred

to Adam Zurofsky, Esq.