## CPR INSTITUTE FOR DISPUTE RESOLUTION

THE FAIRCHILD CORP.,

        Claimant-Counter-Respondent,

  - v. -

ALCOA INC.

        Respondent-Counter-Claimant.

CPR File No. G-06-22H

## ALCOA INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Evan R. Chesler
Daniel Slifkin
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
(212) 474-1000

*Attorneys for Respondent-Counter-Claimant
Alcoa Inc.*

Table of Contents

Page

Table of Authorities ........................................................................................... iii

Preliminary Statement........................................................................................... 1

Background ........................................................................................................... 5

      The Phase I Investigations ........................................................................ 6

      The Acquisition Agreement...................................................................... 9

      The Phase II Investigations and Compliance Gap Assessments........... 13

      The Post-Phase II Remedial Investigations ........................................... 17

      The Compliance Gap Analyses and EHS Corrective Actions ............... 19

      The Arbitration Demand and Alcoa's Counterclaim ............................. 25

      Fairchild's Claim for an Indemnity Tax Credit ..................................... 26

Argument ........................................................................................................... 28

I.      THE ACQUISITION AGREEMENT IS UNAMBIGUOUS................................ 28

II.     THE COST OF INVESTIGATIONS INTO ENVIRONMENTAL
       CONTAMINATION AND THREATENED ENVIRONMENTAL
       CONTAMINATION IS SUBJECT TO INDEMNIFICATION UNDER
       SECTION 11.6 OF THE ACQUISITION AGREEMENT ................................... 30

III.    THE COST OF BRINGING THE FASTENER BUSINESS FACILITIES
       INTO COMPLIANCE WITH WORKPLACE HEALTH AND SAFETY
       LAWS, INCLUDING OSHA AND ITS STATE AND FOREIGN
       EQUIVALENTS, IS SUBJECT TO INDEMNIFICATION UNDER
       SECTION 11.6 OF THE ACQUISITION AGREEMENT ................................... 35

IV.   NOTICE AND AN OPPORTUNITY TO COMMENT ARE NOT
       CONDITIONS PRECEDENT TO INDEMNIFICATION UNDER THE
       TERMS OF THE ACQUISITION AGREEMENT ............................................. 39

          A.     Conditions Precedent Are Disfavored Under Delaware Law. .................. 41

          B.     The Acquisition Agreement Expressly Provides That Notice and
                Opportunity to Comment Are Not Conditions Precedent.......................... 43

Page

C.    Fairchild Has Never Commented on Alcoa's Actions, Sought to Discuss Claims or Sought to Visit the Fastener Business Facilities..........49

D.    Fairchild Cannot Produce Any Evidence That It Has Been Prejudiced in Any Measurable Way .........................................................51

V.    THE AMOUNTS OF ANY INDEMNITY TAX CREDITS UNDER SECTION 11.8 OF THE ACQUISITION AGREEMENT ARE THOSE SET FORTH IN THE FRENCH TAX REPORT OF BREDIN PRAT DATED OCTOBER 31, 2006 .............................................................54

Conclusion ....................................................................................................58

Table of Authorities

Page(s)

**Cases**

<u>AES Puerto Rico, L.P. v. Alstom Power, Inc.</u>, 429 F. Supp. 2d 713
(D. Del. 2006) ........................................................................................ 41, 43, 44, 49

<u>Barnard v. State</u>, 642 A.2d 808 (Del. Super. Ct. 1992) ..................................... 39

<u>City Investing Co. Liquidating Trust v. Cont'l Cas. Co.</u>, 624 A.2d 1191
(Del. 1993) ........................................................................................................ 29

<u>E. I. du Pont de Nemours & Co. v. Admiral Ins. Co.</u>, 711 A.2d 45 (Del.
Super. Ct. 1995) ............................................................................................... 29

<u>Elliott Assocs., L.P. v. Avatex Corp.</u>, 715 A.2d 843 (Del. 1998)........................ 34, 35, 48

<u>GB Biosciences Corp. v. Ishihara Sangyo Kaisha, Ltd.</u>, 270 F. Supp. 2d
476 (D. Del. 2003) ..................................................................................... passim

<u>Lank v. Moyed</u>, No. 251, 2006 WL 2901842 (Del. Oct. 12, 2006)................................... 29

<u>Manley v. Assocs. in Obstetrics and Gynecology, P.A.</u>, No. CIV. A. 00C-
049-JOH, 2001 WL 946489 (Del. Super. Ct. July 27, 2001)................................. 29, 41

<u>Pellaton v. Bank of New York</u>, 592 A.2d 473 (Del. 1991)................................. 28

<u>Seabreak Homeowners Ass'n, Inc. v. Gresser</u>, 517 A.2d 263 (Del. Ch.
1986) ......................................................................................................... 34, 48

<u>Sonitrol Holding Co. v. Marceau Investissements</u>, 607 A.2d 1177 (Del.
1992) ......................................................................................................... 34, 48

<u>Tamarind Resort Assocs. v. Gov't of the Virgin Islands</u>, 138 F.3d 107 (3d
Cir.1998) ..................................................................................................... 28

**Statutes & Rules**

29 C.F.R. § 1910.147 ................................................................................... 36

29 C.F.R. § 1910.212 ................................................................................... 36

29 U.S.C. § 651(b) ....................................................................................... 36

29 U.S.C. § 654(a) ....................................................................................... 36

Page(s)

**Other Authorities**

American Heritage Dictionary (4th ed. 2004) .................................................. 39

Bulletin Officiel des Impôts, BOI 4 H-5-04 No. 187, Dec. 7, 2004 ................................ 57

E. Allan Farnsworth, Farnsworth on Contracts (3d ed. 2004) .......................................... 38

Pursuant to Rules 9 and 10 of the CPR Rules for Non-Administered Arbitration and Scheduling Order #2 dated August 1, 2006, of the Hon. James F. Stapleton, Respondent-Counter-Claimant Alcoa Inc. ("Alcoa") submits this Motion for Partial Summary Judgment against The Fairchild Corp. ("Fairchild").

<u>Preliminary Statement</u>

This dispute arises out of Fairchild's refusal to honor certain indemnification provisions of a 2002 contract pursuant to which Fairchild sold the bulk of its aerospace business to Alcoa for more than $657 million in cash. Fairchild's actions have resulted in losses to Alcoa of approximately $8 million to date—and threaten to result in far greater future losses—as Fairchild has summarily rejected each of more than 200 separate indemnification claims brought by Alcoa under the terms of the contract. Fairchild has violated the plain language of the contract, which provides that Fairchild will reimburse Alcoa for the cost of investigating and cleaning up environmental contamination at the facilities Alcoa acquired—some of which date from the 1940s—as well as the cost of bringing those facilities into compliance with environmental and workplace health and safety laws in the jurisdictions in which they are located.

The extent of Fairchild's breach of contract is striking, in that Fairchild denies <u>any</u> indemnification obligation to Alcoa. Fairchild's position is that it owes Alcoa nothing for the cost of bringing its former facilities into compliance with environmental and workplace health and safety laws and for investigating and cleaning up environmental contamination at those facilities. At the same time, in both the contract and its contemporaneous filings with the Securities and Exchange Commission ("SEC"), Fairchild acknowledged that its pre-existing liabilities for such expenses totaled at least $8.45 million—an amount that Fairchild set aside in an accounting reserve it maintained

on its books.  Alcoa acquired that reserve as part of the transaction.  Fairchild also agreed in the contract to set aside an additional $25 million in an escrow account, to be used to reimburse Alcoa for expenses that exceeded the amount of Fairchild's reserve.  To this day, however, Fairchild has not only rejected <u>every single one</u> of Alcoa's claims against the escrow, but it has also rejected <u>every single one</u> of Alcoa's claims against the reserve. Fairchild has thus taken the remarkable position that Alcoa is not even entitled to the benefit of a reserve that Fairchild itself maintained on its books to cover liabilities that Fairchild itself acknowledged it owed.

At the same time, Fairchild cannot dispute the following three facts:

<u>First</u>, the soil and groundwater at several of Fairchild's former facilities in California and France were severely contaminated by chlorinated solvents that were used at the facilities in the decades before Alcoa acquired them.  It is undisputed that Fairchild was aware of that contamination at the time of the sale.  Indeed, Fairchild itself had been ordered by regulatory authorities to clean up several of the sites and remediation actions were underway at the time of the acquisition.  (<u>See</u> <u>infra</u> at 15-18, 33.)

<u>Second</u>, Fairchild's facilities did not comply with a wide variety of environmental and workplace health and safety laws at the time of the acquisition.  It is undisputed that Fairchild was aware of many, if not most of those noncompliance issues, and that Alcoa placed Fairchild on notice of many more in the months immediately following the sale.  For example, among the noncompliance issues that Fairchild knew about before the sale was the fact that its facility in Montbrison, France lacked a required operating permit; that employees at its facility in St. Cosme, France made false reports to regulators in an effort to hide noncompliance with applicable wastewater discharge

regulations; and that workers at several of its California facilities had lost fingers and even hands in the months and years leading up to the acquisition by using machines that were either noncompliant with applicable safety regulations or missing required safety devices altogether. (See infra at 20-23.)

Third, Fairchild has literally contracted away its ability voluntarily to fulfill its financial obligations to Alcoa. It is undisputed that, in May, 2006, Fairchild obtained a $30 million loan to be used for purposes of general working capital. (See Alcoa Ex. 12 at Item 1.01.) The loan is secured, in part, by Fairchild's interest in the proceeds of the escrow account it established for Alcoa. (Id.; see also Beckford Dep. 38:12-39:9.) The loan agreement provides that Fairchild will be in default if it settles any pending legal dispute for $2 million or more. (See Alcoa Ex. 12, Credit Agreement §§ 1.01, 8.01(g).) Accordingly, if Fairchild were to agree to reimburse Alcoa for even a small part of what it owes, its lender would immediately be entitled to require repayment of the $30 million Fairchild has borrowed. (Id. § 8.02.)

Those facts being indisputable, Fairchild has based its denial of Alcoa's indemnification claims on a reading of the Agreement that ignores both its plain language and basic principles of contract interpretation. Pursuant to that reading, Fairchild contends that: (1) it owes nothing for the cost of investigations into existing and threatened environmental contamination at its former facilities, even though the plain language of the contract provides that the cost of such investigations is indemnifiable, and even though Fairchild previously acknowledged its liability for at least a portion of that cost and even encouraged Alcoa to undertake certain of those investigations; (2) it owes nothing for the cost of bringing its former facilities into compliance with workplace

health and safety laws, even though that cost is indemnifiable under the plain language of the contract; and (3) it owes nothing for any corrective action for which it was not provided with what it, in its unilateral discretion, deems "adequate" notice or an opportunity to comment. This last contention is all the more remarkable in light of the fact that Fairchild now concedes that it had advance notice of most of Alcoa's actions but has never commented on a single one—except to deny indemnification—and the fact that the Acquisition Agreement specifically provides that neither notice nor an opportunity to comment are conditions precedent to indemnification.

For these reasons, Alcoa seeks a determination as a matter of law, prior to any hearing, that the contract: (1) requires that Fairchild indemnify Alcoa for the cost of investigating and cleaning up existing and threatened contamination at the sites Fairchild sold to Alcoa; (2) requires that Fairchild indemnify Alcoa for the cost of bringing the former Fairchild facilities into compliance with workplace health and safety laws; and (3) does not establish notice or an opportunity to comment as conditions precedent to indemnification.

A ruling in Alcoa's favor on those contract questions would substantially narrow the indemnification issues to be resolved in this arbitration. Such a ruling would allow the parties, at the hearing on the merits, to focus on the question of whether the actions for which Alcoa seeks indemnification were, as Alcoa intends to prove, in fact actions to bring the former Fairchild facilities into compliance with environmental and workplace health and safety laws or to investigate or clean up environmental contamination at those facilities—and what specific amounts Alcoa is due.

Finally, Alcoa also requests summary judgment on a separate tax-related provision of the contract, which Fairchild has invoked as a setoff to the payments it owes. Fairchild has come forward with no expert witness on the tax issue and no documentary evidence save a single three-paragraph letter, accompanied by an inconclusive two-page email chain and a two-page fax, notifying Alcoa of its tax claim. There are thus no factual issues in dispute and nothing to be tried. The only meaningful documentary evidence that is or can be in the record are the approximately 1,500 pages of tax returns and correspondence with the French Tax Authority that was produced by Alcoa, along with the unchallenged report of Alcoa's French tax expert (whom Fairchild has not even asked to depose). That report concludes that, although the amount of certain tax benefits recognized by Alcoa and potentially creditable against Fairchild's indemnification obligation is not disputed, those benefits remain subject to possible audit, and are thus not creditable to Fairchild <u>at this time</u>. Alcoa intends to comply with its obligation to credit Fairchild under Section 11.8 according to the rolling timetable set forth in its expert report. (<u>See</u> <u>infra</u> at 54-57.) Alcoa's evidence is unopposed and supports a ruling in its favor on this issue.

Background

The key facts underlying this arbitration are not in dispute. In early 2002, Alcoa engaged in negotiations with Fairchild concerning the acquisition of Fairchild's business devoted to the manufacture of aerospace fasteners (the "Fastener Business"), such as nuts, bolts, screws and other devices used in the construction of military and commercial aircraft. During the course of those negotiations, Alcoa and its advisors sought to engage in standard financial and environmental due diligence concerning the condition of the Fastener Business and of the manufacturing facilities it operated.

