# In The Matter Of:

## *In re:  THE FAIRCHILD CORPORATION*

---

### ARBITRATION
### *January 10, 2007*

---

# *MERRILL LEGAL SOLUTIONS*

## *420 Lexington Avenue - Suite 2108*
## *New York, NY 10170*
### *PH: 212-557-7400 / FAX: 212-692-9171*

### ARBITRATION - Vol. 3

CPR INSTITUTE OF DISPUTE RESOLUTION

-----------------------------------x

In Re

THE FAIRCHILD CORPORATION

                    Claimant,


        -against-

ALCOA CORPORATION,

                    Respondent.


-----------------------------------x

                    Cravath, Swaine & Moore, LLP
                    Worldwide Plaza
                    825 Eighth Avenue
                    New York, New York

                    January 10, 2007

                    9:00 a.m.


B E F O R E:

    JAMES F. STAPLETON, Arbitrator




TAMMEY M. PASTOR, RPR, CLR, Hearing Reporter

JOHN GEORGE - REDIRECT

1
2     Q.    Turn to page 577.
3     A.    Yes.
4     Q.    Under Assessments of Remediation
5  Liabilities.  It says "M Hodge agrees with our
6  assessments remediation issues are significant,
7  but only 14 of the 15 manufacturing facilities
8  to warrant Phase II investigation." Do you see
9  that?
10    A.    Yes.
11    Q.    You typed that in as he said it;
12 didn't you?
13    A.    Yes.
14    Q.    He also said, so Mr. Hodge was
15 telling you it was appropriate to do these Phase
16 II?
17    A.    Yes.
18    Q.    Did he also tell you at the meeting
19 his client, Fairchild didn't want to pay for
20 them?
21    A.    I don't recall.
22    Q.    Well, earlier Mr. Zurofsky said
23 Fairchild might refuse to pay for them; you saw
24 that?
25    A.    This is on --

JOHN LEASE - DIRECT

1
2     Q.    Turn to page 576 under Who Pays?
3     A.    Right. That was with reference to
4  Alcoa's rationale for taking remedial action
5  which I would distinguish from conduct of the
6  Phase IIs.
7           MR. SLIFKIN:  Okay, thank you very
8  much, sir.
9           MR. ZUROFSKY:  Nothing further.
10          THE ARBITRATOR:  Thank you very
11 much.
12          (Witness excused.)
13
14          (Luncheon Recess: 12:08 p.m.)
15 A F T E R N O O N   S E S S I O N
16          1:03 p.m.
17
18          MR. CHESLER:  We call John Lease.
19          JOHN LEASE,
20 having been first duly sworn by the Notary
21 Public (Tammey M. Pastor), was examined and
22 testified as follows:
23 DIRECT-EXAMINATION BY MR. CHESLER:
24    Q.    Would you state your full name for
25 the record, please.

JOHN LEASE - DIRECT

1
2     A.    John Lease.
3     Q.    And by whom are you employed, Mr.
4  Lease?
5     A.    Employed by Alcoa.
6     Q.    What is your job at Alcoa?
7     A.    I am the environmental group
8  services leader.
9     Q.    What generally speaking are your
10 responsibilities as environmental group services
11 leader?
12    A.    My role with Alcoa is to manage a
13 group of environmental professionals that act as
14 internal consultants to Alcoa and support
15 various environmental service areas, such as air
16 management, air compliance, solid and hazardous
17 waste management compliance, water and waste
18 water compliance as examples.
19    Q.    Are you within a larger services
20 organization within Alcoa?
21    A.    Yes, I am.
22    Q.    What is the name of that
23 organization?
24    A.    The organization is called the
25 environment health & safety services group.

JOHN LEASE - DIRECT

1
2     Q.    Is the acronym for that EHS?
3     A.    EHSS.
4     Q.    What is the second S for, services?
5     A.    Services.
6     Q.    It is environmental, health and
7  safety services?
8     A.    Correct.
9     Q.    Is there a single person who is the
10 director or manager of the EHSS group?
11    A.    Yes. There is a director position
12 in that organization.
13    Q.    Who holds that job right now?
14    A.    Currently that is held by Kevin
15 McKnight.
16    Q.    Is he your boss?
17    A.    Yes, he is.
18    Q.    Do you have a counterpart for
19 health who reports to Mr. McKnight?
20    A.    Yes, there is.
21    Q.    Is there a counterpart for safety?
22    A.    Yes.
23    Q.    So the E, the H and S all then
24 report into Mr. McKnight?
25    A.    That's correct.

40  (Pages 830 to 833)

JOHN LEASE - DIRECT

1
2     Q.    Were you involved personally in the
3  negotiations of the acquisition by Alcoa of the
4  Fairchild Fasteners business?
5     A.    No.
6     Q.    Were you involved in the due
7  diligence that Alcoa did in connection with that
8  transaction?
9     A.    No.
10    Q.    Did there come a point when you
11 were in any way involved in the assumption of
12 the Fasteners business by Alcoa from Fairchild?
13    A.    No.
14    Q.    At some point did you become the
15 representative of Alcoa pursuant to the
16 Acquisition Agreement that was entered into in
17 December of 2002?
18    A.    Yes.
19    Q.    When did that happen,
20 approximately?
21    A.    I don't recall specifically.  I
22 believe it was early in 2003 or shortly after
23 the acquisition was finalized.
24    Q.    How did you come to assume that
25 position?

JOHN LEASE - DIRECT

1
2     A.    I was assigned to be the contact by
3  Jim Boyt who was my supervisor at the time.
4     Q.    Mr. Boyt testified here the other
5  day, same man?
6     A.    Yes.
7     Q.    What is your understanding of what
8  your responsibilities are in that position?
9     A.    My understanding was that I was to
10 be the point of contact for communication with
11 my counterpart at Fairchild.  To send and
12 receive information relative to environmental
13 health and safety matters.
14    Q.    When you first took that position,
15 I think you said it was beginning 2003; is that
16 right?
17    A.    Approximately.
18    Q.    Who was your counterpart at
19 Fairchild at that point?
20    A.    A gentleman by the name of Mike
21 Hodge.
22    Q.    Did he remain your counterpart
23 thereafter up until today?
24    A.    Actually after the acquisition,
25 after I was named as the contact I didn't hear

JOHN LEASE - DIRECT

1
2  from Mike Hodge in reply to the correspondence
3  that I sent to him relative to my role as the
4  contact point person.
5     Q.    You never did hear from Mr. Hodge?
6     A.    I received no phone calls, no
7  correspondence directly back from Mike.
8     Q.    Did you ever have any
9  communications with anybody else at Fairchild,
10 other than Mr. Hodge?
11    A.    Yes.  There were several people
12 that responded to correspondence from me.  The
13 first person was Donald Miller.  He was followed
14 by a gentleman named Ernesto Beckford.  Most
15 recently a woman Susan Hall.
16    Q.    From 2003 until today you have
17 consistently been the Alcoa representative
18 pursuant to the Acquisition Agreement; is that
19 right?
20    A.    That's correct.
21    Q.    On the Fairchild side you have gone
22 through Hodge, Miller, Beckford and now Hall, is
23 that the order in which they seem to have
24 replaced each other?
25    A.    Yes.

JOHN LEASE - DIRECT

1
2     Q.    I'd like you to look at tab 1.
3  Would you look at tab 1 in the binder I've just
4  handed you, Mr. Lease.  Can you tell us what
5  that document is this is Exhibit 31 for the
6  record, Alcoa 31.
7     A.    This is a draft agenda for a
8  meeting that was held between myself, and Mike
9  Hodge as well as two other individuals from
10 Fairchild, Tony Miramadi and Matilda Enriquez
11 some time in the neighborhood of September 2002.
12    Q.    Just to get the chronology right,
13 the agreement between Fairchild and Alcoa was
14 signed in July of 2002 is that consistent with
15 your understanding?
16    A.    Yes.
17    Q.    The deal closed in December; is
18 that right?
19    A.    Yes.
20    Q.    You say you took on responsibility
21 of being the contact person on the Alcoa side,
22 you think at the beginning of 2003; correct?
23    A.    That's my recollection, yes.
24    Q.    So at the time of September of
25 2002, after the signing of the agreement before

41 (Pages 834 to 837,

JOHN LEASE - DIRECT

1  the closing and before you took on that role
2  that you served in since, what was your reason
3  for participating in this meeting with Fairchild
4  representatives?
5      A.    Within Alcoa we had established an
6  integration team for the acquisition of
7  Fairchild. I was the EHS representative on the
8  acquisition team or on the integration team.
9  And in that role I did have communications or
10  discussions with Mike Hodge during the period
11  from roughly, I would say mid-August through the
12  end of the acquisition period, which was early
13  December of 2002.
14      This meeting was set up to allow us
15  to meet with Mike and a couple of his
16  representatives in the EHS program area. And
17  find out more about the Fairchild EHS programs.
18  Discuss some of the issues that had arisen from
19  the Phase I investigations, Phase I assessments
20  that had been performed earlier that year by
21  ERM.
22      And to talk about the possibility
23  of going forward with some site visits at the
24  locations before the closing.

JOHN LEASE - DIRECT

1
2      Q.    Who prepared this draft agenda?
3      A.    I think it was jointly prepared
4  between Mike and myself.
5      Q.    I notice in the heading, the title
6  of the agenda, Alcoa/Fairchild Industries EHS
7  Integration Meeting. In at least the first six
8  of the numbered -- I guess in seven of the
9  numbered nine entries, numbers 1 through 6 plus
10  number 9, the acronym EHS appears; is that
11  right?
12      A.    Yes.
13      Q.    Did you believe that you and Mr.
14  Hodge had an understanding of what EHS stood
15  for?
16      A.    Yes, I think so.
17      Q.    Was the term used at this meeting
18  that you had in September of 2002?
19      A.    Yes, it was.
20      Q.    What was the term used to mean both
21  in the preparation of the agenda and in the
22  meeting you all had in September of 2002?
23      A.    Well the term, we understood the
24  term to mean EHS function, which was comprised
25  of environment, health and safety within the

JOHN LEASE - DIRECT

1  companies.
2      Q.    Was there any discussion that in
3  this context health and safety was in any way
4  limited to environmentally related health and
5  safety issues?
6      A.    No.
7      Q.    How did you understand, for
8  example, safety issues, what are things that are
9  included within the meaning of safety as it was
10  used in the discussions between Alcoa and
11  Fairchild in the fall of 2002?
12      A.    Safety was meant to mean or
13  included workplace safety, primarily because we
14  were both industrial firms and both regulated by
15  OSHA. And workplace safety was the same as the
16  term safety, the word safety.
17      Q.    What sort of safety issues, for
18  example, would be included under that heading?
19      A.    Programs such as confined space
20  entry, machine guarding, mobile equipment, fall
21  protection, electrical safety, as examples of
22  some of those.
23      Q.    Would you look at tab 2, please.
24  For the record this is Alcoa Exhibit 101. If

JOHN LEASE - DIRECT

1  you look at the first page of Exhibit 101, it
2  looks like there are two separate emails. I
3  would like to start with the lower of the two.
4  Is that an email that you received from Michael
5  Hodge of Fairchild on or about September 6,
6  2002?
7      A.    Yes.
8      Q.    It says in the text of the email,
9  "John" addressed to you "Tony Miramadi" now he
10  was a Fairchild employee; correct?
11      A.    Yes, Tony was the EHS director for
12  the programs in the California facilities
13  located in Los Angeles. Tony was at the meeting
14  in September along with Mike.
15      Q.    You say, he was the EHS director.
16  That was as far as you understood his job at
17  Fairchild prior to the sale of the business to
18  Alcoa?
19      A.    Yes.
20      Q.    The note says "John, Tony Miramadi
21  passed on to me your request for a copy of the
22  slide presentation which we used during the EHS
23  integration meeting here at Dulles earlier this
24  week." It goes on to say, "I am enclosing an

42 (Pages 838 to 841)

2c5facfb-a662-4159-8094-057d0344af74

Page 842

JOHN LEASE - DIRECT

1
2 electronic version."
3        Had you asked for a copy of the
4 slide presentation that Fairchild had made to
5 Alcoa at the meeting?
6    A.    Yes.
7    Q.    Then I see above that it appears
8 that there is a note from Donald Miller to Mr.
9 Beckford, Mr. Flynn and others. I take it that
10 is not a note that you saw at the time; is it?
11    A.    Yes, that's what I recall.
12    Q.    Let's look at the slides that Mr.
13 Hodge sent to you. Are these in fact slides
14 that were presented by the Fairchild folks at
15 that meeting in September 2002?
16    A.    Yes, they are.
17    Q.    If you look at the second page of
18 the slides, which is the Bates page 9443 is that
19 an organization chart which purports to be for
20 the Fairchild EHS management approach, their
21 organization and structure?
22    A.    Yes.
23    Q.    They presented that to you at the
24 meeting?
25    A.    Yes, they did.

Page 843

JOHN LEASE - DIRECT

1
2    Q.    Apparently Mr. Miramadi's title at
3 the time was director EHS U.S. operations;
4 correct?
5    A.    Correct.
6    Q.    He had under him reporting to him
7 various people who had environmental
8 responsibilities as well as safety
9 responsibilities; is that right?
10    A.    That's right.
11    Q.    If you look at the next page of the
12 presentation they made to you 9444. It is
13 entitled Fairchild Fasteners EHS Management
14 Approach Policies and Standards. It says
15 "Fairchild has developed environmental health
16 and safety policies --"
17        THE ARBITRATOR:   Which page are we
18 on?
19        MR. CHESLER:   Sorry --
20        THE ARBITRATOR:   I have it okay.
21    Q.    It says "Fairchild has developed
22 environmental health and safety policies based
23 on" then it lists four things "Best management
24 practices, federal state and local agency
25 regulations, ISO 9000 and the EHS vision

Page 844

JOHN LEASE - DIRECT

1
2 statement."
3        Did you have an understanding what
4 they were referring to by best management
5 practices?
6    A.    I think in a general sense they
7 were practices that had been developed at the
8 various facilities owned by Fairchild at that
9 time that related to various aspects of their
10 EHS program.
11    Q.    Did you understand their best
12 management practices to be somehow distinct from
13 federal, state and local agency regulations and
14 the other items on this list?
15    A.    That was my basic understanding,
16 yes.
17    Q.    Did they also talk about an EHS
18 vision statement at Fairchild?
19    A.    Yes.
20    Q.    What was that?
21    A.    That's basically the next slide in
22 the presentation which described their approach
23 to EHS within Fairchild, assigned certain roles
24 and responsibilities to various individuals and
25 defined what their objectives were in a general

Page 845

JOHN LEASE - DIRECT

1
2 sense related to EHS.
3    Q.    As stated here that included not
4 just protecting the environment but providing an
5 incident free workplace, meeting regulatory and
6 company standards and addressing community
7 concerns; correct?
8    A.    That's correct.
9    Q.    If you flip to page 9451, please,
10 this is under heading of Key Ehs Initiative and
11 Issues Safety, do you see that?
12    A.    Yes, I do.
13        THE ARBITRATOR:   This is page.
14        MR. CHESLER:   9451.
15    Q.    This was a discussion of key EHS
16 initiatives and issues with respect to safety;
17 correct?
18    A.    That's correct.
19    Q.    Did they in fact present to you on
20 the point that they had an OSHA training series
21 as part of their EHS safety initiative?
22    A.    Yes, they did.
23    Q.    Did they tell you they also under
24 heading of EHS safety engaged in equipment
25 modification and replacement practices,

43 (Pages 842 to 845

JOHN LEASE - DIRECT

1  JOHN LEASE - DIRECT
2  including machine guarding?
3      A.   Yes, they did.
4      Q.   If you turn to page 9453, please it
5  looks like they went through EHS safety, then on
6  9452 EHS health.  Then on 9453, EHS
7  environmental; is that what they did?
8      A.   Yes.
9      Q.   Under environmental on 9543 did
10 they present to you on the facts they had
11 pollution control programs and waste
12 minimization programs?
13     A.   Yes, they did.
14     Q.   Did they tell you they met with
15 local businesses on environmental issues in the
16 communities in which they operated?
17     A.   Yes, they did.
18     Q.   Did they tell you also they used
19 various systems including EnviroSoft to take
20 care of the documentation and reporting
21 responsibilities they had with respect to
22 environmental issues?
23     A.   Yes.
24     Q.   Did there come a time when you came
25 into possession of what are called scopes of

1  JOHN LEASE - DIRECT
2  work for the Phase II investigations that Alcoa
3  was going to conduct after the closing?
4      A.   Yes.
5      Q.   Generally speaking, what are scopes
6  of work with respect to a Phase II
7  investigation?
8      A.   In general scope of work describes
9  the actions that will be taken as part of the
10 investigation described, sampling locations, the
11 type of media to be sampled, for example, number
12 of samples to be taken and so forth.
13     Q.   It says this is what we are going
14 to do, this is the scope of the work we are
15 going to perform when we go do our Phase II
16 investigation; is that a fair one sentence
17 summary?
18     A.   Essentially, yes, that's correct.
19     Q.   Did you provide those scopes of
20 work to Fairchild prior to any Phase II
21 investigations being done?
22     A.   Yes, we did.
23     Q.   Would you turn to tab 3, please.
24 Do you recognize this as an email that you sent
25 to Jeff Flanzenbaum of ERM and to John George on

1  JOHN LEASE - DIRECT
2  October 16, 2002?
3      THE ARBITRATOR:  Tab?
4      MR. CHESLER:  Tab 3, your Honor.
5      A.   Yes, I do.
6      Q.   That is Exhibit Alcoa 34 for the
7  record.
8      A.   Correct.
9      Q.   It says in the first paragraph it
10 says "I gave copies of the Phase II SOW" that
11 stands for scopes of work?
12     A.   Correct.
13     Q.   "To Mike Hodge yesterday." Is that
14 consistent with your memory on or about October
15 15, 2002 you gave the Phase II scopes of work to
16 Mr. Hodge of Fairchild?
17     A.   Yes.
18     Q.   It says, "He took a brief look at
19 them and asked a few questions about how the
20 sampling plans were developed.  He also
21 commented that for the California facilities the
22 plans seemed like 'overkill' to him.  I'm not
23 surprised by this.  At this point I think Mike's
24 primary role in this deal is to control costs
25 for remediation that could go back against

1  JOHN LEASE - DIRECT
2  Fairchild post closing."
3          Was it your understanding at the
4  time that the Phase II studies that were going
5  to be done were studies that Alcoa was going to
6  seek reimbursement for under the agreement?
7      A.   Yes, that was my understanding.
8      Q.   Is that the context in which you
9  made the comments about Mr. Hodge appearing to
10 you to be primarily interested in controlling
11 the remediation costs that his firm would have
12 to pay for?
13     A.   Yes.
14     Q.   Did Mr. Hodge then or at any time
15 provide any substantive comments with respect to
16 the scopes of work that you provided?
17     A.   Not that I'm aware of, no.
18     Q.   You were the person to whom any
19 such comments were supposed to come at Alcoa;
20 weren't you?
21     A.   Typically at this point I wasn't
22 the official representative, but for purposes of
23 communication before the deal in substance Mike
24 and I were counterparts.
25     Q.   Did you have a meeting with Mr.

44  (Pages 846 to 849)

2c5facfb-a662-4159-8094-057d0344af74

Page 850

JOHN LEASE - DIRECT

1      JOHN LEASE - DIRECT
2   Hodge after you sent the scopes of work to him
3   on October 15, 2002?
4       A.   Yes, we did.
5       Q.   Do you recall that that meeting
6   took place on or about November 8th; 2002?
7       A.   I believe that's the date, yes.
8       Q.   At that time did Mr. Hodge provide
9   any substantive comments on the scopes of work
10  which he had for about three weeks at that
11  point?
12      A.   No, he did not.
13      Q.   Would you look at tab 4, please,
14  this is Alcoa Exhibit 35.  Is this an email you
15  sent, is it Mr. Kluthe, is that the way it is
16  pronounced?
17      A.   Kluthe.
18      Q.   K-L-U-T-H-E.  Is this an email you
19  sent to Mr. Kluthe on November 11, 2002?
20      A.   Yes, it is.
21      Q.   What was his position at the time?
22      A.   Mr. Kluthe was in the corporate
23  development. Mr. Kluthe was a member of the
24  corporate developments group in Alcoa.  His role
25  in the Fairchild deal was primarily to manage

Page 851

JOHN LEASE - DIRECT

1      JOHN LEASE - DIRECT
2   the integration team that I referred to earlier
3   which was the multidiscipline team that was
4   working on transitioning Fairchild into Alcoa
5   post acquisition.
6       Q.   I want you to take a moment and
7   look at the paragraph numbered 1 on Exhibit 35.
8   For the record it reads "We met with Mike Hodge,
9   Fairchild assistant counsel environmental on
10  Friday to review Phase II scopes of work for 14
11  Fairchild plants.  Others in the meeting
12  included John George, Sandy Harvey and Jeff
13  Flanzenbaum.  We briefly reviewed our approach
14  to the Phase II work at Fullerton and more
15  generally Alcoa's approach to remediation,
16  investigation and remedial action.
17       "Mike had very few comments and
18  noted that Fairchild would not object to our
19  plans for Phase II work, nor would they approve
20  them (Fairchild has no veto rights under the
21  agreement anyway) this meeting satisfied the
22  agreement requirement that we share relevant EHS
23  info with Fairchild and give them opportunity
24  for comment."
25       Is that what you believed was the

Page 852

JOHN LEASE - DIRECT

1      JOHN LEASE - DIRECT
2   case at the time, sir?
3       A.   Yes, it is.
4       THE ARBITRATOR:  Let me ask you
5   the scopes of work preceded Phase II.  These
6   were scopes of work that would be done in the
7   Phase II study?
8       THE WITNESS:   That's correct.
9       THE ARBITRATOR:  Thank you.
10      Q.   He had them for about three weeks
11  before the meeting, you had the meeting, he gave
12  you no substantive comments at the meeting;
13  correct?
14      A.   Correct.
15      Q.   At any time after that meeting and
16  up to when the Phase II work was actually done
17  several months later, did he call or write or
18  communicate in any way and give you substantive
19  comments to the Phase II scopes of work?
20      A.   No, he did not.
21      Q.   Were the scopes of work for the
22  Phase II investigations revised in any way
23  subsequent to the original versions that you
24  provided to Mr. Hodge in October of 2002?
25      A.   Yes.  Some of them were revised.

Page 853

JOHN LEASE - DIRECT

1      JOHN LEASE - DIRECT
2       Q.   Generally speaking what was the
3   nature of the revisions?
4       A.   Generally they would reflect
5   changes that were going to take place in the
6   field sampling.  This was based on the fact that
7   the ERM personnel that were carrying out the
8   Phase II studies were able to go on to the sites
9   shortly after the acquisition and physically
10  locate where they were going to sample some
11  locations had to be moved, simply because there
12  may be a building in the way or some impediment.
13       They also redefined some of the
14  other aspects of the field work that was to take
15  place.
16      Q.   So we're not talking about
17  revisions that said we're going to do Phase IIs
18  at entire other facilities we didn't originally
19  plan for; are we?
20      A.   No.  They were fairly minor changes
21  to what had already been presented in the
22  original scopes of work.
23      Q.   Would you turn to tab 5, please.
24      MR. CHESLER:  Your Honor, for the
25  record, we previously identified bulk Exhibit C

45 (Pages 850 to 853,

2c5facfb-a662-4159-8094-057d0344af74

Page 854

JOHN LEASE - DIRECT

1
2  as in Charles which are all of the Phase II
3  documentation.
4        This appears in that bulk exhibit.
5  So we haven't marked it separately here.
6     Q.    What is the document behind --
7        THE ARBITRATOR:   This says Alcoa
8  Arbitration Exhibit C.
9        MR. SLIFKIN:   We haven't done C
10 before.
11       MR. CHESLER:   Let me apologize and
12 correct that, your Honor.  My mistake.  B were
13 the Phase II.  My error.  Exhibit C I will come
14 to, your Honor, a little later on in the
15 examination.  It is a bulk exhibit of all of the
16 correspondence and reports Mr. Lease has
17 provided to Fairchild over time.  This
18 particular document appears in that bulk exhibit
19 so we haven't given it a separate number.  I
20 apologize.
21    Q.    What is the document behind tab 5,
22 Mr. Lease?
23    A.    This is a transmittal letter with
24 attachments whereby I provided Mike with the
25 revised scopes of work that we had just

Page 855

JOHN LEASE - DIRECT

1
2  discussed.
3     Q.    Did you get any substantive
4  comments from Mr. Hodge in response to this
5  communication?
6     A.    No.
7     Q.    After the transaction closed in
8  December of 2002 did Alcoa conduct something
9  call the RIP or rapid integration process?
10    A.    Yes.
11       THE ARBITRATOR:   Rest in peace,
12 one or the other.
13       MR. CHESLER:   One or the other.
14 Might be both.
15    Q.    What is the rapid integration
16 process?
17    A.    The rapid integration process or
18 RIP is a process whereby teams of Alcoa
19 individuals in different functional areas, such
20 as EHS, HR, finance.
21    Q.    That is human resources?
22    A.    Human resources.
23    Q.    What else did you say, what was the
24 third one you mentioned?
25    A.    Finance, I believe.

Page 856

JOHN LEASE - DIRECT

1
2     Q.    Okay.
3     A.    Will visit a new acquisition, a new
4  location in an acquisition.  And the intent of
5  the site visit is to examine the facility's
6  programs in the functional area in this case.
7  In our area, EHS, we would send a team of EHS
8  professionals to a location.  And the objective
9  of that team was during their site visit to
10 identify the EHS program elements that that
11 facility had in place.  Identify and measure the
12 compliance status of that facility relative to
13 the applicable rules and regulations within that
14 jurisdiction.
15    Q.    Are you familiar with a term called
16 gap analysis?
17    A.    Yes, I am.
18    Q.    What is a gap analysis in the
19 context of the rapid integration process?
20    A.    A gap analysis is an assessment
21 that demonstrates or measures the facility
22 performance, in this case regulatory requirement
23 against the standard, against the regulator.  In
24 other words, if a facility has an air permit as
25 an example the environmental representative on

Page 857

JOHN LEASE - DIRECT

1
2  that team would look at the requirements within
3  that air permit and determine if the facility
4  was in fact meeting all of the requirements for
5  that permit.
6        In places where they were not
7  meeting those requirements that would be
8  considered a gap.
9     Q.    That is a gap in compliance?
10    A.    A gap in compliance.
11    Q.    Was this rapid integration process
12 and gap analysis done by Alcoa only for or
13 uniquely for the Fairchild acquisition or was
14 that a standard process the company followed
15 with respect to acquiring assets in companies
16 elsewhere?
17    A.    This was a standard process we used
18 before this acquisition.  And we have used since
19 this acquisition as a standard practice within
20 the company.
21    Q.    Has Alcoa ever made a request for
22 indemnification to Fairchild for the costs
23 associated with the rapid integration process
24 and the gap analyses?
25    A.    No.

46  (Pages 854 to 857)

Page 858

JOHN LEASE - DIRECT

1             JOHN LEASE - DIRECT
2    Q.   Now, did the gap analyses done with
3  respect to the Fairchild facilities identify any
4  noncompliance EHS noncompliance gaps?
5    A.   Yes, it did.
6    Q.   Can you tell us in what areas or
7  what types of areas if it is not an exhaustive
8  list did you find noncompliance gaps?
9    A.   Essentially we identified
10  noncompliance gaps in just about every area
11  within EHS.  That included environmental
12  compliance, air, water, waste water, solid and
13  hazardous waste, management.  As well as
14  chemical substance reporting.
15        We identified gaps in health areas,
16  including industrial hygiene, monitoring and
17  exposures.  We also identified gaps in workplace
18  safety areas such as machine guarding, confined
19  space, fall protection and so forth.
20    Q.   Let me go back for one moment and
21  make sure we have the right context here.
22        Prior to the gap analyses, prior to
23  the Phase II studies, prior to the scopes of
24  work for the Phase II studies, had Alcoa
25  conducted Phase I studies with respect to the

Page 859

JOHN LEASE - DIRECT

1             JOHN LEASE - DIRECT
2  Fairchild facilities?
3    A.   Yes, we had.
4    Q.   Had the Phase I studies been
5  supplied to Fairchild prior to the closing of
6  the transaction?
7    A.   Yes, they had.
8    Q.   Now, did you at some point send
9  Fairchild any correspondence relating to the
10  compliance gap analyses that you did.
11    A.   Yes, I did.
12    Q.   Did you send such analysis with
13  respect to every one of the Fairchild facilities
14  at that point?
15    A.   No, I did not.
16    Q.   As to how many of those did you
17  send Fairchild gap analyses?
18    A.   I believe there were four gap
19  analyses reports that were sent.
20    Q.   How were those chosen, what was the
21  basis?
22    A.   The initial RIP schedule targeted
23  the four largest Fairchild facilities, at that
24  time were St. Cosme in France, Toulouse, France,
25  Fullerton, California and Torrance; California.

