JOHN LEASE - CROSS

respond to emergencies at the plant due to congestion in the parking lot, as well as some more specific issues related to safety at the facility such as fire hydrants and control of secondary containment for chemicals.

THE ARBITRATOR:  Fire hydrants had to be in the parking lot? They couldn't be by the building?

THE WITNESS:  Well, I think the parking lot arrangement constricted their ability to put fire hydrants where they needed to be.  So they had to redesign the parking lot to will a low them to put them closer to the building, as I recall.

Q.    What else was involved in that project, Mr. Lease?

A.    What else?

Q.    Yes.  What other work did Alcoa do?

A.    I'm not sure of all the details. There were several I just listed.  There may have been more.

Q.    Did Alcoa have to plant trees to provide shade for the cars, is that what Alcoa did?

JOHN LEASE - CROSS

A.    I believe that was actually a requirement in the local regulation.

Q.    Let's look at another document, previously introduced as Claimant's 73. Claimant's 73.  Exhibit 73, do you recognize Exhibit 73, you are an addressee on this email from Hodge, Mr. Lease?

A.    I see it.

Q.    This is, do you know what Exhibit 73 is?

A.    Mr. Snee?

Q.    Well, who Mr. Snee is, first let's do that?

A.    What is your first question?

Q.    I was asking you what Exhibit 73 is.  Then we can talk about Mr. Snee.

A.    It is an email from Bill Snee to myself and others in Alcoa.

Q.    It includes his summary of Phase I findings; is that right?

A.    Yes.  That is the subject.

Q.    Who is Mr. Snee?

A.    Mr. Snee is manager of compliance in Alcoa.

JOHN LEASE - CROSS

Q.    Alcoa's compliance manager; is that what you're saying?

A.    Basically, yes.

Q.    We will look at a couple of items on here, but let's look on page, turn to page 21 of document.  Bates stamped FAIR 57178.  Do you see that, sir? Are you with me, Mr. Lease?

A.    Yes, I do.

Q.    This is a document prepared by Mr. Snee and his group to analyze the results of compliance issues; right?

A.    I am not sure what Bill developed this chart for, to tell you the truth.

Q.    Go back to the cover email then and look at the first two sentences.  It says "Attached" is a summary of the Phase I report findings for the Fairchild sites compliance put this together to aid in our review of the identified compliance issues and assist those participating in the RIP."

The RIP we talked about yesterday was not rest in peace, but the rapid integration process; right?

A.    I see it.

JOHN LEASE - CROSS

Q.    Back to page 21 of the document it says there, the first item on page 21 -- your Honor, it is Bates page 57178.

THE ARBITRATOR:  I have it.

Q.    The first entry under issue says "Integrated EHS operating permit.  Authorize required one car parking lot be available for each employee (Not a strict EHS issue)."  Do you see that, sir?

A.    I see that.

Q.    That is Mr. Snee's comments; right?

A.    No.

Q.    Whose comments are they?

A.    I believe they extracted this from the Phase I report.

Q.    Next, "The site has identified this issue as one of their main compliance issues to address.  In addition, the permit requires a second entrance, to provide additional access to the emergency services in the event of an accident or emergency situation."

Do you see that, Mr. Lease?

A.    Yes, I do.

Q.    So that is the description of the

JOHN LEASE - CROSS

1  JOHN LEASE - CROSS
2  issue. It says there, going back to our
3  discussion just a minute ago about St. Cosme the
4  site was aware of this issue; right?
5       A.    I don't think this description
6  captures the scope of the issue.
7       Q.    It is not just emergency access for
8  vehicles and the parking one per spot?
9       A.    No. When we discussed this with
10 the site during the site visit, the gap analysis
11 site visit, they provided further detail to the
12 team. And they also provided the estimated cost
13 that is in the table supplied to Mr. Hodge of
14 350,000 Euros.
15      Q.    We will get back to that in a
16 second. Sticking with Mr. Snee's chart. If you
17 look all the way to the right the column that
18 says EPC Costs. Do you know EPC stands for
19 estimated probable cost; right?
20      A.    I believe that is what it stands
21 for, as I recall from Phase I.
22      Q.    Just above in the heading on that
23 chart. It is broken down.
24      A.    Okay.
25      Q.    Next to it says reasonable worst

1  JOHN LEASE - CROSS
2  case cost?
3       A.    Yes.
4       Q.    It is listed there as estimated EPC
5  cost as $42,000; do you see that?
6       A.    Yes.
7       Q.    Next one over says 60,000 for
8  reasonable worst case cost?
9       A.    I see that.
10      Q.    Did you understand the site
11 actually had a quote for $42,000 to do that work
12 at the time?
13      A.    As I said, this was a number that
14 was developed by ERM based on their Phase I.
15      Q.    Let's move a couple columns to the
16 left under risk management. Do you see that?
17      A.    Okay.
18      Q.    It says there the second entrance
19 needs to be established. The site has obtained
20 a quote of 42,000 for expanding the car park to
21 allow one lot per employee present as opposed to
22 one lot per employee at the company. Do you see
23 this?
24      A.    Uh-huh.
25      Q.    So now, in your chart you sent to

1  JOHN LEASE - CROSS
2  Mr. Hodge, it is a much bigger number for this
3  project; right?
4       A.    Right.
5       Q.    350,000 Euros, in fact; right?
6       A.    Yes.
7       Q.    Given the weakness of the dollar,
8  that is more than that in dollars, right, it is
9  like over $400,000 or whatever it is?
10           THE ARBITRATOR:   These claims in
11 Euros or dollars?
12           MR. ZUROFSKY:   These in this chart
13 I believe in Euros.
14           THE ARBITRATOR:   The whole case?
15           MR. ZUROFSKY:   The claims are
16 dollars.
17      Q.    So 350,000 Euros; right, Mr. Lease?
18      A.    That is what I have in my chart.
19      Q.    Your testimony I believe a little
20 while ago was well the facility knew about these
21 things and therefore when we are talking about
22 St. Cosme the facility should have known what we
23 are talking about in these charts, is that true
24 of this chart, too, the Toulouse chart?
25      A.    Sorry?

1  JOHN LEASE - CROSS
2       Q.    When we were talking about St.
3  Cosme you told me that Mr. Miller should know
4  about the state of his facilities; right?
5       A.    Yes.
6       Q.    I want to make sure you still feel
7  the same about this issue, too?
8       A.    Yes.
9       Q.    What happens here, we have
10 estimate, the site had estimate for 42,000 to do
11 the work at the parking lot; correct?
12      A.    I don't know if the site had an
13 estimate for 42,000. That is what ERM reported.
14      Q.    ERM reported in its Phase I the
15 site had a quote for $42,000?
16      A.    I am not sure where they got their.
17      Q.    You just told me from the Phase I?
18      A.    I see they obtained a quote for
19 42,000.
20      Q.    That is what the site had done
21 prior to the sale; right?
22      A.    Back whenever this was written,
23 July of or early summer 2002.
24      Q.    Now with this item parking lot
25 expansion described in the Phase I as not a

JOHN LEASE - CROSS

1 strict EHS issue, you send a chart that shows
2 estimated cost of 350,000 Euros which is ten
3 times that amount, roughly?
4    A.    Depending on the exchange rate.
5    Q.    1.2 exchange rate it would be
6 $420,000, that is ten times, right?
7    A.    Correct.
8    Q.    Ten times the amount; right?
9    A.    Yes.
10    Q.    Mr. Miller writes back to you and
11 asks you for more detail on the cost estimates
12 for that project; right? We looked at that
13 letter at tab 17?
14    A.    Yes.
15    Q.    He asked you for all the projects
16 but that one included. Mr. Harvey writes back
17 to Mr. Miller saying those estimates are being
18 developed. Those assessments will be sent to
19 you, Fairchild when they are done. Do you
20 recall that?
21    A.    I recall what Mr. Harvey wrote,
22 yes.
23    Q.    In light of that project why didn't
24 you send the information regarding the Toulouse

JOHN LEASE - CROSS

1 parking lot to Fairchild before sending them the
2 bill, the information being assessments and cost
3 estimates?
4    A.    This is the same issue we spoke
5 about at St. Cosme. This was an ongoing issue
6 before acquisition we can debate about what
7 number actually is the correct number, but I
8 received the 350,000 Euro estimate directly from
9 the plant manager. When I showed him the issues
10 we went -- he provided the information in this
11 table.
12        So if the plant manager has this
13 information in his possession of this magnitude,
14 this is an issue that the facility had planned
15 to undertake and complete to comply with the
16 permit.
17    Q.    The facility had a quote for 42,000
18 we just looked at; right, Mr. Lease?
19    A.    That was in May of 2002 when ERM
20 came through. If the project was reviewed, if
21 other issues related to site issues for things
22 such as hazardous chemical storing, secondary
23 containment, storm water management, which were
24 compliance issues included in this project that

JOHN LEASE - CROSS

1 could account for the increase in cost.
2    Q.    Was there any reason at all not to
3 provide Mr. Miller with that information you
4 just described to me, about increase in cost?
5    A.    As I mentioned before, this is
6 information that we felt Fairchild had and was
7 aware of.
8    Q.    Did you say that in any letter to
9 Mr. Miller?
10    A.    No, I did not.
11    Q.    Did Mr. Harvey say that in his
12 letter to Mr. Miller?
13    A.    No, he did not.
14    Q.    Did you communicate in any way to
15 Fairchild in response to Mr. Miller's letter,
16 hey, you already got that stuff and you're aware
17 of these issues?
18    A.    Well, I'll points out it is a
19 two-way street. At no point did anyone from
20 Fairchild approach us and say this number looks
21 out of line, could we send consultants, can we
22 consult with your consultants or consult with
23 the plant to determine what this cost is.
24    Q.    Turn to tab 17 again, sir,

JOHN LEASE - CROSS

1 Mr. Miller's letter, let's look at what he says
2 paragraph 2. He says "In light of the foregoing
3 Fairchild is unable to determine and in any
4 event disputes number 2 says whether estimated
5 costs in those tables are justified. Those
6 estimated costs include the 350,000 Euro parking
7 lot cost." Right, Mr. Lease?
8    A.    Yes.
9    Q.    He is saying we are questioning
10 whether or not that is justified. He goes on to
11 say, "So that we can discuss this with you
12 further, please provide us with the
13 documentation." Right?
14    A.    That is what he is asking.
15    Q.    In the two-way street he is driving
16 toward you, he say saying give me documentation
17 so we can discuss it; right?
18    A.    Yes.
19    Q.    Mr. Harvey part of that two-way
20 street writes back and says it is coming;
21 doesn't he?
22    A.    As I mentioned to you, Mr. Harvey
23 was not aware of all the information that was
24 available or not available in this process, he

JOHN LEASE - CROSS

1 JOHN LEASE - CROSS
2 was responding to Mr. Miller's contention none
3 of these issues were subject of a notice of
4 violation. They weren't planning to pay for it
5 anyway. They didn't see any environmental
6 condition in their view. That was the sentiment
7 conveyed in these letters from Mr. Miller.
8    Q.    But Mr. Harvey doesn't say that,
9 does he? He says I am going to give you
10 documentation.
11    A.    Mr. Harvey, as I mentioned, was an
12 attorney responding primarily to Mr. Miller's
13 contention any issue to be indemnifiable
14 required a notice of violation from an agency.
15    Q.    You were cc'd on Mr. Harvey's
16 letter; right?
17    A.    Yes.
18    Q.    You never write Mr. Miller to tell
19 him I am revoking Mr. Harvey's promise; did you?
20    A.    I didn't respond to every line item
21 in every letter. There was a lot of
22 correspondence and lot of information flowing.
23 If I missed that point you can blame me for
24 that. But, frankly, the fact is these issues on
25 site were known to Fairchild. They were

1 JOHN LEASE - CROSS
2 noncompliance issues that needed to be resolved.
3 It was clear we had a process in place to
4 identify them as noncompliance and verify them
5 we were going to go forward to fix this issue
6 because it was a liability to our company as
7 long as it remained unresolved.
8    Q.    Let's talk about the issue
9 regarding the parking lot. You say it is a
10 noncompliance issue. It says here in Mr. Snee's
11 chart adopted from ERM's Phase I hired by you,
12 it is not a strict EHS issue. How is providing
13 parking spaces an environmental issue,
14 Mr. Lease?
15    A.    It says right in front it is part
16 of the integrated EHS operating permit, which is
17 EHS.
18    Q.    Operating permit in France; right?
19 Is that what you're referring to?
20    A.    Yes.
21    Q.    Is your testimony any issue under
22 that operating permit, no matter how unrelated
23 to the environment qualifies as a Fasteners
24 Environmental Condition if there is
25 noncompliance with the permit?

1 JOHN LEASE - CROSS
2    A.    Not any condition in the operating
3 permit. Those that related to EHS. When we did
4 the analysis of this issue with our experts in
5 France, in compliance and regulations and spoke
6 with the individuals at the plant who were
7 responsible for EHS, they came to the conclusion
8 this project was an EHS project.
9    Q.    Now Phase Is a you pointed out to
10 me says it is not a strict EHS issue; right?
11    A.    That is the, that is that
12 assessor's opinion who did the Phase I.
13    Q.    That is the Phase I you provided to
14 Mr. Miller and to Fairchild?
15    A.    That's correct.
16    Q.    As far as Fairchild knew Alcoa's
17 consultants said it was not a strict EHS issue;
18 right?
19    A.    There may have been parts of the
20 parking lot that were not strictly EHS, but
21 there were parts of the parking lot project that
22 were.
23    Q.    My question Fairchild, the
24 communication Alcoa provided to Fairchild on
25 this issue included the comment it is not a

1 JOHN LEASE - CROSS
2 strict EHS issue; right?
3    A.    I don't know if that was verbatim
4 what was stated in the Phase I.
5    Q.    You told me before it was when I
6 pointed out the language?
7    A.    I said these issues were distilled
8 from the Phase I reports. I don't know if the
9 parenthetical insertion of not a strict EHS
10 issue is Mr. Snee's opinion or if it was in the
11 report. I can't attest to that at this point.
12    Q.    At no point following Mr. Miller's
13 letter which not only asked for cost estimates
14 but also asked for documentation supporting the
15 claims did you say, hey, that is an EHS issue
16 because of X, Y, Z you never responded; did you?
17    A.    I felt the information provided in
18 my table was sufficient documentation and
19 supported the claim.
20    Q.    Let's talk about machine guarding
21 at Toulouse, our favorite topic. What does it
22 say in your chart, this is now tab 16 your page
23 a lot of zeros 12, do you see the entry about
24 machine guarding there, sir, second up from the
25 bottom?

16 (Pages 1091 to 1094)

JOHN LEASE - CROSS

1
2    A.    I see the machine guarding
3    category.
4    Q.    Yes.  Do you see it?  Do you see
5    it, sir?
6    A.    Machine guarding?
7    Q.    Yes.
8    A.    Yes.
9    Q.    How much did Alcoa spend on machine
10   guarding in Toulouse to date?
11   A.    To date --
12   Q.    You can go to tab 38 if you like.
13   A.    $444,000.
14   Q.    Before spending that kind of money
15   Alcoa performed a survey or assessment like we
16   looked at yesterday for Fullerton; right?
17   A.    Yes, we did.
18   Q.    You never sent that to Fairchild;
19   right?
20   A.    What's that.
21   Q.    Survey about machine guarding at
22   Toulouse.
23   A.    Well, I don't know if we did a
24   survey at Toulouse, frankly.
25   Q.    I thought you just said you did?

JOHN LEASE - CROSS

1
2    A.    Sorry, I thought you were talking
3    about Fullerton.
4    Q.    No.  I was saying like the one we
5    saw at Fullerton.
6    A.    I don't know what specifically was
7    done as far as surveys, if anything at Toulouse.
8    THE ARBITRATOR:    Do you bid these
9    things out when you have a project?  How do they
10   go about deciding which machines to fix, what
11   kind of fix to put on them, how much it is going
12   to cost?  How do they go about that?
13   THE WITNESS:    Well, typically we
14   would hire a consultant to do the survey, which
15   would define, you know, the scope of the
16   compliance requirements to achieve compliance.
17   They would, in essence, prepare a one sheet
18   solution which is kind of like a cookbook.  Say
19   here are the deficient areas, here is what you
20   need to do to fix them, put this guard on this
21   piece of the equipment to keep people from
22   putting their hands in.
23   THE ARBITRATOR:    They give you
24   estimates, costs?
25   THE WITNESS:    Yes.  They would

JOHN LEASE - CROSS

1
2    estimate the cost for each machine.
3    THE ARBITRATOR:    So they wouldn't
4    be the one to do the work, they would have to
5    hire someone else?
6    THE WITNESS:    I think it could be
7    done in some cases the consultant could
8    actually, was qualified to install the guards.
9    In other cases --
10   THE ARBITRATOR:    Did they bid
11   these projects, how did they go about that?
12   THE WITNESS:    For the actual --
13   THE ARBITRATOR:    For the work in a
14   place like this you're talking about, Toulouse.
15   Do you know what they did at Toulouse?
16   THE WITNESS:    I think at
17   Toulouse, I'm not certain, but for local
18   projects they could go to local vendors and bid
19   them out.  It was dependent really on the
20   capabilities that existed in that particular
21   area for this type of work.
22   THE ARBITRATOR:    Thank you.
23   Q.    Did Alcoa employ a competitive bid
24   process with respect to say machine guarding?
25   A.    For all of them, I don't know.

JOHN LEASE - CROSS

1
2    Typically the Alcoa process for conducting
3    outside work does include competitive bidding.
4    We also have a process whereby we select certain
5    consultants based on their capabilities and we
6    negotiate low rates, lower rates than they would
7    offer commercially due to the leverage that
8    Alcoa has in terms of its use of these
9    consultants.  So those are called Master Service
10   Agreements.
11   Q.    But you don't know in this
12   situation if there was competitive bid process?
13   A.    For this particular project, I
14   don't know how they bid the work out.
15   Q.    Back just to finish the discussion
16   of machine guarding at Toulouse, Mr. Snee's
17   chart on page 20 of this chart, 57177.
18   A.    Page 20?
19   Q.    Yes.
20   THE ARBITRATOR:    What exhibit?
21   MR. ZUROFSKY:    Mr. Snee's chart, I
22   guess 430 we introduced.
23   (Arbitration Exhibit 430
24   was marked.)
25   THE ARBITRATOR:    Mr. Snee's chart

17  (Pages 1095 to 1098)

JOHN LEASE - CROSS

1    JOHN LEASE - CROSS
2  is 73, isn't it?
3       MR. ZUROFSKY:  73, previously
4  marked.  Right.  Sorry.
5       Q.    Do you see page 20, sir?
6       A.    I'm on 20.
7       Q.    The middle line in the chart, does
8  that relate to the machine guarding project at
9  Toulouse that we just discussed that ended up
10 being $444,000?
11      A.    Yes.
12      THE ARBITRATOR:  You are on
13 page 20?
14      MR. ZUROFSKY:  Yes.  In the middle
15 row.
16      Q.    That's discussing the machine
17 guarding project.  This is based upon Mr. Snee's
18 review of the Phase I reports; right?
19      A.    That's my understanding of what he
20 did.
21      Q.    Which are the reports provided to
22 Fairchild; right?
23      A.    Yes.
24      Q.    He comes up with an estimate, if
25 you look over on the right for EPC, estimated

1    JOHN LEASE - CROSS
2  probable cause and reasonable worst case, of
3  between 27 and 40,000?
4       A.    Mr. Snee comes up with the
5  estimate?
6       Q.    Yes.
7       A.    I don't think that is Mr. Snee's
8  estimate.
9       Q.    Whose estimate is it?
10      A.    I think it is probably from ERM.
11      Q.    But it is an estimate Mr. Snee has
12 in his chart?
13      A.    It is not his estimate, it is here.
14 He didn't go through each one of these and
15 estimate them individually I think he was just
16 compiling data from existing report.
17      Q.    From the Phase Is.  So from the
18 Phase I process the number is between 27 and
19 40,000 estimated, the worst case scenario is
20 40,000 for machine guarding at the Toulouse
21 facility; correct?
22      A.    That is what the reports say.
23      Q.    You spent $444,000; right?
24      A.    Yes.
25      Q.    The estimate in the chart you send

1    JOHN LEASE - CROSS
2  to Mr. Hodge was in Euros, we don't have to do
3  the conversion was roughly 180,000 Euros; right?
4       A.    That's correct.
5       Q.    A little over 200,000, somewhere
6  over $200,000; right?
7       A.    Approximately.
8       Q.    It is 444,000 today at Toulouse;
9  right for machine guarding?
10      A.    Correct.
11      Q.    You're not done yet; right?
12      A.    I don't know if they are done or
13 not.
14      Q.    Are you done at any of the
15 facilities, do you know with machine guarding
16 work?
17      A.    There are some we may be finished
18 with.
19      Q.    How far out, how many years? How
20 many years are you planning to work on the
21 machine guarding?
22      A.    To complete all of the machines?
23      Q.    Yes.
24      A.    I think the plants would forecast
25 out two to three years in advance maybe 2007,

1    JOHN LEASE - CROSS
2  this is 2007.  Maybe 2008.
3       Q.    So period of six years or so, five
4  to six years following acquisition; right?
5       A.    I am not sure they create forecasts
6  right at the time of the acquisition.  I don't
7  know what the business unit was doing in terms
8  of their forecasting, when they started or what
9  their projections were.
10      Q.    We looked at back on tab 41.
11      THE ARBITRATOR:  These machine
12 guardings are required by local authority,
13 are they, or pursuant to some local regulation?
14      THE WITNESS: Yes.
15      THE ARBITRATOR:  They allow you
16 six years to do this work?  If it is a hazard to
17 an employee's health isn't there any time limit
18 you can spend doing it?
19      THE WITNESS: It is a good question.
20 These guards are required either by local or
21 national level legislation, I guess the
22 practicality is that all machines in cases like
23 this where numerous machines are noncompliant it
24 is very difficult to go in and do them all at
25 one time.  It takes the machine down, has to be

JOHN LEASE - CROSS

1  reconfigured to allow the guarding to be put in
2  place.
3      So what Alcoa typically does is
4  identifies the highest risk machines. If you
5  recall yesterday we had that risk matrix.
6      THE ARBITRATOR: Yes.
7      THE WITNESS: They then go
8  through highest risk machines first and work
9  their way through until the end.
10     In the interim you can implement
11 what are called administrative controls which
12 limit the workers' ability to actually access
13 the machine at a critical point. Those are not
14 preferred because employee can actually
15 disregard them. So the preferred solution is to
16 put an engineered guard in that is effective and
17 meets the requirements.
18     Q.   We have gone through the first
19 three letters on the chart on tab 41; right?
20     A.   Okay.
21     Q.   Skip Torrance for a minute because
22 I understand we may have a document issue, I
23 will go to City of Industry under safety
24 compliance. Do you see that?

JOHN LEASE - CROSS

1      A.   Back on.
2      Q.   Tab 41, the chart City of Industry;
3  right?
4      A.   We are under equipment safety.
5      Q.   It is listed there John Lease to
6  Mike Hodge 2004. That document is tab 20 in
7  your binder from Mr. Chesler. Do you remember
8  yesterday there was some discussion about
9  Mr. Miller's letter referring to Torrance
10 facility when the "Re:" line was the Torrance
11 facility?
12     A.   Say that again.
13     Q.   There was some discussion about
14 Mr. Miller's letter had reference to the
15 Torrance facility but the "Re:" line was the
16 Fullerton facility, do you remember that?
17     A.   Yes.
18     Q.   Typographical letters and
19 oversights happen in letters; right, Mr. Lease
20 from time to time?
21     A.   That is a question.
22     Q.   Look at your letter from City of
23 Industry, you dated it 2003. But I think you
24 told us actually it was 2004; right?

JOHN LEASE - CROSS

1      A.   Yes.
2      Q.   Must have missed it in the
3  proofreading; right? Let's look at the letter.
4  This is the letter listed as providing notice
5  for City of Industry; right?
6      A.   Yes.
7      Q.   What kind of notice is this of our
8  three buckets of notice, what type of notice is
9  this, sir?
10     A.   This is primarily a -- well it is
11 notice of costs incurred primarily. As I
12 mentioned yesterday, we felt that the Phase I
13 reports and the four letters related to the
14 major facilities in former Fairchild plants
15 represented notice of environmental conditions
16 at all locations.
17     Q.   So the City of Industry was not one
18 of those four facilities that had the four
19 letters we talked about yesterday?
20     A.   No. There was not a gap analysis
21 for that facility.
22     Q.   So this is a letter basically
23 saying work has already started, here are the
24 bills. It is a notice of liability letter;

JOHN LEASE - CROSS

1  right?
2      A.   Yes.
3      Q.   There are other things in it. That
4  is its primary purpose?
5      A.   It describes the work that is being
6  done and costs incurred up to this point.
7      Q.   It is not a, hey, here is what we
8  are going to do before we start work, right,
9  letter?
10     A.   I think in the descriptions we are
11 describing specifically what the costs related
12 to. But the description also conveys what
13 activities are going on and would go on in the
14 future. Clearly these were not finished in all
15 cases.
16     Q.   Work had started though; right?
17     A.   Work had started, correct.
18     Q.   Let's turn forward to page, it
19 should be marked fair 500198. You have
20 different numbers, sorry, I will give you your
21 version of this one second. I am working off of
22 a different version. Your version of the FC
23 263 -- 253, excuse me.
24     A.   Sorry, I'm lost.

19 (Pages 1103 to 1106)

Page 1107

JOHN LEASE - CROSS

1
2    Q.    Your version, tab 20 of the binder,
3 Bates page will be FC 253.
4    A.    Okay.
5    Q.    And then 254 actually is the page I
6 want to look at.  256 is an invoice from
7 Premiere Safety; right?
8    A.    Yes it is.
9    Q.    It is an invoice you are sending to
10 Fairchild for work done by premiere safety;
11 right?
12    A.    Yes.
13    Q.    Premiere safety was a contractor
14 used by Alcoa in this case at the Unruh and City
15 of Industry facility?
16    A.    City of Industry, I am not sure
17 which one of the two plants it is.
18    Q.    If you look at the -- it looks like
19 it covers both.  Look at entries on the invoice,
20 first two relates to Unruh.  Third says Unruh,
21 transfer of stuff from Unruh and Temple?
22    A.    Right.
23    Q.    I want to draw your attention to
24 the paragraph that begins "These draft procedure
25 for lock, tag and verify and confined space

Page 1108

JOHN LEASE - CROSS

1
2 entry."  Do you see that there?
3    A.    Yes, I do.
4    Q.    "They ship for SPA at COI."  Do you
5 know what SPAs are?
6    A.    Yes.
7    Q.    What are they? What is SPA?
8    A.    In this context it would be, I
9 think the single point accountable person which
10 is the individual that would have responsibility
11 for this particular EHS area.
12    Q.    Then COI? City of Industry; right?
13    A.    City of Industry.
14    Q.    It says "to review to ensure all
15 OSHA and Alcoa compliance directives are met."
16 Do you see that?
17    A.    I see that.
18    Q.    This is an invoice for work done in
19 part at least to ensure compliance with Alcoa --
20 Alcoa compliance requirements; right?
21    A.    No.  We talked earlier regarding
22 Alcoa standards such as lock tag verify and
23 machine guarding and so forth, there is overlap,
24 significant overlap in countries such as complete
25 regulatory citations for things such as machine

Page 1109

JOHN LEASE - CROSS

1
2 guarding, lock tag verify.  So components of the
3 Alcoa standard would include much of what is
4 required in OSHA.
5    Q.    Mr. Lease, I believe I asked you at
6 your deposition if you had compared Alcoa
7 standards with OSHA or CAL OSHA standards; have
8 you ever done that?
9    A.    Line by line.
10    Q.    Let's look at page 232.
11    A.    Okay.
12    Q.    Here we're talking about Alcoa
13 standard 33.013.  Do you know what that is? It
14 is referenced in 231, that's why.  Do you know
15 which one that is?
16    A.    In my letter, 231?
17    Q.    On your deposition, 231 to 232.  I
18 apologize.  Do you still have your transcript
19 there from yesterday?
20    A.    Page 231 in the deposition?
21    Q.    Yes.  I realize here we are
22 talking about a specific Alcoa standard.  But I
23 want to ask you the question about more
24 generally.
25    A.    Okay.  I'm there.

Page 1110

JOHN LEASE - CROSS

1
2    Q.    231 into 232, we are talking about
3 difference between OSHA standards and Alcoa
4 standards.  On 232 I asked you "Do you have any
5 knowledge, sir, in this particular instance" I
6 was talking about standard 33.1013 the
7 recommendation being made here is being made to
8 comply with OSHA or CAL OSHA standard?  Do you
9 see that?
10    A.    Yes.
11    Q.    You said "As I said earlier I am
12 not a safety expert.  You would need to talk to
13 the individuals involved here to see if there
14 was, you know, what the difference was between
15 these."
16          Do you see that?
17          With respect to -- are you a safety
18 expert when it comes to lock tag verify issues?
19    A.    No.
20    Q.    Do you feel competent to testify as
21 an expert between the Alcoa standards and OSHA
22 standards on that issue?
23    A.    I think I was just making a general
24 statement.
25    Q.    It does list here on the invoice,

20  (Pages 1107 to 1110)

Page 1111

JOHN LEASE - CROSS

back now in tab 20, work was done to comply not
just with OSHA but OSHA and Alcoa compliance;
right?

A.     That's what is listed on the
invoice.

Q.     Two different things; right?

A.     With overlap.

Q.     They say, they are listed as two
different things; right?

A.     They are listed as two different
things.

Q.     You sent this invoice to Fairchild
for reimbursement under the agreement; right?

A.     Yes.

Q.     You agree that work done to comply
with Alcoa standards is not reimbursable under
the agreement; correct?

A.     That is in excess of the regulatory
requirements.

Q.     Now back to our chart on tab 41.
We have looked at now the correspondence under
equipment safety for City of Industry.  That was
the document we just looked at.

MR. CHESLER:  Sorry, what the tab

Page 1112

JOHN LEASE - CROSS

are we at?

MR. ZUROFSKY:  41.  Second page.

