# In The Matter Of:

## THE FAIRCHILD CORPORATION vs. ALCOA CORPORATION

---

**ARBITRATION**
*February 28, 2007*

---

# MERRILL LEGAL SOLUTIONS

### 420 Lexington Avenue - Suite 2108
### New York, NY 10170
PH: 212-557-7400 / FAX: 212-692-9171

**ARBITRATION - Vol. 8**

Page 2521

CPR INSTITUTE OF DISPUTE RESOLUTION

-----------------------------------x

In Re

THE FAIRCHILD CORPORATION,

                    Claimant,


        -against-

ALCOA CORPORATION,

                    Respondent.


-----------------------------------x

                    Cravath, Swaine & Moore, LLP
                    Worldwide Plaza
                    825 Eighth Avenue
                    New York, New York

                    February 28, 2007

                    9:15 a.m.


B E F O R E:

    JAMES F. STAPLETON, Arbitrator



TAMMEY M. PASTOR, RPR, CLR, Hearing Reporter

ROBERT SHOFSTALL - REDIRECT

1
2  this is notice.
3      A.  Yes.
4      Q.  Turn back, I think you reference
5  this on direct, but let's make sure we have it.
6  Tab 7 second page.  What do you understand this
7  to be?
8      A.  I understand that to be the meeting
9  minutes of, the minutes of the meeting with the
10  DRIRE on 30 July 2003.
11     Q.  Sorry July 30, 2003?
12     A.  30 July 2003.
13     Q.  That some months before the Phase
14  II report we just looked at; right?
15     A.  Yes it is.
16     Q.  What kind of information -- do you
17  read this to be minutes of a meeting in which
18  Alcoa conveyed information to the DRIRE about
19  the Montbrison facility and investigations going
20  on there?
21     A.  The question did they convey
22  information?
23     Q.  Yes.  Is that what this is
24  reflecting?
25     A.  Yes, it is.

ROBERT SHOFSTALL - REDIRECT

1
2      Q.  Is it also reflecting in your view
3  an action, a plan to go forward?  Look at, for
4  example page 3 do you see there I know it is a
5  terrible translation, but the second bullet
6  point.
7      A.  The part we were talking about
8  earlier --
9      Q.  Yes.  Does that make any comments
10  on the action plan proposed by the site?  Do you
11  see that there?
12     A.  Yes.
13         MR. SLIFKIN:  Sorry, where?
14         MR. ZUROFSKY:  Second bullet
15  point.
16         MR. SLIFKIN:  On page 3?
17         MR. ZUROFSKY:  Page 3.
18     Q.  There are bullet point, fourth
19  paragraph, second bullet point.  English version
20  of the second bullet point.  I will read it for
21  the sake of completion?
22         "Mr. Gorse underlines, obviously it
23  is a tricky translation is agreeable surprised
24  by advancement studies carried out.  It does not
25  make any comments on the action plan proposed by

ROBERT SHOFSTALL - RECROSS

1
2  the site."  See that, Mr. Shofstall?
3      A.  Yes.
4      Q.  That indicate to you there had been
5  proposals made?
6      A.  Absolutely, yes.
7          MR. ZUROFSKY:  I have not going
8  further.
9          THE ARBITRATOR:  Thank you.
10  We are not going to go over the same ground
11  again; are we?
12         MR. SLIFKIN:  No, I just have two
13  questions.
14  RE-CROSS-EXAMINATION BY MR. SLIFKIN:
15     Q.  Mr. Shofstall, you see the two
16  lower shelves of this bookcase, the binders with
17  the blue labels?
18     A.  Yes.
19     Q.  Have you read those?
20     A.  Can I go see what they are?
21     Q.  Sure.
22     A.  I see correspondence,
23  correspondence, correspondence, correspondence.
24  So you're asking me if I read all the
25  correspondence?

SUSAN HALL - DIRECT

1
2      Q.  Yes.  That is the correspondence,
3  that is all correspondence from Alcoa to
4  Fairchild.  One way.  Have you read that?
5      A.  I cannot represent to you that I
6  read all the correspondence.  I know I have read
7  some correspondence that was provided to me.
8      Q.  Okay.  Last question.  Isn't it
9  true, sir, that you don't have any experience
10  post acquisition involving an indemnity
11  provision?
12     A.  Post acquisition Indemnity
13  Agreement?  That would be correct, sir.
14         MR. SLIFKIN:  Thank you very much.
15         THE ARBITRATOR:  Thank you.
16  You're excused.
17         (Witness excused.)
18         SUSAN HALL,
19  having been first duly sworn by the Notary
20  Public (Tammey M. Pastor), was examined and
21  testified as follows:
22         MR. ZUROFSKY:  Your Honor, our
23  next witness will be Ms. Hall.
24         MR. SLIFKIN:  If you may, your
25  Honor, I will excuse myself but I will be back.

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2734

SUSAN HALL - DIRECT

1    SUSAN HALL - DIRECT
2    DIRECT-EXAMINATION BY MR. ZUROFSKY:
3        Q.    Good afternoon, Ms. Hall.
4        A.    Good afternoon.
5        Q.    By whom are you currently
6    employed --
7            THE ARBITRATOR:    Why don't you
8    start with your full name.
9            MR. ZUROFSKY:    Fair enough.
10        Q.    Why don't you state your full name
11    for the record.
12        A.    Susan L. Hall.
13        Q.    By whom are you currently employed?
14        A.    Fairchild Corporation.
15        Q.    In what capacity?
16        A.    I am the environmental counsel at
17    the Fairchild Corporation.
18        Q.    How long have you been with the
19    Fairchild Corporation?
20        A.    About two years and four, five
21    months.
22        Q.    Roughly what, October 2004 around
23    there?
24        A.    That's when I started, yes.
25        Q.    Do you have experience dealing with

Page 2735

SUSAN HALL - DIRECT

1    Environmental Law?
2        A.    I do have experience.
3        Q.    Describe that experience.
4        A.    I was in private practice from
5    19956 following a clerkship until.  As both an
6    associate and a partner in a private practice I
7    dealt with, I represented clients against EPA
8    actions, I was a member of PRP group.  You know
9    what that is, potentially responsibility party
10    groups.
11            I have dealt with regulators.
12    Things of that nature.
13        Q.    Does that include either in private
14    practice or at your time at Fairchild work on
15    Southern California environmental regulatory
16    items?
17        A.    Yes.  Did you ask me what I do
18    specifically at Fairchild or just my background?
19        Q.    No, I am just asking if you have
20    that background.
21        A.    Yes.
22        Q.    Do you have a background in OSHA
23    compliance?
24        A.    No, I don't.

Page 2736

SUSAN HALL - DIRECT

1    Q.    What are your current
2    responsibilities at Fairchild?
3        A.    I am currently responsible for our
4    environmental sites.  We have sites that are
5    undergoing remediation in a number of states,
6    Massachusetts, Florida, Michigan, Wisconsin, and
7    a number in Southern California.  I supervise
8    the remediation projects.  I deal most directly
9    with our environmental consultants.
10            I have also had occasion to deal
11    with the regulators in terms of our remediation
12    approaches.
13        Q.    Do you also serve as Fairchild's
14    designated representative with respect to the
15    Alcoa relationship?
16        A.    I do.
17        Q.    On environmental matters.
18        A.    Yes, I do.  I was designated -- I
19    became the designated representative for
20    Fairchild in, I think February of 2005.
21        Q.    Are you familiar with the
22    environmental indemnification provisions of the
23    Acquisition Agreement between the parties?
24        A.    Yes, I am somewhat familiar.

Page 2737

SUSAN HALL - DIRECT

1    Q.    Sorry?
2        A.    I said I am somewhat familiar with
3    them, yes.
4        Q.    Do you have an understanding of any
5    rights Fairchild might have to participate in
6    connection with actions taken by Alcoa?
7        A.    Yes, I do.
8        Q.    Describe that understanding for us,
9    please.
10        A.    My understanding is that Fairchild
11    has a number of rights to participate in terms
12    of actions that Alcoa will either contemplate
13    taking or may take.
14            We have the right to be consulted
15    on various things.  We have the right to comment
16    on proposed responses to environmental actions.
17    Basically consistent with the good faith
18    obligations that are implied in the contract we
19    have an opportunity to essentially work with
20    Alcoa and be heard.
21        Q.    Are those important rights to
22    Fairchild?
23        A.    Yes, they are.
24        Q.    Why is that?

55   (Pages 2734 to 2737)

SUSAN HALL - DIRECT
1
2      A.    Because if there is a potential or
3  actual Fastener Environmental Liability for
4  which Fairchild is going to have to indemnify
5  Alcoa, we obviously have to be involved.
6      Q.    Ms. Hall, in connection with your
7  role as Fairchild's designated representative,
8  have you had the opportunity to review all the
9  correspondence between Alcoa and Fairchild
10 related to the claims at issue in this case?
11     A.    I can't say all, but I would
12 certainly think that most all.  I am not aware
13 of anything that I haven't seen.
14     Q.    You just don't want to swear you
15 have seen everything that is out there?
16     A.    Yes.  When I look over here, it is
17 somewhat daunting.
18     Q.    Based upon your knowledge you have,
19 Ms. Hall, has Alcoa honored Fairchild's
20 participation rights in connection with the
21 claims it is making here for indemnification?
22     A.    Generally they have not.
23     Q.    By generally what are you excepting
24 from that answer?  Let me come at it another
25 way.  We heard some testimony about this.

SUSAN HALL - DIRECT
1
2           Prior to undertaking the Phase IIs
3  Alcoa met with Michael Hodge about the scopes of
4  work.  Are you aware of that?
5      A.    Yes I am.
6      Q.    In that sense would you say with
7  respect to the Phase IIs Alcoa honored
8  Fairchild's, somewhat honored Fairchild
9  participation rights?
10     A.    Yes.
11     Q.    Is there any other item you're
12 aware of on which you can say Alcoa has honored
13 Fairchild's participation rights?
14     A.    No.
15     Q.    Why do you say that?
16     A.    Because the pattern that was
17 established by the time I came on board was one
18 where Alcoa was unilaterally taking the lead on
19 activities related to environmental issues
20 without including Fairchild in the process.  Our
21 participation rights were simply ignored.
22     Q.    Just to introduce tab 2 of your
23 binder there is Claimant's 455 there should be
24 two demonstrative sites which we sent to the
25 other side last night, your Honor.

SUSAN HALL - DIRECT
1
2           This is a summary chart.  There is
3  a breakdown behind it?
4           THE ARBITRATOR:  This is under
5  tab?
6           MR. ZUROFSKY:  2 of Ms. Hall's
7  binder.
8      Q.    Ms. Hall, why don't we walk through
9  this chart a little bit.  What is this chart,
10 just generally speaking before we get into the
11 columns and rows, what does this information
12 convey?
13     A.    This is a chart that has three
14 categories.  On the broad picture it is claims
15 that Alcoa has made in which they have failed to
16 accord Fairchild the right to participate.
17     Q.    Let's walk through, you said there
18 is three categories.  Is the first category the
19 one on the left there the heading is Items For
20 Which Alcoa Has Admitted Its Failure to Honor
21 Fairchild's Participation Rights?
22     A.    That's correct.
23     Q.    What -- it is broken into two sub
24 columns maybe take them in order.  What is
25 represented by this category?

SUSAN HALL - DIRECT
1
2      A.    The first column that is captioned
3  Chart Distributed At the Hearing, these are the
4  items that Alcoa admitted at the first
5  arbitration hearing that Fairchild had not been
6  given any notice of.
7           The second chart which is captioned
8  Correspondence From Alcoa consists of items that
9  appeared in letters from John Lease to
10 Fairchild.  I think the dates of those letters
11 were in July of 2005.  And February of 2006.  In
12 which Mr. Lease had asterisked items that Alcoa
13 admitted Fairchild had not been given notice of.
14           There is no overlap between these
15 two.
16     Q.    Go ahead.  Sorry.
17     A.    The items that are in the second
18 column are distinct from the ones in the first
19 column.  So that you have a total that is in
20 excess of 3.6 million.
21     Q.    Let's look at the sub column, first
22 sub column, the one that says Chart Distributed
23 At the Hearing.  Let's call it category 1A if
24 you will.
25     A.    Okay.

56  (Pages 2738 to 2741)

SUSAN HALL - DIRECT

1
2    Q.    If you turn to tab 6 of your
3 binder, is this the chart you were referring to
4 that Alcoa handed out at the first week of the
5 hearing?
6    A.    Yes.  That is the chart.
7    Q.    The total there, if you turn to the
8 pages are these the same items that are listed?
9    A.    Yes.  As you can see the total is
10 $2,115,831 which is exactly the amount on the
11 first what we are calling column A.
12    Q.    Let's look at column B.  You
13 mentioned Mr. Lease's letters.  Are those the
14 letters found behind tabs 3 and 4, first one
15 being Alcoa arbitration C, bulk Exhibit C volume
16 5 of 22.  The second one being Alcoa Arbitration
17 Exhibit C volume 7 of 22?
18        THE ARBITRATOR:  Are they in the
19 book?
20        MR. ZUROFSKY:  They are in the
21 book, your Honor, tabs 3 and 4.
22    A.    Yes.  Those are the letters that
23 contain the items that were asterisked.
24    Q.    You referred to asterisk, let's
25 make sure we are on the same page.  Tab 3, the

SUSAN HALL - DIRECT

1
2 first of those letters says "In connection with
3 the mediation session scheduled for July 13,
4 2005, these find enclosed a chart reflecting
5 amounts spent by Alcoa through May 2005 for
6 environmental liabilities.  Some of the items on
7 the charts identified with an asterisk or double
8 asterisk have not been the subject of prior
9 notice pursuant to section 11.6 of the
10 Acquisition Agreement."  Do you see that?
11    A.    I do.
12    Q.    When you said Mr. Leased admitted
13 failure of notice --
14        THE ARBITRATOR:  Are you reading
15 from his letter?
16        MR. ZUROFSKY:  Yes, I am, your
17 Honor.
18        THE ARBITRATOR:  This is the
19 letter dated July 6, 2005?
20        MR. ZUROFSKY:  Right.  Same
21 language appears in the next one, too that is
22 the one I am looking at.
23    A.    Yes.  That is what I  am referring
24 to.  I would just add the qualification I think
25 there was some testimony by Mr. Lease in the

SUSAN HALL - DIRECT

1
2 first arbitration hearing that he admitted there
3 were a couple of errors.  And we did not include
4 those.
5    Q.    Those items?
6    A.    In the second category.
7    Q.    Column 1B?
8    A.    There were two items.
9    Q.    So, I think you testified, there is
10 no overlap between 1A and 1B if an item is an
11 asterisked one and appeared at the chart in the
12 hearing you didn't count them both; right?
13    A.    No.  1A and 1B represent Alcoa's
14 admissions either at the arbitration hearing or
15 in Mr. Lease's letters to Fairchild about items
16 for which no notice had been given.  There is no
17 overlap.
18    Q.    Let's talk about the second major
19 column?
20        THE ARBITRATOR:  Let me just look
21 at the other letter here if I may.  You're going
22 back to tab 2.
23        MR. ZUROFSKY:  Yes.
24        THE ARBITRATOR:  I am following it
25 in the book.

SUSAN HALL - DIRECT

1
2        MR. ZUROFSKY:  Tab 2.  Same chart.
3 I was going to move, your Honor, if it is all
4 right with you, I was going to move to the
5 second column.
6    Q.    Ms. Hall, the third column over,
7 second major heading Items For Which Alcoa
8 Ignored Fairchild's Attempt to Participate.  Do
9 you see that, Ms. Hall?
10    A.    I do.
11    Q.    What is reflected in this column?
12    A.    This column reflect items where
13 Fairchild made it clear that it wanted to
14 participate, that it wanted further information.
15 Those requests for further information,
16 consultation and opportunity to comment were
17 disregarded.  By way of example included in this
18 column are what we have I think informally been
19 referring to as the four gap letters.  With
20 respect to Fullerton, St. Cosme, Toulouse and
21 Torrence.
22        Also the Phase II reports which
23 Fairchild analyzed and asked that Alcoa provide
24 us with any -- let me take that back.  Fairchild
25 asked to be included in any further

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2746

SUSAN HALL - DIRECT

1  investigations that were going to be follow ons
2  or follow ups to the Phase IIs.
3  Q.    To the Phase IIs.
4  A.    Correct.
5  Q.    I think we have got your answer.
6  Let's break it down.  The first thing you
7  mentioned were four gap analysis letters?
8  A.    Correct.
9  Q.    Then you mentioned cost that were
10 included as follow-up investigations to the
11 Phase IIs?
12 A.    Right.
13 Q.    Take the first category you
14 mentioned the four gap analysis letters are
15 those just for purpose of the record, are those
16 letters found at tab 7 with respect to
17 Fullerton, that is the first one?
18 A.    Yes.
19     THE ARBITRATOR:  Let me just look
20 at this.
21 Q.    Sorry if I didn't get an answer I
22 was just checking something.
23     THE ARBITRATOR:  I am trying to
24 look at the material you are referencing.

Page 2747

SUSAN HALL - DIRECT

1  MR. ZUROFSKY:  Sorry, I was just
2  making sure --
3     THE ARBITRATOR:  You are referring
4  to gap analysis.  What is the gap?
5  MR. ZUROFSKY:  The reason I think
6  that phrase is being used that is what Mr. Lease
7  referred to were the letters for the four
8  facilities that had charts attached to them.
9     THE ARBITRATOR:  What does that
10 stand for, gap?
11 MR. ZUROFSKY:  We can look at Mr.
12 Lease's testimony.  I think he meant gaps in
13 compliance.  I don't think it was an acronym.  I
14 am sure Mr. Chesler will correct me if I'm
15 wrong.
16     THE ARBITRATOR:  I have 7.  Go
17 ahead.
18 Q.    Tab 7 with respect to Fullerton.
19 A.    Yes.
20 Q.    Then tab 10 with respect to
21 Torrance.
22 A.    That's right.
23 Q.    These are all contained in Alcoa
24 Arbitration Exhibit C volume 1 of 22.  Then tab

Page 2748

SUSAN HALL - DIRECT

1  12 with respect to St. Cosme.
2  A.    Yes, that's correct.
3  Q.    Then tab 16 with respect to
4  Toulouse?
5  A.    Yes.  Those are the four what Mr.
6  Lease referred to as the gap letters.
7  Q.    These came pretty early on, right,
8  these are first half of 2003?
9  A.    Yes.  March of 2003.  Then June of
10 2003.
11 Q.    What was Fairchild's response to
12 these gap letters?
13 A.    I believe Mr. Miller responded to
14 those letters asking for more information.
15 Those letters essentially had estimated costs
16 for doing various things.  And Mr. Miller wrote
17 to Alcoa and asked for additional information
18 and justification of these costs.
19     For example, I noted at Exhibit 12
20 for St. Cosme, Alcoa is estimating that it
21 expect in incur over $5 million in costs for six
22 categories of items.  Two of which they don't
23 even know what the costs are going to be.  I
24 wasn't there at the time, of course, but if I

Page 2749

SUSAN HALL - DIRECT

1  were Mr. Miller, you're talking about $5 million
2  out of an $8 million reserve, I would have been
3  somewhat stunned and want additional
4  information.  Which is what he asked for.
5  Q.    Let's look at an example of that in
6  tab 8, stick with Fullerton just for ease.  This
7  is Claimant's 92.  Do you see that there,
8  Ms. Hall?
9  A.    Yes.
10 Q.    Tab 8 of your book.
11 A.    Yes.
12 Q.    The last paragraph on the first
13 page "Nevertheless, pursuant to section 11.7 of
14 the Acquisition Agreement we are willing to
15 discuss this matter further with you in order
16 that we may do so effectively, please provide us
17 with specific and complete background
18 documentation supporting the items and estimated
19 costs summarized in the table.  Such
20 documentation should include copies of any
21 assessments, reports, legal analyses, cost
22 analyses prepared by or for Alcoa and any other
23 documentation which support the various findings
24 as listed in the tables included with your

58  (Pages 2746 to 2749)

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

SUSAN HALL - DIRECT
1
2  letter." Do you see that?
3      A.   I see that.
4      Q.   Is that the request you are
5  referring to Mr. Miller made?
6      A.   That is what I am referring to.
7  Additionally he says we will respond once we get
8  further information.
9      Q.   How did Alcoa respond to that
10  request?
11     A.   I believe that one of the Alcoa
12  attorneys, Mr. Harvey wrote to Fairchild in
13  August, a couple months later, indicating that
14  as additional documentation and support for
15  those costs became available that they would be
16  provided to for example.  And that we would be
17  kept apprised of what was going on.
18     Q.   Is that the document found at tab 9
19  of your book, Claimant's Exhibit 429?
20     A.   That is the letter I was referring
21  to.
22     Q.   If you look at the second page of
23  that document?
24     A.   On the second page he says at the
25  penultimate paragraph, "We will provide

SUSAN HALL - DIRECT
1
2  Fairchild with further documentation to support
3  the estimates developed for the three
4  facilities.  Documentation is being compiled for
5  each project and will consist of such items as
6  scopes of work, consultant proposals summary
7  reports and invoices.  We will provide you with
8  this documentation in a timely manner once it is
9  complete for your review."
10     Q.   To your knowledge, Ms. Hall, did
11  Fairchild ever receive the documentation such as
12  consultant proposals, scopes of work or whatnot
13  before Alcoa went ahead and spent the money?
14     A.   I am not aware of any.  I have not
15  seen any in my review of the file.
16     Q.   But Alcoa has tried to claim
17  reimbursement for the projects contained in the
18  four charts in these gap analysis; is that
19  right?
20     A.   Yes.  That's right.
21     Q.   Is that part of what is reflected
22  in the summary chart at tab 2 is the second
23  significant column?
24     A.   That is exactly what is in column
25  2.

SUSAN HALL - DIRECT
1
2      Q.   Those items are in there?
3      A.   Yes.
4      Q.   What else is mentioned in that
5  column.  You mentioned follow on to Phase II,
6  let's talk about that -- before we go there I
7  don't want to go through all these items.  It is
8  worth a couple of examples.
9          If you look at the Fullerton, back
10  to sort of tab 7 you see the chart attached to
11  Mr. Lease's letter.
12     A.   Yes.
13     Q.   There are estimates on the
14  right-hand side?
15     A.   Yes.
16     Q.   Turn to the second page that first
17  item there is machine guarding.  Do you see
18  that?
19     A.   Yes.  $58,000 is estimated for
20  machine guarding.
21     Q.   Based on your review of the file,
22  did Fairchild ever receive any more information
23  about machine guarding at Fullerton before
24  getting the bill?
25     A.   No.

SUSAN HALL - DIRECT
1
2      Q.   How much has Alcoa to date claimed
3  for machine guarding at Fullerton, if you want
4  we have included at tab 5 of your book the
5  letter that we have been dealing with, the
6  latest claims letter we have been working off of
7  the last couple days, if that is helpful to you?
8      A.   I think machine guarding is at it
9  looks like it is item 42.
10         THE ARBITRATOR:  What tab are we
11  in?
12         MR. ZUROFSKY:  Tab 5, your Honor.
13     Q.   Tab 2 of 6?
14     A.   2 of 6.  It says item 42 machine
15  guarding compliance and it is adjusted total
16  through September is 1,032,289.
17         THE ARBITRATOR:  What item?
18         THE WITNESS:  Item 42.
19     Q.   Ms. Hall, were you here during the
20  testimony of John Lease during the first week of
21  the hearing?
22     A.   I was here for I think the bulk of
23  it.
24     Q.   Were you here when we put in front
25  of Mr. Lease the assessment for machine guarding

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2754

SUSAN HALL - DIRECT
1
2  that was done at Fullerton with all the
3  individual pages?
4      A.   I really don't recall.
5      Q.   Let's look at another one.  That is
6  at Fullerton.  How about same site just for --
7  see fall protection there, line two above
8  machine guarding?
9      A.   Yes.
10     Q.   How much is the total cost on line
11 item 40, I guess it is?
12     A.   The fall control program.
13     Q.   Yes.
14     A.   $45,773 in the gap letter.  And
15 what is the line, please?
16     Q.   Line 40, I believe.
17     A.   Line 40.  $151,658.
18     Q.   Almost four times more; right?
19     A.   Correct.
20     Q.   Let's turn attention briefly to St.
21 Cosme.
22          THE ARBITRATOR:  Where was the
23 other reference to the fall protection?
24          THE WITNESS:   It is in Exhibit 5.
25          THE ARBITRATOR:  Tab 5.

