## CPR INSTITUTE FOR DISPUTE RESOLUTION

THE FAIRCHILD CORP.,

          Claimant-Counter-Respondent,

  - v. -

ALCOA INC.

          Respondent-Counter-Claimant.

CPR File No. G-06-22H

## ALCOA INC.'S POST-HEARING MEMORANDUM

Evan R. Chesler
Daniel Slifkin
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
(212) 474-1000

*Attorneys for Respondent-Counter-Claimant
Alcoa Inc.*

Table of Contents

Page

Table of Authorities .................................................................................................. iii

Citation Conventions ................................................................................................. iv

Citation Conventions ................................................................................................. iv

Introduction .................................................................................................................1

Argument .....................................................................................................................4

I.    THE ACQUISITION AGREEMENT PROVIDES THAT FAIRCHILD
      WILL INDEMNIFY ALCOA FOR THE COST OF COMING INTO
      COMPLIANCE WITH WORKPLACE HEALTH OR SAFETY LAWS,
      INCLUDING LAWS REGULATING MACHINE GUARDING AND
      SIMILAR ISSUES. ..............................................................................................4

      A.    The Contract's Definition of "Environmental Law" Uses the Term
            "Workplace Health or Safety" in its Ordinary Sense, Which
            Includes Machine Guarding, Equipment Safety, Fall Protection and
            Similar Issues. ..........................................................................................5

      B.    Alcoa Repeatedly Rejected Fairchild's Attempts to Rewrite the
            Definition of Environmental Law to Eliminate or Limit Fairchild's
            Liability for Workplace Health or Safety Claims. ..................................11

      C.    The Parol Evidence of the Negotiations Demonstrates that Both
            Parties Understood Workplace Health or Safety Costs To Be
            Indemnified. ...........................................................................................13

      D.    Fairchild's Conduct Before the Closing Demonstrates that it
            Understood Workplace Health or Safety in the Same Way Alcoa
            Did...........................................................................................................16

      E.    The Parties' Conduct Immediately After the Closing Demonstrates
            that Both Fairchild and Alcoa Understood Fairchild's
            Indemnification Obligation to Extend to Machine Guarding and
            Similar Workplace Health and Safety Issues...........................................18

II.   THE ACQUISITION AGREEMENT PROVIDES THAT FAIRCHILD
      WILL INDEMNIFY ALCOA FOR THE COST OF INVESTIGATIONS,
      INCLUDING VOLUNTARY INVESTIGATIONS INTO ACTUAL OR
      THREATENED CONTAMINATION AT THE FASTENER
      FACILITIES. ....................................................................................................20

i

Table of Contents
continued

Page

III.    FAIRCHILD'S ALTERNATIVE ARGUMENT THAT IT WAS
       DEPRIVED OF NOTICE AND AN OPPORTUNITY TO COMMENT IS
       UNTRUE AND REPRESENTS ANOTHER ATTEMPT TO DENY
       ALCOA ITS BARGAINED-FOR INDEMNIFICATION RIGHTS....................24

IV.    ALCOA'S ACTIONS WERE COMMERCIALLY REASONABLE AND
       FAIRCHILD HAS FAILED TO INTRODUCE ANY EVIDENCE OF
       "ADVERSE EFFECT". .......................................................................................32

V.     THE CALCULATION OF ALCOA'S DAMAGES. ...........................................37

Conclusion .......................................................................................................39

Table of Authorities

Page(s)

**Cases**

Barnard v. State,
    642 A.2d 808 (Del. Super. Ct. 1992) ................................................................. 7

Derry Finance N.V. v. Christiana Cos., Inc.,
    797 F.2d 1210 (3d Cir. 1986) ......................................................................... 9

In re Continental Airlines, Inc.,
    932 F.2d 282 (3d Cir. 1991) .......................................................................... 7

Motorola, Inc. v. Amkor Tech., Inc.,
    849 A.2d 931 (Del. 2004) ............................................................................. 9

O'Brien & Gere Eng'rs, Inc. v. Taleghani,
    525 F. Supp. 750 (E.D. Pa. 1981) ................................................................. 13

Sonitrol Holding Co. v. Marceau Investissements,
    607 A.2d 1177 (Del. 1992) ............................................................................ 9

Warner Commc'ns. Inc. v. Chris-Craft Indus., Inc.,
    583 A.2d 962 (Del. Ch. 1989) ....................................................................... 9

**Other Authorities**

Am. Heritage Dictionary 977 (4th ed. 2004) ..................................................... 6

Arthur L. Corbin, Corbin on Contracts § 24.28 (Joseph M. Perillo ed., rev.
    ed. 1998) ....................................................................................................... 9

<u>Citation Conventions</u>

The following conventions will be used throughout this Memorandum.

- "AX" for references to Alcoa's arbitration exhibits.

- "Bulk AX" for references to Alcoa's bulk arbitration exhibits.

- "Findings" for references to Alcoa's Proposed Findings of Fact and Conclusions of Law, dated April 16, 2007.

- "Interim Decision" for references to the Interim Decision on Alcoa's Motion for Partial Summary Judgment, dated December 28, 2006.

- "S.J. Brief" for references to Alcoa's Motion for Partial Summary Judgment, dated December 1, 2006.

- "S.J. Reply" for references to Alcoa's Letter in Reply to Fairchild's Memorandum in Opposition to Alcoa's Motion for Partial Summary Judgment.

- "Tr." for references to the transcript of the hearing conducted from January 8, 2007, through January 12, 2007, and from February 26, 2007, through March 1, 2007.

<u>Introduction</u>

The evidence presented at the hearing has clearly demonstrated that:

<u>First</u>, the Fastener facilities Alcoa acquired from Fairchild in 2002 were, at the time of the transaction, out of compliance with a wide variety of applicable environmental and workplace health and safety laws, including laws regulating wastewater treatment, air emissions, machine guarding and equipment safety. (<u>See</u> Findings ¶¶ 38-71, 172-72.1, 178-78.1.) In addition, the soil and groundwater at the facilities suffered from extensive contamination by chlorinated solvents and other pollutants. (<u>See</u> <u>id.</u> ¶¶ 41-42.2, 51, 53-54, 61-62, 72-79.)

<u>Second</u>, Fairchild did little or nothing to correct those problems—even though it was aware that its inaction was causing employees to lose limbs in unguarded machines and exposing employees and the communities in which Fairchild did business to cancer-causing chemicals in the air, soil and groundwater. (<u>See</u> <u>id.</u> ¶¶ 18-18.1, 51-52, 54.) In some instances, Fairchild simply ignored orders from government agencies to correct environmental and workplace safety violations. (<u>See</u> <u>id.</u> ¶¶ 47, 58.) In other instances, Fairchild used outright deception to hide those violations from regulators. (<u>See</u> <u>id.</u> ¶¶ 46, 59, 182.) And Fairchild's $8.45 million accounting reserve for environmental, health and safety liabilities was entirely inadequate to address the magnitude of the issues it faced. (<u>See</u> <u>id.</u> ¶¶ 20.2-21.4, 42-44, 197.)

<u>Third</u>, as part of the negotiations over the sale of the Fastener Business, Fairchild and Alcoa specifically discussed and allocated financial responsibility for the environmental and workplace health and safety issues at the Fastener facilities. (<u>See</u> <u>id.</u> ¶¶ 14-20.) The parties agreed that Alcoa would be responsible for the first $8.45 million of those costs—the amount of Fairchild's existing reserve—and that Fairchild would

indemnify Alcoa for costs in excess of that amount.  (See id. ¶¶ 5, 20.1.)  To ensure that Fairchild would have adequate resources to meet its indemnification obligations, the parties agreed that $25 million would be held in an escrow account from which Alcoa's anticipated claims would first be drawn.  (See id. ¶¶ 21-21.1.)  The parties provided for the escrow to be replenished during the first five years after the sale, as funds were withdrawn, and they agreed that Fairchild would be directly responsible for claims beyond the escrow.  (See id. ¶¶ 21.2-21.4.)

      Fourth, the parties agreed that Fairchild's indemnification obligation was not limited to environmental matters, but rather would extend to workplace health and safety issues such as those related to machine guarding.  (See id. ¶¶ 5.2-5.3, 22-22.6.5, 24-24.7.2.3, 27-28.1.4.1.)  Alcoa specifically advised Fairchild that its due diligence had uncovered widespread evidence of violations of workplace health and safety laws—as well as of environmental laws—at the Fastener facilities.  (See id. ¶¶ 16-17.2, 61-69.)  Similarly, Fairchild informed Alcoa that machine guarding was among the "key" workplace health and safety issues it would be assuming.  (See id. ¶¶ 24.7.1-24.7.2.3.)  During the drafting of the Acquisition Agreement, Alcoa insisted—and Fairchild ultimately agreed—that workplace health and safety laws be included as a separate category of regulations covered by the indemnity.  (See id. ¶¶ 23-23.2.3.)

      Fifth, while the Agreement provides that Fairchild has certain notice and comment rights, those rights do not affect the breadth of the indemnity to which Fairchild is contractually obligated.  Nevertheless, the evidence showed that Fairchild has, to date, rejected every single one of Alcoa's claims for indemnification against both the $25 million escrow and the $8.45 million reserve.  (See id. ¶¶ 96, 199.)  Among the claims

Fairchild has rejected are claims for projects that Fairchild initiated and Alcoa inherited, projects that Fairchild was ordered to undertake by regulators in Europe and the United States, and projects that Fairchild's own expert witnesses conceded were both necessary and conducted in a commercially reasonable manner. (See id. ¶¶ 97-105, 131.5-31.6, 135-36, 145, 146.2, 147.3, 152.2-52.3, 159.2.2, 173.2, 174.3, 177, 180.1.1, 187.1-88, 189.1-90, 191.2-91.4, 195.2.1-95.3.1.)