- 5 -

The Phase I Investigations

As part of its due diligence, Alcoa retained ERM Group, Inc. ("ERM"), a leading environmental consulting firm that had previously conducted work for both Alcoa and Fairchild, to perform "Phase I" environmental site assessments and limited compliance reviews (the "Phase I investigations") of 16 Fastener Business facilities in the United States, France, Germany, Hungary, Portugal, Australia and the United Kingdom.[1] The Phase I investigations had two components. First, they sought "to evaluate the potential for environmental impacts on the subject propert[ies] as a result of past or current activities on the property or surrounding properties", including any existing or threatened environmental contamination by toxic chemicals or other hazardous materials. (See, e.g., Alcoa Ex. 59 at FC 903.) Second, they sought "to evaluate the current compliance status of facility operations with federal, state, and local regulatory requirements, and [to] identify material instances of non-compliance" with both environmental and workplace health and safety regulations. (Id. at FC 904.) The Phase I investigations involved a review of documents and property records, as well as one-day site visits to each of the 16 Fastener Business facilities and interviews with Fairchild personnel. (Id. at FC 903-04.) During the site visits, ERM and Alcoa representatives were accompanied at all times by Fairchild representatives. (Hodge Dep. 42:9-44:11.) At the European sites, the Fairchild representatives included employees of URS, an

---

[1] B. Michael Hodge, Fairchild's in-house environmental counsel at the time of the acquisition, testified that ERM is "a well-known and respected environmental operation". (Hodge Dep. 154:25-155:7.) Mr. Hodge testified that Fairchild had previously retained ERM to conduct an environmental due diligence investigation of the Fastener Business facility in Montbrison, France at the time Fairchild acquired that facility. (Id. at 154:5-20.)

environmental consulting firm that was engaged by Fairchild to "shadow" the Alcoa representatives.  (See id.)

The Phase I investigations were conducted in May and June of 2002 and the resulting reports (the "Phase I reports") for each site were provided to Fairchild upon completion, long before the closing of the transaction.  (Id. at 44:13-21.)  Those reports, which were generally each 30 to 40 pages long, and occasionally much longer, identified instances of actual or potential non-compliance with a variety of environmental and workplace health and safety laws at each of the Fastener Business facilities.  For example, the Phase I report for the Montbrison, France facility comprised nearly 30 pages of text, plus accompanying tables, figures and other appendices.  (See Alcoa Ex. 46.) Among the noncompliance issues identified by the report were the facts that:  the facility appeared to lack an operating permit, it did "not have separate piping networks for rainwater, sanitary wastewater and industrial wastewater", it did "not perform any wastewater discharge monitoring", it did "not perform any air emission monitoring", including monitoring of volatile organic compounds discharged by a trichloroethylene ("TCE") degreasing machine, and it had not performed any noise monitoring to assess compliance with local regulations.  (Id. at FC 1893.)  The report indicated that the Montbrison facility would need to take a number of actions in order to come into compliance with the requirements of its permit (once it obtained one), including, among others, "separation of [rainwater and wastewater] networks, installing [a] closed loop cooling circuit, performing air and wastewater monitoring to check compliance and take appropriate actions, perform noise monitoring, etc."  (Id.)  It noted, among other things, that the facility's storage of hazardous and nonhazardous waste was not compliant with

French regulatory guidelines. (Id. at FC 1894.) It also noted that the facility's machines were not compliant with European Community safety regulations, and that a plan to bring the machines into compliance with those regulations—which are analogous to domestic regulations promulgated under the Occupational Safety and Health Act ("OSHA") —had not been completed by the end of 2001, as scheduled. (Id. at FC 1867, 1894.) It recommended that the machine safety plan "be completed and applied to ensure worker safety". (Id. at FC 1894.) Finally, the report identified a variety of property contamination issues, including potential oil leaks from aging underground storage tanks and from an uncoated concrete waste storage pit, and potential TCE contamination of the soil and groundwater. (Id.) The report indicated that previous investigations of the site, conducted by ERM for Fairchild in 1998 and 1999, had concluded that remediation of contamination by total petroleum hydrocarbons and chlorinated hydrocarbons was "very likely" required, but that no follow-up to that recommendation had ever occurred. (Id. at FC 1889-90.)[2] The report recommended a follow-up "Phase II" investigation of the soil and groundwater, along with a "risk analysis . . . to evaluate the risks to potential receptors". (Id. at FC 1894.)

Like the Montbrison report, the other Phase I reports identified a variety of environmental and health and safety noncompliance issues at each of the Fastener Business facilities. The Phase I reports for 14 of the facilities recommended follow-up Phase II investigations involving sampling of the soil and groundwater. It is undisputed that Fairchild received and reviewed the Phase I reports. The reports were reviewed by

---

[2] That was confirmed by Fairchild's former environmental counsel, Mr. Hodge. (See Hodge Dep. 153:5-154:4)

Mr. Hodge—Fairchild's former in-house environmental counsel—as well as by Anthony

Miremadi—Fairchild's former Director of Environmental, Health and Safety ("EHS")

compliance—and by other Fairchild employees at several of the Fastener Business

facilities. (Hodge Dep. 44:13-45:11; 51:1-52:16.) In at least some cases, Fairchild also

provided the reports to its consultants, including URS and Envirosolve, a small

environmental consulting firm located in southern California, for review. (Id. at 46:4-9;

50:3-15.) It is undisputed that Fairchild received at least some written "correspondence"

from its consultants concerning the Phase I reports, and that those written comments were

not provided to Alcoa. (Id. at 46:13-16, 47:20-21.)[3]

The Acquisition Agreement

      During the course of the negotiations with Fairchild, Alcoa asked

permission to perform follow-up "Phase II" investigations at the Fastener Business

facilities prior to the closing of the transaction. (See Hodge Dep. 55:18-56:4.) Phase II

investigations—which are generally invasive and may require sampling and testing of

soil, sediment and groundwater—are designed to identify and further define

environmental contamination that cannot be determined from simple visual inspections or

review of documentary records. (See Hodge Dep. 53:8-19.) The purpose of the proposed

investigations was to delineate further the nature and extent of any contamination at the

facilities, and to evaluate the scope of possible remediation work that might be required.

It is undisputed that Fairchild denied Alcoa's request. (See id. at 56:5-9; Lease Dep.

14:13-15:5.)

---

[3] Fairchild has invoked the attorney-client privilege to shield its consultants'
comments from Alcoa. (See Hodge Dep. 46:19-23.)

Instead, Alcoa and Fairchild agreed that Alcoa would assume an $8.45 million "reserve" for environmental and workplace health and safety liabilities that Fairchild maintained on its balance sheet prior to the transaction. That reserve, which was disclosed in Fairchild's SEC filings, reflected anticipated expenses for certain known environmental and workplace health and safety liabilities that Fairchild regarded as material to the company. (See Alcoa Ex. 19 at FC 4400; Alcoa Ex. 20 at 63; see also Flynn Dep. 104:20-109:2; Hodge Dep. 95:5-9.)[4]

Alcoa and Fairchild also agreed that, to the extent that Alcoa's actual environmental and workplace health and safety liabilities exceeded the amount of Fairchild's reserve, Fairchild would indemnify Alcoa against that excess. Toward this end, Alcoa and Fairchild agreed that Alcoa would set aside $25 million of the purchase price in an escrow account to pay for such liabilities, and that Fairchild would agree to cover any amounts over that $25 million from its own funds. Those agreements were reflected in the Acquisition Agreement the companies entered into on July 16, 2002, as amended on December 3, 2002 (the "Acquisition Agreement" or "the Agreement"), pursuant to which Alcoa paid more than $657 million in cash to acquire the major assets of the Fastener Business in the United States, as well as the stock of the Fastener Business's non-U.S. subsidiaries.

Section 11.6(a) of the Acquisition Agreement provides that Fairchild will "indemnify, defend and hold harmless [Alcoa] . . . from and against any and all Fastener

---

[4] Fairchild's former deputy general counsel, Ernesto Beckford, has testified that the Fairchild reserve was not intended to be exhaustive, but rather to reflect only those known liabilities that rose to a level of materiality for the corporation as a whole. (Beckford Dep. 31:21-32:17.)

Environmental Liabilities in excess of the amount of the reserve . . . ".  (Alcoa Ex. 1

§ 11.6(a) at FC 2808.)[5]  The Agreement defines "Fastener Environmental Liabilities" as:

> "[A]ll losses, damages, charges, liabilities, costs, expenses, deficiencies, fines, penalties, claims, demands, actions, suits or proceedings, including reasonable attorneys' and consultants' fees and expenses in connection therewith, and expenses of investigation incurred by [Alcoa] after the Effective Time based on any applicable Environmental Laws existing on the Closing Date in respect of any Fastener Environmental Condition . . . ."

(Id. § 11.6(e)(iv) at FC 2810.)[6]

There are two types of "Fastener Environmental Conditions" that are

relevant to this arbitration.  The first is "Environmental Contamination" or "threatened

Environmental Contamination".  The Agreement defines Environmental Contamination

as "the presence, whether known or unknown, of any Hazardous Materials in soils,

surface water, groundwater, sediments or other environmental media . . . ".  (Id.

§ 11.6(e)(ii) at FC 2809.)[7]  The Agreement provides that Fairchild will indemnify Alcoa

for:

> "(A)    Environmental Contamination or threatened Environmental Contamination arising out of any Release or threatened Release of Hazardous Materials arising out of the Fastener Business . . . that occurred on or prior to the Effective Time . . . [and]

---

[5] Section 1.10(b) of the Agreement provides that "the amount of the reserve for environmental, health, safety and litigation on the Closing Date Balance Sheet" is $8,450,000.  (Alcoa Ex. 1 § 1.10(b) at FC 2729.)

[6] Section 1.42 of the Agreement defines the "Effective Time" as "the close of business on the Closing Date", which was December 3, 2002.  (Alcoa Ex. 1 § 1.42 at FC 2732.)

[7] Section 3.24(g)(iii) defines "Hazardous Materials" as "any pollutant, contaminant, waste, substance, chemical or material, including, without limitation, petroleum or petroleum products, radioactive materials or friable asbestos, regulated or which can give rise to liability under applicable Environmental Law".  (Alcoa Ex. 1 § 3.24(g)(iii) at FC 2767.)

- 11 -

(B)    Environmental Contamination at or migrating from the Fastener
Business Assets prior to the Closing Date, whether or not such
Environmental Contamination came into existence as a result of the
Fastener Business . . . ".

(Id. § 11.6(e)(iii) at FC 2809.)

The second type of Fastener Environmental Condition that is relevant to

this arbitration is "any violation or alleged violation of, or noncompliance or alleged

noncompliance with, applicable Environmental Law with respect to the Fastener

Business that commenced prior to the Effective Time".  (Id. § 11.6(e)(iii)(C) at FC 2809.)

The Agreement defines "Environmental Law" to include:

"any Law of any Government entity, or any binding agreement with any
Government entity, relating to (a) pollution or protection of the
environment or natural resources, including, without limitation, those
relating to cleanup, preservation or reclamation thereof, any Release or
threatened Release of Hazardous Materials; or the presence, handling, use,
manufacture, distribution, treatment, storage, disposal, or recycling of or
exposure to Hazardous Materials, (b) workplace health or safety or (c)
exposure of persons or property to Hazardous Materials."

(Id. § 3.24(g)(ii) at FC 2767.)[8]  The Agreement notes that "with respect to

Environmental Contamination at a Fastener Business Asset, applicable Environmental

Law shall include the Remediation Standards in each relevant jurisdiction . . . ".  (Id.

§ 11.6(e)(iv) at FC 2810.)  The Agreement, in turn, defines "Remediation Standards" to

include not only "numerical or narrative standards . . . resulting from an enacted statute,

promulgated rule or regulation issued by a Government regulatory agency", but also

standards "developed on a case-by-case basis through a risk assessment or other

methodology . . . which are commercially reasonable for companies in the fastener

---

[8] The Agreement defines "Law" to include: "any order, writ, injunction, decree,
judgment, permit, license, ordinance, law, common law, statute, code, standard,
requirement, rule or regulation . . . ".  (Alcoa Ex. 1 § 3.5(iv) at FC 2755.)

- 12 -

industry and which are commercially reasonable for the use and given the location of the properties . . . ".  (Id. § 11.6(e)(vii) at FC 2811.)

The Agreement requires that Alcoa move expeditiously to address any Fastener Environmental Conditions it identifies.  Toward that end, the definition of Fastener Environmental Liability provides that:

> "to the extent [Alcoa] contributes to or exacerbates a Fastener Environmental Condition as a result of its actions or omissions, including, without limitation, its unreasonable failure to mitigate any violation or noncompliance with applicable Environmental Law, any material increase in losses, damages, charges, liabilities, costs or expenses resulting from said exacerbation or failure to mitigate shall not be a Fastener Environmental Liability".

(Id. § 11.6(e)(iv) at FC 2810.)

The Phase II Investigations and Compliance Gap Assessments

Alcoa provided Fairchild with ERM's written proposals, or "Scopes of Work", for the Phase II investigations in October 2002—before the December 3, 2002, closing date of the transaction.  (See Hodge Dep. 56:10-57:6.)  The Scope of Work proposals were prepared only for the 14 Fastener Business facilities at which the results of the Phase I investigations indicated that further investigation of Environmental Contamination or threatened Environmental Contamination was necessary.  (See Flanzenbaum Dep. 50:11-54:12.)