Page 860

JOHN LEASE - DIRECT

1             JOHN LEASE - DIRECT
2    THE ARBITRATOR:  What was the last
3  one?
4    A.   Torrance.  And the intention —
5    Q.   The intention?
6    A.   The intention there was that the
7  Phase Is assessments that we examined had
8  indicated there were EHS compliance issues at
9  these facilities, as well as remediation issues.
10  And we felt they represented, by and large, the
11  breath of all operations, manufacturing
12  operations that existed within Fairchild at that
13  time.
14    Q.   To put it simply, was it your view
15  the problems that you had found in the gap
16  analyses at the four largest plants were going
17  to be inclusive of whatever duplicative problems
18  you found at the other smaller plants?
19    A.   That was our sense based on site
20  visits.  And also based on the fact that further
21  documentation on compliance issues was included
22  in the Phase Is, which supported what we found
23  in the gap analysis.
24    Q.   They had the Phase Is by then, now
25  you were sending them the gap analyses or

Page 861

JOHN LEASE - DIRECT

1             JOHN LEASE - DIRECT
2  summaries of the gap analyses for the four
3  largest facilities you had just acquired;
4  correct?
5    A.   That's correct.
6    Q.   Did you send the gap analyses to
7  Fairchild before or after further work went on
8  to address whatever the compliance gaps were you
9  had found?
10    A.   These were sent before the work was
11  started to correct these deficiencies.
12    Q.   Would you look at tab 6, please in
13  the book?
14    MR. CHESLER:  This, again, your
15  Honor, is a document that appears in bulk
16  Exhibit C.  We just have not separately numbered
17  it because it would just be extra documentation.
18    Q.   What is the document behind tab 6
19  which is bulk Exhibit C, page 2?
20    A.   This document is the gap analysis
21  report for St. Cosme.
22    Q.   You sent this to Mr. Hodge?
23    THE ARBITRATOR:  This is tab 6?
24    MR. CHESLER:  Tab 6, yes, your
25  Honor.  It should be a letter on Alcoa

47 (Pages 858 to 861)

2c5facfb-a662-4159-8094-057d0344af74

Page 862

JOHN LEASE - DIRECT

stationery addressed to Mr. Hodge.

THE ARBITRATOR:  Yes.

Q.    Is this in fact a gap analysis summary you sent to Mr. Hodge on or about March 4, 2003?

A.    Yes, it is.

Q.    You tell him in the first sentence you identified a number of existing regulatory noncompliance issues that are summarized in the attached table; correct?

A.    Correct.

Q.    If we nip over to the back of that page bulk Exhibit C, page 3, you identify six different areas of noncompliance; is that right?

A.    That's correct.

Q.    The first is waste water.  Second air emission.  Third, hazardous materials.  Fourth is fall control requirements.  Fifth, machine guarding.  And six, noise reduction.  Correct?

A.    Correct.

Q.    What was the intention of the regulatory citation column on that chart, the second column?

Page 863

JOHN LEASE - DIRECT

A.    The agreement we had signed with Fairchild for the acquisition included a provision to recoup costs for corrective actions to address noncompliance issues that existed at the time of the acquisition.

So when we looked at these areas of compliance within the facility, we intended and actually were diligent in identifying the specific regulatory requirement that applied to the specific operation.

In this case it included environmental areas as well as safety areas and health areas.

Q.    So these were not Alcoa requirements, these were governmental requirements of various types?

A.    That's correct.

Q.    Then under corrective actions, what was the intent of that column in the gap analysis summary?

A.    This corrective action summary really was our plan going forward to address the noncompliance issue we had identified.

Q.    By and large were these different

Page 864

JOHN LEASE - DIRECT

problems at these different facilities and potential corrective actions also the subject of comment in the Phase I reports?

A.    Yes, they were.

Q.    What was the intent of estimated cost column in these summaries?

A.    These estimated costs were our estimate at that time of what it would take to bring or implement the corrective action that was identified in the corrective action column.

Q.    Were these final estimates, preliminary estimates, what were they?

A.    I would consider these to be preliminary estimates.

Q.    Did some of them change thereafter?

A.    I can't recall specifically, but it is possible, yes.

Q.    Did you get a response from Fairchild to this gap analysis summary that you sent with respect to the St. Cosme facility?

A.    Yes, I did.

Q.    Would you look at tab 7, please, in the book.  Is this the response you received to that letter?

Page 865

JOHN LEASE - DIRECT

A.    Yes, it is.

Q.    I note this one came from Mr. Miller.  You sent yours to Mr. Hodge, but Mr. Miller responded?

A.    Yes, that's correct.

Q.    Mr. Miller says that "Based upon our previous understanding of the environmental issues at the St. Cosme facility" this is the facility that was until December 2003 owned by Fairchild; correct?

A.    December of 2002.

Q.    Excuse me, December 2002; correct?

A.    Correct.

Q.    So based upon his previous understanding of the environmental issues at that facility, it says "It leads us to question" then he goes on to talk about whether all of the items listed in the table fall within the ambit of 11.6 of the agreement and whether the estimated costs are justified.

He goes on to say they want specific and complete background documentation, costs, etc.

Did you understand this letter to

48  (Pages 862 to 865)

Page 866

JOHN LEASE - DIRECT

1
2 tell you that the items in your March 4th letter
3 relating to fall control, machine guarding and
4 noise reduction were not covered in any way,
5 shape or form by the indemnification?
6     A.    That was my general impression of
7 this letter, yes.
8     Q.    He was telling you he wasn't going
9 to pay?
10     A.    Essentially he was questioning,
11 yes, he is questioning whether these are
12 eligible for payment under the agreement.
13     Q.    Did you respond to Mr. Miller's
14 letter of March 14?
15     A.    Yes, I did.
16     Q.    We will get to your response soon.
17 Let me ask you a couple of other questions
18 first.
19         With respect to St. Cosme and Mr.
20 Miller in particular saying he was basing his
21 position, in part at least on Fairchild's
22 previous understanding of the environmental
23 issues at the St. Cosme facility, did you in the
24 first months of 2003 get to acquire any
25 information now that Alcoa owned these

Page 867

JOHN LEASE - DIRECT

1
2 facilities about what in fact had been going on
3 at St. Cosme with respect to environmental
4 issues during the period of time in which
5 Fairchild owned it?
6     A.    Yes, we did.
7     Q.    Particularly with respect to waste
8 water treatment at the St. Cosme facility, what
9 did you learn in the first months of 2003 had
10 been going on there during Fairchild's ownership
11 of the facility?
12     A.    We learned that they had ongoing
13 noncompliance with their waste water discharges
14 to the community sewer. And that they had
15 proposed the construction and installation of a
16 new waste water treatment facility to address
17 those issues.
18     Q.    Did you learn anything else with
19 respect to the way in which the St. Cosme
20 facility had reported information about waste
21 water to the authorities in France?
22     A.    Yes, we did.
23     Q.    What did you learn?
24     A.    Well, I was a member of this
25 integration team. So I visited the site with

Page 868

JOHN LEASE - DIRECT

1
2 the team. My specific area of responsibility
3 was water and waste water compliance.
4         In the process of examining their
5 waste water program for compliance matters, I
6 learned from the environmental manager who was
7 also the plating line superintendent at the
8 facility, that she had been instructed when
9 reporting the discharge results to the local
10 authorities to essentially lie about the levels
11 that were in the waste water, contaminants in
12 the waste water whenever the levels exceeded
13 their permit limit.
14     Q.    Would you look at tab 8 in the
15 book, please. For the record this is Alcoa
16 Exhibit 41.
17         Do you recognize this as an email
18 from Catherine Tabary?
19     A.    Yes.
20     Q.    Who is she?
21     A.    Catherine was the environmental
22 manager and plating line superintendent at St.
23 Cosme at that time.
24     Q.    She says in this note, "Please find
25 enclosed the water analysis from our waste water

Page 869

JOHN LEASE - DIRECT

1
2 treatment plant that were sent to authorities
3 from 1999 until now. I will compile actual
4 results as soon as possible."
5         Did you understand that from your
6 conversations with her that the actual waste
7 water results differed from the results reported
8 to the authorities for a period of three or four
9 years?
10     A.    That was my understanding, yes.
11     Q.    We heard some testimony earlier
12 today about when Fairchild actually bought
13 certain facilities. Was it your understanding
14 Fairchild owned the St. Cosme facility in 1999
15 when this misreporting commenced?
16     A.    That was my understanding, yes.
17     Q.    Did Ms. Tabary subsequently give
18 you the actual waste water discharge data for
19 the St. Cosme facility?
20     A.    Yes, she did.
21     Q.    Would you turn to tab 9, please.
22 By the way was there an attachment to the
23 original email, was there data in fact attached,
24 the data she refers to as having been sent to
25 the authorities from 1999 on?

49 (Pages 866 to 869

Page 870

JOHN LEASE - DIRECT

1
2    A.    Yes, a series of spreadsheets, data
3  summaries that were attached to the email.
4        MR. CHESLER:  They follow, your
5  Honor, in the exhibit, the pages thereafter.
6        THE ARBITRATOR:  Yes.
7    Q.    Tab 9, Exhibit 42, do you recognize
8  this as a subsequent email from Ms. Tabary in
9  which she says she is enclosing the actual
10  values regarding water discharge, many from the
11  waste water treatment plant for the last two
12  years at St. Cosme?
13    A.    Yes.
14    Q.    If you look down toward the bottom
15  of that same page you see a note from Catherine
16  Tabary to Richard Tomicek; correct?
17    A.    Tomicek.
18    Q.    Is he also an Alcoa employee?
19    A.    Yes, he is.
20    Q.    At that point he was Alcoa.  She
21  says in the second paragraph of her note at the
22  bottom of the first page of Exhibit 42,
23  "Concerning water analysis, the spreadsheets I
24  sent you last Friday are the ones we sent to
25  authorities.  The limits that we should comply

Page 871

JOHN LEASE - DIRECT

1
2  to are placed in the line called norm.  You
3  should not find a lot of noncompliance in these
4  spreadsheets except in the last months.  The
5  spreadsheets with the actual values for the last
6  two years are under preparation.  I will try to
7  send them before the call."
8        Then she in fact subsequently sent
9  them; correct?
10    A.    Correct.
11    Q.    Did the actual data for waste water
12  discharge at St. Cosme differ from what St.
13  Cosme had reported while it was a Fairchild
14  facility?
15    A.    Yes, it did.
16    Q.    Without going through the specific
17  numbers, can you generally describe for the
18  judge what kind of discrepancies or differences
19  there were between the actual data and reported
20  data?
21    A.    Well, the Fairchild facility at St.
22  Cosme reported as subject to limits for
23  flow, what waste water flow, various
24  contaminants such as metals, suspended solids in
25  the water, oil and grease.  Limits were

Page 872

JOHN LEASE - DIRECT

1
2  established for all those parameters in the
3  discharge.  And generally the levels that were
4  reported to the local agency were below the
5  actual levels that were recorded in the samples.
6    Q.    Did you or did Alcoa ask the
7  consultants at ERM to analyze the different
8  data, the books that were given to the
9  authorities versus the actual data?
10    A.    Yes, we did.
11    Q.    Would you turn to tab 10, please.
12        THE ARBITRATOR:  Is that okay in
13  trance to keep two sets of books?
14        THE WITNESS:  No, sir.
15        MR. CHESLER:  Some things seem to
16  be universal truths, your Honor.
17        THE ARBITRATOR:  Even in France
18  they don't allow it.
19        MR. CHESLER:  Even in France and
20  even though they like Jerry Lewis.
21    Q.    Would you look at Exhibit 43 which
22  is behind tab 10, please.  Do you recognize this
23  as ERM analysis of the two sets of books at St.
24  Cosme?
25    A.    Yes, I do.

Page 873

JOHN LEASE - DIRECT

1
2    Q.    I notice if you look in the first
3  page of Exhibit 43, about a third of the way
4  down there is a bold heading that says Flow.  Do
5  you see that?
6    A.    Yes, I do.
7    Q.    Then it says "The waste water flow
8  is, by far the parameter which is the most
9  frequently out of compliance with the limit
10  value set in the permit.  From January 1, 2002,
11  27 percent of the real flow values are in
12  exceedance of the permit value."
13        THE ARBITRATOR:  That is a volume
14  number, the flow that is what they are talking
15  about volume of liquid?
16        THE WITNESS:  Yes, it is measured
17  as cubic meters per hour, I believe.  Cubic
18  meters per day.
19    Q.    Then if you go down that same
20  section to about six or eight lines above the
21  bold heading PH at the bottom, if you go six
22  lines above that heading you see there is a text
23  that says "To show compliant values, the site
24  has undervalued 70 data, and has reported to the
25  authorities 142 flow data which were not

50  (Pages 870 to 873)

Page 874

JOHN LEASE - DIRECT

1    JOHN LEASE - DIRECT
2    included in the real value tables."
3          Then they give the average real
4    flow values from the beginning of 2000 and the
5    average sent value, meaning what was sent to the
6    authorities; correct?
7    A.    Correct.
8    Q.    So you had or Alcoa had ERM analyze
9    the discrepancies in the two sets of books; is
10   that right?
11   A.    That's correct.
12   Q.    This is the report about that --
13   A.    Exactly.
14   Q.    -- to you. Would you look on
15   page 58542, which is the third page of this ERM
16   report. The third section of that page up from
17   the bottom, third from the bottom is entitled
18   Water Consumption of the Surface Treatment
19   Facilities. Do you see that?
20   A.    Yes, I do.
21   Q.    They reported there, ERM reported
22   the site exceeds for 12 surface treatment lines
23   out of 19 the limit value set in the order of
24   September 26, 1985.
25         That was that a permit in effect,

Page 875

1    JOHN LEASE - DIRECT
2    under which they were operating?
3    A.    Yes, it is.
4    Q.    It says for 12 of the 19 surface
5    treatment lines they were in excess of the
6    limits permitted by the permit?
7    A.    That's correct.
8    Q.    It says "A water recycling study
9    was carried out in 2002." Now 2002 was when
10   Fairchild owned the place; right?
11   A.    That's correct.
12   Q.    So ERM is telling you that while
13   Fairchild owned it there was a water recycling
14   study done which showed that approximately, I
15   think that is a typo 400,000 Euros should be
16   spent in treatment equipment for allowing the
17   recycling of water; correct?
18   A.    Correct.
19   Q.    "We estimate" ERM estimates "This
20   figure should be at least double 800,000 to 1
21   million Euros if you include the works to
22   install the modified lines." Is that right?
23   A.    That's correct.
24   Q.    Is that something that was
25   disclosed to you, to Alcoa by Fairchild so far

Page 876

1    JOHN LEASE - DIRECT
2    as you know prior to this investigative work
3    Alcoa did?
4    A.    Not that I'm aware of, no.
5    Q.    It wasn't until Alcoa hired ERM in
6    the face of finding two separate sets of books
7    at St. Cosme that you learned that Fairchild had
8    itself had a study done before the sale in which
9    they were told it would cost something on the
10   order of 400,000 Euros they needed to replace
11   this water recycling facility; correct?
12   A.    That's my understanding, yes.
13   Q.    I want you to look at tab 11?
14   MR. CHESLER:    Your Honor, behind
15   tab 11, which is Exhibit 44, the first three
16   pages are of course in French. Immediately
17   following that is an English translation of the
18   French document, beginning the fourth page
19   behind the tab. The last page is a
20   certification from our translators here at
21   Cravath that this is accurate French to English
22   translation.
23   MR. ZUROFSKY:    We will reserve our
24   right to review the translation and see if we
25   disagree with it. I don't have at this point a

Page 877

1    JOHN LEASE - DIRECT
2    basis to object.
3    MR. CHESLER:    Fine.
4    Q.    Would you turn, Mr. Lease, to the
5    first page of the English translation which is
6    the fourth page I believe behind tab 11.
7    A.    Okay.
8    Q.    Do you recognize this as a proposal
9    made to Fairchild back in March of 2001 for
10   water treatment facility at the St. Cosme
11   location?
12   A.    Yes, I do.
13   Q.    If you look on page that end 859,
14   you see there is a heading Roman III Indicative
15   Budget. Do you see that?
16   A.    Yes.
17   Q.    Is it the case this study done by
18   Fairchild back in 2001 indicated the budget
19   estimate they received for doing this work was
20   something close to 900,000 Euros?
21   A.    That's correct.
22   Q.    If you turn to the next page, the
23   page that ends 11860, the last page of the
24   English translation. Under the heading Comments
25   Regarding the Project?

51 (Pages 874 to 87'

2c5facfb-a662-4159-8094-057d0344af74

Page 878

JOHN LEASE - DIRECT

2  A.  I see that, yes.
3  Q.  Fairchild was told these
4  consultants suggested, based on the study of
5  pollution flows that they plan to have an
6  engineering study performed in which they could
7  elaborate on the following points. The first of
8  which is waste water treatment based on the data
9  that was done, derived from the study; correct?
10  A.  That's right.
11  Q.  When you took over the facilities
12  did you find that Fairchild had in fact taken
13  this recommendation and done the study that was
14  suggested?
15  A.  I don't believe they had at this
16  point, no.
17  Q.  So this was being suggested in
18  early '01. You didn't take over the facility
19  until the end of '02; correct?
20  A.  That's correct.
21  Q.  Despite all of that and apparently
22  according to him, based upon Fairchild's prior
23  knowledge of the environmental issues at this
24  facility, that is what Mr. Miller said, he
25  wanted more information from you before he would

Page 879

JOHN LEASE - DIRECT

2  tell you one way or the other if he was going to
3  pay you for the work, investigative work you
4  were doing at St. Cosme, do you recall that?
5  A.  Yes, I do.
6  Q.  You indicated earlier you responded
7  to that request for more information. Would you
8  look at tab 12, please. Is this your response
9  to Mr. Miller's request for more information on
10  the ground he supposedly based upon their
11  knowledge of St. Cosme, needed this information?
12  A.  Sorry, could you repeat that.
13  Q.  Yes. Is this your response to Mr.
14  Miller's request for more information which he
15  said he needed based upon his review of what you
16  sent him and their own prior knowledge of what
17  had gone on in St. Cosme?
18  A.  Yes, it is.
19  Q.  Attached to this letter on the back
20  of the letter, did you in fact provide further
21  detail on each of the six areas of noncompliance
22  you had identified in your first gap summary?
23  A.  Yes, I did.
24  Q.  Let's look at that page. This is
25  the page that ends 005, your Honor. It is the

Page 880

JOHN LEASE - DIRECT

2  backside of the document behind tab 12. Which,
3  for the record is bulk Exhibit C, page 20. That
4  is the backside is page 20.
5       Do you have that, Mr. Lease?
6       THE ARBITRATOR:  Bulk Exhibit C
7  volume 1 of 22.
8       MR. CHESLER:  Yes, there is a lot
9  of correspondence and reports, your Honor, many,
10  many volumes. Maybe they are here. The entire,
11  just for your Honor, just for your reference the
12  entire two bottom two shelves of the bookcase in
13  front of you are the correspondence and reports
14  sent by Mr. Lease.
15       THE ARBITRATOR:  You will bring
16  those up to my office?
17       MR. CHESLER:  One page at a time.
18  We have all the paralegals waiting outside.
19  A.  Yes.
20  Q.  The first item of the six that are
21  listed here again is waste water; correct?
22  A.  That's correct.
23  Q.  That is the area in which they were
24  keeping two sets of books; correct?
25  A.  Correct.

Page 881

JOHN LEASE - DIRECT

2  Q.  You say under Issues and Regulatory
3  Background in this additional detail that Mr.
4  Miller asked for, "The facility waste water
5  discharge is routinely noncompliant with the
6  numerical limitations for several parameters,
7  flow" you give others, "In its operating permit
8  which was issued in 1986." Correct?
9  A.  Correct.
10  Q.  That is the information you learned
11  from hiring consultants who analyzed the two
12  sets of books that Fairchild kept; isn't it?
13  A.  I think timing-wise I have to look
14  at the date on this versus the date on the ERM
15  report. But the ERM study was in progress at
16  the time this reply was sent.
17       So we were aware at that point that
18  there were two sets of books through discussions
19  with Catherine. That is reflected in this
20  statement.
21  Q.  Fine. So you sent this letter, did
22  you get a response from Fairchild to this
23  additional information they requested?
24  A.  I believe I did. Yes.
25       THE ARBITRATOR:  What on this

52  (Pages 878 to 881)

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com

2c5facfb-a662-4159-8094-057d0344af74

Page 882

JOHN LEASE - DIRECT

1  chart we were just looking at is additional?
2  Much of it looks to be the same as the last one
3  we saw. You added a column, what column.
4      THE WITNESS:   I believe the
5  middle column, your Honor.
6      THE ARBITRATOR:   That wasn't in
7  the last one?
8      MR. CHESLER:   We can go back and
9  look. Let's see. Yes, if you look your Honor,
10  behind tab 6, the original report behind tab 6
11  had four columns, issue description, regulatory
12  citation, corrective actions and estimate of
13  cost. Now there has been added issue and
14  regulatory background column. Which I just read
15  from in the waste water entry. There is one for
16  each of the entries.
17      Q.    Would you look at tab 13, Mr.
18  Lease.
19      A.    Yes.
20      Q.    Is this Mr. Miller's response to
21  the additional information you provided in
22  response to his earlier request with respect to
23  St. Cosme?
24      A.    Yes, it is.

Page 883

JOHN LEASE - DIRECT

1      Q.    He tells you toward the end of the
2  first paragraph, that the further background
3  detail you provide is really no more conclusory
4  statements as to your rationale for including
5  these issues and he asked whether you performed
6  more assessments. And says "I want still more
7  documentation." Correct?
8      A.    Correct.
9      Q.    What did you do with respect to
10  this letter?
11      A.    At this point Mr. Miller had
12  everything we had. Much of the information that
13  he was asking for was in fact in Fairchild's
14  possession at the time of the sale and we really
15  had nothing further to give him to describe the
16  issues that he requested us to respond to.
17      Q.    By the way, was St. Cosme the only
18  Fairchild facility at which you found that the
19  Fairchild folks had been misrepresenting the
20  environmental information to the regulators?
21      A.    No. It was not.
22      Q.    Where else did you find such
23  information?
24      A.    When we visited the Torrance

Page 884

JOHN LEASE - DIRECT

1  facility to conduct the rapid integration site
2  visit, I was also a member of that team assigned
3  to waste water again.
4      During my discussions with the
5  personnel on the site that treated the waste
6  water and waste water treatment plant, I was
7  told by the chief treatment plant operator
8  during periods when the Los Angeles County
9  Sanitation District was on site sampling the
10  waste water for compliance with their limits, it
11  was a routine practice to turn on the fresh
12  water flow in the plating line operation to, in
13  essence, dilute the discharge with clean water
14  thereby lowering the concentration of
15  contaminants which allowed them to meet their
16  permit limits.
17      Q.    With respect to the St. Cosme and
18  Torrance situations where you found this
19  evidence of misrepresentation, what was Alcoa's
20  instruction to the plant personnel going forward
21  now that Alcoa owned those facilities?
22      A.    They were told to immediately cease
23  the practices they were undertaking at the time
24  that Fairchild owned them.

Page 885

JOHN LEASE - DIRECT

1      Q.    What was the response you got from
2  the folks in the plant sites?
3      A.    They were happy to oblige. The
4  practices that were occurring at Torrance, for
5  example, would be considered criminal offenses
6  under the Clean Water Act.
7      Q.    You mentioned earlier you provided
8  gap analysis summaries for the four largest
9  plants, which you thought had comprehensive list
10  of the problems you were finding. Did you have
11  any better success getting an agreement from
12  Fairchild that they would indemnify expenses
13  with respect to the other plants for which you
14  gave gap analyses than you did respect to St.
15  Cosme?
16      A.    No.
17      Q.    Did you get pretty much the same
18  response?
19      A.    Very much the same response.
20      Q.    Let's look at tab 14, please. This
21  is again from bulk Exhibit C. This happens to
22  be a document that begins at page 35 of bulk
23  Exhibit C. Tab 14, your Honor.
24      Is this your gap summary for the

53  (Pages 882 to 885,

Page 886

JOHN LEASE - DIRECT

1    JOHN LEASE - DIRECT
2  Fullerton facility?
3     A.    Yes.
4     Q.    Just skip ahead a minute, would you
5  go to tab 16 which is Exhibit C, beginning at
6  page 32. Is this your gap summary for the
7  Toulouse facility?
8     A.    Yes, it is.
9     Q.    Did you get responses from
10 Fairchild with respect to Fullerton and
11 Toulouse?
12    A.    Yes, I did.
13    Q.    Why don't you look at tab 15, which
14 is Alcoa Exhibit 47. Do you have that?
15    A.    Yes, I do.
16    Q.    Is this Mr. Miller's response on
17 behalf of Fairchild to your gap summary for the
18 Fullerton facility?
19    A.    Yes, it is.
20    Q.    Just to take a moment if we can,
21 sorry to make you flip back and forth so much, I
22 am trying to save us a little time, behind tab
23 14, that is the Fullerton gap summary. Among
24 the areas that you reported the issues on which
25 you reported noncompliance were lock out tag

Page 887

JOHN LEASE - DIRECT

1    JOHN LEASE - DIRECT
2  out; is that right?
3     A.    That's right.
4     Q.    That is a question of whether the
5  power supply to the machine is locked so people
6  don't get hurt during maintenance procedures?
7     A.    That's correct.
8     Q.    You gave them information about
9  noncompliance for confined space entry; is that
10 right?
11    A.    Right.
12    Q.    Would you describe very quickly for
13 the judge what confined space entry deals with?
14    A.    Confined space entry procedures
15 define the practices that employees such as
16 maintenance personnel will use in the workplace
17 when they enter a piece of equipment such as a
18 tank or some kind of chamber that typically
19 would not support life, human life. And to
20 protect the employee, confined space procedures
21 define various actions the employee must take to
22 test the atmosphere inside that confined space,
23 provides for a stand by person to remain outside
24 should any problems develop while the person is
25 in the confined space.

Page 888

JOHN LEASE - DIRECT

1    JOHN LEASE - DIRECT
2         And also procedures to follow to
3  notify others in the area that there is a person
4  inside of a confined space.
5     Q.    You also identified in this gap
6  summary machine guarding as another area on the
7  top of page 38; right?
8     A.    That's correct.
9     Q.    That is putting up guards to make
10 sure people don't lose hands and toes, that sort
11 of problem?
12    A.    Yes.
13    Q.    Then you have fall control. What
14 are the OSHA fall control issues relate to?
15    A.    Fall control is a program that
16 again provides protective measures for employees
17 that work at various heights.
18        THE ARBITRATOR:  Whereabouts are
19 you on this exhibit, 14?
20        MR. CHESLER:  Yes, your Honor
21 Exhibit 14, the page up at the top right-hand
22 corner is numbered 38.
23        THE ARBITRATOR:  Right.
24        MR. CHESLER:  The second box in
25 the middle of the page is the location under

Page 889

JOHN LEASE - DIRECT

1    JOHN LEASE - DIRECT
2  issue description.
3        THE ARBITRATOR:  Tab 38 did you
4  say.
5        MR. CHESLER:  Page 38 in the upper
6  right-hand corner of the page.
7        THE ARBITRATOR:  I'm looking at
8  the number on the bottom.
9        MR. CHESLER:  The number in the
10 bottom is old Bates numbers, when we put them in
11 bulk volumes we numbered them sequentially at
12 the top.
13    Q.    You have a fall control section.
14 You were explaining what fall control relates
15 to?
16    A.    Yes. Fall control is a program
17 area in work place health and safety that deals
18 with protecting employees when they work at
19 various heights above the floor, on platforms,
20 or on a roof, for example, to ensure that, in
21 essence they don't fall off.
22    Q.    Putting up railing and the like?
23    A.    Yes, that's correct.
24    Q.    Let me pick out one other one. The
25 last category, I guess not the last category,

54  (Pages 886 to 889)

Page 890

JOHN LEASE - DIRECT

1 the next category on the next page, page 39 is
2 is mobile equipment practices and conditions.
3 Does that have to do with safety measures for
4 equipment that moves around like cranes and
5 things of that sort?
6      A.    Cranes and fork trucks, industrial
7 vehicles in the workplace, yes.
8      Q.    You gave Mr. Miller all these
9 sections and cites to OSHA regulations and the
10 like.  And he responded with the letter behind
11 tab 15; correct?
12     A.    That's correct.
13     Q.    It says in the subject line of the
14 letter, Exhibit 47 behind tab 15, it says "Re:
15 Fullerton."  So he is responding with respect to
16 Fullerton; correct?
17     A.    That's correct.
18     Q.    Did you find anything odd when you
19 read this letter given he was responding to you
20 concerning the Fullerton facility and his letter
21 begins that this is Re:  Fullerton?
22     A.    Sorry, could you repeat that.
23     Q.    Yes.  Did you find anything odd
24 about the content of this letter considering
25

Page 891

JOHN LEASE - DIRECT

1 that he was supposedly responding to you with
2 respect to the Fullerton facility? In particular
3 would you look down toward the bottom of the
4 second paragraph of the letter what facility is
5 referred to in the text of the letter.
6      A.    I see what you're saying.  The
7 content of the letter was to deal with
8 Fullerton.  His comments regarding the only
9 notice of violation that had been received
10 actually related to the Torrance facility, which
11 wasn't the subject of this particular gap
12 analysis.
13     Q.    In fact why don't you flip to tab
14 17.  This is Alcoa Exhibit 49.  Tab 17.
15           This is Mr. Miller's response to
16 you, to your gap analysis summary for the
17 Toulouse facility, right that was one of the
18 four major facilities?
19     A.    That's correct.
20     Q.    You wrote to him about Fullerton.
21 He writes back telling you about a problem in
22 Torrance.  Then you write to him about Toulouse
23 and he writes back and what does this letter
24 say?
25

Page 892

JOHN LEASE - DIRECT

1      A.    This letter says exactly the same
2 thing that the Fullerton letter said,
3 referencing a notice of violation at Torrance.
4      Q.    So what did you conclude from
5 writing letters about different facilities and
6 you keep getting the same letter back about
7 Torrance?
8      A.    This appears to be a form letter,
9 to me.
10     Q.    This form letter in addition to
11 telling you they were complaining about
12 something in Torrance says "Nevertheless
13 pursuant to section 11.7 of the agreement we are
14 willing to discuss this matter further" it goes
15 on.
16           Did you have an understanding of
17 what 11.7 was?
18     A.    I think 11.7 referred to dispute
19 resolution.
20     Q.    We heard some testimony earlier
21 well it refers to dispute resolution, but it
22 says we are willing to discuss it further with
23 you.
24           Did you have any understanding in
25

Page 893

JOHN LEASE - DIRECT

1 order to continue discussing things between the
2 two companies Fairchild had to invoke the
3 procedures of section 11.7?
4      A.    I am not an attorney.  So I wasn't
5 fully sure of what this particular statement
6 meant in terms of future discussions with
7 Fairchild.
8      Q.    You had correspondence back and
9 forth with them before that didn't involve
10 anybody citing to the dispute resolution
11 procedures; hadn't you?
12     A.    That's correct.
13     Q.    If they called you up and said,
14 John, we want to talk to you about what you've
15 told us about Toulouse, would you have spoken to
16 them?
17     A.    Yes, I would.
18     Q.    Did they ever call you?
19     A.    No.
20     Q.    Did they ever ask to have a visit?
21     A.    No.
22     Q.    Did they ever ask to send
23 consultants to look at any of their former
24 sites?
25

55 (Pages 890 to 893

Page 894

JOHN LEASE - DIRECT

2  A.  No.
3  Q.  Did they ever ask to talk to your
4  consultants?
5  A.  No.
6  Q.  Would you have said to them I won't
7  talk to you, I won't communicate with you unless
8  we do it under the dispute resolution procedures
9  of the contract?
10  A.  No.
11  Q.  So you send them these gap analyses
12  and they send you these form letters telling you
13  about Torrance and citing to 11.7.
14       In this 2003, the same time period,
15  the Phase II studies are going forward; aren't
16  they?
17  A.  Yes, they are.
18  Q.  The studies you had given them
19  scopes of work for back in 2002, then gave them
20  revised scopes of work for in early '03;
21  correct?
22  A.  Correct.
23  Q.  As to which you never got any
24  comments; right?
25  A.  That's correct.