Q.     Right.  We have been working our
way down this chart, Mr. Lease; right?

A.     Yes.

Q.     So the one under City of Industry,
under equipment safety was dated March 9, 2004
letter from you to Mr. Hodge.  We just looked at
that document; right?

A.     Yes, we did.

Q.     That document as you described it
was a notice of liability, what fell into the
notice of liability category, right you said
here is work that is started, here is the cost,
here is the invoices?

A.     It was somewhat of also detailed
notice that further explained the general
categories we had provided before.

Q.     The work had started; right?

A.     Yes, it had.

Q.     So, let's move down to Fullerton
now.  This is -- I think we only have one more
after this to do because they all repeat after
that.  Or two more.

Page 1113

JOHN LEASE - CROSS

So, the next one is Fullerton.  We
looked a little bit at this yesterday, right,
sir?

A.     Yes, we did.

Q.     That is the letter we talked about
yesterday that had the machine guarding
estimate.  Then we looked at the machine
guarding survey.  Do you recall that?

A.     Yes.

Q.     I won't belabor the point on this
document, this is again one of those documents
that Mr. Miller responded then was covered by
Mr. Harvey's letter and returned; right?

A.     Well, you keep referring to
Mr. Harvey's letter as though it was --

THE ARBITRATOR:  It is not your
favorite letter; right?

THE WITNESS:  It certainly isn't.
But I think it points out the fact
that certainly there were some disconnects in
the communication internally at times.  I think
that happens.  Mr. Harvey's response is what it
is.  I wouldn't categorize it as Alcoa's formal
policy in this particular case.

Page 1114

JOHN LEASE - CROSS

Q.     Again, you never cc'd on that letter
and never sent Mr. Miller a correction on his
letter; right?

A.     That's correct.

Q.     So, but Fullerton is one of the
facilities that is referred to in Mr. Harvey's
letter; right?

A.     It was one of the facilities that
was in sandy's response, correct.

Q.     We looked at the machine guarding
number before.  I just want to do one or two
other of these and we can just move off of this.
We looked at machine guarding.  If you look on
the, I guess second page of your chart; so the
Bates stamp, if we have the same version, which
we may or may not, tab 14, we have the sale
version, 41.

THE ARBITRATOR:  Tab 14?

MR. ZUROFSKY:  Yes, your Honor.

Q.     We looked at machine guarding that
had an estimate of $58,000 yesterday.  It turned
out to be over a million dollars as of today,
right, Mr. Lease?

A.     What was your figure?

21  (Pages 1111 to 1114)

JOHN LEASE - CROSS

Q.    58,000 as of this letter.
Yesterday you told me it was 1,032,289 as of end
of last year?
A.    From the liability table?
Q.    Yes.
A.    Yes.
Q.    They are still doing machine
guarding work at Fullerton; right?
A.    I believe they are.
Q.    Next item down is fall control
listed there as 45,000.  How much has been spent
to date on fall control at Fullerton?
A.    Fall protection compliance,
$151,000.
Q.    So 151.1,000.  The number in the
chart is 45.  The number in the chart you sent
to Fairchild is 45; right?
A.    That's correct.
        THE ARBITRATOR:  Where, that is
the next one here underneath the machine
guarding; right?
        MR. ZUROFSKY:  Right, your Honor.
Listed as 45,773.  Mr. Lease told us it is over
150,000.

JOHN LEASE - CROSS

Q.    The next one down is fire
prevention.
A.    Yes.
Q.    It is estimated there at $28,000;
right?
A.    That's correct.
Q.    Can you tell me how much has been
spent to date on fire prevention at the
Fullerton facility?
A.    2,800.
Q.    $2,800, are you sure?  Let's look
at tab 38.  Where are you looking?
A.    Fire safety.
Q.    It says here "The work is not
limited to permit program, storage, handling of
flammable and combustible liquids controlling
use storage and handling of flammable gases and
dispensing of flammable and combustible
liquids."
        Let's look at Fullerton, the work
that has been done on that doesn't that include
combustion safety, sir?
A.    I don't know if that is a straight
match or not.

JOHN LEASE - CROSS

Q.    It says here in your description,
maybe it is just not clear enough from your
chart for anyone to figure it out.  It says
handling of combustible liquids; right?
A.    Yes.
Q.    The word, in chart 38 for
combustion safety says the word combustion
safety line 50 lists $154,000; doesn't it?
A.    Well, that is what has been listed
for combustion safety but I am not sure that
corresponds to this particular entry in the
table.
Q.    So if the entry is not on the table
you didn't tell Fairchild about it beforehand;
right?
A.    I can't say either way.  I don't
have the information related to the specific
project to detail what is covered in it.
Q.    You just can't tell based upon the
description in your letter to Mr. Hodge; right?
A.    I can't tell what the individual
project titles refer to.  That's the detail I'm
lacking.
Q.    Sorry?

JOHN LEASE - CROSS

A.    That's the detail I am lacking
right now.
Q.    In tab 38, that is what you are
referring to?
A.    Yes.  My summary table.
Q.    That is the same form of table we
will look at it a little later in which you
provided what you called notice to Fairchild
with those asterisk system; right?
A.    This table?
Q.    Not this exact version, earlier
version?
A.    Yes.
Q.    That is kind of thin descriptions
you said you can't figure out what the project
was with the same descriptions contained in the
earlier table sent to Fairchild; right?
A.    Sorry.
Q.    You just told me you couldn't tell
from entry on tab 38 what combustion safety
related to; right?
A.    That's correct.  I don't have
detailed understanding of what that is for.
Q.    That is the only description, if

JOHN LEASE - CROSS

you go back, that you provided in those asterisk
tables as well; right?
    A.    Combustion safety, the project
titles didn't change.
    Q.    Right. I am saying that is what you
told Fairchild was 154,000, combustion safety;
right?
    A.    In this table, yes.
    Q.    You can't figure out if that is the
same project as listed in your letter from June
of 2003?
    A.    I can't figure out what all is
included in that number.
    Q.    Let's move on to the next — that's
Fullerton. Let's move to the next item in our
chart from tab 41, this is the letter under St.
Cosme, under St. Cosme we have first two are
ones we looked at already; right?
    A.    The first two letters?
    Q.    Yes. Those are the ones we looked
at at the top of the chart.
    A.    Okay.
    Q.    Are you with me?
    A.    Yes. I'm with you.

JOHN LEASE - CROSS

    Q.    The third letter, letter from John
Lease to E. Beckford on December 13, 2004 is one
we have not looked at yet; right?
    A.    I believe that is true.
    Q.    Let's take a look at it I am not
sure it is in your binder. It may not be. In
which case I will have to give it to you. It
may be in my binder.
    Counsel, do you know if that letter
referenced there is in Mr. Lease's binder?
    MR. CHESLER: It is not.
    Q.    Let's go to the binder we handed
you. It is going to be easiest to work from the
back. Do you see that there?
    A.    What am I looking at?
    Q.    The binder I handed you, the
correspondence binder. There is tabs by sort of
the name of the facilities. The last tab is
multiple sites, miscellaneous.
    A.    Okay.
    Q.    Right?
    A.    Okay.
    Q.    If you look under that, these are
chronologically in order sort of moving forward

JOHN LEASE - CROSS

on this subject, the miscellaneous sites. Okay?
    A.    Okay.
    Q.    Letters are separated by yellow
sheets.
    A.    Okay.
    Q.    So, move your way forward
chronologically until we get to December 13,
2004, it should be, I think it is the sixth
letter. In any event, chronologically forward
to December 13, 2000?
    A.    I don't have yellow sheets in my
book.
    Q.    I apologize then.
    A.    December 13.
    Q.    2004.
    A.    Okay.
    Q.    Do you see it there?
    A.    I'm there.
    MR. ZUROFSKY: Your Honor?
    THE ARBITRATOR: Yes.
    Q.    Is this the letter that is referred
to in the chart on tab 41 from you to
Mr. Beckford on December 13, 2004?
    A.    Yes.

JOHN LEASE - CROSS

    Q.    This relates to lock tag and verify
noncompliance issues at the "Re:" line?
    A.    Yes.
    Q.    Looking at this letter, this is
similar letter to the one we just looked at
regarding -- withdrawn.
    If you go to the second paragraph
of this letter.
    A.    Okay.
    Q.    It says "These findings necessitate
a more thorough review and survey of each
facility's LTV programs be undertaken to
determine full scope of noncompliance." Do you
see that?
    A.    Yes.
    Q.    Does that tell you that Alcoa did
undertake surveys at each of these facilities
regarding lock tag verify?
    A.    That refreshes my recollection.
    Q.    You did, yes?
    A.    Pardon?
    Q.    Alcoa did?
    A.    I believe that's the case, yes.
    Q.    Alcoa never sent those surveys to

Page 1123

JOHN LEASE - CROSS

1   JOHN LEASE - CROSS
2   Fairchild in advance of incurring costs with
3   regard to the work; right?
4       A.   The LTV surveys?
5       Q.   Yes, at these facilities?
6       A.   I don't recall sending them. No.
7       Q.   It goes on to say "As well as the
8   required corrective actions to bring the
9   facility's programs into compliance surveys are
10  completed and corrective actions are being
11  implemented at the following facilities."
12      Do you see that?
13      A.   Yes.
14      Q.   This is another instance in which
15  you refer to surveys that were not provided to
16  Fairchild, and two are sending Fairchild a bill
17  for work already started; right?
18      A.   We are sending them a bill for work
19  that's being done, correct.
20      Q.   That is the letter referred to in
21  the chart between you and Mr. Beckford on tab
22  41; right?
23      A.   Let me check that's correct.
24      Q.   The next document in my binder is
25  the letter dated December 20, 2004.  I think

Page 1124

JOHN LEASE - CROSS

1   JOHN LEASE - CROSS
2   that is the last chronological letter listed in
3   the chart on tab 41.
4       THE ARBITRATOR:   What is that
5   under?
6       MR. ZUROFSKY:   Go down, your
7   Honor, to the Nemesvamos facility and Kelkheim
8   facility there is a reference to a letter J.
9   Lease to E. Beckford December 20, 2004.  I
10  believe and Mr. Lease can tell us, that is the
11  letter that we're looking at, the next one we're
12  looking at in my binder is that letter.
13      THE ARBITRATOR:   In this book
14  here?
15      MR. ZUROFSKY:   Yes.  After the one
16  we just looked at for December 13.  It is the
17  next one.
18      A.   Which letter are we on?
19      Q.   December 20, 2004.  The one after
20  the December 13 letter related to lock tag
21  verify.  Do you see it?
22      A.   Yes.
23      Q.   I believe chronologically this is
24  the last letter listed in the chart on tab 41
25  that we discussed, remember we talked about

Page 1125

JOHN LEASE - CROSS

1   JOHN LEASE - CROSS
2   nothing past December 31, 2004?
3       A.   Yes.
4       Q.   This is the last one in the chain
5   chronologically.  Again this looks familiar to
6   the last letter if you look at the second
7   paragraph.  This one relates however to machine
8   guarding; right, sir?
9       A.   Yes.
10      Q.   Second paragraph "These findings
11  necessitated that a more thorough review and
12  survey of each facility's machine guarding
13  programs be undertaken to determine the scope of
14  noncompliance issues as well as the needed
15  corrective actions to bring the noncompliance
16  equipment into compliance."
17      It continues on "The detailed
18  surveys were conducted, detailed surveys were
19  conducted and corrective actions are being
20  implemented at the following facilities to bring
21  the machine guarding programs into compliance
22  with existing governmental requirements." Do you
23  see that?
24      A.   Yes.
25      Q.   That lists eight facilities, City

Page 1126

JOHN LEASE - CROSS

1   JOHN LEASE - CROSS
2   of Industry, Fullerton, Kelkheim, Stoughton, St.
3   Cosme, Torrance, Simi Valley and Nemesvamos.  Do
4   you see that?
5       A.   Yes.
6       Q.   Again, like the last letter, this
7   is a situation where you have done surveys on
8   these issues; right?
9       A.   You have identified issues in the
10  initial review of the facilities in Phase Is and
11  site assessments yes.
12      Q.   You say detailed surveys were
13  conducted.  Those detailed surveys referenced in
14  the second paragraph are surveys that followed
15  on the original site assessment; correct?
16      A.   After we, we indicated we were
17  going to do surveys at the facilities, which is
18  what we did.
19      Q.   You did those; right?
20      A.   We did them.
21      Q.   One of the ones we looked at
22  yesterday Fullerton is listed here, that is the
23  box we talked about yesterday?
24      A.   Yes.
25      Q.   There is similar surveys for all

24 (Pages 1123 to 1126)

Page 1127

JOHN LEASE - CROSS

these facilities?

A.   Yes.

Q.   They were done by the time of this letter?

A.   That's what is stated here, yes.

Q.   At this letter the work had already started at those facilities; right?

A.   For corrective actions?

Q.   Yes.

A.   That's correct.

Q.   You were sending Fairchild the bill for some of that work; right?

A.   Yes.  Because the assessment we performed indicated that all of the facilities had machine guarding compliance issues.  The surveys confirmed that.  And we were going about fixing the problem.

Q.   You spent $729,000 at the time of this letter doing that work; right?

A.   I believe, yes.

Q.   This falls again into the category of notice of bills already incurred, notice of liability; right?

A.   What was your first comments.

Page 1128

JOHN LEASE - CROSS

Q.   Notice of liability, bills already incurred.

A.   Well, we had I think in our notice of the environmental condition provided notice of the condition.  This would have been the first correspondence related to the costs that were being incurred for the condition we found.

Q.   Sorry, what?

A.   For the machine guarding corrective actions.

Q.   That work had already started; right?

A.   Yes, it had.

Q.   We are done chronologically.  I have to circle back to one.  Then we will take the break.  We have one more letter we skipped over, then we can obviously take a break.

So this is previously introduced as Exhibit 69.  The reason I had to pause there is a different version in my binder?  This is the letter, sir, is it not referenced with respect to Torrance in the chart on tab 41.  Okay?

A.   Yes.

Q.   So here again is one of these

Page 1129

JOHN LEASE - CROSS

letters that Mr. Miller responded to.  And that was the subject of Mr. Harvey's letter; right?

A.   In the context of the contention that anything that was indemnifiable had to be in notice of violation from Mr. Miller.

Q.   I am not sure I understand the answer.  My question was, this is a letter to which Mr. Miller responds and then is the subject of Mr. Harvey's response of August 1, 2003; right?

A.   Yes.  Mr. Harvey responded to Mr. Miller's letter.

Q.   This is one of the four gap analysis facilities you say provide notice for all of the 16 facilities; right?

A.   Correct.

Q.   On this facility, let's look at some of the numbers discussed here.  On the chart, look at the second row, the facility is not complying.  Do you see that?

A.   Yes.

Q.   Estimate there is 10,000; right?

A.   Yes.

Q.   How much -- go to tab 38 if you

Page 1130

JOHN LEASE - CROSS

like.

MR. ZUROFSKY:  Your Honor, I am on page --

THE ARBITRATOR:  I have it.

Q.   How much has Alcoa spent on that project?

THE ARBITRATOR:  This is the air permit?

MR. ZUROFSKY:  Yes, air permit. Torrance air compliance survey, 56,900.

Q.   The next one done on Exhibit 69 is lock out tag out verify; right?

A.   In the table?

Q.   Yes.

A.   Yes.

Q.   If you notice just before we get to the numbers, if you look in the left-hand column, the one under issue description, it says there "the facility's lock out tag out verify system is not formally implemented and procedures are not being followed consistently." Do you see that, sir?

A.   I see that.

25 (Pages 1127 to 1130)

JOHN LEASE - CROSS

1
2    Q.    There were procedures in place at
3    the facility with respect to lock out tag out
4    verify; right?
5    A.    They were inadequate to meet the
6    OSHA requirements, but --
7    Q.    There were some procedures?
8    A.    Ineffective.
9    Q.    They were not being followed
10   regularly that is what it says here; right?
11   A.    And they were ineffective.
12   Q.    Didn't say that. Move over,
13   estimated cost is 30,000. Right?
14   A.    Yes.
15   Q.    How much has Alcoa spent on that
16   project?
17   A.    $88,000.
18   Q.    Next one down confined space?
19   A.    I see it.
20   Q.    23,000 estimate?
21   A.    Yes.
22   Q.    How much has Alcoa spent so far?
23   A.    $59,000.
24   Q.    Turn the page if you will on the
25   Torrance chart. Estimated cost?

JOHN LEASE - CROSS

1
2    A.    Machine guarding now?
3    Q.    We are on machine guarding.
4    A.    20,000.
5    Q.    How much has Alcoa spent to date?
6    A.    $131,000.
7    Q.    You are not done yet; right?
8    A.    I can't say for Torrance.
9    Q.    Next one down, fall protection.
10   A.    Sorry, I am looking at the wrong
11   table. 20,000.
12   Q.    How much has Alcoa spent to date?
13   A.    132,000.
14   Q.    Next one down?
15   A.    Electrical safety?
16   Q.    Yes, sir?
17   A.    30,000.
18   Q.    Then how much has Alcoa spent to
19   date?
20   A.    100,000.
21   Q.    Next one down?
22   A.    Mobile equipment.
23   Q.    Estimate 15,000.
24   A.    15,000.
25   Q.    You spent to date?

JOHN LEASE - CROSS

1
2    A.    30,000.
3    Q.    Back to tab 41 just to make sure we
4    completed our journey here.
5    A.    Let me make a comment about these
6    discrepancies, if I may. The measures that were
7    taken following the survey typically would have
8    fixed the problem. It is basic industrial
9    operations. When you see an issue and it is
10   noncompliance you do and fix it. This isn't
11   much more complicated than that.
12   Q.    These were just -- sorry.
13   A.    So as we continue, you know, we
14   identify noncompliance issues at any of these
15   facilities, once it is confirmed we fix it. We
16   can't continue to operate in noncompliance while
17   we wait for cost estimates to be exchanged and
18   reviewed. We have to operate in compliance to
19   protect the people or meet our permit limit.
20   That is the fact of industrial operation in a
21   regulated environment.
22   Q.    These were preliminary cost
23   estimates; right?
24   A.    Preliminary. In 2003 they were
25   preliminary.

JOHN LEASE - CROSS

1
2    Q.    They were later updated based upon
3    work Alcoa did in terms of surveys and
4    assessments and all that, we looked at some of
5    those?
6    A.    Updated?
7    Q.    Yes.
8    A.    I think in reality what happened
9    was they did a survey identified compliance
10   issues, they went and fixed it. I don't know
11   that it included a scope of work, work plan.
12   These are very basic types of compliance issues
13   that require basic fix.
14   Q.    Like -- sorry?
15   A.    So, facilities just undertook these
16   corrective actions.
17   Q.    Like the box of documents we saw
18   with respect to the Fullerton machine guarding
19   with a sheet for every machine; right?
20   A.    Yes.
21   Q.    Again, that is what Mr. Miller was
22   asking you for was updated and finalized cost
23   estimates; right?
24   A.    That was a box that contained a
25   survey for every machine. I am not sure, I

Page 1135

JOHN LEASE - CROSS

1  
2 don't think every machine has undergone
3 corrective action at this point, as I mentioned
4 earlier. So a subset of that box was likely
5 under corrective action.
6     Q.    But those pages in those machines
7 we saw as Judge Stapleton asked you yesterday
8 have dollar signs of potential costs associated
9 with them; right?
10     A.    Yeah. I will point out that costs
11 to correct the noncompliance situation. These
12 issues needed to be addressed and recovered
13 under the indemnity.
14     Q.    That is the updated cost
15 information you and Mr. Harvey promised to
16 provide to Fairchild; right?
17     A.    I didn't promise to provide that.
18     Q.    Let's look at your letter on St.
19 Cosme before we take a break since we have to
20 make sure we nailed this down. Your letter on
21 St. Cosme, tab 12, second paragraph.
22     A.    Okay.
23     Q.    You say in the second paragraph "As
24 the cost estimates are updated and finalized we
25 will communicate this information to Fairchild

Page 1136

JOHN LEASE - CROSS

1  
2 Corporation."
3     Q.    Do you see that?
4     A.    Yes, I do.
5     Q.    You did promise to provide that
6 type of information for the St. Cosme facility,
7 yes?
8     A.    That might have been my intent in
9 April of 2003. You know, I can't say we
10 provided a project by project, machine by
11 machine cost estimate for everything we were
12 doing.
13     The fact is when we started this
14 work the basis was we would not have any
15 corrective action follow-up unless it was
16 justified based on regulatory noncompliance. I
17 can say that is the process we followed.
18     So I'm confident the money that has
19 been spent to fix these noncompliances is in
20 fact justified under the agreement.
21     If we didn't send Fairchild every
22 single piece of paper, you can blame us for poor
23 document management or inability to transmit
24 documents when needed. But in fact the main
25 focus of our efforts were to come into

Page 1137

JOHN LEASE - CROSS

1  
2 compliance. We felt the actions we were
3 undertaking were justified based on the
4 noncompliance issues we found.
5     Q.    Sir, we finished, let's break now.
6 We just want to confirm we now looked at every
7 letter that is referenced in the last two pages
8 of tab 41; right?
9     A.    Could you ask your question again,
10 sorry.
11     Q.    Tab 41, remember we were looking at
12 the last two pages of that chart you and
13 Mr. Chesler had gone over.
14     A.    Yes.
15     Q.    I want to confirm we have now
16 looked at this morning every letter listed there
17 for any of these items because I don't want to
18 repeat for each of the items because the letters
19 do repeat.
20     A.    On page 2.
21     Q.    Page 2 and 3, all the compliance
22 issues we talked about when we first started
23 this journey?
24     A.    Did we get through them all?
25     Q.    Yes. They repeat. That is why I

Page 1138

JOHN LEASE - CROSS

1  
2 am asking you. I want to make sure you agree
3 with me.
4     THE ARBITRATOR:  Pages 2 and 3?
5     MR. ZUROFSKY:  Of Exhibit 41.
6     THE ARBITRATOR:  The ones we have
7 seen included all of the ones on these two
8 pages?
9     MR. ZUROFSKY:  Right. That is what
10 I am confirming with the witness.
11     THE ARBITRATOR:  Well, they will
12 tell you if that is not the case.
13     MR. ZUROFSKY:  Fair enough. Then
14 let's break.
15     (Recess taken.)
16     MR. CHESLER:  Just a housekeeping,
17 your Honor, Mr. Zurofsky and I have been
18 conferring during the break we are trying to
19 manage the logistics of this which are getting
20 ever more complicated. We agreed as follows,
21 subject to being acceptable to you: We have our
22 next witness who is an expert by the name of
23 Powell who has an unmoveable obligation
24 tomorrow, out of state, in Florida involving the
25 EPA in a completely unrelated matter which he

27 (Pages 1135 to 1138)

JOHN LEASE - CROSS

1  JOHN LEASE - CROSS
2  can't move.
3          To accommodate that, since this is
4  moving not quite at the pace we anticipated, we
5  agreed at the lunch break if we are not done
6  with Mr. Lease, we will subject to your approval
7  suspend the testimony of Mr. Lease at whatever
8  stage it is, put Mr. Powell on right after lunch
9  so he can make a plane this evening to West
10  Florida.  Whenever Mr. Powell is done we will
11  immediately resume with Mr. Lease wherever we
12  left off.
13          MR. ZUROFSKY:  Mr. Lease is one of
14  the witnesses, not just one of their witnesses,
15  he is one of our witnesses, too.  We are fine
16  with that considering we have been doing this
17  sort of combined anyway.
18          THE ARBITRATOR:  Fine.  You do
19  seem to be moving a little slowly from the point
20  of view of concluding Alcoa's case this week.
21  We have several other witnesses.
22          MR. ZUROFSKY:  Right. Let's try to
23  pick up the pace now, not speaking too quickly,
24  I know, Tammey, you get upset.
25      Q.   Mr. Lease, we covered the letters

1  JOHN LEASE - CROSS
2  this morning and I wanted to turn now to the
3  asterisk items that are on the chart.  The
4  chart, there is a series of asterisk charts.
5  Let's turn to the one on 36, tab 36.
6      A.   Okay.
7      Q.   If you remember we were talking
8  this morning about the compliance issues,
9  compliance claims and we identified that the two
10  sources of notice that you had put out there
11  were those series of letters we looked at this
12  morning then the Phase Is right for the
13  compliance claims?
14      A.   Yes.
15      Q.   So, the asterisk items as we went
16  over yesterday with your cover letter as you
17  said were not the subject of prior notice;
18  right?
19      A.   That's correct.  That is what it
20  says here.
21      Q.   You were thereby, by virtue of the
22  letter, notifying Fairchild about the asterisk
23  items; right?
24      A.   Well, I think as we pointed out
25  when we went through my discussion with

1  JOHN LEASE - CROSS
2  Mr. Chesler, there were some items on here that
3  had been noticed to Fairchild, as I recall, City
4  of Industry, for example.  Then we kind of
5  wondered if these were actually liability
6  notifications or notice of environmental
7  conditions.
8          So, I'm not quite sure if you're
9  asking was this a notice of liability or notice
10  of environmental condition.
11      Q.   Let's do all three.  All three
12  categories of notice.
13      A.   Yes.
14      Q.   The third category first, notice of
15  liability.  I am just referring now to the
16  asterisk items.  The other items are subject of
17  the some of the letters and environmental
18  issues.  Just the asterisk items which are all,
19  as you understand it, compliance issues, one or
20  two I think might be related to investigation.
21  I am putting that aside.  They are compliance
22  issues by and large; right?
23      A.   The ones with asterisks?
24      Q.   Yes.
25      A.   Well, there are the entries that

1  JOHN LEASE - CROSS
2  did not have the 8 digit project number.
3      Q.   That is a better way to do it.
4      A.   The asterisk items that follow the
5  general convention of, you know, 5 digit number
6  followed by 3 digit number would be compliance
7  issues with the exception of a few.  There is
8  some stuff in here that got carried into the
9  project, projects that later became
10  predominantly compliance issues that were
11  related more to remediation.
12      Q.   For Judge Stapleton's sake maybe we
13  can clarify what we mean by project numbers.
14  You will see on these charts there are two
15  formats of project numbers.  For example, the
16  first whatever however many, I guess 18 or so
17  are listed with a 5 digit newspaper, a dash and
18  3 digit number.  That continues through the
19  chart.  Then there is a separate type of project
20  number below that.
21          Mr. Lease, you tell me, the second
22  type of project number, the one that doesn't
23  have 5 digits and the dash and 3, those are
24  contamination related projects?
25      A.   Yes.  The P numbers.

Page 1143

JOHN LEASE - CROSS

Q.   The P numbers.

A.   Right.

Q.   So those are contamination projects which we talked about earlier just putting aside for now, still talking about compliance. I am focused on the compliance items. The asterisk items here in the three buckets of notice you were clearly telling Fairchild here notice as you called it of liability for those items. You are saying here is the bill here is how much we spent?

A.   This is how much we spent for these projects, correct.

Q.   Is it your testimony you are also telling them about the other two buckets of notice in this letter for those projects?

A.   No. It is not my understanding. This table was put together in anticipation of the mediation session I look back at this now, for example the first asterisk entry is confined space compliance 009. I think what we are saying here we are noticing that 23,495 was spent on that project. That is a specific project as opposed to a condition.

Page 1144

JOHN LEASE - CROSS

THE ARBITRATOR:   Which one are you looking at, first item on the top, City of Industry?

THE WITNESS:   City of Industry. The project number is 36010009.

Q.   Perhaps it is easier, I know we had that letter on City of Industry you went over with Mr. Chesler. Let's look at another facility just because it doesn't have perhaps that complication. We will come back to City of Industry.

Let's do Simi Valley a second which is not subject of any letters; right? That is on page 5 of 6 in the chart?

A.   The gap analysis letter?

Q.   No. The chart in tab 36 of the project and their project numbers. Amounts spent?

A.   I am on Simi Valley.

Q.   You see. 5001097 there is a couple of items there. Not that many. We can probably deal with this pretty quickly.

THE ARBITRATOR:   When you use the phrase compliance, are there areas of

Page 1145

JOHN LEASE - CROSS

environmental compliance; there are, right?

MR. ZUROFSKY:   Yes.

THE ARBITRATOR:   Some of them are environmental, some of them are work safety?

MR. ZUROFSKY:   Yes, your Honor.

THE ARBITRATOR:   But compliance as opposed to contamination?

MR. ZUROFSKY:   Correct. That is the divide we are drawing right now. Within compliance there are different items that might fall into different categories.

Q.   But Simi Valley pretty manageable number of claims here. So the asterisks, there is three asterisks items there in Simi Valley. Do you see that?

A.   Yes.

Q.   What does the asterisk mean in this chart for Simi Valley?

A.   What the asterisk means is that that project, let's look at confined space compliance which is 002, that specific project was being noticed for liability to Fairchild.

Q.   Is it your testimony that project had previously been provided, Fairchild had

Page 1146

JOHN LEASE - CROSS

previously been provided notice with respect to that project in either of the first two categories of notice we discussed?

A.   Yes. Confined space compliance was a common finding across multiple Fairchild facilities in terms of noncompliance. So now we have a specific project at Simi Valley that is addressing that compliance issue.

Q.   It is your testimony the source of that notice on the first two buckets was one, either the letters we looked at this morning; right?

A.   Yes.

Q.   Or the Phase Is; right?

A.   That is my general recollection. Right.

Q.   Anything else you can think of that might have provided the notice other than the letters we talked about this morning and Phase Is for Simi Valley?