Page 2755

SUSAN HALL - DIRECT
1
2          THE WITNESS:   Tab 5, page 2 of 6.
3          THE ARBITRATOR:  I have that.  You
4  referred back to the estimate.  Where is that?
5          MR. ZUROFSKY:  Tab 7, your Honor.
6  On page, right below the machine guarding
7  estimate for 58,000 is the next one.
8      Q.   Ms. Hall, we don't want to take up
9  the time today --
10         THE ARBITRATOR:  I understand
11 that.  You made reference to it so I would like
12 to see what you're referring to.  You are
13 referring to fall protection.
14         MR. ZUROFSKY:  Yes.
15         THE ARBITRATOR:  That is the
16 second item on page 0041?
17         MR. ZUROFSKY:  Yes, your Honor.
18     A.   45,000.
19     Q.   All I was suggesting, Ms. Hall, I
20 was going to ask you a more general question.
21 In general as you have been able to compare them
22 up overstated estimates that are understating
23 what the eventual costs were?
24     A.   Yes.  There were a number of
25 discrepancies.

Page 2756

SUSAN HALL - DIRECT
1
2      Q.   I think you pointed out for the St.
3  Cosme facility sort of skipping around just a
4  little bit, tab 14, the second page of tab 14,
5  similar chart; right, Ms. Hall?
6      A.   Yes.
7      Q.   You pointed out, I believe, for two
8  of the items, again machine guarding in this
9  case and fall control there is no estimate at
10 all?
11     A.   Right.
12     Q.   Do you know how much was spent on
13 those items at the St. Cosme facility?
14     A.   Let's see, I'm looking at it.  Fall
15 control compliance has a cost of $37,857.
16     Q.   How about machine guarding, I think
17 there is actually more than one reference to
18 machine guarding?
19     A.   Machine guarding, well there is one
20 entry for 3300.  But I know there is a larger
21 one than that.
22     Q.   How about line 90.
23     A.   Line 90.  Yes line 90 machine
24 guarding, $625,142.
25     Q.   Again, I don't want to belabor the

Page 2757

SUSAN HALL - DIRECT
1
2  point and go through all of them, just give some
3  examples.
4          You were talking before we went to
5  a couple of those examples, I think you were
6  about to discuss the other items in category 2
7  which I think you testified earlier follow on
8  investigations to Phase IIs?
9      A.   Yes, that is what I said.
10     Q.   What else is in -- why are those
11 items in category 2?
12     A.   Well --
13         THE ARBITRATOR:  When you say
14 category 2?
15         MR. ZUROFSKY:  I am referring to
16 the broad category, third column over.
17         THE ARBITRATOR:  Items for which
18 Alcoa ignored Fairchild's attempts?
19         MR. ZUROFSKY:  Yes.
20         THE ARBITRATOR:  They are not
21 numbered columns.
22         MR. ZUROFSKY:  Right.
23         THE ARBITRATOR:  Third column of
24 numbers.
25         MR. ZUROFSKY:  Right.

60  (Pages 2754 to 2757)

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2758

SUSAN HALL - DIRECT

1       SUSAN HALL - DIRECT
2       A.    Right. The other numbers in that
3  column represent follow on, follow-up
4  investigations that Alcoa did in the furtherance
5  of their Phase II reports. And Fairchild had
6  made a specific request of Mr. Ernesto Beckford,
7  had specifically requested two things. More
8  information about these Phase IIs. And,
9  secondly, that Fairchild's designated
10 representative be consulted with respect to any
11 further investigative activities.
12      Q.    I believe -- let's take a look at
13 that letter. Is that the letter, Ms. Hall found
14 at tab 18 of your binder, Claimant's Exhibit 2,
15 co-Exhibit 2.
16      A.    Yes.
17      Q.    Tab 18.
18      A.    That is the letter I was referring
19 to.
20      Q.    Let me draw your attention to page
21 marked FC 299. Do you see that there?
22      A.    Yes.
23      Q.    Under 9A under Torrance facility on
24 that chart, do you see that?
25      A.    Yes.

Page 2759

SUSAN HALL - DIRECT

1       SUSAN HALL - DIRECT
2       Q.    It says at the end of those
3  comments, "The source of this impact is not
4  entirely clear Alcoa's assessment however it
5  presents an issue which should be followed up."
6            Do you see that, Ms. Hall?
7       A.    With respect to Torrance, yes, that
8  is what it says.
9       Q.    These were Fairchild's comments on
10 the Phase II reports that were provided to them
11 by Alcoa?
12      A.    Yes. It's my understanding. I
13 wasn't there at the time. But that is my
14 understanding what this is about.
15      Q.    If you look back to Mr. Beckford's
16 cover letter, he made reference to a request to
17 be consulted on follow up investigations.
18      A.    That's exactly what he asks.
19      Q.    Is that page FC 296?
20      A.    Yes.
21      Q.    Which part are you referring to?
22      A.    He indicates that on the sites, I'm
23 quoting "As to those sites to which we agree
24 there should be further investigation, please
25 ensure that the actual investigative measures

Page 2760

SUSAN HALL - DIRECT

1       SUSAN HALL - DIRECT
2  are first discussed with our designated
3  representative (Michael Hodge) as required by
4  section 11.6C of the Acquisition Agreement."
5       Q.    Irrespective of whether or not Mr.
6  Beckford had made that request, do you see the
7  reference there to as required by section 11.6C,
8  is it your understanding of the contract that
9  Alcoa would have, in any event, be required to
10 discuss with Fairchild before taking those
11 measures, even if Mr. Beckford hadn't made this
12 request?
13      A.    That's my reading of the contract.
14 That Alcoa must discuss and confer and consult
15 with Fairchild on anything that might be or is a
16 Fasteners environmental liability.
17      Q.    So did Alcoa consult and discuss
18 with Fairchild about the follow on
19 investigations of the Phase II before doing
20 them?
21      A.    No, they did not. That's what the
22 second column represents. The costs that they
23 incurred for investigations for which Fairchild
24 was accorded no participation rights.
25      Q.    Let's look at some examples. The

Page 2761

SUSAN HALL - DIRECT

1       SUSAN HALL - DIRECT
2  first is on tab 19 which is marked as Alcoa
3  arbitration C, volume 2 through 4 of 22.
4       A.    I see that.
5       Q.    This is the cover letter here.
6  There was also significant amount of reports
7  included with this, or as attachments to it,
8  right, Ms. Hall? Just looking at the first line.
9       A.    When you are referring to the list
10 that is attached?
11      Q.    No. We will get to the list in a
12 second. I am just looking at the first line
13 just to make a point.
14      A.    Okay.
15      Q.    "Enclosed for your information is
16 reports." In other words, what we have
17 excerpted here is just the cover letter not all
18 the reports that came with it?
19      A.    Yes.
20      Q.    Is this the next communication from
21 Alcoa to Fairchild regarding investigation at
22 the facilities?
23      A.    Yes.
24      Q.    It is dated almost a year after Mr.
25 Beckford's letter. Let me ask you a question:

61 (Pages 2758 to 2761)

Page 2762

SUSAN HALL - DIRECT

1
2 Did you review this correspondence when it came
3 in, you were on board at this time?
4     A.    Yes, I did.
5     Q.    What did you understand this
6 correspondence to be representing?
7     A.    Can I take minute to look at it?
8     Q.    Sure.  Of course?
9     A.    This is essentially Alcoa advising
10 us of the results of their follow on
11 investigations that they had done.
12     Q.    In other words, the investigations
13 were done at this point?
14     A.    The investigations were done.
15     Q.    That is why the reports were
16 attached they were done.
17     A.    Right.
18     Q.    You see where it says at the bottom
19 of that first page, second to last paragraph
20 "The costs" see that there?
21     A.    Yes.
22     Q.    "The costs that have been incurred
23 by Alcoa for remedial projects at the former
24 Fairchild Fasteners facilities in Los Angeles,
25 total $1,073,208 through October 2004."

Page 2763

SUSAN HALL - DIRECT

1
2     A.    Yes, I see that.
3     THE ARBITRATOR:  Where is that?
4     MR. ZUROFSKY:  Sorry, your Honor.
5 Fourth paragraph down in the letter.  The one
6 that begins "The costs that have been."
7     THE ARBITRATOR:  Yes, I see it.
8     Q.    Is that the same number, Ms. Hall,
9 if you turn two pages forward there is a chart,
10 a table attached to the letter?
11     A.    Yes.
12     Q.    Same number $1,073,000?
13     A.    Yes.
14     Q.    That is how much Alcoa was claiming
15 is applicable under the Indemnification
16 Agreement in connection with this letter?
17     A.    Yes, this sum I understand to
18 represent the costs associated with doing
19 follow-up, follow on work, characterization,
20 investigations emanating from Phase IIs.
21     Q.    In response to Mr. Beckford's
22 letter we looked at minute ago, did Alcoa ever
23 say to you we are going to go forward with the
24 following investigations?
25     A.    Not to my knowledge.

Page 2764

SUSAN HALL - DIRECT

1
2     Q.    None of the investigations listed
3 on this chart?
4     A.    No.  I have not seen any evidence
5 of that in the records.
6     Q.    One of the items I want to points
7 you to, you see in that chart attach to the
8 letter, under the site Temple Avenue, City of
9 Industry?
10     A.    Yes.
11     Q.    There is some references including
12 one that is six down, to groundwater
13 remediation.
14     A.    I see that.
15     Q.    At the time of the acquisition --
16     THE ARBITRATOR:  What page are you
17 on?
18     MR. ZUROFSKY:  Sorry, your Honor.
19 Third page of tab 19 there is a chart.
20     THE ARBITRATOR:  One page chart.
21     MR. ZUROFSKY:  Yes.  Table I, I
22 think is what it is.
23     THE ARBITRATOR:  I have it.
24     Q.    Under Temple Avenue, six entries
25 down it says "groundwater remediation."

Page 2765

SUSAN HALL - DIRECT

1
2     A.    I see that.
3     THE ARBITRATOR:  Yes.
4     Q.    Ms. Hall, at the time of the
5 acquisition is it your understanding that there
6 was in fact groundwater remediation had been
7 going on at the Temple Avenue facility?
8     A.    That's my understanding from my
9 review of the records.
10     Q.    We talked about, I think Mr. Wolff
11 testified about the pump and treat.  Is that
12 what you're talking about?
13     A.    Yes.
14     Q.    Was this a continuation of work by
15 Alcoa that Fairchild had been doing during its
16 ownership of the facilities?
17     A.    I wouldn't be able to answer that
18 question because I don't know what they did.  We
19 didn't have -- we weren't given any
20 opportunities to participate in the course of
21 the pump and treat system after we sold the
22 project, after we sold the facility.
23     Q.    I want to point your attention to
24 one item there, if you look two over it says
25 "expenditure to date."  See that there?

62  (Pages 2762 to 2765)

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2766

SUSAN HALL - DIRECT

1
2    A.    Under which item?
3    Q.    Sorry.  Under groundwater
4 remediation.  That same line we were looking at.
5    A.    Uh-huh.
6    Q.    Two columns over there is two
7 entries, 48,300-Mission, 82,000-EnviroSolve.
8    A.    Exactly.
9    Q.    Was EnviroSolve Fairchild's
10 consultant?
11    A.    Yes.  EnviroSolve was and in fact
12 still is Fairchild's consultants it was
13 Fairchild's consultant on Temple Avenue it still
14 is our consultant on other sites we have in
15 California.
16    Q.    To your knowledge had Alcoa told
17 Fairchild EnviroSolve was going to continue to
18 be the consultant on Temple Avenue project?
19    A.    I think I have seen something to
20 that effect.
21    Q.    You see the other entry is
22 reference to Mission; do you see that?
23    A.    Yes.
24    Q.    Do you understand who this is?
25    A.    I do now.  Mission Geoscience was

Page 2767

SUSAN HALL - DIRECT

1
2 apparently retained by Alcoa to replace
3 EnviroSolve.
4    Q.    Had Alcoa provided to your
5 knowledge Fairchild with any advance notice of
6 that fact?
7    A.    No.
8    Q.    It is your understanding under the
9 agreement that is information that Alcoa needed
10 to communicate to Fairchild?
11    A.    My reading of the contract says
12 that Alcoa's selection of environmental
13 consultant has to be reasonably acceptable to
14 Fairchild. But we were not told that they had
15 changed to Mission Geoscience, nor given an
16 opportunity to express our opinions on that.
17    Q.    You responded to this letter,
18 right, this January 25 letter?
19    A.    I am sure I did.
20    Q.    Turn to tab 20 the next tab in your
21 book. I will ask you is this your response?
22    A.    Yes, this is my response.
23    Q.    Okay I want to spend some time
24 going over this response. I want to for now
25 point to one item. On the third page of this

Page 2768

SUSAN HALL - DIRECT

1
2 response, this is Alcoa arbitration 103.  Page
3 FC 341?
4    A.    I'm there.
5    Q.    Do you see that?
6    A.    Yes.
7    Q.    The third full paragraph, the one
8 beginning "similarly?"
9    A.    I see that.
10    Q.    I want to look four lines down.
11    A.    The one beginning "The only
12 expenses?"
13    Q.    Right. "The only expenses that
14 might have been legitimate Fastener
15 Environmental Liabilities are the groundwater
16 remediation costs associated with the Temple
17 Avenue facility." Do you see that?
18    A.    I do.
19    Q.    "By reference to table 1 attached
20 to your letter these remediation costs total
21 $130,000." Do you see that Ms. Hall?
22    A.    I do.
23    Q.    Is the reference there to the fact
24 they might have been legitimate Fastener
25 Environmental Liabilities reference to the fact

Page 2769

SUSAN HALL - DIRECT

1
2 that Fairchild had been operating the pump and
3 treat system on groundwater remediation before
4 the acquisition?
5    A.    Yes.
6    Q.    You go on to say "However, since
7 Alcoa refused to honor its obligation to consult
8 under sections 11.6C provide prompt notice,
9 these expenses are challenged as well."
10    A.    That is what it says.
11    Q.    What are you referring to there
12 when you say Alcoa's refusal to honor its
13 obligation?
14    A.    There is a pump and treat system
15 operating when the site was acquired by Alcoa.
16 They obviously changed consultants. You know
17 what arose out of the change of consultants, we
18 don't know whether they changed their approach
19 to the pump and treat. There was just no --
20 complete absence of information.
21    Q.    If you go back to the chart that
22 you're referring to, table I in Mr. Lease's
23 letter, which is in the tab right before, the
24 first item there is remediation transition
25 management. Do you see that?

63  (Pages 2766 to 2769)

SUSAN HALL - DIRECT

1
2    A.    Yes.
3    Q.    Did you know what that referred to?
4    A.    Well, I don't know exactly.  I can
5    guess.  It probably means they transferred the
6    remedial action to Mission Geoscience.  But all
7    I am looking at are these bare words, we were
8    not informed of anything other than what is on
9    this chart.
10        THE ARBITRATOR:   That is what
11   happens you hire a new law firm, they read all
12   the letters of the old firm.
13        MR. ZUROFSKY:   Like the dentist,
14   the guy tells you the guy before was terrible
15   and you have to redo it.
16   Q.    Let's go back to your response.
17   You discuss some of the other facilities.  On
18   page 3, still that page we were just looking at.
19   I had pointed your attention to the paragraph
20   about Temple Avenue, Ms. Hall.
21   A.    Third full paragraph?
22   Q.    Yes.  FC 341.
23   A.    Yes.
24   Q.    We looked at the last sort of half
25   of that.  I want to now move up to the top half

SUSAN HALL - DIRECT

1
2    of that in which you write "Similarly, the
3    Temple Avenue site was fully characterized prior
4    to closing and was undergoing remediation at the
5    time of sale."
6        What are you referring to there,
7    Ms. Hall?
8    A.    I'm referring to the fact that
9    prior to Fairchild's acquisition of the site it
10   had been characterized by environmental
11   consultant and a pump and treat and soil vapor
12   extraction system were operational the site has
13   been assessed there is a remedy in place.
14   Q.    You were responding to the claim
15   for indemnification for further investigation?
16   A.    Correct.
17   Q.    Let's talk about the Fullerton
18   facility, next paragraph down.  It says
19   "Likewise, the Fullerton facility had been fully
20   characterized by June 2002."
21       What are you referring to there,
22   Ms. Hall?
23   A.    Well, the Fullerton facility was
24   only acquired by Fairchild in 1999.  It was
25   owned prior to that by an operation called

SUSAN HALL - DIRECT

1
2    Kaynar.  Kaynar retained SCS Engineers.  SCS
3    Engineers conducted a complete assessment of the
4    site, I think they issued something like four
5    reports.
6        They had prepared a remedial action
7    plan that had been submitted to the regulators.
8    And I believe it recommended, although I'd have
9    to look at the actual documents, I believe that
10   a soil vapor extraction system was recommended.
11   And that Mission Geoscience essentially redid
12   all that work.  And its conclusions, based on my
13   statement here that nothing that was reported by
14   Mission Geoscience is fresh, I assume without
15   having it in front of me that they concluded the
16   same as had been previously concluded in the
17   prior assessments.
18   Q.    You are aware, are you not, SCS did
19   not actually test the groundwater at Fullerton
20   during its investigations, does that sound right
21   to you?
22   A.    I believe that's true, yes.
23   Q.    Do you understand Mission
24   Geoscience did in fact test the groundwater?
25   A.    Yes.

SUSAN HALL - DIRECT

1
2    Q.    But why do you then say there is
3    nothing new or fresh or whatever it was you
4    referred to; do you recall?
5    A.    Well, as I recall SCS had done very
6    extensive investigation of the soil.  I think
7    they had done something like 125 or 26 soil
8    borings to find out the depth and extent of the
9    contamination.
10       They went down to approximately 80
11   feet below ground surface.  And after 80 feet
12   there were no more hits.  And the groundwater
13   level at that site is at approximately 130 feet
14   below ground surface.
15       They also did very extensive
16   modeling.  They did very extensive conservative
17   modeling.  So what they did, based on a worst
18   case scenario, in other words, contamination
19   directly into the ground, whereas in this site
20   you had asphalt and you had concrete floor, so
21   obviously that would make intrusions into the
22   ground less likely.
23       Taking all that away, they did this
24   modeling, this very conservative modeling that
25   the conclusion of which the VOCs that were in

64  (Pages 2770 to 2773)

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2774

```
 1          SUSAN HALL - DIRECT
 2   the soil, the probability of their ever reaching
 3   groundwater was extremely remote.
 4       Q.    That would be VOCs that were coming
 5   from the soil below the plant?
 6       A.    That's correct.
 7       Q.    But Mission did find contamination
 8   in the groundwater when they tested it at
 9   Fullerton; correct?
10       A.    I believe they did.  If my memory
11   serves me, what they did, actually I would have
12   to see the report.
13       Q.    Is Fullerton in an area that has
14   regional contamination, Ms. Hall?
15       A.    Yes.  There is a huge area of
16   contamination in Southern California in the LA
17   area.  Mostly emanating around the San Gabriel
18   Valley water basin.
19       Q.    So does that fact refresh your
20   recollection as to what Mission concluded with
21   respect to the groundwater?
22       A.    I believe that Mission's ultimate
23   conclusion the contamination hits that were in
24   the groundwater were result of a regional
25   problem.
```

Page 2775

```
 1          SUSAN HALL - DIRECT
 2       Q.    Next item -- is that why you said
 3   here it was fully characterized by June 2002?
 4       A.    Yes.
 5       Q.    Next item says "Finally the
 6   Torrance facility."  Okay?
 7       A.    Yes.
 8       Q.    I want to draw your eye to the last
 9   line, last sentence of the paragraph, second to
10   last sentence "In any event."
11       A.    Yes.
12       Q.    "In any event, all of the
13   assessments for this site like all the other
14   assessments and characterizations -- "
15          THE ARBITRATOR:  Which paragraph?
16          MR. ZUROFSKY:  Sorry, "Finally the
17   Torrance facility," the last paragraph on that
18   page.
19          THE ARBITRATOR:  Yes.
20       Q.    About four lines down "In any event
21   all of the assessments for this site, like all
22   of the other assessments and characterizations
23   are not Fastener Environmental Liabilities."
24          Do you see that, Ms. Hall?
25       A.    I do.
```

Page 2776

```
 1          SUSAN HALL - DIRECT
 2       Q.    You write "Unless and until
 3   Remedial Action commences there is no basis for
 4   a claim under section 11.6."  Do you see that?
 5       A.    Yes.
 6       Q.    You are using the defined term
 7   Remedial Action?
 8       A.    Yes.
 9       Q.    The capitalized term?
10       A.    Yes.
11       Q.    You mean there to refer to the
12   defined term in the agreement?
13       A.    Yes.
14       Q.    Why do you say "unless and until
15   remedial action commences there is no basis for
16   a claim under section 11.6?"
17       A.    Because that is what the contract
18   requires, if you have environmental
19   contamination at a site, there are no
20   indemnification obligations that arise until you
21   have got a Remedial Action.  You need a
22   regulatory driver.
23       Q.    Why do you say that these
24   assessments are not Remedial Actions as defined
25   term in the agreement, if you recall?
```

Page 2777

```
 1          SUSAN HALL - DIRECT
 2       A.    Because they aren't being required
 3   by regulators.  They are being voluntarily
 4   undertaken to assess the situation at the site.
 5       Q.    Two other items on this letter.
 6   The next page at the top there you wrote "And
 7   lastly, as you should know."  Do you see that
 8   there, Ms. Hall?
 9       A.    Yes.
10       Q.    "Lastly as you should know section
11   11.6C requires Alcoa to consult with and provide
12   information to Fairchild with respect to
13   Fastener Environmental Liabilities.  Section
14   11.6D requires prompt written notice of matters
15   which may give rise to indemnification
16   obligation."
17          THE ARBITRATOR:  What paragraph
18   are you on?
19          MR. ZUROFSKY:  Sorry, top of the
20   page Bates stamped FC 342, your Honor.
21          THE ARBITRATOR:  All right.
22       Q.    Right before the signature on this
23   letter.  Then you write "No information was
24   imparted, no consultation was sought and no
25   prompt notice was given with respect to any of
```

65 (Pages 2774 to 2777,

Page 2778

SUSAN HALL - DIRECT

1
2 the expenses incurred and actions undertaken at
3 Alcoa on the matters under review."
4       Do you see that, Ms. Hall?
5    A.    Yes, I do.
6    Q.    Is that response to the fact as we
7 saw in Mr. Lease's letter the work had been done
8 before the information had been sent to you?
9    A.    That's right.
10    Q.    Are the costs as you understand the
11 million dollars or so we saw in your chart is
12 that included in the category Alcoa ignored
13 Fairchild for attempts to participate?
14    A.    That's right.
15    Q.    Sticking with this letter, just one
16 more item on a separate item, on FC 340.
17    A.    Yes.
18    Q.    See at the bottom last paragraph
19 beginning in short.
20    A.    Yes.
21    Q.    You write there "In short, Alcoa
22 can commission all the environmental assessments
23 it wishes.  Such assessments, be they
24 environmental, workplace health and safety or
25 OSHA, are not Fastener Environmental

Page 2779

SUSAN HALL - DIRECT

1
2 Liabilities." Do you see that?
3    A.    I do.
4    Q.    Then there is a footnote?
5    A.    Yes.
6    Q.    I want to talk about that footnote.
7 First for a second, do you recall Mr. Beckford's
8 letter that we looked at in which he, the
9 response to the Phase II investigations with the
10 chart?
11    A.    Yes.
12    Q.    Do you understand in that letter
13 Mr. Beckford indicated to Alcoa that certain
14 portions in his view the Phase IIs might be
15 subject to reimbursement under certain
16 situations?
17    A.    That is what his letter said.
18    Q.    Did you agree with Mr. Beckford's
19 position when you looked at the contract?
20    A.    No, I did not.
21    Q.    Why not?
22    A.    Because I did not in my reading of
23 the contract, assessments, Phase II assessments
24 do not satisfy the definition of a Fastener
25 Environmental Liabilities because there is no

Page 2780

SUSAN HALL - DIRECT

1
2 Fastener Environmental Condition that in any way
3 implicates an Environmental Law.
4       Q.    Are you referring again to the
5 Remedial Action discussion we had just minute
6 ago as well?
7    A.    Yes.  In part.
8    Q.    So, the letter we saw from Mr.
9 Lease that was at tab 19 respected the U.S.
10 California facilities; is that right, Ms. Hall?
11    A.    The lease letter at 19 is Fullerton
12 and Torrance.  The attachment has two others.
13    Q.    Those are all in the United States?
14    A.    Yes.
15    Q.    Is it your understanding did Alcoa
16 also do follow-up investigations to the Phase
17 IIs at European facilities as well?
18    A.    Yes, they did, I believe.
19    Q.    Do you recall which facilities, we
20 don't have to do a whole laundry list.
21    A.    Where they did follow-up to Phase
22 IIs?
23    Q.    Yes.
24    A.    I think they did follow-up to Phase
25 IIs at Montbrison, St. Cosme, Toulouse and maybe

Page 2781

SUSAN HALL - DIRECT

1
2 Vougy.  Did you say European or French.
3    Q.    I said European.  You just gave us
4 the French?
5    A.    I think there were two in Germany I
6 can't pronounce.
7    Q.    Kelkheim and Hildescheim.  Is that
8 right?  Does that sound right?
9    A.    Yes.  That sounds right.
10    Q.    Let me ask it this way:  Have you
11 seen anything or do you have any information to
12 suggest Alcoa, per Mr. Beckford's letter and his
13 request, consulted with Fairchild before
14 undertaking those investigations?
15    A.    No, I have not seen anything that
16 would suggest that they consulted with us.
17    Q.    Let's turn to tab 21 of your
18 binder.  Look at some of these examples.  Do you
19 see that there, Ms. Hall?
20    A.    Yes.
21    Q.    This is a letter to Mr. Beckford
22 from Mr. Lease, you had just become the
23 designated representative at this time; right?
24    A.    Right around this time, yes.
25    Q.    You read this when it came in?