In response to those facts, Fairchild has made two principal arguments for why it should not have to fulfill its indemnification obligations. First, Fairchild argues that virtually all of the claims for which Alcoa seeks indemnification—including all of Alcoa's workplace health and safety claims and all of its claims for environmental investigations—are not subject to indemnification under the terms of the contract. Second, Fairchild argues in the alternative that even if Alcoa's claims are subject to indemnification, Fairchild should not have to pay those claims because it was denied the "participation" rights afforded it by the contract. Those arguments are simply wrong.

Fairchild's attempt to limit the scope of the indemnity—and thereby to exclude the vast majority of Alcoa's claims—is at odds with the Agreement the parties signed and was explicitly rejected by Alcoa during the negotiations. Fairchild's current, tortured reading of the contract was invented more than three years after the contract was signed by an attorney who was not even employed by Fairchild at the time of the transaction. It amounts to nothing more than an attempt to impose, through this arbitration, the result Fairchild was unable to achieve through negotiation.

Fairchild's alternative argument similarly seeks to rewrite history. Fairchild invokes its contractual right to "participate"—a word that appears nowhere in the text of

3

the contract's indemnity provisions—and contends that Alcoa denied it the notice and opportunity to comment called for by those provisions.  At the same time, Fairchild's own witnesses conceded at the hearing that Fairchild <u>never</u> intended to pay Alcoa's claims—regardless of any notice or opportunity to comment—on the basis of Fairchild's position that those claims were not subject to indemnification.  While it is possible for lawyers to argue in the alternative, it is not possible for events to occur in the alternative.  Fairchild does not, because it cannot, dispute that it has never offered a substantive comment on a single one of the investigations or corrective actions Alcoa has taken over the past five years—other than to dispute Alcoa's decision to take the action at all.  Fairchild cannot now contend it was denied participation rights that it concedes it never attempted nor intended to exercise.  Put another way, Fairchild's alternative argument to avoid liability is not a viable means to do so.  In adopting the position that Alcoa was not entitled to indemnification, Fairchild rendered meaningless any later claim that it was denied some sort of "participation" right.  (<u>See</u> <u>infra</u>, p. 31.)

As we demonstrate below, Fairchild's legalistic, self-contradictory arguments lay bare its true objective:  to avoid, by whatever means, fulfilling its contractual obligations.

<u>Argument</u>

I.    THE ACQUISITION AGREEMENT PROVIDES THAT FAIRCHILD WILL INDEMNIFY ALCOA FOR THE COST OF COMING INTO COMPLIANCE WITH WORKPLACE HEALTH OR SAFETY LAWS, INCLUDING LAWS REGULATING MACHINE GUARDING AND SIMILAR ISSUES.

The plain language of the Acquisition Agreement provides that Fairchild is to indemnify Alcoa for the cost of bringing the Fastener facilities into compliance with laws relating to "workplace health or safety".  (AX 1 § 3.24(g)(ii)(b).)  Alcoa's argument is straightforward:  those words mean what they say.  Both the drafting history of the

4

contract and the parties' conduct before and after it was signed support that understanding. Fairchild, by contrast, contends that its indemnification obligation is somehow limited to only those types of workplace health or safety laws that are "environmental" in nature. Fairchild's argument resorts to obscure and inapplicable Latin maxims and a tortured reading of the contract's language that would deprive the words "workplace health or safety" of any meaning. Not surprisingly, Fairchild's current position is contradicted by its own prior actions and is unsupported by any evidence. That is not what the parties intended.

    A.    The Contract's Definition of "Environmental Law" Uses the Term "Workplace Health or Safety" in its Ordinary Sense, Which Includes Machine Guarding, Equipment Safety, Fall Protection and Similar Issues.

A step-by-step reading of the contract's indemnification provisions demonstrates that the scope of the indemnity hinges on the definition of the capitalized term "Environmental Law". (See Findings ¶¶ 22.1-22.4.) The contract specifically defines that term to include "any Law of any Government entity . . . relating to . . . workplace health or safety". (AX 1 § 3.24(g)(ii)(b).) The contract, however, does not put a special definition on the term "workplace health or safety"—leaving it to have its usual and ordinary meaning. And Fairchild's own witnesses testified that the usual and ordinary meaning of workplace health or safety includes matters such as machine guarding, equipment safety and related issues. (See Findings ¶¶ 22.5.3-22.5.5.)

Fairchild's indemnification obligations are set forth in Section 11.6 of the Agreement. Section 11.6(a) provides that Fairchild will "indemnify, defend and hold harmless [Alcoa] . . . from and against any and all Fastener Environmental Liabilities in excess of the amount of the reserve for environmental, health, safety and litigation". (AX 1 § 11.6(a).) Section 11.6(e)(iv) defines the term "Fastener Environmental Liability" to

include "all losses, damages, charges, liabilities, costs, expenses, deficiencies, fines,

penalties, claims, demands, actions, suits or proceedings . . . and expenses of

investigation incurred by [Alcoa] . . . based on any applicable <u>Environmental Laws</u>

existing on the Closing Date in respect of any Fastener Environmental Condition". (<u>Id.</u> §

11.6(e)(iv) (emphasis added).)  Section 11.6(e)(iii) defines "Fastener Environmental

Condition" to include, among other things,  "any violation or alleged violation of, or

noncompliance or alleged noncompliance with, applicable <u>Environmental Law</u> with

respect to the Fastener Business". (<u>Id.</u> § 11.6(e)(iii)(C) (emphasis added).)  Accordingly,

both the definition of Fastener Environmental Liability and the definition of Fastener

Environmental Condition require the reader to turn to the definition of the capitalized

term "Environmental Law" to understand their scope.

> Section 3.24(g)(ii) of the Agreement provides that definition:
>
> "'Environmental Law' means any Law of any Government entity, or any
> binding agreement with any Government entity, relating to (a) pollution or
> protection of the environment or natural resources, including, without
> limitation, those relating to cleanup, preservation or reclamation thereof,
> any Release or threatened Release of Hazardous Materials; or the
> presence, handling, use, manufacture, distribution, treatment, storage,
> disposal, or recycling of or exposure to Hazardous Materials, (b)
> workplace health or safety or (c) exposure of persons or property to
> Hazardous Materials."

(<u>Id.</u> § 3.24(g)(ii).)  The contract further defines the capitalized term "Law" in yet another

provision, Section 3.5, to include "any order, writ, injunction, decree, judgment, permit,

license, ordinance, law, common law, statute, code, standard, requirement, rule or

regulation" applicable to Fairchild or the Fastener Business. (<u>Id.</u> § 3.5.)

> The definition of Environmental Law is noteworthy in three respects.  <u>First</u>, the

term is defined by reference to three separate and distinct subsections, which are set off

from one another as independent alternatives by the use of commas and the disjunctive

6

term "or". See, e.g., Barnard v. State, 642 A.2d 808, 817 (Del. Super. Ct. 1992) (noting that the "typical, everyday meaning of the word 'or'" is "the disjunctive conjunction 'or' rather than the conjunction 'and'"); see also Am. Heritage Dictionary 407, 977 (4th ed. 2004) (defining "disjunctive" as "[o]f a proposition that presents two or more alternative terms" and noting that "or" is primarily "used to indicate an alternative, usu[ally] only before the last term of a series"). Cf. In re Continental Airlines, Inc., 932 F.2d 282, 288 (3d Cir. 1991) (noting that a term should not be defined "by reference to the other words that surround it" where "other evidence reveals that Congress intended to treat the disputed term differently from its neighbors", and that "[w]hen Congress has separated terms with the conjunction 'or,' it is presumed that Congress intended to give the terms 'their separate, normal meanings'" (citation omitted)).  Accordingly, Environmental Law, as defined in the Agreement, includes three different types of laws.  Those are (1) "any Law of any Government entity . . . relating to . . . pollution or protection of the environment or natural resources", (2) "any Law of any Government entity . . relating to . . . workplace health or safety", or (3) "any Law of any Government entity . . relating to . . . exposure of persons or property to Hazardous Materials".  That same disjunctive structure is used elsewhere in the Acquisition Agreement to denote separate and distinct alternatives.  (See, e.g., AX 1 §§ 9.1(b)(i)-(iii), 11.6(b)(i)-(iii).)

The use of the disjunctive makes logical sense because the three separately lettered provisions of Section 3.24(g)(ii) concern three distinct categories of laws. Section 3.24(g)(ii)(a) implicates laws protecting the natural world (soil, groundwater and air) from contamination by Hazardous Materials.  Section 3.24(g)(ii)(c), by contrast, implicates laws protecting individuals and their real and personal property from exposure

to Hazardous Materials. And Section 3.24(g)(ii)(b) implicates laws intended specifically to protect the health and safety of workers in the workplace.