On November 8, 2002, Alcoa representatives met in Pittsburgh with Fairchild's Environmental Counsel, Michael Hodge, to discuss the Phase II Scope of Work proposals.  (See Hodge Dep. 208:15-209:10.)  At that meeting, Mr. Hodge indicated no substantive disagreement with ERM's Phase II investigation plans.  (See George Dep. 307:4-13.)  Following the closing of the transaction, ERM prepared slightly revised Scope of Work proposals for 10 of the 14 facilities.  (See Flanzenbaum Dep.

104:5-17.) The revisions to those Scope of Work proposals were provided to Fairchild by letter dated April 2, 2003. (See Alcoa Ex. 64.) It is undisputed that neither Mr. Hodge, nor any other Fairchild representative, ever provided written comments to Alcoa on the Scope of Work proposals or the revised Scope of Work proposals. (See Hodge Dep. 56:22-59:3; 208:15-212:9.)

Following the closing, ERM initiated the Phase II investigations in accordance with the Scopes of Work and the revised Scopes of Work that had been provided to Fairchild. Unlike the Phase I investigations, the Phase II investigations did not include a review of the facilities' compliance with health and safety laws and regulations. Instead, the Phase II investigations focused solely on Environmental Contamination and threatened Environmental Contamination, as defined in Section 11.6(e)(ii) of the Acquisition Agreement. (See Alcoa Ex. 1 § 11.6(e)(ii) at FC 2809; Flanzenbaum Dep. 149:24-150:6.) Moreover, the Phase II investigations were conducted only at the 14 Fastener Business Facilities at which there was reason to believe, based upon the Phase I investigations, that further investigation of Environmental Contamination or threatened Environmental Contamination was needed. (See Flanzenbaum Dep. 53:25-54:7.) The Phase II investigations thus went beyond the observations and assessments conducted in the Phase I investigations, and included invasive fieldwork such as soil borings, sampling of soil, gas and sediment, and the installation of groundwater monitoring wells. (See Hodge Dep. 53:8-54:17.)

In November 2003, Alcoa provided Fairchild with lengthy reports, prepared by ERM, detailing the results of the Phase II investigations. Pursuant to the Acquisition Agreement, Alcoa requested indemnification from Fairchild for the cost of

the Phase II investigations. (<u>See</u> Alcoa Ex. 4.) Fairchild responded in two letters, dated December 1, 2003 (Alcoa Ex. 5) and February 26, 2004 (Alcoa Ex. 2). In Fairchild's initial response, the company's then-Deputy General Counsel, Ernesto Beckford, indicated that, having reviewed the Phase II reports, Fairchild had concluded that the cost of preparing the "vast majority" of those reports was not indemnifiable because the reports did "not identify Fastener Environmental Conditions". (<u>See</u> Alcoa Ex. 5 at FC 52-53.) Mr. Beckford's letter quoted the Acquisition Agreement's definition of Fastener Environmental Condition—including the language concerning "threatened Environmental Contamination" and "alleged noncompliance" with Environmental Law— as well as its definition of Fastener Environmental Liability, including the language concerning coverage of "expenses of investigation". (<u>Id.</u>) Mr. Beckford then suggested, without analysis or elaboration, that only "[t]o the extent that a Phase II report identifies and relates to a Fastener Environmental Condition" might it be "appropriate for Alcoa to seek reimbursement for the pro-rated cost of such report (pro-rated specifically to the work that relates to the identified Fastener Environmental Condition)". (<u>Id.</u> at FC 53.)

Thereafter, in Fairchild's February 26, 2004, response, Mr. Beckford delineated where, in Fairchild's view, the Phase II investigations had found <u>actual contamination</u> and where they had not (as opposed to the Acquisition Agreement's definition of a Fastener Environmental Condition). (<u>See</u> Alcoa Ex. 2 at FC 292-96.) The letter conceded that for the Torrance and Fullerton, California sites, as well as for the Montbrison, Roques, St. Cosme and Vougy, France sites, the Phase II investigations had "identified some Fastener Environmental Conditions which may require further action under applicable environmental laws (including applicable remediation standards)". (<u>See</u>

- 15 -

id. at FC 295.) Mr. Beckford acknowledged that the Phase II investigations had also identified Fastener Environmental Conditions at the City of Industry - Temple Avenue site, but contended that those conditions had previously been known to Fairchild (again, with no explanation as to why that fact was relevant). (Id. at FC 294.) Mr. Beckford calculated that the total cost of the Phase II investigations that "could be subject to indemnification" was as much as $528,130.78, and requested that Alcoa "have the provider (ERM) rework the invoices to split out the costs for these facilities between the two categories (indemnifiable costs and non-indemnifiable costs)." (Id. at FC 296.)

Accompanying the February 26 letter from Mr. Beckford was a ten-page chart prepared by Fairchild's Mr. Hodge. (See id. at FC 297-306; see also Beckford Dep. 26:12-16; Hodge Dep. 214:2-215:7.) In a section of the chart labeled "comments", Mr. Hodge conveyed Fairchild's position that the results of the Phase II investigations warranted further investigations at six of the Fastener facilities: those in Torrance and Fullerton, California, as well as those in Montbrison, Roques, St. Cosme and Vougy, France. (See Alcoa Ex. 2 at FC 297-306; see also Hodge Dep. 215:8-219:16.) For example, Mr. Hodge noted that soil and groundwater samples from around the location of former underground storage tanks at the Torrance, California facility revealed the presence of contaminants, including "a significant amount of tetrachloroethylene (PCE) and some chromium" that "should be followed up". (See Alcoa Ex. 2 at FC 299.) He stated that groundwater samples from around a chemical waste storage area at Torrance revealed "[v]ery high levels of PCE" that required further investigation. (See id. at FC 300.) Similarly, he noted that at the Fullerton, California facility, "[s]oil samples under the former plating line showed the presence of significant levels of PCE, which would

- 16 -

justify further investigations to determine if remediation in this area is necessary". (<u>See</u> <u>id.</u>)

<u>The Post-Phase II Remedial Investigations</u>

Following Alcoa's receipt of Fairchild's February 26, 2004, letter, Alcoa's environmental consultants conducted further investigations of the Environmental Contamination and threatened Environmental Contamination identified in the Phase II reports—including those suggested by Fairchild's Mr. Hodge. Alcoa's designated representative for communications with Fairchild, John Lease, sent Fairchild periodic updates concerning those investigations, along with requests for indemnification accompanied by backup documents including investigative reports and communications with regulatory authorities. For example, by letter dated January 25, 2005, Mr. Lease transmitted to Fairchild reports summarizing the results of further investigations at the Fullerton and Torrance, California facilities. (<u>See</u> Alcoa Ex. 34.) With respect to the Fullerton facility, Mr. Lease noted that the investigations had, in fact, revealed "impacted soils in the former degreaser area and the former plating area which have PCE concentrations up to 17,000 ug/kg, which is significantly above the industrial soils preliminary remediation goals (PRG) established by [the United States Environmental Protection Agency ("USEPA")] for this compound". (<u>Id.</u> at FC 308.) Mr. Lease indicated that "[t]he scope of remedial activities at this location will be dependent upon the results of additional site investigative work coupled with the results of interactions with the [California Regional Water Quality Control Board ("CRWQCB")] on necessary measures. . . ". (<u>Id.</u>) With respect to the Torrance facility, Mr. Lease noted that Alcoa's investigations had identified a "significant chlorinated solvent groundwater plume . . . in addition to vadose zone impacts that are related to past operations at the site". (<u>Id.</u>) He

- 17 -

explained that Alcoa had found groundwater concentrations of tetrachloroethylene of 160,000 ug/l, compared with maximum allowable contaminant levels of 5 ug/l established by the USEPA. (Id.)  And he noted that Alcoa intended to "contact the [CRWQCB] shortly and recommend the installation of an interim groundwater capture system to stabilize the site conditions until a full investigation of the site and associated analysis of long term remedial options can be completed and approved . . . ".  (Id.)

Fairchild rejected all of Alcoa's claims for those investigations, without any substantive comment.  By letter dated February 25, 2005, Mr. Hodge's successor as Fairchild's Environmental Counsel, Susan Hall, contended that "the Fullerton facility had been fully characterized by June 2002", and that "[n]othing reported" by Alcoa's consultants was "fresh information".  (Alcoa Ex. 6 at FC 341.)  Similarly, Ms. Hall contended that, although Alcoa's investigations had revealed "signs of some environmental contamination" at the Torrance facility, "[u]nless and until Remedial Action commences, there is no basis for a claim under Section 11.6".  (Id.)

In a footnote to her February 25 letter, Ms. Hall also withdrew Mr. Beckford's offer to pay for a portion of Alcoa's Phase II investigations, and went on to reject claims for investigations of any sort.  (See id.)  She stated:

> "On further analysis, we have determined that . . . the $528,130.78 in costs incurred by Alcoa are not indemnifiable.  Such costs do not relate to a Fastener Environmental Condition; rather, they relate to Alcoa's 'kicking the tires.'  These are not Fastener Environmental Liabilities and we reject any attempt by Alcoa to apply these sums against the $8,[450],000 Environmental Reserve.  In short, all of Alcoa's claims for indemnification under Section 11.6 for environmental assessments . . . are rejected entirely."

(Id. at FC 340-41)  In explaining this rejection, Ms. Hall has testified that she disagreed with Mr. Beckford's suggestion that Fairchild was required by the Acquisition

- 18 -

Agreement to pay for those portions of the Phase II investigations that "identif[y] and relate[] to a Fastener Environmental Condition". (See Hall Dep. 47:15-49:20.) Instead, Ms. Hall testified, she understood the contract to provide that "[i]nvestigations that are undertaken prior to there being an established Environmental Condition are simply voluntarily undertaken investigations that are an ordinary business expense that Alcoa is incurring". (Id. at 50:12-16.) Ms. Hall testified that this understanding was based solely on her "reading of the contract" and not on anything other than the language of the Agreement. (See id. at 50:16-52:4; 58:15-59:3.)

The Compliance Gap Analyses and EHS Corrective Actions

In addition to the Phase I, Phase II and follow-on remedial investigations, which were conducted by ERM and other third-party consultants, in-house Alcoa employees conducted studies at each of the Fastener Business facilities immediately following the closing to identify instances of noncompliance with EHS regulations. (See Lease Dep. 77:9-20.) Alcoa referred to those studies, which were conducted as part of Alcoa's post-closing "Rapid Integration Process", as "Compliance Gap Analyses". (Jackson Dep. 115:10-21.) The Compliance Gap Analyses identified some of the Fastener Environmental Conditions for which Alcoa is seeking indemnification. Alcoa has not sought indemnification for the cost of any in-house studies themselves.

In early 2003, Alcoa provided Fairchild with written notice of the results of the Compliance Gap Analyses for a number of the Fastener Business facilities. For example, by letter dated March 4, 2003, Alcoa provided Fairchild with notice of certain Fastener Environmental Conditions involving noncompliance with environmental and workplace health and safety laws and regulations at the Fastener Business facility in St. Cosme, France. (See Alcoa Ex. 44.) By letter dated April 8, 2003, Alcoa provided

- 19 -

Fairchild with further information concerning the St. Cosme noncompliance issues

identified in the March 4 letter. (See Alcoa Ex. 43.) Included among the noncompliance

issues identified in the Alcoa letters were issues that had previously been identified in the

Phase I report for the St. Cosme facility and issues that were already known to Fairchild

through its operation of the facility. For example, the St. Cosme Phase I report had noted

that, according to information provided by Fairchild employees, only "70 percent of all

machinery on site complie[d] with French national machinery safety requirements".

(Alcoa Ex. 40 at FC 844.) The report noted that ERM had "observed a number of

machinery which are suspected not to be in full compliance with the machine guarding

requirements (such as metal stamping machines and presses)" and recommended "that a

full inspection of all the machines be conducted by an external qualified organization".

(See id.) Alcoa's April 8 letter notified Fairchild that, because "[a]n assessment of

machinery at the facility has identified the need to install machine guarding devices to

comply with provisions specified in the Labour Code (e.g., every machine that has a

turning part, hot surface or parts under power should be provided with adequate internal

safety systems and appropriate guarding)", Alcoa would "[c]onduct [a] machine guarding

survey and install required guards". (Alcoa Ex. 43 at FC 145.) Similarly, the Phase I

report had indicated that according to Fairchild employees, ambient air quality

monitoring for "maximum workplace concentrations" had not been checked "in the area

of the TCE degreasing and distillation units". (Alcoa Ex. 40 at FC 844.) The April 8th

letter notified Fairchild that Alcoa intended to achieve compliance with certain air

emissions limits by removing the TCE degreaser pursuant to a plan that had been

developed and provided to local authorities by Fairchild. (See Alcoa Ex. 43 at FC 145;

<u>see also</u> Hodge Dep. 137:2-138:14.) In addition, while the Phase I report noted that "the facility plans to install a new wastewater treatment plant since wastewater discharge volumes are close to their maximum discharge allowance" (Alcoa Ex. 40 at FC 843), the letter notified Fairchild that Alcoa intended to "[u]pgrade/replace [the] wastewater treatment plant" because, in fact, "[t]he facility wastewater discharge is routinely non-compliant with the numerical limitations for several parameters . . . in its Operating Permit which was issued in 1986". (Alcoa Ex. 43 at FC 145).[9] The Alcoa letters indicated that Alcoa's preliminary estimate for correcting some, but not all, of the identified conditions at St. Cosme was $5,140,000. (<u>See</u> Alcoa Ex. 44 at FC 170.)