Page 895

JOHN LEASE - DIRECT

2  Q.  Did you give them the Phase II
3  reports?
4  A.  Yes, we did.
5  Q.  Did you get any responses with
6  respect to any Phase II reports?
7  A.  Yes, I did.
8  Q.  Would you look at tab 18, please.
9  This is Alcoa Exhibit 32.
10  A.  Okay.
11  Q.  Do you recognize this as a letter
12  you received from Ernesto Beckford at Fairchild
13  with respect to the Phase II assessment costs
14  for 14 of the former Fairchild facilities?
15  A.  Yes.
16  Q.  In fact you had only done Phase IIs
17  at 14 facilities; right?
18  A.  That's correct.
19  Q.  So Mr. Beckford basically divides
20  up all of the invoice information you gave him
21  into three categories; is that right?
22  A.  That's correct.
23  Q.  Look at the first category on
24  page 293, your Honor.  It is the backside of the
25  first page of Exhibit 32.

Page 896

JOHN LEASE - DIRECT

2       This says "No Fasteners
3  Environmental Conditions." Did you agree with
4  the Fairchild position that if you did
5  investigation work at a facility and had not
6  identified up to that point some environmental
7  condition like a contamination situation, that
8  they had no obligation to pay you for the study?
9  A.  That was not my understanding, no.
10  Q.  Second category says well these are
11  environmental conditions which were already
12  disclosed by Fairchild and were already being
13  remediated, that is what his letter says; right?
14  A.  Yes.
15  Q.  Did you have an understanding if
16  you expended money with respect to a condition
17  they did tell you about as opposed to the ones
18  they didn't tell you about, that they had no
19  obligation to pay you for your own investigative
20  expenses with respect to those conditions?
21  A.  No.
22  Q.  The third category says, here are
23  mixed reports disclosing no action required and
24  disclosing potential Fasteners Environmental
25  Conditions.  You see he says there "The Phase II

Page 897

JOHN LEASE - DIRECT

2  assessments for the following facilities" now on
3  page 295, your Honor.  "Identified some
4  Fasteners Environmental Conditions."
5       THE ARBITRATOR:  Slow up a little
6  bit.  Let me just look at this.
7       MR. CHESLER:  Yes, sir.
8       THE ARBITRATOR:  I take it in his
9  letter bottom of the first paragraph the number
10  he cites should be 940,000?
11       MR. CHESLER:  Yes, your Honor, I
12  believe.
13       THE ARBITRATOR:  A zero at the end
14  there.
15       MR. CHESLER:  Yes, I think so.
16       Can we proceed, your Honor?
17       THE ARBITRATOR:  Yes.
18  Q.  Mr. Lease, I would like you to look
19  at the third of Mr. Beckford's three categories
20  into which he grouped the invoices you sent him
21  that would be on page 295 of Exhibit 32 which is
22  behind tab 17 in the book.  Do you have that?
23  A.  Okay.
24  Q.  As to these, this third category,
25  Mr. Beckford told you that you had identified

56  (Pages 894 to 897)

2c5facfb-a662-4159-8094-057d0344af74

Page 898

JOHN LEASE - DIRECT

1 some Fasteners conditions which may require
2 further action under applicable environmental
3 laws, including applicable remediation
4 standards; correct?
5    A.    Correct.
6    Q.    But he said, you've also
7 investigated some things in which we don't think
8 you found any Fasteners condition, Fasteners
9 environmental condition, we want you to break
10 those up; right?
11   A.    That's right.
12   Q.    What did you do in response to
13 that?
14   A.    We did not response to this letter
15 with further data, broke up the cost data.
16   Q.    Why is that?
17   A.    Our understanding was that based on
18 the Phase I assessments which identified the
19 areas of potential contamination, on which we
20 base the Phase II scopes of work, and revised
21 scopes of work on which were based these Phase
22 II reports, the full cost of the investigation
23 was covered as part of the agreement. And was
24 not subject to what we found.

Page 899

JOHN LEASE - DIRECT

1    Q.    By the way, were you later informed
2 by Fairchild that they had changed their
3 position in any way about the possibility of
4 paying for at least some of the items in this
5 category 3?
6    A.    Yes, I believe at some point in a
7 subsequent letter we were advised by Susan Hall
8 they were withdrawing this potential
9 reimbursement for portions of the Phase II site
10 investigations.
11   Q.    Would you look at tab 19, please.
12 Do you recognize this as a letter you received
13 from Ms. Hall on or about February 25 of 2005?
14   A.    Yes.
15   Q.    Would you turn to the second page
16 of the document, this is Exhibit 103. There is
17 a footnote at the bottom of that page. It says
18 "On a related matter?"
19        THE ARBITRATOR:  This is page 342?
20        MR. CHESLER:  340, your Honor. Is
21 yours double-sided?
22        THE ARBITRATOR:  Yes.
23   Q.    Bottom of page 340, Mr. Hall's
24 letter has a footnote that says "On a related

Page 900

JOHN LEASE - DIRECT

1 matter, by letter dated February 26, 2004, we
2 requested additional information regarding
3 approximately $528,000 of Phase II assessment
4 costs incurred by Alcoa."
5        That is referring to that category
6 3 from your Phase II notice letter; correct?
7    A.    Correct.
8    Q.    She says "On further analysis, we
9 have determined that for the same reasons
10 expressed in this letter, the $528,000 in costs
11 are not indemnifiable."  She says they don't
12 relate to a Fasteners environmental condition,
13 she says "all you're doing is kicking the tires"
14 correct?
15   A.    Correct.
16   Q.    Is that the reference you had in
17 mind earlier when you said that they
18 subsequently withdrew, to the extent they said
19 anything about possibly paying for any of these
20 they subsequently withdrew that position?
21   A.    Yes, this is it.
22   Q.    Were there particular claims that
23 you passed on to Fairchild that related to work
24 being done by contractors that was already

Page 901

JOHN LEASE - DIRECT

1 underway by Fairchild using those contractors
2 when you acquired the facilities?
3    A.    Yes.
4    Q.    Would you look at tab 20, please.
5 Of this is Alcoa Exhibit 52. After the first
6 page which is a buckslip from Mr. Miller and Mr.
7 Hodge if you turn to the back of that page you
8 see that as a letter from you to Mike Hodge for
9 which the typed date is March 9, 2003. Do you
10 see that?
11   A.    Yes, I do.
12   Q.    By the way, was that the actual
13 date that you sent the letter?
14   A.    No. The year is incorrect. It was
15 actually 2004.
16   Q.    It is a typo?
17   A.    Yes.
18   Q.    You see the Fairchild received
19 stamp right next to it is actually dated March
20 19, 2004?
21   A.    Yes.
22   Q.    So this is a letter you sent to
23 Fairchild about the City of Industry, California
24 noncompliance issues. Is this a gap analysis

57 (Pages 898 to 901

Page 902

JOHN LEASE - DIRECT

1    summary for the City of Industry facility?
2        A.    Essentially, yes, it is.
3        Q.    If you look further on in your
4    submission to them at page 238, beginning at 238
5    there are a number of pages which appear to be
6    invoices from a company called EnviroSolve.  Do
7    you see that?
8        A.    Yes, I do.
9        Q.    What was EnviroSolve?
10       A.    EnviroSolve was the contractor that
11   Fairchild was using at the time we acquired them
12   to operate a groundwater pump and treat system
13   located at the City of Industry, Temple Avenue
14   location.
15       Q.    So were these invoices you were
16   submitting to Fairchild for services performed
17   by the same contractor with respect to the same
18   work at the same facility they'd been using?
19       A.    Yes, in fact we had paid these
20   invoices and were submitting them for
21   reimbursement.
22       Q.    Did Fairchild agree to pay you back
23   for this?
24       A.    No, they have not.

Page 903

JOHN LEASE - DIRECT

1        Q.    Now this same letter with respect
2    to the City of Industry facility identifies
3    beginning at page 232, identifies nine different
4    areas of noncompliance; is that right?
5        A.    That's correct.
6        Q.    Are these areas of environmental
7    health and safety at City of Industry --
8        A.    That's true -- I'm sorry.
9        Q.    Yes.  Are these areas of
10   environmental health and safety at the City of
11   Industry facility about which the Phase I
12   reports had also flagged issues?
13            THE ARBITRATOR:  There are two
14   facilities, aren't they, in City of Industry?
15            MR. CHESLER:  Yes, Temple Avenue
16   and Unruh.
17            THE ARBITRATOR:  Does this relate
18   to both of them?
19            MR. CHESLER:  It does.  If you
20   look, your Honor, at the first sentence of Mr.
21   Lease's letter which is on page 231.
22            THE ARBITRATOR:  Right.
23            MR. CHESLER:  You see he
24   references both.

Page 904

JOHN LEASE - DIRECT

1        Q.    The question is whether these were
2    areas of noncompliance that were also flagged in
3    the Phase I reports?
4        A.    Yes, in fact many of the same
5    issues were identified in the gap analysis work
6    as well as Phase I.
7        Q.    After the Phase II work was done
8    were there follow on studies, investigations
9    performed at some or all of the 14 facilities?
10       A.    Yes.
11       Q.    Are those follow on studies that
12   were suggested by and referenced in the Phase II
13   analyses?
14       A.    Yes, they were.
15            MR. CHESLER:  Your Honor, at this
16   point I just want to note for the record as I
17   indicated earlier, there is a large bulk
18   Exhibit consisting of the binders on the lower
19   two shelves of the bookcase, all of which are
20   labeled Exhibit C.
21            THE ARBITRATOR:  Right.
22       Q.    I'll ask the witness, what is in
23   Exhibit C, what is the universe of materials
24   generally speaking that are behind those three

Page 905

JOHN LEASE - DIRECT

1    inch binders?
2        A.    I believe Exhibit C is the
3    documents comprising --
4            THE ARBITRATOR:  How many volumes
5    is it?
6            MR. CHESLER:  22, your Honor.
7            THE WITNESS:  The Phase II
8    studies documentation as well as the follow on
9    studies that were triggered by the Phase IIs.
10       Q.    Just to we are clear, B, Exhibit B
11   are the Phase IIs.  So this would be the follow
12   on, everything that followed the Phase IIs?
13       A.    Yes.
14       Q.    And to the best of your knowledge
15   did you in fact send, in either hard copy or
16   electronic form, all of the materials in those
17   volumes that followed on the Phase II studies,
18   did you send them to Fairchild?
19       A.    Yes, I did.
20            MR. ZUROFSKY:  Your Honor, just to
21   note, I don't think -- we would request a set of
22   whatever they are introducing to give to you,
23   your Honor, as copy set.  So we can look at the
24   same exhibits.

58  (Pages 902 to 905)

Page 906

JOHN LEASE - DIRECT

1    JOHN LEASE - DIRECT
2    MR. CHESLER:  Sure.
3    MR. SLIFKIN:  We have a Bates
4  numbered indexes.  It is all out of production
5  we have an indexes we can give you with the
6  Bates numbers on it.
7    MR. CHESLER:  That may be a more
8  environmentally friendly way of doing it.
9    MR. SLIFKIN:  We can do the
10  indexes right now.
11    MR. CHESLER:  Okay. There is
12  nothing in this, in these volumes, your Honor,
13  that hasn't been subject of production before
14  and was not only produced in the litigation but
15  provided to Fairchild prior to the litigation.
16    Q.    Would you turn to, just jumping
17  ahead for a moment to tab 40.  This is your
18  Honor, a demonstrative.  It is for demonstrative
19  purposes only.  We labeled it for identification
20  Alcoa Exhibit 125.  We have a blow up of the
21  same thing but your Honor has it in front of
22  you.
23    THE ARBITRATOR:  It is just one
24  page.
25    MR. CHESLER:  Just one page.

Page 907

1    JOHN LEASE - DIRECT
2    Q.    What is Exhibit 125 intended to
3  represent, Mr. Lease?
4    A.    This exhibit is a summary of the
5  major noncompliance categories that we found
6  across all of the Fairchild facilities.  We
7  found we could group the issues that were
8  identified into nine basic categories that you
9  see here.  And what we've done is indicated
10  where we had provided notice to Fairchild
11  regarding the noncompliance issues we found in
12  these nine areas.
13    MR. CHESLER:  The column headed
14  Phase I reports, just so the court has it clear,
15  those are what is contained in bulk Exhibit A,
16  your Honor.
17    THE ARBITRATOR:  Yes.
18    MR. CHESLER: Column headed Phase II
19  reports is what is contained in bulk Exhibit P.
20  And the column headed other correspondence is
21  what is contained in bulk Exhibit C.
22    Q.    Now, Mr. Lease, would you turn to
23  tab 41 -- before you do that, sorry --
24    THE ARBITRATOR:  These numbers.
25    MR. CHESLER:  I was about to come

Page 908

1    JOHN LEASE - DIRECT
2  back to that your Honor, sorry.
3    Q.    What is represented by the amount
4  column, what are those?
5    A.    The amount column is the
6  expenditures that Alcoa has paid in each of
7  these areas listed here.
8    THE ARBITRATOR:  Paid for what,
9  for studies and investigations?
10    THE WITNESS:  Studies,
11  investigations, corrective actions.
12    THE ARBITRATOR:  Everything is in
13  there?
14    THE WITNESS:  Everything is in
15  here.
16    THE ARBITRATOR:  To date? What
17  does this go through?
18    THE WITNESS:  I believe it is in
19  the neighborhood of 15 to 16.
20    MR. CHESLER:  The judge wants to
21  know when.
22    THE ARBITRATOR:  The period of
23  time of costs, it has to be cut off somewhere.
24    THE WITNESS:  This covers January
25  2003 through approximately September of this

Page 909

1    JOHN LEASE - DIRECT
2  year.
3    Q.    Of '06?
4    A.    '06.
5    THE ARBITRATOR:  Is there a total
6  number there?
7    MR. CHESLER:  I am about to get to
8  that, your Honor, in a moment.  We will give you
9  the total.  But I want to make sure the witness
10  describes what is and is not in here.
11    Q.    First of all, Mr. Lease, if we were
12  to add up all the numbers under the amounts
13  column, would that represent 100 percent of all
14  of the funds for which Alcoa is seeking
15  reimbursement under the indemnification and/or
16  from the reserve through this proceeding.
17    A.    No.  These figures total up to
18  approximately 90 percent of what we have spent
19  and were seeking from the reserve.
20    Q.    Why is it 90 percent rather than
21  100 percent?
22    A.    Well, when we went through the
23  analysis with Cravath on this table the only
24  projects and categories that were listed here
25  were project where we could identify a report,

59 (Pages 906 to 909)

2c5facfb-a662-4159-8094-057d0344af74

Page 910

JOHN LEASE - DIRECT

1
2 notification, a piece of paper or document that
3 was provided to Fairchild describing the issues
4 that we were working on related to these
5 categories.
6        When we looked at that total it did
7 not account for all of the total money spent.
8 So we had about 10 percent of the project where
9 we could not identify a document that went to
10 Fairchild notifying them of the issue, the plan
11 or the corrective action.
12        So that's why we only totaled up to
13 90 percent.
14    Q.    Is it your position -- let me ask,
15 with respect to your position as the point
16 person if you would --
17        THE ARBITRATOR:  Just stop for a
18 minute.  The document that went to Fairchild
19 that was either a Phase I report, a Phase II
20 report or correspondence and follow-up, is
21 that what you're saying?
22        THE WITNESS:  That's correct.
23    Q.    Now, Mr. Lease, with respect to
24 your role as the person who was providing
25 information to Fairchild, what is your position

Page 911

JOHN LEASE - DIRECT

1
2 with respect to whether or not you have provided
3 adequate notice to Fairchild with respect to the
4 other 10 percent of the dollars which are not
5 included on Exhibit 125?
6    A.    I believe in essence we have
7 provided adequate notice to Fairchild for the
8 remaining 10 percent, in this case this would
9 represent issues that were the same as the
10 issues that we did provide distinct physical
11 notice for.  In other words we may not be able
12 to identify a Phase I report or letter that went
13 to Fairchild describing a particular issue at a
14 particular plant.  In a case like that it was
15 deducted from the total.
16        However, as you look across that
17 broad list of issues for which we are not
18 representing this table we feel either through
19 the fact these issues were very similar and in
20 effect, present in all the Fairchild facilities,
21 that are issues that Fairchild was working on
22 already, that in essence the remaining 10
23 percent just could not be characterized
24 sufficiently to place in any of these
25 categories.  So we do feel confident, though,

Page 912

JOHN LEASE - DIRECT

1
2 they are valid claims.
3        THE ARBITRATOR:  With respect to
4 the environmental issues which are the first two
5 categories; right?
6        THE WITNESS:  Yes.
7        THE ARBITRATOR:  Were all of the
8 expenditures in those categories referenced in
9 the Phase II or Phase I reports, or were there
10 things that came up that didn't get into those.
11        THE WITNESS:  The environmental
12 contamination category represents, in essence,
13 the Phase II studies onward.  Much of the
14 discussion we had over the last day related to
15 the Phase II work.  In addition to all of the
16 follow on studies that resulted from the Phase
17 II work initially.
18        In the category of waste water,
19 storm water, sewer and septic, the issues
20 represented here were cited and referenced in
21 the Phase I reports, as well as in the gap
22 analysis reports that we forwarded to Fairchild
23 post closing.
24        MR. CHESLER:  Your Honor, one
25 clarification also for the record, none of the

Page 913

JOHN LEASE - DIRECT

1
2 10 percent for which the witness excluded that
3 because of this conservative position he took in
4 compiling it, none of that appears in the
5 contamination category, first category.  That is
6 that number would be the same.
7        THE ARBITRATOR:  That is what I
8 was wondering.
9        MR. CHESLER:  I thought so.  That
10 number represents 100 percent.  The 10 percent
11 appears in the other categories to varying
12 degrees.
13    Q.    So, for example, Mr. Lease, if you
14 notified Fairchild that there was a machine
15 guarding problem at a particular facility and
16 there is a piece of paper that identified that
17 particular machine guarding, then the money
18 associated with that would be within the 3.4
19 million that appears on the third line?
20    A.    That's a fair statement, yes.
21    Q.    But if there was some machine
22 guarding for a different machine at the same
23 facility or different facility for which you
24 didn't find a piece of paper that that is in the
25 10 percent that wasn't included in here?

60 (Pages 910 to 913)

Page 914

JOHN LEASE - DIRECT

1         A.    That's correct.
2         Q.    They never accepted a single
3  machine guarding claim; did they?
4         A.    They have not accepted any claims
5  in the four years we have been sending notices.
6         Q.    On any topic?
7         A.    On any issue.
8         Q.    Again, if you gave them a piece of
9  paper that said you owe us a certain amount of
10 money for this mobile equipment noncompliance
11 issue and you found a piece of paper that
12 identified that particular piece of mobile
13 equipment in that particular dollar amount it is
14 in the 614,000; correct?
15        A.    Correct.
16        Q.    Even if it was an identical piece
17 of mobile equipment, same Crane at the same
18 facility or different facility and you couldn't
19 find that piece of paper for it you put it in
20 the 10 percent; correct?
21        A.    Correct.
22        MR. CHESLER:    Your Honor, is this
23 a good time to give the court reporter a break?
24        THE ARBITRATOR:    Sure.

Page 915

JOHN LEASE - DIRECT

1         (Recess taken.)
2         Q.    Mr. Lease, before the break we were
3  talking about the illustrative exhibit behind
4  tab 40, which is Exhibit 125.
5         In connection with that exhibit I
6  wonder if you would turn to tab 41 please which
7  is Alcoa Exhibit 161. Would you just explain
8  for the judge what Exhibit 161 is.
9         A.    This exhibit is an expanded table,
10 the one we were just looking at. Basically
11 takes each of the nine categories and breaks out
12 the individual locations that we acquired from
13 Fairchild. The amount that has been spent in
14 each category for each facility. And it
15 provides a description of the notice of the
16 particular issue by direct documentation that
17 was made to Fairchild describing each of these
18 issues.
19        So, if you look at the first block,
20 for example City of Industry, this is in the
21 environmental contamination category, we have
22 spent roughly $1.5 million in environmental
23 contamination investigative work.
24        THE ARBITRATOR:    How do you know

Page 916

JOHN LEASE - DIRECT

1  that is environmental contamination from this?
2         THE WITNESS:    On the very top bar
3  you will see the gray line. It says
4  environmental contamination.
5         THE ARBITRATOR:    I am looking at
6  the Exhibit 161.
7         MR. CHESLER:    Yes, your Honor. If
8  you look at the very top of the page.
9         THE ARBITRATOR:    Okay. I see it.
10 So all of these on this page are environmental
11 contamination.
12        THE WITNESS:    Correct.
13        Q.    If you go to the second page,
14 Mr. Lease?
15        A.    The second page breaks down the
16 water and waste water categories, equipment,
17 safety compliance, air emissions compliance in
18 the same fashion listing each location where
19 notice was provided to Fairchild describing this
20 particular issue.
21        Continuing on to the third page in
22 a similar fashion the categories of hazardous
23 materials compliance, mobile equipment, traffic,
24 fall protection, fire safety and electrical

Page 917

JOHN LEASE - DIRECT

1  safety compliance are listed.
2         THE ARBITRATOR:    These are
3  illustrative exhibits. Were these given to Mr.
4  Zurofsky?
5         MR. ZUROFSKY:    I got copies
6  yesterday, your Honor.
7         THE ARBITRATOR:    Okay.
8         Q.    Again, you're talking here about
9  issues, this shows where you notified them of
10 each of these particular issues with respect to
11 each of those particular facilities; correct?
12        A.    That's correct.
13        THE ARBITRATOR:    So going back
14 City of Industry, you have the amount then
15 environmental contamination Phase I reports.
16 This exhibit A, this is referring to the volumes
17 that are up there?
18        MR. CHESLER:    Yes, your Honor.
19        THE ARBITRATOR:    Okay. Then other
20 correspondence.
21        MR. CHESLER:    Other correspondence
22 should all be citations to Exhibit C.
23        THE ARBITRATOR:    Lease meaning
24 letter from Lease to Hodge or it could be an

61 (Pages 914 to 917)

Page 918

1          JOHN LEASE - DIRECT
2    email.
3          MR. CHESLER:  Correct.
4          THE WITNESS:   These were all
5    letters.
6          THE ARBITRATOR:  They are all in
7    Exhibit C?
8          MR. CHESLER:  Yes.  One other
9    clarification, your Honor, so we are absolutely
10   clear, some of the pages in Exhibit C were
11   actually sent to Fairchild in the form of
12   electronic media, for example a CD-ROM because
13   they were so voluminous.  But for this purpose
14   we printed out in hard copy what was on the CD
15   disk.  It is in Exhibit C.  But it would have
16   been an attachment with or enclosure to a
17   letter.
18         THE ARBITRATOR:  Okay.
19         MR. CHESLER:  We numbered
20   Exhibit C from 1 to whatever sequentially.  The
21   page cites are here on 161.
22         THE ARBITRATOR:  This says
23   multiple facilities on that first column of the
24   location, that covers?
25         THE WITNESS:  That would

Page 919

1          JOHN LEASE - DIRECT
2    represent the Phase II study.
3          THE ARBITRATOR:  When it says
4    multiple facilities, what facilities is that
5    referring to?
6          THE WITNESS:  That refers to the
7    14 facilities where Phase II study was
8    conducted.
9          THE ARBITRATOR:  It refers to all
10   of them?
11         THE WITNESS:  Yes.
12         THE ARBITRATOR:  That's the amount
13   983 is what the costs were for the
14   investigations?
15         THE WITNESS:  That's correct.
16         THE ARBITRATOR:  In Phase I.  No,
17   you are not charging for that.
18         MR. CHESLER:  That's correct.
19         THE ARBITRATOR:  You received
20   indemnification for that.  So it would be the
21   Phase II reports.  And the follow on reports;
22   right, for that 983,000 number, that covers the
23   Phase II reports and the follow on reports?
24         MR. CHESLER:  Just the Phase IIs
25   your Honor, just the Phase IIs.  To the extent

Page 920

1          JOHN LEASE - DIRECT
2    there were follow on studies they were typically
3    done with respect to particular facilities.
4    That would be under the particular facilities
5    relating to whatever substantive category they
6    related to.
7          THE ARBITRATOR:  But this relates
8    to all of the Phase II reports?
9          MR. CHESLER:  That's right.  They
10   were done for the 14 facilities.
11         THE ARBITRATOR:  Okay.
12         MR. CHESLER:  May I proceed, your
13   Honor?
14         THE ARBITRATOR:  Yes.
15         MR. CHESLER:  Thank you.
16   Q.    Mr. Lease, would you turn to tab
17   24, which is Exhibit 55, Alcoa 55.
18   A.    Okay.
19   Q.    Hold on one second, I may have
20   taken you to the wrong chart sorry tab 12, I
21   apologize.  Wrong tab.
22         Now, do you recognize Exhibit C,
23   page 4222 behind tab 23 as a letter you sent to
24   Mr. Beckford at Fairchild on or about February
25   2, 2005?

Page 921

1          JOHN LEASE - DIRECT
2    A.    Yes.
3    Q.    That relates to the Temple Avenue
4    City of Industry facility?
5    A.    Yes.
6    Q.    It says "Work plan reports" I am
7    reading from the subject line "Work plan reports
8    for supplemental soil and groundwater testing
9    and extraction well installation and extraction
10   testing."  Correct?
11   A.    That's correct.
12   Q.    If you look down at the bottom of
13   that page under enclosures, it says you enclosed
14   two work plans from Mission Geoscience; correct?
15   A.    That's correct.
16   Q.    That was a consulting firm you were
17   using?
18   A.    Yes, they were located in Los
19   Angeles, we were using them for remediation
20   investigation.
21   Q.    One of the two work plans you sent,
22   the one listed as item two is a work plan for
23   extraction well installation and aquifer testing
24   at that facility dated January 1, 2005; correct?
25   A.    Correct.

62  (Pages 918 to 921)

Page 922

JOHN LEASE - DIRECT

1
2    Q.    You sent this letter to Mr.
3  Beckford on or about February 2, 2005; correct?
4    A.    That's correct.
5    Q.    Had any work actually been done
6  with respect to that particular work plan when
7  you sent this material along to Mr. Beckford?
8    A.    No, it did not.
9    Q.    Did you ever get any substantive
10  comments back from Fairchild about the work plan
11  you proposed with respect to the
12  extraction well installation and aquifer testing
13  at the Temple Avenue facility?
14    A.    No.
15    Q.    Would you turn to tab 28, please.
16  This is Exhibit C beginning an at page 4517.  Do
17  you recognize this as a letter that you sent
18  to --
19        THE ARBITRATOR:  Sorry, do you
20  want to wait just a second.
21        MR. CHESLER:  Yes, your Honor.
22        THE ARBITRATOR:  What is the next
23  exhibit?
24        MR. CHESLER:  Tab 28, which is
25  bulk Exhibit C, beginning at page 4517.