A.   For Simi Valley, I don't recall there was anything else.

Q.   Now I want to look at the Phase I for Simi Valley. My hope in this exercise we

JOHN LEASE - CROSS

1 don't go through all the Phase Is. Let's see if
2 we can do it with Simi Valley 424.
3        MR. CHESLER:   Your Honor, may I
4 just through the court make a comment which may
5 be of value to Mr. Zurofsky, maybe save us time
6 or maybe not.
7        The witness testified before he
8 can't from the witness stand pick out what was
9 in that 10 percent that wasn't, the 10 percent
10 of the items that were not included in the
11 summary chart for which this -- behind tab 40
12 for which tab 41 is backup.
13        I can represent to the court this
14 particular one which Mr. Zurofsky is on right
15 now, which is confined space compliance at Simi
16 Valley is in fact one of the items in that 10
17 percent. So if the point of this
18 cross-examination is to say I can't find a
19 reference in the Phase I report for Simi Valley
20 to confined space, I will stipulate it is not
21 there.
22        Our point is different, as I assume
23 the court understands. That is why it is in the
24 10 percent. We can try to do that for others if

JOHN LEASE - CROSS

1 you like.
2        Since the witness says he doesn't
3 know, taking an hour to make that point seems to
4 me not to be a proper use of time.
5        MR. ZUROFSKY:   I am fully in
6 agreement. If you can identify what items that
7 are those in the Phase Is that comprise those 10
8 percent. I am happy not to go over those.
9        MR. CHESLER:   We will pull that
10 together and provide it. I know that is one of
11 them.
12        MR. ZUROFSKY:   How about the other
13 two for Simi Valley, other two asterisked items
14 fall protection and electrical compliance?
15        MR. CHESLER:   They are not. One
16 of the ways you can tell, your Honor, if you
17 look at tab 41, which is the backup to tab 40
18 you will see those entries are not there in the
19 backup for Simi Valley. That is therefore,
20 since that is the backup with each of the
21 numbers that adds up to the 14 million and
22 change that represents the 90 percent, it is
23 kind of self-evident on its face. I am trying
24 to save us time.

JOHN LEASE - CROSS

1        MR. ZUROFSKY:   I appreciate that.
2 There is a lot of these that go on. I am happy
3 not to do Simi Valley.
4        THE ARBITRATOR:   Simi Valley, you
5 are referring to chart 41?
6        MR. CHESLER:   Yes.
7        MR. ZUROFSKY:   Yes.
8        THE ARBITRATOR:   It does appear in
9 here somewhere.
10        MR. ZUROFSKY:   That is a different
11 item that is not asterisked item, 625. My
12 point, just to be clear, it is our position that
13 none of the asterisk items notice for the first
14 two buckets are provided in the Phase Is at all
15 for any of the asterisk items. Maybe one or two
16 that is slipping my mind. They are not in the
17 Phase Is.
18        I am trying to avoid having to take
19 the court's time where we go through all the
20 Phase Is, and witness' time as well. The
21 witness said --
22        THE ARBITRATOR:   Why don't you
23 look at this at lunch time or something, maybe
24 you can agree on, you already said on Simi

JOHN LEASE - CROSS

1 Valley.
2        MR. CHESLER:   Yes. As I say, we
3 will give counsel a list of which particular
4 items were in the 10 percent as we said and the
5 witness testified, the 10 percent was intended
6 to represent specific items for which we don't
7 believe there was any notice that addressed that
8 item as opposed to the issue.
9        THE ARBITRATOR:   Prior notice for
10 that project and that item.
11        MR. CHESLER:   We may disagree on
12 what the requirements under the contract are,
13 that is a different question.
14        MR. ZUROFSKY:   I am happy to look
15 at the list. If there is any left over after
16 that I will reserve my rights to ask the witness
17 about it if that is fine.
18        MR. CHESLER:   Fine.
19    Q.   We can move off the asterisks for
20 now. One before we do, in St. Cosme, Mr. Lease,
21 there is a couple projects one titled pedestrian
22 and forklift traffic organization; do you know
23 which one I am talking about?
24    A.   Which table are you looking at?

JOHN LEASE - CROSS

Q.   Sorry, tab 36, page 2 of 6.
A.   Do you have the number.
Q.   Bates number 50 -- tab 36, Bates
5000195. I am looking at project 36230-036?
A.   Okay.
Q.   What was going on with the forklift
traffic organization what is that project about?
A.   That is a, I believe it relates to
mobile equipment. I don't know the details.
Q.   Forklifts moving around the plant?
A.   Forklifts moving around. They need
to provide for separation of pedestrians and
forklift traffic for safety so the forklifts
don't run people over.
Q.   Is Alcoa still claiming that as
indemnifiable expense under the agreement?
A.   Yes.
Q.   The next one, smoking area?
A.   Smoking area?
Q.   Yes. Next project down.
A.   Right. I don't have specific
knowledge of that particular project.
Q.   Was it building a fenced off area
so people can smoke?

JOHN LEASE - CROSS

A.   I don't know.
Q.   Is Alcoa still claiming that for
indemnification under the agreement?
A.   We are claiming it, yes.
Q.   Go down 36230-052?
A.   Okay.
Q.   Traffic compliance.
A.   Yes.
Q.   What is that?
A.   Again, industrial environment
traffic usually refers to mobile equipment.
That is really the extent of my knowledge on
this particular project.
Q.   You can put that to the side,
obviously pending the list of items that comes
from your counsel.
     Let's switch gears talk about
subsequent investigations on the contamination
side. Okay.
A.   Okay.
Q.   That is everything in the binders
past Volume 1; right?
A.   Volume C?
Q.   Volume C. Binder C.

JOHN LEASE - CROSS

A.   The blue ones?
Q.   Yes.
A.   Yes.
Q.   Plus the documents above it.
A.   Phase IIs. To the extent the Phase
Is discuss environmental contamination.
Q.   I believe you testified on
direct-examination that the Phase II scopes of
work were provided to Mr. Hodge and that the
Phase IIs were later provided to Fairchild;
right?
A.   Phase IIs, what was the last part
of your statement?
Q.   The Phase IIs themselves were
later, the reports themselves were later
provided to Fairchild?
A.   Yes.
Q.   The Phase IIs, I think I heard your
testimony is the basis on which you consider to
be the notice to Fairchild of the condition and
of the proposed response going forward with
respect to contamination investigations; is that
right?
A.   Yes.

JOHN LEASE - CROSS

Q.   Both buckets one and two?
A.   Yes.
Q.   So, it is your testimony that not
only does the Phase IIs say here are the
conditions at the facility, also they say here
is what we are going to do about them?
A.   Yes.
Q.   Let's look at what you said when
you sent the Phase IIs to Fairchild. That is
in, I believe it is in your, is it a tab in your
binder? I think you had it.
     MR. CHESLER:  I am told the Phase
IIs actually came from ERM. They weren't
transmitted from Alcoa.
Q.   In the correspondence binder I put
in front of you, Mr. Lease.
A.   Okay.
Q.   Under multiple facilities the last
tab again we were looking at earlier. I am
looking now at three letters in -- two letters
in, the second letter, November 3, 2003 letter.
A.   Okay.
Q.   To Mike Hodge, do you see it, sir?
A.   Yes.

31 (Pages 1151 to 1154)

JOHN LEASE - CROSS

1
2    Q.    Bates stamped FAIR 50000967; right?
3    A.    Yes.
4    Q.    This is the letter you sent to Mike
5  Hodge which was providing notice of liability
6  for the Phase IIs; right?
7    A.    Yes.
8    Q.    Any request in this letter you sent
9  to Mr. Hodge that says let's discuss what the
10  findings are or what we are going to do next?
11    A.    There was no requirement that I --
12  I said please contact me with any questions
13  regarding this information or my email.
14    Q.    That is what it is, that's what
15  you're saying?
16    A.    That is what is said here.
17    Q.    So you got a response from
18  Fairchild; right to that letter?
19    A.    Yes, I did.
20    THE ARBITRATOR:  Let me just read
21  this letter, please.  Thank you.
22    Q.    Mr. Lease, before moving on, Phase
23  IIs did not contain recommendations from ERM;
24  did they?
25    A.    I think they did.

JOHN LEASE - CROSS

1
2    Q.    Were you here on Tuesday for
3  Mr. Flanzenbaum's testimony?
4    A.    I don't recall when I was in here.
5  I was in and out.
6    Q.    I will refer on page 59, I don't
7  have a copy of the transcript, I haven't
8  actually been provided with it yet, I haven't,
9  page 59, 59 lines 4 through 7 Mr. Flanzenbaum
10  was asked did these reports contain specific
11  recommendations what to do next?
12    "Answer: Specifically no, we
13  basically finalized these reports with our
14  conclusions." Do you agree with that testimony?
15    A.    I don't particularly agree with
16  that statement.  I think there was enough detail
17  in these reports, as I understand them, to say
18  this is where we go next.
19    Q.    You don't recall ERM communicated
20  recommendations separately from its Phase IIs?
21    A.    They were in the Phase IIs.
22    Q.    No separate recommendations
23  provided to Alcoa with respect to ERM's
24  recommendations arising out of the Phase IIs?
25    A.    Recommendations from ERM?

JOHN LEASE - CROSS

1
2    Q.    Yes.
3    A.    It was in the Phase II report.  I
4  don't understand what your question is.
5    Q.    Mr. Flanzenbaum testified on
6  Tuesday there were separate recommendations made
7  by ERM to Alcoa about what to do following the
8  Phase IIs.  They were not in the Phase II
9  reports themselves.  Do you recall that
10  testimony?
11    MR. CHESLER:  Your Honor, I object
12  to the characterization of the testimony.  The
13  man was on the stand for hours, he said several
14  different things.  I am not going to say what
15  they are because he is in the middle of
16  cross-examination.  I object to the
17  mischaracterization of testimony.
18    Q.    Do you recall it?
19    THE ARBITRATOR:  Why don't you
20  just ask this witness what his understanding is.
21  The other gentlemen's testimony will stand as it
22  is.  There was a little ambiguity in what he
23  said, although my understanding there weren't
24  clear firm recommendations on everything, there
25  were things that might have been interpreted as

JOHN LEASE - CROSS

1
2  suggested.  He made some subsequent
3  recommendations.  Whatever it is, it is.  This
4  gentlemen can testify what he knows.
5    Q.    You received the response when you
6  sent that letter to Fairchild about the Phase II
7  costs you received actually more than one
8  response from Fairchild; right?
9    A.    Yes.  There were two responses, I
10  think.
11    Q.    I want to focus on the second
12  response which is the one I think in your binder
13  from Mr. Chesler at tab, I believe in tab 18.
14    A.    Looking at Mr. Beckford's letter?
15    Q.    Mr. Chesler's -- yes,
16  Mr. Beckford's letter, exactly.
17    A.    We are out of your binder now.
18    Q.    Yes.  It is also in mind.  As I
19  promised, whenever we can go back to
20  Mr. Chesler's, we will.
21    A.    Okay.  I'm there.
22    Q.    I want to focus on a couple of
23  things.  First off, Mr. Beckford attaches a
24  chart here that breaks down Fairchild's
25  interpretations of the Phase IIs that were

32 (Pages 1155 to 1158)

JOHN LEASE - CROSS

1
2    provided; correct?
3        A.    Yes.
4        Q.    It comments on those findings of
5    the Phase IIs; right?
6        A.    Very generally, but it did comment.
7        Q.    Comment.  The chart does, so does
8    Mr. Beckford; right?
9        A.    Yes, he commented on the cost.
10       Q.    The chart does more than that;
11   doesn't it, sir?
12       A.    Okay.
13       Q.    Does it?  Is that your recollection
14   of the chart, it talks substantively about the
15   issues at some of the facilities?
16       A.    Three categories he commented on
17   related to contamination.
18       Q.    With respect to some of the items,
19   the chart says, I will refer you to page, I have
20   a different Bates number, Bates page FC 299,
21   this is category 3 it is talking about?
22       A.    Yes.
23       Q.    Under there he has a symbol system.
24   I believe this chart actually was prepared by
25   Mr. Hodge.  I will just use Mr. Beckford for

JOHN LEASE - CROSS

1
2    convenience.  There is a symbol system you see
3    there Y, N, NN?
4        A.    Yes, I do.
5        Q.    I want to look at Y.  Under Y the
6    chart says "Costs of this portion of the report
7    may be appropriate for indemnification depending
8    on what if any remedial action is
9    recommended/required." Do you see that?
10       A.    Yes.
11       Q.    Is Fairchild in this letter
12   communicating to you it had analyzed the Phase
13   IIs and with respect to at least some of them it
14   thought maybe there might be future work needed
15   to be done; is that right?
16       A.    I really don't know what his
17   comments here was.  We are getting into an area
18   now where I think the experts on the Phase II
19   investigations and remedial investigation
20   follow-ups are really the experts that need to
21   discuss what actions follow the recommendations
22   in the Phase II.
23       Q.    Who did you send the chart to when
24   you got it, if any, which experts did you send
25   the chart to?

JOHN LEASE - CROSS

1
2        A.    I believe I sent it to John George
3    and perhaps others in the remediation group.
4        THE ARBITRATOR:   What charts are
5    you referring to?
6        MR. ZUROFSKY:   I am talking to the
7    chart attached to Mr. Beckford's letter.
8        THE ARBITRATOR:   Mr. Beckford's
9    chart?
10       MR. ZUROFSKY:   Yes.  Sorry.  There
11   is a chart in the main letter which deals with
12   the costs.  Then there is a chart attached which
13   provides comments analyzing the Phase II
14   results.
15       THE ARBITRATOR:   Right.
16       MR. ZUROFSKY:   I was focused
17   specifically on the third category of comments
18   which begins on page FC 299 in which for some
19   portion of the Phase II those designated by the
20   symbol Y, Fairchild is saying cost of this
21   portion of the report may be appropriate for
22   indemnification, depending on what if any
23   remedial action is recommended/required.
24       Q.    I am asking you, do you understand
25   that to be Fairchild's commenting on the Phase

JOHN LEASE - CROSS

1
2    II results?
3        A.    It's a comment.
4        Q.    Do you see it says there may, I can
5    show you an example if you like, but there are
6    some examples as we go through that chart in
7    which the comments is there may be a need for
8    future investigation or remediation.  Do you
9    recall that there is comments to that effect?
10       A.    I haven't looked at this chart in
11   two or three years.  Do you want to point out
12   specific areas?  I will be glad to look at them.
13       Q.    I am happy to do that, although you
14   did go through it with Mr. Chesler yesterday.
15       MR. CHESLER:   Again, your Honor --
16       MR. ZUROFSKY:   The document I am
17   saying.  He said the document.
18       MR. CHESLER:   You just said the
19   chart.
20       Q.    Go to the same page we're on,
21   right.  The first entry.
22       A.    Which page are we on now.
23       Q.    The one we were just on FC 299.
24   First entry 9 A, the bottom, do you see the
25   bottom of the comments section?

JOHN LEASE - CROSS

1
2       A.      Yes.
3       Q.      "The source of this impact is not
4   entirely clear from Alcoa's assessment." Do you
5   see where I'm reading?
6       A.      Yes.
7       Q.      "However it presents an issue
8   which should be followed up" do you see that?
9       A.      Yes, I see that.
10      Q.      There is Fairchild saying that this
11  might be an issue to follow-up; right?
12      A.      That's what they're saying.
13      Q.      I want to return your attention to
14  the cover letter from Mr. Beckford, which is FC
15  296.  That comment was with respect to the
16  Torrance facility.  We can look back but it was
17  with respect to the Torrance facility.
18          Let's look at FC 296, end of
19  Mr. Beckford's cover letter with that chart.
20  Are you with me?
21      A.      I follow you so far.
22      Q.      The last paragraph before the
23  asterisks at the end there it says "On those
24  sites as to which we agree there should be
25  further investigation, as noted in attachment 1

JOHN LEASE - CROSS

1
2   under category 3, please ensure that the actual
3   investigative measures are first discussed with
4   our designated representative, Michael Hodge as
5   required by section 11.6 C of the Acquisition
6   Agreement." Do you see that, Mr. Lease?
7       A.      Yes.
8       Q.      So, is Mr. Beckford saying to you
9   here, that for those items where, those
10  facilities where there might be need for further
11  investigation, pursuant to 11.6 C which is
12  something we looked at yesterday, make sure you
13  talk to us before you go and do the
14  investigating; do you see that?
15      A.      Yes.
16      Q.      Is that what he is saying there, is
17  that what you understood him to mean?
18      A.      He is asking that we discuss these
19  with Mike Hodge.
20      Q.      Before doing it; right?
21      A.      Before doing it, correct.
22      Q.      One of the ways one would discuss
23  investigation would be to provide proposals and
24  scope of work before doing the work; right?
25      A.      Could be one way.

JOHN LEASE - CROSS

1
2       Q.      That is what you did with the Phase
3   IIs; right?
4       A.      Yes, we gave the Phase II scope of
5   work to Mike.
6       Q.      It is your view, as I understand
7   your testimony, that someone looking at the
8   Phase IIs would know what the investigation
9   follow on were going to be in terms of scope;
10  right?
11      A.      A person that is a professional in
12  that field should know that yes.
13      Q.      Should know the scope of those
14  investigations?
15      A.      To know the scope?
16      Q.      Yes.  The scope of those
17  investigations.
18      A.      Not they know the scope.  But they
19  would certainly know what the actions were that
20  would be needed, I would think.  Sampling,
21  groundwater wells, that kind of thing.
22      Q.      Is that the reason why you didn't
23  respond to Mr. Beckford before pursuing
24  investigations by saying here are scopes of work
25  or anything like that?

JOHN LEASE - CROSS

1
2       A.      I think we did provide scopes of
3   work to Fairchild.
4       Q.      Let's look at some documents.
5   This has been I believe previously introduced.
6   I am not sure if we have additional copies up
7   there however.  It is 134.  Do you see
8   Exhibit 134 there, Mr. Lease?
9       A.      Yes.
10      Q.      Who is Eric Hendrix?
11      A.      Eric is a consultant who works for
12  Mission Geoscience.
13      Q.      Mission Geoscience is the firm of
14  environmental professionals Alcoa hired to do
15  the follow-up investigations to the Phase IIs
16  for the Southern California sites; right?
17      A.      I believe that's true, yes.
18      Q.      Who is Larry McShae?
19      A.      Larry is a member of the
20  remediation work group, works for Alcoa.
21      Q.      Now, he was in charge, was he not,
22  of the follow-up investigations at the Southern
23  California facilities, Fasteners facilities?
24      A.      At this time, I believe he was
25  overseeing the Southern California facilities.

34 (Pages 1163 to 1166)

Page 1167

JOHN LEASE - CROSS

1  JOHN LEASE - CROSS
2      Q.    So, let's turn to the last, this is
3  the time period, just so we have it is October
4  2003; right?
5      A.    Yes.
6      Q.    That is after or right around the
7  time the Phase IIs are being communicated to,
8  right before, excuse me, communication of Phase
9  IIs go to Fairchild?
10     A.    I recall it is about October,
11  November.
12     Q.    I want to start with the last email
13  chronologically, sorry first email
14  chronologically, last one on the page 00050292.
15     A.    Okay. .
16     Q.    This is from Mr. McShae to
17  Mr. Hendrix.  He says "I met with John Lease and
18  Sandy Harvey today to cover a number of issues
19  related to the former Fasteners Fairchild sites
20  in Southern California, a couple things for you
21  to note: 1, I committed to John that we would
22  begin preparing a monthly report for him and the
23  others involved to track both progress at the
24  sites and expenditures.  Format is open at this
25  point" so on and so forth.

Page 1168

1  JOHN LEASE - CROSS
2      "Number 2, I told John we would
3  prepare for him to send to Fairchild a document
4  that describes the overall plan to address each
5  of the issues identified to date at the sites.
6  This would basically be a refinement of the
7  bullet lists you have already started assembling
8  and sent along with the CEAT estimates." CEAT
9  estimates were Alcoa's estimates for future
10  costs, right?
11     A.    I am not sure what the CEAT
12  estimates encompassed as far as costs.
13     Q.    Generally speaking a CEAT estimate
14  however is estimate of future cost; is it not?
15     A.    Cost for what I'm not sure.
16  Remediation. You have to go back to talk to
17  Mr. George about that.
18     Q.    "This is also the vehicle by which
19  we can make them aware of our intention to
20  contact the RWQCB on Temple as a necessary step
21  moving forward" do you see that there?
22     A.    I see that.
23     Q.    Do you recall having that meeting
24  with Mr. McShae and Mr. Harvey?
25     A.    Frankly I don't at this point in

Page 1169

1  JOHN LEASE - CROSS
2  time.
3      Q.    Let's move forward in time, back
4  one page in the email to fair 50291.  Bottom
5  email on that page.
6      A.    Yes.
7      Q.    "One item I forgot to mention last
8  night" this is from again Mr. McShae to
9  Mr. Hendrix.
10     THE ARBITRATOR:  Where are you?
11     MR. ZUROFSKY:  Sorry, your Honor,
12  page before which is the next email in time.
13  Page 50291.  Mr. McShae writes again "One item I
14  forgot to mention last night, John Lease will
15  shortly be sending the ERM reports to Fairchild
16  and asked that if we see anything in there that
17  we are not in agreement with we let him know as
18  soon as possible.  So if you have noticed
19  anything from what you have seen so far, let me
20  know."
21     Q.    Do you see that, Mr. Lease?
22     A.    I see that.
23     Q.    These are the two, this is the
24  Mission Geoscience, the consultant that Alcoa is
25  hiring to do the follow-up investigations and

Page 1170

1  JOHN LEASE - CROSS
2  Mr. McShae who is overseeing those
3  investigations talking about whether or not they
4  disagree with the, if there is anything in the
5  Phase II that they are not in agreement with;
6  right?
7      A.    That's what this says.
8      Q.    Mr. McShae says that you asked if
9  they have any such disagreement about that
10  stuff, that they provide it to you so that you
11  can, before sending the reports to Fairchild, is
12  that right, before ERM sending the reports to
13  Fairchild?
14     A.    I am looking for where it says
15  that.
16     Q.    It says "John Lease will shortly be
17  sending the ERM reports to Fairchild and asked"
18  this is Mr. McShae saying you asked, that if we
19  see anything in there that we are not in
20  agreement with we let him know as soon as
21  possible.
22     A.    Okay.
23     Q.    Does this indicate, do you recall
24  asking Mr. McShae for him and Mr. Hendrix,
25  people who are responsible for these further

35 (Pages 1167 to 1170)

JOHN LEASE - CROSS

2 investigations if there is anything they
3 disagreed with about the ERM reports they should
4 tell you about it before you send the reports to
5 Fairchild?
6    A.    I believe so.  Yes.
7    Q.    Let's move up in the chain,
8 Mr. Hendrix, he says "Will do.  How soon
9 before John intends to submit the ERM reports to
10 Fairchild?"
11        Then he goes on to say, "Regardless
12 of the findings or opinions expressed by ERM
13 within their documents, it seems to us that
14 Alcoa clearly has the right to agree or disagree
15 and proceed with whatever course of action you
16 believe is appropriate, given the data.  This is
17 particularly true of the three sites, Torrance,
18 Fullerton and Unruh for which regulatory
19 involvement may be inappropriate or at a minimum
20 premature.  The CEAT projections and bullet
21 lists which mission has prepared obviously
22 reflect this."
23        At this time had Mission prepared
24 CEAT projections and bullet lists that reflect
25 the fact they might disagree with ERM?

JOHN LEASE - CROSS

2    A.    I was not aware they had been
3 prepared.
4    Q.    Mission is clearly qualifies as
5 environmental professionals on your definition;
6 right?
7    A.    I would say yes.
8    Q.    They did the work for Alcoa; right?
9    A.    Yes.
10    Q.    Let's move forward again in time to
11 the next page, Mr. McShae responds.  Again they
12 are talking about ERM Phase IIs; right, sir?
13    A.    Yes.
14    Q.    Mr. McShae respond "I think the
15 main issue here if a contractor we retained to
16 do the work came up with conclusions that we are
17 not in agreement with it would be prudent for us
18 to point this out now to Fairchild so that if we
19 move forward in a manner that is inconsistent
20 with what our Phase II contractor has
21 recommended there is some documentation that
22 Fairchild has been notified.  Focus should be on
23 big picture issues and not the details."
24        Do you see that?
25    A.    Yes.

JOHN LEASE - CROSS

2    Q.    Is it your understanding that does
3 this reflect that Mr. McShae's -- strike that.
4        So, at this time, this is still
5 prior to sending the Phase IIs to Fairchild;
6 right?
7        MR. CHESLER:  Your Honor, excuse
8 me.  So long as we were talking about emails
9 that purported to refer to conversations with
10 Mr. Lease, I remained silent.  But now we are
11 talking about conversations between or among
12 some consultants, there is no indication
13 Mr. Lease ever saw this, he is not copied on any
14 of this string.  He is just reading him
15 documents and asking him to comment on it.  That
16 is not cross-examination.
17        THE ARBITRATOR:  Mr. McShae is an
18 Alcoa person.
19        MR. ZUROFSKY:  Alcoa.  Yes.  Your
20 Honor, the point of this, it started if you
21 recall when Mr. Lease said he thought an
22 environmental professional would read the ERM
23 reports --
24        THE ARBITRATOR:  I understand.
25        MR. ZUROFSKY:  These are the

JOHN LEASE - CROSS

2 environmental professionals.
3        THE ARBITRATOR:  Would you repeat
4 the last question.
5    Q.    I will move on to the next topic.
6        THE ARBITRATOR:  I think you can
7 ask him questions about whether he agrees or
8 disagrees, whatever conclusions he draws from
9 it.
10        MR. CHESLER:  I wouldn't have
11 objected had that been the question.  It wasn't.
12    Q.    Let's move up in time again.  Now
13 we get Mr. Hendrix's response to Mr. McShae
14 about ERM reports.  "How soon does John intend
15 to send the ERM reports to Fairchild?"  Do you
16 see that?
17    A.    Yes.
18    Q.    Then it says "In a general big
19 picture sense, all four sites require more
20 characterization than ERM suggests in their
21 Phase II reports.  This is reflected within our
22 CEAT projections."  Do you see that?
23    A.    Yes.
24    Q.    Does that refresh your recollection
25 Mission disagreed with the scope of the

Page 1175

JOHN LEASE - CROSS

1
2 suggestions, as he calls it in the ERM Phase
3 IIs?
4        A.    I have no recollection about it
5 because I didn't know this was going on.  These
6 are specific discussions between Mr. McShae and
7 Mr. Goltz, all I am doing now is reading what he
8 said.
9        Q.    Let's move forward to the first
10 page.  The email on the top third paragraph.
11 This is from Mr. Hendrix again at Mission;
12 right?
13        A.    Yes.
14        Q.    He says "Also, we should discuss
15 how to best 'abbreviate' these CEAT spreadsheets
16 prior to their submission to Fairchild.
17 Obviously, some of these numbers will scare them
18 a bit, if nothing else.  But I would imagine we
19 will not need to provide excruciating detail to
20 them as to all of our assumption specifics,
21 e.g., to avoid inciting a pissing contest over
22 numbers of borings/wells at each clack cakes,
23 depth of boring/wells, monitoring frequency,
24 duration and type of remediation cost and
25 frequency of new GAC vessels or other O & M

Page 1176

JOHN LEASE - CROSS

1
2 specs, etc. etc. I am sure you already have some
3 ideas as to how to present this data to
4 Fairchild responsibly without violating
5 provisions of the your agreement."
6         Do you recall any discussion, Mr.
7 Lease, with Mr. McShae or Mr. Hendrix about the
8 topic referenced in the paragraph I just read?
9        A.    No.
10        THE ARBITRATOR:    What was
11 Mr. McShae's relationship with you, how did he
12 fit into the hierarchy?
13        THE WITNESS:    Mr. McShae was an
14 engineer in the remediation work group which
15 is --
16        THE ARBITRATOR:    Would he report
17 up to you?
18        THE WITNESS:    No.  That is a
19 completely separate group from the group I'm in.
20 They focus strictly on remediation.  Once the
21 Phase IIs reports were completed and
22 investigation moved forward the remediation work
23 group took control of that process.
24        THE ARBITRATOR:    Your group is
25 called the compliance group?

Page 1177

JOHN LEASE - CROSS

1
2        THE WITNESS:  Yes.
3        Q.    Mr. Lease, at the same time as
4 Mission was scoping out this work they also, as
5 you understand it preparing scope of work and
6 proposals about further investigations they were
7 going to be doing for Alcoa?
8        A.    I am not sure what the activities
9 were with Mission at this time.  They were our
10 consultant for Southern California.  But I
11 wasn't involved in that project from a detail
12 stand point.  It was Larry was running the
13 projects in California and Mr. George was
14 running the projects in Europe.  They were the
15 ones that were having direct contact with the
16 consultants on these matters.
17        Q.    Would you agree with me, Mr. Lease,
18 if Mission was at this time preparing proposals
19 and scope of work about future investigation
20 that is something under the agreement you should
21 have sent to Fairchild?
22        A.    The time I received them from
23 remediation folks, yes.
24        Q.    Actually, let's rephrase the
25 question.  If Mission was preparing scopes of

Page 1178

JOHN LEASE - CROSS

1
2 work and proposals and documents like that for
3 future work, is that something Alcoa under the
4 agreement should provide to Fairchild as you
5 understand it?
6        A.    I would say yes.
7        Q.    Do you know -- strike that.
8         We will go through it in more
9 detail.  Did you ever at any point ask
10 Mr. Hendrix to prepare scopes of work and
11 proposals for purposes of sending to Fairchild?
12        A.    No.
13        Q.    You don't recall doing that?
14        A.    I don't think I met Mr. Hendrix
15 until a few months ago.
16        Q.    Did Mr. McShae ever tell you that
17 he was going to have Mission prepare scopes of
18 work and proposals so you could send to
19 Fairchild?
20        A.    I don't recall what Larry's
21 conversations were or emails were regarding
22 that.
23        Q.    You don't recall if you had that
24 conversation with Mr. McShae or not?
25        A.    No.