66   (Pages 2778 to 2781)

Page 2782

SUSAN HALL - DIRECT
2  A.   Yes, I did.
3  Q.   Here Mr. Lease is referring to
4  remedial investigations at the Montbrison
5  facility.  Do you see that?
6  A.   I do.
7  THE ARBITRATOR:   What tab are you
8  on?
9  MR. ZUROFSKY:   Tab 21, your Honor.
10  THE ARBITRATOR:   Thank you.
11  Q.   Ms. Hall, what is this letter?  How
12  did you understand this letter when you read it?
13  A.   Just give me minute to look at it.
14  This is Alcoa advising Fairchild it has
15  undertaken in follow-up to Phase II assessments
16  additional -- a simplified risk assessment and
17  they refer to a scope of work and estimated
18  proposal for a detailed risk assessment.  A
19  letter from Alcoa to the French authorities and
20  invoices.
21  Q.   Let's break that down.  There are
22  invoices attached to this letter; correct?
23  A.   They are not attached to this
24  exhibit.
25  Q.   Not this exhibit.

Page 2783

SUSAN HALL - DIRECT
2  A.   I assume they were attached to the
3  original.
4  Q.   Do you see reference there at the
5  bottom of the first page to cost incurred to
6  date at the Montbrison facility for this work
7  totaled $208,000?
8  A.   Yes.
9  Q.   Did you understand when you
10  reviewed those documents those costs were
11  incurred related to both simplified risk
12  assessment that had been finished and work on
13  the detailed risk assessment?
14  THE ARBITRATOR:   Work under?
15  MR. ZUROFSKY:   Detailed risk
16  assessment.  The second step.
17  A.   I would assume but I don't know for
18  sure based on this letter.
19  Q.   Let's look at your response, which
20  I believe is at tab 22, Claimant's 456.
21  A.   Yes.
22  Q.   See there on the second page at the
23  top, third line down "Your letter describes the
24  investigation as 'the ERM scope of work and cost
25  estimate proposal for carrying out the detailed

Page 2784

SUSAN HALL - DIRECT
2  risk assessment study' on the face of it the
3  investigation is a cost and scope of work
4  proposal, the latter being the operative word.
5  Not so, on page 2 ERM states in two separate
6  places that the detailed risk assessment has
7  been conducted since April 2004."
8  Do you see that, Ms. Hall?
9  A.   Yes, I do.
10  Q.   Does that refresh your recollection
11  when you reviewed these documents the claims
12  that were submitted you understood the claims to
13  be submitted related to both simplified risk
14  assessment and work on the detailed risk
15  assessment?
16  A.   Yes.  I misunderstood your original
17  question.
18  Q.   That's fine.  Just to tie that up,
19  the chart at tab 5, remember this is sort of our
20  master claim chart, Montbrison is on page 4 of
21  6?
22  A.   Which item?
23  Q.   Sorry, tab 5, the December 19 chart
24  that has all the expenses.  Do you see that
25  there?

Page 2785

SUSAN HALL - DIRECT
2  A.   What page?
3  Q.   Page 4 of 6.
4  A.   Yes.
5  Q.   If you look on line 145 the
6  simplified risk assessment is listed as --
7  A.   15,735.
8  Q.   If you go to the bottom the
9  detailed risk assessment.
10  A.   287,704.
11  Q.   Coming back to tab 21, again I will
12  ask, is it your understanding this covers both
13  the simplified risk assessment and work on
14  detailed risk assessment, work on both those?
15  A.   Yes.
16  Q.   It says here, as we discussed, it
17  was a scope of work.  Did you comment on the
18  scope of work that was provided in terms of
19  giving substantive technical comments on that
20  scope of work, Ms. Hall?
21  A.   No, I did not.
22  Q.   Why not?
23  A.   Because my understanding is the
24  detailed risk assessment was already underway.
25  In fact given the timing here, was probably

67 (Pages 2782 to 2785)

Page 2786

SUSAN HALL - DIRECT

1 almost complete, because I think my letter
2 refers to the fact that -- I need to look at it
3 at tab 22 -- that the detailed risk assessment
4 had been conducted since April 2004.
5    Q.    Did you understand Mr. Lease's
6 letter to be a notice of proposed response
7 asking you to comment?
8    A.    No.  He was not asking me to
9 comment.
10    Q.    What did you understand him to be
11 saying?
12    A.    I understood him to be saying that
13 we've done this, this is a claim.  Not that
14 we're asking you for any input.
15    Q.    The Toulouse facility which is at
16 tab 23 of your binder, Claimant's 457.  Again,
17 Ms. Hall, we don't have to go through the whole
18 back and forth on this, is this again another
19 letter where Alcoa is asking for payment for
20 work already done?
21    A.    Yes.
22    Q.    Was Fairchild to your knowledge
23 consulted or notified that that work was going
24 to be done before the costs were started to be

Page 2787

SUSAN HALL - DIRECT

1 incurred?
2    A.    I don't think so.  But if you look
3 at my letter.
4    Q.    Which is 458, the next tab; is that
5 right?
6    A.    Yes.
7    Q.    Let's go there.
8    A.    I forgot what the question was.
9    Q.    Let's go back.  Did you understand
10 Mr. Lease's letter to be a claim for work
11 already either underway or completed?
12    A.    Yes.  Absolutely.
13    Q.    How about at St. Cosme, tab 25
14 which is Alcoa arbitration bulk C volume 6 of
15 22.  Same thing?
16    A.    Work that's already completed or
17 underway for which we had no opportunity to
18 comment.
19    Q.    Those are the French facilities you
20 mentioned before; right?
21    A.    St. Cosme, Toulouse, Montbrison.
22    Q.    Are those the expenses that are in
23 the category titled, in addition to the gap
24 analysis expenses we talked about earlier, are

Page 2788

SUSAN HALL - DIRECT

1 those the expenses in the titled column Items
2 For Which Alcoa Ignored Fairchild's Attempts to
3 Participate?
4    A.    Yes, those are the follow on
5 investigations.
6       THE ARBITRATOR:  Those in that
7 column 3, those include remedial work as well as
8 investigative costs, do they not?
9       MR. ZUROFSKY:  I think, I will ask
10 the witness, I think we discussed earlier the
11 remedial work is the work at the City of
12 Industry facility.
13       THE WITNESS:  Right.
14       THE ARBITRATOR:  What about St.
15 Cosme?
16       MR. ZUROFSKY:  I will ask the
17 witness.
18    Q.    Are you aware of any remedial work
19 done at St. Cosme other than investigations,
20 Ms. Hall?
21    A.    No.  The only remedial work of
22 which I'm aware, let me say I'm aware at the
23 time of that letter was the pump and treat
24 system at Temple Avenue.  I don't believe there

Page 2789

SUSAN HALL - DIRECT

1 remediation underway.
2       THE ARBITRATOR:  At St. Cosme?
3       MR. ZUROFSKY:  Perhaps I should
4 clarify, your Honor, what the definition of
5 remediation is.  Why it is 5 million.
6       THE ARBITRATOR:  It is 4.4
7 million.
8       MR. ZUROFSKY:  I think the term
9 remediation is being used here to talk about
10 cleaning up soil and things in the ground and in
11 the groundwater.
12       THE ARBITRATOR:  This includes the
13 degreaser, it includes a lot of other things.
14       MR. ZUROFSKY:  Includes all the
15 other things on this gap analysis chart.  This
16 includes, as Ms. Hall testified, includes
17 investigations there is only one remediation but
18 also those gap analysis charts, the four charts
19 we looked at because of the correspondence.
20    Q.    Let's turn to the last column here,
21 Ms. Hall.
22    A.    Yes.
23    Q.    You mentioned the work going on at
24 the City of Industry facility.  Is it your

68  (Pages 2786 to 2789)

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2790

SUSAN HALL - DIRECT

1    SUSAN HALL - DIRECT
2  understanding that following the January 25th
3  letter, the chart we saw from Mr. Lease's
4  letter, that Alcoa did further investigations at
5  the City of Industry facility?
6      A.   Yes.
7      Q.   If you turn to tab 28 which is
8  Claimant's 461, is this a letter with respect to
9  some of that work?
10     A.   Yes.
11     Q.   Perhaps I should have paused before
12 asking you about this letter.  Just ask you
13 describe what is in that last category, what
14 type of items are in there?
15     A.   The items in the last category
16 consist of incidents where Fairchild received a
17 bill or was not given any opportunity to
18 participate in what was going on.  It was mostly
19 we were receiving after the fact notice of
20 efforts that had been undertaken or just a bill.
21     Q.   So let's make sure we all
22 understand what is in each of these sort of
23 categories.  The broad category 1 are items
24 listed on those charts we saw from Alcoa and
25 from Mr. Lease; right, that is items they

Page 2791

SUSAN HALL - DIRECT

1    SUSAN HALL - DIRECT
2  indicated they didn't give prior notice of;
3  right?
4      A.   That is what the first two are.
5      Q.   The category we were just looking
6  at is areas, I think you testified where there
7  was Fairchild sort of knew about possibilities,
8  asked for more information and didn't get it; is
9  that right?
10     A.   Yes.  The gap letters and Phase
11 IIs.
12     Q.   You mean follow on, I think you
13 testified the follow ons and Phase IIs?
14     A.   That is what I mean.
15     Q.   The last one is the other stuff;
16 right?
17     A.   Items where we were either given
18 after the fact notice or just got bills.
19     Q.   Let's look at tab 28.
20     A.   Okay.
21     Q.   Claimant's 461.  There is a
22 reference here to two work plans that describe
23 the scope of work; do you see that in the first
24 sentence?
25     A.   Yes.

Page 2792

SUSAN HALL - DIRECT

1    SUSAN HALL - DIRECT
2      Q.   If you look at tab 29, claim's 462,
3  this appears to be your response to this letter.
4      A.   Yes it is.
5      Q.   In responding to the letter did you
6  offer any -- first let me ask you this:  What
7  was your response to Mr. Lease's submission of
8  the work plans for the further work at Temple
9  Avenue?
10     A.   Give me minute just to look at
11 them.  Okay?
12     Q.   Of course.
13     A.   My response to Mr. Lease's letter
14 about the work plans for City of Industry were
15 that they were not Fastener Environmental
16 Liabilities.
17     Q.   That was one response.  We can talk
18 about that.
19     A.   Yes.
20     Q.   Did you also respond if you look on
21 the second page that lastly section 11.6C
22 requires Alcoa to consult with and so on.
23     A.   Yes.
24     Q.   Is that another reason why you
25 thought those were inappropriate expenses?

Page 2793

SUSAN HALL - DIRECT

1    SUSAN HALL - DIRECT
2      A.   Right. I pointed out once again
3  they failed to consult and provide us with
4  relevant information or to give us prompt
5  written notice of their proposed response to
6  potential liability.
7      Q.   I guess the question is, these were
8  Mr. Lease was sending you work plans for scope
9  of work.  Why is that, in this instance do you
10 say that that was not an opportunity to
11 participate?
12     A.   Because these work plans had
13 already been provided to the regulators.
14     Q.   Why is that a problem, why can't
15 you still comment on the work plans?  Why
16 wouldn't you still comment?
17     A.   Because the appropriate time to
18 comment on a work plan is when it is being
19 developed and before it is submitted to the
20 regulators.  Once it is submitted to the
21 regulators your opportunity to comment is really
22 fairly useless because you're not going to go to
23 the regulators and contradict what Alcoa has
24 said.  You lose all credibility with the
25 regulators if you do something like that.  It is

69  (Pages 2790 to 2793)

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2794

SUSAN HALL - DIRECT

1  not the way things like this are handled.
2      There is supposed to be an implied
3  good faith here that the parties are going to
4  deal with each other and work together before a
5  work plan is submitted to the regulators.
6      Q.   Were you finished?
7      A.   Yes.
8      Q.   The last two sentences, the one
9  beginning moreover. "Moreover, had we been --"
10     A.   Sorry.
11     Q.   In that same paragraph page FAIR
12 53314. "Moreover, had we been properly
13 consulted in advance, we would have weighed in
14 on the merits of Mission Geoscience's proposed
15 work plans. Without belaboring the point these
16 work plans are better characterized as 'the full
17 employment for environmental consultants act'."
18     I always appreciate a good turn of
19 phrase. What did you mean by that?
20     A.   I don't have them in front of me,
21 but I would have reviewed them and if I used
22 that characterization, it was because they were
23 very robust. They were doing things I think
24 that had already been done. They were very,

Page 2795

SUSAN HALL - DIRECT

1  very broad.
2      I guess the best way to describe it
3  they were doing more than was necessary.
4      Q.   Were you familiar with -- maybe you
5  weren't here, but are you familiar with Mr.
6  Wolff's testimony in this case in which he
7  discussed these work plans?
8      A.   I wasn't here. But I understand
9  that's what he felt, too.
10     Q.   So you agree with Mr. Wolff?
11     A.   Well, he agreed with me.
12     Q.   There you go. The costs of these
13 items are included in the last category we were
14 looking at?
15     A.   That's correct.
16     Q.   Next tab is tab 30. We're getting
17 there. Tab 30.
18     THE ARBITRATOR:   Maybe time now to
19 recess?
20     MR. ZUROFSKY:   Sure, your Honor.
21     THE ARBITRATOR:   How are we
22 progressing?
23     MR. ZUROFSKY:   We are progressing,
24 we are in the last column. We have a couple

Page 2796

SUSAN HALL - DIRECT

1  more items to touch on, then I think I'm done.
2      THE ARBITRATOR:   My understanding
3  you are hoping to finish with this witness
4  today. We can go after 5, if necessary.
5      MR. ZUROFSKY:   I am happy to go a
6  little later if you are. I think it is a good
7  idea to try to get done tomorrow.
8      THE ARBITRATOR:   You have two
9  witnesses tomorrow?
10     MR. ZUROFSKY:   Although my guess
11 they will probably take less time. I don't
12 know. My guess they are a little bit narrower
13 subject matter. We would like to finish
14 Ms. Hall today if we can.
15     THE ARBITRATOR:   You are still
16 anticipating finishing all your witnesses
17 tomorrow?
18     MR. ZUROFSKY:   Absolutely. Hope
19 so.
20     THE ARBITRATOR:   You are still not
21 anticipating redirect?
22     MR. CHESLER:   Not so far. Your
23 Honor. I assume you meant rebuttal.
24     THE ARBITRATOR:   Yes.

Page 2797

SUSAN HALL - DIRECT

1      MR. CHESLER:   Not so far.
2      (Recess taken.)
3      Q.   Ms. Hall, when we broke we were
4  sort of making our way through the last category
5  of items. We talked about work at the Temple
6  Avenue facility where the work plans, I think
7  you said had been submitted to the regulators,
8  do you recall that before we broke?
9      A.   Yes.
10     Q.   I want to turn your attention to
11 tab 30 in your binder. Which is Alcoa
12 arbitration Exhibit bulk C volume 1 of 22.
13     It is a letter dated -- it is
14 originally written March 9, 2003, but I think
15 the parties have all stipulated it is March 9,
16 2004 as the handwriting indicates there?
17     A.   Right.
18     Q.   Do you recognize this letter?
19     A.   Yes, I obviously was not the
20 recipients because I wasn't there at the time,
21 but I reviewed this letter, yes.
22     Q.   This purports to be at the top
23 there City of Industry EHS non-compliance issues
24 and accrued cost for corrective actions; do you

70  (Pages 2794 to 2797)

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2798

SUSAN HALL - DIRECT

1  see that?
2      A.    Yes.
3      Q.    The reference to EHS is that a
4  reference -- this is not an environmental
5  remediation type of matter; is it, Ms. Hall?
6      A.    No.  It is workplace health and
7  safety.
8      Q.    And EHS compliance is what it says;
9  correct?
10     A.    Correct.
11     Q.    So is this a request for Fairchild
12 to comment on proposed responses by Alcoa to
13 those situations?
14     A.    No.
15     Q.    What is it?
16     A.    It is just a notice of potential
17 claim.
18     Q.    Potential claim against the
19 indemnity?
20     A.    Yes.
21     Q.    If you look at the attachment there
22 is a bunch of invoices attached here; right?
23     A.    Yes.  There are.
24     Q.    That is, if you turn into the

Page 2799

SUSAN HALL - DIRECT

1  document, I am looking at the fifth page which
2  is Bates stamped FAIR 50000180 you see there it
3  says table 1, cost summary by project through
4  December 3, 2003 City of Industry.  Then it has
5  a bunch of items.  It totals $120,000.
6      A.    I see that.
7      Q.    Did Alcoa consult with Fairchild
8  with respect to any of these items as you
9  understand it before these costs were incurred?
10     A.    To my understanding they did not.
11     Q.    Did you understand these projects
12 continued past the date of this letter, some of
13 them?
14     A.    I believe they did.
15     Q.    Did Alcoa consult with Fairchild
16 with respect to that?
17     A.    No.
18     Q.    I want to draw your attention to
19 some of the invoices, in particular.  First off
20 at 183.
21     A.    183.  I'm there.
22     Q.    That is EnviroSolve.  Do you see
23 that there?
24     A.    Yes.

Page 2800

SUSAN HALL - DIRECT

1      Q.    Is this the document that refers to
2  what we talked about earlier about the work done
3  at the Temple Avenue pump and treat system?
4      A.    It would appear that way based on
5  what this invoice says.  It says groundwater
6  treatment unit.  It looks like City of Industry.
7          So --
8      Q.    When you referred earlier you
9  recall in your letter you said that the only --
10 the February 25 letter you said the only cost
11 that might have been Fastener Environmental
12 Liabilities were the groundwater remediation at
13 Temple Avenue.  Do you recall that testimony a
14 little while ago?
15     A.    Yes.
16     Q.    But you said there was no notice of
17 consultation.  You said you referred to the
18 switch to Mission; do you recall that testimony?
19     A.    Yes, I do.
20     Q.    This is work for EnviroSolve.  So
21 why did you claim, why did you say there was no
22 notice for this work?
23     A.    Well, because once Alcoa acquired
24 the Fasteners business, we were no longer in the

Page 2801

SUSAN HALL - DIRECT

1  loop on these things.  I mean we knew what was
2  underway when we owned the facilities, but after
3  that we did in the know the scope of the work or
4  what was being undertaken there.
5      Q.    As you understand it, Ms. Hall, can
6  the amount of, if you will, water being pumped
7  in the pump and treat change, is it a static
8  quantity? Let me rephrase my question.
9          Can there be, can a pump and treat
10 system operate at different volumes?
11     A.    Oh, absolutely.  The volume you are
12 pumping, which is generally referred to as
13 gallons per minute, is very important.
14     Q.    Do you understand that Mission in
15 fact increased the volume as I think there was
16 testimony about that yesterday, as time went on,
17 on Monday?
18     A.    I think they did.  I think this is
19 the site where they increased the volume to 175
20 gallons per minute.
21     Q.    I said Mission, I meant Alcoa.  I
22 didn't necessarily mean Mission itself.  Someone
23 working for Alcoa.
24          Let's turn to the invoice that is

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2802

SUSAN HALL - DIRECT

1
2 located at Bates stamp page FAIR 50000199; do
3 you see that?
4     A.    I do.
5     Q.    It appears to be an invoice from
6 Premiere Safety.
7     A.    It does.
8     Q.    I want to turn your attention to
9 the last paragraph there "These draft procedure
10 for lock, tag and verify and confined space
11 entry shipped, I think it says shipped for the
12 SPAs at the COI up to review to ensure all OSHA
13 and Alcoa compliance directives were met."
14         Do you see that?
15     A.    I do.
16     Q.    Do you understand that Alcoa has a
17 certain set of internal standards or compliance
18 directives?
19         MR. CHESLER:   Your Honor, I object
20 for lack of foundation to that. The witness
21 wasn't even there at the time of the
22 negotiations.
23         THE ARBITRATOR:   If she knows,
24 fine. If she doesn't know.
25         MR. ZUROFSKY:   I am not sure what

Page 2803

SUSAN HALL - DIRECT

1
2 negotiations you are referring to.
3     Q.    I asked do you know if Alcoa has a
4 set of internal compliance directives related to
5 environmental, health and safety matters?
6     A.    Obviously I didn't in March 9 of
7 2004 because I wasn't there. But since I have
8 been in the employ of Fairchild, I have seen
9 this reference a number of times. So, yes, I
10 understand based on the documents that I
11 reviewed that Alcoa has a separate set of
12 standards.
13     Q.    If you look at the next invoice
14 from Premiere Safety it is referenced there
15 again. Do you see that?
16     A.    On 199?
17     Q.    200. Excuse me. The next page.
18 There are others is my point. I just wanted to
19 ask you this question: In your understanding of
20 the agreement, Ms. Hall, did Fairchild agree to
21 indemnify Alcoa for work done to meet Alcoa's
22 internal compliance directives?
23     A.    That is certainly not what the
24 agreement says.
25     Q.    Turning to 31. Do you recognize

Page 2804

SUSAN HALL - DIRECT

1
2 this letter, Ms. Hall?
3     A.    Yes, in fact I recognize this
4 letter, I think this may have been the first
5 letter that I addressed after coming on board at
6 Fairchild.
7     Q.    What is this letter, as you
8 understand it, what is Alcoa asking for in this
9 letter?
10     A.    Well, Alcoa is notifying us that
11 they have incurred actual costs in connection
12 with machine guarding at eight --
13     Q.    Eight?
14     A.    -- at eight facilities.
15     Q.    You understand this letter to be a
16 request from Alcoa to consult or discuss
17 proposed response?
18     A.    No. This is not an effort to
19 consult. This is an effort to tell us that they
20 believe they have a claim.
21     Q.    The number that is listed there, in
22 the second, penultimate paragraph through
23 September 2004 is 729 --
24     A.    729,114.
25     Q.    Some of these facilities, for

Page 2805

SUSAN HALL - DIRECT

1
2 example, St. Cosme and Fullerton and Torrance
3 were the subject of those gap analysis letters
4 we looked at before; right?
5     A.    That's correct.
6     Q.    But were the others, were there any
7 gap analysis letters provided before work
8 commenced at any of the other facilities?
9     A.    I don't believe there were any gap
10 analyses for the Hungary site, the Simi Valley
11 site, the Stoughton site and the Germany site.
12 I think I'm right, but --
13     Q.    We just looked -- well, strike it.
14         Did you respond to this letter?
15     A.    I am pretty sure I did.
16     Q.    If you look at 32, was that your
17 response?
18     A.    Yes.
19     Q.    It says there in the second
20 sentence "Our response to Alcoa's claim for
21 $729,000 in reimbursable expenses for Fastener
22 Environmental Liabilities are as follows."
23         The first paragraph there, I just
24 want to draw your attention to the first line
25 "First, Alcoa has failed to demonstrate that the

72  (Pages 2802 to 2805)

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2806

SUSAN HALL - DIRECT

1  guarding requirements of OSHA section 1910.212
2  or state or foreign equivalents are Fastener
3  Environmental Liabilities as described in the
4  Acquisition Agreement." Do you see that,
5  Ms. Hall?
6      A.   Yes.
7      Q.   What are you referring to there,
8  what are you saying?
9      A.   What I'm saying in order to have a
10 Fastener Environmental Liability, you must have
11 a loss that is based on applicable Environmental
12 Law in respect of a Fastener Environmental
13 Condition.  If you look at the definition of
14 Environmental Law it does not, in my estimation,
15 include machine guarding.
16     Q.   You said this is one of the first,
17 you might have said the first, but one of the
18 first letters that you responded to; right?  When
19 you came on board.
20     A.   Yes.  I think it was the first one
21 or the second.
22     Q.   In order to respond to this did you
23 look at the contract and definition of
24 Environmental Law that you just referenced?