Under Fairchild's proposed reading, however, the three categories should be understood to have no independent meaning. Rather, they should be read to be "informed by their companions" (Tr. 2811:9-17)—and thus, overlapping to the point of total redundancy. Fairchild's General Counsel, Donald Miller, for example, speculated that a "workplace health or safety" claim that is also "environmental" might occur "[i]f water is percolating up through the floor where it isn't supposed to be and making the floor slippery". (Tr. 2438:5-13.) He then narrowed that category still further:

> "Q.    So it is your testimony somebody falling off a high ledge could be an environmental safety issue if they slipped on a puddle of water?
>
> A.    No. That is not what I testified.
>
> Q.    If the water percolated up from the ground and they slipped and fell off a high place, then we would be covered under the indemnity?
>
> A.    You might be.
>
> Q.    Really?
>
> A.    I would have to think about that. Depends whether or not it was a solvent that percolated up through the floor."

(Tr. 2439:3-16.) Mr. Miller's testimony was so utterly incredible that Fairchild's own witnesses found it laughable. But the absurdity of the example reveals Fairchild's purpose: to cabin the term "workplace health or safety" to a factually impossible scenario that deprives the words of any meaning.

Fairchild's Environmental Counsel, Susan Hall, conceded that, even though Section 3.24 is written in the disjunctive, under Fairchild's approach sections (b) and (c) would be treated as "subsumed within" section (a). (Tr. 2808:18-2809:8; 2849:18-

2850:8.)  Such a reading violates the most fundamental principles of contract interpretation.  See, e.g., Sonitrol Holding Co. v. Marceau Investissements, 607 A.2d 1177, 1183 (Del. 1992) ("Under general principles of contract law, a contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless."); Warner Commc'ns Inc. v. Chris-Craft Indus., Inc., 583 A.2d 962, 971 (Del. Ch. 1989) ("An interpretation that gives an effect to each term of an agreement, instrument or statute is to be preferred to an interpretation that accounts for some terms as redundant."); see also 5 Arthur L. Corbin, Corbin on Contracts § 24.28 (Joseph M. Perillo ed., rev. ed. 1998) (noting "the preference for giving effect to as many of the contract terms as possible").  Indeed, Ms. Hall's testimony conflicts with her own stated understanding of how a contract should be read insofar as she admitted that "disjunctive" means that an item is including in one category but not in another, and admitted that Section 3.24(g)(ii) is written in the disjunctive, but then testified that Sections 3.24(g)(ii)(b) and (c) should be "subsumed" within section (a).  (Tr. 2848:2-14; 2849:18-2850:8).

Second, it is hornbook contract law that a lowercase, undefined term—such as "workplace health or safety"—is to be given its usual and customary meaning.  See, e.g., Derry Finance N.V. v. Christiana Cos., Inc., 797 F.2d 1210, 1214 (3d Cir. 1986) (noting the distinction between a contract's use of capitalized and defined terms and its use of lowercase, undefined terms, which are to be accorded their "ordinary, plain meaning"); Motorola, Inc. v. Amkor Tech., Inc., 849 A.2d 931, 935 at n.2 (Del. 2004) ("Words used in a contract are to be given their ordinary, natural, and commonly accepted meanings unless it clearly appears that the parties intended to ascribe to them a peculiar or unusual definition." (citation and internal quotation marks omitted)).

9

In this case, there is no dispute that the usual and customary definition of "workplace health or safety" includes machine guarding, equipment safety, fall protection and similar issues. For example, Robert Adams, Alcoa's expert on workplace health and safety issues in the United States, testified that "workplace health or safety" is a commonly used term that encompasses "those conditions that are regulated by the Occupational Safety and Health Administration" and that relate to "the protection of the workers within facilities, the manufacturing plants, commercial businesses". (Tr. 1571:24-1572:12.) Mr. Adams testified that he had "never heard" the term used "to exclude things such as machine guarding". (Tr. 1572:13-17.) Similarly, Michael Hodge, Fairchild's own Environmental Counsel at the time of the transaction, testified that he also understood the term "health and safety" to refer to matters regulated by the Occupational Safety and Health Administration ("OSHA"), including machine guarding and equipment retrofitting. (Tr. 2220:23-25; 2231:20-2232:9.) And both of Fairchild's proffered experts on workplace health and safety—Jerome Lange and Mark Katchen—testified that issues such as machine guarding are included within the generally accepted definition of workplace health or safety. (Tr. 3013:24-3015:7; 3171:8-15.) Mr. Katchen, for example, testified that workplace health or safety includes "mechanical safety issues throughout the workplace". (Tr. 3171:8-15.)

Third, the contract defines "Environmental Law" in sweeping language that expands rather than limits its scope. The definition encompasses "any Law of any Government entity, or any binding agreement with any Government entity". It incorporates a definition of "Law" that could hardly be broader. And it employs a definition of "Government" that is similarly expansive, encompassing "any agency,

division, subdivision, audit group or procuring office of the government of the United States, any state or territory thereof, or any city, county or municipality thereof or any foreign government, including the employees or agents thereof". (AX 1 § 1.76.) The sheer breadth of the definition plainly includes regulations relating to workplace health and safety enacted by OSHA and its state and foreign equivalents.

Fairchild's approach stands the law on its head. It seeks to apply a generic meaning to a specially defined term—"Environmental Law"—and a special meaning to a generic term—"workplace health or safety". (See, e.g., Tr. 2326:20-2327:4.) There is no basis for rewriting the contract in that way.

B.    Alcoa Repeatedly Rejected Fairchild's Attempts to Rewrite the Definition of Environmental Law to Eliminate or Limit Fairchild's Liability for Workplace Health or Safety Claims.

A review of the Agreement's drafting history—which Fairchild tried mightily to keep out of evidence (Tr. 2386:5-2392:19)—confirms that "workplace health or safety" should be given its ordinary meaning. Thus, during the contract negotiations, Alcoa specifically rejected Fairchild's attempt to remove the phrase "workplace health or safety" from the definition of Environmental Law. Fairchild then sought to rewrite that definition to subsume "workplace health or safety" within the language of what is now subsection (a)—the very construction Fairchild now proposes. But Alcoa rejected that attempt as well, requiring that it be rejected again now. (See Findings ¶¶ 23-23.2.3.)

As Fairchild's Mr. Miller conceded during cross-examination, Fairchild's counsel submitted to Alcoa its "preliminary comments" on the draft Acquisition Agreement on May 6, 2002—two months before the Agreement was signed. (Tr. 2393:14-19; AX 150.) As part of that markup, Fairchild proposed extensive revisions to the definition of "Environmental Law". (AX 150 at 35.) One of those proposals was to strike subsection

11

3.24(g)(ii)(b) altogether, thereby cutting the phrase "workplace health or safety" out of the definition. (Id.; Tr. 2395:20-2396:2.) Under Fairchild's proposal, "Environmental Law" would have been limited to just those laws relating to "pollution or protection of the environment or natural resources, including without limitation, any Release or threatened Release, handling, use, manufacture, distribution, treatment, storage, disposal, or recycling of or exposure to, Hazardous Materials." (AX 150 at 35.) That proposal, as Mr. Miller acknowledged, was rejected by Alcoa. (Tr. 2396:3-7.)

Having failed to excise the term "workplace health or safety", Fairchild next attempted to limit it. That effort was equally unsuccessful. Thus, on May 24, 2002, Fairchild's counsel submitted to Alcoa a markup in which it proposed rewording the definition of "Environmental Law" as a single sentence, without separately lettered subsections. (AX 151 at 50.) Under that proposal, "Environmental Law" would have included laws "relating to the pollution or protection of the environment or natural resources, including without limitation, workplace health or safety; or any Release or threatened Release of Hazardous Materials, or the presence, handling, use, manufacture, distribution, treatment, storage, disposal, or recycling of or exposure to Hazardous Materials." (Id.; Tr. 2398:2-10.) The Fairchild proposal would have rendered "workplace health or safety" subordinate to—and therefore, limited by—"pollution or protection of the environment". (Tr. 2398:11-19.) But, like its proposal to eliminate "workplace health or safety" altogether, Fairchild's proposal to cabin the term was rejected by Alcoa. (Tr. 2398:20-23.)

Instead, the definition of "Environmental Law" that was ultimately agreed on included "workplace health or safety" as a separate, free-standing subsection that is

neither modified nor limited in any way.  (Tr. 2398:24-2399:12; AX 1 § 3.24(g)(ii).)

"Environmental Law" can include any law relating to "pollution or protection of the

environment or natural resources", or any law relating to "workplace health or safety", or

any law relating to "exposure of persons or property to Hazardous Materials".  (AX 1 §

3.24(g)(ii).)  It is that definition—and not Fairchild's earlier proposals that were rejected

during the drafting—that is binding on the parties.  See, e.g., O'Brien & Gere Eng'rs, Inc.

v. Taleghani, 525 F. Supp. 750, 760 (E.D. Pa. 1981) (noting that "previous drafts of a

written agreement, negotiations, and circumstances may be considered in determining the

meaning of specific words and clauses", but that "the intention of the parties is to be

determined from the final agreement executed by them").

    C.    <u>The Parol Evidence of the Negotiations Demonstrates that Both Parties
Understood Workplace Health or Safety Costs To Be Indemnified.</u>

Beyond the dispositive evidence of the contract's drafting history, the testimonial

and documentary evidence introduced at the hearing demonstrates that, during the

negotiations, both parties understood that Fairchild's indemnity would encompass

workplace health and safety claims such as machine guarding.  (See Findings ¶¶ 5.2-5.3,

16-18.1, 22-22.5.5, 24-24.7.2.3, 27-28.1.4.1, 63, 70-71.)