Similarly, by letter dated June 13, 2003, Alcoa notified Fairchild of the results of the Compliance Gap Analysis for the Fastener Business facility located in Fullerton, California. (<u>See</u> Alcoa Ex. 65.) Like the St. Cosme letters, Alcoa's letter regarding Fullerton identified various Fastener Environmental Conditions involving noncompliance with environmental and workplace health and safety regulations, and included citations to specific regulations governing storm water discharges, hazardous waste, machine safety, entry into confined spaces, fall prevention, fire prevention, electrical safety and mobile equipment safety, among others. (<u>See</u> <u>id.</u> at FC 134-37.)

---

[9] The replacement of the wastewater treatment plant was a project for which Fairchild itself had obtained a cost estimate in early 2001, prior to the sale of the Fastener Business to Alcoa. (<u>See</u> Alcoa Ex. 41.) Indeed, employees of the St. Cosme facility had been instructed, while the facility was owned by Fairchild, to hide the wastewater treatment plant's noncompliance from French authorities by reporting false discharge numbers to regulators. (<u>See</u> Nugteren Dep. 232:23-234:25.) The Phase I report was based on interviews with those same Fairchild employees as well as on data provided by those employees before the closing of the transaction. Alcoa's Compliance Gap Analysis, by contrast, was based on information obtained by Alcoa after it acquired control of the plant.

The letter also notified Fairchild of Alcoa's planned corrective actions for the conditions identified and a preliminary cost estimate for those actions. (See id.)

For example, with respect to the Fullerton facility's noncompliance with regulations governing machine safety, the letter referenced federal and California OSHA provisions governing so-called "lockout-tagout" devices, designed to "disable machines or equipment to prevent unexpected energization, start-up or release of stored energy in order to prevent injury to employees". (Id. at FC 134.) The letter notified Fairchild that Alcoa intended to "[c]onduct a facility-wide review and survey to compile the necessary data and information to develop and document specific energy isolation procedures and space specific energy isolation and work permit conditions for safe entry into confined spaces". (Id.) Similarly, the letter cited several federal and state OSHA provisions specifying "requirements for guarding equipment such as abrasive grinding wheels, grinders, and mechanical power presses". (Id. at 135.) The letter notified Fairchild that Alcoa intended to "[c]onduct a hazard assessment of the equipment at the facility subject to the OSHA regulations on Machine Guarding" and to "[u]se the survey to develop equipment-specific machine guarding installations and procedures to comply with regulatory requirements". (Id.)

Fairchild responded to Alcoa's notice concerning Fullerton by letter dated June 27, 2003, from Fairchild General Counsel Donald Miller. (See Alcoa Ex. 66.) Mr. Miller made no substantive comment on Alcoa's proposals, but rather flatly denied Fairchild's liability for the claims identified by Alcoa and invoked Fairchild's rights under Section 11.7 of the Acquisition Agreement. (See id. at FC 97-98.) That section sets forth the procedures for dispute resolution, including mediation and arbitration. (See

Alcoa Ex. 1 § 11.7 at FC 2811-12.) That same day—barely six months after the acquisition had closed—Mr. Miller made a similar blanket invocation of the Agreement's mediation and arbitration provisions with respect to all of Alcoa's EHS noncompliance claims for the Torrance, California and Toulouse, France facilities via an identically worded form letter in which he changed only the name of the facility in the caption. (See Alcoa Exs. 3, 68.)

Fairchild went on to reject all of Alcoa's workplace health and safety claims, yet again offering no substantive comment on Alcoa's proposals—it just denied coverage. For example, by letter dated December 13, 2004, Alcoa notified Fairchild of actions to correct noncompliance with regulations governing lockout-tagout devices at nine Fastener Business facilities, including the Fullerton and St. Cosme sites. (See Alcoa Ex. 29.) In a table appended to that letter, Alcoa referenced the facilities' noncompliance with specific regulations under federal and state workplace health and safety laws in the United States, Germany and France. (See id. at FC 4080.) Alcoa's letter requested indemnification in the amount of $363,154 and provided supporting documentation for those costs. (See id. at 4078.) Similarly, by letter dated December 20, 2004, Alcoa notified Fairchild of corrective actions with respect to machine guarding noncompliance at eight Fastener Business facilities. (See Alcoa Ex. 27.) Alcoa's letter referenced, once again, the facilities' noncompliance with specific regulations under federal, state and foreign workplace health and safety laws, provided supporting documentation and requested indemnification in the amount of $729,114. (See id.)

Fairchild rejected those claims in their entirety. By letter dated December 23, 2004, Ms. Hall contended that Alcoa had "failed to demonstrate that

[lockout-tagout] requirements, presumably OSHA § 1910.147, qualify as Fastener Environmental Liabilities". (See Alcoa Ex. 30 at FC 203.) Similarly, by letter dated January 31, 2005, Ms. Hall stated that Alcoa had "failed to demonstrate that the guarding requirements of OSHA § 1910.212, or the State or foreign equivalents, are 'Fastener Environmental Liabilities' as defined in the Acquisition Agreement." (See Alcoa Ex. 28 at FC 4091.)[10] In testimony explaining her response, Ms. Hall has acknowledged that she neither read any of the foreign regulations cited in Alcoa's letters, nor consulted with any foreign attorneys or other experts about them. (See Hall Dep. 62:12-63:2; 69:4-70:5; 70:13-17.) Instead, Ms. Hall testified, her conclusions that Alcoa's machine guarding

---

[10] Ms. Hall's letters of December 23, 2004, and January 31, 2005, provided several additional reasons for rejecting Alcoa's claims, including that Alcoa had "produced no non-compliance citations issued by OSHA", had reported "no non-compliance matters in connection with its pre-acquisition due diligence", and had failed to provide prompt notice of its actions as required by § 11.6(d) of the Acquisition Agreement. (See Alcoa Ex. 30 at FC 203; Alcoa Ex. 28 at FC 4091-92.)

In its answer to Alcoa's Interrogatory No. 1, Fairchild stated that it "does not assert that an expense incurred by Alcoa qualifies for indemnification as a Fastener Environmental Liability only to the extent that the expense was incurred in response to a regulatory notice, non-compliance citation or other action by regulatory authorities". (See Claimant Fairchild's Objections and Answers to Respondent Alcoa's First Set of Interrogatories at 3, appended hereto.) In her deposition testimony, Ms. Hall elaborated that a regulatory non-compliance citation or violation notice "would have been an indicator or evidence that there was a potentially indemnifiable event, if you can get past the fact that—that a machine guarding—I mean a lock, tag and verify claim, in my reading of the contract, is not subject to indemnification under the plain language of the contract". (Hall Dep. 67:23-68:5.)

Ms. Hall further explained that she had been mistaken when she had previously contended that Alcoa failed to provide notice of its EHS noncompliance claims for several of the facilities. (See id. at 111:15-112:24.) Ms. Hall testified that, before writing the letters of December 23, 2004, and January 31, 2005, she had not reviewed the Phase I reports for the facilities referenced in Alcoa's letters. (See id. at 68:13-25.) Ms. Hall also testified that she had not seen Alcoa's earlier letters to Fairchild summarizing the results of Alcoa's Compliance Gap Analyses. (See id. at 71:12-72:22.) Those letters had been received by Fairchild before Ms. Hall was hired as its "Environmental Consulting Counsel" in September 2004. (See id. at 16:8-12.) Ms. Hall testified that, after rejecting Alcoa's claims, she at some point realized that "[w]e had been given notice that Alcoa believed that [for at least four of the facilities] Alcoa believed that they had EHS non-compliance issues". (See id. at 112:13-14.)

and lockout-tagout claims were not indemnifiable were based on her reading of the

Acquisition Agreement, and specifically of the definition of "Environmental Law"

contained in Section 3.24(g)(ii) of the Agreement. (See id. at 63:3-64:20.) She

explained:

> "The definition of Environmental Law embraces pollution and protection
> of the environment[] and releases[,] threatened releases of hazardous
> material, the presence of[,] handling, use, manufacture, distribution,
> treatment, storage, disposal or recycling of or exposure to hazardous
> materials. That is basically a summary of Subsection A. Subsection B is
> Workplace Health or Safety; [a]nd Subsection C is exposure of persons or
> property to hazardous materials. My evaluation of this language is that
> both B and C are subsets of A. And I read into this that Workplace Health
> and Safety has to relate in some way to an Environmental Workplace
> Health and Safety OSHA regulation."

(Id. at 64:6-20; see also id. at 66:10-19.)[11] Ms. Hall testified that her reading of the

Agreement's definition of "Environmental Law" was a primary consideration in her

rejection of Alcoa's claims for indemnification of the cost to correct EHS

noncompliance. (See, e.g., id. at 77:13-79:2, 111:20-112:5.)

The Arbitration Demand and Alcoa's Counterclaim

        As noted, Fairchild invoked the dispute resolution procedures contained in

Section 11.7 of the Acquisition Agreement for the first time in its correspondence with

Alcoa in June 2003—six months after the acquisition closed. (See, e.g., Alcoa Ex. 66.)

It was not until March 2005, however, that Fairchild formally requested that the parties

submit their dispute to mediation. The mediation was conducted before Robert

Mundheim, Esq. on July 13, 2005, and concluded without result. Thereafter, Fairchild

---

[11] Ms. Hall did not explain what she meant by an "Environmental Workplace Health
and Safety OSHA regulation". In fact, she conceded that she had no experience with
health and safety regulations, had never dealt with OSHA and did not recall ever reading
any OSHA regulations prior to receiving Alcoa's indemnification notices. (See Hall Dep.
31:7-22; 61:13-23.)

notified Alcoa by letter dated July 20, 2005, that it intended to exercise its right under Section 11.7 to proceed to binding arbitration. (See Letter of S. Hall dated 7/20/05, appended hereto.) Specifically, Fairchild indicated that "[t]he general nature of this dispute concerns Alcoa's claims for indemnification under Section 11.6 of the Amended Agreement for alleged Fastener Environmental Liabilities . . . ". (Id.) Fairchild asked for a declaration that "Alcoa has failed to demonstrate that Fairchild is required to indemnify Alcoa for its alleged Fastener Environmental Liabilities under Section 11.6 of the Agreement". (Id.) Fairchild's invocation of Section 11.7 applied without exception to every penny of every indemnification claim Alcoa has ever made under Section 11.6. Indeed, to this date, Fairchild has not acknowledged that even a single one of Alcoa's more than 200 separate claims for indemnification is even partially indemnifiable under the terms of the Acquisition Agreement.

By letter dated August 5, 2005, Alcoa notified Fairchild of its defense and counterclaim. (See Letter of D. Slifkin dated 8/5/05, appended hereto.) In its counterclaim, Alcoa sought payment from Fairchild for costs that Alcoa had incurred through May 2005 for Environmental Liabilities in excess of the $8.45 million reserve, as well as "a declaration that under the terms of the Acquisition Agreement, it is entitled to indemnification from Fairchild for any additional documented costs that Alcoa incurs for Environmental Liabilities". (Id.)

Fairchild's Claim for an Indemnity Tax Credit

Following the start of this arbitration, Fairchild notified Alcoa, on May 10, 2006, that "[i]n the event of any award by the arbitrator to Alcoa", Fairchild would seek "to offset such award" by a "credit of 767,536 Euros" to which Fairchild contended it was entitled under Section 11.8 of the Acquisition Agreement. (See Alcoa Ex. 11 at FC

- 26 -

452.) Section 11.8 of the Agreement provides, in relevant part, that Fairchild's indemnification obligations under Section 11.6

> ". . . shall be credited by the net cumulative amount of (i) any Tax Benefits recognized by [Alcoa] resulting from the actual utilization in any Tax period beginning after the Closing Date by [Alcoa] of any French . . . net operating loss of a Transferred Fastener Subsidiary organized in France . . . that [Alcoa] carr[ies] forward from a Tax period ending on or before the Closing Date and that may no longer be subject to possible disallowance by any French . . . Taxing authority minus (ii) any such Tax Benefit amounts that have previously been used to reduce any of [Fairchild's] indemnification obligations".

(Alcoa Ex. 1 § 11.8 at FC 2812.)

Alcoa has produced to Fairchild approximately 1,500 pages of relevant tax-related documents, including correspondence with the French Tax Authority and multiple years of tax returns for multiple Alcoa subsidiaries showing the amounts of the tax benefits Alcoa has recognized in the years following the acquisition based on net operating losses previously recorded by Fairchild. Those documents have also been analyzed by tax experts from the French law firm Bredin Prat, who have confirmed the amounts of the tax benefits and concluded that those amounts remain subject to possible audit and disallowance under the applicable French laws. Alcoa produced Bredin Prat's written report to Fairchild on October 31, 2006. (See French Tax Report of Bredin Prat dated 10/31/06, appended hereto.) The report indicates that, in Bredin Prat's expert opinion—and assuming that there are no intervening disallowances—the amount of the indemnity tax credits applicable under Section 11.8 of the Acquisition Agreement will be €200,081 as of January 1, 2007, an additional €545,802 as of January 1, 2008, and an additional €146,336 as of January 1, 2009. (See id. at 9.) Beyond its letter of May 10, 2006, and a four-page enclosure accompanying that letter, Fairchild has introduced no

- 27 -

documentary evidence and no expert witnesses on the tax issue. Accordingly, there is no triable dispute on this topic.

<u>Argument</u>

I.    THE ACQUISITION AGREEMENT IS UNAMBIGUOUS

The Acquisition Agreement at issue in this arbitration was the product of an arms-length negotiation between sophisticated parties represented by well-known counsel. That negotiation, which lasted several months, produced a lengthy and detailed contract containing all the terms and provisions that are standard in such agreements, including an integration clause providing that the contract embodies "the entire agreement and understanding of the parties . . . in respect of the transactions contemplated". (Alcoa Ex. 1 § 10.11 at FC 2802.) The clause continues: "There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein or therein. This Agreement supersedes all prior agreements and understandings between the parties with respect to such transactions." (<u>Id.</u>) The Acquisition Agreement, which is clear and unambiguous on its face, can be construed within this arbitration as a matter of law.