Page 923

JOHN LEASE - DIRECT

1
2    Q.    Do you recognize this as a letter
3  you sent to Ms. Hall at Fairchild on or about
4  April 5, 2005?
5    A.    Yes.
6    Q.    Does this relate to a work plan for
7  supplemental subsurface investigation at
8  Fullerton?
9    A.    Yes.
10    Q.    I see in the first line of your
11  letter, it says "Enclosed for your information
12  is a work plan that describes a proposed scope
13  of work for supplemental soil and groundwater
14  sampling."
15        Had any of that work actually been
16  done at the time you sent this material to
17  Ms. Hall on or about April 5, 2005?
18    A.    No.
19    Q.    Did you ever get any substantive
20  comments back from Ms. Hall about that proposed
21  work at the Fullerton site?
22    A.    No, I did not.
23    Q.    Would you look at tab 29.  This is
24  Exhibit C, beginning at page 4938.  Do you
25  recognize this as a letter you sent to Ms. Hall

Page 924

JOHN LEASE - DIRECT

1
2  on or about December 16, 2005 concerning the
3  City of Industry, Temple Avenue site and work
4  plan for well installation and remedial action?
5    A.    Yes.
6    Q.    At the time you sent this material
7  to Ms. Hall had any of the work relating to that
8  project yet been done?
9    A.    No, it had not.
10    Q.    Did you ever get any substantive
11  comments from Ms. Hall about that proposed plan?
12    A.    No.
13    Q.    Would you turn back to tab 23,
14  please.  I asked you about one of the two
15  enclosures that went along with this letter a
16  few moments ago, enclosure number 2.
17        Let's go back to enclosure number 1
18  that is referenced at the bottom of that page,
19  first page.  It says "work plan for supplemental
20  soil and groundwater investigation."  This is
21  from Exhibit C, page 4222; correct?
22    A.    Correct.
23    Q.    That work plan says it is dated
24  July 12, 2004 and I am partly sent it to
25  Ms. Hall in early February of 2005; correct?

Page 925

JOHN LEASE - DIRECT

1
2    A.    Correct.
3    Q.    So had any work been done up to
4  that point with respect to that work plan?
5    A.    Likely it had been.
6    Q.    Had Fairchild been doing
7  remediation work at the Temple Avenue site with
8  respect to soil and groundwater prior to the
9  time that you acquired that site from them?
10    A.    Yes, they had.
11    Q.    Now, I would like you to turn to
12  tab 24, Alcoa Exhibit 55.  Do you recognize this
13  as a consultant's letter from EnviroSolve to Mr.
14  Miramadi at Fairchild from May of 2002 relating
15  to the soil and groundwater work that they were
16  using this very consultant for at the Temple
17  Avenue site prior to the sale of the business to
18  Alcoa?
19    A.    Yes.
20    Q.    In fact would you turn to page
21  3323, please of that document.
22    A.    Okay.
23    Q.    It is the page that has Mr.
24  Schmidt's signature on it; do you see that?
25    A.    Yes, I do.

63 (Pages 922 to 925)

2c5facfb-a662-4159-8094-057d0344af74

Page 926

JOHN LEASE - DIRECT

1    JOHN LEASE - DIRECT
2    Q.    You see Mr. Schmidt wrote to
3  Fairchild, wrote to Mr. Miramadi that Fairchild
4  is now in the process, I am reading from the
5  paragraph immediately above his signature,
6  "Fairchild is now in the process of preparing a
7  letter requesting closure of the soil
8  remediation activities at the site.  And it is
9  expected that" then there is an acronym, is that
10  a government agency of some type?
11    A.    Yes, that is the Regional Water
12  Quality Control Board.
13    Q.    In California?
14    A.    In California.
15    Q.    "Will require a verification
16  sampling and testing program consisting of a
17  soil vapor study and collection and analysis of
18  soil samples" it goes on to say "The present
19  groundwater remediation activity is expected to
20  continue for one to several years before
21  residual VOC concentrations have been reduced to
22  levels sufficiently low to request closure of
23  groundwater remediation activities from the
24  regional water quality board." It goes on.
25        In fact were you continuing the

Page 927

JOHN LEASE - DIRECT

1    JOHN LEASE - DIRECT
2  same environmental work relating to soil and
3  groundwater after the acquisition that had been
4  underway by Fairchild before the acquisition?
5    A.    Essentially we were, yes.
6    Q.    Did Fairchild agree to pay you for
7  the continuation of that work after you acquired
8  the facility?
9    A.    No.  I think as I mentioned
10  earlier, they did not offer payment for this
11  work.
12    Q.    Would you turn to tab 25, please
13  this is a Phase II environmental site
14  investigation report done for Alcoa by ERM;
15  correct?
16    A.    Correct.
17    Q.    This relates to the Montbrison
18  facility in France?
19    A.    Yes, it does.
20    Q.    You provided these Phase II reports
21  to Fairchild; correct?
22    A.    Yes, we did.
23    Q.    In the fall of 2003?
24    A.    Yes.
25    Q.    Would you look at page 32273.

Page 928

JOHN LEASE - DIRECT

1    JOHN LEASE - DIRECT
2  There is a heading toward the bottom of that
3  page titled Environmental Issues Of Known
4  Concern; correct?
5    A.    That's correct.
6    Q.    You see that ERM reported to you
7  and you passed on to Fairchild that they, the
8  same consulting company that you were using had
9  completed a previous Phase I assessment of the
10  site back in December of 1998, that is when
11  Fairchild owned it; correct?
12    A.    That's my understanding, yes.
13    Q.    And following the recommendations
14  of that assessment a limited Phase II was
15  performed in January of 1999; correct?
16    A.    Correct.
17    Q.    The environmental assessments were
18  performed for Fairchild.  According to the Phase
19  II it says "It was considered likely that a
20  remediation regarding total petroleum
21  hydrocarbons or TPH and chlorinated hydrocarbons
22  would have to be performed at the site."
23        Did you understand that Fairchild
24  was told that way back in 1999?
25    A.    That is my understanding from

Page 929

JOHN LEASE - DIRECT

1    JOHN LEASE - DIRECT
2  reading this, yes.
3    Q.    If you go over to the next page,
4  32274 in the text in the bottom two paragraphs
5  of the page you see that ERM told you that in
6  the 1999 Phase II report?
7        THE ARBITRATOR:  Hold it.  Let me
8  just make a note here.
9        MR. CHESLER:  We are now on
10  page 32274.
11        THE ARBITRATOR:  Okay.
12        MR. CHESLER:  I am at the next to
13  the last paragraph on the page.
14    Q.    It says, you were informed were you
15  not and you passed this on to Fairchild "In the
16  1999 Phase II report prepared for Fairchild, ERM
17  concluded that in accordance with French
18  legislation a person that is aware of an impact
19  to groundwater --"
20        THE ARBITRATOR:  Sorry, this is
21  page 2274?
22        MR. CHESLER:  32274.  Next to the
23  last paragraph on the page.
24        THE ARBITRATOR:  Yes.
25        MR. CHESLER:  Begins "The 1999

64  (Pages 926 to 929)

2c5facfb-a662-4159-8094-057d0344af74

Page 930

JOHN LEASE - DIRECT

1    Phase II report."
2         THE ARBITRATOR:  "Concluded that
3    in accordance?"
4         MR. CHESLER:  Yes, sir.
5    Q.    "In accordance with French
6    legislation from January of '92 a person that is
7    aware of an impact to groundwater, which
8    hydraulically is or may be connected to water
9    used for drinking is to inform the local
10   authorities in charge of environmental issues."
11   That is what you were informed?
12   A.    Yes.
13   Q.    It goes on in the next paragraph to
14   say "In 1999, ERM recommended to Fairchild
15   further soil and groundwater investigations to
16   verify the results and to delineate the impacted
17   areas." Correct?
18   A.    That's correct.
19   Q.    They told you that despite that
20   recommendation, despite French law Fairchild did
21   no further studies and in fact no further
22   studies were done so far as ERM was aware until
23   the Phase II study that Alcoa commissioned of
24   which this is the report; correct?

Page 931

JOHN LEASE - DIRECT

1    A.    I think they reference here the
2    actually the Phase I assessment in May 2002.
3    That was the first study following the 1999
4    study.
5    Q.    Absolutely. The Phase I was the
6    one Alcoa commissioned in contemplation of
7    entering into this agreement?
8    A.    Correct.
9    Q.    You sent that information as part
10   of the Phase II report to Fairchild about their
11   own prior investigations and their own prior
12   findings and their own prior failure to do
13   anything, and what the was the response you got
14   in substance?
15   A.    There is no substantive comment.
16   They basically refused to pay for this Phase II
17   investigation.
18   Q.    Would you turn to page 32314,
19   please of the same document, still the same
20   exhibit. 32314. Do you have that page?
21        THE ARBITRATOR:  Not yet.
22        MR. CHESLER:  It corresponds to
23   page 47 of the report.
24        THE ARBITRATOR:  I have it.

Page 932

JOHN LEASE - DIRECT

1    Q.    Mr. Lease, do you have it?
2    A.    Yes, I have it.
3    Q.    I would like you to look at the
4    next to the last paragraph on the page the one
5    beginning "with respect to."
6    A.    Okay.
7    Q.    It says "With respect to the
8    current groundwater quality in the general area,
9    there are exceedances of certain substance
10   limits." Is that right?
11   A.    Yes.
12   Q.    In the middle of that paragraph it
13   says "Nonetheless, in France, it is a generally
14   accepted practice to report such findings to the
15   relevant authorities even though there is no
16   legal requirement referred to in the prior
17   sentence?"
18   A.    That's correct.
19   Q.    They go on "Should the local
20   authorities be advised it can be reasonably
21   anticipated they are going to require one or
22   more of several things including something
23   called an SRA." Correct?
24   A.    That's correct.

Page 933

JOHN LEASE - DIRECT

1    Q.    What is an SRA?
2    A.    SRA stands for simplified risk
3    assessment.
4    Q.    When a governmental authorities
5    request a simplified risk assessment and it is
6    done that typically leads to a further
7    assessment called a detailed risk assessment;
8    correct?
9    A.    It is based on the findings of the
10   simplified risk assessment of certain values are
11   exceeded in that risk assessment it triggers the
12   detailed risk assessment.
13   Q.    In fact, you did notify the French
14   authorities they did want a simplified risk
15   assessment and you did one; correct?
16   A.    That's correct.
17   Q.    That then led to performance of a
18   detailed risk assessment; correct?
19   A.    Correct.
20   Q.    I would like you to turn to tab 26.
21   Tab 26 is from bulk Exhibit C beginning on
22   page 4342; correct?
23   A.    That's correct.
24   Q.    This is a letter from you to Mr.

65 (Pages 930 to 933,

2c5facfb-a662-4159-8094-057d0344af74

Page 934

JOHN LEASE - DIRECT
1
2  Beckford dated February 25, 2005; correct?
3      A.    Correct.
4      Q.    In fact you sent along with this
5  letter some documentation which is listed in
6  four numbered items in the middle of that page;
7  right?
8      A.    That's correct.
9      Q.    The first of which is a scope of
10  work and cost estimate for the detailed risk
11  assessment at Montbrison; correct?
12      A.    That's correct.
13      Q.    Had you done the detailed risk
14  assessment before you sent this scope of work to
15  Fairchild?
16      A.    No, we had not.
17      Q.    Did they ever come back with any
18  substantive comments about it?
19      A.    Not that I recall, no.
20      Q.    So you did the detailed risk
21  assessment and then the French regulators
22  required some further investigation; didn't
23  they?
24      A.    Correct.
25      Q.    Would you turn to tab 27.

Page 935

JOHN LEASE - DIRECT
1
2      A.    Okay.
3      Q.    Is this a letter in which you sent
4  to Ms. Hall in July of 2006 various
5  correspondence, communications with the French
6  regulators that followed on the detailed risk
7  assessment as to which they never gave you
8  comments when you sent them the scope of work in
9  advance?
10      A.    Yes.
11      Q.    Did you have an understanding that
12  you were — let me withdraw that.
13          What was your understanding of who
14  conducted and controlled interactions with
15  government agencies with respect to these
16  facilities as of 2006?
17      A.    Under the agreement, the sales
18  agreement?
19      Q.    Yes.
20      A.    My understanding was that Alcoa was
21  to conduct all contact and management of
22  remedial projects with the government.
23      Q.    Then you had these documents that
24  had been submitted to the government and you
25  were providing them to Fairchild with this

Page 936

JOHN LEASE - DIRECT
1
2  letter?
3      A.    That's correct.
4      Q.    Did you believe that that was what
5  you were supposed to be doing under the
6  agreement?
7      A.    That's my understanding.
8      Q.    One of the things that was included
9  in this letter, the third item says "Proposal
10  from ERM to additional work to address the
11  comments from the French agency." Correct?
12      A.    That's correct.
13      Q.    Had the work actually been done by
14  ERM that was addressed in that proposal?
15      A.    No.
16      Q.    At the time you sent it?
17      A.    No.  It had not.
18      Q.    Did you ever get any substantive
19  comments back from Fairchild with respect to
20  that proposed work?
21      A.    No, I did not.
22      Q.    Would you turn to tab 32, please.
23  You recognize this as a letter you sent to
24  Ms. Hall with some attachments on or about
25  February 22, 2006?

Page 937

JOHN LEASE - DIRECT
1
2      A.    Yes.
3      Q.    This is from Exhibit C beginning at
4  page 7881; correct?
5      A.    That's correct.
6      Q.    Now you sent her, apparently a
7  Phase I report from a California agency which
8  uses the acronym DTSC; correct?
9      A.    That's correct.
10      Q.    The Department of Toxic Substances
11  Control?
12      A.    Yes.
13          MR. ZUROFSKY:  Your Honor, it
14  doesn't say he sent the Phase I report, he sent
15  a findings from investigation to confirm the
16  Phase I report.  The Phase I report is dated
17  1996, I believe.  I want to make sure that is
18  clear.
19          MR. CHESLER:  Sorry, I misspoke.
20  You're correct.  Thank you, counsel.
21      Q.    So the report presented findings
22  from a visit done by the DSTC to the Torrance
23  site that was conducted in January 2006; is that
24  correct?
25      A.    That's correct.

66 (Pages 934 to 937)

JOHN LEASE - DIRECT

1
2    Q.    That site visit and report was done
3  to verify information contained, as counsel just
4  corrected me, in a Phase I report submitted on
5  December 27, 1996 by Fairchild Fasteners to that
6  agency; correct?
7    A.    Correct.
8    Q.    Did you understand when you sent
9  this material that you had received, this report
10 from the government agency, that that was what
11 you were supposed to be doing under the agreement?
12   A.    That is my understanding.
13   Q.    In the provision related to
14 documents submitted to and received from the
15 government?
16   A.    Yes.
17   Q.    Until you received this document
18 from the government you didn't have it to send
19 to Fairchild; did you?
20   A.    That's correct.
21   Q.    Now if you turn to tab 34, this is
22 from Exhibit C, beginning at page 7932. Is this
23 in fact a letter and enclosure that you sent to
24 Ms. Hall a few weeks later on March 2, 2006?
25   A.    Yes, it is.

JOHN LEASE - DIRECT

1
2    Q.    This says you were enclosing a copy
3  of a consent agreement between Alcoa and the
4  DTSC which related to this same facility in
5  Torrance; correct?
6    A.    Yes.
7    Q.    Did you have an understanding of
8  whether or not Alcoa was obligated to involve
9  Fairchild in any negotiation of or discussions
10 with the government concerning environmental
11 consent decrease in 2006?
12   A.    No. My understanding was that
13 activity was solely the responsibility of Alcoa.
14   Q.    Having entered into this decree
15 effective February 21, within about ten days you
16 sent it to Fairchild; didn't you?
17   A.    Yes, I did.
18   Q.    Did you understand that was what
19 you were supposed to be doing under the
20 agreement?
21   A.    Yes.
22   Q.    Before this decree was ever
23 entered, did you make any request to Fairchild
24 for reimbursement of investigative work relating
25 to the same environmental issues that were

JOHN LEASE - DIRECT

1
2  ultimately addressed by this decree?
3    A.    I believe we had.
4    Q.    I want you to look back at tab 19.
5    THE ARBITRATOR:  Is this a Consent
6  Decree with respect to the work originally
7  started by Fairchild before you took over?
8    THE WITNESS:  The 1996 report was
9  an assessment report conducted —
10   THE ARBITRATOR:  By a State
11 agency?
12   THE WITNESS:  By a State agency,
13 based on information provided by Fairchild.
14   THE ARBITRATOR:  Right. There was
15 no work being done under that at the time you
16 took over?
17   THE WITNESS:  That, I'm not
18 certain of. I am not certain.
19   THE ARBITRATOR:  Is this a
20 follow-up to that report?
21   THE WITNESS:  In essence, it was.
22 I believe what happened was the DTSC came back
23 to the Torrance site with the 1996 report and
24 updated it based on their tour and assessment of
25 the facility.

JOHN LEASE - DIRECT

1
2    THE ARBITRATOR:  This followed
3  from that?
4    THE WITNESS:  Yes.
5    THE ARBITRATOR:  Okay.
6    Q.    Now, Mr. Lease, would you look at
7  tab 19, Alcoa Exhibit 103.
8    A.    Okay.
9    Q.    This appears to be a letter to you
10 from Ms. Hall dated February 25, 2005; correct?
11   A.    That's correct.
12   Q.    This is the same letter we looked
13 at earlier where in the footnote that begins on
14 page 340 Ms. Hall told you that upon further
15 analysis they weren't going to pay you for any
16 of the $528,000 related to Phase II studies you
17 had previously submitted invoices for, do you
18 remember that?
19   A.    Yes.
20   Q.    In the body of this letter if you
21 look on page 340, the same page where that
22 footnote begins, you see in the next to the last
23 paragraph, Ms. Hall informs you that, according
24 to her, unless you find an environmental
25 condition, your commissioning of assessments —

67 (Pages 938 to 941,

Page 942

JOHN LEASE - DIRECT

1
2    MR. CHESLER:   I am in the next to
3  the last paragraph on the page, your Honor.  I
4  am not reading it verbatim.  I am just
5  summarizing the paragraph asking if the witness
6  agrees with it.
7    THE ARBITRATOR:   Go ahead.
8    Q.   Unless you find what is called an
9  environmental condition, then any environmental
10  assessments you do are, in her judgment, I am
11  now reading on the last line of that paragraph
12  "An ordinary business expense voluntarily
13  incurred by Alcoa." Is that what she informed
14  you?
15    A.   That's correct, that is what the
16  statement says.
17    Q.   She wasn't going to pay for those
18  voluntary incurrences; correct?
19    A.   Correct.
20    Q.   If you look over at the next page
21  she specifically references Torrance, the last
22  paragraph, page 341 the facility we were just
23  talking about.  This is before the decree ever
24  happened.  This is about a year before the state
25  folks showed up with the site visit and

Page 943

JOHN LEASE - DIRECT

1
2  ultimately you entered into a decree with them;
3  correct?
4    A.   Yes.  Correct.
5    Q.   A year before that she is telling
6  you with respect to Torrance according to
7  Alcoa's Phase I and Phase II assessments shows
8  some signs of environmental contamination,
9  however she goes on to say "Groundwater
10  contaminants are the likely product of offsite
11  sources."
12    Then she says "In any event, all of
13  the assessments for this site, like all of the
14  other assessments and characterizations are not
15  Fasteners Environmental Liabilities and unless
16  and until remedial action commences, there is no
17  basis for a claim under 11.6."
18    So with respect same Torrance
19  facility, for that matter all of them, but the
20  same Torrance facility before there ever was a
21  site visit by the state agency, before there
22  ever was a decree she told you you weren't
23  getting any money; didn't she?
24    A.   Yes.
25    Q.   Now you have the decree, you sent

Page 944

JOHN LEASE - DIRECT

1
2  them the decree.  Let's look at page 35 -- tab
3  35 to see what response you got after the
4  decree.  We just seen the response before.
5    THE ARBITRATOR:   The decree
6  provides for some type of remedial action?
7    THE WITNESS:   I believe the
8  decree primarily focuses on further
9  characterization of the site.
10    Q.   Let's look at Exhibit 107 which
11  appears behind tab 35 this is a follow on about
12  the Torrance facility; isn't it?
13    A.   Yes.
14    Q.   You submitted the materials and
15  told them what it is you are going to do there
16  pursuant to the decree; is that right?
17    A.   That's correct.
18    Q.   Let's look at the second paragraph
19  of Ms. Hall's letter.  She says "Our position on
20  Alcoa's incurring expenses foresight assessments
21  and investigations has been thoroughly set forth
22  in our prior correspondence" she cites a letter
23  of March 20.
24    Then she says "In addition, without
25  waiving its previously asserted defenses it is

Page 945

JOHN LEASE - DIRECT

1
2  Fairchild's position the scope of the facility
3  investigation work plan" that is the work plan
4  you were proposing to do pursuant to the decree;
5  correct?
6    A.   Correct.
7    Q.   "Is overly and unnecessarily
8  expansive and not justified" is that her
9  position?
10    A.   Yes.
11    Q.   No money for what you did before
12  the decree, no money for what you were going to
13  do after the decree; right?
14    A.   Right.
15    Q.   Would you turn to tab 36, I just
16  have one or two more topics, your Honor, I'll be
17  done this is in bulk Exhibit C beginning page
18  4931.  Do you have that document?
19    A.   Yes, I do.
20    Q.   This is a letter and long listing
21  of project numbers, project titles and invoice
22  amounts; correct?
23    A.   Correct.
24    Q.   You say in the text of the letter
25  that, I am looking at the first paragraph --

68   (Pages 942 to 945)

Page 946

JOHN LEASE - DIRECT

THE ARBITRATOR: Tab 36?

MR. CHESLER: Tab 36, yes, your Honor.

Q. In the first paragraph of your letter you tell Ms. Hall in connection with the mediation that was then scheduled for shortly thereafter you were sending a chart and that some of the items on the chart had an asterisk or a double asterisk; correct?

A. Correct.

Q. Those items have not been the subject of prior notice under the contract that you are hereby giving them notice.

A. Correct.

Q. You say with respect to the items that have a double asterisk, I am now looking at the last sentence of that first paragraph, you have not yet incurred any expenses; correct?

A. That's correct.

Q. Let's look at the next page which is the first page of the chart. I am going to go to the very first item with a single asterisk which is eighth line down from the top project number 36010-009, confined space compliance.

Page 947

JOHN LEASE - DIRECT

There is an asterisk. According to your cover letter, if I understood it correctly you're saying this is an item as to which we spent some money but haven't given you prior notice.

Did it turn out were you right or wrong about that one?

A. In looking back through the record we were wrong about this one.

Q. Wrong in what sense?

A. We actually had provided documentation to Fairchild which addressed this particular expenditure.

Q. Was that true of some of the other expenditures in here?

A. I believe it was, yes.

Q. So, for example, let's go back for a moment to tab 20. Tab 20 is Alcoa Exhibit 52, right. This was your gap assessments summary for City of Industry; correct?

A. Correct.

Q. If you look page 235 of that document, it is a chart, in fact on page 235, the fifth item down is the same project 36010-009 confined space compliance?

Page 948

JOHN LEASE - DIRECT

A. That's right.

Q. The dollars are very slightly off this is 22,000 and change, later on the total turned out to be 23,000 and change. But that is the same project; isn't it?

A. Yes, it is.

Q. In fact, although you put a star on it that was just a mistake?

A. That's correct.

Q. There are others like that; aren't there?

A. Yes, there are.

Q. For example, if you look at the next one, that is the next one that has a single star back on tab 36, page 4932, that same chart with asterisk, the next one is a mobile equipment compliance item, 36010-11; right?

A. Right.

Q. For 3,000 and change. That one also disclosed back in the tab 20 entry although it is a slightly different number. It is about 2,400 and change; right?

A. Yes, that's correct.

Q. Some of the asterisks in this

Page 949

JOHN LEASE - DIRECT

letter you sent to Ms. Hall in July of '05 were just wrong, you had given them notice twice in effect?

A. Correct.

Q. Some were correct, you hadn't given them prior notice and you gave it to them now?

A. That's correct.

Q. As to double stars you were giving them notice and you hadn't even spent any money yet?

A. Correct.

Q. Now flip to tab 37, please. Is this an updated chart, updated from the one we just looked at behind tab 36?

A. Yes, it is.

Q. This is for the record Alcoa Exhibit C, bulk Exhibit C beginning at page 7924; right?

A. Correct.

Q. In this one did you correct a couple of math errors or accounting errors?

A. I believe that we did at this point. We cleared up some of the misstatements we had made in the earlier table.

69 (Pages 946 to 949,

2c5facfb-a662-4159-8094-057d0344af74

Page 950

JOHN LEASE - DIRECT

1
2       Q.     Look for example, I am on page that
3   end now 1101 or at the top page 7926 of
4   Exhibit C, a chart with a lot of entries in it.
5       A.     Okay.
6       Q.     If you look at item 26 which has to
7   do with groundwater monitoring at the Temple
8   Avenue facility, do you see that?
9       A.     Yes.
10      Q.     It says adjusted the column, next
11  to the last column to the right says adjusted
12  total through December 2005 is $85,687.  It says
13  the adjustments is 85,687.  Was that a
14  correction you were making?  You know what, I may
15  have given you wrong one.  I went one line too
16  low.  I meant to look at line 25, the one right
17  above that.
18          Line 25 is for the Unruh Avenue
19  site, soil and groundwater scoping and
20  follow-up.
21      A.     Okay.
22      Q.     You see it is the total was 75,000
23  and change through May.  The adjusted total is
24  181.  The adjustment is of $105,000.  I think I
25  am creating more confusion.  I am giving you the

Page 951

JOHN LEASE - DIRECT

1
2   letter about corrections, and corrections are
3   behind the next tab.  I that is why you are
4   having trouble with my question.
5          Let's stay with tab 37.  Tab 37 was
6   updated version of the chart as you originally
7   provided as shown behind tab 36?
8       A.     That's correct.
9       Q.     Now, go to tab 38, I apologize both
10  to the court and to you.  Is this yet another
11  chart you provided to Ms. Hall, this one in
12  December of this past year, '06?
13      A.     That's correct.  Yes.
14      Q.     Now, with respect to item 25, which
15  appears on the page numbered 24000 in the upper
16  right-hand corner?
17      A.     Okay.
18      Q.     Did you in fact correct item 25?
19      A.     Yes, we did.  We discovered an
20  accounting error in our records so we reduced
21  the amounts by $90,620 which was exactly half.
22      Q.     Similarly if you go to page 24003,
23  the last item on that page, number 155 was this
24  another accounting error that was corrected?
25      A.     Yes, it is.

Page 952

JOHN LEASE - DIRECT

1
2       Q.     You reduced this one by $39,000 and
3   change?
4       A.     Correct.
5       Q.     Are you familiar with something
6   within Alcoa called the PAR process, P-A-R?
7       A.     Yes, I am.
8       Q.     What is the PAR process?
9       A.     PAR stands for project approval
10  request process.
11      Q.     What is that process?
12      A.     It is a process that was developed
13  by the business that assumed the Fairchild
14  facilities upon acquisition.  It is, in essence,
15  a way for the business and the locations in the
16  business to propose a project, in this case it
17  would be an EHS compliance project, to be
18  carried out at a facility to correct a
19  compliance issue, noncompliance issue.
20          The way it works a facility will
21  complete the PAR form which includes a
22  description of the issue related to compliance.
23  It also has a requirement that the facility
24  complete a regulatory analysis of the situation
25  to ensure that in fact that issue and that

Page 953

JOHN LEASE - DIRECT

1
2   project to correct noncompliance issue is based
3   on a regulatory requirement that exists for that
4   facility.
5          At that point the draft PAR is sent
6   from the plant location to the business unit.
7   It under goes technical and regulatory review to
8   ensure that in fact the regulatory citation is
9   valid and there is a basis for carrying out that
10  project to correct the noncompliance situation.
11          Once that has been verified the
12  form is taken to the business unit management
13  team.  They basically sign off on each project
14  approval request form before the fund are
15  basically approved for that action.
16      Q.     Was that process followed here for
17  the compliance items that have been submitted to
18  Fairchild for reimbursement?
19      A.     Yes, all of these numbers that are
20  listed in the second column as project numbers
21  are in fact numbers that were assigned to each
22  individual PAR.
23      Q.     Was that a process that was
24  developed uniquely for this transaction or is
25  that something Alcoa has used generally?