Page 1179

JOHN LEASE - CROSS

1    Q.    Let's see the if we can help
2 refresh your recollection. I am going to show
3 you Mr. McShae's deposition.
4        THE ARBITRATOR:  Does this witness
5 know whether they were prepared, A, and B
6 whether they were sent to Fairchild?
7        MR. ZUROFSKY:  Mr. McShae -- that
8 is fine, we can ask that testimony.
9        THE ARBITRATOR:  You can shorten
10 it up by asking the question if he knows.
11    Q.    Do you know?
12    A.    No -- wait.  What was the question?
13        THE ARBITRATOR:  Do you know
14 whether these scopes of work were prepared by
15 Mission Geoscience for the work we are talking
16 about? They did scopes of work.  Proposals.
17        THE WITNESS:  Well, I think
18 they've done scopes of work.  I don't know what
19 work we have been talking about though because
20 there has been a lot of work done.  We sent a
21 lot of scopes of work to Fairchild as fart of
22 this project.  So --
23    Q.    We'll come back.
24    A.    I am losing track of where we are

Page 1180

JOHN LEASE - CROSS

1 in the timeline.
2    Q.    Are you aware of any communications
3 from Alcoa to Fairchild other than
4 communications sent by you and the Harvey letter
5 we looked at in which Alcoa communicated to
6 Fairchild information regarding claims under the
7 indemnity?
8    A.    Any other correspondence?
9    Q.    Yes.
10    A.    Not that I'm aware of.
11    Q.    So you were the primary person
12 responsible for that correspondence; right?
13    A.    Yes.
14    Q.    Likely would have gone through you?
15    A.    Pardon?
16    Q.    It likely would have gone through
17 you if it went to Fairchild?
18    A.    Likely, yes.
19    Q.    Let's move forward.  Let's look at
20 the Torrance facility.  I believe some of these
21 documents may be in your binder with
22 Mr. Chesler, perhaps not all of them.  Let's
23 look at Torrance.
24        The first document I want to look

Page 1181

JOHN LEASE - CROSS

1 at is January 25, 2005.  I don't think it is in
2 your binder.  We will have to look in our binder
3 for that.
4    A.    What is the tab?
5    Q.    January 25, 2005.  Under Torrance
6 which is labeled just Torrance.  It says
7 Torrance?
8        THE ARBITRATOR:  Talking about in
9 your book?
10        MR. ZUROFSKY:  Yes, in our book,
11 your Honor.
12    Q.    Do you see that, Mr. Lease?
13    A.    Okay.  I'm there.
14    Q.    Are you aware of any communication
15 between Alcoa and Fairchild regarding the
16 Torrance facility other than the letters we
17 looked at this morning regarding compliance
18 issues, we are now on contamination.  With
19 respect to contamination between the letters
20 with Mr. Beckford regarding Phase IIs and this
21 letter of January 25, 2005?
22    A.    The transmittal letter with the
23 Phase IIs?
24    Q.    Right. Mr. Beckford wrote back to

Page 1182

JOHN LEASE - CROSS

1 you, remember we looked at that document?
2    A.    Yes.
3    Q.    With the chart.  So between the
4 time of that document when Mr. Beckford says
5 please discuss further investigative measures
6 with Michael Hodge until this document, January
7 25, 2005, are you aware of any additional
8 correspondence regarding contamination issues at
9 the Torrance facility from Alcoa to Fairchild?
10    A.    I am not aware of any, no.
11    Q.    Let's look what this letter says.
12 This letter says, "Enclosed for your information
13 are reports summarizing the result of recent
14 soil and groundwater investigative activities
15 undertaken by Alcoa at the former Fairchild
16 facilities in Torrance and Fullerton." Do you
17 see that, sir?
18    A.    Yes.
19    Q.    Were you transmitting to
20 Mr. Beckford at that time reports of
21 investigations that had already been done?
22    A.    Yes.
23    Q.    That is the first communication to
24 Fairchild regarding contamination issues at

MERRILL LEGAL SOLUTIONS
(800) 325-3376     www.MerrillCorp.com

Page 1183

JOHN LEASE - CROSS

1
2  Torrance following his request that you discuss
3  investigations before doing them with
4  Mr. Michael Hodge to your recollection; right?
5      A.    That's my recollection.
6      Q.    It also covers Fullerton; right?
7      A.    Pardon?
8      Q.    This letter also addresses
9  Fullerton; right?
10     A.    Yes.
11     Q.    Turn two pages forward, there is a
12  chart; right? Do you see that there?
13     A.    Yes.
14     Q.    This chart lists up a bunch of
15  investigations done at the Southern California
16  facilities; correct?
17     A.    Correct.
18     Q.    It totaled to $1 million,
19  1,073,208; right?
20     A.    Yes.
21     Q.    With respect to, I will still with
22  Torrance and Fullerton right now.
23           THE ARBITRATOR:  Just a minute.
24           MR. ZUROFSKY:  Sorry, your Honor.
25           THE ARBITRATOR:  Where are you on

Page 1184

JOHN LEASE - CROSS

1
2  the chart?
3           MR. ZUROFSKY:  The chart attached
4  to Mr. Lease's January 25, 2005 letter.  A chart
5  of costs headed table 1 remedial project costs.
6      Q.    These are costs already been
7  incurred by Alcoa as of the time of this letter;
8  right, Mr. Lease?
9      A.    Yes.
10     Q.    Therefore contamination related
11  issues at these facilities; right?
12     A.    That's true.
13     Q.    If you look at, say, Torrance, the
14  items listed are vadose and groundwater
15  investigation, do you see that, Phase I and
16  Phase II?
17     A.    Yes.
18     Q.    Vadose being soil, right, sir?
19     A.    I don't know.
20     Q.    Next one, project coordination?
21     A.    Yes.
22     Q.    Next item is remediation transition
23  management?
24     A.    Yes.
25     Q.    If you look over review previous

Page 1185

JOHN LEASE - CROSS

1
2  remedial consultant documents, do you see that,
3  site recon, meeting with client?
4      A.    Yes.
5      Q.    You never informed before this
6  document, did you-Fairchild that Alcoa had fired
7  EnviroSolve the incumbent consultants and hired
8  Mission Geoscience for the Southern California
9  facilities; did you?
10     A.    I am not sure where EnviroSolve
11  were working at the time, if they were working
12  on all the California sites or City of Industry.
13  I know they were working at City of Industry on
14  the pump and treat system.  I don't know if they
15  were actively employed by Fairchild at the time
16  at the other facilities or not.
17     Q.    Let's break it down.  At the time
18  of the acquisition EnviroSolve was consultants
19  doing at least some work at some of the Southern
20  California facilities when Alcoa took over;
21  correct?
22     A.    Specifically COI from what I
23  recall.  I don't know about the others.
24     Q.    From that time Alcoa retained,
25  continued to retain EnviroSolve for a period of

Page 1186

JOHN LEASE - CROSS

1
2  time, right, we looked at invoices yesterday
3  with Mr. Chesler showed you?
4      A.    I think those are for COI.
5      Q.    The answer is yes?
6      A.    Yes.
7      Q.    At some point however, Alcoa
8  stopped using EnviroSolve; right?
9      A.    That's correct.
10     Q.    Started using Mission Geoscience;
11  right?
12     A.    Yes.
13     Q.    What I am asking you before Mission
14  had done any of those investigations, did Alcoa
15  inform Fairchild that they were switching from
16  EnviroSolve to Mission Geoscience for the work?
17     A.    No, not that I'm aware of.
18     Q.    We looked at email, Exhibit 134
19  that showed as early as October 2003, that is
20  before it is contemplating the Phase IIs
21  investigations are sent to Fairchild Mission was
22  already on board; right?
23     A.    You have to talk to Larry about
24  that.  I don't know what the arrangement was
25  with Mission.

39  (Pages 1183 to 1186)

Page 1187

JOHN LEASE - CROSS

1      JOHN LEASE - CROSS
2    Q.  I am coming back to entry under
3  Torrance "remediation transition management"
4  $10,000?
5    A.  Okay.
6    Q.  Is that as you understand it cost
7  related to the transition cost from EnviroSolve
8  to Mission Geoscience?
9    A.  All I can say what it says here.
10  They are reviewing previous remedial consultants
11  documents, site recon, meeting with clients.
12  That is the extent of what I know about that.
13    Q.  Did you do any efforts to find out
14  what that was about before sending this on to
15  Fairchild for indemnification?
16    A.  No.
17    Q.  These are costs already incurred
18  you sent that bill. Let's move forward in time.
19  I want to move two letters forward. We can go
20  to your binder, they are in your binder,
21  actually. Let's do those. I am looking at tab
22  32 in your binder. Tab 32. Do you see that,
23  sir?
24    A.  Yes.
25    Q.  At some point in 2005 the

Page 1188

JOHN LEASE - CROSS

1      JOHN LEASE - CROSS
2  Department of Toxic Substances -- Toxic
3  Substance Control came to visit the Torrance
4  facility; correct, sir?
5    A.  Did you say 2005?
6    Q.  Yes.
7    A.  I think it was 2006.
8    Q.  That they came to visit? I am not
9  referring to when they filed a report. They
10  came to visit.
11    A.  It says the site visit was
12  conducted on January 13, 2006.
13    Q.  Let me rephrase. I apologize for
14  that. At some point in 2005 the Department of
15  Toxic Substances approached the Torrance
16  facility and Alcoa about entering into Consent
17  Agreement with respect to the Torrance facility;
18  correct?
19    A.  I don't know. I am not aware of
20  that.
21    Q.  Let's look at some documents and
22  see if that refreshes your recollection.
23        (Arbitration Exhibit 431
24  was marked.)
25    MR. CHESLER:  Does this have a

Page 1189

JOHN LEASE - CROSS

1      JOHN LEASE - CROSS
2  number?
3    MR. ZUROFSKY:  431.
4    Q.  Do you see this document, sir?
5    A.  Yes.
6    Q.  Let me refer you to page on the
7  bottom right FAIR 0018018. Do you see that
8  page, sir?
9    A.  Not yet. Can you say it again.
10    Q.  FAIR 0018018 are you with me?
11    A.  Not yet. Okay.
12    Q.  A letter from department of toxic
13  substance control. Do you see that?
14    A.  Yes.
15    Q.  Addressed to Douglas McCauley, who
16  is Douglas McCauley?
17    A.  I think Doug was one of the, he
18  might have been the second person overseeing the
19  work that was going on in Southern California
20  for Alcoa.
21    Q.  Does this reflect -- refresh your
22  recollection, sir, at least or as early as
23  September 2005 department of toxic substance
24  control as referenced here provided the Torrance
25  facility or Alcoa in general with a draft

Page 1190

JOHN LEASE - CROSS

1      JOHN LEASE - CROSS
2  Consent Agreement for that facility?
3    A.  Yes.
4    Q.  It does?
5    A.  Yes.
6    Q.  What is a Consent Agreement with a
7  government agency?
8    A.  I am not an attorney, but it is
9  basically an agreement that both parties agree
10  as to what is going to be done.
11    Q.  A facility doesn't have to enter
12  into a Consent Agreement by law, it is an
13  agreement; right, as you understand it?
14    A.  I don't know. I am not a lawyer.
15    Q.  Do you recall there was a debate in
16  Alcoa regarding whether or not they should enter
17  into this Consent Agreement for the Torrance
18  facility?
19    A.  I wasn't party to any conversations
20  involved around the Consent Agreement, so I
21  can't say.
22    Q.  Let's see if this refreshes your
23  recollection. This is 293. Maybe it has not
24  been previously introduced.
25    THE ARBITRATOR:  Is this a

Page 1191

JOHN LEASE - CROSS

1    JOHN LEASE - CROSS
2  Deposition Exhibit?
3        MR. ZUROFSKY:  Yes, it is, your
4  Honor, 293.
5        Q.    I want to turn your attention to
6  page 79726.
7        MR. CHESLER:  What number did you
8  give this exhibit?
9        MR. ZUROFSKY:  It was already 293.
10       Q.    Look on 79726.
11       A.    Okay.
12       Q.    Bottom there, there is an exchange,
13  the middle one between Mr. McCauley who you say
14  took over for Mr. McShae?
15       A.    McCauley to Hendrix?
16       Q.    Yes.  You see that?
17       A.    Yes.
18       Q.    His question is "what happens if we
19  don't sign and just proceed with voluntary
20  clean-up?"  Do you see that?
21       A.    Yes.
22       Q.    He is responding to an email from
23  Mr. Hendrix below; right?
24       A.    Yes, appears so.
25       Q.    I want to focus on the, turn the

Page 1192

1    JOHN LEASE - CROSS
2  page, the paragraph that spans the page, the one
3  beginning on the bottom line; do you see that?
4        A.    Bottom on 79726?
5        Q.    Yes.
6        A.    I'm there.
7        Q.    The bottom line is that "Alcoa will
8  not be able to get any regulatory agency in
9  California to oversee a large site remediation
10  such as Torrance without some form of Consent
11  Agreement."  This is Mr. Hendrix talking "If we
12  decided to change direction with our oversight
13  strategy not recommended and switch to the LA
14  Water Board, for example Alcoa would still be
15  asked to do the same sort of thing.  No mystery
16  to you CA provides CAL EPA with both a cost
17  recovery mechanism for their oversight and
18  shares the assessment and remedial process
19  follows requirements of the state health and
20  safety code closure and closure itself may be
21  demonstrated to appropriately protective of
22  human health and environment.  Of course it also
23  formally puts Alcoa on the legal hook as it was
24  as RP for the clean-up but on the upside it
25  provides Alcoa with an airtight basis for cost

Page 1193

1    JOHN LEASE - CROSS
2  recovery from Fairchild for remedial tasks which
3  are officially required by statute."
4        THE ARBITRATOR:  What does RP
5  stands for.
6        Q.    Does it stand for responsible
7  party, Mr. Lease?
8        A.    I don't know.
9        Q.    Do you see that language I just
10  read?
11       A.    Yes.
12       Q.    Does that refresh your recollection
13  there was debate between Alcoa, its consultants
14  about whether or not discussion about whether or
15  not to entered into this Consent Agreement?
16       MR. CHESLER:  Let me interpose an
17  objection.  This is an email string between and
18  among people which do not involve Mr. Lease.  He
19  is not being impeached with it.  He didn't
20  profess to have a failure of recollection about
21  this subject.  He said he didn't know about it.
22  There is a difference.
23       THE ARBITRATOR:  I guess he is
24  asking does it refresh his recollection as to
25  the subject matter.  As to what was occurring he

Page 1194

1    JOHN LEASE - CROSS
2  was in charge of this thing.  He either knew
3  about it or he didn't.
4        MR. CHESLER:  That is my point.
5  He said he didn't know about it then he shows
6  him a document and says does it refresh his
7  recollection.  He didn't recall anything about
8  it.
9        THE ARBITRATOR:  I will allow it.
10       MR. ZUROFSKY:  Where we are going
11  which is telling Fairchild about these things.
12  So let's move forward.
13       Q.    That email is November 9, 2005, we
14  looked at the September letter from the
15  Department of Toxic Substances.  Now let's move
16  on to tab 32 in Mr. Chesler's binder.  Do you
17  see that, Mr. Lease?
18       A.    Tab 32.
19       Q.    A letter from you to Ms. Hall dated
20  February 22, 2006; right?
21       A.    Yes.
22       Q.    What you're saying here the caption
23  report is enclosed for your review.  You are
24  sending Ms. Hall a report of investigation or
25  assessment that had already been done at that

41  (Pages 1191 to 1194)

JOHN LEASE - CROSS

1  JOHN LEASE - CROSS
2  point; right report by DTSC?
3      A.   Yes.  This is report from the DTSC,
4  right.
5      Q.   The report present findings from
6  California Department of Toxic Substances
7  Control DTSC site visit that was conducted
8  January 13, 2006 at the Torrance, California
9  facility to verify information contained in the
10 Phase I environmental assessments checklist
11 submitted on December 27, 1996 by Fairchild
12 Fasteners.  Do you see that?
13     A.   Yes.
14     Q.   There is some discussion yesterday
15 about that Phase I checklist from 1996.  Do you
16 know what a Phase I checklist is, sir?
17     A.   No.
18     Q.   You answered I think Judge
19 Stapleton's question beige saying you thought
20 the Consent Agreement covered the same subject
21 matter as Phase I checklist.
22     A.   When did I say that.
23     Q.   You said that yes.  I am
24 confirming --
25     A.   I don't remember saying that.  I am

1  JOHN LEASE - CROSS
2  not sure that is the case.
3      Q.   You don't know what this particular
4  Phase I checklist was about; right?
5      A.   I am not even sure, did we talk
6  about this yesterday?
7      Q.   I think you did.  If you don't
8  know.  I am asking you now do you know what it
9  is about?
10     A.   I don't recall.
11     Q.   Moving forward the rest of the
12 letter says "The DTSC representatives also
13 investigated additional solid waste management
14 units and areas of concern that would require
15 further investigation."  Is there any mention in
16 this letter on February 22, 2006 about the
17 Consent Agreement that had been proposed by the
18 Department of Toxic Substances Control to Alcoa?
19     A.   No.  This was a transmittal letter
20 for this report.
21     Q.   As of February 22, 2006 you didn't
22 say anything about the Consent Agreement to
23 Fairchild; had you?
24     A.   As far as correspondence is
25 concerned?

1  JOHN LEASE - CROSS
2      Q.   Yes.
3      A.   I am not aware of any that was sent
4  related to the Consent Agreement.
5      Q.   Are you aware of any other
6  communications to Fairchild about draft Consent
7  Agreement we looked at two exhibits ago?
8      A.   I don't recall any, no.
9      Q.   That letter from DTSC we saw from
10 September 2005 is about five months earlier?
11     A.   Which letter.
12     Q.   The one two exhibits ago remember I
13 put in front of you Exhibit --
14     A.   The one to Doug McCauley?
15     Q.   Yes, sir.
16     A.   September 19, yes, I see that now.
17     Q.   About five months earlier; right?
18     A.   Right.
19     Q.   You don't say anything about that
20 or Consent Agreement to Ms. Hall in this letter,
21 February 22, 2006; right?
22     A.   I don't appear to, no.
23     Q.   Let's turn the page -- actually in
24 your tab I don't think, I think it is two tabs
25 forward in your book tab 34?

1  JOHN LEASE - CROSS
2      A.   Okay.
3      Q.   Here is March 2, 2006 you writing
4  again to Ms. Hall; right?
5      A.   Yes.
6      Q.   Here you are attaching Consent
7  Agreement; right?
8      A.   Yes.
9      Q.   This is the first time that the
10 Consent Agreement was mentioned as you
11 understand it in any communications with
12 Fairchild; right?
13     A.   I believe so, yes.
14     Q.   What is the date it says is the
15 effective date of the Consent Agreement?
16     A.   The date of the Consent Agreement?
17     Q.   Yes.  There is an effective date
18 listed in your first paragraph.
19     A.   February 21, 2006.
20     Q.   That is the day before the letter
21 we just looked at to Ms. Hall on February 22,
22 2006; right?
23     A.   Yes, it is.
24     Q.   Move forward -- one of the things
25 you say here second paragraph you say "This

JOHN LEASE - CROSS

1           JOHN LEASE - CROSS
2 Consent Agreement is result of the DTSC's
3 reported findings which we received on January
4 13, 2006, and which we forwarded to you on
5 February 22, 2006." Do you see that?
6    A.   Yes.
7    Q.   That is the letter we just looked
8 at before; right?
9    A.   Yes, it is.
10    Q.   But we looked earlier, did we not
11 at the drafts of the Consent Agreement that
12 dated all the way back to September 2005; right?
13    A.   Yes.
14    Q.   So clearly the Consent Agreement
15 was a topic of discussion before the January 13
16 report; right?
17    A.   Apparently so.
18    MR. ZUROFSKY: I am about to
19 switch topics, your Honor. It is almost 12:25.
20 You want to do Powell after lunch. Should we do
21 lunch now? Maybe do lunch now we will resume
22 this afterward.
23    THE ARBITRATOR: How much longer
24 do you think you will be?
25    MR. ZUROFSKY: It depends again,

1       ROBERT L. POWELL - DIRECT
2 of course, what the items are that are in the 10
3 percent. If that matches up, that should be
4 fine, then I don't have that much more after
5 that.
6    THE ARBITRATOR: We will take our
7 lunch break.
8
9    (Luncheon Recess: 12:24 p.m.)
10 A F T E R N O O N   S E S S I O N
11        1:15 p.m.
12
13      ROBERT L. POWELL,
14 having been first duly sworn by the Notary
15 Public (Tammey M. Pastor), was examined and
16 testified as follows:
17    MR. SLIFKIN: Pursuant to our
18 arrangement with respect to Mr. Lease, the next
19 witness will be Robert Powell.
20 DIRECT-EXAMINATION BY MR. SLIFKIN:
21    Q.   Could you please state you full
22 name, sir.
23    A.   Robert Leslie Powell.
24    Q.   I believe it is Dr. Powell; is that
25 right?

1      ROBERT L. POWELL - DIRECT
2    A.   That's correct.
3    Q.   By whom are you employed, Dr.
4 Powell?
5    A.   Environ International Corporation.
6    Q.   Who are they?
7    A.   Environ is a private consulting
8 firm that does work in the public health
9 environmental science and engineering and health
10 and safety fields.
11    Q.   What has Environ's involvement been
12 in this matter?
13    A.   We were retained by the Cravath law
14 firm to provide expert opinions with regard to
15 the claims brought by Alcoa under the indemnity
16 agreement.
17    Q.   I would like to hand out
18 Exhibit 137, your Honor. Can you please tell us
19 what Exhibit 137 is?
20    A.   This is Environ's Expert Report in
21 this matter.
22    Q.   Now, if you could turn to tab 34 in
23 this document, please. Do you that, sir?
24    A.   Yes.
25    Q.   A series of CVs, the first one, I

1      ROBERT L. POWELL - DIRECT
2 believe is yours?
3    A.   That's correct.
4    Q.   Obviously this document is already
5 in the record. Perhaps you can briefly explain
6 for us the relevant education and experience
7 that you have relevant to the task at hand.
8    A.   Okay. I am an engineer by
9 training, environmental engineer. I also have
10 graduate degrees in hydrology and in groundwater
11 hydrology.
12    I have been practicing for about 30
13 years as a consultant. The vast majority of
14 that has been dealing with projects involving
15 various types of pollution. In particular,
16 since receiving my Ph.D. in 1983 I have focused
17 almost exclusively on issues involving water
18 pollution and soil pollution at industrial
19 facilities. Much of that work was done over a
20 16 year period when I lived in California. And
21 I did extensive work on many of the largest
22 Superfund sites, hazardous waste management
23 sites and many industrial facilities in
24 California that involved issue of soil and
25 groundwater pollution.

43 (Pages 1199 to 1202)

Page 1307

1        JOHN LEASE - CROSS
2   contamination was in fact covered?
3        A.   Yes.
4        MR. SLIFKIN:   Thank you.
5        MR. ZUROFSKY:   I have nothing
6   further.
7        THE ARBITRATOR:   Thank you very
8   much, sir.
9        (Witness excused)
10       JOHN LEASE,
11  resumed, having been previously duly sworn, was
12  examined and testified further as follows:
13    CROSS-EXAMINATION CONTINUED BY MR. ZUROFSKY
14       Q.   Mr. Lease, before the break, before
15  lunch, we were discussing you recall
16  environmental contamination issues, notice, the
17  three types of notice and environmental
18  contamination issues, do you recall that?
19       A.   Yes.
20       Q.   We spent the morning talking about
21  compliance issues, there is this issue of the 10
22  percent with the chart now we are on to
23  contamination.
24       Do you recall we were also talking
25  about the Torrance facility and Consent

Page 1308

1        JOHN LEASE - CROSS
2   Agreement at the Torrance facility right before
3   lunch?
4        A.   Yes.
5        Q.   You have sent to Fairchild, since
6   the execution of that Consent Agreement a number
7   of claims for indemnity; correct for Torrance?
8        A.   Subsequent to?
9        Q.   Yes.
10       A.   I have to check and see the record.
11       Q.   Let's quickly go through them,
12  hopefully quickly.
13       If you look in the binder I
14  provided to you, correspondence binder which
15  hopefully is still up there, do you have it?
16       A.   In the Torrance section?
17       Q.   Yes. In the Torrance section there
18  is the little label that says Torrance. If you
19  move forward we had paused on the Consent
20  Agreement which was a letter dated March, I
21  believe it was 2nd. Which is also in Mr.
22  Chesler's binder, at I believe tab 34 I think it
23  will be, yes 34. Looking at the March 2 letter?
24       A.   Looking at the March 2 letter?
25       Q.   Yes. I want to look at it in the

Page 1309

1        JOHN LEASE - CROSS
2   correspondence binder I gave you because we will
3   look at some subsequent.
4        A.   Okay, I have that letter.
5        MR. CHESLER:   Sorry, what is the
6   date?
7        MR. ZUROFSKY:   March 2 was the
8   date of the letter we were looking at right
9   before lunch.
10       THE ARBITRATOR:   March 2006.
11       Q.   March 2 of 2006. We talked about
12  that Consent Agreement at length before lunch.
13  I want to move forward in time to April 12, 2006
14  letter for Torrance.
15       A.   Okay.
16       Q.   This is a notice letter from you to
17  Ms. Hall; is that right?
18       A.   Yes.
19       Q.   This is a notice letter in the
20  third category of notice; right?
21       A.   The third category?
22       Q.   Remember we had three categories of
23  notice, we talked about first one being notice
24  of a condition, second one being here is what we
25  are going to do about it. The third one being

Page 1310

1        JOHN LEASE - CROSS
2   here is the bill for work already done.
3        A.   I am just reading the attachments
4   here to see what I said what the attachment was.
5   There is a payment to DTSC referenced here.
6        Q.   Right. You are saying those
7   payments are in your view indemnifiable; right?
8        A.   That's correct.
9        Q.   Same thing with the next letter in
10  the binder; right? You're saying these are being
11  done, these payments are being done pursuant to
12  the Consent Agreement as well? Take the first
13  question first.
14       A.   Which letter are we on now?
15       Q.   Sorry, June 5, 2006.
16       A.   Okay. The scope of work?
17       Q.   Yes.
18       A.   Okay.
19       Q.   This was something sent, was it
20  not, to the Department of Toxic Substances
21  before it was sent to Fairchild? The scope of
22  work was prepared?
23       A.   It looks like the scope of work
24  went to DTSC in May. My letter of June 5th.
25       Q.   Right. You're saying that you're

MERRILL LEGAL SOLUTIONS
(800) 325-3376        www.MerrillCorp.com

Page 1311

JOHN LEASE - CROSS

1           JOHN LEASE - CROSS
2 claiming to Ms. Hall the costs of that, the
3 scope of work that you say was done pursuant to
4 the Consent Agreement are reimbursable in your
5 June 5 letter; right?
6     A.    That's correct.
7     Q.    Next is June 23rd. I realize this
8 one is unsigned in the book.
9     A.    Yes.
10    Q.    Do you recall sending a letter to
11 Ms. Hall around June, on or about June 23, 2006
12 in sum and substance reflected here, I believe
13 it is perhaps the signed one may be a version --
14 no, the one in Mr. Chesler's book is also
15 unsigned. So perhaps the signed one is not
16 about.
17    A.    This is the transmittal letter.
18    Q.    Again, is this something you are
19 claiming the costs of which are reimbursable
20 because of the -- as a result of the Consent
21 Agreement?
22    A.    Yes. We make that notification.
23    Q.    Next one as well, July 31, 2006.
24 Same issue?
25    A.    Yes.

Page 1312

1           JOHN LEASE - CROSS
2    Q.    Then there is only one more. Let
3 me just close this out. October 17, 2006, same
4 question.
5    A.    Okay.
6    Q.    Yes, agree? You're sending this
7 letter to Ms. Hall saying you owe us these costs
8 because we took them pursuant to the Consent
9 Agreement; is that correct?
10    A.    That's correct.
11    Q.    Let's switch to the Kelkheim
12 facility. I want to move to Europe for a
13 minute, exciting. Do you see the Kelkheim
14 letters?
15    A.    No. Not yet.
16    Q.    Under tab of Kelkheim.
17       MR. CHESLER: There is no Kelkheim
18 tab.
19       MR. ZUROFSKY: I have a Kelkheim.
20 It is the second to the last one in European
21 dated February 20, 2006.
22       MR. CHESLER: I have it now.
23    Q.    FC 003882. What is going on here,
24 are you providing a report for work that had
25 board been done at the Kelkheim facility to

Page 1313

1           JOHN LEASE - CROSS
2 Ms. Hall?
3    A.    Okay. I see that.
4    Q.    Yes. Is that what's going on in
5 this letter you're providing Ms. Hall reports
6 for work that had already been done and
7 demanding payment for those, that work?
8    A.    There is a proposal in here. I am
9 not sure exactly if that was work that had been
10 done at this point. It was still in progress.
11 And the second document is a letter.
12    Q.    A letter to?
13    A.    To appears to be an environmental
14 representative from Wiesbaden for De
15 Recordation.
16    Q.    The regulator?
17    A.    I am not sure if he is a regulator.
18    Q.    Had Alcoa contacted the regulators
19 in Germany regarding the Kelkheim facility and
20 undertaken investigative work by the time of
21 this letter?
22       I'll ask it both ways. Had Alcoa
23 contacted regulators in Germany on this facility
24 prior to the date of this letter?
25    A.    I don't know.

Page 1314

1           JOHN LEASE - CROSS
2    Q.    Look at the second paragraph you
3 say "As a result of these studies the
4 authorities agreed in May 2005," does that
5 refresh your recollection that Alcoa had
6 discussions with these authorities on these
7 investigations?
8    A.    Yes.
9    Q.    It was as a result of these studies
10 so Alcoa performed studies at Kelkheim prior to
11 contacting or prior to having discussions with
12 the regulators?
13    A.    It doesn't say that.
14    Q.    I am asking if it refreshes your
15 recollection as to whether or not you performed
16 the studies before you spoke to the regulators?
17    A.    I wasn't involved in the study, so
18 I am not sure what the sequence here. I can't
19 comment.
20    Q.    We will move on. Let's talk about
21 Hildescheim. Did Alcoa performed work
22 investigative work at Hildescheim following the
23 Phase IIs?
24    A.    I would need to refresh my memory.
25    Q.    Let's look at tab 38 in Mr.