Page 2807

SUSAN HALL - DIRECT

1      A.   Yes.  I absolutely did.
2      Q.   In reading it with respect to
3  machine guarding, what was your first reaction?
4      A.   Well, when you say reading it with
5  respect to machine guarding, what I did is I
6  read it with respect to what a Fastener
7  Environmental Liability is.  In order to
8  determine what a Fastener Environmental
9  Liability is you must also look at the
10 definitions of a Fastener Environmental
11 Condition and Environmental Law.
12     So I went through all those steps.
13 And when I got to a fastener Environmental Law
14 in my interpretation and estimation, machine
15 guarding does not, does not implicate a fastener
16 Environmental Law.
17     Q.   Was that your first reaction when
18 you read this contract, Ms. Hall?
19     A.   Yes.  This is the first time I read
20 the contract and when I read the provisions on
21 fastener Environmental Law, I immediately had a
22 flash back to first year law school.  It just
23 jumped out at me that the definition of fastener
24 Environmental Law had a very odd subsection to

Page 2808

SUSAN HALL - DIRECT

1  it that was inconsistent with the overall scope
2  of that section.
3      That section was environmental
4  matters.
5      Q.   Let's turn and look at that.  If
6  you look on page 41.
7      A.   Of what?
8      Q.   Sorry.  You're right.  Tab 1.  Page
9  41 of the agreement, it is Bates stamped FC
10 2727.  Do you see that?
11     A.   The definition of Environmental
12 Law?
13     Q.   Yes.
14     A.   Yes.
15     Q.   You see there is an A, B and C?
16     A.   Yes, I do.
17     Q.   Do you read, I think at your
18 deposition Mr. Slifkin asked you a question
19 about this, he only asked you one question about
20 this.  And you indicated that you read sort of B
21 and you might have said C, but B as a subset of
22 A.  Do you recall that testimony?
23     A.   Yes, I think that is what I said.
24     Q.   What did you mean, you didn't

Page 2809

SUSAN HALL - DIRECT

1  elaborate on that at your deposition, but what
2  did you mean?
3      A.   Well, what I meant I said that B, I
4  think I said that B and C were subsets of A.  I
5  am not entirely sure.  But what I was trying to
6  convey is that A is extremely broad.  And that B
7  and C are effectively subsumed within A.
8      For example, if you look at the
9  last few words in A, it refers to exposure to
10 hazardous materials.
11     Now if you look at C, it says
12 "exposure of persons or property to hazardous
13 materials."
14     Clearly that C is subsumed and in
15 fact the language is quite similar to A.
16     Given the overall emphasis of this
17 section as relating to, I have to go to the
18 caption of it, environmental matters, in my
19 judgement workplace health or safety was meant
20 to make sure that overlapping OSHA regulations
21 with EPA regulations that related to the
22 workplace were supposed to be within the,
23 embraced within this definition.
24     Q.   Ms. Hall, are you aware as to

73 (Pages 2806 to 2809,

Page 2810

SUSAN HALL - DIRECT

1
2  whether or not there are OSHA or OSHA-like laws
3  that deal with, let's call it pollution or
4  hazardous material issues with specific regard
5  to the workplace?
6      A.    Yes.  In fact there was a
7  Memorandum of Understanding entered into with
8  EPA and OSHA recognizing that there were certain
9  overlaps with respect to environmental matters
10 between the two agencies.
11         The Memorandum of Understanding was
12 for the purpose of the two agencies trying to
13 work together.  For example, the EPA laws tend
14 to be more stringent.
15         So, in my reading of this, I was --
16 it was my opinion and my construction that this
17 definition was designed to make sure that it was
18 clear that the overlap between EPA and OSHA
19 regulations was going to be embraced within this
20 section with respect to environmental matters.
21         The OSHA, my understanding and I am
22 not an expert, regulates many things in the
23 workplace in order to make a safe workplace.
24 Some of which relate to environmental matters,
25 such as air emissions, such as employees

Page 2811

SUSAN HALL - DIRECT

1
2  handling, you know, hazardous substances.
3      Q.    Okay.
4      A.    Items like that.  When I read this
5  I went back and I thought from first year law
6  school.  The first thing that occurred to me is
7  ejusdem generis.  I went and looked it up.
8      Q.    French and Latin today.
9      A.    Ejusdem generis, this is a legal
10 maxim that had to do with interpretation of
11 mostly statutes.  Then in looking at that it led
12 me to the further maximum of noscitur a sociis.
13 I realized these words are basically informed by
14 their companions and that when you look you
15 can't just take these four words out of context,
16 you have to consider them in the larger context
17 in which they appear.  That is my opinion.
18     Q.    Thank you for that.  Going back to
19 32 which is where we were, tab 32 when we
20 started this discussion I just want to do one
21 other item on this letter.  We just talked about
22 the first paragraph.  When you said you didn't
23 think the guarding requirements of OSHA qualify,
24 that is the discussion we just had?
25     A.    Uh-huh.

Page 2812

SUSAN HALL - DIRECT

1
2      Q.    I want to look at the second
3  paragraph now?
4      A.    The one that starts "second?"
5      Q.    Yes.  The one that starts "second"
6  about four lines down "nor did Alcoa." That
7  sentence.
8         THE ARBITRATOR:   Where are you?
9         MR. ZUROFSKY:   Tab 32, is the
10 machine guarding that we left to go to the
11 agreement.
12     Q.    See four lines down, Ms. Hall?
13     A.    Yes, I do.
14     Q.    "Nor did Alcoa report any
15 non-compliance matters in connection with its
16 preacquisition due diligence, which specifically
17 included environmental health and safety surveys
18 for each of the Fasteners facilities identified
19 in your letter." Do you see that there?
20     A.    I do.
21     Q.    I think you testified at your
22 deposition you actually later realized in fact
23 those gap analysis we looked at earlier had come
24 in earlier, do you recall that?
25     A.    I did.  At my deposition I wanted

Page 2813

SUSAN HALL - DIRECT

1
2  to make it clear that at some subsequent time I
3  realized that this was inaccurate.  At this
4  point I was really still fairly new at Fairchild
5  and getting acquainted with the file.
6         Upon further review I did see the
7  four gap analysis letters.  So I wanted to make
8  that clear in my deposition that this was not
9  entirely accurate.
10     Q.    Having reviewed those gap analysis
11 letters, does it change your view with respect
12 to the appropriateness of the machine guarding
13 claims by Alcoa?
14     A.    No, it didn't.  What I was making
15 clear I was wrong we had never been given any
16 notice that Alcoa thought there was a
17 non-compliance.  But the overarching theme here
18 is machine guarding does not qualify as a
19 Fastener Environmental Liabilities.
20     Q.    One other item on this, you talk
21 about your preacquisition due diligence.  Are
22 you familiar that there has been an argument
23 made in this case or testimony in this case the
24 Phase Is, I think Mr. Lease was talking about
25 his view that Phase Is provided sufficient

74  (Pages 2810 to 2813)

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2814

SUSAN HALL - DIRECT

1    notice of proposed responses and whatnot for
2    these facilities, do you recall that?
3        A.    I am aware they have taken that
4    position.
5        Q.    Have you reviewed the Phase Is for
6    facilities we are talking about here?
7        A.    I think I looked at most of them.
8    I can't tell you exactly when.
9        Q.    Having reviewed that do you agree
10   the Phase Is satisfy Alcoa's notice requirement
11   to give notice of proposed responses with
12   respect to conditions?
13       A.    No.  Because they don't give a
14   proposed response, they just give identification
15   of an area of possible concern.
16       Q.    Do they also contain, as you
17   recall, general recommendations?
18       A.    I don't recall.  They may have or
19   they may not have.  I just really don't recall.
20       Q.    Turn to 33.  I just want to make
21   sure we introduce the document.  33 is a similar
22   letter to 31.  This one relates to lock, tag and
23   verify.  Do you see that?
24       A.    Yes.

Page 2815

SUSAN HALL - DIRECT

1        Q.    I think this one actually predates
2    the last one we looked at?
3        A.    Yes.  This was the first one I got.
4        Q.    This is the first letter, a week
5    earlier; right?
6        A.    Yes, this is the first letter I
7    got.
8        Q.    Again, are your answers in respect
9    to what is going on with this letter the same as
10   what was going on with the machine guarding
11   letter, in terms of I asked you questions
12   whether or not this was Alcoa seeking to consult
13   and so on and so forth?
14       A.    No, they were not seeking to
15   consult.  They were seeking to tell us that they
16   had incurred expenses.
17       Q.    If you turn to tab 34, which is
18   Claimant's 464, this is your response?
19       A.    Yes, it is.
20       Q.    The first line there similar to
21   what we talked about earlier on machine
22   guarding; right?
23       A.    Yes.
24       Q.    The second again you make the

Page 2816

SUSAN HALL - DIRECT

1    reference to preacquisition due diligence.  Is
2    the same answer about the gap analysis in Phase
3    I?
4        A.    Same answer.  At this point I was
5    just organizing my files.  And I had not had an
6    opportunity to review everything.  I had to
7    recall a lot of files from storage.  So, I was
8    still getting oriented, which is why I wanted to
9    correct it at my deposition that I was in error
10   about their having not been earlier letters.
11       Q.    If you look at the --
12       THE ARBITRATOR:  Which tab are you
13   on now?
14       MR. ZUROFSKY:  Sorry, on tab 34
15   still.  This is Ms. Hall's response.
16       THE ARBITRATOR:  Right.
17       Q.    Second page of that, Ms. Hall, do
18   you see there at the top it says "Fourth" then
19   you list a number of items?  Do you see that,
20   Ms. Hall?
21       A.    Yes.
22       Q.    I am looking at Roman iv,
23   implementing "Alcoa directives in French
24   operations?"

Page 2817

SUSAN HALL - DIRECT

1        A.    I see that.
2        Q.    Was it your understanding in
3    connection with the claims that Fairchild --
4    sorry, Alcoa was making for these expenses they
5    were making claims for work done to comply with
6    Alcoa directives?
7        A.    That's what I saw in their
8    documentation in support of their claims.
9        Q.    Last topic.  Torrance facility
10   you'll recall we looked at some time ago a
11   letter from Mr. Lease which had that table
12   attached to it that related to the California
13   facilities, do you recall that?
14       A.    Yes.
15       Q.    That letter also contained
16   information about the Torrance facility; did it
17   not?
18       A.    Can you remind me where it is.
19       Q.    Sure.  Let's go back and look at it
20   again.  It is at tab 19.
21       A.    Okay.
22       Q.    Second paragraph there.  Actually
23   first paragraph says "With respect to the
24   Torrance facility" four lines down.  Do you see

Page 2818

SUSAN HALL - DIRECT

1
2 that? First paragraph four lines down with
3 respect to the Torrance facility?
4      A.    Yes.
5      Q.    Do you see that, Ms. Hall?
6      A.    I do.
7      Q.    It goes on in the second paragraph,
8 it says "In view of the concentrations
9 identified in the site groundwater coupled with
10 potential for off-site migration, Alcoa will
11 contact the California Regional Water Quality
12 Control Board." Do you see that?
13      A.    I do.
14      Q.    Was it your understanding when you
15 reviewed this letter that Alcoa was going to go
16 approach the Regional Water Quality Control
17 Board?
18      A.    Yes.
19      Q.    We heard some testimony in this
20 case about the different approaches of the
21 Regional Water Quality Control Board versus the
22 Department of Toxic Substances Control.
23      A.    Yes.
24      Q.    Are you familiar with those
25 agencies in California?

Page 2819

SUSAN HALL - DIRECT

1
2      A.    I am.
3      Q.    You say it with some chagrin.
4      A.    I have projects with both.
5      Q.    Do you -- Mr. Wolff testified the
6 other day, I believe, that he prefers, all
7 things being equal, to be with the regional
8 water board; do you agree with that?
9      A.    I agree with it based on my
10 experience with them. And also on my
11 environmental consultants out in California,
12 EnviroSolve have the same opinion.
13      Q.    As of January 25, 2005 Mr. Lease
14 had informed you they were going to approach the
15 regional water board; right?
16      A.    Right.
17      Q.    That is what Fairchild knew?
18      A.    Yes.
19      Q.    Turn back, I know you wanted to
20 look at that letter, we were really looking at
21 tab 35?
22      A.    Go to tab 35?
23      Q.    Yes, please. What is the date of
24 this letter, Ms. Hall?
25      A.    February 22, 2006.

Page 2820

SUSAN HALL - DIRECT

1
2      Q.    It says there "The captioned report
3 is enclosed for your review, this report present
4 the findings from a California Department of
5 Toxic Substances Control site visit that was
6 conducted on January 13, 2006."
7           Do you see that, Ms. Hall?
8      A.    I do.
9      Q.    Is this the first communication
10 that Fairchild got subsequent to Mr. Lease's
11 January 2005 letter regarding contamination,
12 remediation issues at the Torrance facility?
13      A.    I believe it is.
14      Q.    Is there any mention in here about
15 negotiations or discussions regarding a Consent
16 Agreement with the DTSC?
17      A.    No. The last information we had is
18 that they were going to report to the regional
19 board.
20      Q.    If you turn now to -- you notice
21 the reference there it says that the visit was
22 conducted on January 13, 2006. Do you see that?
23      A.    Yes.
24      Q.    Turn to tab 36 which is again Alcoa
25 bulk Exhibit C, volume 7 of 22. Do you see

Page 2821

SUSAN HALL - DIRECT

1
2 that, Ms. Hall?
3      A.    Exhibit 36?
4      Q.    Yes. Tab 36.
5      A.    Yes.
6      Q.    What is the date of this letter?
7      A.    March 2, 2006.
8      Q.    Do you see there in the first
9 paragraph it says "Please find enclosed a copy
10 of a corrective action Consent Agreement" I will
11 skip the docket number, "Effective February 21,
12 2006 the date on which it was signed by the
13 DTSC." Do you see that?
14      A.    I certainly do.
15      Q.    Is this the first time Fairchild
16 heard about that Consent Agreement?
17      A.    It is.
18      Q.    Let's discuss for a second, what is
19 a Consent Agreement?
20      A.    Consent Agreement is an agreement
21 that is typically negotiated between a
22 potentially responsible party and regulatory
23 authority. It can be a local authority, it can
24 be regional authority, state authority, it can
25 be the U.S. EPA.

76  (Pages 2818 to 2821)

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2822

SUSAN HALL - DIRECT

1
2          The significance of it is, it is
3    going to be your map, your floor plan for lack
4    of a better word of what you are going to be
5    required to do going forward to achieve certain
6    goals.
7          Q.   In his deposition Alcoa's
8    consultant Mr. Hendrix referred to a Consent
9    Agreement as the bible.  Do you agree with that
10   characterization?
11         A.   I guess substantively I think I
12   know what he was trying to convey.  It is your
13   map for what you are committed to going forward.
14   It is a very important document.
15         Q.   As you mentioned I think two
16   answers ago, it is subject, the terms of which
17   are subject to negotiation; is that right?
18         A.   That is typically why it is called
19   a Consent Agreement because the responsible
20   party has an opportunity to deal with the
21   regulatory authority.  There is some give and
22   take as opposed to the alternative can be the
23   authority actually issuing an order compelling a
24   party to do this, that or the other.
25         So it is always preferred to enter

Page 2823

SUSAN HALL - DIRECT

1
2    into a voluntary Consent Agreement with the
3    regulators, rather than being compelled.
4          Q.   The letter we looked at at tab 35,
5    the one before was dated February 22.  Do you
6    recall that?
7          A.   Yes.
8          Q.   That is the day after, according to
9    this letter that agreement was signed.
10         A.   Yes.  That is what it says.
11         Q.   Would you have expected to get some
12   information from Alcoa before the signing of the
13   agreement about potential for Consent Agreement?
14         A.   Well, I would have hoped to have
15   been involved in the process of negotiating the
16   Consent Agreement.  Not that -- I recognize that
17   Alcoa has the right to take the lead with
18   remedial actions.  But if everybody was playing
19   by the rules of the agreement, Fairchild would
20   have been given an opportunity to comment on how
21   this Consent Agreement was going to be, what the
22   framework would have been, how broad it was
23   going to be.  And, frankly, the first thing
24   Fairchild would have tried to do is get out of
25   the DTSC and back in front of the regional

Page 2824

SUSAN HALL - DIRECT

1
2    board.
3          Q.   This is the last document I want to
4    go through with you, Ms. Hall, tab 37 you see
5    there the first line, this is a letter from you?
6          A.   Yes.
7          Q.   It says "We received your two
8    letters of February 22 and March 2 regarding the
9    Torrance facility."
10         A.   Yes.
11         Q.   You're responding to the two
12   letters we just looked at; correct?
13         A.   Correct.
14         Q.   I want to turn your attention to
15   the second page at the top there.  It says "We
16   note that the DTSC's January 13, 2006 Phase I
17   report refers to a 'draft corrective action
18   Consent Agreement' having been 'issued to the
19   facility on September 19, 2005' no such draft
20   Consent Agreement was ever provided to
21   Fairchild, rather Alcoa unilaterally executed
22   the corrective Consent Agreement with DTSC on
23   February 14.
24         "No information was imparted to
25   Fairchild, no consultation was sought, and no

Page 2825

SUSAN HALL - DIRECT

1
2    prompt notice was given with respect to any of
3    these actions.  Accordingly, any expenses
4    incurred and actions undertaken by Alcoa leading
5    up to, arising from and in furtherance of
6    discharging the corrective action Consent
7    Agreement, are Alcoa's exclusive
8    responsibility." Do you see that, Ms. Hall?
9          A.   I do.
10         Q.   Why did you take that position?
11         A.   I think it is pretty clear there
12   that Alcoa unilaterally over a period of months
13   entered into negotiations with the DTSC, the
14   consequence of which was a corrective action
15   Consent Agreement which in the final analysis
16   obligated Alcoa to do certain things which we
17   were going to pay the bill for.
18         Q.   There have been actions that have
19   followed that Consent Agreement that Alcoa is
20   seeking reimbursement for, as you understand it?
21         A.   With Torrance?
22         Q.   Yes.  Following this time frame?
23         A.   I believe so.
24         Q.   Those expenses are included in, are
25   they included in that last category, just to

77 (Pages 2822 to 2825,

Page 2826

SUSAN HALL - CROSS

1
2  finish up our map?
3      A.   Yes.  They are.
4      Q.   If you look at the bottom right,
5  grand total here is what $15,748,521?
6      A.   Yes.
7      Q.   Those are the items that fall into
8  each of the categories we just went over; right?
9      A.   That's correct.  That is in fact,
10 that is Alcoa's number.
11     Q.   Let's do the math, is that the
12 amount Alcoa is claiming in this case less the
13 Phase IIs you talked about at the top?
14     A.   Right.
15     MR. ZUROFSKY:   I have not going
16 further.  Thank you, Ms. Hall.
17     A.   Thank you.
18 CROSS-EXAMINATION BY MR. CHESLER:
19     Q.   Good afternoon, Ms. Hall.
20     A.   Good afternoon, Mr. Chesler.
21     Q.   As I think you just indicated, the
22 number on your chart is in fact the total amount
23 that Alcoa was seeking, except for the Phase
24 IIs; correct?
25     A.   Yes, I believe that's correct.

Page 2827

SUSAN HALL - CROSS

1
2      Q.   So when Mr. Miller came in here
3  yesterday and testified even in fact paid some
4  of our claims under 11.6 he was wrong; wasn't
5  he?
6      A.   No he wasn't wrong.
7      MR. ZUROFSKY:   Objection that is
8  mischaracterizing Mr. Miller's testimony.  It
9  will speak for itself, but I don't think that is
10 what he said.
11     Q.   In fact you know that Fairchild has
12 not paid any of the 11.6A indemnification claims
13 which are the subject of this proceeding; isn't
14 that correct?
15     A.   I think that is correct.
16     Q.   Thank you.  Before you got to the
17 company, you understand that Alcoa had hired
18 consultants and paid those consultants to
19 conduct Phase I studies?
20     A.   Yes.  That is my understanding.
21     Q.   You understand that Alcoa is not
22 seeking reimbursement for the Phase I studies;
23 correct?
24     A.   Correct.
25     Q.   Subsequently Alcoa prepared scopes

Page 2828

SUSAN HALL - CROSS

1
2  of work for Phase II studies, this is after the
3  closing of the transaction; correct?
4      A.   That's my understanding.  May I --
5      Q.   Excuse me.
6      A.   Just to be clear, my understanding
7  is that the transaction actually closed in
8  December of 2002.  And I believe scopes of work
9  were provided to Mr. Hodge in November.  I don't
10 know, that is probably just a technical point.
11     Q.   It is, but I appreciate the
12 clarification.
13          Those were scopes of work for work
14 to be done later in Phase II investigations that
15 were going to follow the closing of the
16 transaction; correct?
17     A.   That's my understanding.
18     Q.   Then prior to any of the Phase II
19 work being done, Alcoa provided Fairchild with
20 revised scopes of work; correct?
21     A.   I believe that's correct.
22     Q.   To which Fairchild made no
23 comments, no substantive comments on the revised
24 scopes of work which were provided prior to the
25 Phase IIs being conducted; isn't that correct?