For example, Alcoa's Assistant Treasurer, Cynthia Holloway, testified that

Fairchild's Chief Executive Officer, Jeffrey Steiner—who, along with Fairchild's Chief

Operating Officer, Eric Steiner, was one of the company's two "principal negotiators"—

"said to us on several occasions, [that] any EHS [environmental, health and safety] issues

that were in existence at the time we bought the facilities[,] they would pay for anything

that was above and beyond the reserve that was on their books for that".  (Tr. 79:6-22;

93:22-94:7; 112:15-113:19.)  Ms. Holloway testified that she understood Mr. Steiner to

be talking about issues such as machine guarding. (Tr. 92:22-93:6; 93:22-94:7.) And, she testified, that understanding was reflected in the use of the phrase "workplace health or safety" in the contract's definition of Environmental Law. (Tr. 119:19-121:23.)

Ms. Holloway's testimony is supported by her notes of her meetings with Fairchild officials as well as with Alcoa's transaction counsel. For example, in an email to her colleagues dated June 8, 2002, under the heading "EHS", Ms. Holloway wrote that Alcoa "will need additional expenditures for guarding of machines and general EHS cleanup for California and European operations". (AX 8 at FAIR 50025537-38.) A few sentences later, she wrote, under the same heading: "Jeffrey told us that of course they were responsible for unreserved liabilities that happened under their ownership." (Id. at FAIR 50025538.) Similarly, Ms. Holloway's notes of an April 30, 2002, "drafting call" with Alcoa's transaction counsel confirm that the definition of "Environmental Law" in Section 3.24 was specifically drafted to encompass "OSHA regs" such as—in the example Ms. Holloway jotted down—equipment safety regulations governing the "lock out" and "tag out" of machines to prevent them from energizing unexpectedly and injuring workers. (AX 10 at FAIR 50025562; Tr. 119:6-121:23.)

Ms. Holloway's testimony is also supported by James Boyt, Alcoa's environmental, health and safety representative on the transaction, who testified that it was his understanding at the time of the negotiations that the parties "were looking at total indemnification of the environmental, health and safety issues". (Tr. 260:2-13.) And Jeffrey Flanzenbaum, of the environmental consulting firm ERM, testified that Alcoa instructed him to evaluate the Fastener facilities' compliance with health and

safety laws—including laws regulating machine guarding—as part of the Phase I investigations ERM conducted in the spring of 2002.  (Tr. 357:2-358:3.)

Ms. Holloway also testified that she participated in negotiations with Jeffrey Steiner over the purchase price for the Fastener Business, including a negotiating session on June 11, 2002, at which Alcoa sought an adjustment to that price.  (Tr. 122:22-124:10; (see also Findings ¶¶ 25-26.2.)  Ms. Holloway testified that the adjustment Alcoa sought totaled more than $60 million, and was intended to account for a variety of performance, inventory, 401(k) and other issues related to Fairchild's earnings.  (Tr. 125:13-127:9.) She testified that the purchase price issue was unrelated to the EHS indemnification, and that the parties never discussed workplace health and safety matters in the context of the purchase price adjustment.  (Tr. 127:5-22; 128:23-129:11.)

Ms. Holloway's testimony is, once again, supported by her contemporaneous, handwritten notes—which include an itemized list of the components of the purchase price adjustment Alcoa sought at the June 11 meeting with Jeffrey Steiner.  (AX 7 at FAIR50025593.)  That list includes no reference to workplace health or safety.  (Id.) Instead, under the heading "Price Adj.", Ms. Holloway's notes list "401k, IT, French", "Performance", "Inventory", "WComp" and "Cash".  (Id.)  Next to that list is a column of numbers which Ms. Holloway testified reflected Alcoa's estimate that the listed items were expected to total more than $60 million.  (Tr.  127:5-9.)  On a separate page of Ms. Holloway's June 11 notes, under the heading "Jeffrey", the notes state:  "EHS/Litigation" and "Responsible for anything above $8.5".  (AX 7 at FAIR 50025598.)

Tellingly, Fairchild declined to produce either Jeffrey or Eric Steiner to respond to Ms. Holloway's testimony.  Instead, Fairchild produced Mr. Miller, its General

Counsel, who testified first that he attended the June 11 meeting described in Ms. Holloway's notes, but later conceded that he was <u>not</u>, in fact, present. (Tr. 2453:24-2454:2; 2455:23-2456:17.) Despite that, Mr. Miller insisted that the purchase price adjustment Alcoa sought was intended to reflect the anticipated cost of bringing the Fastener facilities into compliance with workplace health and safety laws. (Tr. 2358:15-2359:17.) Not surprisingly—given that he was not there—Mr. Miller's testimony is unsupported by any of his own notes. (Tr. 2450:8-14.) It is simply not credible.

### D. Fairchild's Conduct Before the Closing Demonstrates that it Understood Workplace Health or Safety in the Same Way Alcoa Did.

Following the conclusion of the negotiations and the signing of the Acquisition Agreement, the parties continued to engage in detailed discussions about environmental, health and safety matters in the months before the transaction closed. The evidence showed that those discussions specifically addressed machine guarding and other equipment safety issues. (<u>See</u> Findings ¶¶ 24-24.7.2.3.) It flatly contradicts Mr. Miller's contention that Fairchild was unfamiliar with the terms "Environmental, Health and Safety" or "EHS", and that Fairchild did not understand machine guarding to be among the key health and safety issues covered by the indemnity. (Tr. 2347:10-20.)

For example, the evidence showed that in September 2002, a Fairchild employee, Anthony K. Miremadi, delivered a PowerPoint presentation to Alcoa representatives entitled "EHS Integration". (AX 101.) The term "EHS" appears some 43 times in the 12-page presentation, including as part of the job titles of Mr. Miremadi—who is identified as the "Director - EHS" for Fairchild's "U.S. Operations"—and Mathilde Enriquez, who is identified as the "Director - EHS" for Fairchild's "South Bay Operations". (<u>Id.</u> at FC 9443.) The presentation demonstrates that Fairchild used the

term "EHS" precisely as Alcoa did, to refer to three distinct categories of issues—environmental, health and safety—that were grouped together organizationally under a common leadership. (Tr. 2229:22-2230:7.) Among the "Key EHS Initiatives and Issues" that Fairchild identified in the "safety" category were "[m]achine guarding" and "[e]quipment retrofitting". (Tr. 2231:20-2232:9; AX 101 at FC 9451.)

Confronted with those facts, Mr. Miller testified that Mr. Miremadi and Ms. Enriquez must have invented titles for themselves that incorporated the term "EHS" in an effort to improve their prospects of securing employment with Alcoa. (Tr. 2348:13-2349:5.) Mr. Miller testified that Mr. Miremadi did so unbeknownst to Fairchild (Tr. 2349:4-5), even though Mr. Miller himself not only received a copy of the presentation, but forwarded it to other Fairchild employees (Tr. 2445:2-7), and even though Fairchild's former Environmental Counsel, Michael Hodge, testified that he was present in the room when Mr. Miremadi delivered the presentation to Alcoa (Tr. 2233:2-9). Moreover, Mr. Hodge conceded that Ms. Enriquez identified herself as Fairchild's "Environmental, Health & Safety Manager" and Mr. Miremadi as Fairchild's "U.S. Operations Environmental, Health & Safety Director" long before Alcoa became involved with the Fastener business, in a letter written to California regulators—not to Alcoa—in June 2001, more than a year before the sale. (Tr. 2223:13-2224:23; AX 244 (emphasis added).) Unable to offer any explanation for that letter, Mr. Miller suggested, simply, that Ms. Enriquez must have "aggrandized" her own and Mr. Miremadi's positions. (See Tr. 2441:11-24.) Once again, Mr. Miller's testimony is simply not credible. It is also irrelevant, because the evidence is uncontradicted that Mr. Miremadi and Ms. Enriquez used the term "EHS" in representing themselves to Alcoa.

17

Notably, Fairchild's witnesses had no response to the fact that Fairchild included machine guarding as a "key" safety issue in its presentation to Alcoa. Fairchild cannot credibly argue that it understood "health and safety" to include machine guarding in the context of its representations to Alcoa, but that it understood "health and safety" to exclude machine guarding in the context of the contract's language.

E.    The Parties' Conduct Immediately After the Closing Demonstrates that Both Fairchild and Alcoa Understood Fairchild's Indemnification Obligation to Extend to Machine Guarding and Similar Workplace Health and Safety Issues.

The parties' conduct immediately after the closing further supports Alcoa's position. In the spring and early summer of 2003, just a few months after the transaction closed, Alcoa began notifying Fairchild of indemnification claims for workplace health and safety matters, including machine guarding. Fairchild did not, however, promptly reject those claims on the basis that they were not within the scope of the indemnity—as one would expect it to do if that were, in fact, its understanding. Instead, Fairchild requested more information from Alcoa regarding the very types of claims it now contends it never believed were covered. (See Findings ¶¶ 28.1-28.1.4.1.)

For example, beginning in March 2003—three months after the closing—Alcoa's Designated Representative to Fairchild, John Lease, sent Fairchild a series of five letters notifying it of "EHS Non-Compliance Issues and Estimated Corrective Action Costs" at four of the largest Fastener Business facilities in France and the United States. (See AX 39; AX 45, AX 46, AX 48, AX 113.) Many of those claims concerned issues about which Alcoa had previously notified Fairchild in the Phase I reports prepared by ERM. (Tr. 863:25-864:5.) In each of the letters, Mr. Lease listed Alcoa's claim for machine guarding among a variety of workplace health and safety issues that Alcoa intended to

address and for which it sought indemnification, together with explanations of what those issues involved and citations to applicable government regulations. Thus, in a table attached to Mr. Lease's letter of March 4, 2003, concerning the St. Cosme, France facility, he noted that the facility's "[m]achine guarding does not meet regulatory requirements". (AX 39 at FC 170.) The table cited the French Labor Code as a basis for Alcoa's claim and noted that Alcoa intended to address the problem by conducting a machine guarding study and installing required guards. (Id.)