"[D]isputes involving the interpretation of unambiguous contracts are resolvable as a matter of law, and are, therefore, appropriate cases for summary judgment." <u>GB Biosciences Corp. v. Ishihara Sangyo Kaisha, Ltd.</u>, 270 F. Supp. 2d 476, 481 (D. Del. 2003) (quoting <u>Tamarind Resort Assocs. v. Gov't of the Virgin Islands</u>, 138 F.3d 107, 110 (3d Cir. 1998) (internal quotation marks omitted)); <u>see also</u> <u>Pellaton v. Bank of New York</u>, 592 A.2d 473, 478 (Del. 1991). The Acquisition Agreement at issue here provides that it shall be governed by Delaware law "as to all matters". (Alcoa Ex. 1 § 10.8 at FC 2802.) Under Delaware law, where contract language is clear and

- 28 -

unambiguous, that language should be given its plain meaning.  See Lank v. Moyed,

No. 251, 2006 WL 2901842, at *3 (Del. Oct. 12, 2006); see also GB Biosciences, 270

F. Supp. 2d at 481 ("Unambiguous contract language must be construed in accordance

with how it would be understood by an objective reasonable third party.") (internal

quotation marks omitted); E. I. du Pont de Nemours & Co. v. Admiral Ins. Co., 711 A.2d

45, 56 (Del. Super. Ct. 1995) (quoting City Investing Co. Liquidating Trust v. Cont'l Cas.

Co., 624 A.2d 1191, 1198 (Del. 1993) ("'If a writing is plain and clear on its face, i.e., its

language conveys an unmistakable meaning, the writing itself is the sole source for

gaining an understanding of intent.'") (emphasis omitted)).

　　　"Contractual language is not ambiguous merely because parties in

litigation disagree concerning the provision's proper construction." E.I. du Pont, 711

A.2d at 57.  "A contract is ambiguous only when the provisions in controversy are

reasonably or fairly susceptible of different interpretations or may have two or more

different meanings.  The true test is . . . what a reasonable person in the same position of

the parties would have thought it meant." Manley v. Assocs. in Obstetrics and

Gynecology, P.A., No. CIV. A. 00C-049-JOH, 2001 WL 946489, at *4 (Del. Super. Ct.

July 27, 2001).  Here, although Alcoa and Fairchild disagree as to the proper construction

of several provisions of the Acquisition Agreement, there is no dispute that the

Agreement is unambiguous and may be construed simply by reference to its plain

language.  That is exactly how Fairchild's witnesses—all of them attorneys—have

testified they determined what the contract meant.  None of Fairchild's witnesses has

suggested that their understanding of the contract depended on any specialized

knowledge concerning terms of art or the negotiation history of the Agreement.  Indeed,

none of those witnesses has suggested that there is anything ambiguous about any aspect of the Agreement. To the contrary, Fairchild's witnesses have repeatedly testified that the Agreement is clear and may be understood simply by reading its plain language. For example, Fairchild's former deputy general counsel, Ernesto Beckford, testified that his understanding of the Agreement's notice provisions was based on nothing outside the four corners of the contract. (See Beckford Dep. 47:10-24.) Mr. Beckford stated at <u>three</u> separate points during his deposition—using precisely the same words each time—that "[t]he Agreement speaks for itself". (<u>Id.</u> at 46:10-11; 47:24; 61:9-10.) Similarly, Fairchild's former Chief Financial Officer, John Flynn, testified—using the exact same words—that "[t]he Agreement speaks for itself". (Flynn Dep. 159:24). And Fairchild's current Environmental Consulting Counsel, Susan Hall, testified that she formed her understanding of the contract simply by reading it. (Hall Dep. 51:16-52:4.) Because the terms of the Acquisition Agreement are unambiguous, Alcoa submits that the meaning of those terms may be resolved by reference to the language of the contract itself, as understood by an objective reasonable third party.

II.    THE COST OF INVESTIGATIONS INTO ENVIRONMENTAL CONTAMINATION AND THREATENED ENVIRONMENTAL CONTAMINATION IS SUBJECT TO INDEMNIFICATION UNDER SECTION 11.6 OF THE ACQUISITION AGREEMENT

There is no dispute that chlorinated solvents and other Hazardous Materials were used by the Fastener Business in large quantities over a period of decades. There is also no dispute that some of the Fastener Business facilities have been in continuous operation since the 1940s. There can, therefore, be no serious dispute that, by virtue of the age of the facilities and the use and presence of contaminants at those facilities, the threat of Environmental Contamination existed at the facilities Alcoa

acquired from Fairchild. Alcoa's Phase I investigations revealed numerous instances of threatened contamination, and Alcoa's Phase II and subsequent investigations in many cases confirmed the presence of actual contamination.

Among the items for which Alcoa has sought indemnification from Fairchild is the cost of its post-Phase I investigations into Environmental Contamination and threatened Environmental Contamination at the Fastener Business facilities. Alcoa has not sought indemnification for the Phase I investigations themselves. It is undisputed that the reports of those Phase I investigations, which were provided to Fairchild well before the closing of the transaction, identified instances of actual and threatened Environmental Contamination by chlorinated solvents and other Hazardous Materials. It is also undisputed that Alcoa's subsequent remedial investigations, including the Phase II investigations, were targeted to validate and delineate the Environmental Contamination, whether actual or threatened, that was identified either in the Phase I investigations or in the follow-on studies. Indeed, it is undisputed that Alcoa only performed Phase II investigations at 14 of the 16 Fastener Business facilities because two of the Phase I investigations—at the Nemesvamos, Hungary and Simi Valley, California facilities—did not identify sufficient actual or threatened Environmental Contamination to warrant further study. Similarly, Alcoa only pursued post-Phase II investigations at those facilities where the Phase II investigations provided a basis for further review.

By its plain language, the Acquisition Agreement makes clear that the cost of such investigations into Environmental Contamination and threatened Environmental Contamination is indemnifiable as a Fastener Environmental Liability. The Agreement's definition of Fastener Environmental Liability includes the "expenses of investigation . . .

in respect of any Fastener Environmental Condition". (Alcoa Ex. 1 § 11.6(e)(iv) at FC 2810.) The definition of Fastener Environmental Condition includes not only Environmental Contamination at the Fastener Business facilities, but also "threatened Environmental Contamination". (Id. § 11.6(e)(iii) at FC 2809.) And the definition of Environmental Contamination includes "the presence, whether known or unknown, of any Hazardous Materials in soils, surface water, groundwater, sediments or other environmental media". (Id. § 11.6(e)(ii) at FC 2809.) If Alcoa's investigation of threatened Environmental Contamination at a Fastener Business facility does not reveal an actual Release of Hazardous Materials, the investigation is itself still a Fastener Environmental Liability and is still subject to indemnification.[12] Nothing in the Agreement suggests otherwise.

---

[12] It is also undisputed that there have been actual Releases of Hazardous Materials at the Fastener Business facilities, as, for example, Fairchild acknowledged in its report to its auditors shortly before the sale of the Fastener Business closed, and again in a schedule of disclosed "Environmental Matters" that was appended to the Acquisition Agreement (See, e.g., Alcoa Ex. 42 at FC 3563-66 (noting "PCED contamination in the soil" at Fairchild's Fullerton, California facility, "the presence of very high levels of VOC contamination" in the soil and groundwater at its City of Industry - Temple Avenue facility, and "cadmium contamination" in the soil at its Saint Cosme, France facility); Alcoa Ex. 21 at FC 23-24 (noting possible fuel leakage from underground oil storage tanks at the Montbrison, France facility and "surface soil staining in the area used to store waste oil drums and metal shavings"); see also Hodge Dep. 190:12-192:5.) The cost of investigating and cleaning up or containing such actual Releases pursuant to Remediation Standards that are commercially reasonable for companies in the fastener industry is plainly covered by the Agreement. (See Alcoa Ex. 1 § 11.6(e) at FC 2809-11.) Moreover, the Agreement's definition of Remedial Actions—the cost of which is also included in the definition of Fastener Environmental Liability (id. § 11.6(e)(iv) at FC 2810)—includes not just "actions required by any Government entity: (i) to clean up, remove, treat, abate or in any other way address any Hazardous Materials in the environment; [and] (ii) to prevent the Release or threat of Release or minimize the further Release of any Hazardous Materials", but also "studies and investigations in connection with, or as a precondition to, clause (i) or (ii) above". (Id. § 11.6(e)(vi) at FC 2810-11.) However, the Agreement is not limited to covering only investigations of actual Releases and actual Environmental Contamination, or those that are required by government regulators, but also extends coverage to the cost of investigating threatened Releases and threatened Environmental Contamination. (See id. § 11.6(e)(iii) at FC 2809-10.)

Moreover, Fairchild's own report to its auditors—prepared after Fairchild received the Phase I reports but before the Phase II investigations were conducted—confirms that Fairchild was aware of such threatened contamination. (See, e.g., Alcoa Ex. 42.) That report, for example, notes that at one of the two plants constituting the Fullerton facility—where Fairchild planned to remediate "PCED contamination in the soil" at a projected cost of up to $300,000—Alcoa's Phase I investigation "raised several potential contamination issues", including "the possibility of further soil contamination, particularly beneath the older plating lines within the facility". (Id. at FC 3563.) The report states: "A Phase II assessment has not been conducted to determine whether such contamination in fact exists at levels which would require remediation." (Id.) The report notes that at the other Fullerton plant, the Alcoa Phase I investigation had also "raised the possibility of solvent contamination in the soil" and that "[f]urther sampling of the site would be necessary in order to determine if any such contaminants in fact presented a current threat to the environment". (Id. at FC 3564.) Similarly, the Fairchild letter notes that at the Stoughton, Massachusetts facility, Alcoa's Phase I report "noted the possibility that some contamination may have entered the environment as a result of discharges into the septic system from former operations at this site". (Id.) The letter continues: "A Phase II assessment has not been conducted to determine whether such contamination in fact exists or is at levels which would require remediation. Consequently, at this time, it is impossible to determine the range of liability, if any, which Fairchild Fasteners may have for this matter." (Id.)

As Fairchild itself acknowledges, the post-Phase I remedial investigations were pursued in response to threatened Environmental Contamination that Alcoa first

identified in its Phase I investigations.  Moreover, as previously noted, Alcoa has sought indemnification only for remedial investigations, such as the Phase II investigations, that it undertook when "threatened Environmental Contamination" existed, as documented by prior investigations.

To read the Agreement as providing indemnification only for that portion of an investigation that reveals <u>actual</u> Environmental Contamination—as Fairchild initially contended—or to exclude coverage of "[i]nvestigations that are undertaken prior to there being an established Environmental Condition", as Ms. Hall suggested in her deposition testimony (Hall Dep. 50:12-17), is contrary to the plain language of the Agreement.  Fairchild's reading of the contract would simply cross out the contractual language concerning "threatened Environmental Contamination" and "threatened Releases" and would apply indemnification coverage only to actions taken in response to findings of actual contamination.  That is not what the contract says.

Fairchild's proposed reading ignores the fundamental principle of contract law that "a contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless".  <u>Sonitrol Holding Co. v. Marceau Investissements</u>, 607 A.2d 1177, 1183 (Del. 1992); <u>see also</u> <u>Elliott Assocs., L.P. v. Avatex Corp.</u>, 715 A.2d 843, 854 (Del. 1998) ("It is well established that a court interpreting any contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument."); <u>Seabreak Homeowners Ass'n, Inc. v. Gresser,</u> 517 A.2d 263, 269 (Del. Ch. 1986) ("[A] contract must be construed as a whole, giving effect to all of its provisions and avoiding a construction which would render any of those provisions illusory or meaningless").  The

Acquisition Agreement's explicit references to "threatened Environmental Contamination" and "threatened Releases" "cannot be ignored or wished away as surplusage" as Fairchild proposes. See Elliott Assocs., 715 A.2d at 854. Those provisions plainly provide for the indemnification of the Phase II and subsequent remedial investigations Alcoa undertook, regardless of whether those studies confirmed the existence of the threats they were undertaken to investigate.

III.   THE COST OF BRINGING THE FASTENER BUSINESS FACILITIES INTO COMPLIANCE WITH WORKPLACE HEALTH AND SAFETY LAWS, INCLUDING OSHA AND ITS STATE AND FOREIGN EQUIVALENTS, IS SUBJECT TO INDEMNIFICATION UNDER SECTION 11.6 OF THE ACQUISITION AGREEMENT

The Agreement's plain language also makes clear that the cost of bringing the Fastener Business facilities into compliance with workplace health and safety laws, such as OSHA and its state and foreign equivalents, is subject to indemnification. Under the Agreement, a "Fastener Environmental Condition" includes "any violation or alleged violation of, or noncompliance or alleged noncompliance with, applicable Environmental Law". (Alcoa Ex. 1 § 11.6 (e)(iii)(C) at FC 2809.)