70  (Pages 950 to 953)

2c5facfb-a662-4159-8094-057d0344af74

Page 954

JOHN LEASE - DIRECT

1    JOHN LEASE - DIRECT
2    A.   It was really developed for this
3 transaction.  Because we felt there was a need
4 to document that everything we did under the
5 corrective action process was in fact justified
6 for reimbursement from the escrow fund that was
7 set up with Fairchild.
8    Q.   Mr. Lease, do you believe you gave
9 Fairchild adequate notice of the items for which
10 Alcoa is seeking indemnification in this
11 proceeding?
12    A.   Yes, I do.
13    Q.   Through what forms of notice, what
14 actual physical forms of notice did you do that?
15    A.   Primarily the Phase I reports which
16 in essence started the notice process.  Followed
17 by the site assessment reports, the gap analysis
18 reports that were undertaken at the four major
19 facilities.  And follow up correspondence
20 associated with those reports.
21        For the remedial projects that were
22 undertaken starting with the Phase I reports
23 that identified the areas of concern for
24 remedial project, followed by Phase II scopes of
25 work which identified where we were going to

Page 955

1    JOHN LEASE - DIRECT
2 undertake remedial action, followed by the Phase
3 II reports, which reported on the findings from
4 the Phase II investigations.  And also contained
5 specific information that detailed where that
6 next phase of the investigation was to take
7 place to address areas where we found
8 contamination or threatened contamination.
9        So that whole body of work, in
10 essence, covers our, that is our view of the
11 forms of notice that we provided to Fairchild
12 that covers this list of projects that we see in
13 this table.
14    Q.   I believe it is your testimony you
15 have been the person who has been sending and
16 receiving communications to and from Fairchild
17 with respect to these sites for something
18 approaching four years now, since beginning of
19 2003; is that right?
20    A.   That's correct.
21    Q.   Based upon that four years of
22 experience in this position, have you formed an
23 opinion about Fairchild's intention to pay Alcoa
24 anything with respect to these indemnification
25 claims?

Page 956

1    JOHN LEASE - DIRECT
2    A.   Yes, I have.
3    Q.   What is that opinion?
4    A.   Well, in light of the fact they
5 have not paid a single claim, now number close
6 to 200 claims, I think that is certainly proof
7 that there is no intention to pay on their part.
8        Coming before that going to the
9 early years of this acquisition, obviously the
10 Phase I reports that we commissioned created
11 findings of a compliance nature and remediation
12 nature that concerned us.  It appeared as though
13 there were significant compliance issues across
14 all the facilities.
15        Since these facilities, in essence,
16 do the same things in terms of their operations,
17 we saw a lot of commonality across the
18 facilities in terms of compliance issues.  That
19 were discovered in the Phase Is.  Similarly the
20 contamination issues related to soil and
21 groundwater were similar.  Since these
22 facilities use similar chemicals such as TCE,
23 PCE and oils and solvents of other compositions.
24 So we had a picture going into this as to what
25 we might find.

Page 957

1    JOHN LEASE - DIRECT
2        When we did our rapid integration
3 visits we, in essence, confirmed what the Phase
4 I assessments found that being noncompliance
5 issues across environmental health and safety
6 disciplines.
7        In the operations we found
8 contamination, that required further
9 investigation and maybe more disturbingly we
10 found cases that indicated there were practices
11 at Fairchild related to illegal reporting and
12 record keeping that created a significant level
13 of concern within Alcoa.
14        As an example, one year after we
15 acquired Fairchild the St. Cosme facility had
16 over 500 waste water violations reported with
17 the agency.  That one facility in that one area
18 had more violations than the entire Corporation
19 in the environmental area.
20        That's a case in point.  Certainly
21 this business unit with its performance created
22 a significant level of attention, the upper
23 levels of the company.  Their injury rates were
24 four times what Alcoa's injury rate was
25 corporate-wide.

71 (Pages 954 to 957,

MERRILL LEGAL SOLUTIONS

(800) 325-3376        www.MerrillCorp.com

2c5facfb-a662-4159-8094-057d0344af74

Page 958

JOHN LEASE - DIRECT

1
2    So, we felt there was a significant
3  basis for going forward to complete the
4  corrective actions as quickly as possible. In
5  essence, Alcoa was liable at this point for all
6  of the issues that came into the company from
7  the Fairchild acquisition. We faced legal
8  liability and we faced danger to our work force
9  with safety issues as well as health issues.
10    So our goal was to fix this as
11  quickly as possible. Our baseline level of
12  performance in the company is zero
13  noncompliance. That was far from what we found
14  with Fairchild.
15    As we began to apprise Fairchild of
16  these issues, many of which they had discovered
17  themselves and were working to correct, we
18  received information back that said well, you
19  don't really see things here that are similar to
20  what we had noticed when we had the facilities,
21  even though they were working to correct some of
22  these. Please send us more information. We
23  sent more information. They came back and said
24  that still isn't enough. We'll talk to you
25  about it, but, you know, we just don't think any

Page 959

JOHN LEASE - DIRECT

1
2  of these issues or amounts you're seeking for
3  indemnification are valid.
4    That pretty much continued on from
5  that point. Every time we filed a notice, every
6  time we filed a claim it was rejected for
7  variety of reasons. Case in point for the
8  investigations, they basically, the main focus
9  was well investigations aren't covered under the
10  agreement. So that doesn't count.
11    For the noncompliance we discovered
12  and reported they came back and said you haven't
13  shown us you received a notice of violation from
14  any agency in any jurisdiction. Which wasn't a
15  requirement of the agreement.
16    So this continued on through four
17  years. I believe I counted, before I came to
18  this testimony, over 80 letters that I had sent
19  to Fairchild in every case it came back and said
20  we aren't going to cover this. It is either not
21  covered under the agreement or we don't think it
22  is an environmental condition therefore it is
23  not reimbursable. Based on that exposure over
24  the four years to the interchange between the
25  companies, my sense is they have no intention of

Page 960

JOHN LEASE- CROSS

1
2  paying for any of this work that was done.
3    Q.    Thank you.
4    MR. CHESLER:   Your Honor, I have
5  no further questions at this point.
6    MR. ZUROFSKY:   Just to handle a
7  little housekeeping. It is four o'clock. I am
8  happy to start. We talked about Mr. Rutschmann
9  carrying on a little into the evening. That
10  will not happen. I think we will still be
11  working with Mr. Lease when we break today.
12    MR. CHESLER:   We will hold him
13  over in New York until tomorrow.
14    CROSS-EXAMINATION BY MR. ZUROFSKY:
15    Q.    Mr. Lease, good afternoon. Let me
16  first start with the topic of your chart that
17  you spent some time going over with Mr. Chesler
18  in your book. It is Exhibits 40 and 41. Or
19  tabs 40 and 41, I should say.
20    You indicated, I believe to
21  Mr. Chesler there was about 10 percent, you said
22  were not included in the total there; right?
23    A.    10 percent of the cost, yes.
24    Q.    The total costs, now if we turn
25  back in that same book to the December 19 letter

Page 961

JOHN LEASE- CROSS

1
2  that you sent is tab 38.
3    Look at the last page of that
4  exhibit. Do you see that at the end of
5  Exhibit 38 the total is 16,385,000?
6    A.    Yes.
7    Q.    The math as I did it on Exhibit 40
8  totals up to 14,616,000. We can get a
9  calculator out. Does that sound about right to
10  you?
11    A.    That represents, what 90 percent?
12    Q.    That is a little less than 90
13  percent. Difference of 1.768 million. Does
14  that sound about right to you, the number not
15  included in the chart?
16    A.    10 percent, that is about right.
17    Q.    It is a little more than 10
18  percent. I want to ask you first off which
19  items on the chart on 38 are not included in the
20  chart on 40?
21    A.    I would have to go back and look in
22  more detail. I don't know those offhand.
23    Q.    Maybe what we will do, we will be
24  spending a lot of time with the chart on 38, as
25  we go through it you can tell me which ones if

72  (Pages 958 to 961)

JOHN LEASE- CROSS

1
2  they come to mind.  Okay.
3      A.    I don't think I can accurately tell
4  you every one.
5      Q.    Give it your best shot.  Okay.  You
6  just spoke at some length about notice that you
7  think you provided to Fairchild over the four
8  years you been working in your current position;
9  right?
10        Now the agreement provides
11  Fairchild with more than just the right to have
12  notice of a condition; correct, sir?
13     A.    Yes.
14     Q.    Let's take a look at the agreement
15  just so we all have it.
16     MR. CHESLER:   Your Honor, if you
17  have the Holloway binder up there, it is the
18  first exhibit in the Holloway binder.
19     Q.    Turn to page 83, please, sir.  I am
20  looking at section 11.6 C, sir.
21     A.    C?
22     Q.    Yes.  Do you see it there?
23     A.    Okay.
24     Q.    The first line "Prior to the
25  closing, sellers and buyers will each designate

JOHN LEASE- CROSS

1
2  a representative to receive information and
3  consult with the other with respect to Fasteners
4  environmental liabilities." Do you see that?
5      A.    Yes.
6      Q.    The references section 5.3?
7      THE ARBITRATOR:   What page are you
8  on?
9      MR. ZUROFSKY:   Sorry, your Honor,
10  page 83, Arabic number but FC 2279.
11     Q.    Do you see that, Mr. Lease?
12     THE ARBITRATOR:   Wait, page 83 of
13  the agreement?
14     MR. ZUROFSKY:   Yes, sir.
15     THE ARBITRATOR:   I am using the
16  copy from Mr. Chesler's opening statement
17  because it is more legible than the photostat
18  you gave me.  There is a different page number.
19  I think it is 2809.  Because it came from
20  another marking, I guess.  In any event, page
21  83.
22     MR. ZUROFSKY:   It should be
23  section 11.6 C.  It is on the screen.  We will
24  blow it up on the screen for your Honor as well.
25     Q.    Do you have it, Mr. Lease?

JOHN LEASE- CROSS

1
2      A.    Yes.
3      Q.    "Prior to the closing the sellers
4  and the buyers, the buyer will each designate a
5  representative to receive information and
6  consult with the other with respect to Fasteners
7  Environmental Liabilities." As I say it
8  references section 5.3.  Do you see that, sir?
9      A.    Yes, I do.
10     Q.    Do you read and understand that to
11  mean Fairchild had the right to consult with
12  Alcoa regarding Fasteners Environmental
13  Liabilities?
14     A.    Yes, I believe that's true.
15     Q.    Let's move down a couple of lines,
16  now I am going down to probably easier to count
17  up from the bottom, eight lines.  It says there
18  "The buyer will select consultants and
19  contractors to implement such remedial actions
20  (Who shall be reasonably acceptable to parent)."
21  Let me pause there.  You understand parent to be
22  Fairchild; right, sir?
23     A.    If you say so.
24     Q.    I will represent to you it is a
25  defined term parent refers to Fairchild?

JOHN LEASE- CROSS

1
2      A.    Okay.
3      Q.    "And will also provide the seller's
4  representative and its environmental consultants
5  with copies of all reports, analytical data,
6  correspondence, directives, orders and
7  documents, submitted to or received by the buyer
8  from any government entity in connection with
9  the remedial action and other nonprivileged
10  documents created or received by or on behalf of
11  the buyer in connection with the remedial
12  action." Do you see that, sir?
13     A.    I see that.
14     Q.    There is two things I want to pause
15  on and talk about there.  Does that tell you
16  Fairchild had the right to be informed of and
17  determined to be reasonably acceptable any
18  consultants that Alcoa would use in connection
19  with remedial actions?
20     MR. CHESLER:   Excuse me, your
21  Honor, may I have one point of clarification for
22  the record.  Obviously counsel can question the
23  witness about the agreement.  I want it to be
24  clear this is a nonlawyer being asked about a
25  legal document which ultimately is to be

73 (Pages 962 to 965)

2c5facfb-a662-4159-8094-057d0344af74

Page 966

JOHN LEASE- CROSS

1
2  construed as a matter of law by the court.
3  Therefore any questions are only for the lay
4  person's opinion about what provisions mean.
5  They are not in fact legal interpretation of the
6  contract.
7       MR. ZUROFSKY:  I will just note
8  before agreeing to that the last question Mr.
9  Chesler asked, he asked Mr. Lease did he think
10 he provided to Fairchild.  These are the
11 provisions to which the contract applies.  I
12 want to understand his understanding of the
13 term.
14      THE ARBITRATOR:  We understand all
15 of that.
16      MR. CHESLER:  I don't think we
17 differ.  I just want the record to be clear it
18 is his understanding, and not the legal
19 interpretation.
20      Q.   Do you understand, Mr. Lease, the
21 first part of the sentence I read to you to be
22 saying Fairchild had the right to be informed of
23 and to find reasonably acceptable consultants
24 that Alcoa chose to work on remedial actions?
25      A.   Well, as Mr. Chesler noted, I am

Page 967

JOHN LEASE- CROSS

1
2  not a lawyer.  As I just generally read this the
3  term "remedial actions" refers to actions
4  related to CERCLA is that right?  I'm asking
5  you.
6       Q.   We can go look at it, whatever that
7  defined term is, they had the right, focusing on
8  the consulting word, the word "consultants," if
9  Alcoa is taking something defined as a remedial
10 action, however defined, Alcoa is using
11 consultants, does Fairchild have the right to
12 know about it and find those consultants to be
13 reasonably acceptable?
14      A.   It basically says, yes, provide
15 Fairchild the opportunity to comment on the
16 consultants and contractors that are reasonably
17 acceptable.  And provide reports to the parent,
18 I guess is the proper term.
19      Q.   Not just reports though, is it,
20 sir, it says "and will also provide the sellers'
21 representative and its environmental consultants
22 with copies of all reports, analytical data,
23 correspondence, directives, orders and documents
24 submitted to or received by the buyer from any
25 government entity in connection with remedial

Page 968

JOHN LEASE- CROSS

1
2  action and other nonprivileged documents created
3  or received by or on behalf of the buyer,"
4  that's Alcoa, "in connection with remedial
5  action."  It is not just reports right, it is a
6  lot of documents we are talking about?
7       A.   Okay.
8       Q.   You agree with that?
9       A.   That is what it says.
10      Q.   Let's look at the next sentence
11 "The buyer shall afford the sellers a reasonable
12 opportunity to comment on the buyer's proposed
13 response to a Fasteners environmental condition
14 and buyer shall not unreasonably refuse to
15 incorporate the seller's comments."
16      Do you see that, sir?
17      A.   I do.
18      Q.   What do you understand that to
19 mean?
20      A.   I understand that to mean Fairchild
21 has the right comments on reports generated or
22 information provided to them related to remedial
23 action.
24      Q.   We will get into what you told me
25 about this at your deposition, Mr. Chesler when

Page 969

JOHN LEASE- CROSS

1
2  he talked with you was talking about scopes of
3  work, do you recall that?
4       A.   Yes.
5       Q.   When he is defining scope of work
6  he asked you scope of work means this is what we
7  are going to do, do you recall that?
8       A.   Yes.
9       Q.   You said that sounds right to you?
10      A.   Basically, yes.
11      Q.   When we look at the term "proposed
12 response" here in that sentence do you
13 understand proposed response to also mean hey
14 this is what we are going to do, a proposed
15 response?
16      A.   Basically, yes.
17      Q.   This is the action we are going to
18 take?
19      A.   Pardon?
20      Q.   This is the action we are going to
21 take?
22      A.   Okay.
23      Q.   You understand that Fairchild had
24 the right to comment on that proposed response
25 pursuant to this provision of the agreement;

74 (Pages 966 to 969)

2c5facfb-a662-4159-8094-057d0344af74

Page 970

JOHN LEASE- CROSS

1
2  correct?
3      A.    Yes.
4      Q.    In order to comment on proposed
5  response you need to know about proposed
6  response in the first place; right?
7      A.    Yes.
8      Q.    That is what I want to spend some
9  time talking about, Mr. Lease, whether or not
10  Fairchild knew about Alcoa's proposed response
11  in connection with some of the claims we are
12  going to go through in tab 38. Okay. Let's
13  first start with the document page -- tab 36 of
14  your binder.
15          Let's be clear about something
16  before we go on. At your deposition I believe
17  you told me you thought the Fairchild's right to
18  comment on proposed response only extended to
19  proposed response with respect to government
20  actions. Do you recall that testimony?
21      A.    Yes.
22      Q.    Is that your position?
23      A.    No, as you recall we were bouncing
24  around in the agreement quite a bit in that
25  deposition. I think I became confused regarding

Page 971

JOHN LEASE- CROSS

1
2  what was covered in different sections.
3      Q.    Let me make sure I have it clear,
4  because we did go over if you recall at your
5  deposition some documents from the 2002, 2003
6  time frame. I asked you if your position on
7  that issue had changed over time. You said yes
8  it had. Do you recall that?
9      A.    Vaguely. I don't recall the
10  specifics.
11      Q.    Is it worth taking a look at it
12  just a minute. I want to make sure we are
13  talking about the same thing. Let's turn, Mr.
14  Lease, to page 34 of that deposition. At the
15  bottom there I asked you line 22 "so is it your
16  understanding at this point in time just so you
17  know is referring back to an email from 2003, I
18  believe, "That Alcoa was required to provide
19  Fairchild with notice of activities, in this
20  case Phase IIs that were to be performed in the
21  future."
22      THE ARBITRATOR:    You are on
23  page 34.
24      MR. ZUROFSKY:    Bottom of page 34,
25  your Honor.

Page 972

JOHN LEASE- CROSS

1
2      Q.    Do you see that, Mr. Lease?
3      A.    Yes, I do.
4      Q.    You said "At this point in time"
5  again referring to an email, I can put it in
6  front of you, it is an email from 2002,
7  actually, I believe end of 2002, "At this point
8  in time that was my understanding."
9      A.    What time frame are we talking
10  about here?
11      Q.    The time frame of the document we
12  are talking about here is 2002. It is actually
13  in your book, if you want to take a look at it.
14  The document we were talking about is the
15  document in which you said you satisfied the
16  requirement to provide Mike Hodge with scopes of
17  work. Do you remember that document?
18      A.    Okay.
19      MR. ZUROFSKY:    Do you happen to
20  know which tab it is, Evan, you went through it
21  a little earlier? It is tab 4 it looks like.
22      MR. CHESLER:    I thought 3 or 4.
23      Q.    That is the Exhibit that is being
24  referred to in this portion of deposition.
25  November of 2002. I asked you is that your

Page 973

JOHN LEASE- CROSS

1
2  understanding at the time Alcoa was required to
3  provide Fairchild with notice of activities in
4  this case Phase II that were to be performed in
5  the future. You said at this point in time that
6  was my understanding.
7      A.    Correct.
8      Q.    I asked you "How does your
9  understanding differ now with respect to Alcoa's
10  requirement to notify Fairchild of actions to be
11  taken in the future?"
12          You said "Well, as I read the
13  agreement here today, and in subsequent to this
14  meeting the requirement to provide them with
15  information in advance was limited to activities
16  associated with governmental interactions
17  related through remedial activities." Do you
18  recall that?
19      A.    Yes.
20      Q.    That statement at the deposition
21  you're saying is no longer your belief?
22      A.    That is no longer my understanding,
23  correct.
24      Q.    You understand now that Fairchild
25  had the right to comment on all proposed actions

75 (Pages 970 to 973

2c5facfb-a662-4159-8094-057d0344af74

Page 974

JOHN LEASE- CROSS

1
2  that Alcoa was taking that could qualify as a
3  Fasteners environmental liability; right?
4      A.    Yes.
5      Q.    With that in mind now that we have
6  that cleared up, let's move to the chart.  The
7  first thing I want to talk about on the chart
8  are these asterisk.  Mr. Chesler pointed you to
9  two asterisk items from City of Industry.  Do
10  you recall that on tab 36 of the binder?  Do you
11  recall that?
12         THE ARBITRATOR:  36 or 38?
13         MR. ZUROFSKY:  36.  38 is the
14  master chart that comes later.  36 is the first
15  one with the asterisks.
16      A.    Okay.  I'm on the chart.
17      Q.    Mr. Chesler pointed you to confined
18  space compliance entry at 36010-009; right?
19      A.    That's correct.
20      Q.    He pointed you to mobile equipment
21  compliance.  Do you remember that at 011?
22      A.    What was the number.
23      Q.    36010-011.  Two below.
24      A.    Okay.
25      Q.    He pointed you back to tab 20 in

Page 975

JOHN LEASE- CROSS

1
2  the binder.  Do you remember that?
3      A.    Yes.
4      Q.    Tab 20 is a letter from you to Mike
5  Hodge; right?
6      A.    Yes, it is.
7      Q.    The letter says, does it not, sir,
8  the attachment Mr. Chesler pointed you to, the
9  chart on 235 is for costs already incurred;
10  right?  So look at the mobile equipment
11  compliance there.  On 235, 36010, mobile
12  equipment compliance.  Do you remember that?
13      A.    I see it.
14      Q.    Mr. Chesler asked you well you are
15  really notifying them twice; right?  You said
16  yes, do you recall that?
17      A.    Yes.
18      Q.    Here you are notifying Fairchild,
19  are you not, of costs already incurred in
20  connection with that project; right?
21      A.    These were costs incurred but the
22  notice that this was an environmental condition
23  had been provided earlier.
24      Q.    You're going to tell me the
25  mobile equipment compliance is provided in the

Page 976

JOHN LEASE- CROSS

1
2  Phase Is; is that right?
3      A.    Phase Is and the general approaches
4  that we provided to Fairchild for corrective
5  actions related to compliance issues in our
6  notice letters.
7      Q.    I am not sure what you mean by
8  general approach you provided to Fairchild.
9  What does that mean?
10      A.    Well, if you recall the letters we
11  provided for the four major facilities that we
12  conducted gap analyses for.  The major
13  categories that we found there included mobile
14  equipment compliance.
15      Q.    There is no letter for City of
16  Industry in those four letters, correct, the gap
17  analysis letters?
18      A.    No.  There is no specific letter
19  for City of Industry.  However, as I noted in my
20  discussion with Mr. Chesler, these issues
21  related to safety and health compliance as well
22  as environmental compliance were common across
23  the facilities.
24         The approach that we took as
25  described in the gap analysis letters basically

Page 977

JOHN LEASE- CROSS

1
2  said we found a non-compliance here.  We are
3  going to conduct a study to determine what needs
4  to be done to fix the problem and we are going
5  to fix the problem.
6      Q.    Mr. Lease, there is no mention in
7  the Phase I for City of Industry about mobile
8  equipment compliance; is there?
9      A.    I can't recall specifically.
10      Q.    I am going to ask you a series of
11  questions that sort of follow that for a lot of
12  these items.  We can handle it how you like.  We
13  can go to the Phase Is, you can look at them or
14  tell me you don't recall.  Let the documents
15  speak for themselves.  I want to make sure we
16  covered all these.  Because I know you're saying
17  Phase Is mention these type of items and they
18  don't, sir.  If you want to look at them you can.
19  I am going to ask you these questions.  Okay?
20      A.    Let's go.
21      Q.    Mobile equipment compliance, do
22  you — let's get the list we want to establish
23  before we go to Phase I.  The next one — before
24  I move on, what was Alcoa's proposed response to
25  mobile equipment compliance issue?

76  (Pages  974 to 977)

Page 978

JOHN LEASE- CROSS

1    JOHN LEASE- CROSS
2        A.    Basically the program areas in
3    mobile equipment were lacking components that
4    were in compliance with OSHA.  So based on the
5    analysis that was done for each individual
6    program the appropriate corrective actions are
7    put into place to bring that particular program
8    area up to OSHA standard.
9        Q.    When did Alcoa propose that
10   response to Fairchild, for City of Industry?
11       A.    As I mentioned, it was part of the
12   overall gap analysis reporting process we
13   followed through.
14           THE ARBITRATOR:  What are you
15   talking about mobile equipment? What are you
16   talking about?
17           THE WITNESS:   Mobile equipment is
18   equipment on the site such as forklifts, Cranes
19   that move.
20           THE ARBITRATOR:  What is the
21   noncompliance you're talking about?
22           THE WITNESS:   I am not a safety
23   expert, but I will try to explain to the best I
24   can.  OSHA set certain requirements in their
25   regulations related to aspects of the mobile

Page 979

JOHN LEASE- CROSS

1    JOHN LEASE- CROSS
2    equipment such as inspections, certain types of
3    -- getting outside of my area here, but in
4    essence there are a list of compliance
5    requirements that must be met under OSHA
6    standards for variety of industrial practices
7    such as mobile equipment.
8           So when we talk about deficiencies
9    in the program, our analysis, based on our gap
10   analysis relative to compliance would identify
11   areas where they were noncompliant.  Those areas
12   would need to be corrected to bring the program
13   into compliance.
14           THE ARBITRATOR:  I guess my
15   question what did you spend 2487 doing for that
16   item, the item we are discussing, what would you
17   have spend $2400 on a piece of mobile equipment
18   to do? It doesn't work, I mean what is the --
19           THE WITNESS:   It could have been
20   for some guarding on the piece of equipment.  It
21   could have been to replace piece of the
22   equipment that was defective such as on a crane
23   which is moving, so it is a piece of mobile
24   equipment.  There would be corrective action for
25   that specific piece of equipment to bring it

Page 980

JOHN LEASE- CROSS

1    JOHN LEASE- CROSS
2    into compliance.
3        Q.    Your testimony, Mr. Lease, Alcoa's
4    proposed response to that situation at the City
5    of Industry can be found in letters related to
6    Torrance, Fullerton, Toulouse and St. Cosme;
7    right?
8        A.    Basically the approach was to
9    conduct a review of each area where we
10   identified significant compliance issues.
11   Basically the nine areas we're looking at.  And
12   to fix the problem.  It is a very common
13   approach in industry, you don't create a work
14   plan, scope of work to effect the $2,400 repair.
15       Q.    Where did you tell Fairchild you
16   were going to do that we will move to bigger
17   numbers in a minute?
18       A.    I have to say our assessments of
19   the Fairchild facilities were that the
20   individual plants knew what the issues were,
21   Fairchild knew what the issues were and we
22   carried out the corrective actions in the most
23   effective way possible.
24       Q.    Mr. Lease, my question where and
25   when and in what document did you tell Fairchild

Page 981

JOHN LEASE- CROSS

1    JOHN LEASE- CROSS
2    you were going -- that was your proposed
3    response for mobile equipment?
4        A.    For each specific project.
5        Q.    Yes?
6        A.    We did not go to that level of
7    detail.
8        Q.    With respect to proposed responses?
9        A.    Not all of them, no.
10       Q.    Let's continue down the list.  Next
11   starred item is earthquake hazard reduction for
12   76,000?
13           THE ARBITRATOR:  Where are you?
14           MR. ZUROFSKY:  Back on tab 36 your
15   Honor going through that list that has asterisk
16   under project number heading if you go down to
17   36010-014 it says earthquake hazard reduction
18   76,000.
19       A.    Which tab?
20       Q.    Tab 36, first page of the chart.
21           THE ARBITRATOR:  The fact it has a
22   single asterisk indicates what?
23       Q.    Let's clarify that.  That is a very
24   good point.  Go back to the cover letter, Mr.
25   Lease on tab 36.

77 (Pages 978 to 981,

Page 982

JOHN LEASE- CROSS

1
2     A.    14?
3     Q.    Judge Stapleton asked a question
4  about what the single asterisk means, I want to
5  be sure we are all clear about that. Your
6  Honor, Mr. Lease says it in the cover letter of
7  tab 36. He says --
8         THE ARBITRATOR:  He just says they
9  haven't been the subject of prior notice.
10 Either asterisk. Double asterisk they haven't
11 incurred expenses.
12    Q.    Aren't you here saying these have
13 not been the subject of prior notice, any of
14 these items?
15    A.    I know in this particular case,
16 number 14 --
17    Q.    We are back on the cover letter
18 answering Judge Stapleton's question.
19       THE ARBITRATOR:  In general they
20 were not subject of prior notice?
21       THE WITNESS:  Prior notice of
22 liabilities of expenses.
23    Q.    You don't say that here, do you,
24 you say have not been the subject of prior
25 notice to section 11.6 of the Acquisition

Page 983

JOHN LEASE- CROSS

1
2  Agreement; right, Mr. Lease; right? Is that what
3  you say in the letter?
4     A.    Pardon?
5     Q.    Does it not say in the letter some
6  of the items on this chart identified with an
7  asterisk or double asterisk have not been the
8  subject of prior notice pursuant to section 11.6
9  of the Acquisition Agreement period. You don't
10 say notice of liability; do you?
11    A.    That is inherent in this chart. It
12 is a liability chart.
13    Q.    In other words, it is for costs
14 already incurred?
15    A.    Costs incurred that we had not
16 reported to Fairchild at the time.
17    Q.    For work already done?
18       THE ARBITRATOR:  Some of the
19 double asterisk is costs not yet incurred
20 according to this letter?
21       MR. ZUROFSKY:  Right.
22       THE ARBITRATOR:  Either asterisk,
23 single or double means it was not subject to
24 prior notice pursuant to section 11.6, that is
25 what we're talking about?

Page 984

JOHN LEASE- CROSS

1
2         THE WITNESS:  In terms of
3  liability notification, yes.
4         THE ARBITRATOR:  All it says
5  subject to prior notice pursuant to section 11.6
6  of the Acquisition Agreement.
7         THE WITNESS:  It is probably
8  unfortunate wording in this letter. The charts
9  reflect liabilities that we had incurred up to
10 this point.
11       THE ARBITRATOR:  What do you mean
12 by liabilities?
13       THE WITNESS:  Actual money spent.
14       THE ARBITRATOR:  The double
15 asterisk says you have not incurred the expense
16 in connection --
17       THE WITNESS:  That's correct.
18 These were projects we anticipated spending
19 money for in the future so we included them.
20    Q.    With respect to those double
21 asterisk projects, you were providing what kind
22 of notice to Fairchild?
23    A.    Pardon?
24    Q.    With respect to the double asterisk
25 items, you were providing what kind of notice to

Page 985

JOHN LEASE- CROSS

1
2  Fairchild?
3     A.    Well, I can't say that each
4  individual project was noticed to Fairchild with
5  double asterisk.
6     Q.    Hold on. Let's work through this.
7  You told Judge Stapleton the double asterisk
8  mean no expenses had been incurred yet; right?
9     A.    That's correct.
10    Q.    You said your interpretation of the
11 word notice there, no prior notice of liability;
12 right?
13    A.    That's correct.
14    Q.    But there is no liability with
15 respect to items for which you have not yet
16 incurred any expenses; right?
17    A.    Potential liability.
18    Q.    Doesn't say that either, right,
19 doesn't say liability or potential liability;
20 does it?
21    A.    We are getting wrapped around the
22 axle here on this chart. In essence what we
23 tried to convey is where the asterisk was
24 included next to the project, it represents the
25 first notice of liability.