JOHN LEASE - CROSS

1
2 Chesler's binder. The very last page.
3    A.    Hildescheim.
4    Q.    Yes.
5    A.    I see one project listed.
6    Q.    Which one? 210, is that the one?
7    A.    I see confirmatory groundwater
8 sampling.
9    Q.    Right. That one; right? Does that
10 refresh your recollection that Alcoa performed,
11 it says confirmatory groundwater investigation,
12 Alcoa performed investigations at Hildescheim?
13    A.    That would refresh my recollection
14 they did a project there.
15    Q.    Do you recall at any point ever
16 telling Fairchild about that prior to this
17 arbitration? I should say prior to the provision
18 of these types of charts, the first one dates
19 actually prior to this arbitration.
20    A.    Prior notice for this?
21    Q.    Yes.
22    A.    Would have been in the Phase II
23 report.
24    Q.    That is all you recall about that?
25    A.    I haven't looked back at the

JOHN LEASE - CROSS

1
2 correspondence file to see if there is a letter
3 for this.
4    Q.    Are you aware of any correspondence
5 or communications? The documents are there, but
6 are you aware outside of --
7    A.    I would have to check the records.
8    Q.    Mr. Lease, in preparing documents,
9 in connection with ERM's Phase IIs did Alcoa
10 participate in the editing, did it provide
11 comments and edit those documents before they
12 were sent to Fairchild?
13    A.    I believe there were technical
14 reviews conducted.
15    Q.    Were you involved in that?
16    A.    To some degree. Not so much on the
17 technical aspect. Just on readability. Form.
18    THE ARBITRATOR: Which reports are
19 these that you're referring?
20    MR. ZUROFSKY: The Phase IIs
21 before they were sent to Fairchild.
22    Q.    Here is document 170 previously
23 introduced at depositions, I believe. The top
24 email is from you; right, Mr. Lease?
25    A.    Yes, it is.

JOHN LEASE - CROSS

1
2    Q.    The subject line is French law for
3 reporting and remediation. Do you see that
4 there?
5    A.    Yes.
6    Q.    We have had some discussion over
7 the first few days of this hearing, have we not,
8 about that section in ERM's report that deals
9 with French reporting requirements, do you know
10 which one I'm talking about?
11    A.    French reporting?
12    Q.    Yes. In the Phase IIs there is a
13 discussion of French reporting; right?
14    A.    I believe there is, yes.
15    Q.    You have heard testimony about that
16 at this hearing a couple different times?
17    A.    Yes.
18    Q.    Is that the section, as you
19 understand it, in July of 2003 that is being
20 addressed in this email?
21    A.    Yes.
22    Q.    So, I'd like to with that
23 background, look at the top email in the email
24 from you. If you look down four paragraphs,
25 beginning "At any rate." Do you see that there?

JOHN LEASE - CROSS

1
2    A.    In parentheses?
3    Q.    No. Sorry the one before. "At any
4 rate."
5    A.    Okay.
6    Q.    I want to go down -- you say "At
7 any rate, we still need French legal review of
8 these sections before we go to final with the
9 reports." DO you see that?
10    A.    Yes.
11    Q.    The distribution group on this
12 email is only internal Alcoa people; right, this
13 is not many could meant back to ERM?
14    A.    I don't see anybody from ERM on
15 this list.
16    Q.    If you look down seven lines in
17 that paragraph beginning "As we go."
18    A.    Yes.
19    Q.    "As we go through this exercise,
20 let's keep in mind that reimbursement from the
21 escrow fund remedial work under the sales
22 agreement is tied to regulatory drivers and/or
23 risk assessment." Do you see that?
24    A.    Yes.
25    Q.    When you were making comments on

JOHN LEASE - CROSS

1  JOHN LEASE - CROSS
2  ERM -- when Alcoa was making comments on ERM's
3  Phase II reports was one of the things they had
4  in mind comments that would most likely satisfy
5  the requirements of the agreement for
6  indemnification?
7      A.    My comments here were really to
8  ensure we were clear from a legal standpoint as
9  to how the French law was read.  And in fact
10  said.
11          It wasn't intended to dictate how
12  the technical portion of the report should be
13  phrased to meet any condition that we felt at
14  the escrow fund.  My intent to try to get clear
15  language in the Phase IIs with French review, or
16  counsel review to make sure we understood what
17  the guidelines were in France.
18      Q.    Just so we're clear, this is prior
19  to the time when you submitted those reports to
20  Fairchild, the Phase II reports?
21      A.    Yes.  This would have been before
22  then.
23      Q.    You are now taking the position
24  that those Phase II reports provided financial
25  with notice of the subsequent investigations

1  JOHN LEASE - CROSS
2  that Alcoa was going to take?
3      A.    Yes.
4      Q.    Let's look at the French
5  facilities.  I believe Mr. Chesler's binder
6  contains some documents related to the
7  Montbrison facility.  It is on tab 26.  I think
8  the first one.
9      A.    Which tab?
10      Q.    Let's do the Phase II.  Tab 25,
11  page 25.
12      A.    Okay.
13      Q.    You have seen this reporting
14  section of this document before; right?
15      A.    The Phase II report?
16      Q.    Yes.
17      A.    Yes, we reviewed it in part
18  yesterday.
19      Q.    It talks about it being generally
20  understood as good management practice to
21  communicate relevant information to the
22  regulatory authorities, do you recall that?
23      A.    In this report?
24      Q.    Yes.
25      A.    I don't recall specifics in here.

1  JOHN LEASE - CROSS
2      Q.    This section does not say or
3  anywhere in the Phase II, do you know if it says
4  that Alcoa will in fact be reporting to the
5  regulatory authorities the findings of the Phase
6  II?
7      A.    Pardon?
8      Q.    Are you aware of any part of the
9  Phase II report in which Alcoa or ERM says that
10  Alcoa will in fact be reporting the findings of
11  that investigation to the regulators?
12      A.    In any Phase II report or this
13  Phase II?
14      Q.    Any.
15      A.    I really haven't read these in any
16  detail.  Pretty much from the point that the
17  contract ended with ERM, as far as the Phase II
18  studies were concerned, I didn't get involved in
19  the technical aspects of the reports.
20      Q.    All I am asking, sir, are you aware
21  in any of the Phase IIs whether or not it
22  contains a statement that says something to the
23  effect of Alcoa will be reporting, not that it
24  is good practice, but it will be reporting the
25  results to regulators?

1  JOHN LEASE - CROSS
2      A.    I don't know.
3      Q.    Turn to tab 26, please.  February
4  25, 2005 letter to Ernesto Beckford.  Right?
5      A.    Yes.
6      Q.    At this point in time of this
7  letter had Alcoa contacted the French DRIRE and
8  provided results of investigations to the DRIRE?
9      A.    Yes.  There appears to be a letter
10  from Alcoa to the DRIRE.  It is referenced in
11  the letter.
12      Q.    Let's turn to 27.
13      A.    Okay.  I'm there.
14      Q.    Is this again here you're
15  reflecting some attachments.  If you look at the
16  first two the first one says a note from the
17  DRIRE inspector.  Do you see that?
18      A.    Yes.
19      Q.    Then the second one says a response
20  to the DRIRE inspector dated May 22?
21      A.    Response to the DRIRE inspector,
22  yes.
23      Q.    Had Alcoa provided the note from
24  the DRIRE inspector to Fairchild before it
25  responded to the DRIRE inspector, do you know?

73 (Pages 1319 to 1322)

Page 1323

JOHN LEASE - CROSS

1      A.    We provided Fairchild with the
2  letter to the authorities which would have been
3  the DRIRE. This letter I provided the note from
4  the inspector back to Alcoa and our response to
5  his letter. Response to his comments.
6      Q.    So, in fact Alcoa had responded to
7  the DRIRE's comments before sending those
8  comments to Fairchild?
9      A.    Yes.
10     Q.    I want to come back state side and
11 talk about Fullerton a little bit. At the time
12 following the Phase IIs as we just saw with Dr.
13 Powell, Alcoa was aware, as was Fairchild, that
14 there had been an approval for a plan for a soil
15 vapor extraction system at the Fullerton
16 facility?
17        MR. CHESLER: Your Honor, I
18 object. That is not what the testimony was. We
19 just heard the expert talk about, he asked the
20 same question before, wasn't this an approval of
21 the plan. The expert testified clearly it
22 wasn't.
23        MR. ZUROFSKY: I think he said it
24 was conditioned on the pilot testing, he said

Page 1324

JOHN LEASE - CROSS

1  conditional approved.
2        MR. CHESLER: Conditioned upon the
3  pilot testing, you just put that in because I
4  objected to your question.
5        THE ARBITRATOR: He used the word
6  conditional approval.
7      Q.    You understood at the time there
8  was conditional approval of a SVE system at the
9  Fullerton facility?
10     A.    Personally I didn't.
11     Q.    Now Fullerton is another facility
12 where following the Phase IIs Alcoa conducted
13 further investigations; right?
14     A.    I believe that's true.
15     Q.    If you look under the Fullerton tab
16 of the binder I gave you --
17     A.    Your binder?
18     Q.    Yes, sir.
19     A.    Okay.
20     Q.    I want to move forward in time
21 chronologically. To January 25th, 2005. We
22 looked at this letter in connection with
23 Torrance but it also applies to the Fullerton
24 facility?

Page 1325

JOHN LEASE - CROSS

1      A.    Okay.
2      Q.    Is this notifying Fairchild here
3  that an investigation had taken place at the
4  Fullerton facility prior to this date?
5      A.    Yes.
6      Q.    That is an investigation that was
7  after this Phase II investigation?
8      A.    Yes, this would have been after.
9      Q.    Let's move forward in time to the
10 next correspondence. Actually two forward,
11 excuse me. So it is a letter dated April 8th.
12 Then I want to go one more past that. The May
13 9th. Do you see that, Mr. Lease?
14     A.    May 9?
15     Q.    May 9, 2005.
16        MR. CHESLER: I don't have a May 9
17 in mine. Mine goes to February 15.
18        MR. ZUROFSKY: You don't have that
19 letter?
20        MR. CHESLER: It is not in my
21 book.
22        THE ARBITRATOR: There is April 8
23 and February 8th.
24     Q.    Moving forward from April 8 --

Page 1326

JOHN LEASE - CROSS

1        THE ARBITRATOR: May 15.
2      Q.    We will get the May 9 letter and
3  come back to it. We can do it off of May 15.
4  Do you see the May 15 letter there, sir?
5      A.    Yes.
6      Q.    This is a letter from Ms. Hall to
7  you; right?
8      A.    Yes.
9      Q.    She says there "we received your
10 letters of April 5 and April 8, 2005 regarding
11 Alcoa Fastening systems plant 1 located at 800
12 South State College Boulevard, Fullerton." Do
13 you see that?
14     A.    Yes.
15     Q.    She is talking about investigations
16 you sent to her on April 5 and April 8; yes?
17     A.    Yes.
18     Q.    My binder is also a little messed
19 up. I am looking for a letter June 9, 2005. I
20 apologize this is all out of order. It should
21 be one before or one after it, it is a letter
22 from Ms. Hall June 9, 2005.
23        MR. CHESLER: I don't have that.
24     A.    Not in here.

Page 1327

JOHN LEASE - CROSS
1  JOHN LEASE - CROSS
2    Q.    That is the one we will get to, a
3  copy.  My apologies for that.  We can talk about
4  another topic while we're getting that.
5        Let's go forward to the section of
6  multiple sites at the back, sir.
7    A.    Okay.
8    Q.    Do you see that first letter that
9  you sent to Mr. Hodge on April 30, 2003,
10  hopefully it is there?
11    A.    April 30, 2003.
12    Q.    Yes.  Do you see that?
13    A.    Got it.
14    Q.    Do you know what this relates to?
15    A.    Pardon?
16    Q.    Do you know what this relates to?
17    A.    Yes, it is just reading this, this
18  involved the notice that came to Alcoa to the
19  Fullerton plant regarding an offsite disposal
20  area.  It involved Kaynar Technologies, which
21  is, I guess the company that owned the Fullerton
22  plant before Fairchild.
23    Q.    Do you recall that Fairchild
24  accepted responsibility of this notice, right,
25  of the liabilities associated with this notice?

Page 1328

JOHN LEASE - CROSS
1  JOHN LEASE - CROSS
2    A.    I think all offsite claims were
3  carved out of the agreement.  They agreed to
4  take responsibility.
5    Q.    At the Fullerton site itself was
6  the Fullerton site named in a lawsuit by the
7  Orange County water commission at some point?
8    A.    I seem to recall that, yes.
9    Q.    Did you provide a copy of that
10  Complaint to Fairchild when it was named?
11    A.    I think that correspondence was
12  between Sandy Harvey and Fairchild.
13    Q.    Do you know if Fairchild accepted
14  the cost and claims related to that lawsuit,
15  accepted responsibility for them?
16    A.    I don't know.  I mean I think that
17  correspondence has been primarily between
18  lawyers.
19    Q.    We will get a document and try to
20  refresh your recollection on that.
21        Now, Mr. Chesler, when he spoke to
22  you yesterday asked you about a number of
23  documents.  I want to work my way through a few
24  of them.  Turn to tab in his binder tab 1 and 2.
25    A.    Okay.

Page 1329

JOHN LEASE - CROSS
1  JOHN LEASE - CROSS
2    Q.    He is talking about a meeting you
3  had with Mr. Hodge, do you recall that
4  discussion?
5    A.    I recall the meeting, yes.
6    Q.    That meeting postdated the signing
7  of the acquisition, of the deal; right?
8    A.    Yes.
9    Q.    What is that?
10    A.    Signing of the agreement.
11    Q.    Signing of the agreement.
12    A.    In July.
13    Q.    Yes.
14    A.    Yes.
15    Q.    It postdated the signing of the
16  agreement?
17    A.    Yes.
18    Q.    You were not involved in
19  negotiating the terms of the agreement?
20    A.    No.
21    Q.    Moving forward to tab 4.
22    A.    Okay.
23    Q.    Number 1, when you talk about we
24  met with Mike Hodge?
25    A.    Yes.

Page 1330

JOHN LEASE - CROSS
1  JOHN LEASE - CROSS
2    Q.    It says there "We met with Mike
3  Hodge on Friday to review Phase II scope of work
4  for 14 Fairchild plants." Do you see that?
5    A.    Yes.
6    Q.    That is the meeting on November 8
7  in Pittsburgh that has been talked about so far?
8    A.    Yes.
9    Q.    We briefly reviewed our approach to
10  the Phase II work at Fullerton.  Was the discuss
11  brief at that meeting, Mr. Lease?
12    A.    Did we discuss what?
13    Q.    It says here "We briefly reviewed
14  our approach to the Phase II work at Fullerton.
15  And more generally." Do you see that?
16    A.    Yes.
17    Q.    Do you recall that discussion about
18  the Phase II work being brief at that meeting?
19    A.    I believe that is generally
20  accurate.
21    Q.    You went on to say "And more
22  generally, Alcoa's approach to remediation
23  investigation and remedial action." Do you see
24  that?
25    A.    Yes.

75 (Pages 1327 to 1330)

JOHN LEASE - CROSS

1
2      Q.    Those are two separate things,
3   remediation investigation and remedial action?
4      A.    As I understood it, yes.
5      Q.    Moving forward, Mr. Chesler spent a
6   lot of time with you talking about St. Cosme and
7   the waste water issue at St. Cosme; right?
8      A.    Yes.
9      Q.    How did you learn about this issue
10   of reporting at St. Cosme, this waste water
11   facility?
12      A.    Reporting what?
13      Q.    You remember the discussion about
14   waste water reporting at St. Cosme?
15      A.    Yes.
16      Q.    Did you indicate yesterday, I think
17   you did, that you learned about it via
18   Ms. Tabary?
19      A.    Yes.
20      Q.    Who is Ms. Tabary?
21      A.    Ms. Tabary was the environmental
22   manager and plating line superintendent.
23      Q.    And she worked at the facility from
24   when to when?
25      A.    I don't know.

JOHN LEASE - CROSS

1
2      Q.    Do you know if she was still at the
3   facility after the time of this, of the
4   acquisition?
5      A.    After the acquisition, yes, she
6   was.
7      Q.    For how long?
8      A.    I don't recall.
9      Q.    Did Alcoa fire her when it found
10   out that she had been reporting wrong numbers if
11   you will to the regulators?
12      A.    I don't know.  The matter was
13   turned over to the compliance group and legal
14   group.  They took it from there.
15      Q.    Do you know if Alcoa has faced any
16   disciplinary action by the regulators or any
17   investigation regarding that issue?
18      A.    I don't know.
19      Q.    You don't know?
20      A.    No, I don't.
21      Q.    Did you know that at the time of
22   the acquisition Fairchild, I think you testified
23   about this earlier, had already indicated it was
24   intending to replace that system?
25      A.    What system?

JOHN LEASE - CROSS

1
2      Q.    Waste water treatment system.
3      A.    I believe they had mentioned it in
4   their permit application.
5      Q.    You told me, I think this morning,
6   that you thought Mr. Miller knew all about that
7   because it was something that was being planned
8   before the acquisition; right?
9      A.    Because they had prepared an
10   estimate in 2001 for a new waste water plant.
11      Q.    Has Alcoa been fined at all by
12   virtue of this supposed practice?
13      A.    I don't know.
14      THE ARBITRATOR:  As a result of
15   what practice?
16      MR. ZUROFSKY:  The practice what
17   they were talking about yesterday, the reporting
18   practice at the St. Cosme waste water.
19      Q.    What was the reaction of the
20   regulator when Alcoa informed the regulator
21   about this issue?
22      A.    I wasn't involved in the
23   discussions with the regulator.  As I mentioned,
24   the compliance group and legal group took the
25   lead after this closed.

JOHN LEASE - CROSS

1
2      Q.    I'm going to introduce a document,
3   433.  I will write it on so we all have it.
4           (Arbitration Exhibit 433
5   was marked.)
6      Q.    The top email is from Jeffrey
7   Shockey.  Who is Jeffrey Shockey?
8      A.    At this time Jeffrey Shockey was
9   the safety manager in the services group that
10   I'm in.
11      Q.    He is reporting to you, Ken Ford
12   and Ken Meholic here?
13      A.    Yes.
14      Q.    Did I hand you a memo from Jeffrey
15   Shockey?
16      THE ARBITRATOR:  It is from
17   Jeffrey Shockey October 1, 2003.  It is a series
18   of emails.
19      MR. ZUROFSKY:  It seems the lunch
20   time recess has discombobulated our document
21   system.
22      Q.    I will ask you to put that to the
23   side.  I will return to the issue I wanted to
24   talk about at Fullerton.  This will be 434.
25      MR. CHESLER:  Are we putting this

Page 1335

```
1          JOHN LEASE - CROSS
2  one aside?
3          MR. ZUROFSKY:  Yes.
4          (Arbitration Exhibit 434
5  was marked.)
6          THE ARBITRATOR:  Are we coming
7  back to this one?
8          MR. ZUROFSKY:  We will, your
9  Honor.  I apologize for that.
10     Q.    This letter is the June 9 letter I
11 was referring to earlier regarding Fullerton.
12 Mr. Lease, does this refresh your recollection
13 that Fairchild accepted responsibility for the
14 defending Alcoa and Fairchild in connection with
15 the lawsuit filed against Fullerton?
16     A.    I will take a short read here if
17 you don't mind.
18           Well, I am not sure.  I am not a
19 lawyer, so I am not quite sure what the last
20 paragraph means.  "Conditionally prepared to
21 undertake the defense of the lawsuit."  I am not
22 sure what the conditions were.
23     Q.    It says here the condition is that
24 the sites are in fact former Fairchild Fasteners
25 facilities.  Do you see that there?
```

Page 1336

```
1          JOHN LEASE - CROSS
2     A.    Okay.
3     Q.    You referenced earlier some
4  correspondence between Ms. Hall and Mr. Harvey;
5  right?
6     A.    Yes.
7     Q.    This is a letter addressed to you?
8     A.    Yes.
9     Q.    Does this refresh your recollection
10 that since this time Fairchild has in fact
11 defended this lawsuit for Alcoa and Fairchild?
12     A.    What do you mean defended?  They
13 will undertake defense, I guess.
14     Q.    Have they?
15     A.    I don't know.
16     Q.    You testified yesterday, did you
17 not, facility has not accepted one claim that
18 you have submitted to it; right?
19          MR. CHESLER:  Your Honor, he
20 testified about indemnification claims pursuant
21 to 11.6.  As counsel well knows, this is
22 governed by an entirely different section of the
23 agreement, had nothing to do with the prior
24 testimony.  It is called third-party claims.  It
25 is in a different section of the agreement.
```

Page 1337

```
1          JOHN LEASE - CROSS
2     Q.    Did Fairchild accept this claim?
3     A.    Did they accept?
4     Q.    This liability here.
5     A.    They accepted what they accepted in
6  the letter.
7     Q.    Now I want to go back to St. Cosme.
8  This will be 435.
9          (Arbitration Exhibit 435
10 was marked.)
11     Q.    This is the memo at St. Cosme.
12 Have you seen this document before, Mr. Lease.
13     A.    No, I don't recall seeing this.
14     Q.    Let's turn to page FAIR 91345.  I
15 want to see if this refreshes your recollection
16 about the matter.  Under the heading Waste Water
17 Treatment Plant.  "The site has explained that
18 historically some waste water discharge values
19 given to the authorities were wrong because of
20 inadequate monitoring methodology."  Do you see
21 that?
22     A.    Yes.
23     Q.    Do you understand it to be a report
24 as to what the site told the St. Cosme
25 regulator?  Do you understand that to be a
```

Page 1338

```
1          JOHN LEASE - CROSS
2  report?
3          MR. CHESLER:  Your Honor, again, I
4  don't want to be --
5          MR. ZUROFSKY:  I'm asking.
6          MR. CHESLER:  How can the witness
7  testify as a matter of foundation this is a
8  report to regulators?  He just said he's never
9  seen the document before.
10          MR. ZUROFSKY:  I am asking if it
11 refreshes his recollection as to what Alcoa
12 reported to the regulators.  You spent whole
13 time talking about Alcoa reported to the
14 regulators.
15          THE ARBITRATOR:  If he knows.
16          MR. ZUROFSKY:  Right. If he knows.
17          MR. CHESLER:  Can we take, your
18 Honor, this is, I know this is not an evidence
19 class, may I just read for your Honor the
20 question to which I just objected, please.
21          "Question: Do you understand it to
22 be a report as to what the site told the St.
23 Cosme regulator? Do you understand that to be
24 the report?"
25          That doesn't remotely relate to
```

JOHN LEASE - CROSS

1 JOHN LEASE - CROSS
2 refreshing his recollection, he is trying to
3 testify about something for which this witness
4 has absolutely no foundation.
5 THE ARBITRATOR: Well, if
6 understand that he can answer the question.
7 You're not objecting to these documents, all
8 these documents are coming in without
9 authenticity.
10 MR. CHESLER: No, your Honor,
11 remember, the rule was the document was presumed
12 to be admissible unless we stood up and
13 objected. I am absolutely objecting. I don't
14 know what this document is.
15 MR. ZUROFSKY: We said -- we are
16 not talking admissibility. This is a document
17 you produced.
18 MR. CHESLER: Excuse me. If we go
19 back again to look at the record what we said at
20 the beginning of this hearing we said all
21 documents will presume to be admissible, if a
22 party had an objection they should rise and make
23 the objection.
24 THE ARBITRATOR: Any objection as
25 to authenticity?

1 JOHN LEASE - CROSS
2 MR. CHESLER: I have no idea what
3 the document is. I am making objection not to
4 authenticity because I don't know what it is, I
5 am making objection to admitting this document
6 without foundation through a witness who said he
7 has no idea what it is, where counsel is making
8 representations in a question about reports to
9 regulators.
10 MR. ZUROFSKY: You produced this
11 document.
12 THE ARBITRATOR: Just a minute,
13 please. Where did this document come from?
14 MR. ZUROFSKY: Their files. That
15 is what the FAIR number means at the bottom
16 right.
17 MR. CHESLER: Okay. Along with
18 thousands and thousands of other pages. I am
19 objecting to the admissibility of this document.
20 THE ARBITRATOR: Do you want
21 somebody to come in and identify this particular
22 document?
23 MR. CHESLER: If counsel is going
24 to make representations about what it is, it was
25 submission to regulators or representations to

1 JOHN LEASE - CROSS
2 regulators I am. I have no idea if it is.
3 THE ARBITRATOR: It appears to be
4 memorandum of a meeting that was held in the
5 facility after your company assumed ownership of
6 it. It was produced from your files. I suppose
7 it is admissible for whatever it says. If it is
8 authentic. You are not questioning its
9 authenticity.
10 MR. ZUROFSKY: Are you?
11 MR. CHESLER: I am not questioning
12 the fact it was apparently produced from my
13 client's files. It has a Bates number on it.
14 THE ARBITRATOR: It is probably
15 not appropriate to ask this witness very much
16 about it. You can always take a dictionary
17 definition of something and ask the witness if
18 he agrees with it.
19 MR. CHESLER: Yes. That was not
20 the question to which I rose to object.
21 MR. ZUROFSKY: I will make that
22 question. You now objected to this document.
23 You changed your objection. The question on the
24 table are you objecting to admissibility of this
25 document?

1 JOHN LEASE - CROSS
2 MR. CHESLER: Yes.
3 MR. ZUROFSKY: I will ask you to
4 produce any of the following people who are
5 listed as participants here so they can
6 authenticate it --
7 MR. CHESLER: It says a DRIRE
8 division manager, DRIRE inspector and several
9 people --
10 MR. ZUROFSKY: Including
11 Ms. Tabary who you identified as the person who
12 made the report in the first place about
13 discrepancies in the waste water treatment
14 plant.
15 MR. CHESLER: He just asked the
16 witness if she works for us anymore, apparently
17 she doesn't.
18 THE ARBITRATOR: I was unclear on
19 that. She worked for you after you assumed
20 ownership of this facility for some period of
21 time?
22 MR. CHESLER: Yes.
23 THE ARBITRATOR: Whether she was
24 still there or not, I was not clear.
25 MR. CHESLER: I have no idea.

MERRILL LEGAL SOLUTIONS
(800) 325-3376        www.MerrillCorp.com

Page 1343

JOHN LEASE - CROSS

2 THE ARBITRATOR: Maybe he doesn't
3 know either. I don't know. The problem with
4 this hearing, gentlemen, you have got dozens of
5 volumes of documents that we're not questioning,
6 we are letting documents produced by the parties
7 into evidence without objection.
8 If we are going to start to object
9 to admissibility of documents, I think we are
10 going to have to lengthen this hearing.
11 MR. CHESLER: Just so we are
12 clear, I rose because counsel asked a question
13 of this witness which represented in the
14 question that representations were made to
15 regulators concerning a document he had said two
16 minutes before he had never seen that's why I
17 rows to object.
18 MR. ZUROFSKY: That is not what
19 you're doing now.
20 THE ARBITRATOR: I will sustain
21 your objection. Do you want to rephrase the
22 question?
23 MR. ZUROFSKY: I do want to
24 rephrase the question about this document.
25 THE ARBITRATOR: Go ahead.

Page 1344

JOHN LEASE - CROSS

2 Q. Third page FAIR 91345. Waste water
3 treatment plant. Do you see that there?
4 A. Yes.
5 Q. It says "The site has explained
6 historically some waste water discharge values
7 given to the authorities were wrong because of
8 inadequate monitoring methodology. They have
9 indicated that since the beginning of 2002 the
10 values are more accurate and show frequent
11 noncompliances in basement water flow and in
12 mass flow of heavy metals. It was indicated two
13 areas of improvements were current Lucent being
14 studied one reduction of effluents at the
15 source, two installation of a new waste water
16 treatment plants. These aspects are described
17 in the application file."
18 Two bullets, "Did we give them the
19 spreadsheet summary comparing what we reported
20 versus what were the actual values? If so, for
21 what period for what time period? No, we did not
22 give them those spreadsheets."
23 Second bullet. "It does not sounds
24 like they were that upset? Were they? No they
25 did not seem to be upset but certainly

Page 1345

JOHN LEASE - CROSS

2 embarrassed."
3 Mr. Lease, does reading that
4 refresh your recollection as to how the
5 regulators, about Alcoa's interactions with the
6 regulators regarding waste water treatment plant
7 issues at St. Cosme?
8 A. I have no recollection about this
9 memo or this topic.
10 Q. You testified yesterday with Mr.
11 Chesler about a discrepancy in numbers being
12 reported to the authorities at the waste water
13 treatment plant do you recall that?
14 A. Yes.
15 Q. This document says here they have
16 indicated, they being the site indicated since
17 beginning of 2002 the values are more accurate.
18 Sir, when did the acquisition take
19 place between Fairchild and Alcoa?
20 THE ARBITRATOR: December 2002.
21 A. December 2002.
22 Q. You can put that aside. Mr.
23 Chesler asked you yesterday what the DRIRE in
24 France wanted Alcoa to do a detailed risk
25 assessment, do you remember that testimony?