Page 2829

SUSAN HALL - CROSS

1
2      A.   I don't have anything in front of
3  me that suggests it is not correct.
4      Q.   Then Alcoa conducted or its
5  consultants conducted the Phase II studies and
6  they provided the Phase II studies to Fairchild;
7  correct?
8      A.   That's correct.
9      Q.   Then before you got to the company
10 several folks at Fairchild, including Mr. Hodge
11 and Mr. Beckford, prepared a response to Alcoa
12 about the Phase II results and the work that was
13 proposed in those Phase II studies to be done;
14 correct?
15     A.   That's correct.
16     Q.   Both Mr. Beckford and Mr. Hodge
17 were at Fairchild at the time the agreement with
18 Alcoa to sell this business was negotiated,
19 drafted, signed and closed; correct?
20     A.   That's correct.
21     Q.   You weren't there?
22     A.   I was not there.
23     Q.   You were off practicing law
24 somewhere, you weren't working for Fairchild
25 either inside or outside; correct?

78  (Pages 2826 to 2829)

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2830

```
1            SUSAN HALL - CROSS
2     A.    Absolutely correct.
3     Q.    These two folks, Beckford and Hodge
4  who were there prepared these responses to the
5  Phase II reports and among other things, they
6  indicated in a transmittal from Mr. Beckford a
7  number of items in their response for which they
8  put the letter Y indicating that there might in
9  fact be an indemnifiable claim related to
10 certain Phase II work; correct?
11    A.    Not exactly correct.  My
12 understanding is that Mr. Beckford put those Ys
13 there indicating further follow-up.  And Mr.
14 Hodge's contribution to that chart consisted of
15 the analysis of the Phase IIs.
16    Q.    Let's be precise.  Mr. Beckford's
17 Ys didn't suggest, as you just said, further
18 work.  It suggested and in fact said that those
19 items were items for which Alcoa might well have
20 indemnifiable claims relating to the work done
21 as part of the Phase II process; isn't that
22 true?
23    A.    I'd have to look at his letter, but
24 whatever it says is what it says.
25    Q.    Right. As you sit here today you
```

Page 2831

```
1            SUSAN HALL - CROSS
2  don't have any reason to disagree with what I
3  just said; do you?
4     A.    No.  I just want to be precise.
5     Q.    In the Phase II reports there were
6  described both general and specific risk
7  assessments that were recommended to be done by
8  Alcoa's consultants; isn't that true?
9     A.    I would have to look at them.  I
10 don't recall that they made certain -- I don't
11 recall that they made recommendations.  I
12 believe that they highlighted areas of concern.
13 But I frankly don't recall.  There were a lot of
14 them.  I don't have them in front of me.
15    Q.    Fair enough.  The documents speak
16 for themselves, they are all in evidence.  If
17 they in fact recommend both general and specific
18 risk assessments you wouldn't quarrel with that
19 would you?
20    A.    I wouldn't quarrel with that.  I'm
21 just saying it has been a while.
22    Q.    So then you get hired, you come in
23 and you counterman the position Mr. Beckford
24 took when he listed all those Ys in his response
25 to the Phase II assessments that were provided
```

Page 2832

```
1            SUSAN HALL - CROSS
2  to Fairchild and Alcoa; correct?
3     A.    I disagreed with Mr. Beckford's
4  analysis of the contract, yes, I did.
5     Q.    Beckford, Mr. Beckford is a lawyer,
6  you're a lawyer; correct?
7     A.    Correct.
8     Q.    Two lawyers working for the same
9  company at two different times disagree about
10 the meaning of this agreement; correct?
11    A.    Actually three lawyers disagreed.
12    Q.    Okay.  Three lawyers, even better.
13 The lawyers with whom you disagreed were
14 actually at the company when this deal was
15 negotiated, signed and closed and you weren't;
16 correct?
17    A.    That's correct.
18    Q.    Now, the chart you spent most of
19 your direct-examination talking about, the chart
20 with all the numbers on it --
21    A.    Yes.
22    Q.    -- but for, I think you said maybe
23 one matter or two, for example, the work that
24 was being done at City of Industry pumping the
25 water, remember you said that was a remediation
```

Page 2833

```
1            SUSAN HALL - CROSS
2  project?
3     A.    Yes.  The pump and treat.
4     Q.    But for that virtually everything
5  on that chart falls into one of two categories,
6  doesn't it, it is either related to workplace
7  health and safety or it is some kind of an
8  assessment of potential environmental work to be
9  done or potential remediation to be done;
10 correct?
11    A.    I think that's generally true, yes.
12    Q.    Let's take those two categories.
13 Your position as you sit here today is that the
14 workplace health and safety claims that Alcoa
15 has submitted are not covered as a matter of
16 contract by the indemnification provision of the
17 agreement; isn't that right?
18    A.    Yes, that's correct.
19    Q.    So we could be sending you notices
20 every day saying here is a workplace health and
21 safety projects we want to do, here is a machine
22 we want to guard, here is a railing we want to
23 put up to prevent people from falling and
24 hurting themselves, your position is none of
25 that is covered, not because of notice problems,
```

79 (Pages 2830 to 2833,

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2834

SUSAN HALL - CROSS

1
2 not because you didn't get to participate in the
3 decision to put up a railing, but because the
4 contract doesn't cover it in your view; isn't
5 that true?
6     A.    No.  That is not correct.
7     Q.    It is not correct?
8     A.    No, I think I --
9     Q.    You answered my question.  It is
10 not correct?
11     A.    That's not correct.
12     Q.    All right.  Your position is if a
13 workplace health and safety item falls under the
14 description of Environmental Law in subpart A or
15 C of 3.24G ii, then it is covered but only in
16 that event; correct?
17     A.    Could you repeat that.
18     Q.    Yes.  In order for a workplace
19 health or safety claim to be covered under the
20 indemnity in your view, it must be an
21 environmentally related workplace health and
22 safety claim; correct?
23     A.    That's correct.
24     Q.    And if it is not environmentally
25 related, if it is a plain old workplace health

Page 2835

SUSAN HALL - CROSS

1
2 or safety claim like an OSHA claim, it is not
3 covered; correct?
4     A.    That's correct.
5     Q.    You were here yesterday when I
6 asked Mr. Miller to give me an example of how
7 fall protection, protecting people against
8 falling off of high places could be covered
9 under the agreement.  Do you remember that?
10     A.    I do.
11     Q.    His explanation was that if a
12 solvent bubbled up out of the ground and formed
13 a puddle and somebody slipped on the puddle and
14 fell off of a high place then it was cover;
15 right?  Do you remember that?
16     A.    That is what he said.
17     Q.    That is what he said.  I remember
18 it very well.  But if the same person fell off
19 the same platform because there was no railing
20 there, but there was no puddle of solvent that
21 had somehow bubbled up from underground, then it
22 is not covered; correct?
23     A.    Correct.
24     Q.    Let's take machine guarding, you
25 understand what machine guarding is; don't you?

Page 2836

SUSAN HALL - CROSS

1
2     A.    Yes, I do.
3     Q.    It is to put some kind of
4 mechanism, guard or shield around a machine to
5 prevent the workers from being hurt, for example
6 by having to put their hands into an area with
7 moving parts?
8     A.    That's my understanding.
9     Q.    Tell me how preventing somebody
10 from losing a finger by sticking their hand into
11 the sharp spaces in a machine would ever be a
12 "Environmental workplace health and safety"
13 item?
14     A.    I can't really sitting here today
15 think of any instances where it would be.
16     Q.    Nor can I. Let's take electricity
17 control, one of the items we sought
18 indemnification.  Is modifications of to
19 equipment to prevent people from being
20 electrocuted or harmed from surges of
21 electricity, do you understand that?
22     A.    Do I understand what?
23     Q.    That we made indemnification claims
24 for management and control of electricity in
25 connection with the operation of equipment.

Page 2837

SUSAN HALL - CROSS

1
2     A.    Yes.
3     Q.    How can that be an environmentally
4 related workplace health or safety claim?
5     A.    I don't think it is.
6     Q.    I take the same thing is true about
7 mobile equipment rules to make sure people don't
8 get run over by tractors and things, that can't
9 be environmental; can it?
10     A.    I can't really think of any
11 instances where it would have an environmental
12 nexus.
13     Q.    How about lock tag procedures, you
14 understand what that is, making sure a machine
15 doesn't start up accidently during maintenance
16 and cut somebody's hand off?
17     A.    Yes, I understand what that is.
18     Q.    That can't be environmentally
19 related workplace health and safety claim; can
20 it?
21     A.    Based on the claims Alcoa submitted
22 for those items I do not see an environmental
23 nexus.
24     Q.    So we are now about 24 hours away
25 from finishing this entire two-week proceeding,

80  (Pages 2834 to 2837)

SUSAN HALL - CROSS

1
2  you correct me if I'm wrong, the only example in
3  this entire record that is consistent with your
4  view of what that contract language means is Mr.
5  Miller's explanation of a puddle of solvent
6  bubbling out of the ground and somebody slipping
7  off a platform and hurting themselves, that is
8  the only example of a workplace health or safety
9  claim that ever been introduced to this judge as
10  an example of what would be covered under the
11  indemnification; isn't that true?
12      A.   That is what Mr. Miller testified.
13      Q.   He is the only one; isn't he?
14      A.   Well I'm testifying today.  And
15  there are OSHA regulations that address
16  environmental matters.
17      Q.   Yes, but I just asked you, I have
18  gone through every category of workplace health
19  and safety we asked about, machine guarding,
20  fall protection, mobile equipment, electrical
21  safety, lock and tag out procedures, you haven't
22  been able to give me a single example of how any
23  of those could involve an environmental
24  workplace health and safety claim and thereby
25  get under your indemnification; have you? Not

SUSAN HALL - CROSS

1
2  one?
3      A.   No.  Because those are not -- those
4  do not satisfy the definition of Environmental
5  Law.  In my reading.
6      Q.   Okay.
7      A.   Frankly, if I might add --
8      Q.   No.  No.  That is for redirect.
9          Let's go back to your summary
10  chart.  We have agreed for maybe one
11  remediation involving pumping water at City of
12  Industry, everything else on that chart is
13  workplace health and safety or assessments,
14  studies or assessments?
15      A.   Could you tell me which are you
16  looking at that chart?
17      Q.   Yes.
18      A.   Which column?
19      Q.   The whole thing.  Now let's talk
20  about assessments, investigations or assessments
21  of possible work to be done to clean-up
22  environmental problems.  Your position, isn't it
23  correct that your position is that, as you said
24  in one of your letters, and as your counsel said
25  he loves a good turn of phrase, I think your

SUSAN HALL - CROSS

1
2  turn of phrase was something like you guys can
3  continue to do assessments all you want, unless
4  and until you do remediation we are not paying,
5  it is not covered; isn't that right?
6      A.   I rather look directly at my
7  letters.
8      Q.   Tab 20.  Would you turn to tab 20,
9  Ms. Hall.  Would you turn to the second page of
10  the letter.  This is your letter; isn't it?
11      A.   Yes, it is.
12      Q.   We are looking at the page marked
13  340 in the bottom right.
14      A.   Correct.
15      Q.   Bottom of that page last paragraph
16  that carries over you said "In short Alcoa can
17  commission all the environmental assessments it
18  wishes, such assessments be they environmental,
19  workplace health and safety or OSHA are not
20  Fastener Environmental Liabilities.  The
21  expenses associated with implementing a remedy
22  based on those assessments might qualify.  But
23  not the assessments themselves.  Unless and
24  until there is a Fastener Environmental
25  Condition there is no basis for

SUSAN HALL - CROSS

1
2  indemnification."
3          You wrote those words; right?
4      A.   I did indeed.
5      Q.   You standby that position; right?
6      A.   I do.
7      Q.   So whether or not Alcoa gave you
8  what you view as timely notice of an assessment,
9  whether or not Alcoa permitted you, in your
10  view, to participate in determining what that
11  assessment would be or how it would be done,
12  your position is, as you wrote in that letter,
13  assessments are not covered; isn't that true?
14      A.   I think I have to limit this to the
15  items that I was addressing at this time this is
16  February 25, 2005.  There could be instances
17  where an assessment or investigation was
18  required by some sort of regulatory driver which
19  would make a difference.
20          If you're doing an assessment or
21  investigation or a study as a result of the
22  regulators requiring that, that's a different
23  story.
24      Q.   We will come to a few of those.
25  Because you refuse to pay those, too, we will

81 (Pages 2838 to 2841,

Page 2842

SUSAN HALL - CROSS

1
2  come to those soon.  Let me go back to what you
3  said on February 25, 2005 you said Alcoa can
4  commission all the environmental assessments it
5  wishes, you didn't say with respect to only the
6  ones you already done; did you, in fact your
7  sentence says you can do whatever you want but
8  I'm not paying for it.  Doesn't it?
9      A.    That's what it says, Fairchild is
10 not paying for it.
11     Q.    The fact is your 15 million and
12 charge total on your summary chart but for one
13 instance of what you call remediation is made up
14 entirely either of workplace health and safety
15 items which you say are not indemnified as a
16 matter of contract and assessments which you say
17 are not indemnified as a matter of contract;
18 isn't that true?
19     A.    I would say by and large that is
20 probably correct.
21     Q.    So the two hours we just spent
22 listening to you tell your counsel and the judge
23 about how we didn't give you timely notice, we
24 didn't give you an opportunity to participate
25 and all that explanation of the bad things my

Page 2843

SUSAN HALL - CROSS

1
2  client has done in not complying with the
3  contract has absolutely nothing to do with your
4  position on why you're not going to pay for
5  either of those two categories; isn't that so?
6      A.    I don't think that is a correct
7  statement.  Because --
8      Q.    You don't think it is a correct
9  statement, fine.
10     THE ARBITRATOR:  If it is an
11 alternative ground, should I disagree with her
12 assessment of language of the contract, I
13 suppose that is another defense I would have to
14 consider; isn't it?
15     MR. CHESLER:  Sorry, your Honor, I
16 am not sure I understood your question.
17     THE ARBITRATOR:  If she is wrong
18 on how she is interpreting the contract in those
19 regards I still have to consider the question
20 of, the second question she raised about notice.
21 It is a separate ground.  She has got
22 alternative ground of defense.  She may be wrong
23 on both of them, but she has alternative ground.
24     MR. CHESLER:  Absolutely, your
25 Honor.  I am simply trying to make clear to the

Page 2844

SUSAN HALL - CROSS

1
2  court, I think I have, most of what we have
3  heard today is on a ground that is, under her
4  own interpretation of the contract, irrelevant.
5  I agree with you there is a separate question of
6  notice.  Your Honor can read the contract as
7  well as anybody.
8      THE ARBITRATOR:  It is a
9  complicated case, there are a lot of details, I
10 am not critical of counsel.  I think you have
11 done a marvelous job pulling it together in the
12 time you have, but there is a lot of detail
13 here.  No question.
14     MR. CHESLER:  Absolutely.  I
15 agree.  I think the point is made.
16     Q.    We are going to talk about some of
17 the notice in a little bit on your alternative
18 ground with respect to your interpretation of
19 3.24 the definition of Environmental Law which
20 you testified to on direct --
21     A.    Correct.
22     Q.    You would agree with me, I take it
23 you're the one who came up with this
24 interpretation of what workplace health and
25 safety means under that paragraph; aren't you?

Page 2845

SUSAN HALL - CROSS

1
2      A.    I am not entirely sure what you
3  mean.  When I came on board I was the only one
4  that had this interpretation; is that what
5  you're suggesting or asking?
6      Q.    Let me ask.  When you came on board
7  you read the contract.  You came up with this
8  interpretation of what it meant.  You thought it
9  was a subset of paragraph A, I think you said.
10 You did that on your own, you didn't consult
11 with anybody else at the company about that; did
12 you?
13     A.    Yes, I did.
14     Q.    You did?
15     A.    I did.
16     Q.    Before you came up with the
17 interpretation?
18     A.    Well, I arrived at that
19 interpretation.  I then consulted with Donald
20 Miller and Ernesto Beckford.
21     Q.    That is my point.  First you came
22 up with the interpretation, is your testimony
23 before you asked them what they thought it
24 meant?
25     A.    Yes.

82 (Pages 2842 to 2845)

Page 2846

SUSAN HALL - CROSS

1
2       Q.      You know that up until the time you
3   got there, any submissions of claims for
4   workplace health or safety expenses by my client
5   to your company were not in fact rejected out of
6   hand.  The response was we need more
7   information; right?
8       A.      That's my review of the
9   correspondence.  That's correct.
10      Q.      The words of the contract hadn't
11  changed between the time Mr. Miller and Mr.
12  Beckford were sending letters telling us to give
13  them more information and the time you arrived,
14  read the agreement and decided you understood
15  what it meant; did it?
16      A.      No.
17      Q.      It was only after you got there
18  that a letter came saying we are not paying for
19  these workplace health and safety claims, not
20  because of the information we have or don't
21  have, not because of the notice or
22  participation, but because they are not
23  indemnified.  You are the first person who ever
24  said that to Alcoa; isn't that right, as far as
25  you know?

Page 2847

SUSAN HALL - CROSS

1
2       A.      I also said there wasn't timely
3   notice.  I think in fairness you
4   mischaracterized Fairchild's letters in response
5   to Mr. Lease's gap letters.
6       Q.      The letters say whatever they say.
7       A.      They do.
8       Q.      They are all in evidence.
9       A.      They also say these may not
10  qualify, please give us more information.
11      Q.      May not?
12      A.      May not.
13      Q.      You concluded in one reading, first
14  year law school training, they did not?  You
15  didn't have any qualification or doubt in your
16  mind; did you?  This was unambiguous to you;
17  wasn't it?
18      A.      No, it was not unambiguous.  I
19  think the judge has made the same conclusion.  I
20  looked at the definition of Environmental Law in
21  the context of the entire section.  To me those
22  words had to be informed by the context in which
23  they appeared.  That's my reading.  Reasonable
24  minds can differ.  I guess that is really why we
25  are here today.

Page 2848

SUSAN HALL - CROSS

1
2       Q.      I am not sure I now understand your
3   testimony.  You read the contract.  You said
4   what popped into your mind was the basic axiom
5   you learned about interpreting contracts in your
6   first year of law school.  Based upon that
7   reading, no parole evidence, nothing else, based
8   upon your reading of the document you understand
9   what the definition of Environmental Law was, in
10  particular, that workplace health or safety was
11  in fact subsumed within or included within
12  subpart A of that section; isn't that your
13  testimony?
14      A.      That is my testimony, yes.
15      Q.      Same contract was available to your
16  predecessors who said it may be covered, we need
17  more information; right?
18      A.      Apparently.
19      Q.      Thank you. Would you look at 3.24,
20  I think tab 1 in your book.
21      A.      Could you tell me the contract
22  page.
23      Q.      I will in a moment.  If you give me
24  a moment.
25          THE ARBITRATOR:  41, Environmental

Page 2849

SUSAN HALL - CROSS

1
2   Law.
3       Q.      41.  The words, you pointed out
4   before the words "exposure to hazardous
5   materials" in A are similar to words in C.  They
6   are not the same.  C says "exposure of persons
7   or property to hazardous materials."  But there
8   are some common overlapping words.  Remember you
9   pointed that out earlier?
10      A.      Yes.
11      Q.      Do you see any common or
12  overlapping words between A and B?
13      A.      There is probably an "or" in both.
14      Q.      Yes, but for the "or" is there any
15  other overlapping word, do you see the "words
16  workplace health or safety" in A?
17      A.      No, I don't.
18      Q.      Do you see that A ends with a
19  comma, and then comes B, which ends with the
20  word "or," then comes C?
21      A.      Yes, I see that.
22      Q.      When you were taking contract law
23  in your first year of law school did you learn
24  what the word "or" in a string of separated
25  subclauses to a contract means?

83  (Pages 2846 to 2849,

Page 2850

SUSAN HALL - CROSS

1
2    A.    I believe I did.
3    Q.    What did you learn it meant?
4    A.    I believe it is disjunctive.
5    Q.    Disjunctive, meaning it is not in
6  one, but it is in the other, isn't that the
7  definition of disjunctive?
8    A.    Probably.
9    Q.    Thank you.  Did that pop into your
10 head when you read this when you were thinking
11 of your Latin axiom?
12    A.    I don't remember whether I was
13 focused on commas, I was focused on the overall
14 substance and meaning of the whole section.
15    Q.    I think we can save a little time
16 on the next subject I was otherwise going to ask
17 you about because I think Mr. Zurofsky covered
18 it with you toward the end of
19 direct-examination.
20          With respect to a variety of these
21 workplace health or safety items that we sought
22 indemnification for, lock tag, machine guarding,
23 I guess those two in particular, when you wrote
24 to us at some point saying you made these
25 requests and you never sent a single letter

Page 2851

SUSAN HALL - CROSS

1
2  giving us any notice or any kind of advance
3  warning, you admitted now you hadn't gone back
4  and looked at the prior correspondence.  That
5  was in error; correct?
6    A.    I had looked at prior
7  correspondence.  But I had not looked at those
8  four letters.  That's correct.
9    Q.    Now you have looked at those
10 letters, the so-called gap analysis letters and
11 while you admit the language of your letter was
12 wrong, it hasn't changed your view they are not
13 covered; correct?
14    A.    That's correct.
15    Q.    The reason again for that, you
16 simply read the contract as not covering those
17 items; right?
18    A.    That and -- yes, I read it as not
19 covering those items, but there were also the
20 fact we were not kept -- we were not kept
21 apprised of exactly what Alcoa was going to do
22 with respect to those, their alleged
23 non-compliances.
24    Q.    You keep saying that, but you said
25 on direct and also in some of your

Page 2852

SUSAN HALL - CROSS

1
2  correspondence the overarching reason which
3  takes precedence in your mind over keeping you
4  abreast of what we were doing is that you don't
5  believe they were covered by the agreement;
6  right?
7    A.    That's correct.
8    Q.    It is also the case, you spent a
9  lot of time showing that between the time we
10 gave you the gap -- not you, but gave Fairchild
11 the gap analysis letters shortly after the
12 closing, and the time we later submitted
13 invoices on those same categories, the numbers
14 had gone up, we spent more money; right?
15    A.    Well, the gap analyses I believe
16 had estimates.
17    Q.    Right.
18    A.    The actual invoices were actual
19 invoices.
20    Q.    Right. As you said there were
21 discrepancies, perhaps a less pejorative term,
22 the estimates were lower than the actual expense
23 turned out to be; right?
24    A.    That is a very fair
25 characterization.

Page 2853

SUSAN HALL - CROSS

1
2    Q.    Your view is as of the time the gap
3  analyses were submitted with the lower estimates
4  that turned out to actually cost more, those
5  weren't covered items as of that time either;
6  were they?
7    A.    Mr. Chesler, I wasn't there when
8  those gap letters came.  So, I shouldn't be
9  required to address those.
10         My position when I got the bills
11 for machine guarding and the lock, tag and
12 verify is set out in my letters.  I did not read
13 the contract as embracing those kind of claims.
14 For the reasons we have already gone over.
15    Q.    My question probably wasn't
16 particularly well worded.  I understand your
17 point.  Your view of the contract is what it is.
18 You formed that view later because you got there
19 later; right?
20    A.    Right.
21    Q.    The gap analyses letters were sent
22 before any work had been done though; correct?
23    A.    I believe that's correct.  I'd have
24 to look at them to be sure.  If you are going to
25 represent to me that's the case, I accept that.