Fairchild's Mr. Miller responded on March 14, 2003, by requesting that Alcoa provide additional information so that Fairchild could "more fully consider these issues". (AX 40.) However, Mr. Miller testified at the hearing that, under Fairchild's reading of the contract, machine guarding could never have been indemnifiable because it is not "environmental" in nature. (Tr. 2415:17-23.) Machine guarding, Mr. Miller testified, was "never part of the deal" (Tr. 2352:25-2353:4), and Fairchild would not have agreed to indemnify Alcoa for machine guarding under any circumstances (Tr. 2360:16-23). And Mr. Miller testified that this was Fairchild's firm conviction at the time he responded to Mr. Lease's letter. (Tr. 2415:17-23.) But that is not what he told Mr. Lease.

Mr. Lease, in response, continued to press Alcoa's machine guarding claims, providing Mr. Miller with the information he requested in a letter dated April 8, 2003. In an expanded table attached to that letter, Mr. Lease explained that "[a]n assessment of machinery at the facility has identified the need to install machine guarding devices to comply with provisions specified in the Labour Code (e.g., every machine that has a turning part, hot surface or parts under power should be provided with adequate internal safety systems and appropriate guarding". (AX 45 at FC 145.) Mr. Miller again

19

responded <u>not</u> by rejecting out of hand a claim that, according to him, was "never part of the deal", but rather by requesting still more information. (AX 144.)

Similarly, in response to Mr. Lease's letters identifying machine guarding as an issue for which Alcoa sought indemnification at the Toulouse, France facility (AX 48 at FC 140), the Fullerton, California facility (AX 46 at FC 135), and the Torrance, California facility (AX 113 at FAIR 50000071), Mr. Miller requested that Alcoa provide more information. (AX 47, AX 49, AX 117.) <u>Not a single one</u> of Mr. Miller's five letters in the months immediately following the closing of the transaction informed Alcoa of Fairchild's purported belief that machine guarding was "never part of the deal".

Instead, Fairchild developed that argument only two years later, after it hired a new in-house counsel, Susan Hall, to deal with Alcoa's indemnification requests. (<u>See</u> Findings ¶¶ 28.1.4-28.1.4.1.) Ms. Hall testified that, upon reading the Acquisition Agreement for the first time, she "immediately had a flash back to first year law school" and knew that machine guarding was not an indemnifiable claim. (Tr. 2807:18-2808:5; 2848:2-18.) She informed Alcoa of that—for the very first time—by letter dated January 31, 2005. (Cl. Ex. 463.) The evidence could hardly be clearer that Fairchild's counsel simply manufactured an argument concerning the scope of the indemnity, long after the closing, in an attempt to escape the obligations Fairchild had assumed.

II.    THE ACQUISITION AGREEMENT PROVIDES THAT FAIRCHILD WILL INDEMNIFY ALCOA FOR THE COST OF INVESTIGATIONS, INCLUDING VOLUNTARY INVESTIGATIONS INTO ACTUAL OR THREATENED CONTAMINATION AT THE FASTENER FACILITIES.

Fairchild has similarly attempted to evade its obligation to indemnify Alcoa for the cost of investigations into environmental contamination. As Your Honor has previously concluded in the Interim Decision on Alcoa's Motion for Partial Summary

Judgment, the Acquisition Agreement "gives Alcoa the authority to conduct investigations where there is a reasonable basis to do so." (Interim Decision at 2.) That decision is plainly correct. (See AX 1 § 11.6(e)(iv) (defining "Fastener Environmental Liability" to include "all losses, damages, charges, liabilities, costs, expenses, deficiencies, fines, penalties, claims, demands, actions, suits or proceedings, including reasonable attorneys' and consultants' fees and expenses in connection therewith, <u>and expenses of investigation</u>" (emphasis added).) The Interim Decision provided that it would "be incorporated into and made a part of the final Award" in this matter. (See Interim Decision at 1; Findings ¶ 12.) In light of Your Honor's decision, Alcoa will not restate here its legal and contractual arguments for seeking indemnification for investigations. (See S.J. Brief at 30-35; S.J. Reply at 2-3.) However, the evidence introduced at the hearing amply confirms those arguments.

<u>First</u>, several Alcoa witnesses who were involved in the acquisition and had regular contact with Fairchild officials testified that this was their contemporaneous understanding of the Agreement's terms. (See Findings ¶¶ 30-30.3.1.) For example, Ms. Holloway testified that the parties agreed that Fairchild's indemnity would extend to investigations conducted after the closing. (Tr. 153:5-22.) With respect to the Phase II investigations, in particular, Ms. Holloway testified—and her notes confirm—that Alcoa sought Fairchild's permission to conduct the Phase IIs <u>before</u> the closing, but that Fairchild refused that request and insisted that Alcoa defer the Phase IIs until <u>after</u> the closing. (Tr. 89:6-21; AX 4.) Ms. Holloway testified that she was present at meetings at which Fairchild officials were told that Alcoa did, in fact, intend to conduct the Phase IIs after the closing, and that it was her clear understanding that the costs associated with

21

those investigations would be covered by Fairchild's indemnity. (Tr. 101:2-10; 153:5-22.)  Similarly, Mr. Boyt and Mr. Lease both testified that they understood Fairchild's indemnification obligation to encompass the cost of the Phase II investigations. (Tr. 300:12-25; 849:3-7.)

Second, Fairchild's own conduct just before and just after the closing indicates that it shared Alcoa's understanding. (See Findings ¶¶ 32-32.3.)  For example, Fairchild sent its then-Environmental Counsel, Mr. Hodge, to a pre-closing meeting in Pittsburgh with Alcoa officials and Alcoa's environmental consultant in November 2002.  At that meeting, the group reviewed the "Scopes of Work" for the Phase II investigations, and Mr. Hodge indicated that Fairchild had engaged its own environmental consultant to review at least some of the Scopes of Work. (Tr. 2186:23-2187:10; 2286:16-2287:6; AX 22 at FAIR 00094574.)  Immediately after the closing, Alcoa sent Mr. Hodge slightly revised Scopes of Work for the Phase II investigations. (Tr. 2279:17-20; AX 100.)  At no time did Mr. Hodge offer any objection to Alcoa's plans. (Tr. 2279:21-2280:14.)

Third, Fairchild's conduct after the Phase IIs were completed further confirms its understanding. (See Findings ¶¶ 33-34.1.)  In two separate letters sent to Alcoa following Fairchild's receipt of the Phase II reports and Alcoa's request for indemnification, Fairchild acknowledged that it "may be appropriate for Alcoa to seek reimbursement" for at least a portion of the investigative costs. (AX 158 at FC 53; AX 32.)  In the second of those letters, dated February 26, 2004, Fairchild's Deputy General Counsel, Ernesto Beckford, went so far as to send Alcoa a detailed chart—prepared in part by Mr. Hodge—identifying those portions of the Phase II investigations that even Fairchild thought were indemnifiable given the evidence of contamination. (AX 32 at FC 296-

306.) Fairchild also indicated its belief that some of that contamination required <u>further</u> investigation to determine its source and scope. (<u>Id.</u>)

While the limitations Fairchild sought to impose on its indemnification obligation for investigations in February 2004 finds no support in the language of the Acquisition Agreement, it was nonetheless more generous than the position Fairchild adopted for the first time a year later, after Ms. Hall was hired and revoked the offer on the basis that Alcoa had "voluntarily incurred" the expense of the Phase IIs. (AX 103 at FC 340-41.) Thus, less than one month after she rejected Alcoa's workplace health and safety claims on the basis that she read the contract to exclude those claims, Ms. Hall informed Alcoa that she also read the contract to exclude coverage of voluntary investigations. Accordingly, she wrote, "all of Alcoa's claims for indemnification under Section 11.6 for environmental assessments, lock tag and verify assessments, machine guarding assessments, or any other assessments or characterizations, are rejected entirely." (<u>Id.</u> at FC 340-41 n.1.) Ms. Hall conceded at the hearing that her new interpretation of the Agreement was at odds with the understanding of the two Fairchild lawyers—Messrs. Beckford and Hodge—who preceded her and who had been employed by Fairchild at the time the contract was negotiated. (Tr. 2779:12-2780:3; 2829:9-2831:17.)

At the same time, Fairchild <u>also</u> rejected indemnification claims for investigations that were not voluntary but, in fact, required by government regulators. (<u>See</u> Findings ¶¶ 96, 103, 148.1, 153, 156.1, 195.2.1.) For example, Fairchild denied Alcoa's claims for investigations at the Torrance facility that Alcoa was ordered to undertake pursuant to a Consent Decree with the California Department of Toxic Substances Control ("DTSC"). (Tr. 2887:12-21.) Ms. Hall testified that Fairchild rejected those claims on the basis that

23

Fairchild "would have hoped to have been involved in the process of negotiating" the Consent Decree—even though the Acquisition Agreement provides that Alcoa, not Fairchild, "shall conduct and control all Remedial Action and negotiations with any Government entity" (AX 1 § 11.6(c)), and even though the evidence showed that the DTSC ordered Alcoa to execute the Decree. (Tr. 2823:14-16; 2888:15-2889:20; AX 167.) Fairchild's approach could not be clearer: whether Alcoa's actions are "voluntary" or "involuntary", Fairchild will invent some excuse not to pay for them.