The definition of "Environmental Law" contained in Section 3.24(g)(ii) of the Agreement includes "any Law of any Government entity, or any binding agreement with any Government entity, relating to" three separate subjects, each of which is described in its own subsection. (Id. § 3.24(g)(ii) at FC 2767.)[13] Section (a) covers Laws relating to "pollution or protection of the environment or natural resources, including,

_____

[13]   As noted, the Agreement's definition of "Law" is similarly broad, encompassing "any order, writ, injunction, decree, judgment, permit, license, ordinance, law, common law, statute, code, standard, requirement, rule or regulation . . ." applicable to the Fastener Business. (Alcoa Ex. 1 § 3.5(iv) at FC 2755.)

- 35 -

without limitation, those relating to cleanup, preservation or reclamation thereof, any Release or threatened Release of Hazardous Materials; or the presence, handling, use, manufacture, distribution, treatment, storage, disposal, or recycling of or exposure to Hazardous Materials". (Id.) Section (b) covers Laws relating to "workplace health or safety". (Id.) And Section (c) covers Laws relating to "exposure of persons or property to Hazardous Materials". (Id.) Alcoa seeks a determination, as a matter of law, that the plain language of the Agreement provides for the indemnification of actions taken to bring the Fastener Business facilities into compliance with workplace health or safety Laws such as OSHA and its state and foreign equivalents.

The Occupational Safety and Health Act of 1970 ("OSHA") was enacted by the U.S. Congress "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). OSHA includes a broad "general duty" clause that obligates every employer to "furnish to each of [its] employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to [its] employees" as well as to "comply with occupational safety and health standards promulgated under [the Act]". Id. § 654(a). Pursuant to the Act, the Occupational Safety and Health Administration has promulgated very specific federal workplace safety regulations, including requirements for machine safety such as lockout-tagout and machine guarding. See, e.g., 29 C.F.R. §§ 1910.147, 1910.212. In addition, both the State of California and foreign jurisdictions such as France and Germany have comparable workplace health and safety regulations. (See, e.g., Alcoa Ex. 56 at FAIR 50022426 (referring to "CalOSHA regulations . . . dealing with 'Mechanical Punch

Presses'"); see also Hodge Dep. 15:17-16:2, 75:12-21; Jackson Dep. 71:21-72:24.) Those federal, state and foreign regulations are "Environmental Laws" under the plain terms of the Agreement, and noncompliance with those Environmental Laws constitutes a Fastener Environmental Condition.

Fairchild's contention, as elaborated in the testimony of Ms. Hall, that workplace health and safety laws are not indemnifiable under the terms of the Agreement violates basic principles of contract interpretation. Ms. Hall testified that she construed Section (b) of the definition of Environmental Law—which refers to "workplace health or safety" Laws—as a "subset" of Section (a) of that definition, which refers to Laws relating to "pollution or protection of the environment or natural resources". (Hall Dep. 64:16-17.) On that basis, she testified, she "read into" the Agreement "that Workplace Health and Safety has to relate in some way to an Environmental Workplace Health and Safety OSHA regulation." (Id. at 64:17-20.)

As an initial matter, it is not clear what Ms. Hall means when she refers to "Environmental Workplace Health and Safety OSHA regulation[s]". As previously noted, Ms. Hall specifically testified that she had no experience with health and safety regulations, that she had never dealt with OSHA, and that the first time she specifically recalled reading an OSHA regulation was in the context of responding to Alcoa's indemnification notices. (See id. at 31:7-22; 61:13-23.) Ms. Hall further testified that she had never advised clients concerning European health and safety regulations. (See id. at 32:3-6.) And she testified that she had never "look[ed] at" or sought to have translated the French, German and Hungarian health and safety laws cited by Alcoa in its notice

letters, and that she had not sought the advice of European consultants or counsel about any of those laws.  (See id. at 62:12-63:2; 69:2-70:5; 75:18-76:16.)

Moreover, Ms. Hall's attempt to "read into" the Agreement's definition of Environmental Law a limitation based on one section of that definition defies the most basic principles of contract interpretation.  No tenet of contract construction—and no "normal habit[] in the use of language"—permits Section (b) to be read as a "subset" of Section (a).  E. Allan Farnsworth, Farnsworth on Contracts § 7.11 (3d ed. 2004).  See also id. ("When interpreting contract language, courts start with the assumption that the parties have used the language in the way that reasonable persons ordinarily do and in such a way as to avoid absurdity.  This assumption covers matters of grammar and syntax as well as the meaning of words.").

If Alcoa and Fairchild had intended the Laws described in Sections (b) or (c) to be subsets of the Laws described in Section (a) they could have indicated as much.  For example, just as Section (a), as written, refers to Laws relating to "pollution or protection of the environment or natural resources, including, without limitation, those relating to" several specific categories identified within Section (a), it could have also included, without limitation, Laws relating to workplace health or safety.  It does not.  Alternatively, if the parties had intended to require that Laws relating to "workplace health or safety" be a subset of Laws relating to "pollution or protection of the environment or natural resources", they could have made that plain by labeling "workplace health or safety" as Subsection (a)(1).  The parties did not do that either.

To the contrary, not only did the parties create an independent section for workplace health and safety laws, but they also used the disjunctive term "or" to indicate

that the three sections of the definition reflect distinct alternative categories.  See, e.g., Barnard v. State, 642 A.2d 808, 817 (Del. Super. Ct. 1992) (noting that the "typical, everyday meaning of the word 'or'" is "the disjunctive conjunction 'or' rather than the conjunction 'and'"); see also Am. Heritage Dictionary 977 (4th ed. 2004) (noting that "or" is primarily "used to indicate an alternative, usu[ally] only before the last term of a series").  The parties thus made crystal clear that they intended costs incurred to comply with Laws relating to workplace health or safety to be separately indemnified under Section 11.6.  There is simply no basis in law or logic for Ms. Hall's proposed reading of the contract.

IV.  **NOTICE AND AN OPPORTUNITY TO COMMENT ARE NOT CONDITIONS PRECEDENT TO INDEMNIFICATION UNDER THE TERMS OF THE ACQUISITION AGREEMENT**

Section 11.6 sets forth the environmental indemnification provisions of the Acquisition Agreement.  (See Alcoa Ex. 1 § 11.6 at FC 2808-11.)  Section 11.6(a) provides:

> "Subject to the provisions of Sections 11.5 and 11.6, from and after the Closing Date, [Fairchild] will . . . indemnify, defend and hold harmless [Alcoa] . . . from and against any and all Fastener Environmental Liabilities in excess of the amount of the reserve for environmental, health, safety and litigation on the Closing Date Balance Sheet. . . ."

(Id. § 11.6(a) at FC 2808.)  Section 11.5 and the remainder of Section 11.6, in turn, contain an extended description of the operation of the indemnity.  (See id. §§ 11.5-11.6 at FC 2807-11.)  Thus, Section 11.5 provides, inter alia, that, following the closing of the transaction, "the remedies provided in this Article XI shall constitute the sole and exclusive remedies with respect to all Indemnifiable Losses. . . ."  (Id. § 11.5 at FC 2807.)  Section 11.6(b) imposes a five-year limit on Fairchild's indemnification obligations, with certain exceptions.  (Id. § 11.6(b) at FC 2808.)  Sections 11.6(c) and (d), discussed

- 39 -

further below, describe how certain notice is to be provided as well as how other post-closing communications between Alcoa and Fairchild and between Alcoa and government regulators are to be conducted, and also provide for Alcoa's post-closing control over the remediation process. Section 11.6(e) defines key terms used throughout Section 11.6, including "Environmental Contamination", "Fastener Environmental Condition" and "Fastener Environmental Liability". (See id. § 11.6(e) at FC 2809-11.) Finally, Section 11.6(f) provides that nothing in Section 11.6 shall affect either party's rights against any third party, and that with the exception of the $8.45 million worth of Fastener Environmental Liabilities it has assumed, Alcoa "retains all rights it may possess under any applicable Law with respect to Fastener Environmental Liabilities". (Id. § 11.6(f) at FC 2811.)

  Fairchild's position is apparently that Alcoa must comply perfectly with each of the detailed provisions of Sections 11.5 and 11.6 before Fairchild's indemnification obligation is triggered. Fairchild contends that because, in its unilateral estimation, Alcoa has not adequately complied with its obligations under Sections 11.6(c) and (d) to provide Fairchild with notice and an opportunity to comment—and irrespective of whether there has been any adverse effect on Fairchild—Alcoa has forfeited its right to indemnification altogether. That contention is wrong both as a matter of law and as a matter of fact, and may be rejected, in advance of any hearing in this matter, based on the plain language of the Acquisition Agreement, applicable Delaware law and the undisputed record.

  First, as a legal matter, Alcoa's obligations under Sections 11.6(c) and (d) are not conditions precedent to Fairchild's indemnification obligation under the explicit

language of the Acquisition Agreement. <u>Second</u>, as a factual matter, Alcoa plainly complied with those provisions, giving Fairchild ample notice of Alcoa's actions and an opportunity to comment on those actions. Fairchild simply chose not to offer any such comment (other than to assert, without more, that Alcoa's actions were unnecessary). Alcoa cannot now be charged with Fairchild's failure to provide any substantive comments. <u>Third</u>, there has been no prejudice to Fairchild, and Fairchild has neither shown, nor even attempted to show, that the course of events or cost to it would have been different under any other circumstances.

A.     <u>Conditions Precedent Are Disfavored Under Delaware Law.</u>

As an initial matter, conditions precedent are disfavored under Delaware law. <u>See, e.g.</u>, <u>AES Puerto Rico, L.P. v. Alstom Power, Inc.</u>, 429 F. Supp. 2d 713, 717 (D. Del. 2006) (applying Delaware law).[14] Accordingly, courts have refused to find conditions precedent where the parties have not expressly provided for them via plain and unambiguous contractual language, particularly where reading a condition precedent into the contract "would undercut the parties' transaction". <u>GB Biosciences</u>, 270 F. Supp. 2d at 482; <u>see also, e.g.</u>, <u>Manley</u>, 2001 WL 946489 at *5.

In <u>GB Biosciences</u>, for example—a case with a factual scenario strikingly similar to this one—the court considered an environmental indemnification provision contained in a contract governing the sale of a pesticide business. <u>See</u> 270 F. Supp. 2d at 478. The provision in that contract, Section 9.4(a), obligated the seller to "reimburse the [buyer] for expenses as they are incurred", but stipulated that the buyer would repay the

---

[14] "A condition precedent is '[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises.'" <u>AES Puerto Rico, L.P. v. Alstom Power, Inc.</u>, 429 F. Supp. 2d 713, 717 (D. Del. 2006) (citation omitted).

seller in the event of a subsequent determination that the buyer had not been entitled to the requested indemnification. Id. (citation and internal quotation marks omitted). A separate provision of the contract, Section 9.2, specified that the seller's obligation applied to:

> "any and all losses, claims (including, without limitation, Environmental Claims), damages (including, without limitation, natural resource damages and punitive damages awarded to a third party), penalties, fines, judgments, settlements, Remediation Costs, costs, fees and expenses (including without limitation, reasonable attorneys, accountants and consultants fees and expenses incurred in connection with any matter indemnifiable hereunder) . . . ."

Id. (citation and internal quotation marks omitted). The contract provided that the seller's liability would be capped at $85 million for so-called "Site Claim" losses and at $25 million for so-called "Off-Site Claim" losses. Id.

The seller argued that the buyer was obligated, under Section 9.2, to demonstrate that its claims were "reasonable" and "incurred in connection with any indemnifiable matter" as a condition precedent to reimbursement. Id. at 480-81. The seller argued that this condition meant that the buyer was required to provide the seller "with sufficient information to determine the reasonableness and connectedness of the claimed fees and expenses before [the seller] was obligated to reimburse the Buyer". Id. at 479.

The court rejected that argument, concluding that "the plain language of Section 9.4(a) includes no conditions precedent to reimbursement and to imply such conditions or to import them from another section of the [contract] would undercut the parties' transaction." Id. at 482. The court noted that "[h]ad the parties intended to require [the buyer] to establish the reasonableness and connectedness of their expenses

- 42 -

prior to reimbursement, the parties and their attorneys could have easily inserted the necessary language in Section 9.4(a)". Id. It explained:

> "Section 9.4(a) places the burden on [the seller] to reimburse [the buyer] before contesting the propriety of the reimbursed loss. [The seller] accepted this burden in order to induce [the buyer] to purchase property with potential environmental contamination. . . . The high indemnity limits for environmental claims in the [contract] (e.g., $85 million for Site Claims and $25 million for Off-Site Claims) demonstrate the significant risk attached to the purchase of the allegedly contaminated property, and in the Court's view, [the seller] accepted the possibly high transaction costs related to possible reimbursement disputes in order to convince [the buyer] to purchase the high-risk property."

Id.

By contrast, in AES Puerto Rico, where the court did recognize a condition precedent in a contract governing the sale of pollution-control equipment, the contract plainly and unambiguously conditioned the seller's warranty on the buyer's proper operation of the system. See 429 F. Supp. 2d at 717. The relevant section of that contract provided that the contractor would warrant the system "against the consequences of accelerated corrosion" but noted, in the very next sentence, that the "corrosion guarantee is conditioned upon operation and maintenance of the system in accordance with the Contractor's Operation and Maintenance manual . . . ". Id. at 717. The explicit use of the phrase "conditioned upon", and the contextual proximity of the warranty and the condition in neighboring sentences, led the court to conclude that the operation of the equipment according to the manual's instructions was a condition precedent to the contractor's warranty obligations. See id.