78  (Pages 982 to 985)

Page 986

JOHN LEASE- CROSS

1
2     THE ARBITRATOR:   When you say
3  liability, what do you mean by that?
4     THE WITNESS:   Liability, expended
5  cost, expended funds we had spent for the
6  project.
7     THE ARBITRATOR:   You are saying
8  you gave prior notice of this problem in this
9  particular location?
10     THE WITNESS:   As I said earlier,
11  I think each individual project is the
12  subject of notice to Fairchild.  We provided
13  notice of issues at the facilities.
14     THE ARBITRATOR:   Generic issues at
15  any facilities is that what you're saying.
16     THE WITNESS:   Basically, yes.
17     Q.   Let's talk about that a second.
18  This chart is not done by general issues, is it
19  it is done by line items of particular project;
20  right?  Right?
21     A.   I think that's your opinion.
22     Q.   Let's turn to the chart.  What is
23  the chart listing?  In the chart, these are line
24  items, particular expenses projects; right?
25     A.   These are projects.

Page 987

JOHN LEASE- CROSS

1
2     Q.   They have project numbers; right?
3     A.   Pardon?
4     Q.   They have project numbers assigned
5  by Alcoa; right?
6     A.   That's correct.
7     Q.   Distinct one for each project?
8     A.   Yes.
9     Q.   So when you say what you're
10  providing notice of here, you're not saying you
11  are providing general subject areas, you're
12  talking about particular projects; right?
13     A.   Under broader heading as we
14  discussed earlier with Mr. Chesler.
15     Q.   Which heading with Mr. Chesler you
16  discussed?
17     A.   Mobile equipment was under mobile
18  equipment, machine guarding was under equipment,
19  I forget the exact line item in the large chart.
20  Equipment safety compliance.
21     Q.   Not in the chart you sent to
22  Fairchild; was it? Not in the chart you sent to
23  Fairchild in connection with this letter in
24  May -- excuse me July 2005.  There is no
25  headings like we saw in the chart at tab 40 and

Page 988

JOHN LEASE- CROSS

1
2  41 of your binder; were there?
3     A.   We are talking about notice.
4  Notice of the issue as it relates to that
5  category.
6     Q.   We have three types, let's make
7  sure we are talking the same language.  We
8  really have three types of information we are
9  talking about so far today, don't we, we have
10  notice of a potential problem, notice of a
11  condition; right? Are you with me?
12     A.   Notice of an environmental
13  condition?
14     Q.   Notice of a Fasteners Environmental
15  Condition, that is called for by 11.6 D of the
16  agreement.  Do you remember that?
17     A.   No.
18     Q.   Let's put it up 11.6 D of the
19  agreement which is found on page 84 of the
20  agreement if you want to use the hard copy.
21  11.6 D says "The buyer shall inform any of the
22  sellers," buyer being Alcoa, sellers being
23  Fairchild, "promptly in writing of any Fasteners
24  Environmental Condition or environmental action
25  in respect of which the sellers may have an

Page 989

JOHN LEASE- CROSS

1
2  indemnification obligation under this section
3  11.6." Do you see that?
4     A.   Yes, I see it.
5     Q.   That is the first type of notice I
6  would like to discuss, which is notice of a
7  Fasteners environmental condition; right?
8     A.   Okay.
9     Q.   Then we talked a little earlier, I
10  think you said you agree with me, that Fairchild
11  was also had the right to consult and comment on
12  proposed responses to those conditions; right?
13     A.   Yes.
14     Q.   We agreed in order to comment and
15  consult on those proposed responses one needs to
16  know what that proposed response is; right?
17     A.   Yes.
18     Q.   So those are two different things;
19  right?
20     A.   The response to a condition?
21     Q.   Yes.  Condition and response to it.
22     A.   Yes.
23     Q.   The third type is notice, as you've
24  called it with your Honor, is of liability;
25  right?

79  (Pages 986 to 989

2c5facfb-a662-4159-8094-057d0344af74

Page 990

JOHN LEASE- CROSS

2    A.    Correct.
3    Q.    That is notice when Alcoa is saying
4  here is the bill, Fairchild, pay us; right?
5    A.    Right.
6    Q.    Those three, keep those three
7  categories in mind as we work our way through
8  these materials. Okay? Going back to the cover
9  page of tab 36. You are saying here some of the
10 items on this chart identified with an asterisk
11 or double asterisk have not been the subject of
12 prior notice pursuant to section 11.6 of the
13 Acquisition Agreement.
14        You, I believe, have now said the
15 notice you're referring there to is notice of
16 liability; right?
17   A.    That's what I have said, yes.
18   Q.    Is it your testimony and belief you
19 had those items with the asterisks were also
20 Fairchild was provided notice of any other two
21 categories for those items?
22   A.    Fairchild had been provided notice?
23   Q.    Yes. By Alcoa.
24   A.    I believe that's the case, yes.
25   Q.    On what basis do you say that's the

Page 991

JOHN LEASE- CROSS

2  case?
3    A.    If we take the mobile equipment
4  example for an example, we provided notice to
5  Fairchild through a variety of documents. The
6  first is the Phase Is reports. The second is
7  the gap analysis reports.
8        These reports basically identified
9  Fasteners Environmental Conditions to Fairchild.
10 Okay. Included in those reports to Fairchild,
11 especially in the gap analysis reports there was
12 proposed action or corrective action that was
13 included which was then provided to Fairchild.
14       Their comment on those actions was
15 basically we disagree their Fasteners
16 Environmental Conditions, we dispute that these
17 are Fasteners Environmental Conditions and we
18 object to release of the escrow funds to pay for
19 this.
20   Q.    Lets be clear, you say that, we can
21 talk about any of these, we will talk about
22 mobile equipment at City of Industry. You say
23 that Fairchild was on notice of the condition,
24 i.e., the problem with the mobile equipment
25 there at City of Industry for both Phase I and

Page 992

JOHN LEASE- CROSS

2  gap analysis that were provided. You never
3  provided the gap analysis there were summary
4  charts of gap analysis; right, sir?
5    A.    There was gap analysis provided
6  later for City of Industry that included this
7  item.
8    Q.    Later?
9    A.    Later.
10   Q.    After costs were incurred; right?
11   A.    After the costs were incurred but,
12 as I said before, the environmental condition,
13 deficiencies in mobile equipment had been
14 noticed to Fairchild.
15   Q.    For City of Industry where?
16   A.    It was a general environmental
17 condition that existed across the company at
18 that time.
19   Q.    But you wrote letters about four
20 specific facilities right, Torrance, Fullerton
21 -- excuse me, St. Cosme and Toulouse; right?
22   A.    That's right.
23   Q.    You didn't write a letter about
24 City of Industry?
25   A.    The condition itself, as I

Page 993

JOHN LEASE- CROSS

2  mentioned to Mr. Chesler, the rationale for
3  doing the four sites initially within the gap
4  analysis process was to identify the scope of
5  issues that existed within Fairchild.
6    Q.    You didn't tell Fairchild that was
7  the purpose of these just doing these four
8  facilities, right, you just sent them letters
9  about four facility; right?
10   A.    We discussed the approach, rapid
11 integration approach with Mr. Hodge our meeting
12 in Dulles. We repeated that in our plant visits
13 with Mr. Hodge at Torrance, Fullerton, Stoughton
14 and City of Industry. So we in our view had
15 provided general, well not general, we provided
16 notice to the company that these issues were
17 found to be in noncompliance and we were going
18 to address them in a similar way.
19   Q.    Let's talk about one of those.
20 Let's look at one of those letters and what
21 happens with one of those letters. The letters
22 for the four facilities. Let's look at the
23 Fullerton letter. The Fullerton letter is in
24 bulk Exhibit C. I am not sure it is in your
25 binder or not.

80  (Pages 990 to 993)

Page 994

1        JOHN LEASE- CROSS
2        MR. CHESLER:   Fullerton compliance
3   letter?
4        MR. ZUROFSKY:   June 13 letter from
5   Mr. Lease to Hodge.
6        MR. CHESLER:   Tab 14.
7        A.   Okay.
8        Q.   This is one of the letters you're
9   talking about you say told Fairchild fulfilled
10  the first two buckets of notice we established
11  earlier of the three; right?
12       A.   Right.
13       Q.   You say not just extended to
14  Fullerton, but to all 16 facilities for these
15  issues; right?
16       A.   Fullerton plus the other three
17  facilities, I think capture the scope and
18  breadth of the issues we identified.
19       Q.   Let's look at the Fullerton letter.
20  You provided a chart which you went through with
21  Mr. Chesler at some length.  I want to look at
22  machine guarding here at Fullerton.  Before I do
23  that I want to nail one thing down.  That is the
24  following:  You say you got a response from Mr.
25  Miller on this for these letters; correct?

Page 995

1        JOHN LEASE- CROSS
2        A.   Yes.
3        Q.   What did Mr. Miller say?  You can
4   look at it.
5        MR. ZUROFSKY:  Tab 15.
6        MR. CHESLER:   That is response on
7   Fullerton.
8        MR. ZUROFSKY:  We will get to that
9   in a minute, too.
10       Q.   Tab 15 captured Fullerton, Mr.
11  Miller writes back to you; right?
12       A.   Yes.
13       Q.   He says "we've received and
14  reviewed your letter."  He says "based upon our
15  initial review of the issues noted in your
16  letter, Fairchild hereby disputes Fairchild's
17  liability for costs associated with the
18  corrective actions listed in the table attached
19  to your letter."  Right?
20            I want to go down to the third
21  paragraph where Mr. Miller says "Nevertheless,
22  pursuant to section 11.7 of the Acquisition
23  Agreement, we are willing to discuss this matter
24  further with you." Do you see that, sir?
25       A.   I see that.

Page 996

1        JOHN LEASE- CROSS
2        Q.   Does he mention mediation there,
3   does he use the word mediation?
4        A.   Mediation?
5        Q.   Yes.
6        A.   I believe it is mentioned in
7   section 11.7.
8        Q.   Does he -- well, does he mention
9   the word mediation in this letter?
10       A.   In his text, no.
11       Q.   Does he mention the word
12  arbitration in this text?
13       A.   No.
14       Q.   He mentions discussions, right,
15  discuss this matter further with you; right?
16       A.   Yes.
17       Q.   Let's pull up 11.7 of the
18  agreement.  Found on page 86 if you want to look
19  at the hard copy.  It says, I will read it for
20  the record "If a dispute arises in connection
21  with determining validity or amounts of a claim
22  for indemnification," I will skip "If the
23  dispute cannot be settled through direct
24  discussions between representatives of the
25  parent and representative of the buyer" then it

Page 997

1        JOHN LEASE- CROSS
2   goes on to talk about mediation and arbitration.
3            Do you think Mr. Miller is
4   referring to discussions referenced here in
5   section 11.7 to negotiate these things -- sorry,
6   to resolve these things through direct
7   discussions?
8        A.   I don't know what his true intent
9   was, frankly.
10       Q.   He doesn't mention anything other
11  than discussion.  Let's go forward.  So he asks
12  you next sentence of the letter, "in order that
13  we may do so effectively, Mr. Miller asks for,
14  please provide us with specific and complete
15  background documentation supporting the items
16  that estimated costs summarized in the table.
17  Then he says "such documentation should include
18  copies of any assessments, reports, legal
19  analyses or cost analyses prepared by or for
20  Alcoa and any other documentation which support
21  the various findings as listed in the tables
22  included with your letter of June 13." Do you
23  see that request, Mr. Lease?
24       A.   Yes, I do.
25       Q.   Did Alcoa respond to that request?

Page 998

JOHN LEASE- CROSS

1
2     A.     We did not provide any further
3  documentation because, in essence, what we
4  provided in this table was sufficient to
5  demonstrate the environmental condition and the
6  response.
7     Q.     Let's turn now, I don't think your
8  counsel put this in front of you, we certainly
9  will.  My question, by the way, did Alcoa at all
10 respond to Mr. Miller's letter?
11    A.     I answered the question.
12    Q.     You said Alcoa did not because you
13 thought there was sufficient information; right?
14    A.     This issue was well described in
15 the table.
16    MR. ZUROFSKY:  We put together a
17 separate binder, there is more in here than not.
18 We will try to cross-reference whenever we can.
19 We promise not to undo the duplications for you.
20 Mr. Chesler put in front of you some of the
21 correspondence but there, as you see two shelves
22 there, there are some others we want to put in
23 front of you as well we will cross-reference it
24 later if that makes sense.
25    Q.     What I want to look at is under tab

Page 999

JOHN LEASE- CROSS

1
2  Fullerton, you see tabs there relating to the
3  different sites in the binder I just handed you.
4     A.     Okay.
5     Q.     Under Fullerton there are letters
6  separated by yellow sheets.
7     A.     First letter I have in Fullerton
8  tab is City of Industry.
9     Q.     It relates to Fullerton, City of
10 Industry, Temple Avenue and Fullerton.
11    A.     Okay.
12    Q.     Go past that letter and the next
13 letter, the next letter by the way is your June
14 13 letter; do you see that there? Right?
15    A.     Pardon.
16    Q.     Second letter in Fullerton is your
17 June 13 letter the EHS noncompliance letter that
18 had the chart attached to it; right?
19    A.     Okay.
20    Q.     Are you with me?
21    A.     Yes.  I see it.
22    Q.     Then go forward another letter
23 which relates to oversight cost reimbursement;
24 right?
25    A.     Okay.

Page 1000

JOHN LEASE- CROSS

1
2     Q.     Then another letter.  This is Mr.
3  Miller's letter that we were looking at before;
4  right?
5     A.     Okay.
6     Q.     That we just talked about; right?
7     A.     Okay.
8     Q.     I asked you and pointed you to the
9  language where Mr. Miller requested such
10 documentation should include copies of any
11 assessments, reports, legal analyses or cost
12 analyses prepared by or for Alcoa and any other
13 documentation which support the various findings
14 as listed in the details.  Do you recall that?
15    A.     I see it.
16    Q.     I asked you had Alcoa responded to
17 that. You told me there was no need to.  It was
18 already known to Fairchild; right?
19    A.     It was known to Fairchild.  It was
20 also the issue was well described in this table.
21    Q.     I want you to turn to the next
22 letter in the binder I just put in front of you,
23 a letter, there is a cover letter, cover sheet
24 dated August 13, from Sanford Harvey to Michael
25 Hodge?

Page 1001

JOHN LEASE- CROSS

1
2     A.     Okay.
3     Q.     Who is Mr. Harvey?
4     MR. CHESLER:  Sorry, August what?
5     MR. ZUROFSKY:  August 13.
6     MR. CHESLER:  Of?
7     MR. ZUROFSKY:  2003.
8     MR. CHESLER:  Behind the Fullerton
9  tab?
10    MR. ZUROFSKY:  Yes.
11    Q.     Are you with me, Mr. Lease?
12    THE ARBITRATOR:  This is a letter
13 from Mr. Harvey sent to Michael Hodge and
14 addressed to Donald Miller?
15    MR. ZUROFSKY:  Correct, your
16 Honor.
17    Q.     Who is Mr. Harvey, just so we have
18 it?
19    A.     Mr. Harvey is an attorney for
20 Alcoa, works in Pittsburgh.
21    Q.     He had involvement in these
22 environmental issues with the Fasteners
23 Fairchild facilities; right?
24    A.     I wouldn't say that.  He was
25 responding in this case specifically to Mr.

82 (Pages 998 to 1001)

JOHN LEASE- CROSS

1
2    Miller's position the only way that an
3    environmental condition qualified for
4    reimbursement was if it resulted from a notice
5    of violation.
6        Q.    We heard some talk about this
7    November 8, 2002 meeting with Mr. Hodge, the
8    meeting you were at.
9        A.    On the scopes of work?
10       Q.    The meeting you talked about with
11   Mr. Chesler?
12       A.    Yes.
13       Q.    Mr. Harvey was at that meeting too?
14       A.    Yes.
15       Q.    Here is Mr. Harvey writing to Mr.
16   Miller.  I want to draw your attention to the
17   second page of Mr. -- before we do that look at
18   the title Re line Fullerton, Toulouse, Torrance
19   France EHS noncompliance issues.  Do you see the
20   "Re:" line?
21       A.    Yes.
22       Q.    He is referring to three facilities
23   for which you provided letters to Fairchild;
24   right?
25       A.    That's correct.

JOHN LEASE- CROSS

1
2        Q.    Three of the four?
3        A.    Correct.
4        Q.    He doesn't say here -- he
5    understood that Mr. Miller had written him about
6    Fullerton, Torrance and Toulouse, right, he is
7    referring to all three?
8        A.    Right.  Three letters from Mr.
9    Miller.
10       Q.    It says in your letters to John
11   Lease dated June 27 you disputed Fairchild's
12   liability and so on and so forth; right?
13       A.    Right.
14       Q.    Turn to the second page where Mr.
15   Harvey writes in a paragraph beginning "We
16   will."
17       A.    Okay.
18       Q.    Remember Mr. Miller asked for
19   documentation such as reports, analyses, backup
20   studies and all the rest of it; right?
21       A.    Yes.
22       Q.    So Mr. Harvey here says "We will
23   provide Fairchild with further documentation to
24   support the estimates developed for the three
25   facilities.  Documentation is being compiled for

JOHN LEASE- CROSS

1
2    each project."
3        Is it your recollection, Mr. Lease,
4    there was documentation being compiled at this
5    time for those projects?
6        A.    I have no firsthand knowledge that
7    was the case.
8        Q.    And will consist, this is Mr.
9    Harvey, he says "And will consist of such items
10   as scopes of work, he says or work, we assume
11   scopes of work."  Go back to Mr. Chesler's
12   definition earlier, scope of work are things
13   that say this is what we are going to do; right?
14       A.    Basically that's right.
15       Q.    Then it says consultant proposals,
16   same thing proposal about what we are going to
17   do?
18       A.    Right.
19       Q.    Then it says summary reports and
20   invoices; right?
21       A.    Right.
22       Q.    Then Mr. Harvey says we will
23   provide you with this documentation in a timely
24   manner once it is complete for your review; do
25   you see that there, Mr. Lease?

JOHN LEASE- CROSS

1
2        A.    Yes, I see it.
3        Q.    Alcoa never sends that
4    documentation to Fairchild regarding those
5    projects; did it?
6        A.    Well, frankly this was Mr. Harvey's
7    letter.  In the case of these three facilities,
8    this documentation he is referencing to the best
9    of my knowledge was not available.
10       Q.    Let's talk about that.
11       A.    This represents -- this doesn't
12   represent official Alcoa response.  This
13   represent's Sandy's response to Mr. Miller.
14       Q.    It is on Alcoa letterhead the
15   letter, yes?
16       A.    Yes.
17       Q.    From Mr. Miller; right?  He is
18   saying he is responding to Mr. Miller's letter's
19   right?
20       A.    The focus is really to address the
21   issue related to notice of violation.
22       Q.    Mr. Lease says he is responding to
23   Mr. Miller's letter; right?
24       A.    He is responding.
25       Q.    Mr. Miller's letter included

83  (Pages 1002 to 1005,

2c5facfb-a662-4159-8094-057d0344af74

JOHN LEASE- CROSS

1
2    request for precisely the type of documentation
3    he says he will provide in a timely manner?
4        A.    It requested that.  I think Sandy's
5    focus in this response was to address the legal
6    issue that was involved here.
7        Q.    Are you saying Mr. Harvey was not
8    speaking for Alcoa when he wrote that letter?
9        A.    I can't say he is speaking for
10   Alcoa in this individual clause you pulled out
11   of the letter.
12       Q.    Let's go back to the notice chart
13   you provided you say with respect to Fullerton.
14   You just, I believe, testified you didn't think
15   the additional assessments and information was
16   available to provide to Mr. Miller on these
17   items.  Is that what you said, Mr. Lease?
18       A.    Pardon me?
19       Q.    Is that what you said?
20       A.    This table represented the
21   information that we had we felt was sufficient
22   to justify the corrective action.
23       Q.    Not my question, sir. You just
24   testified just a couple minutes ago when I said
25   to you I was pointing out that language in Mr.

JOHN LEASE- CROSS

1
2    Harvey's letter you said, well, I don't think
3    that such documentation was available.  Do you
4    recall that.  We can read it back.
5        A.    Yeah.  Based on what I knew at the
6    time that was the case.
7        Q.    He doesn't talk about documentation
8    at the time Mr. Harvey says it is being
9    finalized and will be provided.  Did it
10   eventually come to exist?
11       A.    I don't know how Mr. Harvey would
12   know that.  He wasn't involved in the technical
13   aspects of these projects.
14       Q.    Let's go back to your letter from
15   June 13 which has the chart.  You remember I
16   want to start talking about machine guarding, do
17   you recall that?
18       A.    Yes.
19       Q.    Look at the chart, in particular
20   back a couple letters page FAIR 5000041.  You
21   can also refer to it if you like in tab 15 of
22   Mr. Chesler's binder.  It is in both places.
23   However it is easier to do it.
24           THE ARBITRATOR:  It would be
25   easier to stick with the things that are marked.

JOHN LEASE- CROSS

1
2    You give us a whole other book now, to find
3    anything as you go through is very difficult.
4           MR. ZUROFSKY:  For anything
5    already in Mr. Chesler's binder, obviously I
6    didn't know until cross what I will be
7    introducing --
8           THE ARBITRATOR:  Just tell me what
9    you want.
10          MR. ZUROFSKY:  I will work off Mr.
11   Chesler's book to the extent they cross over.
12   Mr. Chesler's book tab 14.  I will only go in
13   our book for an item not in Mr. Chesler's book.
14   We will provide you later a set of those.
15       Q.    Tab 14 of Mr. Chesler's book.
16   Let's look at the page marked at the bottom fair
17   5000041.  Do you see that, Mr. Lease?
18       A.    Yes.
19       Q.    This is as you say, I think you
20   testified you believe satisfies both first
21   categories of notice with respect to this
22   machine guarding items; right?
23       A.    Yes.  That is our position.
24       Q.    Not just for Fullerton, you say it
25   extends out to the other facilities as well?

JOHN LEASE- CROSS

1
2        A.    Yes.
3        Q.    Lets look at this.  If you look
4    under corrective action here it says "conduct a
5    hazard assessment of the equipment at the
6    facility subject to the OSHA regulations on
7    machine guarding.  Use the survey to develop
8    equipment-specific machine guarding
9    installations and procedures comply with
10   regulatory requirements."
11          Do you see that there?
12       A.    I see it.
13       Q.    The estimated cost there is
14   $58,000, Mr. Lease?
15       A.    Yes.
16       Q.    This is what you told Fairchild;
17   right?
18       A.    This is what we sent them.
19       Q.    $58,000.  I think we just looked at
20   a letter from Mr. Harvey in which he said
21   documentation is being prepared and will be
22   forwarded to you shortly.  Do you recall that
23   letter?
24       A.    I recall the letter.
25       Q.    Did Alcoa perform the assessment

84  (Pages 1006 to 1009)

Page 1010

JOHN LEASE- CROSS

1    referenced here with respect to Fullerton
2    machine guarding?
3    A.    I believe we did, yes.
4    Q.    It is a pretty voluminous report;
5    right?
6    A.    I don't know.
7         These studies were carried out at
8    the plant level. So I didn't see the report or
9    survey?
10    Q.    You were in charge of giving
11    information to Fairchild; right?
12    A.    I was in charge of the transmitting
13    what I received to Fairchild.
14    Q.    As I say, I don't want to create a
15    Miracle on 34th Street moment where we start
16    bringing in the mailman with all sort of boxes.
17    Let's look at this report. One report on
18    machine guarding.
19         I promise your Honor, we will have
20    paralegals come out and bring these for you if
21    you need it.
22    THE ARBITRATOR:   This particular
23    entry, $58,000 is for the study hazard
24    assessment of the equipment and facilities

Page 1011

JOHN LEASE- CROSS

1    subject to OSHA regulations and machine
2    guarding. Use the survey to develop
3    equipment-specific machine guarding
4    installations and procedures to comply with
5    regulatory requirements. This relates to
6    Fullerton, California facility; right?
7    THE WITNESS:   Correct.
8    THE ARBITRATOR:   That study hadn't
9    been done at this time; right? This is a
10    proposal to do that.
11    THE WITNESS:   That's correct.
12    THE ARBITRATOR:   I take it that
13    study was done.
14    MR. ZUROFSKY:   That is it right
15    there, your Honor.
16    A.    This is it.
17    THE ARBITRATOR:   That is the study
18    just on this one topic.
19    MR. ZUROFSKY:   One topic for this
20    one facility. We also excerpted some documents
21    so we don't have to go through it in bulk. Just
22    to show you the sense we are talking.
23    Q.    It fills up the whole box; right?
24    THE ARBITRATOR:   So they did a

Page 1012

JOHN LEASE- CROSS

1    study at Fullerton, so I understand what you're
2    talking about?
3    MR. ZUROFSKY:   Yes.
4    THE ARBITRATOR:   On machine
5    guarding.
6    MR. ZUROFSKY:   Yes.
7    THE ARBITRATOR:   As a result of
8    that study, I take it, they did some corrective
9    work on these machines?
10    THE WITNESS:   That's my
11    understanding, your Honor.
12    THE ARBITRATOR:   How much money
13    was spent on that, do you know?
14    THE WITNESS:   On the study.
15    THE ARBITRATOR:   Machine guarding
16    corrective steps taken at the Fullerton
17    facility, do you know?
18    MR. ZUROFSKY:   Tab 38 will have
19    the latest numbers from December you sent to
20    Ms. Hall.
21    THE ARBITRATOR:   Just to follow
22    this one issue.
23    Q.    Tab 38 in the book, on page 2 of 6
24    at Fullerton.

Page 1013

JOHN LEASE- CROSS

1    A.    Where are we now?
2    Q.    Tab 38 in the book from Mr.
3    Chesler. I believe Judge Stapleton was asking
4    you how much was spent on the machine guarding
5    project at Fullerton. I think you communicated
6    that information to Ms. Hall in December 2006 at
7    tab 38. If you look at line 42 on page 2 of 6
8    in the adjusted total what is the number?
9    A.    1,032,000.
10    Q.    1,032,000 was spent; is that
11    correct?
12    A.    That's correct.
13    Q.    Go back to your chart under tab 14
14    estimated cost there references assessment is
15    58,000; right?
16    THE ARBITRATOR:   That is estimated
17    cost for the study?
18    THE WITNESS: That is for the study.
19    THE ARBITRATOR:   Right?
20    THE WITNESS: That's correct.
21    THE ARBITRATOR:   Is it your
22    position the giving to Fairchild notice of this
23    particular study at Fullerton plant was
24    sufficient to put them on notice that there

85  (Pages 1010 to 1013,

2c5facfb-a662-4159-8094-057d0344af74

Page 1014

JOHN LEASE- CROSS

1
2  would be machine guarding studies in a number of
3  other plants.
4         THE WITNESS:   That is our
5  position, yes.
6         THE ARBITRATOR:  So the notice for
7  other plants, unless there is some notice I am
8  not aware of, this notice would have covered all
9  their plants with respect to machine guarding?
10        THE WITNESS:  Yes.  The situation
11 we found with respect to --
12        THE ARBITRATOR:  Just in general
13 is that your position?
14        THE WITNESS:   Yes.  Same issues
15 existed at all the plants.
16     Q.    Coming back to our study here, that
17 study was performed.  You can look through it if
18 you like.  But that is the production that was
19 made to us by your counsel of the study.  Those
20 documents to your knowledge, Mr. Lease, were
21 never provided to Fairchild before this
22 arbitration; right?
23        THE ARBITRATOR:  Which documents?
24        MR. ZUROFSKY:  The documents in
25 the box as a result of the study.