Page 1346

JOHN LEASE - CROSS

2 A. No. Can you give me more detail?
3 Q. He asked you whether or not the
4 DRIRE, you know what the DRIRE is; right?
5 A. Yes.
6 Q. Wanted Alcoa to do a detailed risk
7 assessment at Montbrison. Do you recall him
8 asking you that?
9 A. Yes.
10 Q. Were you here for the testimony of
11 Mr. George?
12 A. I was in and out of that testimony,
13 not for the full time.
14 Q. Do you recall we looked at some
15 documents indicating comments by the DRIRE that
16 they had no objection to Alcoa proceeding
17 voluntarily with the detailed risk assessment?
18 A. I don't specifically recall that.
19 Q. I will read you the document we
20 introduced with Mr. George. I will read it to
21 you. It should be there from yesterday, if it
22 is not I guess we can get you another copy. It
23 would be Exhibit 12, if not I can get you
24 another copy. You may have it there. It was up
25 there yesterday with Mr. George. Not in the

Page 1347

JOHN LEASE - CROSS

1    book with Mr. George. It is one we handed up.
2    I can get another copy right here.
3         THE ARBITRATOR: Is he going to be
4    able to add anything to what Mr. George already
5    said about this subject?
6         MR. ZUROFSKY: You're right, your
7    Honor. We will let the document speak for
8    itself. That's fine.
9         THE ARBITRATOR: Mr. George was
10   there and had personal knowledge.
11        MR. ZUROFSKY: Fair enough. Your
12   Honor, I would like to request a short recess to
13   go over that chart with my colleague and see
14   what we want to do about that, if anybody.
15        THE ARBITRATOR: All right.
16        (Recess taken.)
17        MR. ZUROFSKY: Your Honor, we
18   reviewed the chart. There are some items we
19   might have some quibble with. But we are happy
20   to brief those off the chart. There is also
21   some items that Alcoa is claiming for while they
22   technically notice the Phase I, we don't think
23   is technical notice. We will brief those. So
24   with that and all reservations of course I have

Page 1348

JOHN LEASE - REDIRECT

1    nothing further at this time.
2         THE ARBITRATOR: Thank you.
3    RE-DIRECT EXAMINATION BY MR. CHESLER:
4         Q.  I want to start asking you about
5    some questions about the Acquisition Agreement
6    related to the topics counsel questioned you
7    about.
8         Mr. Lease, would you turn to page
9    83 there are various copies which have different
10   Bates numbers on them, rather than confuse the
11   record with the Bates number, I am interested in
12   you looking at page 83 of the contract.
13        A.  Okay.
14        Q.  You see bottom of page 83 there is
15   a section that defines Fasteners Environmental
16   Condition. Do you see that?
17        A.  My page 84.
18        Q.  Okay. We don't even have
19   consistent pages. Okay. 84. For the record it
20   is section 11.6 E iii. Do you have that?
21        A.  Yes.
22        Q.  Counsel asked you a number of
23   questions about whether you had given notice, as
24   opposed
25   Fasteners Environmental Conditions, as opposed

Page 1349

JOHN LEASE - REDIRECT

1    to what you were going to do about it, as
2    opposed to how much actions would cost, do you
3    recall that subject coming up over and over?
4         A.  Yes.
5         Q.  I want to take a moment since he
6    asked you all these questions about whether you
7    gave notice of environmental conditions. I to
8    ask you to look at the definition under the
9    agreement you were operating under of Fasteners
10   Environmental Condition. You see it says "Means
11   any" I want you to drop all the way down to
12   capital C as in Charlie?
13        A.  Okay.
14        Q.  "Any violation or alleged
15   violation or noncompliance or alleged
16   noncompliance with applicable environmental law
17   with respect to the Fasteners business that
18   commenced prior to the Effective Time."
19        Now, you recall that you provided
20   what we previously described as gap analysis
21   summaries to Fairchild for four or five
22   different facilities?
23        A.  Yes.
24        Q.  Do you recall you testified those

Page 1350

JOHN LEASE - REDIRECT

1    were selected because they were the big ones
2    which had the largest range of problems
3    associated with them?
4         A.  Problems as well as operations.
5         Q.  Keeping in mind this definition of
6    violation or alleged violation or noncompliance
7    or alleged noncompliance with environmental law
8    with respect to the Fasteners business, did you
9    provide in the gap analysis summaries you gave
10   Fairchild notice of the existence of Fasteners
11   environmental conditions?
12        A.  Yes.
13        Q.  Did you give such notice with
14   respect to the Fasteners Environmental Condition
15   of machine guarding requirements not being met?
16        A.  Yes.
17        Q.  Did you give notice of Fasteners
18   Environmental Conditions with respect to fall
19   control requirements not being met?
20        A.  Yes.
21        Q.  Did you give notice of Fasteners
22   Environmental Condition with respect to noise
23   reduction requirements not being met?
24        A.  Yes.

80 (Pages 1347 to 1350)

Page 1351

JOHN LEASE - REDIRECT

1
2     Q.    Did you give notice of the
3  Fasteners Environmental Condition with respect
4  to lock out tag out requirements not being met?
5     A.    Yes.
6     Q.    Did you give notice of Fasteners
7  Environmental Condition with respect to confined
8  space requirements not being met?
9     A.    Yes.
10    Q.    Did you give notice of Fasteners
11 Environmental Condition with respect to fire
12 prevention requirements not being met?
13    A.    Yes.
14    Q.    Did you give notice of a Fasteners
15 Environmental Condition with respect to
16 electrical safety requirements not being met?
17    A.    Yes.
18    Q.    Did you give take of the Fasteners
19 Environmental Condition notice with respect to
20 mobile equipment requirements not being met?
21    A.    Yes.
22    Q.    For all or many of them were
23 notices with respect to those conditions given
24 in more than one gap analysis summary?
25    A.    Yes.

Page 1352

JOHN LEASE - REDIRECT

1
2     Q.    In the gap analysis summaries, all
3  of which or many of which we have been through
4  before -- let me withdraw that and point you to
5  another section in the agreement.
6        Look at 11.6 C, a few subsections
7  earlier.  I don't know what page it is on in
8  your particular draft 11.6 C.
9     A.    Yes.
10    Q.    11.6 is section entitled Seller
11 Environmental Indemnity.  C begins with "prior
12 to the closing."  Do you have that?
13    A.    Yes, I do.
14    Q.    I am going to ask you about several
15 different parts of this section.  But the first
16 part I want to ask you about is the last
17 sentence.  It says "The buyer" that was Alcoa;
18 correct?
19    A.    Correct.
20    Q.    "Shall afford the sellers a
21 reasonable opportunity to comment on the buyer's
22 proposed response to a Fasteners Environmental
23 Condition."
24        Now, when you provided notice to
25 Fairchild about all of the Fasteners

Page 1353

JOHN LEASE - REDIRECT

1
2  Environmental Conditions we just went through in
3  that list, when you provided that notice in the
4  gap assessment summaries, did you also tell them
5  what your proposed response was with respect to
6  each of those conditions?
7     A.    Yes.
8     Q.    You told them, for example, we are
9  going to go do a study of machine guarding and
10 we will fix whatever machines need guarding
11 didn't you?
12    A.    Yes.
13    Q.    We are going to do study of fall
14 control requirements and fix whatever fall
15 control requirements aren't met; didn't you?
16    A.    Yes.
17    Q.    Etc. down the list; right?
18    A.    Yes.
19    Q.    Did they come back to you at any
20 time and say to you, prior to this proceeding
21 and prior to the time they hired lawyers to
22 litigate over the question, did they say to
23 you -- I am going to withdraw that.  Let me hold
24 onto that for a minute.
25        I said I want to ask you about a

Page 1354

JOHN LEASE - REDIRECT

1
2  few other provisions in 11.6 C.  Let me do that
3  before we go to the next topic.  If you follow
4  along with me under C it says  "Prior to the
5  closing, both sides will designate a
6  representative to receive and consult."  You're
7  the representative designated by Alcoa; correct?
8     A.    That's correct.
9     Q.    Apparently you have been through a
10 series of them on the other side.  You have been
11 the representative throughout on the Alcoa; is
12 that right?
13    A.    Yes.
14    Q.    It says next sentence "From and
15 after the closing, the buyer, Alcoa will conduct
16 and control all remedial action and negotiations
17 with any government entity in respect of all
18 Fasteners Environmental Conditions subject to
19 this indemnification." Do you see that?
20        THE ARBITRATOR:   What provision
21 are you reading from?
22        MR. CHESLER:   11.6, C your Honor
23 from the second sentence, C as in Charlie.
24        THE ARBITRATOR:   Thank you.
25    Q.    Do you see that section, Mr. Lease?

Page 1355

JOHN LEASE - REDIRECT

1
2   A.   Yes.
3   Q.   To the best of your knowledge with
4 respect to all those government interactions
5 that counsel asked you about on
6 cross-examination, did Alcoa conduct and control
7 those just as the contract said it had a right
8 to do?
9   A.   Yes, we did.
10   Q.   Does it say anything in here that
11 the Fairchild Fasteners get to conduct them?
12   A.   That they get to conduct them?
13   Q.   Yes.
14   A.   No, it doesn't.
15   Q.   Does it say they have any control
16 over them?
17   A.   No.
18   Q.   Does it even say that you consult
19 with them and talk to them about what you should
20 or shouldn't do with the government regulators?
21   A.   No, it does not.
22   Q.   If you go further down, staying in
23 11.6 C, I don't know where on your copy of the
24 document this appears, I can't tell you how many
25 lines up from the bottom of the page it is. I

Page 1356

JOHN LEASE - REDIRECT

1
2 want you to find the sentence if you can that
3 reads as follows "The buyer will provide the
4 sellers' representative and the sellers'
5 environmental consultants with reasonable access
6 to the properties of the Fasteners business." I
7 am going to stop there for a moment.
8       Do you have that sentence?
9   A.   Yes.
10   Q.   In all the time you've been the
11 representative of Alcoa under this provision,
12 since the provision went into effect, have they
13 ever once at Fairchild asked you to have any
14 access, reasonable or otherwise, to a single one
15 of these facilities?
16   A.   No.
17   Q.   Then it says "And," continuing in
18 the same sentence, "And copies of all
19 nonprivileged information with respect to the
20 remedial actions to be taken in respect of such
21 environmental actions."
22       This provision about providing them
23 with copies of information relates directly to
24 something called remedial actions; right?
25   A.   Yes.

Page 1357

JOHN LEASE - REDIRECT

1
2   Q.   Stay with me for a moment. I want
3 you know to find the section 11.6 E little Roman
4 6, VI.
5   A.   Okay.
6   Q.   That is entitled remedial action.
7 Do you have that section?
8   A.   Yes.
9   Q.   So this is the subject matter as to
10 which the provision we were just looking at says
11 that you're supposed to give them copies of
12 nonprivileged information with respect to the
13 remedial actions to be taken in respect of such
14 environmental actions; right?
15   A.   Right.
16   Q.   This provision we don't have to
17 read it, but it basically relates to
18 environmental contamination laws, doesn't it,
19 CERCLA, talks about cleaning up, removing,
20 abating hazardous materials, preventing the
21 release or threat of release or further release
22 of hazardous materials and performance of
23 studies and investigations with respect to those
24 particular subsequent; right?
25   A.   Correct.

Page 1358

JOHN LEASE - REDIRECT

1
2   Q.   So this provision about giving
3 materials, this has nothing to do with fixing
4 machine guarding and noise control. This has to
5 do with these hazardous materials and particular
6 environmental clean-up requirements that are
7 laid out in that remedial action section; right?
8   A.   That is my understanding, yes.
9   Q.   To the best of your knowledge in
10 the Phase Is that take up half of the top shelf
11 in the Phase IIs that take up about half the
12 second shelf, in all that correspondence and
13 reports that take up the bottom two shelves, did
14 you give them whatever documents you had that
15 related to the actions to be taken with respect
16 to the remedial -- with respect to remedial
17 actions concerning these particular types of
18 environmental conditions?
19   A.   I believe we have.
20   Q.   If you go down a couple lines past
21 that, by the way the next sentence says "The
22 buyer will select consultants and contractors to
23 implement such remedial actions who shall be
24 reasonably acceptable to parent." I will stop
25 there for a second.

MERRILL LEGAL SOLUTIONS
(800) 325-3376    www.MerrillCorp.com

Page 1359

```
 1          JOHN LEASE - REDIRECT
 2          There was some comments about you
 3  getting rid of one set of consultants and hiring
 4  something called Mission Geoscience; right?
 5      A.    Yes.  Mission Geoscience.
 6      Q.    In all the time since Fairchild has
 7  known you hired Mission Geoscience, has anybody
 8  ever told you that they were unacceptable to
 9  Fairchild?
10      A.    No.  All I seen is comments we
11  didn't tell them that we were going to use them.
12  They never said they were not acceptable.
13      Q.    Then it says going on there, "you
14  will provide the sellers' representative and its
15  consultants with copies of all reports,
16  analytical data, correspondence, directives,
17  orders and documents submitted to or received by
18  the buyer from any government entity in
19  connection with the remedial action."  Let's
20  stop there.
21          Does it tell you when you have to
22  give the materials received from or given to a
23  government entity?
24      A.    No.
25      Q.    Just says you have to give it to
```

Page 1360

```
 1          JOHN LEASE - REDIRECT
 2  them; right?
 3      A.    Right.
 4      Q.    So far as you know did you give
 5  them whatever you got from or gave to the
 6  government?
 7      A.    As far as I know, we did.
 8      Q.    So all these questions they asked
 9  you about, why didn't you give us the decree,
10  the draft degree before it was signed or the
11  decree the minute it was signed, you gave them
12  whatever government documents you have?
13      A.    Yes.
14      Q.    Then it says "And other
15  nonprivileged documents created or received by
16  or on behalf of the buyer in connection with the
17  remedial action."
18          Again, that goes back to the things
19  in the bookcase we talked about before; correct?
20      A.    Correct.
21      Q.    Now, they showed you, they said a
22  box full, I looked at it, it wasn't quite a box
23  full.  It was a pile of paper about some study
24  done in one of the facilities about machine
25  guarding; right?
```

Page 1361

```
 1          JOHN LEASE - REDIRECT
 2      A.    Right.
 3      Q.    You didn't know whether that was
 4  given to the Fairchild people or not; was that
 5  your testimony?
 6      A.    My best recollection we did provide
 7  that to them.
 8      Q.    I want to ask you about machine
 9  guarding, they spent a lot of time on that.
10  Before we get to that particular report and what
11  you did and didn't give them, you remember you
12  said in answer to several of counsel's questions
13  when he was asking you about whether you gave
14  them correspondence after particular dates, you
15  kept saying, yeah, but what about the Phase Is
16  we gave them.  Remember that?
17      A.    Yes.
18      Q.    I want to show you seven Phase I
19  reports.
20          MR. CHESLER:  Your Honor, these
21  are all in bulk Exhibit A on the top shelf.
22  Each one of them indicates where in Exhibit A
23  they appear.
24          THE ARBITRATOR:  The book you
25  previously had with him, none of those appears?
```

Page 1362

```
 1          JOHN LEASE - REDIRECT
 2          MR. CHESLER:  Just excerpts of a
 3  few.  These are the actual Phase Is.  I will
 4  hand your Honor a set.  I don't want to load you
 5  up unnecessarily with paper.  Obviously you can
 6  keep them if you like.  I don't want to burden
 7  you with more than you need.
 8      Q.    Now, counsel asked you a lot of
 9  questions about machine guarding at Fullerton
10  and a few other locations, what you did and
11  didn't tell or did or didn't give Fairchild.
12          By the way, before I get to the
13  Phase Is, one preliminary question, at one point
14  you said something like mentioning machine
15  guarding in a single gap letter constituted
16  notice with respect to all of the facilities.
17  Do you remember generally saying something like
18  that?
19      A.    Yes.
20      Q.    In fact with respect to machine
21  guarding, did your notice of the Fasteners
22  Environmental Condition of machine guarding
23  requirements not being complied with, did that
24  go to them in one gap summary notice letter and
25  only in one?
```

83 (Pages 1359 to 1362)

Page 1363

JOHN LEASE - REDIRECT

1    JOHN LEASE - REDIRECT
2        A.    No.  I don't recall the total
3    number.  But I know it was an issue at all the
4    facilities that we visited and reported on.
5        Q.    What I want you to do, let's start
6    with Fullerton.  That should be the first one in
7    your pile.  This is Exhibit A, volume 3.
8        A.    Okay.
9        Q.    That is where it appears.  I want
10   you to look at page 52.  Again, that is the
11   original printed page 52 not Bates number page.
12       A.    Okay.
13       Q.    Do you have that?
14       A.    Yes.
15       Q.    You see under occupational safety,
16   in the Phase I for Fullerton it is reported the
17   plant received two citation and notification of
18   penalties in October of '01?
19       A.    Yes.
20       Q.    It goes on to say, I am looking at
21   the third paragraph under occupational safety,
22   "second citation was related to machine guarding
23   for seven punch presses etc.," it goes on they
24   were ordered to comply, they had to pay a fine.
25   Do you see all that?

Page 1364

1    JOHN LEASE - REDIRECT
2        A.    Yes.
3        Q.    Now let's go to the recommendations
4    in the back, page 71.  Page 71 under Compliance
5    Issues, second paragraph, last sentence says "It
6    is recommended that the facility ensure that all
7    machinery -- "
8        THE ARBITRATOR:   What page are you
9    on?
10       MR. CHESLER:   Sorry, page 71, your
11   Honor.  That is the original printed page 71.
12   Under Compliance Issues.  This is the Phase I
13   report for Fullerton, California.
14       Q.    It says "It is recommended that the
15   facility ensure that all machinery be equipped
16   with proper guarding."
17       This report was sent to Fairchild
18   well before the deal ever closed; wasn't it?
19       A.    Yes.
20       Q.    Now let's look at Stoughton,
21   Massachusetts.
22       A.    Okay.
23       Q.    I want you to look at page 32.
24   This is, this comes from bulk Exhibit A, volume
25   5.  Printed page 32.

Page 1365

1    JOHN LEASE - REDIRECT
2        A.    Okay.
3        Q.    This is from the conclusions and
4    recommendations in the Phase I report.  And
5    under compliance issues, last paragraph on
6    page 32.  It informs you and ultimately
7    Fairchild that ERM observed some of the
8    machines --
9        THE ARBITRATOR:   Hold on a minute.
10   I will get to page 32.  There are several page
11   32s in here.  I have it.  Thank you.
12       MR. CHESLER:   Okay.  Bottom of the
13   page, your Honor, last paragraph.
14       Q.    "ERM observed some of the machines
15   are outfitted with what appears to be adequate
16   guarding protection, however many of the
17   machines do not have adequate machine guarding"
18   then it cites to a section of the federal
19   regulations, CFR.  Do you see that?
20       A.    Yes.
21       Q.    "It is recommended the facility
22   undertake a survey of machine guards and ensure
23   that all machinery meet minimum manufacturer
24   guarding requirements." Correct?
25       A.    Correct.

Page 1366

1    JOHN LEASE - REDIRECT
2        Q.    Let's look at St. Cosme, volume 15
3    from bulk Exhibit A.  In particular, I want you
4    to turn to printed page 37.
5        A.    Okay.
6        Q.    Printed page 37, St. Cosme, Phase
7    I.  Third full paragraph on the page.  Says "70
8    percent, according to the information provided
9    70 percent of all the machinery on site complies
10   with French National machinery safety
11   requirements, safety analysis were performed by
12   trained employees.  ERM observed a number of
13   machinery which are suspected not to be in full
14   compliance with the machine guarding
15   requirements.  It is recommended that a full
16   inspection of all the machines be conducted by
17   an external qualified organization."
18       That is what you passed on to
19   Fairchild before the -- or it was passed on by
20   Alcoa before the closing; correct?
21       A.    Correct.
22       Q.    Now let's look at Montbrison, which
23   is in volume 11.
24       THE ARBITRATOR:   The next one I
25   have is Roques.  Whatever order you want to take

1            JOHN LEASE - REDIRECT
2    them.  That is the order you gave them to me.
3    You want to do Montbrison.
4            MR. CHESLER:  Montbrison.  Your
5    Honor.  Let's do Roques.  I didn't have it in my
6    pile.  I apologize.
7            THE ARBITRATOR:  This is also
8    known as Toulouse?
9            MR. CHESLER:  Yes.
10        Q.    If you look at page 31, printed
11    page 31.
12        A.    Okay.
13        Q.    First full paragraph.  "A machine
14    guarding upgrade program is ongoing in order to
15    comply with the safety requirements stipulated
16    in French decree 93-40, no EC Complaint label
17    was noted on the machines at the time of the
18    visit.  This upgrade program should also reduce
19    cuts and other accidents described above."
20            I am told I said Complaint, I
21    should have read compliance, I apologize.
22            THE ARBITRATOR:  EC, European
23    Community label that is what you're talking
24    about?
25            MR. CHESLER:  Yes, I believe so.

1            JOHN LEASE - REDIRECT
2        Q.    Would you look at page 38 in the
3    same Phase I report.  Again for Toulouse.  Page
4    38.
5        A.    Okay.
6        Q.    Next to the last paragraph on the
7    page.  Printed page of the Toulouse report.
8    Next to the last paragraph.  It says "Site
9    management" by the way, site management that ERM
10    was reporting about here was Fairchild's site
11    management; right?
12        A.    Right.
13        Q.    They still owned this plant.
14        A.    Correct.
15        Q.    At the time.  It says "They are
16    aware of the following noncompliance health and
17    safety issues.  The site has yet to complete the
18    last phase of the machine guarding/upgrade plan
19    estimated to be completed during 2002" goes on
20    then to talk about fire protection.
21            Then the last sentence says "It is
22    recommended that the facility representatives
23    complete the machine guarding program and make
24    the fire fighting system fully operational."
25            That is what you read in the

1            JOHN LEASE - REDIRECT
2    report.  It was sent on to Fairchild; correct?
3        A.    Correct.
4        Q.    Now let's look at Montbrison.
5    Which is in volume 11 of the bulk exhibit.
6    Let's look at page 27.  Sorry, first page 20.  I
7    apologize.  Page 20.  Montbrison.  Bottom of the
8    page under Occupational Safety.
9        A.    Okay.
10        Q.    Do you see it says there is "A plan
11    for putting the machines in compliance with the
12    EC regulations, however it has not been
13    completed.  The plan was stopped due to work
14    overload and planning for this activity was
15    given to the work inspection team and the
16    retrofit was expected to have been completed by
17    the end of 2001."
18            So they had a plan in place, they
19    were retrofitting the machines, putting the
20    guards on, they stopped the program and although
21    it had been expected to have been completed by
22    end of '01 apparently it was not done as of this
23    point in '02; correct?
24        A.    Correct.
25        Q.    Now, if you go to page 27.  You see

1            JOHN LEASE - REDIRECT
2    in the second full paragraph, no I guess the
3    third full paragraph on the page it repeats that
4    the site has not completed the safety plan for
5    putting the machine into compliance with EC
6    Regs?
7            THE ARBITRATOR:  Page 27?
8            MR. CHESLER:  Yes.  Third
9    paragraph.
10        Q.    It says "It is recommended this
11    plan be completed and applied to ensure worker
12    safety," that is completed and applied to put
13    the machines in compliance with EC regulations;
14    correct?
15        A.    Correct.
16        Q.    Now, let's look at Hildescheim,
17    Phase I for Hildescheim.  Page 29 printed page
18    29.  You see at the very bottom of 29 and over
19    to the top of 30, it says "The German
20    legislation requires that employees be protected
21    against risks during their work during a site
22    inspection the authorities noted an open area on
23    a machine which must be closed."  It says "that
24    puts the employees in potential danger.  And it
25    is recommended that a system be put in place to

85  (Pages 1367 to 1370)

JOHN LEASE - REDIRECT

1  ensure worker safety through proper machine
2  guarding." Correct?
3      A.    Correct.
4      Q.    Let's look at Kelkheim.  Page 23 of
5  the Phase I for Kelkheim.  Under Compliance
6  Issues.  The last paragraph under Compliance
7  Issues.  It says, again, here as it did in the
8  prior report, the other German facility that
9  "German law requires employees be protected
10 against risk during their work and at press and
11 drilling units machine guarding was found to be
12 a need of improvements as a result of internal
13 risk assessment.  The recommendation is that a
14 system be put in place to assure that proper
15 safety precautions be adhered to."  Correct?
16     A.    Correct.
17     Q.    Just to putting again the
18 chronology in place, after all the Phase Is are
19 sent, after the deal closes, the gap analyses
20 are done and in the first months of '03 you send
21 at least four separate letters about four major
22 sites, every one of them mentions machine
23 guarding which you previously told us is a
24 Fasteners Environmental Condition you notified

JOHN LEASE - REDIRECT

1  them of and informed them of what your plan was
2  to do about it; correct?
3      A.    Correct.
4          THE ARBITRATOR:  These reports you
5  went through are all Phase I; right?
6          MR. CHESLER:  Yes, your Honor.
7  They were all provided during 2002.  Prior to
8  the closing of the transaction in December.
9      Q.    Now, you understand, don't you, Mr.
10 Lease, that Fairchild' position with respect to
11 machine guarding is that they won't pay for it
12 because it's not covered by the indemnity
13 provision; isn't that your understanding of
14 their position?
15     A.    I think they specifically say it is
16 not a Fasteners Environmental Condition.
17     Q.    So you can notify them from now
18 until the cows come home, they say that's
19 interesting, but you are notifying us about
20 something we are not obligated to pay under any
21 circumstances; isn't that what they have told
22 you?
23     A.    Essentially, yes.
24     Q.    This isn't a notice issue, this is

JOHN LEASE - REDIRECT

1  a definitional issue; isn't it?
2      A.    Yes.
3      Q.    By the way, Mr. Zurofsky must have
4  said eight times during the cross-examination
5  you're still doing machine guarding work, you
6  have got more to do.  Do you recall him saying
7  that?
8      A.    Yes.
9      Q.    I'll tell you the numbers they are
10 what they are, it indicates you spent maybe
11 something on the order of 3 million so far on
12 machine guarding.  You understand that Alcoa is
13 estimating it has something like $15 million
14 more machine guarding expense staring it in the
15 face?
16     A.    I am vaguely aware of that.  I
17 think the business prepared some kind of
18 estimate around that, yes.
19     Q.    As far as you know through the
20 prior communications you did before we got into
21 this dispute resolution process and through all
22 the materials that have been provided to
23 Fairchild's counsel through this dispute
24 resolution process, are you aware of anything

JOHN LEASE - REDIRECT

1  the company has done, any study, any analysis,
2  any report relating to machine guarding that
3  they don't have?
4      A.    Not at this point, no.
5      Q.    So they have got everything, I will
6  tell you they had it for three, four months,
7  that is the lawyer's job, we produced
8  everything, everything was produced at least by
9  last September.  You have $15 million more to
10 spend, counsel says you are doing it, he knows
11 you still have to spend more money, to this day
12 have you gotten a single comment from Fairchild
13 about machine guarding ahead of all the $15
14 million you haven't spent yet?
15     A.    No, I have not.
16     Q.    Let me ask you to look at what we
17 marked as Exhibit 165.
18         THE ARBITRATOR:  Before you change
19 the subject, Mr. Chesler, while we are on this
20 subject I have a question.
21         MR. CHESLER:  Yes, sir.
22         THE ARBITRATOR:  Of the witness.
23 I know in this arbitration Fairchild has made
24 definitional objections to the inclusion of

Page 1375

JOHN LEASE - REDIRECT

1  
2  machine guarding based on the definitions in the
3  contract. But as I am trying to recall all of
4  the letters they wrote, it seemed to me that a
5  number of those letters they ask for more
6  information on machine guarding and various
7  other things.
8      THE WITNESS: They asked for more
9  information on assessments, reports, so forth.
10      THE ARBITRATOR: In other words,
11  did they actually make this definitional
12  objection to you in the course of this or is
13  that something that has just come up more
14  recently with the lawyers in the arbitration? Do
15  you recall?
16      THE WITNESS:   Well, I believe
17  there is correspondence from Fairchild prior to
18  this arbitration where they have stated machine
19  guarding, we have not demonstrated that machine
20  guarding is a Fasteners Environmental Condition.
21      THE ARBITRATOR: They made that
22  objection, but at the same time they asked for
23  more documentary information about this subject,
24  because they had more than one ground of
25  objection.

Page 1376

JOHN LEASE - REDIRECT

1  
2      THE WITNESS:   Well, initially
3  they did ask for more information. Subsequently
4  when we sent them basically claims, they
5  basically said --
6      THE ARBITRATOR: That they had no
7  liability?
8      THE WITNESS: Yes.
9      THE ARBITRATOR: All right. Go
10  ahead Mr. Chesler.
11      MR. CHESLER: Yes, your Honor.
12  Thank you. Your Honor, I would like to show the
13  witness we have marked as Alcoa Exhibit 165.
14      Q.   The first page and back of the
15  first page is in French, but if you turn to the
16  next page you will see an English translation
17  this was produced from the files we inherited
18  from Fairchild. This relates, your Honor, to
19  the St. Cosme facility in France.
20      You see, Mr. Lease, in the middle,
21  I am on the English page which ends with the
22  number 726 at the bottom right-hand corner. Are
23  you there?
24      A.   Yes.
25      Q.   You see in the middle page there is

Page 1377

JOHN LEASE - REDIRECT

1  
2  a letter from apparently the labor inspector for
3  the district in which St. Cosme is located
4  saying significant measures must be taken in
5  order to reduce the exposure of employees to
6  noise pollution. Then I want you to look down
7  one paragraph below that. "The moving housed
8  parts of the machines must be in housings. This
9  placement in conformity cannot be limited to the
10  new machines or those that you consider the most
11  dangerous."
12      Then it goes on to say "You are
13  using products that are hazardous to the health
14  of the employees" and cites labor code they say
15  prohibits that.
16      You recall on cross-examination you
17  said several times your understanding was that
18  you were in many instances informing Fairchild
19  of problems about which they already knew?
20      A.   Yes.
21      Q.   When you were doing the gap
22  analysis and traveling around to the different
23  sites were you told by the former Fairchild
24  employees about a lot of these Fasteners
25  Environmental Conditions that they already knew

Page 1378

JOHN LEASE - REDIRECT

1  
2  about before you got there?
3      A.   Yes.
4      Q.   Including the machine guarding
5  problems at St. Cosme?
6      A.   Yes. We spoke with people in the
7  maintenance organization as well as EHS staff
8  around machine guarding and production.
9      Q.   Let me show you Exhibit 95. This
10  is also from the former Fairchild files relating
11  to St. Cosme. Again it begins in French and
12  goes to English would you look at the page that
13  ends the page that ends 729.
14      A.   Okay.
15      Q.   You see this again is from back in
16  the year 2000. At that time Fairchild owned the
17  St. Cosme facility; correct?
18      A.   Correct.
19      Q.   You see there are estimates here
20  for machine guarding on a whole list, long list
21  of different machines used in the St. Cosme
22  facility?
23      A.   Yes.
24      Q.   This estimate from 2000 is over 6
25  million Euros; do you see that?