84  (Pages 2850 to 2853)

SUSAN HALL - CROSS

1
2    Q.    A large component on the workplace
3  health and safety side of the ledger as opposed
4  to the contamination side if you will,
5  remediation side, a large component of the
6  workplace health and safety side of those
7  requests was machine guarding; right?
8    A.    I don't have them in front of me.
9  Again, if that is what you're telling me it is,
10  I agree, I don't dispute that.
11    Q.    Were you here yesterday when Mr.
12  Miller testified about machine guarding he
13  said -- counsel this is transcript page 2362 --
14  I asked, I guess I didn't, counsel for Fairchild
15  asked on direct, 2361 "Alcoa did not ask for any
16  more due diligence about machine guarding and
17  those types of issues in connection with this
18  transaction?"
19        Mr. Miller's answer at 2362,
20  beginning at line 3 was "no, it" referring to
21  machine guarding, "it is the kind of thing you
22  could walk into the machines, at the machines,
23  count the machines and see instantly whether or
24  not they had machine guards."
25        Were you here for that testimony?

SUSAN HALL - CROSS

1
2    A.    I believe I was.
3    Q.    You agree with that; don't you?
4    A.    I actually didn't understand the
5  question as you read it.
6    Q.    Do you understand the answer?
7    A.    Well, if you could read the
8  question again.
9    Q.    I'd be happy to.
10    A.    I'd appreciate it.
11    Q.    "Question: Alcoa did not ask for
12  any more due diligence about machine guarding
13  and those types of issues in connection with
14  this transaction?"  Meaning the purchase of the
15  business.
16        "Answer: No.  It" machine guarding,
17  "is the kind of thing you could walk into the
18  plant, look at the machines, count the machines
19  and see instantly whether or not they had
20  machine guards."
21        Do you agree with Mr. Miller's
22  answer?
23    A.    I don't disagree with Mr. Miller's
24  answer, I still don't understand what the
25  context of the question was in terms of their

SUSAN HALL - CROSS

1
2  due diligence and providing more information,
3  because there is no foundation for my
4  understanding that question.
5        I suppose that someone could walk
6  into a facility and look at machines and
7  determine whether there is machine guarding.
8  But I am not sure how that relates to --
9        THE ARBITRATOR:  I don't think Mr.
10  Miller's answer was quite responsive to the
11  question.  It is a little bit confusing.
12        MR. CHESLER:  I think that is a
13  fair characterization, your Honor.  Let me try
14  it this way.
15    Q.    Let's not quarrel, since it wasn't
16  my question I have no pride of authorship.
17    A.    It wasn't my answer, so I have none
18  either.
19    Q.    I understand, but unfortunately
20  you're on the witness stand and I'm not.  Let's
21  try again.
22        Let's put aside whether the
23  question and answer matched each other or what
24  the meaning of the question was.  Let me ask you
25  again, do you have any reason to disagree with

SUSAN HALL - CROSS

1
2  Mr. Miller's sworn testimony that machine
3  guarding "Is the kind of thing you could walk
4  into the plant, look at the machines, count the
5  machines and see instantly whether or not they
6  had machine guards" do you agree with that?
7    A.    I just feel like I can't answer it
8  because I don't know what you would see if you
9  went into a facility.  I suppose you could
10  determine whether, if you know where a machine
11  is supposed to have a guard.  I don't know that
12  I would know that walking in.
13        So, I just don't feel I can answer
14  that question.  He answered it the way he did.
15  I can't dispute or --
16    Q.    Fine.  You can't answer it.  He
17  answered it the way he did.
18    A.    He answered it the way he did.
19    Q.    You understand that under the same
20  agreement provision which you talked about at
21  some length on direct, Fairchild had among the
22  rights which you for some reason didn't mention,
23  the right to visit their former facilities; do
24  you understand they had that right?
25    A.    I understand the contract provides

85  (Pages 2854 to 2857)

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2858

```
 1          SUSAN HALL - CROSS
 2  Fairchild with reasonable access to the sites.
 3       Q.    And in fact they could question
 4  Alcoa's consultants about any of the work they
 5  were doing; right?
 6       A.    I think that is another one of the
 7  rights.
 8       Q.    They could go visit to the
 9  facilities, talk to the people there; right?
10       A.    I think with Alcoa's permission,
11  that's a right that's in the contract.
12       Q.    So, I take it you don't know what
13  happened before you got to the company, but
14  since you have gotten there, are you aware of a
15  single instance of where either you or someone
16  else who had something to do with this
17  transaction has ever asked Alcoa to allow any
18  Fairchild personnel to visit a single one of
19  these facilities, for example, to look at the
20  machine guarding or lack thereof?
21       A.    Not that I'm aware of.
22       Q.    If Mr. Miller is right, that all
23  you have to do is walk into the plants and in
24  his words, instantly see whether or not they
25  have machine guards, then all of this stuff
```

Page 2859

```
 1  about giving you notice and telling you, your
 2  alternative arguments, could have been cleared
 3  up by just picking up the phone, calling Mr.
 4  Lease and saying I want to come over and see the
 5  machine guarding at the facility; couldn't it?
 6  Yes or no?
 7       A.    I can't really answer that yes or
 8  no.
 9       Q.    You can't answer that question?
10       A.    I can't answer it yes or no.
11       Q.    All right.  If you can't answer it
12  yes or no, I'll move on.  Seemed to me to be
13  pretty simple, but if it is too complicated.
14       A.    We have already been through the
15  fact in my opinion the contract does not cover
16  machine guarding and lock, tag and verify.  So
17  walking into a facility to observe what the
18  situation is is of no moment.
19       Q.    We are playing a little semantics
20  game, with all due respect, Ms. Hall.  We think
21  it is covered, you think it is not.  Right?
22       A.    As the judge correctly pointed out
23  you come here today and provided under oath two
24  alternative theories, I am talking about machine
25
```

Page 2860

```
 1          SUSAN HALL - CROSS
 2  guarding now.  One theory it is not covered.
 3  The other theory is, as the judge pointed out,
 4  if he disagrees with your reading of the
 5  agreement, he still has to consider whether for
 6  example we gave you adequate notice and what if
 7  any effect that has on our rights to recover
 8  depending upon what the judge determines about
 9  the quality of our notice.  You heard him say
10  that; right?
11       A.    I did.
12       Q.    With all due respect, I am on the
13  alternative theory.  Let's put aside your
14  contractual view which says it doesn't matter
15  how much notice you give me you are not getting
16  the money.  Let's go to the alternative theory.
17          I am asking you a very simple
18  question.  You admitted your company has the
19  right to reasonable access to these facilities
20  we bought from you; correct?
21       A.    I agree.
22       Q.    Mr. Miller says you can walk into a
23  plant, in his words, "instantly see whether
24  machines have guards, you can look at the
25  machines."  That is what he said.  Do you know
```

Page 2861

```
 1          SUSAN HALL - CROSS
 2  whether you can comment on that one way or the
 3  other; correct?
 4       A.    Correct.
 5       Q.    If he is right, and given the
 6  facility access you had, this whole issue of
 7  millions of dollars of machine guarding could
 8  have been cleared up if you had picked up the
 9  phone and said to Mr. -- to our people on our
10  side, any one of them, I want to come look at
11  the facilities and inspect the machines; yes or
12  no?
13       A.    No.  Because by the time I'm on
14  board, Mr. Chesler, I am getting bills for
15  machine guarding.
16       Q.    Fair point.  How about before you
17  got on board -- excuse me, let me finish.  When
18  we sent the gap letters which you and I think
19  just agreed were before any machine guards were
20  put on any machines, we sent gap analysis
21  letters saying we want to do machine guarding.
22  Contract still said at that time your company
23  had a right to reasonable access to the
24  facilities; correct?
25       A.    It did.  It does.
```

86  (Pages 2858 to 2861)

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2862

SUSAN HALL - CROSS

1    SUSAN HALL - CROSS
2    Q.    Yes or no, could Mr. Miller or Mr.
3 Hodge or Mr. Beckford, any of the folks who
4 preceded you, as far as you know could they have
5 exercised Fairchild's right to reasonable
6 access, just called up Mr. Lease and said I want
7 to go visit any of the facilities and seen for
8 themselves what was on the machines, what wasn't
9 and that's all they needed to see, yes or no?
10    A.    Yes.
11    Q.    Thank you.
12    A.    And if they had perhaps they would
13 have exercised that right if their request for
14 additional information had been provided.  But
15 it wasn't.
16    Q.    They needed additional information
17 to pick up the phone and say let me go down the
18 road to Fullerton and see what's there --
19 withdrawn.
20    THE ARBITRATOR:  Is there more
21 than one way to put a guard on a machine?  I
22 don't know much about machine guarding.
23    MR. CHESLER:  Your Honor, I always
24 tell my client I know almost nothing about
25 everything.  That falls into the category of

Page 2863

1    SUSAN HALL - CROSS
2 almost nothing about that topic.  I just don't
3 know.
4    What I do know what Mr. Miller came
5 and testified to under oath.  He seemed to be
6 confident of his position about most things.
7    Q.    Let's talk about Fullerton.  You
8 were asked some questions about Fullerton.
9    A.    Yes.
10    Q.    On April 5 of 2005, that is after
11 you got to the company; correct?
12    A.    Correct.
13    Q.    Mr. Lease sent a letter about
14 proposed scope of work for some soil and
15 groundwater sampling at Fullerton; correct?
16    A.    If you could tell me where the
17 letter is, I would appreciate it.
18    Q.    Let me show you Alcoa Exhibit 59.
19    Do you recognize this as a letter
20 to you from Mr. Lease dated April 5, 2005?
21    A.    Yes, I do.
22    Q.    You recognize it refers to a work
23 plan that describes a proposed scope of work for
24 supplemental soil and groundwater sampling at
25 the Fullerton site?

Page 2864

1    SUSAN HALL - CROSS
2    A.    That's correct.
3    Q.    He says it addresses the California
4 Regional Water Quality Control Board's request
5 for additional monitoring wells at the site.
6    A.    That is what it says.
7    Q.    At the bottom it says "If you have
8 any questions or comments on the information in
9 this letter or the attachments please call me."
10 He gives you his telephone number; correct?
11    A.    That is what he says.
12    Q.    You were also given a draft letter
13 attached to this letter from Mission Geoscience
14 who were Alcoa's consultants to the California
15 Regional Water Quality Control Board; correct?
16    A.    Yes.
17    Q.    You didn't call, take Mr. Lease up
18 on his offer to call if you had any questions or
19 comments, you didn't call him; did you?
20    A.    No.  I didn't call him.  I think I
21 responded in writing.
22    Q.    Yes.  We will get to that.  You
23 didn't call him back and talk to him, say, John,
24 let me talk to you about this, when did these
25 regulators show up, why are they demanding this

Page 2865

1    SUSAN HALL - CROSS
2 additional supplemental work?
3    A.    No, I didn't.
4    Q.    You did write back.  Let me show
5 you Alcoa Exhibit 173.  Is this your response?
6    A.    Yes, it is.
7    Q.    You say "We received your letters,
8 we reviewed the work plan" then the next
9 paragraph where you get down to the business of
10 the letter you say "Our position on Alcoa's
11 voluntarily undertaking risk assessments,
12 investigations and characterizations with
13 respect to the Fullerton facility was conveyed
14 to you" and you refer back to the February 25
15 letter we looked at a few moments ago; right?
16    A.    That's what it says.
17    Q.    You go on to say, in fact you quote
18 there Alcoa -- looking at last sentence of your
19 quote from your earlier letter "Alcoa can
20 continue to undertake site assessments and
21 characterizations" talking about future work;
22 right, "but until remedial action is undertaken
23 there is no Fastener Environmental Liabilities
24 that qualifies for indemnification under 11.6 ."
25 Right?

87 (Pages 2862 to 2865.

Page 2866

SUSAN HALL - CROSS

1
2    A.    Yes.
3    Q.    You understand that that is not
4    consistent with Judge Stapleton's preliminary
5    opinion on summary judgement motion here?
6    A.    I don't know what you're talking
7    about.
8    Q.    Then I won't ask you about it.
9          You say "Inasmuch as the work
10   plan -- "
11   A.    Where are we now?
12   Q.    At the bottom of the first page
13   "Inasmuch as the work plan for supplemental
14   subsurface investigation is simply another
15   assessment of the site we reject all claims for
16   indemnification for the costs relating to the
17   plan, its implementation and any associated
18   expenses." Right?
19   A.    Yes.
20   Q.    If you're wrong, if your reading of
21   the indemnification is incorrect and in fact
22   investigations or studies to determine whether
23   environmental remediation work needs to be done
24   are covered, then your refusal to pay for this
25   particular study was an error; wouldn't you

Page 2867

SUSAN HALL - CROSS

1
2    agree with that?
3    A.    If all your predicates are true, it
4    may be in error.
5          Let me add, I just realized
6    something. Again, I think as with so many of
7    these items, you do have the notice issue here.
8    I believe that the work plan had already been
9    submitted to the regulators. And we had no
10   opportunity to participate in that.
11   Q.    I am glad you added that little
12   qualification. Would you go to the contract,
13   tab 1 to 11.6 which begins on page 82.
14   A.    I'm there.
15   Q.    Where does it say in 11.6, where is
16   the actual language that says before Alcoa
17   submits a proposed work plan to any regulator,
18   Fairchild must be given a copy and the
19   opportunity to change it, comment, modify it?
20   A.    Well, it doesn't have those exact
21   words, but if you look at, page 83 which is the
22   final sentence in connection with 11.6C, it
23   says. "The Buyer shall afford the Sellers a
24   reasonable opportunity to comment on the Buyer's
25   proposed response to a Fastener Environmental

Page 2868

SUSAN HALL - CROSS

1
2    Condition and Buyer shall not unreasonably
3    refuse to incorporate the Seller's comments."
4          Now I recognize in this section
5    that Alcoa has the right to take the lead on
6    remedial actions.
7    Q.    It doesn't say take the lead; does
8    it?
9    A.    I'd have to look at the language.
10   Q.    Yes. Why don't you look at the
11   language. It says "conduct and control all
12   remedial action and negotiations with any
13   government entity," etc., etc. toward the top of
14   section C. Isn't that what it says?
15   A.    Right. That is what it says.
16   Q.    Now, your testimony is
17   notwithstanding my client's contractual rights
18   to conduct and control all remedial action and
19   negotiations with any government entity, that
20   the language at the end of that same paragraph
21   that you read about a reasonable opportunity to
22   comment, in your view means that if we have
23   given a proposed work plan to a regulator at
24   their request, no work's been done, we submit it
25   to you with a letter saying call with any

Page 2869

SUSAN HALL - CROSS

1
2    questions or comments, that you've not been
3    given any reasonable opportunity because the
4    regulators have gotten a draft of the plan on
5    which not a thing has been done yet? That's your
6    testimony; right?
7    A.    My testimony is --
8    Q.    Is that your testimony?
9    A.    That Alcoa has an obligation to
10   consult with us on proposed responses to
11   environmental conditions. A work plan is a
12   proposed response. And before it is submitted
13   to a regulator, Alcoa should consult with
14   Fairchild and get its comments.
15   Q.    That is just your view of it;
16   right? You are not sitting here testifying
17   under oath that you know that Alcoa had no right
18   to make any suggested modifications or have any
19   further discussion with the regulators about the
20   proposed plan? You are not suggesting you know
21   that; are you?
22   A.    I am not suggesting that. I'm
23   suggesting nothing of the kind. I'm suggesting
24   that the contract provides Fairchild with
25   certain participation rights. And that when

88  (Pages 2866 to 2869)

Page 2870

SUSAN HALL - CROSS

1  you're dealing with remediation at these sites,
2  which can be very, very costly, and the parties
3  are supposed to consult and confer and comments
4  are supposed to be listened to from Fairchild,
5  that Alcoa shouldn't in good faith go and submit
6  work plans to the regulators about what they are
7  going to do without giving Fairchild an
8  opportunity to be heard on it. That's all I'm
9  saying.
10    Q.    Let me ask my question again.
11    A.    Sure.
12    Q.    You are not testifying you know as
13  a matter of fact that Fairchild did not have an
14  opportunity to comment on this work plan, merely
15  because Alcoa had given a draft of it to the
16  regulators; are you?
17    A.    No. But what I'm telling you --
18    Q.    You answered my question. You
19  already told me what you wanted to tell me.
20        By the way, my questions earlier
21  about being able to walk into the plants by
22  calling John Lease to see what the machine
23  guarding situation is, that would apply equally
24  to fall protection, wouldn't you, if you called

Page 2871

SUSAN HALL - CROSS

1  John Lease and said I want to go over and look
2  at the Torrance facility, you walk through the
3  facility, you could see whether there is a
4  railing up on a platform or not; couldn't you?
5    A.    Maybe yes, maybe no.
6    Q.    Presumably you could walk through
7  the plant and see what has been put up to
8  protect against falls or what hasn't been
9  couldn't you?
10    A.    Perhaps. I think you have to know
11  something about what fall protection involves.
12  I guess if you have an area where employees are
13  up on a highly elevated platform and there is no
14  railing.
15    Q.    You can see that?
16    A.    You can probably see that, yes.
17    Q.    By the way, you have to know
18  something about it, when you here yesterday -- I
19  think it was yesterday -- losing track of days,
20  when Mr. Hodge said he was being paid $200 an
21  hour to come from his teaching job in Virginia
22  to testify here?
23    A.    I was here for his testimony on
24  that.

Page 2872

SUSAN HALL - CROSS

1    Q.    Presumably this was a long
2  experienced environmental lawyer, if the company
3  was prepared to pay him $200 an hour to take off
4  some time from teaching to testify, you don't
5  have any reason to doubt they could have paid
6  him 200 bucks an hour to go over to the
7  facilities, walk around with his years of
8  expertise, and tell them whether fall protection
9  provisions were, in his view, adequate or not;
10  do you?
11    A.    I think Mr. Hodge testified he is
12  not an expert in OSHA compliance. We could have
13  paid him for that, but it would have been a
14  waste of money.
15    Q.    You could have found somebody and
16  paid him or her for that for whom it wouldn't be
17  a waste of money; couldn't you?
18    A.    Sure. If those were Fastener
19  Environmental Liabilities. But they are not.
20    Q.    We are on the alternative theory
21  again, Ms. Hall.
22    A.    Sorry.
23    Q.    You keep forgetting that. When a
24  judge asks the question at trial, as a trial

Page 2873

SUSAN HALL - CROSS

1  lawyer I learned long ago you better darn well
2  try your best to respond to the question.
3        THE ARBITRATOR:  You are doing
4  very well.
5        MR. CHESLER:  Thank you, your
6  Honor. I will tell my wife you said that. She
7  will be proud of me.
8    Q.    Let's talk about Montbrison for
9  minute. You received a request in February
10  2005, I think you looked at it maybe, on the same
11  day you sent your letter saying we are not
12  paying for any assessments.
13    A.    We are not paying for any what?
14    Q.    Any assessments.
15    A.    At Montbrison?
16    Q.    No. No. You sent the general
17  letter saying assessments are not covered. We
18  looked at that letter.
19    A.    Yes. My February 25 letter.
20    Q.    On the very same day Alcoa sent a
21  letter asking for indemnification for what was
22  called a detailed risk assessment at Montbrison
23  about soil and groundwater issues. Do you
24  recall that?

89 (Pages 2870 to 2873,

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2874

SUSAN HALL - CROSS

1
2    A.    Yes.
3    Q.    You rejected that claim, do you
4  recall that?
5    A.    Could you tell me where it is in
6  the book.
7    Q.    Yes, it is Exhibit 174.
8    MR. ZUROFSKY:  Tab 22.
9    MR. CHESLER:  Thank you, counsel.
10   Q.    Why don't you turn to tab 22 in
11 your direct exam book your counsel kindly
12 pointed out.
13   A.    Okay.
14   Q.    This is your response I want to ask
15 you if you recall you sent this letter rejecting
16 the request for indemnification for the detailed
17 risk assessment relating to soil and groundwater
18 at Montbrison?
19   A.    Yes.
20   Q.    And you said in this letter that
21 Alcoa had been previously informed, I am looking
22 now bottom of the first page.
23   A.    Yes.
24   Q.    "Furthermore Alcoa has been
25 previously informed that Fairchild reject claims

Page 2875

SUSAN HALL - CROSS

1
2  for expenses related to proposal and
3  assessments." Right?
4    A.    Yes.
5    Q.    In the prior paragraph you took on
6  the alternative leg, you took the position that
7  "Alcoa had shown you nothing that evidences
8  contamination arising out of a release or
9  threatened release. It can point to no
10 violations or alleged violations of
11 Environmental Law prior to closing." Right?
12   A.    That is what it says.
13   Q.    Isn't it true, you may not know
14 this, but I'll ask you anyway, that back in 1999
15 ERM -- you know who ERM is?
16   A.    Yes.
17   Q.    ERM did a limited Phase II
18 investigation for Fairchild at the very same
19 facility and concluded that it was likely that a
20 remediation for TPH, that is hydrocarbons and
21 chlorinated hydrocarbons would have to be
22 performed at the site.
23   A.    I don't recall that. If you want
24 to represent to me that's the case, I'll accept
25 that.