III.    FAIRCHILD'S ALTERNATIVE ARGUMENT THAT IT WAS DEPRIVED OF NOTICE AND AN OPPORTUNITY TO COMMENT IS UNTRUE AND REPRESENTS ANOTHER ATTEMPT TO DENY ALCOA ITS BARGAINED-FOR INDEMNIFICATION RIGHTS.

As an alternative to its argument that Alcoa's claims do not qualify for indemnification, Fairchild contends that it should not be required to fulfill its indemnification obligation because it was deprived of sufficient notice and an opportunity to comment on those claims.[1] That is untrue.

First, Alcoa provided Fairchild with thousands of pages of advance written notice concerning its claims for indemnification. Mr. Lease testified that, all together, Alcoa provided Fairchild with specific advance notice, by facility, for claims totaling approximately 90 percent of the $16.385 million Alcoa now seeks to have indemnified. (Tr. 909:11-910:13; see also Findings ¶¶ 60-94.) Mr. Lease's testimony was supported by a demonstrative exhibit and backup chart detailing the nature of that notice, by

---

[1] Fairchild did not initially raise the notice argument in its Reply to Alcoa's Counterclaim. Rather, Fairchild indicated that "[t]he nature of Fairchild's defense is that Alcoa has not incurred any Section 11.6 Environmental Liabilities as defined by the Acquisition Agreement". (Cl.'s Reply to Alcoa's Counterclaim, dated Aug. 11, 2005.)

24

reference to specific documents, for each category of claims at each of the Fastener facilities. (AX 125, AX 161.) Your Honor will recall that those documents consumed literally an entire bookcase. The top shelf of that bookcase contained the Phase I reports that Alcoa provided to Fairchild before the closing identifying numerous problems, facility-by-facility. The second shelf contained the Scopes of Work for the Phase II investigations that Alcoa provided to Fairchild before the closing, along with the Phase II reports themselves, which Alcoa provided to Fairchild after the closing. And the third and fourth shelves contained the additional correspondence and follow-on reports that Alcoa's Mr. Lease sent to his counterparts at Fairchild from after the closing until the present. In the face of that enormous volume of physical evidence, it simply defies logic that Fairchild now contends it was denied adequate notice or an opportunity to comment on Alcoa's actions—on every single one of Alcoa's claims.

The notice Alcoa provided plainly satisfied any reasonable understanding of the Agreement's requirements. For example, the sixteen volumes of Phase I reports provided Fairchild with notice of actual and threatened environmental contamination at each of the Fastener facilities Alcoa acquired, as well as notice of a variety of workplace health and safety issues, including—among others—issues related to machine guarding, machine lockout and tagout procedures, mobile equipment safety, fall protection, electrical safety and confined space procedures. (Tr. 2170:14-20.) As noted above (at 22), Alcoa also provided Fairchild with Scopes of Work for the Phase II investigations it intended to conduct after the closing, and Alcoa officials met with Fairchild's then-Environmental Counsel, Mr. Hodge, to discuss those Scopes of Work. (See Findings ¶¶ 32-32.3.)

Immediately after the closing, as also noted above (at 18-20), Mr. Lease sent Fairchild a series of letters providing additional notice of environmental, health and safety claims at four of the largest Fastener facilities: those in St. Cosme; Toulouse; Fullerton; and Torrance. (See AX 39; AX 45, AX 46, AX 48, AX 113; see also Findings ¶¶ 28.1-28.1.1.) Those letters provided further notice not just of the conditions Alcoa had discovered, but also of Alcoa's proposed responses to those conditions. For example, a table attached to the letter dated April 8, 2003, concerning the St. Cosme facility indicated that in response to the facility's machine guarding problem, Alcoa intended to "[c]onduct [a] machine guarding survey and install required guards". (AX 45 at FC 145.) The same table noted that, in response to the facility's noncompliance with its wastewater permit, Alcoa intended to take a number of steps, among them to "[c]onduct [an] engineering study to identify and categorize wastewater flows and discharges" and to "[u]grade/replace [the] wastewater treatment plant". (Id.) The table provided an estimate for the wastewater projects in excess of $1.5 million. (Id.) Similarly, a table attached to the letter dated June 13, 2003, concerning the Toulouse facility stated:

> "Under local regulations and the facility's integrated operating permit, the facility is required to provide one (1) parking space for each employee and plant a tree for every 4 parking spaces at the facility - this has not been completed. The present parking congestion at the facility creates safety issues related to mobile equipment/pedestrian interface, hazards associated with the delivery of hazardous chemicals and potential impediment to emergency response vehicles in the event of a chemical release or fire. Additionally, the facility is required under their operating permit to upgrade their lightning (firestorm) protection and install additional fire hydrants - these upgrades have not been completed."

(AX 48 at FC 139.) The table noted that in response to that issue, Alcoa intended to "[o]btain authorization from [the] local authority to extend [the] parking lot and install two fire hydrants and implement changes to meet regulatory requirements. Implement

and complete lightning protection project in accordance with project schedule contained in proposed plan." (Id.)  The table also indicated that, because the facility "does not have an adequate number of access points for emergency situations" to comply with the requirements of its operating permit, Alcoa intended to "[l]ocate and install an additional emergency access location in accordance with the operating permit condition as part of the parking lot expansion project".  (Id. at FC 140.)  It provided a preliminary cost estimate for the project of €350,000.  (Id. at FC 139.)

There is no dispute that Alcoa's notice letters were sent before any work was performed.  (Tr. 2853:21-23.)  Yet Fairchild's across-the-board response to the letters was to deny Alcoa's claims while demanding more information.  For example, in response to Alcoa's letters concerning the Fullerton, Toulouse and Torrance facilities, Fairchild responded with a form letter that disputed its liability, invoked the Acquisition Agreement's dispute resolution procedures, and requested additional "background documentation supporting the items and estimated costs" Alcoa had submitted, including "copies of any assessments, reports, legal analyses, or cost analyses".  (AX 47 at FC 97-87; see also AX 49 at FC 95-96; AX 117 at FAIR 50000072-73.)

Fairchild's request for those documents was not supported by the terms of the Acquisition Agreement.  Indeed, the Agreement is quite specific about the documents to which Fairchild is entitled and the circumstances under which it is entitled to them.  It provides that, only in the limited context of "Remedial Actions to be taken in respect of . . . Environmental Actions"—essentially, that subset of environmental investigations and remediation that are required by legal proceedings or regulatory order—does Alcoa have to provide Fairchild with "copies of all reports, analytical data, correspondence,

directives, orders and documents submitted to or received by the Buyer from any Government entity in connection with the Remedial Action and other non-privileged documents created or received by or on behalf of the Buyer in connection with the Remedial Action". (AX 1 § 11.6(c).) However, in the context of all other indemnification claims—including claims for any workplace health or safety matters and any other types of investigation or remediation—the Agreement is silent, providing only that Alcoa "shall inform [Fairchild] promptly in writing of any Fastener Environmental Condition or Environmental Action in respect of which [Fairchild] may have an indemnification obligation" (id. § 11.6(d)), and that it will "afford [Fairchild] a reasonable opportunity to comment on [Alcoa's] proposed response to a Fastener Environmental Condition" (id. § 11.6(c)). Accordingly, Fairchild's request for extensive "background documentation" concerning Alcoa's workplace health or safety claims was simply without basis under the Agreement.

At the same time, Fairchild did not ask for information to which it plainly was entitled under the Agreement, and that would have been helpful had Fairchild actually intended to comment on Alcoa's actions. Fairchild, for example, did not ask to visit any of the Fastener facilities to see the machines, talk to the people doing the work on-site and inspect the operational documents that Alcoa maintained at the plant level—despite the fact that it was plainly entitled to visit the facilities under Section 11.6(c). (Tr. 893:14-894:5; 2264:23-2265:5; 2858:3-21; 2861:16-2262:10; AX 1 § 11.6(c).) Fairchild officials never called Alcoa to inquire about its claims, never sought to speak with Alcoa's contractors or consultants, and never sought to send their own contractors or consultants to visit the sites—all rights to which Fairchild was specifically entitled. (Tr.

893:14-894:5; 2265:6-2266:17; AX 1 § 11.6(c).) Indeed, Fairchild's own expert witness testified that visiting the plants would have been the <u>only</u> proper way to evaluate Alcoa's claims.[2] (Tr. 3004:2-22.) And Fairchild's own General Counsel testified that, with respect to machine guarding—Alcoa's single largest workplace health and safety claim— "[i]t is the kind of thing you could walk into the plant, look at the machines, count the machines and see instantly whether or not they had machine guards". (Tr. 2362:3-6.) Yet, to this day, Fairchild has <u>never</u> sought to avail itself of any of those contractual rights. Rather, it seeks only to create rights it does <u>not</u> have.

Fairchild's request for additional "background documentation" is also striking because, as the evidence showed, during the time Fairchild owned the Fastener facilities it investigated and obtained its own cost estimates for many of the very same corrective actions it later left for Alcoa. For example, Fairchild was ordered by French regulators to correct machine guarding problems at the St. Cosme facility and prepared a cost estimate for that work. (Tr. 3024:7-3027:3; AX 95.) Similarly, the Phase I report for the Toulouse facility—which was prepared before the closing, based upon information provided by Fairchild—indicated that Fairchild's managers were aware that the facility's operating permit required the expansion of the parking lot, the construction of a second entrance for emergency vehicles and the installation of lightning protection devices. (Bulk AX A, Vol. 14 at 3.) Yet Fairchild contends it did not have adequate notice or an opportunity to comment on those claims.