B.     The Acquisition Agreement Expressly Provides That Notice and Opportunity to Comment Are Not Conditions Precedent.

As noted, Fairchild's position is that it has no obligation to indemnify Alcoa for Fastener Environmental Liabilities because, it contends, Alcoa has not

sufficiently complied with the requirements of Sections 11.6(c) and (d) of the Acquisition Agreement, which Fairchild argues are conditions precedent to Fairchild's obligation. That is wrong, as is apparent from an examination of both of those sections. As previously described, Section 11.6(c) sets forth certain mechanical details concerning communications between the parties, negotiations with government regulators, control over Remedial Actions and Fairchild's participation rights. (See id. § 11.6(c) at FC 2808-09.) Section 11.6(d) deals with notice to Fairchild concerning Fastener Environmental Conditions. (See id. § 11.6(d) at FC 2809.) Because notice logically precedes subsequent communications, we will turn first to Section 11.6(d).

Not only does Section 11.6(d) contain no "plain and unambiguous" language suggesting that notice is a condition precedent to Fairchild's indemnification obligation, but it contains language expressly indicating that notice is not such a condition. To be a condition precedent, Section 11.6(d) would have plainly to provide, as in AES Puerto Rico, 429 F. Supp. 2d at 717, that Fairchild's indemnification obligation is in some way "conditioned upon" Alcoa's obligation to provide prompt notice. But Section 11.6(d) provides exactly the opposite: that Alcoa's failure to provide prompt notice "shall not affect" Alcoa's rights "except to the extent that such failure to give prompt notice adversely affects" Fairchild's "rights and obligations". (See Alcoa Ex. 1 § 11.6(d) at FC 2809 (emphasis added).) Far from creating a condition precedent to Fairchild's required performance, Section 11.6(d) instead places the burden on Fairchild to bring a claim against Alcoa proving the "extent" to which it has been "adversely affected". As in GB Biosciences, 270 F. Supp. 2d at 482, "[t]he plain language of the proviso indicates that the parties considered that a dispute regarding the propriety of a

reimbursed expense may arise". But, in <u>GB Biosciences</u>, that did not deprive the buyer of its right to indemnification in the first instance, nor should it here. <u>See id.</u> As in <u>GB Biosciences</u>, if Fairchild has suffered harm from Alcoa's alleged action or inaction, it can seek to prove it—which it has failed even to attempt. (<u>See</u> <u>infra</u> at 51-53.)

Section 11.6(c) sets forth certain mechanics of the remediation process, including, for the most part, details of how that process is to be controlled by Alcoa. (<u>See</u> Alcoa Ex. 1 § 11.6(c) at FC 2808-09.) The section begins by providing that Fairchild and Alcoa "will each designate a representative . . . to receive information and consult with the other with respect to Fastener Environmental Liabilities . . . ". (<u>Id.</u> at FC 2808.) It is undisputed that Alcoa complied with this provision by designating John Lease as its representative to Fairchild. It is also undisputed that Fairchild initially designated its Environmental Counsel, Michael Hodge, as its representative, but that Mr. Hodge was terminated by Fairchild less than two months after the transaction closed. (Hodge Dep. 11:3-9.) Not until more than eighteen months later was Mr. Hodge replaced by Fairchild's current Environmental Consulting Counsel, Ms. Hall, who—as noted—testified that she never visited the Fastener Business facilities, never met or even telephoned her counterpart at Alcoa, Mr. Lease, and did not even read many of Mr. Lease's notice letters until long after she had denied Alcoa's claims on the basis of lack of notice. (<u>See</u> <u>supra</u> 24 n.10; <u>see also</u> <u>infra</u> 49-51.)

Section 11.6(c) provides that Alcoa "will conduct and control all Remedial Action and negotiations with any Government entity in respect of all Fastener Environmental Conditions" and that any Remedial Actions undertaken by Alcoa "shall be

- 45 -

performed in a commercially reasonable manner". (Alcoa Ex. 1 § 11.6(c) at FC 2808.)[15]
It also provides that Alcoa "will make its environmental personnel and consultants
reasonably available to [Fairchild] to discuss Fastener Environmental Conditions" and
that Alcoa "will provide [Fairchild] and [Fairchild's] environmental consultants with
reasonable access to" the Fastener Business facilities. (Id.) It is undisputed that Fairchild
has never requested to meet or even speak with Alcoa's environmental personnel or
consultants, and that, since the closing, Fairchild has never sought access to the Fastener
Business facilities for itself or for its consultants—not even in the context of this
arbitration. (See Hall Dep. 32:7-24; Hodge Dep. 175:4-15.)

　　　　Section 11.6(c) further provides that Alcoa "will select consultants and
contractors to implement such Remedial Actions (who shall be reasonably acceptable to
[Fairchild])" and that it will provide Fairchild with copies of various specific types of
documents "submitted to or received by the Buyer from any Government entity in
connection with the Remedial Action". (Alcoa Ex. 1 § 11.6(c) at FC 2808-09.) To this
day, Fairchild has not suggested that any of the consultants or contractors selected by

---

[15] Section 11.6(e)(vi) of the Acquisition Agreement defines "Remedial Action" to
include:

> "(a) 'remedial action' as such term is defined in CERCLA [the
> Comprehensive Environmental Response, Compensation, and Liability
> Act] and its analogous state Laws, and (b) all other actions required by any
> Government entity: (i) to clean up, remove, treat, abate or in any other
> way address any Hazardous Materials in the environment; (ii) to prevent
> the Release or threat of Release or minimize the further Release of any
> Hazardous Materials so that it does not migrate or endanger or threaten to
> endanger public health, welfare or the environment, and (iii) to perform
> studies and investigations in connection with, or as a precondition to,
> clause (i) or (ii) above".

(Alcoa Ex. 1 § 11.6(e)(vi) at FC 2810-11.)

- 46 -

Alcoa to implement Remedial Actions have not been "reasonably acceptable" to it—nor could Fairchild reasonably do so, insofar as the consultants Alcoa has employed are all from well-known and respected firms.  Moreover, it is undisputed that Alcoa has regularly supplied Fairchild with copies of its correspondence with government regulators, including numerous reports that Alcoa has provided to those regulators.  (See, e.g., Alcoa Ex. 9, 10, 35.)

       The last sentence of Section 11.6(c) provides that Alcoa "shall afford [Fairchild] a reasonable opportunity to comment on [Alcoa's] proposed response to a Fastener Environmental Condition, and . . . shall not unreasonably refuse to incorporate [Fairchild's] comments."  (Alcoa Ex. 1 § 11.6(c) at FC 2809.)  Fairchild appears to contend that this final sentence constitutes a condition precedent to its indemnification obligation, requiring, among other things, that Alcoa provide Fairchild, in advance, with proposals, cost estimates and other documents for each one of its intended responses to a Fastener Environmental Condition.  (See Claimant Fairchild's Objections and Answers to Respondent Alcoa's First Set of Interrogatories at 8-9, appended hereto.)  Thus, for example, in its June 27, 2003, letters rejecting Alcoa's EHS compliance claims at Toulouse, Torrance and Fullerton, Fairchild demanded that Alcoa provide "specific and complete background documentation supporting the items and estimated costs . . . .  Such documentation should include copies of any assessments, reports, legal analyses, or costs analyses prepared by or for Alcoa and any other documentation which support the various findings".  (See, e.g., Alcoa Exs. 3, 66, 68.)  The failure to provide such documents, according to Fairchild, absolves it of its indemnification obligations.

Yet Section 11.6(c) requires no such thing. To the contrary, that section is very specific about the types of documents Fairchild is entitled to receive: documents created in the context of "Remedial Actions to be taken in respect of Environmental Actions", and that are "submitted to or received by [Alcoa] from any Government entity" in connection with such government-ordered Remedial Actions. (Alcoa Ex. 1 § 11.6(c) at FC 2808-09.) Indeed, even within that narrow category, Fairchild is only entitled to receive specific types of documents that are spelled out in the Agreement. Fairchild's asserted entitlement to a vast quantity of proposals, estimates, plans and studies relating to other types of Fastener Environmental Liabilities thus finds no support in the text of Section 11.6(c).

Similarly, Fairchild's claim that this final sentence implicitly creates a condition precedent on its indemnification obligation finds no support in the plain language of the sentence or in its immediate context. Nowhere in Section 11.6(c) is there any conditional language of any sort. No provision of Section 11.6(c) is a "plain and unambiguous" condition precedent to Fairchild's obligation to indemnify.

The notion of such an "implicit" condition also makes little sense in the context of Section 11.6(d)'s explicitly contrary language. If "notice" in Section 11.6(d) is not a condition precedent, it makes no sense that commenting subsequent to any notice is a condition precedent. In other words, it is an inappropriate reading of the contract that a condition precedent could exist by implication in Section 11.6(c), where such a condition would effectively nullify the express language of Section 11.6(d). See, e.g., Sonitrol Holding Co., 607 A.2d at 1183; Seabreak Homeowners Ass'n, 517 A.2d at 269; Elliott Assocs., 715 A.2d at 854. Accordingly, even if it were true—and it is not—that Alcoa

- 48 -

failed in some way to comply with the provisions of Section 11.6(c) or (d), that is no defense to Fairchild's undisputed failure to comply with its underlying indemnification obligation. To suggest otherwise would be to contradict both established Delaware law and the express language of the Agreement.

There simply can be no dispute that Fairchild expected that it would be required to indemnify Alcoa beyond the amount of the $8.45 million reserve. It is for that very reason that the parties agreed, as part of Alcoa's acquisition of the Fastener Business, to place $25 million of the purchase price in escrow. As in GB Biosciences, the creation of the escrow account "demonstrate[s] the significant risk attached to the purchase of the . . . contaminated property". 270 F. Supp. 2d at 482. Fairchild agreed to the escrow specifically "to convince [Alcoa] to purchase the high-risk property". Id. For Fairchild now to suggest that, pursuant to the contract, it owes nothing, is merely an attempt to deny Alcoa the benefit of its bargain. See, e.g., AES Puerto Rico, 429 F. Supp. 2d at 717 ("Conditions precedent 'are not favored in contract interpretation because of their tendency to work a forfeiture.") (citation and internal quotation marks omitted).

C.    Fairchild Has Never Commented on Alcoa's Actions, Sought to Discuss Claims or Sought to Visit the Fastener Business Facilities

Fairchild's contention that it did not have notice of and an opportunity to comment on Alcoa's actions (see, e.g., Alcoa Exs. 3, 28, 30, 66, 68) is demonstrably false. The thousands of pages of Phase I and Phase II reports, and the June 2003 letters summarizing the Compliance Gap Analyses, placed Fairchild on notice at an early stage of both the studies and the corrective actions Alcoa intended to take to correct noncompliance with EHS regulations and to address actual and threatened Environmental

Contamination at the Fastener Business facilities. As noted, many of those actions had previously been planned or initiated by Fairchild, and Fairchild even placed its auditors on notice of certain potential liabilities that were uncovered by Alcoa's Phase I investigations. Fairchild's current Environmental Counsel, Susan Hall, has even specifically acknowledged that Fairchild had notice of Alcoa's key EHS noncompliance claims. (See Hall Dep. 111:15-112:14 ("I realized at—at some point that I was incorrect in one of my early letters to Mr. Lease about the no notice with EHS. . . . We had been given notice that Alcoa believed that they had EHS non-compliance issues.").)

Moreover, as Fairchild's own witnesses have testified:

- Fairchild has never sought to exercise its right under Section 11.6(c) to discuss Fastener Environmental Conditions with Alcoa's environmental personnel and consultants. (See id. at 32:19-33:22; Hodge Dep. 174:19-175:3.)

- Fairchild has never sought to visit the properties of the Fastener Business, as it is entitled to under that section. (See Hall Dep. 32:7-18; Hodge Dep. 175:4-15.)

- Fairchild has never challenged the consultants and contractors selected by Alcoa—several of whom previously worked for Fairchild, including on projects that Fairchild simply handed off to Alcoa—even though Fairchild is plainly aware that those consultants continue to take corrective actions with respect to Fastener Environmental Conditions. (See Hodge Dep. 61:9-62:15, 154:5-155:7.)

- Fairchild's former Environmental Counsel, Mr. Hodge, never met or even asked to meet with his designated counterpart at Alcoa, Mr. Lease, after the closing of the transaction. (See id. at 174:19-175:3.)

- Fairchild's current Environmental Consulting Counsel, Ms. Hall, has never even attempted to communicate with Mr. Lease other than in writing. (See Hall Dep. 32:19-33:22.)

- Ms. Hall did not even attempt to read (or translate) thousands of pages of documents Alcoa provided about Fastener Environmental

Conditions at the facilities Fairchild sold to Alcoa in France, Germany and Hungary. (See id. at 73:18-76:16.)

- With the exception of the February 26, 2004, chart Mr. Hodge prepared concerning Alcoa's Phase II reports—in which Fairchild encouraged Alcoa to undertake further investigations—Fairchild has never provided substantive comment on a single one of Alcoa's actions. (See Lease Dep. 23:2-6.)