Page 1015

JOHN LEASE- CROSS

1
2         THE ARBITRATOR:  The actual study?
3         MR. ZUROFSKY:  We will look at
4  some of those pages I excerpted because they
5  will be unwieldy out, that is the study, right
6  Mr. Lease.
7      A.    Let me look at it.
8      Q.    Sure.
9      A.    Okay.
10     Q.    Does it look like it to you?
11     A.    I never seen this before but it
12 looks like it.
13     Q.    It is put together by a company
14 called STI.  Are you familiar with them?
15     A.    Yes, I am familiar with the STI
16 name.
17     Q.    Were they the company that Alcoa
18 hired to do the study and the machine guarding
19 at the Fullerton facility?
20     A.    I believe that's correct.
21     Q.    What we prepared is an exhibit.
22 What number are we up to?  428.
23        (Arbitration Exhibit 428
24 was marked.)
25     Q.    428 is just an excerpt from that

Page 1016

JOHN LEASE- CROSS

1
2  box, some excerpts from that box.  I would like
3  to draw your attention, Mr. Lease, to three
4  pages in.  To the cover letter.
5      A.    Yes, I do.
6      Q.    You see that page FAIR 20133 for
7  the record.  It is addressed to Mr. Gerbracht?
8      A.    Yes.
9      Q.    Who is Mr. Gerbracht?
10     A.    Mr. Gerbracht is, I mean he works
11 at Fullerton, I am not sure what his position
12 is.
13     Q.    From STI.  It says "Thank you for
14 allowing STI Machine Services to assist you in
15 providing a safer work environment for your
16 employees.  We are pleased to provide our
17 safeguarding evaluation and proposal for your
18 review the comprehensive risk evaluation and
19 turnkey risk guarding solution enclosed, he is
20 enclosing that box are based on guidelines EN
21 1050."  What is EN 1050, do you know?
22     A.    Pardon me?
23     Q.    Do you know what EN 1050 is?
24     A.    No, I don't.
25     Q.    How about ANSI B11 T --

Page 1017

JOHN LEASE- CROSS

1
2      A.    No.
3      Q.    Do you know if ANSI is a government
4  entity?
5      A.    I believe it stands for American
6  National Standards Institute.
7      Q.    A private entity that puts out
8  standards?
9      A.    I am not sure if they are private
10 or public.
11     Q.    You don't know them to be a
12 government entity?
13     A.    I don't know whether they are
14 public or private.
15     Q.    It says NFPA 79, OSHA 1910, NEC and
16 other applicable OSHA ANSI and North America
17 Standards For Safety.  Do you see that, sir?
18     A.    I see that.
19     Q.    Let's move down two paragraphs it
20 says "Enclosed you will find a detailed
21 explanation of our machine guarding assessment
22 process and results of our findings."  This is
23 dated February 16, 2004.  This is after Mr.
24 Harvey's letter to Mr. Miller saying these
25 studies are being put together and will be sent

86  (Pages 1014 to 1017)

2c5facfb-a662-4159-8094-057d0344af74

Page 1018

JOHN LEASE- CROSS

1  JOHN LEASE- CROSS
2  to you; right?
3      A.    Right.
4      Q.    It then goes on to say "We have
5  also included recommended guarding methods and
6  materials along with a plan view drawing of the
7  proposed guarding solutions.  This information
8  is confidential, proprietary." Do you see that?
9      A.    Yes.
10     Q.    He is talking about proposed
11 guarding solutions here; right?
12     A.    Yes.
13     Q.    What we are talking about with
14 respect to the money, the million dollars or so
15 spent on guarding, the proposal, the proposed
16 response is contained in these documents; right?
17     A.    This is a, I believe an individual
18 assessment for each piece of equipment.
19     Q.    For each of the machines?
20     A.    I believe that is the case.
21     Q.    Similar surveys were they not
22 performed at the other facilities for which
23 Alcoa has incurred machine guarding expenses?
24     A.    I am not sure where all of the
25 facilities were that we did surveys, I

Page 1019

1  JOHN LEASE- CROSS
2  believe --
3      Q.    This is not the only survey of this
4  type?
5      A.    I don't believe it is.
6      Q.    There is also surveys performed for
7  other issues such as lock tag verify?
8          THE ARBITRATOR:  For what?
9          MR. ZUROFSKY:  Lock tag verify.
10     Q.    And fall compliance, Mr. Lease?
11     A.    I believe that was a survey process
12 assessment, yes.
13     Q.    Fall protection, I mean. Fall
14 protection and confined space, the activity you
15 were describing to Judge Stapleton earlier;
16 right?
17     A.    Yes.
18     Q.    Some of the other, pretty much all
19 the other items we've been talking about that
20 are any material value; right, Mr. Lease?
21     A.    I don't know if surveys were
22 performed for all those or not.
23     Q.    There were a number of surveys
24 done?
25     A.    There were surveys done for fall

Page 1020

1  JOHN LEASE- CROSS
2  protection, machine guarding, lock tag verify.
3  I don't know what else.
4      Q.    As we work our way, I want to
5  finish this document, ask you one question, then
6  we are going to break for the day.  On
7  page 20135 see at the bottom there, there is a
8  chart level of risk and score?
9      A.    Yes, I see it.
10     Q.    There is three categories, high,
11 medium, low.  Do you see that there?
12     A.    Yes.
13     Q.    So this is an assessment by STI of
14 whether certain machines fall into each of those
15 categories; is that how you understand it?
16     A.    I believe that is correct based on
17 what I see here at the top.  This represents
18 risk for an individual piece of equipment.
19     Q.    Let's move forward in the document
20 to page 21804.  Okay.  There are, what fills up
21 that box are lots of pages like this with
22 picture of machine and analysis.  Okay.  But
23 this is one example.  Do you see 21804?
24     A.    Yes, I do.
25     Q.    It says there risk level low, do

Page 1021

1  JOHN LEASE- CROSS
2  you see that?
3      A.    Okay.
4      Q.    Some of the machines were not at
5  high risk according to this report?
6      A.    I see potential severity, potential
7  injury is serious, frequency of exposure,
8  seldom, probability of injury is possible.  So,
9  you know, based on their assessment they are
10 assigning a low risk level.
11         I would point out that it does
12 reflect serious injury potential for this
13 particular piece of equipment.
14     Q.    Look at the line that says this
15 machine, a little below that.
16     A.    Right.
17     Q.    This machine is currently
18 safeguarded and existing safeguards reduce risk
19 to a low negligible level.  Residual risk, the
20 residual risk level will be negligible to low if
21 the recommended guards are installed correctly
22 this is based on STI, that's the company,
23 interpretation of an ANSI TR 3.  Do you see
24 that?
25     A.    Yes, I do.

87 (Pages 1018 to 1021

Page 1022

JOHN LEASE- CROSS

1    JOHN LEASE- CROSS
2    Q.    If you look through the examples,
3    if you look through the box you see the
4    reference to ANSI TR 3 in pretty much everyone
5    of these individual studies. I want to ask you
6    again do you know what ANSI TR 3 is?
7    A.    No.
8    Q.    You don't know if ANSI is
9    government regulation or requirement?
10   A.    I am not familiar with OSHA machine
11   guarding. But I know that OSHA standards
12   generally refer to various trade standards by
13   incorporation into the regulation.
14   Q.    You don't know if this one is
15   incorporated into ash yo do you?
16   A.    Specifically I don't.
17   Q.    It is your understanding, I think
18   you told me at your deposition for compliance
19   issues under the indemnity only compliance with
20   laws and not some other standards qualify for
21   indemnification; right, Mr. Lease?
22   A.    To the extent that the standards
23   are not incorporated into the regulation.
24   Q.    If a standard is not incorporated
25   into a regulation you would agree work done to

Page 1023

1    JOHN LEASE- CROSS
2    meet that standard does not qualify for
3    indemnification under the agreement; right, sir?
4    A.    That is my general understanding,
5    yes.
6    Q.    One other question, then we will
7    break for the day. You said you prepared the
8    scopes of work of work and handed them to Mike
9    Hodge for Phase II; right?
10   A.    I am not sure if I handed them to
11   them or how he got them.
12   Q.    Why did you give them to Mr. Hodge?
13   A.    We discussed the upcoming
14   activities after the acquisition and informed
15   him we are going to do Phase II studies. So we
16   had the scope of work prepared by ERM at the
17   time we provided them to make.
18   Q.    Back to our three buckets we talked
19   about of notice, right. The scopes of work for
20   Phase IIs you say would qualify for first two
21   buckets, right, they tell Mr. Hodge there is a
22   condition, it tells him what you are going to do
23   about it; right?
24   A.    Generally that's correct.
25   Q.    It is those scopes of work Mr.

Page 1024

JOHN LEASE- CROSS

1    JOHN LEASE- CROSS
2    Harvey was promising to Mr. Miller would be
3    provided for all items on the charts for those
4    three facilities that are referenced in that
5    letter; right?
6    A.    That is my understanding of what a
7    scope of work is. When Sandy wrote it I am not
8    sure what he meant. He was not involved on the
9    technical end of the activity.
10   Q.    This document, I read you the cover
11   email, he talks about proposed guarding solution
12   recommendations and things like that. That
13   would qualify as proposal of this is what we are
14   going to do?
15   A.    In my letter?
16   Q.    No. The box of documents in front
17   of you from STI. With respect to machine
18   guarding, isn't that really a proposal as to
19   what we are going to do with these machine that
20   resulted in the million dollars cost or so of
21   machine guarding at Fullerton?
22   A.    This appears to me to be a risk
23   assessment of the equipment.
24   Q.    Back to the first cover letter.
25   A.    It describes risks associated with

Page 1025

1    JOHN LEASE- CROSS
2    the equipment. The cost to correct that risk to
3    whatever level is appropriate under the
4    regulation.
5    Q.    Mr. Lease, we spoke about this
6    before. I am going to draw your attention back
7    to the cover letter from STI FAIR page 20133.
8    A.    Okay.
9    Q.    The line in the third paragraph
10   beginning we have also included. Do you see
11   that?
12   A.    Which paragraph are you on?
13   Q.    Third paragraph. The one that
14   begins "enclosed." Second line "We have also
15   included recommended guarding methods and
16   materials along with a plan view drawing of the
17   proposed guarding solutions." Do you see that?
18   A.    I see that.
19   Q.    I think you agreed with me, using
20   Mr. Chesler's definition of scope of work he
21   said this is what we are going to do, this
22   document contains information about what Alcoa
23   was going to do and eventually did at the
24   Fullerton machine guarding; right?
25   A.    I don't know what aspects of this

88 (Pages 1022 to 1025)

Page 1026

JOHN LEASE- CROSS

1         JOHN LEASE- CROSS
2 report were actually converted into an actual
3 project.
4     Q.   Isn't it true the reason you gave
5 Mike Hodge the statements of work for Phase II
6 because you knew environmental contamination was
7 something that qualified in the agreement, but
8 you didn't give these documents because you knew
9 machine guarding didn't?
10     A.   No. That is not the case.
11     MR. ZUROFSKY: Let's break for the
12 day.
13     THE ARBITRATOR: I have a few
14 questions before we quit. There is a series of
15 a box full of documents there which they review
16 and evaluate potential dangers of all these
17 pieces of equipment. Later they attempt to
18 quantify the severity, frequency, probability,
19 level of risk. Do these reports also include
20 estimate of the cost to do the corrections they
21 might suggest or could potentially be done? I
22 see numbers in here, I assume that is what it
23 is.
24     MR. ZUROFSKY: It is.
25     THE WITNESS: I believe that is it.

Page 1027

JOHN LEASE- CROSS

1         JOHN LEASE- CROSS
2 That is the estimated price.
3     THE ARBITRATOR: So these reports
4 all went where within Alcoa, to the local
5 factory manager?
6     THE WITNESS: Yes, they went to the
7 local facilities manager, HS manager,
8 specifically.
9     THE ARBITRATOR: Who made the
10 decision as to which of these recommendations
11 would be implemented?
12     THE WITNESS: That was a local
13 decision at the plant.
14     THE ARBITRATOR: If some of these
15 things, one I looked at quickly had a 4 risk
16 which is a fairly low risk, I take it, the
17 decision as to whether to do that particular job
18 was made locally at the plant?
19     THE WITNESS: Basically, yes. I
20 think they base the action on the highest risk
21 machines first when they did implementation.
22     THE ARBITRATOR: They didn't
23 necessarily do all the ones that were studied, I
24 take it?
25     THE WITNESS: No. That's true.

Page 1028

JOHN LEASE- CROSS

1         JOHN LEASE- CROSS
2     THE ARBITRATOR: They made a local
3 decision as to which ones to do or not to do?
4     THE WITNESS: Yes.
5     THE ARBITRATOR: I guess these
6 particular reports and proposals were not sent
7 to Fairchild at any point?
8     THE WITNESS: I don't believe
9 they were.
10     THE ARBITRATOR: All right.
11     (Time Noted: 5:11 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1029

1
2       C E R T I F I C A T E
3
4 STATE OF NEW YORK  )
5          : ss.
6 COUNTY OF NEW YORK )
7
8     I, TAMMEY M. PASTOR, a Registered
9 Professional Reporter, Certified LiveNote
10 Reporter and Notary Public within and for the
11 State of New York, do hereby certify that the
12 foregoing proceedings were taken before me on
13 January 10, 2007;
14     That the within transcript is a true
15 record of said proceedings;
16     That I am not connected by blood or
17 marriage with any of the parties herein nor
18 interested directly or indirectly in the matter
19 in controversy, nor am I in the employ of the
20 counsel.
21     IN WITNESS WHEREOF, I have hereunto
22 set my hand this ____ day of _____,
23 2007.
24
25       TAMMEY M. PASTOR, RPR, CLR

89 (Pages 1026 to 1029)

Page 1030

```
 1                    INDEX
 2  WITNESS:                    PAGE:
 3
        (Arbitration Exhibit 428 was marked.)    1015
 4
                   *****
 5
 6
 7                 *****
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com

2c5facfb-a662-4159-8094-057d0344af74

# In The Matter Of:

## *In re:* THE FAIRCHILD CORPORATION

---

### ARBITRATION
### *January 11, 2007*

---

## *MERRILL LEGAL SOLUTIONS*
### *420 Lexington Avenue – Suite 2108*
### *New York, NY 10170*
#### PH: 212-557-7400 / FAX: 212-692-9171

### ARBITRATION - Vol. 4

Page 1031

```
CPR INSTITUTE OF DISPUTE RESOLUTION
-----------------------------------x
In Re
THE FAIRCHILD CORPORATION,
                    Claimant,

        -against-

ALCOA CORPORATION,

                    Respondent.

-----------------------------------x
                    Cravath, Swaine & Moore, LLP
                    Worldwide Plaza
                    825 Eighth Avenue
                    New York, New York

                    January 11, 2007

                    9:00 a.m.


B E F O R E :
    JAMES F. STAPLETON, Arbitrator


TAMMEY M. PASTOR, RPR, CLR, Hearing Reporter
```

Page 1032

```
 1  A P P E A R A N C E S :
 2  CAHILL, GORDON & REINDEL LLP,
      Attorneys for FAIRCHILD CORPORATION
 3      80 Pine Street
        New York, New York 10005
 4
 5  BY:  ADAM ZUROFSKY, ESQ.
         ROBERT M. HALLMAN, ESQ.
 6       TAMMY L. ROY, ESQ.
         ADAM MADAR, ESQ.
 7       -and-
         ELIZABETH RICHMAN, ESQ.
 8
 9  CRAVATH, SWAINE & MOORE, LLP
      Attorneys for ALCOA CORPORATION
10      Worldwide Plaza
        825 Eighth Avenue
11      New York, New York 10019
12
      BY:  EVAN CHESLER, ESQ.
13         DANIEL SLIFKIN, ESQ.
           STEPHEN E. FRANK, ESQ.
14         ROBERT K. SIMONDS, ESQ.
           JERMEY WINER, ESQ.
15         -and-
           MARCUS J. GREEN, ESQ.
16
17
18  ALSO PRESENT:
19  MEREDITH SHAW, CRAVATH, SWAINE & MOORE, LLP
    LAUREN GREDITZER, CRAVATH, SWAINE & MOORE, LLP
20  SARA BRAUNER, CAHILL GORDON & REINDEL LLP
    MARK A. BARTHOLIC, ESQ., ALCOA
21
22
23
24
25
```

Page 1033

```
 1        JOHN LEASE - CROSS
 2        JOHN LEASE,
 3  resumed, having been previously duly sworn, was
 4  examined and testified further as follows:
 5        MR. ZUROFSKY:  Good morning your
 6  Honor.  Just before resuming with Mr. Lease,
 7  just some housekeeping issues.  Yesterday as you
 8  will recall, your Honor, Alcoa introduced bulk
 9  Exhibit C which is those shelves there.
10        THE ARBITRATOR:  Yes.
11        MR. ZUROFSKY:  We didn't get a
12  copy of that, we only got the indexes.  I am
13  trying to figure out the best way to manage sort
14  of document management here today.  We have, as
15  you know, your Honor, yesterday put in front of
16  you a binder of correspondence that are
17  organized chronologically by site.  We have
18  taken out some of the attachments and exhibits
19  to make it fit in one binder.  It is not
20  everything in Exhibit C, obviously.
21        What I am going to try to do today,
22  if it makes sense, to the extent one of those
23  documents is in Mr. Chesler's binder he handed
24  Mr. Lease, I will certainly refer to that.  I
25  can't pull Exhibit C off the shelf with copies.
```

Page 1034