87 (Pages 1375 to 1378)

JOHN LEASE - REDIRECT

2    A.    Yes.
3    Q.    Francs, excuse me.
4    A.    Yes.
5    Q.    Now, when you in fact inherited St.
6  Cosme, was there still substantial machine
7  guarding work that Alcoa had to do?
8    A.    Yes, there was.
9    Q.    That was pointed out in the Phase
10 Is and pointed out again in the gap analysis;
11 correct?
12    A.    Yes. It was.
13    THE ARBITRATOR:    Just looking at
14 this letter --
15    MR. CHESLER:    95, your Honor.
16    THE ARBITRATOR:    Yes. The one
17 we're on now.  Simmons was the name of
18 Fairchild's facility in St. Cosme?
19    MR. CHESLER:    Yes.
20    THE ARBITRATOR:    This was a letter
21 I am trying to figure out what exactly this is.
22    MR. CHESLER:    This apparently was
23 a report that was done by consultants for them
24 internally at their facility on among other
25 things, costs of equipping a whole long list of

JOHN LEASE - REDIRECT

2  machines used at the facility for machine
3  guarding, two years before.
4    THE ARBITRATOR:    This was an
5  internal report?
6    MR. CHESLER:    Yes.
7    THE ARBITRATOR:    Top right-hand
8  side it says labor inspector Mr. Caspar, with an
9  address.
10    MR. CHESLER:    Apparently what they
11 did is shared this information with the labor
12 inspection, the actual estimates as far as we
13 can tell were done internally within the
14 company.  Either entirely or in large measure
15 the replacement were not done, Alcoa then bought
16 the facility.
17    THE ARBITRATOR:    This list we were
18 referring to on 729 is a list of the machines
19 they're talking about? Amtec Tower, Davenport
20 Tower?
21    THE WITNESS:    Yes, there is a
22 list on the other side, also, a two page table,
23 I believe.
24    THE ARBITRATOR:    Thank you.
25    Q.    I would like to switch to a

JOHN LEASE - REDIRECT

2  different topic.  That is the topic of
3  groundwater at Torrance which was the subject of
4  a lot of questioning during your
5  cross-examination.
6    So the subject is the groundwater
7  issue at the Torrance facility in California,
8  Mr. Lease.
9    A.    Yes.
10    Q.    Do you remember you were questioned
11 at some length about that on cross-examination.
12 I would like to start with Alcoa Exhibit 120.
13 You see this appears to be document entitled
14 Schedule 324 environmental matters.
15    A.    Yes.
16    Q.    You remember that there were
17 various schedules attached to the agreement the
18 agreement between Alcoa and Fairchild?
19    A.    Yes.
20    Q.    I want you to look at the first
21 page of this document.  At the bottom of the
22 first page, the last entry entitled Fairchild
23 South Bay, Torrance.  Do you see that?
24    A.    Yes.
25    Q.    It says "Air permit violation" then

JOHN LEASE - REDIRECT

2  there is some reference to an air permit
3  violation.
4    A.    Okay.
5    Q.    Do you see anything in there about
6  a groundwater problem at Torrance?
7    A.    No.
8    Q.    You were asked 30, 40, 50
9  questions, maybe more about the groundwater
10 problems that were going on while Fairchild
11 owned it and what Alcoa did and the studies
12 Alcoa did to follow-up on the groundwater
13 problems when it took over.  Do you remember
14 that subject?
15    A.    Yes.
16    Q.    Nothing in this disclosure schedule
17 you're aware of from Fairchild that said
18 anything to Alcoa about a groundwater problem.
19 They talked about air permit violation.  Do you
20 see that?
21    A.    I see that.
22    Q.    Let's look at moving
23 chronologically Alcoa Exhibit 143.  You're
24 aware, are you, that among the documents that
25 Fairchild provided from time to time to its

JOHN LEASE - REDIRECT

1            JOHN LEASE - REDIRECT
2 auditors as Alcoa does to its auditors were
3 documents disclosing potential liabilities to
4 the company for which the accountants needed to
5 be on notice?
6     A.   I am aware of that general report.
7 Yes.
8     Q.   The document I just placed in front
9 of you, Exhibit 143 appears to be a letter to
10 Ernst & Young regarding the Fairchild
11 Corporation dated August 29, 2002. On the back
12 page you will see the signature line is by
13 Michael Hodge. There is a copy to Donald
14 Miller, general counsel of the company. Do you
15 see that?
16     A.   Yes.
17     Q.   Do you know whether the due
18 diligence team at Alcoa looked at the reports
19 that Fairchild provided to its auditors looking
20 for what disclosures of EHS risks had been
21 provided to the auditors?
22     A.   The due diligence team?
23     Q.   Yes.
24     A.   I don't have firsthand knowledge of
25 that, no.

1            JOHN LEASE - REDIRECT
2     Q.   The document speaks for itself. If
3 you don't have firsthand knowledge of it then I
4 am not going to ask you about that one.
5     Now I want to show you the Phase I
6 report for Torrance. Okay.
7     A.   Okay.
8     Q.   We looked at the first version of
9 the disclosure schedule that was attached to the
10 agreement. Now I want you to look at the Phase
11 I report for Torrance. This comes from bulk
12 Exhibit A, volume 6.
13     Would you turn to printed page 49,
14 please.
15     A.   Okay.
16     Q.   Do you have printed page 49?
17     A.   Yes. I do.
18     Q.   Do you see property issues, the
19 heading at the top of the page?
20     A.   Yes.
21     Q.   Do you see toward the top, it talks
22 about how there are at least 14 underground
23 storage tanks at the facility?
24     A.   Yes.
25     Q.   That they have stored PCE and other

1            JOHN LEASE - REDIRECT
2 materials, waste oil, oily waste, etc., that
3 there have been spills and leaks of PCE and
4 other materials at all four areas they looked
5 at?
6     A.   Yes.
7     Q.   That in one area levels of mineral
8 spirits reached over 20,000 parts per million at
9 a depth of 25 feet. The tank installation
10 practices in one area were poor.
11     Then it says "Remedial activities
12 have been undertaken at all four areas to
13 different degrees" talks about soil confirmation
14 sampling being performed in two areas, residual
15 soil contamination remains in all four areas.
16 Do you see that?
17     A.   Yes.
18     Q.   Then it says, "Groundwater believed
19 to be present in discontinuous lenses at a depth
20 of about 90 feet beneath the site. No
21 groundwater wells have been installed at the
22 site, it is therefore unknown whether any of the
23 leaks that they were talking about up above have
24 affected shallow or deeper groundwater."
25     Then the Phase I says "It is

1            JOHN LEASE - REDIRECT
2 recommended that a Phase II investigation be
3 performed in all four of these areas to confirm
4 sufficient remedial activities have been
5 performed. Since no groundwater testing has
6 been performed it is recommended that
7 groundwater samples be collected using hydro
8 punch techniques in each of the four areas. And
9 as necessary, based on field observations, etc."
10     So far as you know after this was
11 provided to Fairchild and talked about doing
12 Phase II drilling down into the ground, checking
13 to see if the groundwater was contaminated with
14 these substances, did anybody at Fairchild say
15 to you don't do this, we do not want any further
16 work done pursuing this groundwater problem at
17 Torrance?
18     A.   Not to me, no.
19     Q.   We heard prior testimony there was
20 amended Schedule 3.24 provided to Alcoa. I want
21 to show you Alcoa Exhibit 119.
22     I would like you to look on the
23 second page of 119 which has Bates number ending
24 20 on it. Do you have that?
25     A.   Yes.

JOHN LEASE - REDIRECT
1
2     Q.     You see there are two entries for
3  Fairchild Fasteners toward the top, on the top
4  half of the page?
5     A.     Yes.
6     Q.     In Torrance -- sorry, one in
7  Torrance.  The first full entry on the page.
8     A.     Yes.
9     Q.     I will tell you that is the only
10 one for Torrance in this disclosure schedule.
11 Do you see anything in there about the
12 groundwater problem?
13    A.     No, I do not.
14    Q.     It wasn't in the first one, wasn't
15 in the second one.  But your consultants found
16 it and reported on it in the Phase I; correct?
17    A.     That's correct.
18    Q.     So the Phase II was in fact done as
19 recommended in the Phase I report for Torrance;
20 wasn't it?
21    A.     Yes.
22    Q.     Before the Phase II was done you
23 recall you testified both on direct-examination
24 and cross-examination about scopes of work that
25 were prepared and provided to Fairchild?

JOHN LEASE - REDIRECT
1
2     A.     Yes.
3     Q.     Let me show you, this is E.  I am
4  told you may have one, your Honor, I don't know
5  if you do not.  Exhibit E these are the scopes
6  of work for Phase IIs.  Would you turn to the
7  tab labeled Torrance.  Do you have that?
8     A.     Yes.
9     Q.     You see on the first page behind
10 that tab which ends with Bates number 387?
11    A.     Okay.
12    Q.     It gives a list of, there is a
13 chart in the middle of the page, gives sample
14 locations, media, depth, sample type, analytical
15 parameters, do you see all those columns?
16    A.     Yes, I do.
17    Q.     Do you see the second entry and
18 sixth entry?
19    A.     Yes.
20    Q.     Both talk about sampling
21 groundwater?
22    A.     Yes.
23    Q.     In two different sample locations;
24 correct?
25    THE ARBITRATOR:  I am under

JOHN LEASE - REDIRECT
1
2  Torrance?
3     MR. CHESLER:  Yes, your Honor in
4  the middle of the page, the chart.
5     THE ARBITRATOR:  First page.
6     MR. CHESLER:  Yes.  First page
7  which ends with Bates number 387.  Lower
8  right-hand corner.  Middle of the page, the
9  chart that has columns that start with Sample
10 Location.
11    THE ARBITRATOR:  Yes.
12    MR. CHESLER:  Second line entry A
13 1 groundwater.
14    THE ARBITRATOR:  Right.
15    MR. CHESLER:  Then sixth entry A 4
16 groundwater.
17    Q.     So in the SOWs that you provided to
18 Fairchild, the scopes of work for Phase IIs that
19 you provided, then met about in November, you
20 told them, didn't you, that among all the other
21 things you were going to do was you were going
22 to do testing in the Phase IIs of groundwater at
23 sample depths of about 90 feet using monitoring
24 wells looking for all the different materials
25 listed on the right-hand side of this chart; is

JOHN LEASE - REDIRECT
1
2  that right?
3     A.     That's correct.
4     Q.     Then if you go to the next page
5  which ends 388.  Again the chart in the middle
6  of the page, you told them you were also going
7  to do groundwater sampling at sample location
8  B 4 using an auger monitoring method looking for
9  all the potential hazardous materials listed on
10 the right-hand side of that line; correct?
11    A.     It is actually a monitoring well.
12    Q.     I read auger above.  Sorry.
13    A.     Yes.
14    Q.     You gave them notice you were going
15 to drill what appear to be three different wells
16 in three different locations to test groundwater
17 for a long list of potential contaminations;
18 correct?
19    A.     Correct.
20    Q.     Did they ever say to you no, don't
21 do this?
22    A.     No.
23    Q.     Then you in fact had the Phase IIs
24 done, paid ERM to do them; correct?
25    A.     Correct.

Page 1391

JOHN LEASE - REDIRECT

Q. Let's look at the Phase II report for the Torrance facility. This comes from bulk Exhibit B, volume 5. So Phase I said you may have a big groundwater problem; right?

A. Right.

Q. You better do a Phase II, scopes of work laid out where you were going to drill, how you were going to drill, what you were going to look for; correct?

A. Correct.

Q. Then the Phase IIs were in fact done; correct?

A. Correct.

Q. Would you look at page printed page 18. We are looking at Phase II report for Torrance, which is in, from bulk Exhibit B, volume 5. Printed page 18, your Honor, which corresponds to the Bates number that end 579.

THE ARBITRATOR: Yes.

Q. Do you see that talks about the various regulations in force in California and the agencies that may need to be notified?

A. Yes.

Q. It talks about what if notification

Page 1392

JOHN LEASE - REDIRECT

is made, then there may be various requirements imposed?

A. Correct.

Q. Would you turn to the next page, page 19. It says under reporting toward the top of the page, "notification of a significant spill or threatened release to the California office emergency services must occur verbally and immediately upon discovery, written reports follow verbal notifications." Do you see that?

A. Yes.

Q. Then it goes down under Site Assessments to say "further site assessment and need for remedial action follows after initial notification of a spill or threatened release?"

A. Yes.

Q. It goes on in the next paragraph under 4.1.2 to say "Each step of investigation is preceded by the preparation of a work plan approved by the agency prior to the start of work. The results may lead immediately to the preparation of corrective action plans or remedial action plans, etc." do you see that?

A. Yes.

Page 1393

JOHN LEASE - REDIRECT

Q. Would you turn to page 30, printed page 30 which corresponds to the Bates number ending 592?

A. Okay.

Q. Do you see under groundwater this talks about what they found in the Phase II studies when they sampled the groundwater. Do you remember one of the locations you told them you were going to drill at was B 4?

A. Yes.

Q. It says here talking about B 4, middle of the page "the only VOC detected in the groundwater sample from this location was PCE at concentration of 6800 micrograms per liter." Do you see that?

A. Yes.

Q. This amount of PCE significantly exceeds the 5 micrograms per 1 -- what is?

A. Per liter. Maximum contaminant level.

Q. So this is saying that the maximum level that they would allow in the California law was 5 micrograms per liter. And in fact they detected here 6800 micrograms per liter, is

Page 1394

JOHN LEASE - REDIRECT

that what this says?

A. Yes.

Q. This says "high reported concentration has caused increase in detection limits for other chlorinated VOCs potentially masking their detection," says "this detection of PCE suggests significant impact to the groundwater under the site." It goes on to talk about other findings. You provided this to Fairchild as well; correct?

A. Correct.

Q. You gave them these reports only after it had been mentioned in the Phase I and in the scopes of work; correct?

A. Correct.

Q. This was you found a condition that was already in play when they owned it; correct?

A. Correct.

Q. We heard some testimony about why you went to the authorities or did Alcoa go to the authorities. You heard the expert witness who testified during the break in your testimony talk about his experience with the California regulators and how it works if you don't enter

JOHN LEASE - REDIRECT

1          JOHN LEASE - REDIRECT
2 into a decree with them. Did you hear that?
3     A.  Yes.
4     Q.  Let me show you Exhibit 167, Alcoa
5 167. Do you see these are emails from earlier,
6 just about a year ado February of 2006?
7     A.  Yes.
8     Q.  You see the email at the top of the
9 page is from someone named Charles stone at the
10 DTSC?
11     A.  Yes.
12     Q.  You recognize that as the
13 government agency in California we were talking
14 about earlier?
15     A.  Yes.
16     Q.  Do you know Greg Pfeifer?
17     A.  Yes, I do.
18     Q.  Who is Greg Pfeifer?
19     A.  Greg is an attorney in the
20 environmental practice area in Alcoa.
21     Q.  The subject is Torrance; right? It
22 says about the fifth line down, subject
23 Torrance?
24     A.  Yes.
25     Q.  Mr. Stone of the government agency

1          JOHN LEASE - REDIRECT
2 DTSC writes to Mr. Pfeifer "Greg at this date
3 there are two options available for Alcoa either
4 enter into the CACA or DTSC will issue a
5 unilateral order demanding the site be
6 remediated in a timely fashion. Should you have
7 any questions please feel free to contact me."
8 Just in case that wasn't clear enough.
9       Is that consistent with what our
10 expert told us California regulators do?
11     A.  Yes.
12     Q.  Agree or else; right?
13     A.  Yes.
14     Q.  Did you have any understanding that
15 you were under some kind of duty to consult with
16 or see what the Fairchild people thought you
17 should do with this gun pointed at Alcoa's head?
18     A.  No.
19      MR. ZUROFSKY:  Objection to the
20 characterization of the gun.
21     Q.  Withdrawn. Did you believe you
22 were under any obligation to consult with
23 Fairchild with respect to the position taken by
24 the DTSC concerning the groundwater problems at
25 Torrance?

1          JOHN LEASE - REDIRECT
2     A.  No.
3      THE ARBITRATOR:  This refers to
4 Torrance. Is that what it is referring to, the
5 groundwater problem?
6      MR. CHESLER:  Yes, your Honor, it
7 is.
8     Q.  Two other subjects and then we're
9 done. They asked you about the parking lot
10 situation in Toulouse. I shouldn't say they.
11 Counsel asked you. Correct?
12     A.  Yes.
13     Q.  Again, was this a situation where
14 Fairchild was saying we're not going to pay you
15 because you didn't give us enough notice or were
16 they saying we are not going to pay you because
17 we don't think this is a Fasteners Environmental
18 Condition?
19     A.  I think they were saying it was not
20 a Fasteners Environmental Condition.
21     Q.  You have been at this compliance
22 consulting job for quite a while; haven't you?
23     A.  Yes.
24     Q.  Can you tell us if there is a
25 serious safety problem at the Toulouse --

1          JOHN LEASE - REDIRECT
2      THE ARBITRATOR:  Probably haven't
3 had this much fun in a long time though, huh?
4      THE WITNESS:  Is that what this
5 is?
6     Q.  Ever since that sleeping on nails
7 night at the fraternity house you haven't had a
8 time like this.
9      So, if there were an emergency at
10 the Toulouse facility, people were injured by
11 fire or by some explosion, whatever, and the one
12 entry points to the parking lot were for some
13 reason blocked, based upon your experience in
14 safety compliance, do you think that might have
15 some impact on the well-being of the people
16 inside the facility?
17     A.  I wouldn't even need to be a safety
18 compliance expert to know there would be an
19 impact. Yes.
20     Q.  By the way, the cost estimates you
21 were shown for doing whatever work the permit
22 required at Toulouse, they weren't up a lot;
23 didn't they?
24     A.  Yes, they did.
25     Q.  Is Alcoa making a dime on any of

JOHN LEASE - REDIRECT

2 that? Are you billing these guys for more than
3 it is going to cost you to do what the French
4 permit requires you to do?
5      A.    No.  The best we can do is break
6 even.
7      Q.    The best we can do.  Assuming they
8 are ordered to pay you and they pay you, all you
9 do is break even?
10     A.    Yes.
11     Q.    Last subject.  You were asked some
12 questions about remediation.  Let me ask you to
13 look, do you have the book up there we used
14 during direct-examination?
15     A.    Yes, I do.
16     Q.    Would you turn to tab 18, please.
17 Do you have tab 18, Mr. Lease?
18     A.    I'm there.
19     Q.    We have seen this letter on
20 direct-examination.  You saw it on
21 cross-examination.  This is the letter from Mr.
22 Beckford to you from February 26, 2004, Alcoa
23 Exhibit 32; correct?
24     A.    That's correct.  If I may point out
25 one error in this letter.

JOHN LEASE - REDIRECT

2      Q.    Yes?
3      A.    My title is not esquire.
4      Q.    Well it is now.  We are going to
5 give you an honorary degree after today.
6           You remember this is the letter
7 where Mr. Beckford went through and categorized
8 different requests for payment you had made into
9 category 1, 2, and 3?
10     A.    Yes.
11     Q.    You were asked a lot of questions
12 on cross-examination about the fact that he
13 asked you to take the category 3 stuff and sort
14 it out in various ways and come back with more
15 information.  Do you remember that?
16     A.    Yes.
17     Q.    Then you were shown the chart that
18 I think counsel told you was prepared actually
19 by Mr. Hodge that follows the body of the
20 letter.  That begins at page 297.  Do you recall
21 that?
22     A.    Yes.
23     Q.    Counsel pointed out to you there
24 were some items on this list that had a capital
25 Y on them, do you remember that?

JOHN LEASE - REDIRECT

2      A.    Yes.
3      Q.    He pointed out that according to
4 this letter Y says that "Cost of this portion of
5 the report may be appropriate for
6 indemnification depending on what if any
7 remedial action is recommended/required." Do you
8 remember that?
9      A.    Yes.
10     Q.    So the dangle of a possible payment
11 with a capital Y.  What counsel didn't show you,
12 what I want to go back to, is the letter that
13 you received almost exactly a year later from
14 Ms. Hall who by then had replaced Mr. Beckford
15 as the contact person on the Fairchild side.
16           Would you look at tab 19, please.
17     A.    Okay.
18     Q.    This is in fact the letter you
19 received from Ms Hall; correct?
20     A.    Yes, it is.
21     Q.    I want you to turn to the second
22 page of this letter, the backside, I believe of
23 the first page if you have two-sided copy.
24 Bates number 340 on it.
25     A.    Yes.

JOHN LEASE - REDIRECT

2 THE ARBITRATOR:  Tab 19?
3      MR. CHESLER:  Yes.  In the direct
4 exam book.  On the backside of the first page of
5 the document.  Bates number 340 at the bottom.
6 Do you have that, your Honor.
7      THE ARBITRATOR:  I have it.  What
8 is the page, 340?
9      MR. CHESLER:  Yes.
10     Q.    I want you to look at the next to
11 the last paragraph on this page from Ms. Hall.
12 The paragraph that begins "the agreement
13 requires."  Do you have that?
14     A.    Yes.
15     Q.    The second sentence of that
16 paragraph she told you the following.  "None,
17 none of the various reports, assessments or site
18 characterizations undertaken by Alcoa was in
19 response to a Fasteners Environmental Condition.
20 Without an Environmental Condition Alcoa's
21 commissioning various environmental assessments
22 was and is an ordinary business expense
23 voluntarily incurred by Alcoa." That is what she
24 told you?
25     A.    Yes.

93  (Pages 1399 to 1402)

JOHN LEASE - REDIRECT

1    JOHN LEASE - REDIRECT
2        Q.    She went on to say, bottom
3    paragraph "In short, Alcoa can commission all
4    the environmental assessments it wishes. Such
5    assessments, be they environmental, workplace,
6    health and safety or OSHA, are not Fasteners
7    Environmental Liabilities. " Then she drops a
8    footnote.
9            Did you have any question in your
10   mind, was that ambiguous to you at all what her
11   position was?
12       A.    Yes, it was.
13       Q.    Let's look at the footnote -- you
14   said it was ambiguous to you?
15       A.    Yes.
16       Q.    How was it ambiguous?
17       A.    Well, let me read it again. Well
18   in the first sentence she said that the, without
19   environmental condition Alcoa's commissioning is
20   an ordinary business expense. In the second
21   sentence she says that we can commission all of
22   the environmental assessments we wish to
23   undertake.
24       Q.    She doesn't say she is going to pay
25   you for them; does she?

1    JOHN LEASE - REDIRECT
2        A.    No.
3        Q.    In fact she says such assessments,
4    whether environmental or workplace health and
5    safety or they are OSHA are not Fasteners
6    Environmental Liabilities; isn't that what she
7    says?
8        A.    Yes.
9        Q.    If they are not a Fasteners
10   Environmental Liability, according to Fairchild,
11   they are not going to pay you for them; are
12   they?
13       A.    That's correct.
14       Q.    Then she drops the footnote --
15   sorry, I want to go on to the text then he with
16   will go to the footnote. She says "The expenses
17   associated with implementing a remedy based on
18   those assessments might qualify, expenses
19   associated with implementing a remedy based on
20   those assessments might qualify. But not the
21   assessments themselves. Unless and until there
22   is a Fasteners Environmental Condition there is
23   no basis for indemnification." Do you see what
24   she says?
25       A.    Yes.

1    JOHN LEASE - REDIRECT
2        Q.    So you go to the doctor for a
3    physical. If he tells you you've got eight days
4    to live they will pay you for the physical. If
5    he says you're fine, they won't. That is what
6    it amounted to; right?
7        A.    Yes.
8        Q.    Is that your understanding of the
9    agreement you were operating under?
10       A.    No. It is not.
11       Q.    Do you know whether you have a
12   problem until you investigate to find it?
13       A.    No.
14       Q.    Now, let's look at the footnote.
15   "On a related matter, by letter dated February
16   26, 2004" by the way that is the letter we just
17   looked at. One where Mr. Beckford divided stuff
18   up and put some Ys in that counsel suggested
19   meant boy, if only you played along maybe you
20   would get paid, what does she say here she says
21   with respect to that letter "We requested
22   additional information regarding
23   approximately --"
24           THE ARBITRATOR:  Sorry, where are
25   you reading from now?

1    JOHN LEASE - REDIRECT
2        MR. CHESLER:  Footnote 1, your
3    Honor.
4        Q.    She said she requested in that
5    letter, Fairchild requested "Additional
6    information regarding approximately 528,130.78."
7    I am not sure how you get that approximate. It
8    is like shooting approximately 71 in a golf
9    match. Of Phase II assessment costs incurred by
10   Alcoa. You have not provided such information.
11           Here comes the kicker. "On further
12   analysis we have determined that for the same
13   reasons expressed in this letter, the
14   $528,130.78 in costs incurred by Alcoa are not
15   indemnifiable. Such costs do not relate to a
16   Fasteners Environmental Condition, rather they
17   relate to Alcoa's 'kicking the tires' they are
18   not Fasteners Environmental Liabilities and we
19   reject any attempt by Alcoa to apply these sums
20   against the 8 million," we have the numbers a
21   little wrong "8,450,000 reserve, in short all of
22   Alcoa's claims for indemnification under section
23   11.6 for environmental assessments, lock tag and
24   verify assessments machine guarding assessments
25   or any other an assessments or characterizations

94 (Pages 1403 to 1406)

Page 1407

JOHN LEASE - RECROSS

1
2 are rejected entirely."
3          So the Ys on Mr. Beckford's chart
4 got yanked; didn't they?
5     A.   Yes.
6     Q.   You weren't getting any money, no
7 way, no how out of Ms. Hall; right?
8     A.   That's correct.
9          MR. CHESLER:  Further questions,
10 your Honor.
11          MR. ZUROFSKY:  I will try to be as
12 brief as I can.
13          THE ARBITRATOR:  I will give you
14 five minutes.
15          MR. ZUROFSKY:  This witness was
16 someone we were calling on our direct as well.
17 I know we are running late.
18          THE ARBITRATOR:  It would be nice
19 if we finish him tonight.
20          MR. ZUROFSKY:  We all agree that
21 would be a good idea.
22     CROSS-EXAMINATION BY MR. ZUROFSKY:
23     Q.   Mr. Lease, Mr. Chesler started with
24 the agreement.  So I will, too.  Do you still
25 have a copy of the agreement?

Page 1408

JOHN LEASE - RECROSS

1
2     A.   Yes.
3     Q.   Looking at page 83, top 84 end of
4 section 111.6 C.  At the bottom of page 83 says
5 "the buyer shall afford," do you have the same
6 version?
7     A.   Yes.
8     Q.   Last sentence "The buyer shall
9 afford the sellers a reasonable opportunity to
10 comment on the buyer's proposed response to a
11 Fasteners Environmental Condition buyer shall
12 nod unreasonably refuse to incorporate the
13 seller'S comments."  Do you see that, Mr. Lease?
14     A.   Yes.
15     Q.   I want to focus on two phrase
16 there.  Reasonable opportunities and buyers
17 proposed response.  Who is the buyer?  Do you
18 know who the buyer is in the agreement?  Is the
19 buyer Alcoa in the agreement?
20     A.   Yes.
21     Q.   The buyer is not ERM; is it?
22     A.   They are contracted by Alcoa.
23     Q.   The buyer is not -- ERM didn't buy
24 the facilities did it?
25     A.   No, they did not.

Page 1409

JOHN LEASE - RECROSS

1
2     Q.   Mr. Chesler took you through a
3 whole bunch of Phase Is in which ERM made
4 recommendations.  Do you recall that about
5 machine guarding and other things?
6     A.   Yes.
7     Q.   We are going to look at those
8 recommendations but we are also going to talk a
9 bit.  Those are recommendations from ERM to
10 Alcoa; correct?
11     A.   Correct.
12     Q.   Did Alcoa adopt every single
13 recommendation in the Phase Is?
14     A.   I don't know.
15     Q.   Did Alcoa do other things other
16 than what was recommended in the Phase Is?
17     A.   Based on later information, I am
18 sure that we did.
19     Q.   In fact Alcoa at the four facility
20 we talked about performed gap analysis following
21 Phase Is; right?
22     A.   Yes.
23     Q.   You told me the letters you
24 provided to Mr. Hodge were based on those gap
25 analysis; correct?

Page 1410

JOHN LEASE - RECROSS

1
2     A.   The basis for the letters was an a
3 combination of the gap analysis report, the
4 actual work that was done on site as well as
5 information that we obtained from the Phase Is.
6     Q.   Alcoa just didn't go out and
7 implement all of ERM's recommendations in the
8 Phase Is and just do them; right?
9     A.   I don't know.
10     Q.   You said you performed gap
11 analysis, you did some more study; right?
12     A.   Yes.
13     Q.   So it is not as if once ERM made
14 the recommendation Alcoa adopted it as its own
15 recommendation; is that right?
16     A.   In essence, we reviewed all the
17 recommendations and implemented them as
18 necessary.
19     Q.   After you had done further study?
20     A.   Well we had to tailor them to
21 specific facility, but that was the purpose of
22 the gap analysis to define those a little more
23 clearly for Fairchild.
24     Q.   When you write to Mr. Hodge in
25 connection with those letters with the summary

95 (Pages 1407 to 1410)

Page 1411

JOHN LEASE - RECROSS

1 JOHN LEASE - RECROSS
2 charts that we looked at, we can look at one of
3 them if you want. Turn to page 16 for Toulouse
4 you talked about this is the summary chart of
5 your gap analysis for Toulouse that is attached
6 to this letter.
7     A.    Yes.
8     Q.    You see the first line there, it
9 says "We have completed our initial
10 environmental, health and safety review of the
11 Toulouse facility."
12    A.    Yes.
13    Q.    You are talking about gap analysis
14 there; right?
15    A.    Environmental health and safety
16 reviews, gap analysis is the same thing.
17    Q.    You don't mention Phase I anywhere
18 in this cover letter to Mr. Hodge; do you?
19    A.    No.
20    Q.    You don't say here we are
21 implementing recommendations by ERM as Alcoa's
22 own proposals; do you?
23    A.    No.
24    Q.    Let's talk about what was in those
25 Phase Is. First one I won't hand you -- we will

Page 1412

JOHN LEASE - RECROSS

1 JOHN LEASE - RECROSS
2 do Fullerton first. Mr. Chesler handed you
3 Fullerton. We had a lot of discussion today and
4 yesterday about Fullerton and machine guarding;
5 right, Mr. Lease?
6     A.    Yes.
7     Q.    Mr. Chesler said to you, was
8 Fullerton recommendation, the recommendation
9 contained in Fullerton Phase I regarding machine
10 guarding; do you remember that?
11    A.    Yes.
12    Q.    He pointed you to page 71. Do you
13 recall that?
14    A.    Yes.
15    Q.    Look at page 71 the Fullerton
16 facility consists of two plants and a warehouse;
17 right?
18    A.    Yes. I think that is true.
19    Q.    This is under heading Warehouse;
20 right page 71. Do you see that?
21    A.    Yes.
22    Q.    They are separate if you turn back
23 before there are separate headings for plant 1
24 and plant 2?
25    A.    Okay.