Page 2876

SUSAN HALL - CROSS

1
2    Q.    I will represent to you that's the
3  case.
4
5          Before you rejected this letter,
6  this request, I should say, did you consult with
7  any of the people who had been at Fairchild who
8  were still there at the corporate level when the
9  Fasteners facility business were owned to find
10 out in fact Alcoa was merely asking for
11 indemnification to remediate a problem which had
12 been identified on Fairchild's watch by its own
13 consultants? Did you ask that?
14   A.    No. Because this is not related to
15 remediation. This is related to an
16 investigation. This letter at tab 22 that I
17 wrote to Mr. Lease is specifically addressing
18 the document that he had sent to me. The
19 remedial investigations at Montbrison. That's
20 what I'm addressing. Not addressing -- because
21 that is what he sent to me as a claim. He
22 wanted reimbursement for all of these various
23 studies and investigations.
24   Q.    Let's develop that a little bit.
25   A.    Okay.
26   Q.    You knew by the time you got to the

Page 2877

SUSAN HALL - CROSS

1
2  company -- I apologize for forgetting, when
3  exactly did you arrive at Fairchild?
4    A.    I started right around October of
5  2004.
6    Q.    By October 2004 Fairchild had
7  received all of the Phase II studies that Alcoa
8  had conducted after the closing; isn't that
9  right?
10   A.    Yes. I believe that is correct.
11   Q.    So you had access to the Phase II
12 studies; correct?
13   A.    Yes.
14   Q.    Before you wrote back telling Alcoa
15 for these various reasons set forth in
16 Claimant's Exhibit 456 you weren't going to pay
17 for it, did you look at the information you
18 already had from Alcoa in the Phase II studies
19 about this very facility; yes or no?
20   A.    Yes, I looked at the Phase II. I
21 cannot tell you exactly when. But, I will tell
22 you there is a reasonably good chance I did look
23 at it before writing this letter.
24   Q.    Okay.
25   A.    I can't say with certitude but I

90  (Pages 2874 to 2877)

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2878

SUSAN HALL - CROSS
2 think there was a reasonably good chance.
3    Q.    Let me show you Exhibit 56. Do you
4 recognize this as the Phase II report for the
5 Montbrison facility?
6    A.    Yes.
7    Q.    You don't have any reason to doubt
8 you had this at Fairchild by the time you
9 arrived and certainly when you wrote this letter
10 in March of 2005 rejecting the claim; correct?
11    A.    I definitely had it in 2005.
12    Q.    Would you turn to the page that
13 bears the Bates number ending 32274.
14    A.    Yes.
15    Q.    Do you have that page?
16    A.    I do.
17    Q.    I would like you to look down at
18 the bottom of the page. Your Honor, are you
19 with me?
20    THE ARBITRATOR:  I have it, yes.
21    Q.    Bottom of the page it says "In
22 1999, ERM recommended further soil and
23 groundwater investigations to Fairchild to
24 verify the results and to delineate the impacted
25 areas; however, no further studies were done

Page 2879

SUSAN HALL - CROSS
2 until this Phase II investigation. According to
3 AFS Montbrison, no other environmental
4 assessments or investigations were completed
5 until the ERM ESA in May 2002."
6    Do you see that?
7    A.    I do.
8    Q.    Let me see if I can summarize what
9 happened here, see if you agree with me.
10    Fairchild had consultants in 1999
11 who looked into the same problems and who
12 recommended further soil and groundwater
13 investigations to verify results and delineate
14 the impacted areas; correct?
15    A.    That is what that says.
16    Q.    The Phase II which my client
17 provided to your company reported that and also
18 reported no further studies were done until the
19 current study done by Alcoa; correct?
20    A.    That's what it says.
21    Q.    So Alcoa then comes back to you
22 with the Phase II claims, provides them to your
23 predecessors before you get there. And now
24 comes in and says we want to do the further
25 studies at that very site. They have given you

Page 2880

SUSAN HALL - CROSS
2 a Phase II report that told you three years
3 before the same studies were recommended and
4 never done. You turned them down; right;
5 correct?
6    A.    Yes but not because --
7    Q.    I didn't ask you why. I asked you
8 if you accept the chronology that is laid out in
9 words of English in the Phase II which was
10 sitting somewhere in your offices and which you
11 say you think you consulted before you rejected
12 our claim, you admitted all of that. My only
13 question is did you then turn us down?
14    A.    That's correct.
15    Q.    Thank you. By the way, which
16 column on your chart is this one?
17    MR. ZUROFSKY:  There is detailed
18 back up, by the way.
19    MR. CHESLER:  I know, since it is
20 the witness' chart.
21    Q.    It is tab 2 in the back just if you
22 would like it.
23    A.    Sorry?
24    Q.    Do you know which column of your
25 chart the Montbrison request is in?

Page 2881

SUSAN HALL - CROSS
2    A.    I took it out of my binder.
3    Q.    It is tab 2.
4    A.    I believe it would be largely in
5 the second category, which is the third column.
6    Q.    The one that says we ignored your
7 attempts to participate?
8    A.    Yes.
9    Q.    I want you to just verify for me if
10 your belief in that regard is right.
11    A.    That's correct.
12    Q.    Let me ask you again, now that you
13 have got the Phase II in front of you, which was
14 available to you at the time, and you see that
15 Fairchild's own consultant recommended the
16 studies, Fairchild then didn't do the studies,
17 we came along, did a Phase II, we gave you the
18 Phase II that says the studies should be done,
19 we then said we want you to pay us for the
20 studies and you said no, I won't pay you for the
21 studies, do you stand by your testimony that the
22 bill for that should be under the category that
23 says we didn't allow you to participate in the
24 process? Yes or no?
25    A.    Yes.

91 (Pages 2878 to 2881)

Page 2882

1        SUSAN HALL - CROSS
2     Q.    Thank you.
3        MR. CHESLER:    Just give me a
4   moment, your Honor.
5     Q.    I want to go back to one other
6   topic that I failed to cover on the subject of
7   the definition of Environmental Law.
8           Would you go back to the contract
9   in tab 1, please.  In particular I want you to
10  look first at section 1.88.  Which appears on
11  page 12 which has a Bates number of 2738.
12    A.    I'm there.
13    Q.    You see 1.88 is the definition of
14  Law; right?
15    A.    Yes.
16    Q.    "Shall have the meaning set forth
17  in section 3.5" correct?
18    A.    Yes.
19    Q.    Let's go to 3.5 which is on
20  page 29.  Do you have that that?
21    A.    I do.
22    Q.    There is a lot of words in there,
23  lawyers must have been paid by the word for this
24  agreement.  Go down to iv.
25    A.    Yes.

Page 2883

1        SUSAN HALL - CROSS
2     Q.    This is another one of those
3   sections that set off with separate subparts,
4   commas then the word "or," the disjunctive;
5   correct.  If you look down at the last one or iv
6   it says as part of the definition, you can look
7   at the rest if you like, I am not trying to
8   sneak anything by you, but I am trying to save
9   some time.
10           It says "Violate any order, writ,
11  injunction, decree, judgement, permit, license,
12  ordnance, law, common law, statute, code,
13  standard, requirement, rule or regulation (Law)
14  applicable to any of the sellers, or any of the
15  Transferred Fasteners Subsidiaries, or any of
16  the Fasteners Business Assets or the Fasteners
17  Business."
18           Then it goes on to say "With such
19  exceptions in the case of the foregoing
20  clauses."
21           Would you agree with me at least on
22  reading it here OSHA falls under that
23  definition?
24    A.    I frankly would have to read the
25  whole thing because I don't know what this

Page 2884

1        SUSAN HALL - CROSS
2   modifies, but looking at it in isolation, it is
3   very broad.  It may well and probably would
4   include regulations and statutes, which OSHA is.
5     Q.    Right. By the way, the definition
6   of Environmental Law doesn't say that you should
7   not read the definition of the term Law into the
8   word law in Environmental Law; does it?
9     A.    Say that again, please.
10    Q.    When you look at the definition of
11  Environmental Law, one of the two words is the
12  word law; correct?
13    A.    Let me look at it, if you don't
14  mind.
15    Q.    3.24G ii.
16    A.    And the question again.
17    Q.    Yes.  First question is, I think it
18  is kind of self-evident in English, we should
19  get Mr. Hodge back, he is an English teacher.
20  Environmental Law consists of two words, one of
21  which is the word law; correct?
22    A.    That's correct.
23    Q.    In the contract it begins with a
24  capital L because it is a term of art?
25    A.    That's correct.

Page 2885

1        SUSAN HALL - CROSS
2     Q.    There is nothing you know of in
3   this agreement that says when the word law
4   appears as part of the definition of
5   Environmental Law you should apply a definition
6   of the term law that is different from what the
7   same agreement says the definition of law is; is
8   there?
9     A.    You kind of lost me.  I think I
10  generally agree with you.
11    Q.    I am just asking you -- let me make
12  it simpler.  Law is defined term, law is one of
13  the terms that makes up the term Environmental
14  Law; correct?
15    A.    Correct.
16    Q.    You would think under contract
17  principles you learned in your first year of law
18  school, if law is a defined term whenever you
19  find it in the agreement you apply the
20  definition of law under the agreement; right?
21    A.    I agree.  But I think subsection B
22  makes it clear that OSHA regulations in an
23  environmental context are included.  I don't
24  think that this definition of law, this broad
25  definition of law changes my interpretation of

92  (Pages 2882 to 2885)

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2886

SUSAN HALL - CROSS

1
2  what Environmental Law is.
3      Q.    It may not change your
4  interpretation, but it may change somebody
5  else's.
6          I just want to be sure we're clear
7  that you don't have any basis to dispute reading
8  the contract's own definition of law into the
9  word law, which is part of the term
10 Environmental Law; is that right?
11     A.    That's just the way it is written,
12 Mr. Chesler. I couldn't possibly disagree.
13     Q.    Thank you. I have two other
14 topics. Torrance. Then I want to go back and
15 ask some questions about that chart the witness
16 spent a got deal of her time on on direct, then
17 I will be done.
18          You testified about this Torrance
19 situation with the regulators, do you recall
20 that, in California, the consent decree?
21     A.    Yes.
22     Q.    Did you read the Consent Decree?
23     A.    Yes, I did.
24     Q.    Did you see there is a section,
25 let's look at it, tab 36. Rather than create

Page 2887

SUSAN HALL - CROSS

1
2  more paper we'll use your copy.
3          This is the letter that forwarded
4  to you the Consent Agreement for Torrance;
5  correct?
6      A.    Yes.
7      Q.    Did you read it at the time?
8      A.    Yes.
9      Q.    Would you turn to the page that
10 ends 151, please.
11     A.    Yes.
12     Q.    You see on that page there is a
13 heading Facility Investigation, FI?
14     A.    Correct.
15     Q.    You understand this was a facility
16 investigation which was required by the
17 governmental authorities for Alcoa to perform
18 within 90 days of the effective date of the
19 agreement; right?
20     A.    That is what it says in the
21 document.
22     Q.    In fact, when Alcoa submitted to
23 you a work plan to perform this very facility
24 investigation you rejected the indemnification
25 claim; correct?

Page 2888

SUSAN HALL - CROSS

1
2      A.    I don't know that, that is correct.
3  Are you suggesting that Alcoa submitted the work
4  plan that is referenced in this consent order?
5      Q.    Yes.
6      A.    Oh, yes that's right because --
7      Q.    Just yes they did?
8      A.    What is the question again?
9      Q.    Didn't Alcoa submit to Fairchild
10 the work plan to be done as required by the
11 facility investigation, paragraph 6.1 of the
12 decree and didn't you refuse the indemnification
13 claim?
14     A.    Yes. Absolutely.
15     Q.    Do you know that before Alcoa
16 signed the Consent Decree, it was told by the
17 government regulators in California that either
18 it enter into the decree or the agencies would
19 issue a unilateral order demanding that the site
20 be remediated in a timely fashion? Were you
21 aware of that?
22     A.    No, I wasn't.
23     Q.    Let's look at Exhibit 167. You see
24 this is a, appears to be email from Charles
25 Stone at the DTSC. You know what that is?

Page 2889

SUSAN HALL - CROSS

1
2      A.    Yes.
3      Q.    What is it?
4      A.    Department of Toxic Substances
5  Control in California.
6      Q.    To Gregory Pfeifer. Do you see
7  that?
8      A.    Yes.
9      Q.    You see that if you look about a
10 third of the way down the page you will see an
11 email address for Mr. Pfeifer that says at
12 Alcoa.com?
13     A.    Yes.
14     Q.    This note from Mr. Stone to Mr.
15 Pfeifer dated February 10, 2006. February 10,
16 2006 is before the decree was entered into which
17 was slightly or shortly thereafter in February
18 of the same year; correct?
19     A.    Yes.
20     Q.    The regulator said to Mr. Pfeifer,
21 "At this date there are two options available to
22 Alcoa. Either enter into the CASC or DTSC --"
23 into the CASC which is an acronym for the
24 decree; correct?
25     A.    Yes.

93 (Pages 2886 to 2889,

Page 2890

1          SUSAN HALL - CROSS
2          Q.    "Or DTSC will issue an it should be
3    a unilateral order demanding the site be
4    remediated in a timely fashion.  Should you have
5    any questions please feel free to contact me."
6    That is what it says; right?
7          A.    That is what it says.
8          Q.    As you said before you are aware
9    the contract says we both conduct and control
10   all negotiations and interactions with
11   government agencies related to environmental
12   conditions; right?
13         A.    The agreement says what it says.
14         Q.    Notwithstanding this ultimatum from
15   the DTSC, I take it you stand by your position
16   you were correct in rejecting all of Alcoa's
17   indemnification claims, even including the
18   claims for doing the investigation provided by
19   the decree; is that correct?  Yes or no?
20         A.    Yes.
21         Q.    That is in your chart, too, the
22   expenses you incurred in connection with
23   Torrance as covered in your direct are covered
24   in one of the columns on your chart?
25         A.    I believe they are.

Page 2891

1          SUSAN HALL - CROSS
2          Q.    Which column is that one in?
3          A.    Probably column 3.  Let me
4    double-check I believe it is in column 3.  There
5    might be some in column 2.
6          Q.    Column 3 is items for which
7    Fairchild has otherwise been denied its right to
8    participate; correct?
9          A.    Yes.
10         Q.    If it is in column 2 it is items
11   for which we ignored your right to participate?
12         A.    Right.  It is column 3.
13         Q.    You don't quarrel -- quarrel is the
14   wrong word, you would be quarreling with
15   yourself.  You don't change your view on
16   changing that item Torrance Consent Decree
17   related expenses on this chart; right?  Your
18   position remains as it was when you got here
19   this afternoon on that subject; correct?
20         A.    Yes.
21         Q.    A few questions about the chart
22   then we're done.  One of the things you did was
23   you took this first column and said those are
24   the items that Alcoa admitted that it didn't
25   give us notice about; right?

Page 2892

1          SUSAN HALL - CROSS
2          A.    That's, yes, that is what you gave
3    us at the first mediation.
4          Q.    In fact --
5          A.    Arbitration.
6          Q.    In fact was the testimony from Mr.
7    Lease, that those were items for which he could
8    not point to a particular piece of paper, but in
9    fact, in his view, he showed the documentation,
10   they were covered by other notices; isn't that
11   what he said?
12         A.    I was not here for his entire
13   testimony.  I don't know.
14         Q.    Well, did you compile this chart or
15   did the lawyers compile it?
16         A.    This was a joint effort.
17         Q.    Joint effort.  You came in and
18   swore to it, did you verify all the numbers in
19   here belonged in here and they were completely
20   consistent with the evidentiary record here?
21         A.    I know and confirmed that columns 1
22   and 2 represent -- column 1 represents the list
23   that Alcoa gave us at the first arbitration
24   hearing.  And column 2 represents the asterisked
25   items that appeared in letters that John Lease

Page 2893

1          SUSAN HALL - CROSS
2    sent to Fairchild in July of 2005 and February
3    2006.  And there is no overlap.
4          Q.    So if Mr. Lease testified with
5    respect to the first column items, that they
6    were simply items for which there wasn't a
7    specific piece of paper that referred to it, but
8    he testified at length about what the notice
9    was, you didn't review that testimony before you
10   put or had the lawyers put all those numbers in
11   column 1; is that correct?
12         A.    That's correct.  My understanding
13   was that --
14         Q.    You answered my question.
15         THE ARBITRATOR:  If she wants to
16   clarify, I won't cut her off.
17         Q.    Your understanding was?
18         A.    It was my impression that Alcoa in
19   its own damage claim, I could be wrong, had
20   reduced its damage claim by the 2.1 million.
21         Q.    You could be wrong; right?
22         A.    I could be.
23         Q.    It is also your testimony, I take
24   it -- withdrawn.
25         Let me ask you this: There are

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2894

SUSAN HALL - CROSS

1    SUSAN HALL - CROSS
2    machine guarding items in this first column;
3    aren't there?
4        A.    I'd have to look at the backup.
5        Q.    Look at the backup, for example,
6    there is one for 14,770 at Simi listed in the
7    backup. Why don't you look at Simi.
8        A.    In column 1 or 2?
9        Q.    Column 1.
10        A.    Yes.
11        Q.    Page 3. Right?
12        A.    Yes.
13        Q.    So you included this one, if I
14    understand your testimony, because you believe
15    that Alcoa said it shouldn't be in the damage
16    claim, because there was no specific notice for
17    that; correct?
18        A.    Correct.
19        Q.    You would agree with me, wouldn't
20    you, you got many, many, many notices for
21    payment of machine guarding and you refused all
22    of them because you don't believe machine
23    guarding is covered; right?
24        A.    That's not the same issue.
25        Q.    Is the answer to my question yes?

Page 2895

1    SUSAN HALL - CROSS
2        A.    Ask it again.
3        Q.    You have rejected all of the claims
4    that have been submitted to you for machine
5    guarding at many of the other facilities; isn't
6    that so?
7        A.    That's correct. Although I don't
8    think we ever got a Simi Valley bill.
9        Q.    Ms. Hall, under oath if you had
10    gotten a letter like all the other letters and
11    this one said give us the $14,000 for Simi
12    Valley, you would have handled that one exactly
13    the same way you handled all the others;
14    wouldn't you?
15        A.    Yes, I would.
16        Q.    Thank you. You also list in this
17    first column $91,000 for mobile equipment
18    compliance at various facility including
19    Stoughton?
20        A.    Are you on the big one now?
21        Q.    On the first column, still on the
22    first column. I am asking you to confirm in the
23    first column in, for example, the Fullerton
24    line, the Torrance line -- excuse me, let me
25    restart.

Page 2896

1    SUSAN HALL - CROSS
2        In the City of Industry line, the
3    Stoughton line and St. Cosme line, each one of
4    those contains mobile equipment items which when
5    you add them up are over 90,000. It is late, we
6    don't need to take the time. If those are in
7    your backup you wouldn't dispute those?
8        A.    No, I wouldn't.
9        Q.    Would you also agree with me you
10    got mobile equipment notices for other
11    facilities, for example Fullerton and Torrance,
12    and you rejected those claims; correct?
13        A.    Could you show me exactly what
14    you're referring to.
15        Q.    Sure. For example, let me show you
16    Exhibit 46, tab 7 in your book.
17        A.    Tab 7 is a letter from Mr. Lease to
18    Mr. Hodge.
19        Q.    Right. If you look at page 136, the
20    bottom entry on 136 is for mobile equipment;
21    isn't it?
22        A.    I am at tab 7?
23        Q.    Tab 7, Fullerton.
24        MR. ZUROFSKY:  Bates stamp 42 at
25    the end I think is what you're looking for.

Page 2897

1    SUSAN HALL - CROSS
2        Q.    I am looking -- my problem, your
3    Honor, I am looking at different documents from
4    different books. Let me see, I think I am
5    looking in the wrong tab 7. I feel better
6    because young Mr. Slifkin made the same mistake
7    before. So it is not my age.
8        I've got it, tab 7 in your book.
9        A.    Okay.
10        Q.    Now I want you to look at the page
11    that ends with 42.
12        A.    Yes.
13        Q.    Would you agree with me the bottom
14    entry on that page is 40,000 for mobile
15    equipment?
16        A.    There is an estimation of $40,000
17    for mobile equipment.
18        Q.    Yes. That is a claim you have not
19    paid; right?
20        A.    No, we have not paid. First of
21    all, this is not a claim. It is an estimate.
22        Q.    An estimate. Right. Later on you
23    got a claim and you rejected that?
24        A.    Correct.
25        Q.    My only point here is you listed a

95 (Pages 2894 to 2897,

Page 2898

SUSAN HALL - CROSS

1
2    mobile equipment item for St. Cosme, for
3    Stoughton and for City of Industry over $90,000
4    in claim 1 -- column 1, I should say, because
5    you didn't get a particular piece of paper for
6    those. I am simply trying to get you to agree
7    with me to what I think is a fact, which is you
8    got claims for precisely the same category of
9    indemnification from Alcoa with respect to other
10   facilities and you rejected all of those;
11   correct?
12       A.    Got letters from Alcoa indicating
13   they thought they were going to incur expenses
14   for certain activities. The activities, the
15   health and safety activities in my estimation
16   are not Fastener Environmental Liabilities. We
17   were never given any further -- even assuming
18   they are, there was nothing given to us to let
19   us know what Alcoa was doing until we got the
20   bill.
21       Q.    Right. We have been down that road
22   before. I think the answer to my question is
23   yes, you rejected the other claims for whatever
24   reasons you thought were good reasons. Their
25   claims for the same kind of equipment at other

Page 2899

SUSAN HALL - CROSS

1
2    facilities. Here you put it in a column because
3    you didn't get a particular piece of paper for
4    that facility, even if it was covered, in Mr.
5    Lease's opinion, for other things?
6        A.    The first two columns are Alcoa's
7    admissions.
8        Q.    Your interpretation of Alcoa's
9    admissions?
10       A.    However you like to characterize it
11   I would regard them as Alcoa's admissions.
12       Q.    For example, you said the second
13   column you took all the asterisk numbers out
14   except for two which you said were the only two
15   Mr. Lease identified as mistakes; right?
16       A.    Yes. We were trying to be as
17   accurate as we could.
18       Q.    Didn't Mr. Lease say there were
19   numerous other examples of mistakes, but he only
20   paused on those in his testimony; you didn't
21   read this?
22       A.    I did not read his testimony, but I
23   was here for part of it. I do not recall. He
24   is the one that sent us the document. He
25   asterisked the items that he admitted in his

Page 2900

SUSAN HALL - CROSS

1
2    cover letters Fairchild had not been given
3    notice. This is just a compilation of what
4    Alcoa told us.
5        Q.    Ms. Hall, I don't want to prolong
6    this. I have to correct you about that. My
7    question was about what he said in that chair at
8    this proceeding.
9        THE ARBITRATOR:  Yesterday?
10       MR. CHESLER:  No, in the first
11   phase, your Honor, Mr. Lease who was in our case
12   back in January.
13       Q.    My point is you didn't go back and
14   look at his testimony. I am telling you he
15   testified in fact that those were simply two
16   examples and there were others. You are saying
17   you don't recall that; correct?
18       A.    Okay. I am also saying something
19   as imprecise as there were others wouldn't allow
20   us to do anything other than what we did here.
21   What we did here is we took the numbers that
22   Alcoa gave us.
23       Q.    Okay.
24       A.    We can agree to disagree.
25       Q.    We can and we do.

Page 2901

SUSAN HALL - CROSS

1
2        A.    On whether this is an admission or
3    not.
4        Q.    With respect to that second column,
5    isn't it also the case that, let's take one
6    other example in that column, you listed for
7    Toulouse, look at your back up for that column,
8    look at Toulouse.
9        A.    You mean the large second column?
10       Q.    No. I mean the second column under
11   your first category.
12       A.    Okay. Let me find it, please.
13       Q.    Page 6?
14       A.    Yes, I am there.
15       Q.    You list 444,900 for machine
16   guarding compliance at Toulouse. All of that is
17   in that second half of your first category;
18   correct? Within the Toulouse number which
19   totals -- in fact it is almost all of the
20   511,000; isn't it?
21       A.    Yes.
22       Q.    Isn't it a fact that you received,
23   or Fairchild received a notification of machine
24   guarding expenses at Toulouse way back in June
25   of 2003 before any work was done, before any of

96  (Pages 2898 to 2901)

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2902

SUSAN HALL - CROSS

1  SUSAN HALL - CROSS
2  that money was spent; yes or no?
3      A.   No.
4      Q.   No?
5      A.   No.  What Fairchild received were
6  estimates.
7      Q.   Isn't it a fact you received an
8  estimate for machine guarding work before any of
9  that work was done?
10     A.   That's correct.
11     Q.   We been down the road before of
12 whether you had inspection rights, you could
13 look at the machines, we don't have to repeat
14 that.  You recall that testimony?
15     A.   Yes.  We also been down the road we
16 requested additional information and never got
17 it.
18     Q.   Yes, I heard that.
19     THE ARBITRATOR:  Seems like we
20 been down both roads.
21     MR. CHESLER:  I apologize, your
22 Honor, I am trying to wrap this up.
23     THE ARBITRATOR:  I know you are.
24     Q.   Also included in this category,
25 again under second column of your first

Page 2903

1  SUSAN HALL - CROSS
2  category, are expenses that were incurred after
3  Mr. Lease's letter with the asterisk came;
4  right?
5      A.   I'm not sure.
6      Q.   You're not sure.  All right.
7      A.   In the second column?
8      Q.   Yes.
9      A.   My understanding the second
10 column --
11     Q.   Let me try to ask you a question I
12 think will clarify.  Why don't you look and see
13 whether under Fullerton there is an item for
14 154,218 for combustion safety.
15     A.   That's correct.
16     Q.   Isn't it the case, Ms. Hall, that
17 you received a letter from John Lease back in
18 July of 2005, the letter with the asterisk on
19 it, and the amounts that had been spent on that
20 item as of that time was only $34,740?  If you
21 need to look at that, tab 3.
22     A.   What item is it?
23     Q.   Tab 3, page 2 of 6, under Fullerton
24 about three items up from the end of Fullerton
25 section.