---

[2] As the hearing testimony made clear, however, Fairchild denied its proffered French workplace health and safety expert, Jerome Lange, the right to visit an Alcoa site located just 20 kilometers from his home, even after Mr. Lange told Fairchild's counsel that the inability to visit the site would make it "difficult" for him to render a detailed opinion. (Tr. 3004:2-22; 3005:17 - 3006:20; 3007:19 - 3008:8.)

Alcoa also introduced evidence that, in some cases, Fairchild actively hid the condition of its facilities from Alcoa and from government regulators—and then refused Alcoa's indemnification claims on the basis that it lacked sufficient information to evaluate those claims. (See Findings ¶¶ 28.1-28.1.3, 46, 59, 182.) For example, Alcoa introduced documentary evidence and testimony that Fairchild misled regulators about the condition of the wastewater treatment plant at St. Cosme, keeping two sets of books for the facility—one for regulators, suggesting that the plant was compliant with wastewater emissions limits, the other for internal use, indicating that it was not.[3] (Tr. 867:18-878:20; AX 41, AX 42, AX 43.) Alcoa also introduced evidence that Fairchild obtained its own cost estimate for replacing the wastewater treatment plant. (AX 44.) Yet even for that claim, Fairchild continues to argue that its indemnification obligation should be excused.

Second, Mr. Lease testified that the remaining 10 percent of Alcoa's claims—for which Alcoa could not point to a specific piece of paper providing notice of a particular issue at a particular facility—were, in virtually every case, either identical in nature to the claims about which Alcoa had previously notified Fairchild, or concerned issues about which Fairchild was on notice through its own actions. (Tr. 910:23-912:2; 914:9-22; see also Findings ¶ 30.) For example, Alcoa included in the 10 percent the cost of machine guarding at the Simi Valley facility, even though Alcoa had previously notified Fairchild of machine guarding claims at other facilities, including St. Cosme, Toulouse, Torrance and Fullerton. (AX 168 at 2.) Moreover, Fairchild's Ms. Hall testified that even if Alcoa

---

[3] Remarkably, Fairchild's counsel conceded this fact in his opening statement, but stated that "[i]t was happening at the plant level"—those being the plants owned and operated by Fairchild at the time. (Tr. 72:2-4.)

had provided a separate notice letter concerning machine guarding at Simi Valley, Fairchild would still have denied the claim. (Tr. 2895:3-15.) Similarly, Alcoa included in the 10 percent the cost of earthquake hazard protection measures it took at the City of Industry facility. (AX 168 at 1.) Yet Alcoa introduced evidence that Fairchild had been warned by local regulators, during its ownership of that facility, that it was required to take those very measures or risk having the facility demolished. (Tr. 1628:2-1629:16; AX 83.) In other words, Fairchild knew about the issue, failed to address it, left it for Alcoa to address, and now seeks to renege on its obligation to pay for it on the basis that it lacked sufficient notice or an opportunity to comment on the problem.

Third, Fairchild has never commented substantively on any of Alcoa's investigations or corrective actions, other than to dispute the need for Alcoa to take those actions. (Tr. 849:8-850:12; 850:14-17; 851:6-852:3; 852:10-20; 854:21-855:6; 923:2-924:12; 935:23-936:21; see also Findings ¶¶ 70-71, 73-75, 77-78, 102.1, 111-13.) Indeed, despite the fact that Alcoa has now produced to Fairchild every relevant document in its possession concerning every indemnifiable action at the Fastener facilities, despite the fact that Fairchild has outside counsel and a team of experts working for it and despite the fact that Fairchild is aware of the ongoing nature of many of those actions, Fairchild has still not offered a single substantive comment. That fact is particularly striking in light of the Agreement's affirmative requirement that Alcoa act promptly to avoid exacerbating Fastener Environmental Conditions. (AX 1 § 11.6(e)(iv).) Yet as Fairchild's Ms. Hall testified, Fairchild has never intended to comment on claims for corrective actions, such as machine guarding, that it contends are not subject to indemnification. (Tr. 2858:12-2859:19.) Similarly, Ms. Hall testified,

31

Fairchild has never intended to pay <u>any</u> of Alcoa's claims—regardless of the notice or opportunity to comment it received—on the basis of its principal argument that those claims are not indemnifiable.  (Tr. 2842:11-20; 2850:15-2852:7.)  Fairchild should not now be permitted to deny Alcoa the indemnification for which Alcoa bargained and paid, based on an "opportunity to comment" Fairchild has neither sought nor intended to exercise.

IV.    ALCOA'S ACTIONS WERE COMMERCIALLY REASONABLE AND FAIRCHILD HAS FAILED TO INTRODUCE ANY EVIDENCE OF "ADVERSE EFFECT".

Fairchild's notice argument must also fail in light of the complete absence of evidence that Fairchild was "adversely affected" by any purported lack of notice.  The Acquisition Agreement specifically provides that even in the event Alcoa fails to provide Fairchild with prompt notice of an indemnifiable claim, that failure "shall not affect" Alcoa's rights "except to the extent that such failure to give prompt notice adversely affects" Fairchild's "rights and obligations" under Section 11.6.  (AX 1 § 11.6(d).) Fairchild has introduced <u>no</u> evidence of such an adverse effect.  To the contrary, several of Fairchild's own expert witnesses testified that they viewed Alcoa's actions as reasonable.  (<u>See</u> Findings ¶¶ 118.2, 119.1, 120-20.2, 121.1, 131.5-31.6, 135-36, 145, 146.2, 147.3, 152.2-52.3, 159.2.2, 177, 187.1-87.2, 188, 189.1, 190, 195.2.1.)  At the same time, Alcoa has introduced extensive evidence that its actions were necessary and cost effective.  (<u>See id.</u> ¶¶ 125-28.1.1, 131-31.4, 132-34, 137-40, 143-44.1, 146-46.1, 147-47.2, 152-59.2.1, 160-60.1, 170, 173-73.1, 174-74.2, 175-76, 179-80.1, 181.1, 194-96.)

<u>First</u>, Fairchild has steadfastly refused to produce any evidence that it was adversely affected by a purported lack of prompt notice.  For example, prior to the

hearing in this matter, Alcoa requested that Fairchild "specify how and to what extent (in dollar terms, if appropriate) Fairchild's rights and obligations under the Acquisition Agreement have been adversely affected, if at all, by the purported absence of prompt notice". (Resp't Alcoa's Interrogatory No. 9.)  Fairchild objected to that request as "premature prior to the close of discovery and the exchange of expert reports". (Claimant Fairchild's Answer to Interrogatory No. 9.)  Yet Fairchild never amended its response after discovery closed and expert reports were exchanged.  Similarly, prior to the hearing Alcoa requested that Fairchild "explain in detail the basis for [its] assertion, if any, that [a] Fastener Environmental Condition could have been remediated or otherwise resolved at materially lower cost". (Resp't Alcoa's Interrogatory No. 12.)  Fairchild again objected that the request was "premature prior to the close of discovery and the exchange of expert reports". (Claimant Fairchild's Answer to Interrogatory No. 12.)  Again, however, Fairchild did not later amend its response to provide the requested information.

At the hearing, Fairchild's expert witnesses testified that they had not even attempted to quantify any adverse effect.  Indeed, several of those witnesses testified that Fairchild specifically structured the scope of their assignments to preclude them from offering such testimony.  For example, Fairchild's proffered workplace health and safety expert for France, Jerome Lange, testified that he informed Fairchild's counsel that he would be unable to evaluate the cost-effectiveness of Alcoa's actions without visiting the Fastener facilities. (Tr. 3004:2-22.)  Yet despite the fact that Mr. Lange lives only 20 kilometers from the Toulouse facility, Mr. Lange testified that Fairchild's counsel defined his scope of work to exclude such visits. (Tr. 3002:21-3003:12; 3007:19-3008:8.)  Similarly, Fairchild's proffered workplace health and safety expert for the

33

United States, Mark Katchen, testified that he was not giving an opinion on the commercial reasonableness of Alcoa's actions, or on whether Alcoa could have taken a more cost-effective approach to any particular corrective action, or even on whether any particular alternatives were available with respect to a particular project. (Tr. 3188:2-14; 3194:7-10.) Mr. Katchen testified that he did not visit any of the Fastener facilities because it was not within the scope of his assignment—even though, he too lives in close proximity to one of the California facilities. (Tr. 3091:18-22; 3177:13-21.) And Fairchild also offered <u>no</u> expert testimony whatsoever on any of the environmental compliance work Alcoa performed in the United States and Germany, any of the workplace health or safety actions Alcoa took in Germany and Hungary, or on any of the investigations Alcoa conducted in Germany, Hungary, Portugal or Australia. (<u>See</u> Findings ¶ 117.4.)