Yet, incredibly, Fairchild has cited lack of "notice" and "opportunity to comment" as its basis for refusing to indemnify Alcoa even for remediation work—such as that at the City of Industry facility—that was initiated by Fairchild itself under an express regulatory order, and that was continued by Alcoa using the same consultants hired by Fairchild. (See, e.g., Hodge Dep. 232:24-237:21.)[16]

    D.    <u>Fairchild Cannot Produce Any Evidence That It Has Been Prejudiced in Any Measurable Way</u>

Fairchild's position is particularly troubling because Fairchild has never even attempted to demonstrate that it has been harmed in any way by Alcoa's actions, or that the outcome of those actions would have been different under different circumstances. To date, Fairchild has not pointed to any evidence indicating that it has been "adversely affected" in any measurable way by any purported lack of prompt notice. When Alcoa has asked Fairchild to provide such evidence—or even simply to describe or

---

[16] Fairchild's arguments also ignore the fact that Section 11.6(e)(iv) of the Acquisition Agreement requires that Alcoa act promptly to address any Fastener Environmental Conditions it identifies. (See Alcoa Ex. 1 § 11.6(e)(iv) at FC 2810 (noting that "to the extent [Alcoa] contributes to or exacerbates a Fastener Environmental Condition as a result of its actions or omissions, including, without limitation, its unreasonable failure to mitigate any violation or noncompliance with applicable Environmental Law, any material increase in losses, damages, charges, liabilities, costs or expenses resulting from said exacerbation or failure to mitigate shall not be a Fastener Environmental Liability").)

quantify any such "adverse effect"—Fairchild has refused.  For example, Alcoa's Interrogatory No. 9 to Fairchild requested the following:

> "For each Fastener Environmental Condition, Environmental Action or Fastener Environmental Liability about which you contend Alcoa failed to provide prompt notice, specify how and to what extent (in dollar terms, if appropriate) Fairchild's rights and obligations under the Acquisition Agreement have been adversely affected, if at all, by the purported absence of prompt notice."

(See Claimant Fairchild's Objections and Answers to Respondent Alcoa's First Set of Interrogatories at 8, appended hereto.)  After objecting to Alcoa's interrogatory on a variety of grounds, Fairchild contended that its rights under the Acquisition Agreement "were negotiated and expressly agreed to by the parties so as to avoid, among other things, having to perform a retrospective quantification".  (Id. at 9.)  That contention, of course, is directly at odds with the Section 11.6(d)'s express provision that Alcoa's indemnification rights "shall not" be affected by any purported lack of notice "except to the extent that such failure . . . adversely affects" Fairchild.  In addition, Fairchild objected that "[t]o the extent that the effect of Alcoa's conduct on Fairchild's rights may be quantifiable, in dollar terms or otherwise" a response would be "premature prior to the close of discovery and the exchange of expert reports."  (Id.)  Fairchild's expert report, however, contains no quantification or even any estimate of any purported adverse effect. (See Letter from A. Zurofsky to D. Slifkin, dated 10/31/06, appended hereto.)  That, of course, is because there is none.

Similarly, when Alcoa has asked Fairchild what it would have done differently had it been given the opportunity to comment it alleges it was denied, Fairchild has refused to respond.  For example, Alcoa's Interrogatory No. 12 asked Fairchild to "explain in detail [its] assertion, if any, that [a] Fastener Environmental

Condition could have been remediated or otherwise resolved at materially lower cost" than that incurred by Alcoa. (Claimant Fairchild's Objections and Answers to Respondent Alcoa's First Set of Interrogatories at 11, appended hereto.) After once again objecting to Interrogatory No. 12 on various grounds, Fairchild stated that "responding would require Fairchild to incur the tremendous burden and expense of investigating and evaluating alternative remediation methods for numerous remediation activities already conducted or now being conducted by Alcoa at facilities under Alcoa's exclusive control and located worldwide . . . ". (Id.) Fairchild added that "[t]o the extent that Fairchild determines to perform such an analysis" it would be "premature prior to the close of discovery and the exchange of expert reports". (Id. at 11-12.)

Once again, however, Fairchild's expert report contains no such analysis save a few wholly unsupported assertions, for example: that "for a number of the French health and safety issues, Alcoa <u>may have had</u> less expensive alternatives available to it . . . " (Letter from A. Zurofsky to D. Slifkin, dated 10/31/06 at 2, appended hereto (emphasis added)); that with respect to the installation of groundwater monitoring wells at the Montbrison facility "other cost-effective options exist which could have been considered" (<u>id.</u> Tab 2 at 8 (expert report of Robert Shofstall)); and that with respect to the EHS corrective actions Alcoa took at the California facilities "there can be considerable variability in approach and cost" among different EHS consultants (<u>id.</u> Tab 3 at 3 (expert report of Mark Katchen)). Fairchild's response makes it eminently clear that Fairchild is not and has never been interested in commenting in good faith or in any substantive way on Alcoa's responses to any Fastener Environmental Conditions.

Rather, Fairchild's approach all along has been simply to evade its indemnification obligations.

V.    THE AMOUNTS OF ANY INDEMNITY TAX CREDITS UNDER SECTION 11.8 OF THE ACQUISITION AGREEMENT ARE THOSE SET FORTH IN THE FRENCH TAX REPORT OF BREDIN PRAT DATED OCTOBER 31, 2006

As noted, Fairchild has sought to introduce into this arbitration the question whether its indemnification obligation under Section 11.6 of the Acquisition Agreement may be offset under Section 11.8 by the amount of certain post-closing tax benefits Alcoa received in France.[17] Alcoa does not dispute that Fairchild is ultimately entitled, under Section 11.8, to a setoff to the extent that certain French Tax Benefits recognized by Alcoa are based upon net operating losses previously incurred by Fairchild that "may no longer be subject to possible disallowance by any French . . . Taxing authority". (Alcoa Ex. 1 § 11.8 at FC 2812.) The fact that Fairchild is raising this now merely demonstrates its lack of belief in its own arguments that it has no indemnification obligations. It is also, in any case, premature.

_____

[17] Alcoa has previously noted its position that the determination of any indemnity tax credit under Section 11.8 is not within the jurisdiction of this arbitration. First, the amount of any tax credit is unrelated to "the validity or amount of a claim for indemnification for an Indemnifiable Loss". (See Alcoa Ex. 1 § 11.7 at FC 2811.) Accordingly, any dispute over such a tax credit does not fall within the ambit of the dispute resolution procedures set forth in Section 11.7. Second, even if a dispute over the tax credit were subject to those procedures, Fairchild introduced the issue after the start of this arbitration, such that it was never subject to mediation as Section 11.7 requires. Indeed, in contrast to Sections 11.6(c) and (d), Section 11.7 does contain an unambiguous condition precedent providing that the submission of a claim to mediation is a necessary first step before that claim can be submitted to arbitration. The section sets forth an explicit chronology, providing that "the parties agree first to endeavor to settle the dispute in an amicable manner by mediation . . . before resorting to arbitration". (Id. (emphasis added).) The section continues: "If a Dispute cannot be resolved through such mediation process . . . the Dispute will be settled finally by arbitration". (Id.) Nonetheless, Alcoa will agree to an appropriate setoff against the award it anticipates here, as set forth above.

At the same time, Fairchild has failed to introduce any documentary evidence on this issue save a single letter dated May 10, 2006, by which Fairchild simply notified Alcoa of its Section 11.8 claim, along with an inconclusive four-page enclosure that accompanied that letter. (See Alcoa Ex. 11.) Fairchild has also failed to identify any expert witnesses or produce any expert report on the tax issue.[18]

Section 11.8 of the Acquisition Agreement provides that Fairchild is only entitled to an indemnity tax credit at such time as any net operating losses previously incurred by Fairchild, and utilized by Alcoa to obtain a post-closing tax benefit, "may no longer be subject to possible disallowance by any French . . . Taxing authority". (Alcoa Ex. 1 § 11.8 at FC 2812.) That time has not yet arrived. Instead, as the unchallenged report of Alcoa's expert tax witness makes clear, under French law, all of the net operating losses that were previously incurred by Fairchild, and that Alcoa has carried forward, remain subject to possible disallowance by the French taxing authority. (See French Tax Report of Bredin Prat, dated Oct. 31, 2006, at 7-8, appended hereto.) The Bredin Prat report indicates that, in the absence of any intervening audits, Fairchild may be entitled to an indemnity tax credit of €200,081 as of January 1, 2007, an additional credit of €545,802 as of January 1, 2008, and an additional credit of €146,336 as of January 1, 2009. (Id. at 9.) Alcoa is ready to comply with its obligation under Section 11.8 to provide Fairchild credits against sums it owes Alcoa according to this timetable—provided, of course, that there is no intervening disallowance.

---

[18] Fairchild's former Chief Financial Officer and Senior Vice President for Tax, John Flynn, testified that he is not qualified to practice law in France and has never been qualified as an expert in French tax law. (See Flynn Dep. 183:25-184:3, 184:8-10.)

- 55 -

Fairchild, however, simply asserts in its unverified answers to Alcoa's interrogatories—without more—that it is "at this time entitled to credit from Alcoa" because "the years in which the pre-Closing losses were recognized by Fairchild have been audited by the French tax authorities and are now closed" such that "none of those losses or their associated Benefits are subject to further adjustment by the French tax authorities at this time". (See Claimant Fairchild's Objections and Answers to Respondent Alcoa's First Set of Interrogatories at 12-13, appended hereto.)[19]   That is

_____

[19] Fairchild's former Deputy General Counsel, Ernesto Beckford—who authored the May 10, 2006, letter to Alcoa seeking the tax setoff—testified that his understanding was that the net operating losses applied by Alcoa were "not subject to disallowance because it's a reduction. What gets [audited] is the income. You're always going to claim income. No tax authority is going to come and say that — you get audited — what they audit is going to be the income." (Beckford Dep. 97:3-8.)  To be sure, Mr. Beckford conceded that he is not a tax lawyer and has no expertise in French tax law. (Id. at 98:2-6.)  His opinion is therefore entitled to little weight relative to the opinion of an actual expert on French tax law.  Nevertheless, his contention that only income and not deductions can be audited cannot be credited.  By that logic, taxpayers would be free to apply deductions against 100 percent of their income free from regulatory scrutiny.

At the same time, Fairchild's Mr. Flynn—who, as noted, also conceded that he is neither entitled to practice law in France nor qualified as an expert in French tax law (see Flynn Dep. 183:25-184:3, 183:8-10)—testified that in his understanding, there is no effect on the statute of limitations for auditing a net operating loss when that loss is carried forward and utilized to offset profits in a subsequent year (see id. at 183:15-24).  Mr. Flynn testified: "[I]f the loss—the year the loss arose was audited, examined and a report was issued, that means it's done and over with". (Id. at 188:4-6.)  That contention is directly at odds with the plain language of the French regulation.  As the Bredin Prat report notes, that regulation provides, in translation, as follows:

"[A] company which intends to carry forward its losses in order to set them off against profit in subsequent years must justify the existence of these losses. . . . [T]he tax authorities are entitled to carry out tax inspections in respect of the financial years following the financial year in which the losses were made, even if these years recorded profits and are themselves time-barred, to the extent that the residual losses considered by the undertaking as being a component for determining the taxable profit for the financial year being inspected and not time-barred, are the result of the difference between the initial losses and any profit made in the intervening period and which could not be totally off set.

Bulletin Officiel des Impôts, BOI 4 H-5-04 No. 187, Dec. 7, 2004, ¶15 (unofficial translation) (cited in French Tax Report of Bredin Prat, dated Oct. 31, 2006, at 19-20,

wrong.  As the Bredin Prat report makes clear, while French law ordinarily establishes a three-year statute of limitations for tax audits,

> "[a]n exception to this statute of limitation principle exists in the case where a given fiscal year gave rise to a carried forward tax loss.  In such a case, and according to the French Tax Administration guidelines, the tax loss may be subject to tax audit until the end of the third fiscal year following the one during which it was used to offset taxable profits."

(See French Tax Report of Bredin Prat, dated Oct. 31, 2006, at 7, appended hereto (citing Bulletin Officiel des Impôts, BOI 4 H-5-04 No. 187, Dec. 7, 2004).)  Moreover, the fact that the year in which a tax loss was originally recorded was itself subject to audit is not determinative unless the scope of that audit "conclusively indicates that the tax loss incurred . . . is no longer subject to disallowance".  (Id. at 8.)  The Bredin Prat report indicates that its review of the record "provides no conclusive indication that any pre-2003 audits were sufficiently comprehensive as to encompass all the tax losses used by Alcoa following the Closing Date".  (Id.)  As noted, Fairchild has introduced no factual evidence or expert analysis that contradicts that conclusion.  Because Fairchild has thus made no effort to meet its evidentiary burden, Alcoa's position must prevail as a matter of law.

---

appended hereto.)  The Bredin Prat report explains that "[t]his exception leads to establishing an extended limitation period each time a tax loss recognized during a closed period is used to offset profits realized during a non closed period."  (French Tax Report of Bredin Prat, dated Oct. 31, 2006, at 8, appended hereto.)

<u>Conclusion</u>

For the foregoing reasons, Alcoa respectfully requests the entry of partial summary judgment declaring that:  (1) the cost of investigations into Environmental Contamination and threatened Environmental Contamination is subject to indemnification under Section 11.6 of the Acquisition Agreement; (2) the cost of bringing the Fastener Business facilities into compliance with workplace health and safety laws, including OSHA and its state and foreign equivalents, is subject to indemnification under Section 11.6 of the Acquisition Agreement; (3) the requirements of Sections 11.6(c) and (d) are not conditions precedent to indemnification under the terms of the Acquisition Agreement; and (4) subject to the conditions set forth in the French Tax Report of Bredin Prat dated October 31, 2006, that there be no intervening disallowance of any net operating losses previously incurred by Fairchild and carried forward by Alcoa to obtain tax benefits, the potential amount of any indemnity tax credits applicable under Section 11.8 of the Acquisition Agreement will be €200,081 as of January 1, 2007, an additional €545,802 as of January 1, 2008, and an additional €146,336 as of January 1, 2009.

December 1, 2006

CRAVATH, SWAINE & MOORE LLP

by

Evan R. Chesler
Daniel Slifkin
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Alcoa Inc.*

- 58 -