```
 1        JOHN LEASE - CROSS
 2  I have to work off this.  At the end we can make
 3  you a compendium out of this binder, however you
 4  think makes most sense.
 5        THE ARBITRATOR:  If you would take
 6  out the duplicates, if you are not referring to
 7  them separately, you can do that.
 8        MR. ZUROFSKY:  Right.  We will get
 9  you a version of that.  That makes sense.  Also
10  just for the record, I would like to mark that
11  binder as our bulk Exhibit A.  I think I gave
12  you a copy of it earlier.
13        THE ARBITRATOR:  It is the binder
14  that is now marked correspondence binder.
15        MR. ZUROFSKY:  That will be
16  Fairchild bulk Exhibit A.
17        We also yesterday had looked at a
18  specific document which was a letter from
19  Mr. Harvey, just so we are all tidy since we
20  hadn't marked the binder before, we will mark
21  this as 429.
22        (Arbitration Exhibit 429
23  was marked.)
24        MR. ZUROFSKY:  You have a copy of
25  this in the binder, just for good order sake,
```

JOHN LEASE - CROSS

1  this is 429 this is the letter from Mr. Harvey
2  that we looked at yesterday. So that is just my
3  housekeeping.
4          THE ARBITRATOR:  This is in the
5  binder?
6          MR. ZUROFSKY:  It is in the
7  binder. It hadn't been marked yesterday, we
8  thought for good order sake we would put it in
9  the record officially. It was under, there are
10 several versions of it in the binder because it
11 relates to more than one facility. We looked at
12 the one under Fullerton tab.
13         THE ARBITRATOR:  Which one?
14         MR. ZUROFSKY:  Fullerton tab.
15         THE ARBITRATOR:  Tab number?
16         MR. ZUROFSKY:  It should say
17 Fullerton. The one with the numbers is
18 Mr. Chesler's. Ours is the one with the site
19 names. That is the one we were looking at.
20 Then we looked at machine guarding report and
21 all that.
22         CROSS-EXAMINATION BY MR. ZUROFSKY:
23     Q.    Mr. Lease, I want to reset where we
24 were from yesterday. There was a lot of paper

JOHN LEASE - CROSS

1  flying and discussions. I just want to make
2  sure we are all working off the same ideas as we
3  go forward today.
4          We talked yesterday about three
5  times of, I think we used the word notice, but
6  information that were to be imparted to
7  Fairchild. Let's just make sure we all agree
8  with what they are. There was one you called
9  notice of liability. Do you recall that, sir?
10     A.    I think there is a notice of --
11 okay, notice of liability.
12     Q.    I think you used that term when you
13 spoke, answered Judge Stapleton's questions with
14 respect to costs already incurred; is that
15 right?
16     A.    As per the table that we viewed?
17     Q.    No. Not per the table we reviewed.
18 The one with the asterisk, that table are you
19 referring to?
20     A.    Liability table, yes.
21     Q.    That one?
22     A.    Notice of liability is reflected
23 there.
24     Q.    That we defined as notice of

JOHN LEASE - CROSS

1  expenses already incurred; right?
2      A.    That would have been correct.
3      Q.    Then we also talked about notice of
4  a condition; right? Which we looked at on the
5  screen 11.6 D. Do you recall that?
6      A.    I recall the term. I'm not sure
7  about the sections in the agreement.
8      Q.    Fair enough. The term notice of
9  condition. Here is a condition.
10     A.    Notice of environmental condition,
11 yes.
12     Q.    Then we talked also the third
13 category, I think we actually called it
14 yesterday the second category, we will try to
15 keep it straight, notice of proposed
16 response. In other words, this is what we are
17 going to do, do you recall that?
18     A.    Yes.
19     Q.    Those are the three categories of
20 notice that we talked about.
21         Now, we also spent some time
22 yesterday sort of bouncing back and forth
23 between the chart that had asterisk on it then
24 some of what you called gap analysis summaries.

JOHN LEASE - CROSS

1  Do you recall that?
2      A.    Yes.
3      Q.    Those items we discussed yesterday,
4  both with the asterisk and the gap analysis
5  summaries, those related to compliance issues as
6  opposed to contamination issues; right?
7      A.    Yes.
8      Q.    Let's just to keep ourselves
9  organized today, let's take contamination issues
10 for a minute, put that off to the side. We will
11 deal with that a little later. I want to finish
12 our discussion of compliance related claims
13 okay.
14     A.    Okay.
15     Q.    I think --
16         THE ARBITRATOR:  Compliance
17 relating to environmental conditions?
18         MR. ZUROFSKY:  Well, yes. They
19 made claims for compliance, your Honor, if you
20 look at tab 41, I guess of Mr. Chesler's chart,
21 Mr. Chesler's binder, it has that break down of
22 three pages.
23     A.    Yes.
24     Q.    The first page deals with

Page 1039

JOHN LEASE - CROSS

1  environmental contamination. For the moment I
2  want to put that to the side because that is a
3  separate item relating to the Phase II
4  investigations and follow on investigations
5  about whether or not there was contamination in
6  the soil and how they deal with it.
7  The next two pages, Mr. Lease, you
8  can tell me if you agree with this, the next two
9  pages where the first title of that page is
10  waste water, storm water, sewer, septic?
11  A.    Yes.
12  Q.    Those are what I believe you
13  referred to as compliance issues, those two
14  pages; right?
15  A.    Yes, that's correct.
16  Q.    I want to finish our discussion of
17  the items that relate to those two pages,
18  compliance issues now. I want to leave
19  contamination to the side for a minute. Okay?
20  A.    Okay.
21  Q.    I think we discussed yesterday the
22  series of four letters, the summary gap analysis
23  charts; right?
24  A.    Yes.

Page 1040

JOHN LEASE - CROSS

1  Q.    Those related to four locations,
2  right, the St. Cosme facility, the Toulouse
3  facility, the Torrance facility and Fullerton
4  facility; right?
5  A.    Yes.
6  Q.    So, if you look at the chart that
7  you had in tab 41, there is the column other
8  correspondence.
9  THE ARBITRATOR:  St. Cosme,
10  Toulouse, what were the other?
11  MR. ZUROFSKY:  Torrance and
12  Fullerton, your Honor.
13  Q.    We spent some time yesterday with
14  the Fullerton letter. You recall those are the
15  letters and St. Cosme is slightly different, we
16  will come back to it, those are letters you
17  wrote, Mr. Miller wrote back saying please
18  provide documentation. Mr. Harvey wrote back
19  saying we will provide documentation. Do you
20  recall that discussion yesterday, Mr. Lease?
21  A.    Yes.
22  MR. CHESLER:  Object to the
23  characterization of the letters. They say what
24  they say.
25 

Page 1041

JOHN LEASE - CROSS

1  Q.    Do you recall discussion of those
2  letters yesterday, Mr. Lease?
3  A.    Yes.
4  Q.    The column other correspondence on
5  the two pages of tab 41 which relates to
6  compliance issues, do you see those there?
7  A.    Yes.
8  Q.    First thing I want to look to are
9  dates of all those letters. If you just scan
10  down those two pages, is there any date that
11  appears to you to be after December 31, 2004?
12  A.    No.
13  Q.    So those letters were all in the
14  first two years or so of the period after the
15  acquisition; right?
16  A.    That's correct.
17  Q.    There has been about two years
18  since then now, we are in 2007; right?
19  A.    Yes.
20  Q.    So those are all the first two
21  years. Do you remember yesterday Mr. Chesler --
22  those relate to all the compliance issues, those
23  are all letters related to all compliance
24  issues; right?

Page 1042

JOHN LEASE - CROSS

1  A.    No. In addition to the Phase I
2  reports, which we also include as notice.
3  Q.    Those are in 2002 also. So they
4  still predate December 31, 2004; right?
5  A.    That's right.
6  Q.    We will look at the Phase II a
7  little later. I am talking now about the
8  correspondence.
9  MR. CHESLER:  Phase I.
10  Q.    Sorry. Phase I talking now just
11  about correspondence?
12  A.    Phase I?
13  Q.    Yes. Phase I. All those
14  correspondence go until latest December of 2004;
15  right?
16  A.    That's correct.
17  Q.    For all the compliance issues?
18  A.    This correspondence, yes.
19  Q.    We looked yesterday at one report
20  related to machine guarding at Fullerton which
21  took up a whole box; right?
22  A.    The one you delivered up here?
23  Q.    Yes.
24  A.    Yes.

3 (Pages 1039 to 1042)

JOHN LEASE - CROSS

1
2    Q.    We discussed at the end of the day
3  yesterday there were other assessments and
4  surveys for machine guarding at other
5  facilities; right?
6    A.    I believe that's true, yes.
7    Q.    And for many of the other items
8  listed on this chart, the lock tag verify, fall
9  compliance there were surveys and assessments
10  done for those?
11    A.    I know they were planned. I don't
12  have physical evidence in my possession they
13  were all done. But they were planned.
14    Q.    There were a number of them done to
15  your understanding?
16    A.    Okay.
17    Q.    So now remember Mr. Chesler
18  yesterday was talking about this big exhibit,
19  bulk C exhibit with the two shelves and all the
20  correspondence and all of that; right? Do you
21  recall that?
22    A.    Yes.
23    Q.    And we asked for a copy of it, but
24  we got an index of it, we were able to look at
25  it last night. Can you tell me out of all the

JOHN LEASE - CROSS

1
2  shelves, all those binders in the shelves which
3  binders relate to all of the correspondence
4  related to the compliance issues?
5    A.    I haven't looked at that, so I
6  don't know.
7    Q.    Let's take a look. Binder 1 and
8  the indexes which Alcoa provided demonstrates
9  this, is all the letters and correspondence
10  between the closing date and December 31, 2004.
11  This is it. Okay?
12    A.    Okay.
13    Q.    If you want we can introduce the
14  indexes.
15    MR. CHESLER:   Is there a question?
16    MR. ZUROFSKY:  I'm getting there.
17    Q.    Mr. Lease, I show you this exhibit,
18  this is the indexes. See it? I will leave this
19  for you, too. What does it indicate is the last
20  date for volume two, first entry for volume two,
21  it should be on the second page, third page.
22    THE ARBITRATOR:  What was the
23  question on Volume 1?
24    Q.    Volume 1. Does Volume 1 contain
25  all the correspondence between the closing date

JOHN LEASE - CROSS

1
2  and December 31, 2004?
3    A.    What is your question?
4    Q.    Does Volume 1, as you understand it
5  contain all of the correspondence between the
6  closing date and December 31, 2004 based on your
7  read of the indexes and knowledge about the
8  binders?
9    MR. CHESLER:   Excuse me, your
10  Honor, correspondence about what?
11    MR. ZUROFSKY:   Between the
12  companies, any of the notice correspondence
13  Mr. Lease testified about yesterday.
14    A.    I want to make sure I understand
15  what you're asking. You're asking Volume 1
16  contains all of the correspondence related to
17  compliance issues?
18    Q.    That is eventually what I'm asking.
19  Right now I'm asking you a date question. Based
20  on review of the indexes, is it fair to say that
21  everything on those two shelves that predates
22  December 31, 2004 is contained in -- let me
23  rephrase it. Everything that predates December
24  31, 2004 is contained in Volume 1.
25    A.    Everything that predates December

JOHN LEASE - CROSS

1
2  31, 2004.
3    Q.    December 31, 2004.
4    A.    Is in Volume 1?
5    Q.    Yes.
6    A.    That is what this appears to
7  indicate, yes.
8    Q.    That is Volume 1, that thin binder
9  on top of the witness stand; right?
10    A.    Yes.
11    Q.    Let's put that back. Is it fair to
12  say based on your chart, everything Alcoa told
13  Fairchild about compliance issues is contained
14  in that first binder we just looked at?
15    MR. CHESLER:   Your Honor, excuse
16  me, I don't mean to interrupt the examination.
17  I do object to that. We just been through the
18  fact, quote, we put to the side the first two
19  shelves. Counsel just asked everything we told
20  Fairchild. That is a misleading question.
21    MR. ZUROFSKY:   Everything about,
22  of course leaving aside the Phase I and Phase
23  II. We will get to that later.
24    Q.    Leave aside the Phase I and Phase
25  IIs in that first binder. Is everything that

Page 1047

JOHN LEASE - CROSS

1  Alcoa told Fairchild about compliance issues,
2  leaving aside first two shelves, in that first
3  binder, Mr. Lease?
4      A.    I don't know.  There were other
5  issues related to compliance I believe in
6  documentation related to the Phase IIs and
7  follow on work.  I can't attest to the fact
8  everything outside of that one binder does not
9  contain compliance information.
10     Q.    There is nothing cited in the chart
11  on page 41, is there, that would be outside that
12  first binder -- tab 41?
13     A.    You are just talking about column
14  titled Other Correspondence?
15     Q.    Yes.
16     THE ARBITRATOR:  When you say
17  compliance issues, are any of the compliance
18  issues relating to environmental matters or they
19  could be all matters?
20     MR. ZUROFSKY:  I am actually now
21  referring to all matters, your Honor, they made
22  claims for compliance issues not just for
23  environmental matters.
24     THE ARBITRATOR:  All other matters
25

Page 1048

JOHN LEASE - CROSS

1  but it includes environmental matters?
2      MR. ZUROFSKY:  Correct.
3      Q.    Mr. Lease?
4      A.    I have lost track of your question,
5  sorry.
6      Q.    Maybe it is easier to come this
7  way, on the two pages on tab 41 that deal as we
8  discuss with compliance matters; right?
9      A.    Yes.
10     Q.    You know what pages I'm talking
11  about?
12     A.    Yes.
13     Q.    The letter cited there, none of
14  them postdate December 31, 2004?
15     A.    That's correct.
16     Q.    Based on the indexes for Exhibit C
17  the correspondence up to December 31, 2004 is
18  all in that first binder; correct?
19     A.    Okay.
20     Q.    Right?
21     A.    Presumably.  I didn't look at every
22  document.
23     THE ARBITRATOR:  You have to look
24  at the indexes.  He is asking you to look at the
25

Page 1049

JOHN LEASE - CROSS

1  indexes, not the volume.
2      MR. ZUROFSKY:  We looked at the
3  indexes a minute ago.  You said it did appear to
4  be that way.
5      A.    The indexes would seem to match
6  these entries.
7      Q.    I want to talk about the letters
8  listed here on tab 41.  Before I go on,
9  Fairchild began the mediation process in
10  beginning of 2005; right?
11     A.    I am not sure what the date was.
12     Q.    We'll look at that a little later.
13  So now on tab 41 chart --
14     A.    Okay.
15     Q.    Okay.  These letters listed under
16  other correspondence, do you see that?
17     A.    Yes.
18     Q.    The letters, the first two we see
19  are related to the St. Cosme facility; right?
20     A.    Yes.
21     Q.    What we are going to do now, we are
22  going to go through our discussion of the
23  letters you sent to Fairchild regarding
24  compliance issues.  Some of which we looked at
25

Page 1050

JOHN LEASE - CROSS

1  yesterday.  But let's make sure we've got them
2  all.
3      So, turn to tab 6 in the binder
4  that Mr. Chesler handed to you.  This is the
5  first letter, do you have it there, sir?
6      A.    Pardon me?
7      Q.    Tab 6 in the binder Mr. Chesler
8  handed you yesterday.  You have it there?
9      A.    Yes, I do.
10     Q.    This is the letter, March 4, 2003
11  to Michael Hodge that is referenced under the
12  heading Other Correspondence in tab 41 is the
13  first entry; isn't it?
14     A.    Yes.
15     Q.    This is the letter.  You provide,
16  this is one of the summary gap analysis you were
17  talking about yesterday?
18     A.    That's correct.
19     Q.    This relates to the St. Cosme
20  facility?
21     A.    For St. Cosme, yes.
22     Q.    We are working our way through.
23  You have a chart attached to this letter; right
24  yes?
25

JOHN LEASE - CROSS
1
2    A.    Okay.
3    Q.    On that chart is a number of items.
4  I want to focus for now on number 5 which is
5  machine guarding.  Do you see that, sir?
6    A.    Yes, I do.
7    Q.    Do you see under estimated cost
8  there is an ND?
9    A.    Yes.
10    Q.    Below it says ND means not yet
11  determined?
12    A.    Yes.
13    Q.    The same thing for fall control
14  requirements, it says ND?
15    A.    Yes, that's right.
16        THE ARBITRATOR:  Which other item?
17        MR. ZUROFSKY:  Fall, number 4
18  right above it, your Honor.  Above that is
19  storage of hazardous chemicals and so on.  I am
20  focusing on numbers 4 and 5.
21    Q.    You sent this letter to Mr. Hodge
22  on March 4; right?
23    A.    Yes.
24    Q.    Mr. Hodge relied -- sorry,
25  Mr. Miller replied on behalf of Fairchild, tab 7

JOHN LEASE - CROSS
1
2  of your binder from Mr. Chesler?
3    A.    Which tab?
4    Q.    Tab 7.  Alcoa Arbitration Exhibit
5  40?
6    A.    Okay.
7    Q.    This is Mr. Miller's letter related
8  to the St. Cosme facility; correct?
9    A.    That's correct.
10    Q.    Mr. Miller says in the first
11  paragraph "We reviewed your letter.  Fairchild
12  leads us to question -- this leads us to
13  question whether all of the items listed in the
14  table fall within the ambit of section 11.6.
15  And whether the estimated costs in that table
16  are justified."
17        Do you see that, Mr. Lease?
18    A.    Yes, I do.
19    Q.    Then Mr. Miller says, "So that we
20  may more fully consider these issues, please
21  provide us with specific and complete background
22  documentation supporting the items and costs
23  provided in the table."
24        Then Mr. Miller says "We will
25  respond further as appropriate once we have had

JOHN LEASE - CROSS
1
2  the opportunity to review such documentation."
3        Do you see that?
4    A.    Yes.
5    Q.    Now you responded to that,
6  Mr. Miller's letter; didn't you, Mr. Lease?
7    A.    Yes, I did.
8    Q.    That is the second, back on tab 41,
9  as we are going down that chart, of other
10  correspondence, that is the second item listed;
11  is it not?
12    A.    I believe, yes, it is.
13    Q.    It is listed as an April 8, 2003
14  letter from you to Mr. Miller.  Which is found
15  at tab 12 of your binder that Mr. Chesler handed
16  you.  Do you see that?
17    A.    Yes.
18    Q.    You respond to Mr. Miller and the
19  second sentence of your response says "My letter
20  was intended to provide you with the information
21  that we had at that point in our review." Do you
22  see that, Mr. Lease?
23    A.    Yes.
24    Q.    Then you tell Mr. Miller, "Alcoa is
25  developing final action plans and associated

JOHN LEASE - CROSS
1
2  costs for correcting the noncompliance issues
3  identified at the St. Cosme facility therefore
4  updated cost data is not available at that
5  time." Do you see that?
6    A.    Yes, I do.
7    Q.    Was that true at that time?
8    A.    Pardon.
9    Q.    Was that true at that time?
10    A.    I believe it was, yes.
11    Q.    You go on and say "However, to
12  provide further background detail on the
13  noncompliance issues listed in the table, a
14  column has been added which provides further
15  description of the issue and applicable
16  regulation."
17        That is the column yesterday that
18  Mr. Chesler discussed with you and Judge
19  Stapleton asked about in the middle of the
20  chart; right, Mr. Lease?
21    A.    Pardon me?
22    Q.    Remember yesterday there was
23  discussion about additional column in this
24  letter?
25    A.    Yes.

6 (Pages 1051 to 1054)

Page 1055

JOHN LEASE - CROSS

1
2    Q.    That is the column being referred
3    to; right?
4    A.    That's correct.
5    Q.    Then you go on to say "As the cost
6    estimates," if you recall Mr. Miller asked you
7    about that, as the cost estimates are updated
8    and finalized we will communicate this
9    information to Fairchild Corporation. Do you
10   see that, Mr. Lease?
11   A.    Yes, I do.
12   Q.    You recall back in Mr. Miller's
13   letter which was at tab 7 he said "We will
14   respond further as appropriate once we have had
15   the opportunity to review the documentation he
16   requested." Do you see that?
17   A.    Yes.
18   Q.    Here you are saying you will
19   provide Fairchild with finalized and updated
20   cost estimates; right?
21   A.    Yes.
22   Q.    You never did that; did you, sir?
23   A.    These cost estimates didn't change
24   a great deal between then and the final
25   solution, we developed cost estimates for fall

Page 1056

JOHN LEASE - CROSS

1
2    control surveys and machine guarding surveys.
3    Q.    Let's look at that chart. Remember
4    I pointed you to machine guarding item 5? Do you
5    recall that?
6    A.    Which chart are we on now?
7    Q.    Either one. The chart attached,
8    let's do it to the letter of April 8, the one
9    you sent to Mr. Miller. You said further cost
10   estimates will be forwarded.
11   A.    Okay.
12   Q.    There we have, again, machine
13   guarding which is item 5, again as ND, not yet
14   determined; right?
15   A.    Yes.
16   Q.    How much did Alcoa or how much to
17   date because it is still going on did Alcoa, has
18   Alcoa spent so far on machine guarding at St.
19   Cosme?
20   A.    I don't have that figure offhand.
21   Q.    Turn to tab 38 in the binder
22   Mr. Chesler handed you yesterday which is your
23   December letter that contains the latest
24   numbers.
25   THE ARBITRATOR:    Which tab?

Page 1057

JOHN LEASE - CROSS

1
2    MR. ZUROFSKY:    Tab 38, your Honor.
3    Q.    Do you have that, Mr. Lease?
4    A.    Yes.
5    Q.    Do you see it, sir?
6    A.    Yes, I do.
7    Q.    So, if you look on page 3 of 6 of
8    the chart --
9    THE ARBITRATOR:    I am at the chart
10   with the final expenses to date.
11   MR. ZUROFSKY:    Yes. As of
12   December 2006. Just last month.
13   THE ARBITRATOR:    What page is that
14   on?
15   MR. ZUROFSKY:    Which page is the
16   item I'm looking for?
17   THE ARBITRATOR:    Yes.
18   MR. ZUROFSKY:    I think it is
19   marked in bulk Exhibit C as 24002.
20   THE ARBITRATOR:    We were looking
21   at Exhibit 38.
22   MR. ZUROFSKY:    Yes, your Honor.
23   THE ARBITRATOR:    Is it listed on
24   Exhibit 38.
25   MR. ZUROFSKY:    It is.

Page 1058

JOHN LEASE - CROSS

1
2    THE ARBITRATOR:    Where is it?
3    MR. ZUROFSKY:    Page 3 of 6 of the
4    chart, line 90.
5    Q.    Do you see that, Mr. Lease?
6    A.    Yes.
7    MR. ZUROFSKY:    Your Honor, do you?
8    THE ARBITRATOR:    I have it.
9    Q.    How much is adjusted total through
10   September 2006 for machine guarding at St.
11   Cosme, Mr. Lease?
12   A.    $625,000.
13   Q.    And 142.72; right?
14   A.    Yes.
15   Q.    Just to get the full number.
16   A.    Yes.
17   Q.    That is how much has been spent at
18   St. Cosme on machine guarding since the time of
19   the letter you wrote to Mr. Miller in April of
20   2003; correct?
21   A.    That's correct.
22   Q.    It is listed there as not
23   determined in terms of price; right?
24   A.    Not determined at that time.
25   Q.    Right. You told Mr. Miller you

7 (Pages 1055 to 1058)

JOHN LEASE - CROSS

1
2  would provide updated and finalized cost
3  estimates; correct?
4      A.    That's what I said, yes.
5      Q.    Let's talk also about fall
6  protection, the fall control number.  Again in
7  tab 38 we can look at that.  I will get you the
8  line item.  It is line item 65 on page 2 of 6.
9  How much does it list there, sir?
10     A.    $37,857.
11     Q.    Back on your chart on the April 8th
12 letter, the one you sent to Mr. Miller which is
13 at tab 6 -- sorry, tab 8.  I apologize, tab 12
14 of the binder from Mr. Chesler.
15     A.    Okay.  I'm there.
16     Q.    The one above fall control
17 requirements that actually has a number is
18 improper storage of hazardous chemicals and
19 waste.  Do you see that?
20         THE ARBITRATOR:  Where are you
21 now?
22         MR. ZUROFSKY:  Back on tab 12 of
23 Mr. Chesler's binder.  The chart attached to the
24 letter to Mr. Miller it talked about updated and
25 finalized cost estimates.

JOHN LEASE - CROSS

1
2         THE ARBITRATOR:  Yes.  Which item?
3         MR. ZUROFSKY:  I am looking at on
4  the chart on number 3.  One up from fall
5  control.
6      Q.    You provided in that chart an
7  estimate of $160,000, Mr. Lease?
8      A.    Yes.
9      Q.    So if we go to tab 38 again, which
10 is the numbers to date it is talking about
11 construction of the hazardous building.  That is
12 line 74.
13     A.    Yes.
14     Q.    It says now $255,000; right, sir?
15     A.    That's correct.
16     Q.    And 56 --
17         THE ARBITRATOR:  That is in tab
18 38?
19         MR. ZUROFSKY:  Yes, line 74 of the
20 chart.
21     A.    I will point out there is at least
22 one other category that deals with storage of
23 hazardous substances under waste water section.
24 There were numerous locations in the facility
25 where we stored hazardous chemicals.  So St.

JOHN LEASE - CROSS

1
2  Cosme had a project at that time underway to
3  build a hazardous waste storage building, as
4  well as contain other hazardous chemical storage
5  location in a more secure manner.
6         This points out at the time we
7  visited this site these issues were
8  noncompliance with EHS regulations.  That is the
9  main focus of this chart.
10         If the cost estimates provided in
11 here were not right on target at the time, so be
12 it.  However the underlying basis for these
13 projects was noncompliance, which was
14 indemnifiable under the agreement.
15     Q.    Let's go back to our framework of
16 the three types of notice we talked about,
17 Mr. Lease; right.  So you just said the main
18 purpose of this chart was to provide Fairchild
19 with notice there was noncompliance; right?
20     A.    Yes.
21     Q.    That is noncompliance, that is a
22 condition, that is notice of a condition that we
23 talked about earlier; right?  Here is a
24 condition it is noncompliance; right?
25     A.    Yes.

JOHN LEASE - CROSS

1
2      Q.    There is some reference in this
3  chart to corrective actions; right?
4      A.    Correct.
5      Q.    Did you understand Mr. Miller to be
6  asking you when he is talking about cost updates
7  and whatnot, to be asking you for more
8  information about that, the second category,
9  what are we going to do about it category?
10     A.    Let me look at Mr. Miller's letter.
11         THE ARBITRATOR:  What is the tab
12 on Miller's letter?
13         MR. ZUROFSKY:  Tab 8, I believe.
14 It might be tab 7.  Sorry, tab 7 of the binder.
15     A.    I believe that actually is -- I am
16 looking at the letter, tab 13.
17     Q.    Tab 7 is the one I think we're
18 talking about.
19     A.    Okay.
20     Q.    Tab 7 he says, second paragraph,
21 "Please provide us with specific and complete
22 background documentation supporting the items
23 and costs provided in the table."  Right,
24 Mr. Lease?
25     A.    That is what he says, yes.

8 (Pages 1059 to 1062)

Page 1063

JOHN LEASE - CROSS

1
2  Q.   You said a minute ago there was a
3  project undergoing at St. Cosme at that time to
4  build a new building waste management building?
5  A.   Yes.
6  Q.   The project wasn't done without
7  proposals and scopes of work and things like
8  that; they just don't build a building?
9  A.   I don't know as far as
10 documentation what existed related to the
11 building.
12 Q.   Let's look forward, you pointed to
13 tab 13, that is where I wanted to go next.  Tab
14 13 in the binder is Mr. Miller's response to
15 your April 8th letter in which you did say you
16 would forward to Fairchild updated and finalized
17 cost estimates right?
18 A.   As they became available.  If and
19 as they became available.
20 Q.   On tab 13 Mr. Miller responds to
21 you; right?
22 A.   Yes.
23 Q.   He says this letter is in response
24 to yours.  He then, second sentence says "We
25 understand that Alcoa is still developing final

Page 1064

JOHN LEASE - CROSS

1
2  action plans and cost data for these issues and
3  we look forward to receiving that detail when it
4  is available."
5      Then he says "Nevertheless, the
6  further background detail which you provide are
7  really no more than conclusory statements as to
8  your rationale for including each of these
9  issues."
10     The next paragraph Mr. Miller says
11 "Has Alcoa performed further environmental
12 assessments or engineering studies which would
13 justify the estimated cost provided in the
14 table? Your summary comments refer to
15 assessments which have been made and to various
16 findings of Alcoa.  Please provide us with
17 copies of any such assessments and of any
18 reports, legal analyses or other documentation
19 which support the various findings as listed in
20 the table.
21     "Also please provide us with any
22 documentation specifically supporting the cost
23 estimates provided in the table." Do you see
24 that, sir?
25 A.   Yes.

Page 1065

JOHN LEASE - CROSS

1
2  Q.   You never responded to that letter;
3  did you?
4  A.   At the time we exchanged this
5  correspondence I had no further information in
6  my possession that would support what Mr. Miller
7  is requesting.
8      Furthermore, this was, this
9  assessment at the facility, the gap analysis was
10 done one month after acquisition.  These issues
11 were underway at St. Cosme.  Mr. Miller's
12 response to this letter indicates that he has
13 absolutely no knowledge that any of this, any of
14 these projects were underway.
15     THE ARBITRATOR:   What was underway
16 at St. Cosme before you bought the facility?
17     THE WITNESS:  They had received a
18 proposal for new waste water treatment facility
19 due to the noncompliance issues.  They had plans
20 to construct new hazardous waste storage
21 building to address noncompliance with hazardous
22 chemical storage.  They were addressing issues
23 related to water use to come into compliance
24 with the water use rules in France.
25     So, many of these projects that

Page 1066

JOHN LEASE - CROSS

1
2  were on the original table that I sent to
3  Mr. Miller were in fact in progress at the time
4  we purchased the facility.
5      THE ARBITRATOR:   What about the
6  other items like machine guarding and fall
7  protection?
8      THE WITNESS:   They had conducted
9  a machine guarding assessment partially for
10 their machines.  They were under way at that
11 time with correcting some of the deficiencies to
12 correct the machine guarding issues.  They also
13 were performing noise analysis of the facility.
14     The only area where I wasn't sure
15 that they were doing anything in particular was
16 in the fall protection area.
17 Q.   Mr. Lease, yesterday when Judge
18 Stapleton asked you about the project, machine
19 guarding project for which we had the survey, do
20 you recall that?
21 A.   For Fullerton?
22 Q.   For Fullerton.
23 A.   Yes.
24 Q.   He asked you, he said which one of
25 these were implemented.  You said I don't know,

9 (Pages 1063 to 1066)

JOHN LEASE - CROSS

1
2  that was done at the plant level, do you recall
3  that?
4      A.    I believe, yes, that is what I
5  said.
6      Q.    What makes you think Mr. Miller
7  would know at corporate headquarters in Virginia
8  about actions taken at the plant level you just
9  described to Judge Stapleton?
10     A.    As I recall from looking at the
11 information provided in our meeting in early --
12 or late 2002 with Mr. Hodge, and Mr. Miramadi in
13 Dulles, the information they provided indicated
14 there was a process whereby the EHS issues
15 within the corporation were discussed with Mike
16 and senior management on a routine basis.
17     Q.    Mr. Lease, when Alcoa bought these
18 facilities they bought the documents too; didn't
19 it?
20     A.    I assume we did.
21     Q.    Right? At the plant.
22     A.    What was in the facility, we have.
23     Q.    Right.  The documents at the plant.
24 Did you do a search of Mr. Miller's office and
25 Mr. Miller's files to say, hey, he has all the

JOHN LEASE - CROSS

1
2  documents, I don't need to provide him any of
3  the documents I promised to provide him? Did
4  you?
5      A.    I think that is somewhat of a
6  ridiculous question.
7      Q.    Did you?
8      A.    Did I inspect his office?
9      Q.    Do you know --
10     THE ARBITRATOR:  We will stipulate
11 to that, he did not.
12     Q.    Do you know what files Mr. Miller
13 had at corporate headquarters regarding these
14 projects?
15     A.    No. I think it is reasonable to
16 assume that officials that owned a company and
17 operated a company two months before would have
18 an understanding that they were planning to
19 spend close to a million dollars on a waste
20 water treatment plant at St. Cosme as part of
21 capital project planning.
22          I think they would understand and
23 they did understand they had significant machine
24 guarding issues.  That clearly was a key focus
25 of the discussion for the negotiation and sale

JOHN LEASE - CROSS

1
2  of the facility.
3          So, as I look at these letters,
4  they appeared to me at the time to be simply
5  request for information, very specific nature
6  that Mr. Miller really had, you know, a clear
7  understanding of.  Or at least someone in
8  Fairchild knew that these issues existed.  We
9  identified them as noncompliance.  The facility
10 had identified them as noncompliance.  We were
11 moving forward to correct them.
12     Q.    Anywhere, any of your letters or
13 Mr. Harvey's letters does Alcoa say that, don't
14 worry we are not providing documentation because
15 you have it already?
16     A.    Did we tell them they should have
17 known all of this?
18     Q.    Yes.
19     A.    I think it is implicit in any
20 common understanding that previous owners of a
21 facility that were working to correct
22 noncompliance issues would not lose that memory
23 two months after the sale.
24     Q.    Did you reply to Mr. Miller's
25 letter on April 30 saying in sum or substance I

JOHN LEASE - CROSS

1
2  believe you already have this documentation, it
3  is just duplicative of what you already know?
4      A.    No, I did not.
5      THE ARBITRATOR:  As I understand
6  it your position is that they essentially knew
7  about all these issues.  Do you know whether
8  they had any studies or estimated cost to
9  correct these, what steps could be taken to
10 correct these deficiencies?
11     THE WITNESS:  It was my
12 understanding they would have had that
13 information, or at least knew what the plans
14 were for these facilities.
15     THE ARBITRATOR:  But, in any
16 event, you never gave them specific
17 documentation as to what exactly you proposed to
18 do and how much it was going to cost?
19     THE WITNESS:  For our actions?
20     THE ARBITRATOR:  Yes.
21     THE WITNESS:  For these
22 particular items in the St. Cosme example we did
23 not.
24     THE ARBITRATOR:  The ones we've
25 been talking about.

10 (Pages 1067 to 1070)

Page 1071

```
1          JOHN LEASE - CROSS
2      THE WITNESS:   Aside from what we
3  quoted here, surveys and so forth.  Yes.
4      THE ARBITRATOR:   Okay.
5      Q.    You said aside from the surveys,
6  Mr. Lease?
7      A.    Pardon?
8      Q.    I just want to hear the last
9  answer.
10      A.    I mentioned aside from the
11  estimates that we provided as documentation
12  related to surveys and any other categories that
13  we had in our --
14      Q.    But not the surveys themselves?
15      A.    Pardon?
16      Q.    Not the surveys themselves?
17      A.    Fall protection and -- I don't
18  believe we provided that to Fairchild.
19      Q.    How about surveys relating to any
20  of the compliance issues?
21      A.    There was subsequent correspondence
22  where we filed claim letters, in essence that
23  included background information to support the
24  claim.  I'm not sure what all is included in
25  that.
```

Page 1072

```
1          JOHN LEASE - CROSS
2      Q.    All in binder 1; right?
3      A.    I don't know if all the attachments
4  are in there.  There is documentation attached
5  to some of these letters.
6      Q.    When you say claim letters, you
7  mean notice of liability, in other words, here
8  is money that has already been spent?
9      A.    The money had been spent, yes.
10      Q.    Back on tab 41.  Remember we had
11  our chart.  We covered now the first two items,
12  first two letters listed under other
13  correspondence; right, sir?
14      A.    Okay.
15      Q.    We just looked at those; right?
16      A.    Two letters about St. Cosme.
17      Q.    Yes.
18      A.    Yes.
19      Q.    The third one, next one down, don't
20  worry they repeat, so we won't have to go
21  through every one of these, every entry here.
22  The third one down is Toulouse; right?
23      A.    That's right.
24      Q.    Now that, I believe is in, perhaps
25  counsel can help me, Mr. Chesler's binder.
```

Page 1073

```
1          JOHN LEASE - CROSS
2      MR. CHESLER:   Sorry, which one?
3      MR. ZUROFSKY:   Toulouse.  The
4  reference letter regarding June 13.  I believe
5  it is actually at tab 16.
6      MR. CHESLER:   It is?
7      A.    Tab 16?
8      Q.    Yes.
9      A.    Okay.
10      Q.    This is another one of these
11  letters with the chart, summary chart attached
12  to it; right?
13      A.    Right.
14      Q.    This is for the Toulouse facility;
15  right?
16      A.    Yes.
17      Q.    This is one of the letters that is
18  referenced in Mr. Harvey's letter we looked at
19  yesterday in which he said you will provide more
20  complete documentation at a future time?
21      THE ARBITRATOR:   What is the tab?
22      MR. ZUROFSKY:   This is tab 16,
23  your Honor.
24      Q.    Just to refresh our state of play,
25  here, Mr. Lease, you send this letter to
```

Page 1074

```
1          JOHN LEASE - CROSS
2  Mr. Hodge; right, in June of 2003?
3      A.    Yes.
4      Q.    Do you understand that Mr. Miller
5  responded to this letter with a letter you
6  looked at, similar letter to the one you looked
7  at yesterday with Mr. Chesler, I believe it is
8  actually at the next tab of your binder, tab 17?
9      A.    Okay.
10      Q.    Again, third paragraph of that
11  letter Mr. Miller asked you for complete
12  specific background documentation.  He said
13  "Such documentation should include copies of any
14  assessments, reports, legal analysis or cost
15  analyses prepared by or for Alcoa and any other
16  documentation which support the various findings
17  as listed in the tables included within your
18  letter of June 13."
19      Do you recall that request?
20      A.    I recall this.  I am reading it
21  right now.
22      Q.    You recall yesterday we looked at a
23  yesterday from Mr. Harvey responding to
24  Mr. Miller's letter?
25      A.    Yes.
```

11 (Pages 1071 to 1074)

Page 1075

JOHN LEASE - CROSS
1      JOHN LEASE - CROSS
2      Q.    Mr. Harvey's letter is Exhibit 429,
3  Fairchild Exhibit 429.  Mr. Harvey said he will
4  provide that documentation.  Do you recall that?
5      A.    That was Mr. Harvey's opinion, yes.
6      Q.    But Mr. Harvey said it?
7      A.    Said it in his letter, yes.
8      Q.    On Alcoa letterhead?
9      THE ARBITRATOR:   What is the tab
10  on Harvey?
11      MR. ZUROFSKY:    That is the exhibit
12  we handed up this morning, Exhibit 429 which we
13  looked at yesterday.  Let's just take a look at
14  that again to make sure we have the language.
15  It is dated August 13, 2003 to Mr. Miller.
16      Q.    We looked at the language
17  yesterday, Mr. Lease.  I will refresh everyone's
18  recollection where Mr. Harvey says "We will
19  provide Fairchild with further documentation to
20  support the estimates developed for the three
21  facilities."  Those three facilities include the
22  Toulouse facility, Mr. Lease?
23      A.    That's correct.
24      Q.    The documentation is being compiled
25  for each project and will consist of such items

Page 1076

JOHN LEASE - CROSS
1      JOHN LEASE - CROSS
2  as scopes of work, consultant proposals, summary
3  reports.
4      THE ARBITRATOR:   What paragraph?
5      MR. ZUROFSKY:    Sorry, second
6  paragraph, the paragraph beginning "we will
7  provide."
8      THE ARBITRATOR:   Yes.
9      Q.    It says "This documentation is
10  being compiled for each project and will consist
11  of such items as scope of work, consultant
12  proposals, summary reports and invoices.  We
13  will provide you with this documentation in a
14  timely manner once it is complete for your
15  review."
16      Do you see that, sir? Mr. Lease, do
17  you see that?
18      A.    We're looking at Mr. Harvey's
19  letter?
20      Q.    Yes.  Exhibit 429.  I handed it to
21  you this morning.
22      A.    Yes.
23      Q.    You are cc'd on that letter; right?
24      A.    Yes.
25      Q.    Did you ever call up Mr. Harvey

Page 1077

JOHN LEASE - CROSS
1      JOHN LEASE - CROSS
2  after that and say, whoa, I am not providing
3  that documentation?
4      A.    No, I did not.
5      Q.    So this is, we are back to the
6  Toulouse facility now, the chart at tab 16 of
7  your binder from Mr. Chesler.
8      I want to focus on a couple items
9  here.  The second item down.  Facility does not
10  have adequate number of access points for
11  emergency situations.  Do you see that?
12      MR. ZUROFSKY:    Your Honor, tab 16
13  on the chart, actually in the chart on tab 16, I
14  apologize, it is different.  It is the first --
15  I actually have a different version of this
16  letter.
17      THE ARBITRATOR:   It is a letter of
18  June 13, '03 from Mr. Lease.
19      MR. ZUROFSKY:    Correct.
20      THE ARBITRATOR:   To Mr. Hodge.
21      MR. ZUROFSKY:    Correct.  I have a
22  different version of this letter.  I am
23  actually -- let's circle back to this.  I want
24  to make sure we get the right thing.  Let me
25  identify two issues, I will come back to them.

Page 1078

JOHN LEASE - CROSS
1      JOHN LEASE - CROSS
2      The first one, Mr. Lease, is,
3  parking lot upgrades, do you see that?
4      A.    We are looking at the chart now?
5      Q.    Yes.
6      A.    Okay, I see it.
7      Q.    We will look at parking lot
8  upgrades.  Then the chart continues on; right?
9  On the second page, second to last item is
10  machine guarding.
11      A.    Okay.
12      Q.    Let's talk about the parking lot
13  update for a second.  What was that project?
14      A.    As I recall this was a project that
15  was mandated by the local regulatory agency
16  prior to our ownership.  Because the parking lot
17  itself was creating a situation that hampered
18  the ingress and egress of emergency vehicles,
19  delivery of chemicals, lacked sufficient fire
20  control in form of hire hydrants.  There was a
21  requirement in France that every employee have a
22  single parking space.  And it did not meet that.
23      The net effect was it was creating
24  EHS issues related to hazardous chemical
25  transport, the ability of emergency vehicles to

12 (Pages 1075 to 1078)