Page 1413

JOHN LEASE - RECROSS

1 JOHN LEASE - RECROSS
2     Q.    Now the recommendation Mr. Chesler
3 read to you about machine guarding is under
4 heading warehouse; right?
5     A.    Yes.
6     Q.    It says "It is recommended that the
7 facility ensure that all machinery be equipped
8 with proper guarding." Do you see that?
9     A.    Yes.
10    Q.    Let's move forward to your letter
11 to Mr. Hodge about the Fullerton facility which
12 follows this that is at tab 14. If you turn to
13 the second page of the chart Bates 5000041. Do
14 you see that?
15    A.    Yes.
16    Q.    There we have entry for machine
17 guarding. Now it's talking about plant wide
18 survey of machine guarding; right? Do you see
19 that issue description?
20    A.    Yes.
21    Q.    Estimated cost is what?
22    A.    $58,000.
23    Q.    How much did you spend, have you
24 spent so far at Fullerton on machine guarding?
25    A.    1 million.

Page 1414

JOHN LEASE - RECROSS

1 JOHN LEASE - RECROSS
2     Q.    Over a million; right?
3     A.    Yes.
4     Q.    That was the subject of that
5 recommendations we saw in the box yesterday from
6 STI. Do you recall it said the proposal
7 guarding solutions was in the cover letter?
8     A.    Yes.
9     Q.    That was facility wide; right?
10    A.    I believe so. Yes.
11    Q.    The box we looked at yesterday?
12    A.    Pardon.
13    Q.    The box we looked at yesterday?
14    A.    What box?
15    Q.    The box of documents for Fullerton.
16    A.    Oh, okay.
17    Q.    So that is Fullerton; right?
18    A.    Yes.
19    Q.    Mr. Chesler, you only sent these
20 compliance gap letters for four facilities we
21 talked about that?
22    A.    Yes.
23    Q.    Anywhere in those letters did you
24 say, oh, these really speak for the rest of the
25 facilities at all?

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com

Page 1415

JOHN LEASE - RECROSS
1
2     A.    No.  This was a notice of
3  environmental condition.
4     Q.    At that facility?
5     A.    At all four facilities plus it
6  represented the conditions we found at the other
7  plants based on information contained in the
8  Phase Is which we went through.
9     Q.    Hold on in the Phase Is and one of
10  the ones Mr. Chesler showed you or a bunch of
11  them I believe he pointed you to machine
12  guarding language at among other facilities,
13  Kelkheim, Stoughton, Montbrison, Hildescheim.
14  Do you recall those four?  They are probably
15  right in front of you.
16     A.    I recall it, the names, yes.
17     Q.    Those are four other facilities
18  than the four subject of the notice letters --
19  of the gap analysis letters we talked about;
20  right?
21     A.    Right.
22     Q.    Those four all contain
23  recommendations as Mr. Chesler took you through
24  about machine guarding; right?
25     A.    Yes.

Page 1416

JOHN LEASE - RECROSS
1
2     Q.    As did the four for the letters we
3  looked at; right?
4     A.    Right.
5     Q.    So, you sent four letters to
6  Fairchild, but you didn't send them any gap
7  analysis letters on the four I just mentioned
8  Kelkheim, Stoughton, Montbrison or Hildescheim?
9     A.    No gap analysis letters for those
10  plants.
11     Q.    All eight of them had statements in
12  the Phase Is about machine guarding and
13  recommendations; right?
14     A.    Yes.
15     Q.    How is Fairchild to know that Alcoa
16  was going to proceed ahead with machine guarding
17  at Kelkheim, Stoughton, Montbrison and
18  Hildescheim?
19     A.    How did they know we were going to
20  proceed?
21     Q.    Yes, to go ahead with machine
22  guarding work.
23     A.    They were noncompliance with the
24  regulations.  It is clear in the agreement that
25  when there is an a noncompliance condition

Page 1417

JOHN LEASE - RECROSS
1
2  noted, it is a Fasteners Environmental Liability
3  subject to indemnification.
4     Q.    You sent them this gap analysis for
5  four facilities; right.
6     THE ARBITRATOR:  Fullerton
7  Toulouse, what were the other?
8     Q.    Torrance and St. Cosme.  Right?
9     A.    Yes.
10     Q.    We looked at a lot this morning
11  where Mr. Miller responded.  We will talk about
12  that in one second with respect to Judge
13  Stapleton's question.
14     Mr. Miller responded then Mr.
15  Harvey'S letter covered those facilities, St.
16  Cosme was a little different, but the other
17  three?
18     A.    Yes.
19     Q.    That was the situation at those
20  four facilities; right.  There is no letter at
21  the other facilities; right?
22     A.    What other facilities.
23     Q.    Any of the other facilities other
24  than those four?
25     A.    Yes.

Page 1418

JOHN LEASE - RECROSS
1
2     Q.    Including any of the ones that
3  mentioned machine guardings in the Phase Is?
4     A.    No letters, correct.
5     Q.    Turn our attention, before doing
6  that let's talk about others.  Did you do
7  machine guarding working at City of Industry
8  Temple Avenue?
9     A.    Yes.
10     Q.    Here is the Phase I.
11     THE ARBITRATOR:  Gap stands for
12  what again?
13     THE WITNESS:  The difference
14  between actual condition and regulatory
15  condition.
16     THE ARBITRATOR:  It is not an
17  acronym?
18     THE WITNESS:  No.
19     THE ARBITRATOR:  You just call it
20  a gap.
21     Q.    This is Phase I for City of
22  Industry, Temple Avenue?
23     A.    Yes.
24     Q.    Any mention in there about machine
25  guarding maybe we will draw your attention to

97  (Pages 1415 to 1418)

JOHN LEASE - RECROSS

2 conclusions and recommendations?
3     A.    I don't see it in the conclusions
4 and recommendations.
5     Q.    Nothing; right?
6     A.    Nothing on machine guarding here.
7     Q.    How about next one Simi Valley?
8 Here is 437.
9            (Arbitration Exhibit 437
10 was marked.)
11     Q.    Alcoa performed machine guarding
12 work at Simi Valley too, right?
13     A.    No.
14     Q.    Is there any mention of machine
15 guarding in the conclusions and recommendations
16 of that document?
17     A.    For Simi Valley?
18     Q.    Yes.
19     A.    I don't see any.
20     Q.    Mr. Chesler, actually Judge
21 Stapleton asked you whether or not you recall
22 that Fairchild had objected to machine guarding
23 on the ground of notice or definitional or both.
24 Do you recall that discussion?
25     A.    Yes.

JOHN LEASE - RECROSS

2 out and spend a lot of money on producing those
3 documents we looked at yesterday from STI to
4 find out just what the problems were?
5     A.    They did that to identify what the
6 solution was.
7     Q.    Do you want to go look back at
8 those documents? Are you sure about that? I
9 don't want to bring the box out again.
10     A.    The document contains a solution.
11     Q.    Doesn't it contain also a
12 diagnostic for machine remember we looked at
13 high risk, low risk, medium risk it was
14 assessing each of the machines then proposing
15 potential solution; does that refresh your
16 recollection?
17     A.    I don't recall what came first in
18 the document.
19     Q.    Turn in your correspondence binder,
20 the one I handed to you under the section
21 miscellaneous multiple facilities, the last tab.
22     A.    Where are we now.
23     Q.    Go to a letter dated January 31,
24 2005. It is I would say about two-thirds of the
25 way in in that tab?

JOHN LEASE - RECROSS

2     Q.    I want to draw your attention to
3 two documents. First is Mr. Miller's response
4 at Fullerton which is behind tab 15. Second
5 paragraph. He says "In the first stance the
6 letter and table lack sufficient specificity to
7 satisfy the notice requirements under section
8 11.6. In light of the foregoing Fairchild is
9 unable to determine and in any event disputes
10 whether all of these items," so on and so forth
11 fall within ambit of section 11.6. I don't need
12 to read on.
13            Does that refresh your recollection
14 that Mr. Miller was both claiming there was
15 notice problem and also he was disputing whether
16 or not this falls within the ambit of 11.6?
17     A.    I am not sure what the notice
18 provisions are he is referencing. But to
19 describe the condition that we found in the
20 specific regulation that, where the
21 noncompliance exists it is hard for me to
22 understand how anybody could not see that a
23 Fasteners Environmental Condition existed at
24 that facility.
25     Q.    Subsequent to this didn't Alcoa go

JOHN LEASE - RECROSS

2     A.    On multiple facilities.
3     Q.    Yes. Last tab multiple facilities.
4 Moving into about two-thirds of the way into
5 that tab chronological. I want January 31, 2005
6 if you don't mind?
7     A.    Okay.
8     Q.    You got it there?
9     A.    I have it.
10     Q.    It is a letter from Ms. Hall;
11 right?
12     A.    Yes.
13            MR. CHESLER:    Sorry, counsel, the
14 date?
15            MR. ZUROFSKY:    January 31, 2005.
16            MR. CHESLER:    Thank you.
17     Q.    Letter from Ms. Hall?
18     A.    Yes.
19     Q.    I want to focus on the paragraph,
20 third paragraph, bottom third and equally
21 telling?
22     A.    Yes.
23     Q.    "Third and equally telling is the
24 fact that Alcoa seeks reimbursement for expenses
25 incurred primarily in 2003, later 2004." Do you

Page 1423

JOHN LEASE - RECROSS

1    JOHN LEASE - RECROSS
2  see that?
3         THE ARBITRATOR:   What paragraph
4  are you on?
5         MR. ZUROFSKY:   Third paragraph,
6  sorry, your Honor.
7      Q.    Let me first do the first
8  paragraph. Let's do it in order. Look at the
9  first paragraph which is first. Alcoa failed to
10 demonstrate the guarding requirements of OSHA
11 1910.212 or state or foreign equivalents are
12 fastener environmental liability?
13     A.    Yes.
14     Q.    Do you understand OSHA 1910.212 to
15 be machine regulation in OSHA?
16     A.    Yes.
17     Q.    Does this refresh your recollection
18 that Hall and Fairchild were disputing
19 requirements under that regulation constitute
20 Fasteners Environmental Liabilities at this
21 time?
22     A.    That is what I get from this.
23     Q.    That is before this arbitration
24 proceeding and lawyers got involved; right? You
25 don't know when the lawyers got involved? Go to

Page 1424

JOHN LEASE - RECROSS

1      JOHN LEASE - RECROSS
2  the third paragraph "Third and equally telling
3  is the fact that Alcoa seeks reimbursement for
4  expenses incurred primarily in later 2003 to mid
5  2004." Do you see that?
6      A.    Yes.
7      Q.    "That raises two significant
8  points. 1, Alcoa is in blatant disregard of
9  sections 11.6 C and D of the Acquisition
10 Agreement." See that?
11     A.    Yes.
12     Q.    Does that refresh your recollection
13 Ms. Hall is also objecting on ground of failure
14 of notice?
15     A.    Okay.
16     Q.    There were four letters sent as we
17 looked at before which identified machine
18 guarding but do you understand the subject of
19 this letter, the one she is responding to be
20 about more facilities than those four, do you
21 understand what I'm saying?
22     A.    No.
23     Q.    She is responding to your letter;
24 right?
25     A.    Yes.

Page 1425

JOHN LEASE - RECROSS

1      JOHN LEASE - RECROSS
2      Q.    Your letter of December 20?
3      A.    Okay.
4      Q.    If you go back two letters in the
5  binder I think that is your letter, December 20,
6  2004 letter?
7      A.    Okay.
8      Q.    It refers to eight facilities
9  there?
10     A.    Yes.
11     Q.    More than the four that we had the
12 GAAP compliance discussion about earlier; right?
13     A.    That is more than four, yes.
14     Q.    Those were the four Mr. Harvey --
15 well, three Mr. Harvey promised additional
16 documentation to Fairchild about; right?
17     A.    I wouldn't say Mr. Harvey promised
18 anything. We have been over this.
19     Q.    We don't have to redo that ground.
20     A.    Yes.
21     Q.    Counsel spoke to you at some length
22 about Torrance; right? Do you recall that?
23     A.    Yes.
24     Q.    We discussed also, you discussed
25 also Mr. Beckford's letter with, I think counsel

Page 1426

JOHN LEASE - RECROSS

1      JOHN LEASE - RECROSS
2  used the phrase dangling Y. Do you recall that?
3      A.    The Phase II?
4      Q.    Yes. Response to the Phase IIs?
5      A.    Okay.
6      Q.    Now let's go to that letter. I
7  believe at tab 18 of that binder.
8      A.    I have it.
9      Q.    Did you, do you recall that counsel
10 took you through whole chronology about
11 Torrance; right?
12     A.    Yes.
13     Q.    Said Phase I identified problems
14 then there is Phase II that identifies problems
15 after scope of work had been provided do you
16 recall that?
17     A.    Yes.
18     Q.    Subsequent to the Phase IIs at
19 Torrance Alcoa did perform further
20 investigations at that facility; correct?
21     A.    Yes, I believe we did.
22     Q.    Prior to the involvement of the
23 DTSC and Consent Agreement those investigations
24 happened in that interval; right?
25     A.    I have to check the chronology. I

Page 1427

JOHN LEASE - RECROSS

1    don't know.  I am losing track of time here.
2    don't know.  I am losing track of time here.
3        Q.    I can show you documents for now
4    can we work on that assumption.
5        A.    For the discussion, okay.
6        Q.    Mr. Beckford's letter is in
7    response to the Phase IIs; right?
8        A.    Yes.
9        Q.    I want to turn again to the page FC
10   299 okay.  Do you recall Mr. Chesler talking
11   about the former underground storage tanks at
12   Torrance.
13       A.    Yes.
14       Q.    If you look at that first box, 9 A
15   here on page 299.  It is talking about former
16   underground storage tanks.  Do you see that
17   there?
18       A.    Yes.
19       Q.    The last line of that comment
20   section says "The source of this impact is not
21   entirely clear from Alcoa's assessment." That
22   being the Phase II assessment; right?
23       A.    I assume.
24       Q.    "However it present an issue which
25   should be followed up" do you see that?

Page 1428

JOHN LEASE - RECROSS

1    JOHN LEASE - RECROSS
2        A.    Yes.
3        Q.    Go back to the cover letter from
4    Mr. Beckford, again early 2004 FC 296.
5        A.    Okay.
6        Q.    The last bit of text before the
7    stars says "On those sites as to which we agree
8    that there should be further investigation" we
9    just looked at Torrance, right, as sites on
10   which Fairchild indicated there should be
11   further investigation; right?
12       A.    Yes.
13       Q.    "Please ensure that the actual
14   investigative measures are first discussed with
15   our designated representative Michael Hodge as
16   required by section 11.6 of the Acquisition
17   Agreement." Do you see that?
18       A.    Yes.
19       Q.    Now, prior to Ms. Hall's letter
20   with the footnote that counsel ended on, did you
21   discuss or communicate in any way prior to
22   taking investigative work at Torrance with
23   Fairchild?
24       A.    We sent them information.  I am not
25   sure we communicated directly with Mr. Hodge.

Page 1429

JOHN LEASE - RECROSS

1    JOHN LEASE - RECROSS
2    But we considered the recommendations or
3    suggestions in the table.  Which was our
4    requirement that we should reasonably consider
5    the comments.
6        Q.    Comments on what? What is he
7    commenting on, commenting on Phase I results of
8    the reports; right?
9        A.    He also was commenting, in essence,
10   on the proposed action.
11       Q.    Does it say that? Where does it say
12   that?
13       A.    Present and issue which should be
14   followed up.
15       Q.    At that point had Alcoa put
16   together a proposal or scope of work as to how
17   it should be followed up?
18       A.    Did he what?
19       Q.    Did Alcoa put together a proposal
20   or scope of work as to how it should be followed
21   up?
22       A.    I don't know.  I don't recollect
23   the documents.  There they are.
24       Q.    Actually they are not there.
25   That's the point.  Scope of work is not there.

Page 1430

JOHN LEASE - RECROSS

1    JOHN LEASE - RECROSS
2    Let's move forward.  Ms. Hall, counsel spent a
3    lot of time with you on Ms. Hall's letter of
4    February 25, 2005; right in which she says in
5    the footnote she says voluntary assessments and
6    all that stuff.  Do you recall that?
7        A.    Are we on her letter now?
8        Q.    Yes.
9        A.    Okay.
10       Q.    Right?
11       A.    Right.
12       Q.    That was in response the a letter
13   you wrote on January 25, correct that is what it
14   says there?
15       A.    Okay.
16       Q.    Let's look at that letter.
17       THE ARBITRATOR:  What tab?
18       MR. ZUROFSKY:  Tab of which one?
19       THE ARBITRATOR:  You are going to
20   go to the Hall letter?
21       MR. ZUROFSKY:  The Hall letter is
22   the response.  The one Mr. Chesler spoke about
23   at the footnote is at tab 19 of Mr. Chesler's
24   binder.  Now that was the letter Ms. Hall wrote
25   in response to a letter from Mr. Lease which I

Page 1431

JOHN LEASE - RECROSS

1  would like to look at now.
2      Q.    In my binder if you go to the
3  Torrance tab.
4      A.    Okay.
5      Q.    A couple letters in there should be
6  one from January 25, 2005?
7      A.    Okay.
8      Q.    Do you see it?
9      A.    Yes.
10     Q.    This is the letter Ms. Hall is
11 responding to; right?
12     A.    Yes.
13     Q.    In this letter up at the top you
14 say "Enclosed for your information are reports
15 summarizing the results of recent soil and
16 groundwater investigative activities undertaken
17 by Alcoa at the former Fairchild Fasteners in
18 Torrance and Fullerton subsequent to acquisition
19 of the facilities by Alcoa." Do you see that?
20     A.    Yes.
21     Q.    That is work that had been done at
22 those facilities already, yes?
23     A.    Yes.
24     Q.    It is not work related, it is not

Page 1432

JOHN LEASE - RECROSS

1  the Phase IIs; right?
2      A.    No it is not.
3      Q.    If you turn two pages, there is a
4  chart you attached. From that chart does it
5  seem clear, sir, it wasn't just at Torrance and
6  Fullerton that Alcoa performed work subsequent
7  to the Phase IIs in terms of investigating the
8  California sites?
9      A.    There are four plants listed here.
10     Q.    There is a cost of a million
11 dollars at the bottom there?
12     A.    Yes.
13     Q.    Which is for work that had been
14 done at that point January 25, 2005?
15     A.    Yes.
16     Q.    That work was in addition to the
17 Phase IIs done at those facilities?
18     A.    This would have been yes.
19     Q.    Between the time of Mr. Beckford's
20 letter where he says please discuss any of the
21 investigations prior to the actual investigative
22 measures with Mr. Hodge and this time when you
23 send Ms. Hall -- Mr. Beckford, excuse me, the
24 bill for a million dollars of subsequent

Page 1433

JOHN LEASE - RECROSS

1  investigations at the California facilities did
2  you in any way discuss or approach Fairchild
3  about the investigations that are represented on
4  this chart?
5      A.    I am not sure what reports preceded
6  this January 25 letter.
7      Q.    Are you aware of any?
8      A.    Not offhand without looking at the
9  binders.
10     Q.    They would be in the correspondence
11 between you and Fairchild; correct?
12     A.    They would have been, yes.
13     Q.    If they are not there they didn't
14 exist, you don't have any other recollection of
15 communications; do you?
16     A.    No.
17     Q.    Another thing Mr. Chesler showed
18 you was Phase II report for Torrance. Do you
19 recall that it was Alcoa Exhibit volume B, bulk
20 B, volume 5 of 15. Do you see it?
21     THE ARBITRATOR:  Where are you
22 looking?
23     MR. ZUROFSKY:  Phase II for
24 Torrance which Mr. Chesler handed out. Alcoa

Page 1434

JOHN LEASE - RECROSS

1  arbitration Exhibit B volume 5 of 15.
2      THE ARBITRATOR:  Go ahead. I
3  don't need it, just proceed.
4      Q.    Page 19. Do you recall Mr. Chesler
5  taking you through this page?
6      A.    I haven't found it up here yet.
7  Okay. I will look at it on the screen here.
8      Q.    I want to focus in on section
9  4.1.2.
10     A.    Okay.
11     Q.    Second paragraph. This is the
12 Phase II for Torrance; right?
13     A.    Yes.
14     Q.    This is the document you say
15 provided Fairchild with notice of Alcoa's
16 proposed response with respect to investigations
17 at Torrance; right?
18     A.    I am not sure if this is a general
19 description of the process or what this
20 represents.
21     Q.    I am asking about this document.
22 It was your testimony earlier today, if I recall
23 correctly the Phase IIs provided the information
24 and notice about proposed further investigations

Page 1435

JOHN LEASE - RECROSS

at the facilities; right?

A. Well, the Phase IIs clearly define where the next activities were to occur.

Q. In your view?

A. Yes. In my view.

Q. Responding to that Fairchild said with respect to Torrance, yeah, there might be need for further investigation; do you recall that?

A. For Torrance?

Q. Yes.

A. Yes.

Q. Mr. Beckford said please discuss with Mr. Hodge beforehand; right?

A. Yes.

Q. Read if you can this paragraph. I will read it "Each step of an investigation is preceded by the preparation of a work plan approved by the administrative agency prior to the start of work. The results of site assessments may lead immediately to preparation of corrective action plans or remedial action plans, but may cycle through several site assessments first to adequately define the

Page 1436

JOHN LEASE - RECROSS

extent of environmental impact at a site."

Do you have any reason to doubt, sir, that is a process applicable to further site assessments past Phase II in these areas?

A. I am not sure about the administrative agency aspect of it. I think that refers to a spill or threatened release. But in general the process that followed is do a scope of work defines the next steps that is based on the previous report findings.

Q. Do you recall as well we looked at Exhibit 134 earlier today where there was email exchange between Mr. Hendrix and Mr. McShae. Your counsel objected, he said you weren't on the email chain. It discussed the Phase IIs and going forward in the Southern California sites?

A. Vaguely, yes.

Q. Do you recall the subject matter of that email was comments Mr. Hendrix might have on ERM's Phase IIs before they were sent to Fairchild?

A. Yes.

Q. Do you recall that Mr. Hendrix further said that in the big picture sense the

Page 1437

JOHN LEASE - RECROSS

ERM suggestions were narrower than what Mission had planned at the Southern California sites?

A. They were narrower?

Q. Right.

A. I'd have to look at the email again to get the wording.

Q. The email will speak for itself. Do you recall we had that discussion earlier today?

A. Yes.

Q. Still on Torrance, Mr. Chesler showed you an email from DTSC. He referred to as the gun to the head email. Do you recall that?

A. Yes.

Q. Prior to that time do you know that Consent Agreements, the terms of which are subject to negotiation, Mr. Lease?

A. Say again.

Q. Are Consent Agreements negotiated documents, are the terms negotiated?

A. Generally, yes.

Q. I think we saw earlier today Alcoa received a draft of Consent Agreement at least

Page 1438

JOHN LEASE - RECROSS

as early as September 2005. Do you recall that?

A. Yes.

Q. There was no drafts provided to Fairchild of that agreement prior to the execution of that agreement; right?

A. No, it isn't necessary to do that under the agreement.

Q. Let's look at the agreement then, go back to section 11.6 C.

THE ARBITRATOR: The answer to his question is there weren't any; were there? Why do we have to go back to the agreement?

MR. ZUROFSKY: That's fine.

THE ARBITRATOR: I assume there were not, right, drafts of the Consent Agreement furnished to Fairchild before it was signed?

THE WITNESS: That's right.

Q. Second to last topic Mr. Chesler asked you about was the Toulouse parking lot.

A. Yes.

Q. Do you recall he asked you if it would be in your view as a safety professional a problem if there was not enough access for cars. Do you recall that?

Page 1439

JOHN LEASE - REDIRECT

2  MR. CHESLER:  Object, your Honor,
3  I didn't say it was a safety professional.
4  Q.  Safety experience. We can look it
5  up. Do you recall that?
6  A.  I think the comment was would it be
7  a safety issue if access was blocked to the
8  facility because there were too many cars in the
9  parking lot.
10  Q.  You said I don't need to be a
11  safety expert or professional, I forget the word
12  to know that, it is obvious; right?
13  A.  It is obvious, yes.
14  Q.  Would it be a safety issue for
15  employees at the plants if they didn't have
16  trees to shade their cars while they were
17  working?
18  A.  If somebody was prone to heat
19  stroke, possibly.
20  MR. ZUROFSKY:  Nothing further.
21  MR. CHESLER:  Your Honor, I
22  promise two minutes.
23  RE-DIRECT EXAMINATION MR. CHESLER:
24  Q.  Would you quickly go back to
25  Ms. Hall's letter tab 19 in the book, please,

Page 1440

JOHN LEASE - REDIRECT

2  Mr. Zurofsky asked you about the fact this was a
3  letter you got in response to a letter to
4  Ms. Hall that dealt, among other things, with
5  the Torrance facility, just asked you about that
6  a FEW minutes ago. Do you recall that?
7  A.  Yes.
8  Q.  Would you look at page 341 third
9  page of the letter or front of the second
10  physical page. 341. Do you have that?
11  A.  Yes.
12  Q.  Look at the bottom of the page, the
13  paragraph about Torrance.
14  A.  Okay.
15  Q.  She says "According to Alcoa's
16  Phase I and Phase II assessments there are signs
17  of some environmental contamination, however"
18  she goes on to say "Groundwater contaminants as
19  Mission Geoscience reports likely came from
20  offsite sources" do you see that?
21  A.  Yes.
22  Q.  Then she tells you, "in any event,"
23  in other words, regardless of anything I just
24  said, all of the assessments for this site, like
25  all of the assessments and characterizations are

Page 1441

JOHN LEASE - REDIRECT

2  not Fasteners Environmental Liabilities unless
3  and until remedial action occurs, there is no
4  basis for a claim under section 11.6. She told
5  you unless the doctor tells you you're dying
6  you're not getting paid for the physical; right?
7  A.  Right.
8  Q.  He asked you about the Fullerton
9  facility, he pointed out the particular
10  paragraph I showed you in the Phase I related to
11  the warehouse as opposed to the factory. Do you
12  remember that?
13  A.  Yes.
14  Q.  Based on all your experience with
15  these people over four years, do you believe if
16  you said pay for the machine guarding across the
17  street in the factory rather than the warehouse
18  they would have paid you for it?
19  A.  No, sir.
20  Q.  Last question, after you got this
21  little missive from Ms. Hall, did you honestly
22  think that they would have paid you for machine
23  guarding in any of the other sites other than
24  the four five or six or seven you already told
25  them about?

Page 1442

JOHN LEASE - RECROSS

2  A.  No, sir.
3  MR. CHESLER:  No further
4  questions.
5  MR. ZUROFSKY:  One question, your
6  Honor.
7  RE-CROSS-EXAMINATION BY MR. ZUROFSKY:
8  Q.  That same document, turn the page
9  after the paragraph Mr. Chesler just read you
10  when he said "in any event," so on and so forth.
11  Do you recall that a minute ago, yes?
12  A.  Pardon.
13  Q.  Do you recall Mr. Chesler just read
14  you a paragraph from Ms. Hall's letter?
15  A.  Yes.
16  Q.  Turn the page. Top of the next
17  page, very next paragraph. And lastly, as you
18  should know, section 11.6 C requires Alcoa to
19  consult with and provide information to
20  Fairchild with respect to Fasteners
21  Environmental Liabilities. Section 11.6 D
22  requires proper notice of matters which may give
23  rides to indemnification obligation, no
24  information was imparted no consultation was
25  sought and no prompt notice was given with

103 (Pages 1439 to 1442)

Page 1443

JOHN LEASE - RECROSS
1
2  respect to any of the expenses incurred and
3  actions under taken by Alcoa of the matters
4  under review.  Do you see that?
5      A.    Yes.
6      Q.    She is responding to the chart were
7  you gave a million dollars of investigation
8  costs following Mr. Beckford's letter; right?
9      A.    Let me point out subsequent to this
10  every work plan, every report, every scope of
11  work we sent to Fairchild received no
12  substantive comment.
13      Q.    I didn't get an answer to my
14  question.
15      A.    It gets back to Mr. Chesler's
16  point.  The attitude at this point on behalf of
17  Fairchild was clearly they were going to block
18  every avenue that we had to receive
19  indemnification for the issues we inherited from
20  Fairchild.
21      Q.    The parties went to remediation
22  shortly after this?
23      A.    What is the date on this letter?
24      Q.    February 25, 2005.
25      A.    Thereabouts.

Page 1444

1      JOHN LEASE - RECROSS
2  MR. ZUROFSKY:  I have nothing.
3  THE ARBITRATOR:  You are excused.
4  (Witness excused)
5
6      (Time Noted 6:24 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1445

1      C E R T I F I C A T E
2
3  STATE OF NEW YORK  )
4                     : ss.
5  COUNTY OF NEW YORK )
6
7      I, TAMMEY M. PASTOR, a Registered
8  Professional Reporter, Certified LiveNote
9  Reporter and Notary Public within and for the
10  State of New York, do hereby certify that the
11  foregoing proceedings were taken before me on
12  January 11, 2007;
13      That the within transcript is a true
14  record of said proceedings;
15      That I am not connected by blood or
16  marriage with any of the parties herein nor
17  interested directly or indirectly in the matter
18  in controversy, nor am I in the employ of the
19  counsel.
20      IN WITNESS WHEREOF, I have hereunto
21  set my hand this ____ day of _____,
22  2007.
23
24      _____
25      TAMMEY M. PASTOR, RPR, CLR

Page 1446

1      INDEX
2  WITNESS:                        PAGE:
3
4      (Arbitration Exhibit 429 was marked.)    103
       (Arbitration Exhibit 430 was marked.)    109
5      (Arbitration Exhibit 431 was marked.)    118
6      (Arbitration Exhibit 432 was marked.)    127
7      (Arbitration Exhibit 433 was marked.)    133
8      (Arbitration Exhibit 434 was marked.)    133
9      (Arbitration Exhibit 435 was marked.)    133
10     (Arbitration Exhibit 437 was marked.)    141
11
12      *****
13
14  (Exhibit 436 intentionally skipped.)
15
16
17      *****
18
19
20
21
22
23
24
25

MERRILL LEGAL SOLUTIONS
(800) 325-3376      www.MerrillCorp.com