Page 2904

1  SUSAN HALL - CROSS
2      A.   Right.  34,000 you're talking
3  about?
4      Q.   Yes.  Let's get the record clear.
5  You put in this column you said everything that
6  was subject to Mr. Lease's asterisk; right?
7      A.   That's right.
8      Q.   The asterisk letter told you my
9  client had spent 34,000 and change on this item
10 as of the time he gave you the notice about it,
11 which you say was late; right?
12     A.   Correct.
13     Q.   Since that time approximately
14 $120,000 has been spent on that after you got
15 Mr. Lease's notice which you say is late;
16 correct?
17     A.   Apparently.
18     Q.   You took all of that money and put
19 it into this chart and said we don't owe it to
20 you because Mr. Lease put an asterisk on a
21 letter back in July of 2005; right?
22     A.   He put asterisk on the July letter
23 and also in the February 2006 letter.
24     Q.   Ms. Hall, stay with me.  He told
25 you about combustion safety work at Fullerton

Page 2905

1  SUSAN HALL - CROSS
2  back in July of '05.  He put an asterisk on it
3  to indicate for some reason they hadn't sent you
4  notice before and told you they spent 34,000;
5  right?
6      A.   That is what appears here.
7      Q.   Now they spent over 150,000 almost
8  all of which was spent after you got that notice
9  and you put the entire amount on to your summary
10 chart; right?
11     A.   We put onto our summary chart the
12 items that Mr. Lease had asterisked.  He
13 asterisked that item.  Yes.  Are you suggesting
14 we should have gone through six pages -- never
15 mind.  I am not asking the questions.
16     Q.   I am asking you when you come to
17 court and swear to things under oath you have to
18 be right.  That is what I am suggesting.
19     A.   I disagree.  I have to be truthful.
20     Q.   Excuse me.  I'm asking you whether
21 or not you included on this chart approximately
22 $120,000 of expense that Alcoa incurred after
23 Mr. Lease sent you notice of this with an
24 asterisk on it.  You ought to be able to answer
25 that yes or no.

97 (Pages 2902 to 2905)

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2906

SUSAN HALL - CROSS

2   A.   Yes.
3   Q.   Thank you.  Now let's go to the
4  next column, column 2.  This entire column, I
5  believe you said consists of three things.  The
6  Temple Avenue pump and treat item, right,
7  investigations or assessments and work that was
8  done on items that were the subject of the
9  so-called gap letters.  Do you remember saying
10  that on direct?
11   A.   Yes.  These are the gap letters and
12  these are follow-up investigations that had been
13  done pursuant to the Phase II reports.
14   Q.   And Temple pump and treat; right?
15   A.   I think so.
16   Q.   Temple pump and treat, that is one
17  where Fairchild had used a consultant named
18  EnviroSolve to do the work when it owned the
19  facility; right?
20   A.   I'm sorry.
21   Q.   Fairchild had used a consultant
22  named EnviroSolve to do the pump and treat work
23  at Temple when they owned the facility?
24   A.   That's correct.  Yes.
25   Q.   At least for the whole first year

Page 2907

SUSAN HALL - CROSS

2  or so of Alcoa's ownership of the facility we
3  used the same consultant you used; didn't we?
4   A.   I think it was for a few months,
5  but yes, you did.  Alcoa did use EnviroSolve for
6  the first few months.
7   Q.   You rejected the claims for
8  EnviroSolve's bills to us, your consultant
9  running the same facility at the Temple facility
10  as well as the claims once the other consultants
11  came in; didn't you?
12   A.   I did.
13   Q.   This column also includes the bill
14  for the waste water treatment at St. Cosme;
15  doesn't it?  This second major column?
16   A.   Yes, it does.
17   Q.   That is the facility where there
18  has been testimony here that Fairchild, when it
19  owned it, kept two sets of books and lied to the
20  regulators, do you recall that testimony?
21   A.   I do.
22   Q.   You recall the testimony about how
23  if in fact they hadn't kept the real waste water
24  discharge levels secret from the regulators,
25  that the fact they were in excess of the

Page 2908

SUSAN HALL - CROSS

2  regulatory limits would have been known to the
3  regulators on Fairchild's watch rather than on
4  our watch; do you recall that?
5   A.   I don't recall the testimony coming
6  out that way.  But that's the implication, yes.
7   Q.   I take it -- certainly Mr. Miller
8  said this -- I take it you would agree, if that
9  fact had become known to the regulators on your
10  watch, there were lies being told to the
11  regulators and waste water facility was above
12  its limits then Fairchild would have paid to fix
13  that; right?
14   A.   I can't really speculate on what
15  would have happened.  I know Fairchild would
16  have done the right thing.
17   Q.   When we tried to do the right thing
18  you turned down the request; correct?
19   A.   You say you tried to do the right
20  thing, what are you talking about?
21   Q.   Replace the waste water treatment
22  so that it complied with the law, stop lying to
23  the regulators; would you agree those are the
24  right things to do?
25   A.   I would agree that stopping lying

Page 2909

SUSAN HALL - CROSS

2  to the regulators, if that's what happened, was
3  the right thing to do.
4      In terms of the waste water
5  treatment plant, again, that to me would have
6  been a legitimate cost, proper Fastener
7  Environmental Liabilities had we participated in
8  the fix.
9   Q.   Two more questions then I'm done.
10  I am on the third and final category of your
11  chart.
12   A.   Yes.
13   Q.   There are loads are examples your
14  Honor, if we had an infinite period of time we
15  can do this.  I really --
16      THE ARBITRATOR:  I am available on
17  Friday, you know.  I think we are going to be
18  worn out by Friday.
19      MR. CHESLER:  There is at least
20  one thing on which I hardily agree with my
21  colleague, Mr. Zurofsky, that is to try to get
22  done by tomorrow night.
23      THE ARBITRATOR:  Right.
24   Q.   Ms. Hall, this third category, it
25  includes among other things expenditure of

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

SUSAN HALL - CROSS

1    113,000 for septic system field at Stoughton,
2    Mass; does it?
3        A.    Yes.
4        Q.    It also includes 74,000 for
5    degreaser at Fullerton; does it?
6        A.    I have to look at the background.
7        Q.    If it is in the backup you don't
8    dispute it?
9        A.    Right.
10       Q.    Isn't it the case both of those
11   items were placed by Fairchild in its letter to
12   its own auditors as potential liabilities it
13   felt it needed to disclose to the auditors?
14       A.    I believe that's correct.
15       Q.    Let me make sure we got this clear,
16   Fairchild thought these were sufficiently
17   probable liabilities and estimable liabilities
18   so under the financial accounting rules they
19   were obligated to notify their auditors of them
20   and when we came in and asked for reimbursement
21   for precisely those items you turned it down;
22   isn't that true, yes or no?
23       A.    Yes, that's true.
24       Q.    Last question.  You testified it

SUSAN HALL - CROSS

1    was your understanding that Alcoa had its own
2    compliance directives.  I objected on foundation
3    ground.  Do you remember that?
4        A.    Yes.
5        Q.    You said oh, well, I read these
6    documents.  It is clear to me they have their
7    own compliance directives.  You didn't feel it
8    was appropriate to pay for compliance with
9    Alcoa's rules as opposed to legal rules?
10       MR. ZUROFSKY:    There are two
11   questions, I don't know if she agreed to the
12   first question.
13       Q.    I will break it out.  Do you recall
14   testifying from reading documents you concluded
15   that Alcoa had its own set of directives,
16   compliance directives?
17       A.    I saw those terms right in invoices
18   which Alcoa sent us that said work was done to
19   achieve Alcoa's compliance standards.
20       Q.    You were asked a question on
21   direct-examination, the specifics of which I
22   don't recall, but do you recall your answer
23   which was you did not think it was appropriate
24   to reimburse Alcoa for expenses incurred to

SUSAN HALL - CROSS

1    comply with its own standards; do you recall
2    that?
3        A.    Yes.
4        Q.    Tell me how Alcoa's standards
5    compare to the regulatory standards in place in
6    those facilities.
7        A.    I would have no idea without
8    looking at them side by side.
9        Q.    You have no idea; right?
10       A.    I have no idea without
11   looking at them side by side.  There could be
12   overlap.  You can have an Alcoa standard that
13   was the same as, for example, an OSHA standard
14   on air emissions in the workplace.  Then that
15   would qualify.  Just the word Alcoa standards,
16   there is nothing in this contract that requires
17   Fairchild to indemnify Alcoa for its own
18   standards, which I understand are higher in many
19   instances than what is required.
20       Q.    How do you know that?  You just said
21   you have no idea how they compare; didn't you?
22       A.    I said without looking at a
23   specific standard relating to a specific item.
24   I am talking in general terms right now.

SUSAN HALL - REDIRECT

1        MR. CHESLER:    I'm done.
2        THE ARBITRATOR:    Thank you very
3    much, counselor.
4        MR. ZUROFSKY:    I will be very
5    quick.  We will get done in very brief time.
6    RE-DIRECT EXAMINATION BY MR. ZUROFSKY:
7        Q.    Ms. Hall, just going to clear up a
8    couple things.  I know it is late, it has been a
9    long day.
10       The first question Mr. Chesler
11   asked you was whether or not Fairchild has paid
12   any particular claims under 11.6A.  Do you
13   recall that, or second question he asked?
14       A.    11.6A?
15       Q.    Yes, of the Indemnification
16   Agreement.
17       A.    Yes.
18       Q.    You said no; right?
19       A.    That's right.
20       Q.    Has Fairchild assumed any
21   liabilities in connection with environmental
22   contamination matters at the facilities that are
23   at issue in this case?
24       A.    Yes.

99 (Pages 2910 to 2913,

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2914

SUSAN HALL - REDIRECT

1
2    Q.    Which ones?
3    A.    Fullerton.
4    Q.    What did you assume there?
5    A.    The Orange County water district
6 filed a suit against Alcoa and Fairchild. Alcoa
7 tendered the defense to Fairchild about a year
8 and a half ago. We have assumed the defense
9 costs since that time.
10   Q.    Just for the record, the letter
11 when you accepted those costs found in your book
12 at tab 4, I believe it is. Is that the letter,
13 Claimant's Exhibit 434?
14   A.    Yes.
15   Q.    In that case Fairchild has been
16 paying directly the legal bills directly; right?
17   A.    Paying it directly over $100,000 at
18 this point.
19   Q.    If that claim had fallen under
20 11.6A, if you accepted it under 11.6A who would
21 have been paying those bills and been
22 responsible for those bills to date?
23   A.    They would have been deducted from
24 the reserve. There wouldn't have been any out
25 of pocket on Fairchild's part.

Page 2915

SUSAN HALL - REDIRECT

1
2    Q.    Alcoa would pay?
3    A.    It would come out of a reserve.
4    Q.    Which Alcoa would pay, the cash out
5 to the lawyers?
6    A.    They would have come out of the
7 reserve.
8    Q.    You may have the reserve and
9 escrow — we will clean it up in briefing
10 because we are almost done for day.
11   A.    It would depend -- never mind.
12   Q.    That's fine. Second thing Mr.
13 Chesler asked you about, you remember he talked
14 about Mr. Miller yesterday when he asked Mr.
15 Miller about a hypothetical situation about fall
16 protection. Do you recall that?
17   A.    Yes.
18   Q.    He asked you about whether or not
19 there were any health and safety claims you felt
20 they made that are environmental health and
21 safety claims. Do you recall that?
22   A.    Do I recall his asking Mr. Miller
23 that?
24   Q.    Yes — no, asking you that.
25   A.    Yes.

Page 2916

SUSAN HALL - REDIRECT

1
2    Q.    Two questions on that. Fairchild
3 filed a brief in connection with the Alcoa
4 summary judgement motion in this case. Do you
5 recall that?
6    A.    Yes.
7    Q.    Do you recall in that brief
8 Fairchild gave some examples of OSHA laws that
9 had environmental health and safety aspects, do
10 you recall that?
11   A.    Vaguely.
12   Q.    One of the things you testified on
13 direct was about air emissions; do you recall?
14   A.    That I'm aware of. That is one of
15 the ones I am personally aware of.
16   Q.    Turn to tab 5 in your book. I am
17 not going to go through the whole list of these.
18 I want to give one example to show. Do you know
19 what confined space compliance is, Ms. Hall?
20   A.    Yes.
21   Q.    What is the issue with confined
22 space?
23   A.    The issue with confined space is
24 that a worker, if a worker is going to be in a
25 confined space there have to be certain safety

Page 2917

SUSAN HALL - REDIRECT

1
2 considerations. That's generally it.
3    Q.    Is part of the regulation as you
4 understand it because they can be exposed to
5 toxins in the air?
6    A.    Toxic air.
7    Q.    Things like that?
8    A.    Yes.
9    Q.    Looking at the chart we were
10 talking about on 1 of 6, there are other
11 examples, I will do one.
12        THE ARBITRATOR:  What tab?
13        MR. ZUROFSKY:  Sorry, your Honor.
14 Tab 5. Claims, master claims chart.
15   Q.    Page 1 of 6.
16   A.    I'm there.
17   Q.    Just do one of these. Item 9
18 confined space compliance.
19   A.    Yes.
20   Q.    In your view that's relating to
21 potentially an environmental health and safety
22 issue as you understand it.
23        MR. CHESLER:  Counsel, I can't
24 find where you're talking. I am behind tab 5 in
25 your book.

100 (Pages 2914 to 2917)

Page 2918

```
 1        SUSAN HALL - REDIRECT
 2        MR. ZUROFSKY:  Yes.  Page 1 of 6
 3   on the chart.  Master chart.
 4        MR. CHESLER:  Thank you.
 5        MR. ZUROFSKY:  Confined space
 6   compliance.
 7        Q.    Do you see that?
 8        A.    I do.
 9        Q.    Is that the type of thing that
10   could involve environmental health and safety
11   issues?
12        A.    Yes, it could.
13        Q.    Do you believe there are other
14   examples of that type of issue?
15        A.    On this chart?
16        Q.    I am not going to ask you to go
17   through it.
18        A.    There would be other examples.
19        Q.    Next item I want to cover is you
20   remember Mr. Chesler spent some time with you
21   talking about why you didn't pick up the phone
22   and call Mr. Lease and say I want to visit the
23   facilities; do you remember that?
24        A.    Yes.
25        Q.    What is another way, is writing
```

Page 2919

```
 1        SUSAN HALL - REDIRECT
 2   another way to communicate with people than
 3   picking up the phone?
 4        A.    Yes.  That is what I did.
 5        Q.    Mr. Miller did it too; did he not?
 6        A.    Yes.  Mr. Miller did, Mr. Beckford
 7   did.  I did.
 8        Q.    What was Alcoa's response when Mr.
 9   Miller said I do want to find out more
10   information about the machine guarding issues?
11        A.    Alcoa's response, which came from
12   their lawyer, was we are going to keep you fully
13   apprised as work plans and scope of work and
14   items like that are generated we will give them
15   to you.  The letter is in here if you want more
16   information.
17        I think we all know which one we
18   are talking about.  Alcoa was doing the work,
19   they were actually looking at the machines and
20   making assessments of them?
21        A.    That is my understanding.
22        Q.    Was it your understanding Alcoa
23   promised to provide the results of that work to
24   Fairchild in response to Fairchild's request?
25        A.    That is what Mr. Harvey said.
```

Page 2920

```
 1        SUSAN HALL - REDIRECT
 2        Q.    He did not say, did he not no, no,
 3   no I won't send you the documents just come on
 4   down and take a look at the machines?
 5        A.    That is not what he said.  He said
 6   we will provide you with the information you're
 7   seeking.
 8        Q.    In your view is that an effort by
 9   Fairchild to participate in the process, to
10   request that information and review it?
11        A.    Absolutely.
12        Q.    Next item.  Mr. Chesler spent some
13   time with you talking about Torrance Consent
14   Agreement.  He showed you Exhibit 167.  That
15   email from the DTSC.  Do you recall he called it
16   the ultimatum.
17        A.    Yes.  I can't find it, but I
18   remember it.
19        Q.    It is February 10.
20        A.    Here it is.
21        Q.    The email is dated February 10.  Do
22   you see that?
23        A.    Right.
24        Q.    You make reference, we can pull it
25   up if you want in your letters to when you saw
```

Page 2921

```
 1        SUSAN HALL - REDIRECT
 2   the first reference to a draft Consent
 3   Agreement.  Do you recall what date that was?
 4        A.    The letter is in here.  To give you
 5   the background on this, I knew by some time in
 6   early 2006 that Alcoa had been discussing the
 7   terms of a consent order with the DTSC
 8   unbeknownst to us.  Last time we knew about
 9   Torrance they were dealing with the regional
10   board.  Now they are dealing with the DTSC.
11        Essentially at this point in time,
12   February 10, the terms of the Consent Agreement
13   had already been agreed upon.  I never seen this
14   before.  But my reading of this is the DTSC is
15   saying, look, sign it or we'll issue a
16   unilateral order.
17        Q.    I just want to make sure we have
18   it, we can look, is the date September 19, 2005
19   sound about right for you for the draft?
20        A.    Yes.  That's right.
21        Q.    Is it your understanding Alcoa was
22   negotiating about this Consent Agreement for
23   five months before this email?
24        A.    Absolutely.
25        Q.    In your experience negotiating
```

101 (Pages 2918 to 2921)

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2922

SUSAN HALL - REDIRECT

1
2 consent agreements, the terms of those
3 agreements can in fact be negotiated?
4     A.    That is exactly what it means you
5 negotiate them.  It is a negotiated agreement.
6 As opposed to the regulatory agency just
7 dictating what you will do.
8     Q.    Mr. Chesler also asked you some
9 questions about the chart.  He asked a couple
10 items about why you had put certain asterisk items
11 in column 1B.  Do you recall that?
12     A.    Yes.
13     Q.    He showed you the Toulouse machine
14 guarding item.  Do you recall that?
15     A.    Right.
16     Q.    Is that an asterisked item on Mr.
17 Lease's chart?
18     A.    Yes.
19     Q.    Have you ever heard Mr. Lease say
20 or testify or anyone represent to you he said
21 you know what, that shouldn't have been an
22 asterisked item, I gave enough notice and I gave
23 proposed response to that?
24     A.    No.
25     Q.    Next, Mr. Chesler pointed you to

Page 2923

SUSAN HALL - REDIRECT

1
2 the Fullerton asterisk for combustion safety.
3 This is the one about where the item was listed
4 as 35 -- I forget the number, something
5 thousand, and more money was spent after the
6 asterisk letter.  Do you recall that?
7     A.    Yes.
8     Q.    The asterisk letter we referred to
9 which is the July asterisk letter, in connection
10 with what was it sent to you?
11     A.    In connection with the impending
12 mediation.
13     Q.    It was a notice of claim of money
14 already spent; right?
15     A.    Yes.
16     Q.    Did Mr. Lease ever say to you, did
17 he ever send you in report saying here is what
18 we are doing on combustion safety here is what
19 we propose going forward?
20     A.    No.  Absolutely not.
21     Q.    You got the item there for 30
22 something thousand; right?
23     A.    Correct.
24     Q.    The next thing you heard from Mr.
25 Lease on combustion safety was a bill for more

Page 2924

SUSAN HALL - REDIRECT

1
2 money; right?
3     A.    That's correct.
4     Q.    One other.  Do you remember Mr.
5 Chesler also asked you a series of questions
6 about how you had gotten notice say of a
7 condition of machine guarding at the Fullerton
8 facility but yet you placed the Simi Valley
9 facility in column 1A.  Do you recall that?
10     A.    Vaguely.
11     Q.    Do you recall the questions about
12 how machine guarding, you had notice of machine
13 guarding issues, he claims at some facilities
14 but yet you rejected at the other facilities.
15 Do you recall that?
16     A.    Yes.
17     Q.    Does the letter that tells you, in
18 your view, a letter that says we think there is
19 a machine guarding problem at Fullerton tell you
20 they also think there is a machine guarding
21 problem at Simi Valley?
22     A.    No.
23     Q.    Did you ever receive a letter that
24 said we have machine guarding problem at Simi
25 Valley?

Page 2925

SUSAN HALL - REDIRECT

1
2     A.    No.  There was a letter that
3 addressed machine guarding at one point at ten
4 sites, something like ten sites, five or so of
5 which were brand new.
6     Q.    After that, that letter of course
7 you testified on direct-examination was received
8 after expenses had already been incurred at
9 those sites?
10     A.    Yes.
11     Q.    To finish the last question on
12 this, in fact the fact you got a letter saying
13 we might be doing something at Fullerton but not
14 one at Simi Valley, does that suggest to you
15 perhaps there was not a problem at Simi Valley?
16     MR. CHESLER:  Your Honor, even
17 after five o'clock, I think that is leading.
18     MR. ZUROFSKY:  I will withdraw it.
19     A.    It suggests to me --
20     MR. CHESLER:  It was withdrawn.
21     A.    Thank you.
22     MR. ZUROFSKY:  If you want to ask
23 the judge to give direction to the witness, but
24 don't yell at the witness.
25     MR. CHESLER:  I didn't yell at the

MERRILL LEGAL SOLUTIONS

(800) 325-3376        www.MerrillCorp.com

0850e5e2-96b7-4dca-8b11-f4da6c3f4058

Page 2926

```
 1         SUSAN HALL - RECROSS
 2  witness.
 3         MR. ZUROFSKY:  I'm done.
 4     RE-CROSS EXAMINATION BY MR. CHESLER:
 5     Q.   Two questions.  You pointed to
 6  confined space compliance --
 7         THE ARBITRATOR:  What is your
 8  second question?
 9         MR. CHESLER:  You're right, your
10  Honor.
11     Q.   You pointed to confined space
12  compliance as a type of workplace health and
13  safety that you say could fit within your
14  definition under the agreement; correct?
15     A.   That's what I testified.
16     Q.   In fact you rejected all of our
17  confined space compliance request for
18  indemnification; isn't that true?  Yes or no?
19     A.   Yes.
20     Q.   Last question, in the letter from
21  July of 2005 that Mr. Lease sent you where he
22  gave you the list of items, some of which were
23  asterisked --
24     A.   Yes.
25     Q.   -- he said please contact me if
```

Page 2927

```
 1         SUSAN HALL - RECROSS
 2  Fairchild would like further information
 3  regarding any environmental liability.  You
 4  never contacted him; did you?
 5     A.   No.
 6         MR. CHESLER:  Thank you.  No
 7  further questions.
 8         THE ARBITRATOR:  See you all
 9  tomorrow at 9:15.
10         (Time Noted: 6:17 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 2928

```
 1
 2           C E R T I F I C A T E
 3  STATE OF NEW YORK  )
 4                      : ss.
 5  COUNTY OF NEW YORK  )
 6         I, TAMMEY M. PASTOR, a Registered
 7  Professional Reporter, Certified LiveNote
 8  Reporter and Notary Public within and for the
 9  State of New York, do hereby certify that the
10  foregoing proceedings were taken before me on
11  February 28, 2007;
12         That the within transcript is a true
13  record of said proceedings;
14         That I am not connected by blood or
15  marriage with any of the parties herein nor
16  interested directly or indirectly in the matter
17  in controversy, nor am I in the employ of the
18  counsel.
19         IN WITNESS WHEREOF, I have hereunto
20  set my hand this ____ day of _____,
21  2007.
22
23
24         _____
25         TAMMEY M. PASTOR, RPR, CLR
```

103 (Pages 2926 to 2928,