<u>Second</u>, to the extent Fairchild's witnesses did opine on the commercial reasonableness of Alcoa's actions, they testified at several points that they found those actions to be unobjectionable. For example, Mr. Lange testified that he saw evidence that the machines at Fairchild's French facilities were not in compliance with applicable machine guarding laws at the time of the acquisition, and that he saw no evidence that Alcoa took corrective actions beyond those legal requirements. (Tr. 3016:21-3017:9.) Fairchild's proffered expert on environmental contamination in France, Robert Shofstall, testified that it was reasonable for Alcoa to have conducted the Phase II investigations in light of the results of the Phase I studies, that the scopes of work for those investigations were reasonable, and that the costs of the Phase II investigations also appeared to be reasonable. (Tr. 2629:21-2630:15; 2634:8-2635:10; 2637:10-23.) Mr. Shofstall also

testified that it was not unreasonable for Alcoa to have conducted follow-on studies in light of the Phase II findings and that Alcoa's actions in France were consistent with those of a "good corporate citizen". (Tr. 2630:2-15; 2631:8-12; 2652:6-8.) Similarly, Michael Wolff, Fairchild's proffered expert on environmental contamination in California, testified that Alcoa's approach to the Phase II investigations was entirely standard. (Tr. 1925:4-1926:8.) Mr. Wolff also testified that, in the wake of the Phase IIs, further studies at the Torrance facility were plainly necessary, and that he could identify "nothing particular" about the work Alcoa performed there that was excessive. (Tr. 1988:16-1989:3.) Yet Fairchild has refused to pay for any of the work at Torrance, just as it has refused to pay for <u>any</u> of the other projects that its own experts concede were appropriate.

Third, Alcoa took a variety of measures to ensure that its actions were both necessary and commercially reasonable, including instructing its personnel that any work performed at the Fastener facilities should be performed as though Alcoa itself were paying the bill. (Tr. 277:2-15; 569:22-570:10; 795:25-796:4; AX 20 at FAIR 93488.) Alcoa followed its standard corporate procedures for retaining contractors and consultants, relying on both competitive bidding and pre-negotiated Master Service Agreements that leverage Alcoa's global purchasing power to achieve favorable rates. (Tr. 351:21-352:8; 557:17-558:12; 602:10-603:11; 1097:23-1098:10; 3041:24-3042:16; 3117:17-3118:16.) Alcoa also engaged in extensive negotiations with its contractors and consultants to ensure that it was receiving the best possible price for their work. (Tr. 406:24-409:7; 584:18-586:6; AX 23.) Finally, Alcoa employed a special "Project Approval Request" process whereby all corrective actions at the Fastener facilities were

35

reviewed by a senior-level committee to ensure that they were, in fact, legally required and properly subject to indemnification by Fairchild. (Tr. 952:5-954:7.)

Fourth, Alcoa introduced factual and expert testimony demonstrating that all of its environmental investigations were appropriate and conducted in a commercially reasonable manner. For example, despite the fact that Alcoa understood that the cost of the Phase II investigations was chargeable against the $8.45 million reserve, Alcoa did not conduct Phase II investigations at all of the Fastener facilities. (Tr. 384:8-385:4; 562:12-563:3.) Instead, Alcoa only conducted investigations at facilities where the evidence of actual or threatened contamination suggested that further study was required. (Tr. 384:8-385:12.) Similarly, in the wake of the Phase II investigations, Alcoa did not conduct follow-on investigations at all of the Fastener facilities. (Tr. 1529:5-1530:7.) Rather, Alcoa conducted follow-on investigations only at those facilities where the evidence of contamination was such that further study was necessary. (Tr. 1242:19-1244:2; AX 137 A2-1 to 2.) As noted, Fairchild itself advised Alcoa that follow-on investigations were warranted at at least six of the Fastener facilities. (AX 32 at FC 299-306.) And Alcoa was ordered by regulators to undertake further investigations of contamination at the Torrance site. (AX 63 at FAIR 50000141-44; AX 64; AX 106 at FAIR50000097-99, FAIR50000112-13; AX 167.) Moreover, the evidence showed that in France, Alcoa's follow-on studies were conducted in accordance with the standard methodology set forth by the French government for investigations of environmental contamination. (Tr. 796:13-19; 1520:8-17; 2630:2-15.)

The record also demonstrates that the actions Alcoa took to bring the Fastener facilities into compliance with environmental and workplace health and safety laws were

necessary and appropriate.  As noted, for example, the evidence showed that in 2001, regulators ordered Fairchild to install guards on machines at the St. Cosme facility, and Fairchild itself estimated the cost of those guards at approximately $1 million.  (Tr. 3025:13-3027:3; AX 95 at FAIR 00073729.)  Alcoa has, to date, sought reimbursement for less than $700,000 for machine guarding at St. Cosme.  (Bulk AX C, Vol. 22 at 24001-02.)  Similarly, in 2001, Fairchild estimated the cost of replacing the non-compliant wastewater treatment plant at St. Cosme at €880,000 plus tax—an amount that, at current exchange rates, equates almost exactly to the approximately $1.4 million Alcoa actually spent on that same project.  (AX 44 at FAIR 50011859; Bulk AX C, Vol. 22 at 24001-02.)  More broadly, Alcoa introduced expert testimony that its efforts to comply with environmental and workplace health laws were commercially reasonable.  (AX 137 at V-1 to 2, Attachments 3-25.)  In light of that evidence, and Fairchild's failure to introduce countervailing evidence that it suffered any quantifiable adverse effect, there is simply no basis under the Agreement to deny Alcoa its bargained-for indemnification rights.

V.    THE CALCULATION OF ALCOA'S DAMAGES.

As further set forth in its proposed Findings of Fact, Alcoa has submitted to Fairchild claims for Fastener Environmental Liabilities that, through September 2006, total $16,385,463.92.  (See Findings ¶¶ 197-97.2.)  In addition, Alcoa notified Fairchild on March 19, 2007, that it settled for € 424,483 a lawsuit that was disclosed in Schedule 3.16 to the Acquisition Agreement and that is subject to indemnification pursuant to Section 11.2(a)(iv).  (See Findings ¶ 200.)  The value of that claim in dollars as of March 19, 2007, was $564,477.49.  Accordingly, while Alcoa continues to incur indemnifiable expenses for Fastener Environmental Liabilities—including expenses to complete many

of the exact same projects that are at issue in this arbitration—the total value of the claims for which Alcoa now seeks to be indemnified is $16,949,941.41. Alcoa's claims exceed the $8.45 million reserve for environmental, health, safety and litigation by $8,499,941.41.

Pursuant to Section 11.8 of the Agreement, Fairchild is entitled to a credit against its indemnification obligation for certain tax benefits that Alcoa obtained based on the actual utilization of net operating losses that Fairchild incurred in France and that may no longer be subject to possible disallowance. (AX 1 §11.8.) The total amount of those benefits now creditable to Fairchild is €200,081, or $264,106.92 as of the date they became creditable. (See Findings ¶¶ 201-05.3.) Accordingly, the total amount that Alcoa now seeks to have released from the escrow is $8,235,834.49.

Alcoa also seeks relief for damages caused by Fairchild's failure to fulfill its obligations in a timely manner. First, Alcoa requests prejudgment interest to compensate it for the lost time-value of the money it spent on indemnifiable projects.

Second, Alcoa requests that Fairchild be required to restore the escrow account to $25 million following the release of funds to Alcoa in satisfaction of any judgment. On February 27, 2007, Alcoa wired more than $11 million to Fairchild, representing the final "earn-out" payment required under Section 2.8 of the Agreement, a provision unrelated to this arbitration. (See Findings ¶ 21.2.) Under the terms of the parties' Escrow Agreement, however, if the escrow account stands below $25 million at the end of any one of the first five calendar years following the closing, Alcoa is entitled to use the earn-out payment to "top up" the escrow before directing any remaining sums to Fairchild. (See AX 247 at 8; AX 1 § 2.8(c).) That is what Alcoa would have done had Fairchild

complied with its indemnification obligations and previously agreed to release $8,235,834.49 from the escrow. Accordingly, even if Alcoa now prevails on all of its claims, it will continue to be harmed to the extent the escrow stands below $25 million. Therefore, in addition to the payment of approximately $8.2 million from the escrow, Alcoa is entitled to a payment from Fairchild in that amount to "top up" the escrow to $25 million, as required by the Agreement. That is particularly important because, as the evidence demonstrated, Alcoa will have to spend substantial additional amounts to comply with health and safety requirements and to remediate the significant environmental conditions existing at the former Fairchild facilities.

## Conclusion

For the foregoing reasons, and for the reasons set forth in its Motion for Partial Summary Judgment and its Proposed Findings of Fact and Conclusions of Law, Alcoa respectfully requests a judgment declaring that: (1) all of Alcoa's claims are subject to indemnification under the terms of the Acquisition Agreement, including (a) workplace health and safety claims for items such as machine guarding and equipment safety, fall protection, electrical safety and confined space compliance, and (b) investigations, including the Phase II and follow-on investigations; (2) Alcoa satisfied the Agreement's requirement that it provide Fairchild with notice and an opportunity to comment; (3) Alcoa's investigations and corrective actions had a reasonable basis and were conducted in a reasonable and appropriate manner; (4) Alcoa is entitled to payment from the escrow account of $8,235,834.49 plus prejudgment interest; (5) Fairchild must, following the payment to Alcoa, restore the escrow account to $25 million; and (6) Alcoa is entitled to complete the actions that are reasonably necessary to address the Fastener Environmental

Conditions it has identified, and to be indemnified by Fairchild for the cost of those actions without further proceedings under Section 11.7 of the Agreement.

April 16, 2007

CRAVATH, SWAINE & MOORE LLP

by _____

Evan R. Chesler
Daniel Slifkin
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Alcoa Inc.*

40