### CPR INSTITUTE FOR DISPUTE RESOLUTION

THE FAIRCHILD CORP.,

           Claimant-Counter-Respondent,

   - v. -

ALCOA INC.

          Respondent-Counter-Claimant.

CPR File No. G-06-22H

## ALCOA INC.'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Evan R. Chesler
Daniel Slifkin
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
(212) 474-1000

*Attorneys for Respondent-Counter-Claimant
Alcoa Inc.*

## TABLE OF CONTENTS

Page

Index of Witnesses ............................................................................... vii

ALCOA'S PROPOSED FINDINGS OF FACT .................................................. 1

I.     THE PARTIES ................................................................................. 1

II.    THE CONTRACT IN ISSUE ............................................................... 1

       A.   Agreement for the Sale of the Fairchild Fasteners Business to
            Alcoa. .................................................................................. 1

       B.   The Agreement's Relevant Indemnification Provisions. ................. 1

       C.   The Agreement's Indemnity Tax Credit Provision. ...................... 5

       D.   The Agreement's Dispute Resolution Provision. ......................... 5

III.   PROCEDURAL HISTORY .................................................................. 5

IV.    FAIRCHILD AGREED TO INDEMNIFY ALCOA FOR
       ENVIRONMENTAL, HEALTH AND SAFETY LIABILITIES THAT
       EXISTED AT THE TIME OF THE CLOSING ........................................ 6

       A.   The Agreement Was Negotiated By Sophisticated Parties. ............ 6

       B.   Alcoa Conducted Pre-closing Due Diligence into Environmental,
            Health and Safety Issues. ........................................................ 7

       C.   Fairchild Refused to Allow Alcoa to Conduct More Extensive Due
            Diligence Prior to the Closing. ................................................. 8

       D.   The Parties Agreed to an Indemnity for "Environmental, Health,
            Safety and Litigation" Liabilities. ............................................ 8

       E.   Alcoa Required Adequate Funds to be Available to Cover
            Fairchild's Indemnification Obligation. ..................................... 9

       F.   The Parties Agreed that the § 11.6 Indemnity Would Encompass
            Workplace Health and Safety Issues. ....................................... 10

            1.   The Agreement Clearly States that Fairchild Will
                 Indemnify Alcoa for Liabilities Based on "Environmental
                 Laws" as Defined by the Agreement. .............................. 10

2.      The Agreement Explicitly Defines "Environmental Law" to Include Laws Relating to "Workplace Health or Safety"...............10

3.      "Workplace Health or Safety" Has a Generally Accepted Meaning that Includes Matters Such as Machine Guarding, Lockout Tagout, Confined Space, and Fall Protection...................11

4.      During Negotiations, Alcoa Rejected Fairchild's Attempts to Limit the Scope of Workplace Health and Safety Liabilities Covered by the Indemnity. ............................12

5.      The Parties Clearly Understood the Meaning of Workplace Health and Safety. ........................................13

        a.      Ms. Holloway's conversations...........................13

        b.      The organization of both parties. ......................13

6.      The Purchase Price Adjustment Negotiation of June 11, 2002 Was Unrelated to the Environmental Indemnity. ................14

7.      The Parties Confirmed Their Understanding of the Indemnity Through Their Conduct. ...............................15

G.      The Parties Agreed that the §11.6(a) Indemnity Covered Investigations "In Respect of Any Fastener Environmental Condition"...............................................................16

1.      Before and After the Closing, Both Parties Demonstrated Their Understanding that Investigations Were Indemnifiable. ................................................17

        a.      Fairchild participated in the planning of the Phase II Investigations. ...................................17

        b.      Fairchild wrote to Alcoa that Phase II Investigation costs could be indemnifiable..............................18

        c.      Fairchild subsequently changed its position. ...................18

        d.      Alcoa has always operated under the understanding that investigations were covered........................18

2.      Investigations Are Necessary and Cost-effective Preliminary Steps in the Process of Environmental, Health and Safety Corrective Actions. ...................................19

ii

H.  Both Parties Were Aware that There Were Serious Problems at Many of the Fastener Facilities at the Time of the Acquisition.................20

V.  ALCOA SATISFIED THE AGREEMENT'S NOTICE AND COMMENT PROVISIONS ...........................................................................................21

A.  Fairchild Owned and Operated the Fastener Facilities Prior to Their Sale and Had Advance Notice of Many of the Contamination and Compliance Issues in Dispute. ...........................................21

B.  Alcoa Provided Fairchild With Advance Written Notice of Approximately 90% of Alcoa's Expenditures. ...........................................23

1.  Phase I Reports. ...........................................................23

2.  Phase II Reports. ...........................................................24

3.  Correspondence and Reports. ...........................................25

C.  Fairchild Was Otherwise on Notice of the Remaining 10% of Expenditures. ...........................................................................28

VI. FAIRCHILD'S ALTERNATIVE "PARTICIPATION" ARGUMENT IS A STRAWMAN: FAIRCHILD NEVER SOUGHT NOR INTENDED TO "PARTICIPATE" IN ALCOA'S ACTIONS...........................................................28

A.  Fairchild Denied Indemnification Responsibility for Projects that Fairchild Had Initiated or Planned During Its Ownership.....................28

B.  Fairchild Denied Indemnification Responsibility for Projects for Which Fairchild Had Set Aside Reserves....................................28

C.  Fairchild Denied Indemnification Responsibility for Projects that Were Specifically Mandated by Government Regulators. .....................29

D.  Fairchild Informed Alcoa that It Would Categorically Reject the Vast Majority of Alcoa's Projects.............................................30

E.  Fairchild's Limited Assumption of Litigation and Settlement Responsibilities for Matters Existing Before the Closing Are Irrelevant to this Dispute..............................................................30

F.  Fairchild Has Never Demonstrated Any Willingness to Evaluate Proposed Corrective Actions or Suggest Alternatives..............................31

iii

G.    Alcoa Is Obligated Under the Agreement to Act Promptly in
Addressing Environmental Liabilities and Accordingly Could Not
Wait to Take Action. .......................................................................... 32

VII.  ALCOA'S ACTIONS WERE COMMERCIALLY REASONABLE AND
RESULTED IN NO ADVERSE EFFECT TO FAIRCHILD'S
INDEMNIFICATION OBLIGATION ...................................................... 32

A.    Fairchild Presented No Evidence of Quantifiable Adverse Effect
Due to Any Purported Lack of Opportunity to Comment on
Alcoa's Proposed Responses. .................................................... 32

B.    Fairchild Offered No Evidence that Alcoa's Consultants Were Not
"Reasonably Acceptable", but Rather Attested to Their Good
Reputations. .................................................................................. 36

C.    Alcoa's Experts Systematically Determined that Alcoa's
Corrective Actions Were Performed in a Commercially
Reasonable Manner. ..................................................................... 36

D.    Alcoa Took Considerable Care to Ensure that Its Corrective
Actions Were Performed in a Cost-Effective Manner. ............... 37

1.    Alcoa Instructed Its Employees to Address Indemnifiable
Liabilities as Though Alcoa Would Bear the Costs. ...................... 37

2.    Alcoa Created a Unique System to Track Indemnifiable
Expenditures and Ensure They Were Appropriate. ...................... 37

3.    Alcoa Leveraged Master Service Agreements and
Competitive Bidding Practices. .................................................... 37

E.    There Was a Reasonable Basis to Conduct Phase II Investigations
at Fourteen of the Fastener Facilities. ......................................... 38

F.    The Phase II Investigations Were Performed in a Commercially
Reasonable Manner. ..................................................................... 40

G.    The Phase II Results Warranted Further Investigation at Ten
Facilities, and Those Investigations Were Performed in a
Commercially Reasonable Manner. .............................................. 41

1.    Fairchild Agreed that Further Investigation Should Be
Conducted. .................................................................................. 41

iv

2.    The French Regulatory Methodology Requires Progressive
      Investigative Steps. ....................................................................41

      a.    The results of the Phase II Investigations at four of
            the five French facilities warranted SRAs, which
            were performed in a commercially reasonable
            manner..............................................................................42

      b.    The results of the SRAs at three of the five French
            facilities warranted DRAs, which were performed
            in a commercially reasonable manner...............................42

      c.    Alcoa was able to achieve cost-effective monitoring
            resolutions at St. Cosme and Montbrison based on
            the results of the DRAs. ...................................................43

3.    The Phase II Results at the German Facilities Required
      Further Investigation and Sampling, Which Were
      Performed in a Commercially Reasonable Manner. ......................43

4.    The Phase II Results at the California Facilities Identified
      Contamination that Required Further Actions, Which Were
      Performed in a Commercially Reasonable Manner. ......................44

H.    Alcoa's Corrective Actions Concerning Contamination Have Been
      Performed in a Commercially Reasonable Manner. ................................46

I.    The Environmental, Health & Safety Compliance Actions Taken
      by Alcoa Were Performed to Bring the Facilities into Compliance
      with Applicable Regulations at Commercially Reasonable Costs............47

      1.    The Fastener Facilities Were out of Compliance with
            Environmental, Health and Safety Laws. ......................................47

      2.    Fairchild offered no evidence that Alcoa's compliance
            actions were performed in excess of legal requirements. .............48

      3.    Representative Measures Taken to Correct
            Noncompliances in a Commercially Reasonable Manner............50

            a.    Machine safety...................................................................50

            b.    Mobile equipment, electrical safety, fall protection,
                  combustion safety, etc.......................................................51

            c.    Additional noncompliances of note. ..................................52

J.      There Was a Reasonable Basis to Conduct All of the Compliance
        Assessments or Investigations that Alcoa Conducted. ..............................55

VIII.   ALCOA HAS SPENT A TOTAL OF $16,385,463.92 ON FASTENER
        ENVIRONMENTAL LIABILITIES THROUGH SEPTEMBER 30, 2006
        AND WILL HAVE TO SPEND MUCH MORE TO ACHIEVE HEALTH
        AND SAFETY COMPLIANCE AND ENVIRONMENTAL
        COMPLIANCE AND REMEDIATION ...............................................................56

IX.     FAIRCHILD IS ENTITLED TO A CREDIT OF € 200,081 AGAINST
        ITS INDEMNIFICATION OBLIGATIONS.........................................................57

ALCOA'S PROPOSED CONCLUSIONS OF LAW.........................................................58

## INDEX OF WITNESSES

The following is an alphabetical list of witnesses whose testimony was offered at the hearing or through deposition designations. Testimony of witnesses marked with an asterisk (*) was entered through a deposition designation.

| | |
|---|---|
| Robert Adams | Alcoa expert on health and safety in the United States |
| Philippe Barbier* | Operating Manager at BG Consulting |
| Ernesto Beckford* | Fairchild former Deputy General Counsel |
| James Boyt | Retired Alcoa Director of Environmental, Health & Safety services for North America |
| Jose Fernandez | Alcoa expert on environmental contamination in France |
| Jeffrey Flanzenbaum | Senior Project Manager at Environmental Resources Management Group ("ERM") |
| John Flynn | Fairchild former Chief Financial Officer |
| John George | Special Projects Manager, Alcoa corporate remediation group |
| Michel Guilhem | Alcoa expert on environmental compliance in France, and workplace health and safety compliance in France, Germany, Hungary and the United Kingdom |
| Susan Hall | Fairchild environmental counsel |
| Eric Hendrix* | Partner at Mission Geoscience |
| Michael Hodge | Fairchild former Assistant General Counsel |
| Cynthia Holloway | Alcoa Assistant Treasurer |
| Mark Jackson* | Alcoa Fastening Systems Director of Environmental, Health and Safety |
| Mark Katchen | Fairchild expert on health and safety in the United States |
| Jerome Lange | Fairchild expert on health and safety in France |

## INDEX OF WITNESSES

| | |
|---|---|
| John Lease | Alcoa Group Leader of Environmental Services |
| Lawrence McShea* | Program Manager, Alcoa corporate remediation group |
| Donald Miller | Fairchild General Counsel |
| John Millett* | Retired Director of Environmental, Health and Safety Services, Alcoa Europe |
| Peter Nugteren* | Environmental, Health and Safety Manager, Alcoa Fastening Systems, Europe |
| Robert Powell | Alcoa expert on environmental contamination in the United States, Germany, Portugal and Australia, and environmental compliance in the United States and Germany |
| Yves Rutschmann | Alcoa expert on French tax law |
| Robert Shofstall | Fairchild expert on environmental contamination and environmental compliance in France |
| Michael Wolff | Fairchild expert on environmental contamination in the United States |

# ALCOA'S PROPOSED FINDINGS OF FACT

## I.    THE PARTIES

1. Alcoa Inc. ("Alcoa") is a Pennsylvania corporation that produces aluminum and aluminum alloy products for a wide range of markets including the aerospace and automotive industries. (See AX 1; Holloway, Direct, Tr. 76:21 - 77:6.) Alcoa is a party to the Acquisition Agreement among Alcoa Inc., The Fairchild Corporation, Fairchild Holding Corp. and Sheepdog, Inc., dated July 16, 2002, and amended December 3, 2002 (the "Acquisition Agreement" or the "Agreement"). (AX 1 at 1.) Alcoa Inc. is the "Buyer" under that Agreement. (AX 1 at 1.)

2. The Fairchild Corporation ("Fairchild") is a Delaware corporation and a party to the Agreement. Fairchild is the "Parent" under the Agreement, and, collectively with certain subsidiaries including Fairchild Holding Corp. and Sheepdog, Inc., the "Sellers". (AX 1 at 1.) Fairchild Holding Corp., a Delaware corporation, is an indirect, wholly owned subsidiary of Fairchild. (AX 1 at 1.) Sheepdog, Inc., a Delaware corporation, is an indirect, wholly owned subsidiary of Fairchild. (AX 1 at 1.)

## II.    THE CONTRACT IN ISSUE

### A.    <u>Agreement for the Sale of the Fairchild Fasteners Business to Alcoa.</u>

3. On July 16, 2002, the parties entered into the Agreement whereby Fairchild sold its Fastener Business to Alcoa for more than $657 million. (See generally AX 1; id. § 1.30.) The Agreement was amended on December 3, 2002, when the transaction closed. (Holloway, Direct, Tr. 77:10-12; Lease, Direct, Tr. 837:12-19.)

    3.1 "Fastener Business" is defined in the Agreement as Fairchild's business in "(i) fasteners and fastening systems . . . (ii) fastener components, and (iii) latching devices . . . ." (AX 1 at 1.)

    3.2 The relevant Fastener Business facilities (the "Fastener Facilities") are in the following locations: <u>California</u>: City of Industry (Temple Avenue); City of Industry (Unruh Avenue); Fullerton; Simi Valley; Torrance. <u>Massachusetts</u>: Stoughton. <u>France</u>: Marignier; Montbrison; Roques sur Garonne ("Toulouse"); St. Cosme; Vougy. <u>Germany</u>: Kelkheim; Hildesheim. <u>Hungary</u>: Nemesvamos. <u>Portugal</u>: Guarda. <u>United Kingdom</u>: Bardon. <u>Australia</u>: Oakleigh.

### B.    <u>The Agreement's Relevant Indemnification Provisions.</u>

4. Section 11.2 of the Agreement provides that: "each of the sellers will jointly and severally indemnify, defend and hold harmless the Buyer, the Transferred Fastener Subsidiaries, the Buyer's other Affiliates and the respective directors, officers, employees, agents and representatives (including, without limitation, any predecessor or successor to any of the foregoing) from and against any and all Indemnifiable Losses relating to, resulting from or arising out of: . . . (iv) (A) subject to Section 11.6, the

Fastener Environmental Liabilities and (B) all litigation matters arising out of or resulting from the conduct of the Fastener Business prior to the Effective Time, including the litigation matters set forth on Schedule 3.16, in all cases for purposes of both clause (A) and (B) to the extent the amount of Damages thereof exceeds the amount of the reserve for environment, health, safety and litigation on the Closing Date Balance Sheet". (AX 1 § 11.2.)

4.1  The "Effective Time" is defined as the date of the acquisition's closing.  (AX 1 § 1.42.)

5.  Section 11.6(a) of the Agreement provides that: "from and after the Closing Date, each of the Sellers will jointly and severally indemnify, defend and hold harmless the Buyer, the Transferred Fastener Subsidiaries . . . from and against any and all Fastener Environmental Liabilities in excess of the amount of the reserve for environmental, health, safety and litigation on the Closing Date Balance Sheet, *provided*, that any claims for indemnification related to Discontinued Operations or Pre-Closing Off-Site Disposal Locations shall not be subject to any deductible for the amounts in the reserve for environmental, health, safety and litigation". (AX 1 § 11.6(a).)

5.1  "Fastener Environmental Liability" is defined by the Agreement in § 11.6(e)(iv) to include: "all losses, damages, charges, liabilities, costs, expenses, deficiencies, fines, penalties, claims, demands, actions, suits or proceedings, including reasonable attorneys' and consultants' fees and expenses in connection therewith, and expenses of investigation incurred by a Buyer Indemnified Party after the Effective Time based on any applicable Environmental Laws existing on the Closing Date in respect of any Fastener Environmental Condition; *provided* that with respect to Environmental Contamination at a Fastener Business Asset, applicable Environmental Law shall include the Remediation Standards in each relevant jurisdiction that would be applicable or acceptable to properties such as the Fastener Business Real Properties or the properties leased pursuant to the Fastener Business Leases, based on the use and location of such properties as of the Closing Date, such that the performance of Remedial Action on such properties if Environmental Contamination is discovered above such standards shall be subject to indemnification under this Section 11.6." (AX 1 § 11.6(e)(iv).)

5.1.1  Section 11.6(e)(iv) also provides that: "to the extent that the Buyer contributes to or exacerbates a Fastener Environmental Condition as a result of its actions or omissions, including, without limitation, its unreasonable failure to mitigate any violation or noncompliance with applicable Environmental Law, any material increase in losses, damages, charges, liabilities, costs or expenses resulting from said exacerbation or failure to mitigate shall not be a Fastener Environmental Liability". (AX 1 § 11.6(e)(iv).)

2

5.2 "Fastener Environmental Condition" is defined by the Agreement in § 11.6(e)(iii) to include: "any (A) Environmental Contamination or threatened Environmental Contamination arising out of any Release or threatened Release of Hazardous Materials arising out of the Fastener Business . . . , on-site (owned or leased) or at off-site, non-owned or non-leased locations that occurred on or prior to the Effective Time including, without limitation, at Pre-Closing Off-Site Disposal Locations; (B) Environmental Contamination at or migrating from the Fastener Business Assets prior to the Closing Date, whether or not such Environmental Contamination came into existence as a result of the Fastener Business or any other Person (including a predecessor owner or operator of the Fastener Business Assets); (C) any violation or alleged violation of, or noncompliance or alleged noncompliance with, applicable Environmental Law with respect to the Fastener Business that commenced prior to the Effective Time; or (D) any other circumstance or condition that occurred on or prior to the Effective Time that forms the basis for any Environmental Action against the Fastener Business or any Transferred Fastener Subsidiary (or any of their respective predecessors or successors)." (AX 1 § 11.6(e)(iii).)

5.3 "Environmental Law" is defined by the Agreement in §1.46, which incorporates by reference the definition of "Environmental Law" in § 3.24(g)(ii): "any Law of any Government entity, or any binding agreement with any Government entity, relating to (a) pollution or protection of the environment or natural resources, including, without limitation, those relating to cleanup, preservation or reclamation thereof, any Release or threatened Release of Hazardous Materials; or the presence, handling, use, manufacture, distribution, treatment, storage, disposal, or recycling of or exposure to Hazardous Materials, (b) workplace health or safety or (c) exposure of persons or property to Hazardous Materials". (AX 1 §§ 1.46, 3.24(g)(ii).)

5.4 "Law" is defined by the Agreement in § 1.88, which incorporates by reference the definition of "Law" in § 3.5: "any order, writ, injunction, decree, judgment, permit, license, ordinance, law, common law, statute, code, standard, requirement, rule or regulation". (AX 1 §§ 1.88, 3.5.)

5.4.1 The Agreement's definition of "Environmental Law", defined in §§ 1.46 and 3.24(g)(ii), incorporates the Agreement's definition of Law, defined in §§1.88 and 3.5. (Hall, Cross, Tr. 2886:3-12.)

5.5 Section 11.6(c) states: "From and after the closing, the Buyer will conduct and control all Remedial Action and negotiations with any Government entity in respect of all Fastener Environmental Conditions that are subject to indemnification pursuant to Section 11.6. Such Remedial Actions shall be performed in a commercially reasonable manner consistent

3

with the use of the Fastener Business Assets as of the Closing Date, including to the extent allowed or authorized by applicable Environmental Law or the Government agency with jurisdiction over a Remedial Action, the use of Remediation Standards that are applicable to such properties based on the use and location of such properties as of the Closing Date. The Buyer will make its environmental personnel and consultants reasonably available to the Sellers and the Sellers' Representative to discuss Fastener Environmental Conditions. The Buyer will provide the Sellers' Representative and the Sellers' environmental consultants with reasonable access to the properties of the Fastener Business and copies of all non-privileged information with respect to the Remedial Actions to be taken in respect of such Environmental Actions. The Buyer will select consultants and contractors to implement such Remedial Actions (who shall be reasonably acceptable to Parent) and will also provide the Sellers' Representative and its environmental consultants with copies of all reports, analytical data, correspondence, directives, orders and documents submitted to or received by the Buyer from any Government entity in connection with the Remedial Action and other non-privileged documents created or received by or on behalf of the Buyer in connection with the Remedial Action. The Buyer shall afford the Sellers a reasonable opportunity to comment on the Buyer's proposed response to a Fastener Environmental Condition, and the Buyer shall not unreasonably refuse to incorporate the Seller's comments". (AX 1 § 11.6(c).)

 5.5.1  "Remedial Action" is defined by the Agreement in § 11.6(e)(vi) as: "(a) 'remedial action' as such term is defined in CERCLA and its analogous state Laws, and (b) all other actions required by any Government entity: (i) to clean up, remove, treat, abate or in any other way address any Hazardous Materials in the environment; (ii) to prevent the Release or threat of Release or minimize the further Release of any Hazardous Materials so that it does not migrate or endanger or threaten to endanger public health, welfare or the environment, and (iii) to perform studies and investigations in connection with, or as a precondition to, clause (i) or (ii) above". (AX 1 § 11.6(e)(vi).)

 5.6  Section 11.6(d) states: "The Buyer shall inform any of the Sellers promptly in writing of any Fastener Environmental Condition or Environmental Action in respect of which the Sellers may have an indemnification obligation under this Section 11.6, provided, that the failure of the Buyer to so promptly inform any of the Sellers shall not affect the rights of the Buyer except to the extent that such failure to give prompt notice adversely affects the rights and obligations of any of the Sellers under this Section 11.6." (AX 1 § 11.6(d).)

4

C.     **The Agreement's Indemnity Tax Credit Provision.**

6. Section 11.8 states: "<u>Indemnity Tax Credit Amount</u>. The Sellers' indemnification obligations under Section 8.5 and this Article XI shall be credited by the net cumulative amount of (i) any Tax Benefits recognized by the Buyer (or its Affiliates) resulting from the actual utilization in any Tax period beginning after the Closing Date by the Buyer (or its Affiliates) of any French of German net operating loss of a Transferred Fastener Subsidiary organized in France or Germany (as the case may be) that the Buyer or its Affiliates carry forward from a Tax period ending on or before the Closing Date and that may no longer be subject to possible disallowance by any French or German Taxing authority minus (ii) any such Tax Benefit amounts that have previously been used to reduce any of the Sellers' indemnification obligations." (AX 1 § 11.8.)

6.1 "Tax Benefit" is defined by the Agreement in § 1.132 as: "the Tax savings attributable to any deduction, expense, loss, credit or refund to the indemnified party or its affiliates, when incurred or received; *provided, however*, that if such benefit is reasonably expected to arise or be utilized after the year in which indemnification occurs pursuant to this Agreement, then it means the present value of such Tax Savings (discounted using one year LIBOR (as published in the *The Wall Street Journal*) and a Tax rate equal to the sum of the highest marginal U.S. federal corporate income Tax rate or rates applicable to ordinary income or capital gain, as the case may be, in effect for the taxable period in issue plus five percent (or, in the case of a Transferred Fastener Subsidiary, the highest marginal corporate income Tax rate or rates in the country of organization of such Transferred Fastener Subsidiary applicable to ordinary income or capital gain, as the case may be, in effect for the taxable period in issue))". (AX 1 § 1.132.)

D.     **The Agreement's Dispute Resolution Provision.**

7. Section 11.7 sets forth the mediation and arbitration procedure for "Resolution of Indemnification Disputes". (AX 1 § 11.7.)

## III.     PROCEDURAL HISTORY

8. On June 27, 2003, approximately six months after the acquisition closed, Fairchild for the first time invoked § 11.7, the dispute resolution clause of the Agreement, in several letters to Alcoa. (AX 47 at FC 00097-98; AX 49 at FC 00095; AX 117 at FAIR50000072.)

9. In March 2005, Fairchild formally requested that the parties submit their dispute concerning Fairchild's rejection of Alcoa's claims for indemnification to mediation. (Claimant's Demand for Mediation, dated March 17, 2005, at 1.)

10. The parties engaged in mediation in July 2005, but were unable to resolve their dispute. (Claimant's Notice of Arbitration, dated July 20, 2005, at 2.)

5

11. On July 20, 2005, Fairchild demanded arbitration to resolve the parties' dispute. (Claimant's Notice of Arbitration, dated July 20, 2005.) On August 5, 2005, Alcoa submitted its Notice of Defense, Counterclaim and Relief Sought, seeking both payment of monies (plus interest) for past costs and a declaration as to future costs. (Resp't's Notice of Defense, Counterclaim and Relief Sought, dated Aug. 5, 2005.) On August 11, 2005, Fairchild submitted its Reply to Alcoa's Counterclaim. (Claimant's Reply to Alcoa's Counterclaim, dated Aug. 11, 2005.)

12. On December 28, 2006, the Arbitrator issued an Interim Decision on Alcoa's Motion for Partial Summary Judgment holding that investigations are indemnifiable under § 11.6 if there was a "reasonable basis" to conduct the investigation, and rejecting "Fairchild's argument that each investigation must be 'required by any Governmental entity'". (Interim Decision at 2.) The Arbitrator decided that the Interim Decision "will be incorporated into and made a part of the final Award". (Id. at 1.)

13. From January 8, 2007, through January 12, 2007, and from February 26, 2007, through March 1, 2007, an evidentiary hearing was held.

## IV. FAIRCHILD AGREED TO INDEMNIFY ALCOA FOR ENVIRONMENTAL, HEALTH AND SAFETY LIABILITIES THAT EXISTED AT THE TIME OF THE CLOSING

### A. The Agreement Was Negotiated By Sophisticated Parties.

14. The Agreement was the product of extensive negotiations between sophisticated parties, both of whom were represented by counsel. (Holloway, Direct, Tr. 78:3-17; Miller, Direct, Tr. 2322:17 - 2323:6; AX 150.)

    14.1 Environmental, Health and Safety ("EHS") professionals from both Alcoa and Fairchild were involved in the transaction. (Boyt, Direct, Tr. 247:2-24; Holloway, Direct, Tr. 78:19-25, 79:6-15.)

        14.1.1 Jim Boyt, Alcoa's Environmental, Health & Safety representative for the acquisition, assisted in the drafting of the definition of "Environmental Law" in § 3.24 of the Agreement. (Boyt, Direct, Tr. 260:23 - 261:15.)

    14.2 Cynthia Holloway, currently Alcoa's Assistant Treasurer, participated in nearly all of the negotiations as Alcoa's lead corporate development representative on the transaction. (Holloway, Direct, Tr. 77:20 - 78:8.)

        14.2.1 Ms. Holloway recorded contemporaneous notes of negotiation sessions with Fairchild and internal Alcoa discussions about the acquisition. (Holloway, Direct, Tr. 80:7-16, 82:5 - 83:4.)

        14.2.2 Ms. Holloway participated in negotiations concerning, *inter alia*, the substance of the §11.6 indemnity. (Holloway, Direct, Tr. 93:22 -

94:7, 101:2 - 102:15, 112:24 - 113:9, 113:20 - 116:4.); the definition of "Environmental Law" (Holloway, Direct, Tr. 118:10 - 121:23; see also AX 10 at FAIR50025562.); and the indemnity tax credit provision. (Holloway, Direct, Tr. 133:20 - 134:17.)

14.3 The lead negotiators for Fairchild were Jeffrey Steiner, Chairman and Chief Executive Officer, and Eric Steiner, President and Chief Operating Officer, neither of whom testified at the evidentiary hearing. (Holloway, Direct, Tr. 79:6-22; see also Flynn, Direct, Tr. 2026:22 - 2027:9.)

14.4 Donald Miller, Fairchild's General Counsel, testified at his deposition that he did not recall participating in any conversations with Alcoa concerning the Agreement's definition of "Environmental Law", but testified at the hearing that he did participate in such discussions. (Miller, Cross, Tr. 2401:16 - 2402:14.)

14.4.1 Mr. Miller testified that there were negotiation sessions with Alcoa that he did not attend either in person or by phone. (Miller, Direct, Tr. 2323:3-8.)

15. John Flynn, Fairchild's Chief Financial Officer at the time of the acquisition, did not participate in the negotiation or drafting of the definition of "Environmental Law". (Flynn, Cross, Tr. 2091:5 - 2092:4, 2092:20 - 2093:3.)

**B.    Alcoa Conducted Pre-closing Due Diligence into Environmental, Health and Safety Issues.**

16. As part of its due diligence for the acquisition, Alcoa engaged a consultant, Environmental Resources Management ("ERM"), to review documents concerning the Fastener Business that Fairchild made available in a data room. (Flanzenbaum, Direct, Tr. 350:21 - 351:9, 352:17 - 354:3.) ERM was instructed to look for documents that raised environmental, health and safety concerns about the Fastener facilities. (Id. at 352:17 - 354:3.)

17. Due to the concerns raised by the data room documents, Alcoa engaged ERM to conduct Phase I investigations and Limited Compliance Reviews at sixteen of the Fairchild Fastener facilities. (Flanzenbaum, Direct, Tr. 354:4 - 356:15, 358:4-12; Boyt, Direct, Tr. 254:8 - 256:18; Bulk AX A.)

17.1 The Phase I Investigations and Limited Compliance Reviews consisted primarily of site visits and the review of documents concerning each facility in order to identify evidence of contamination or instances of material noncompliance with environmental, health and safety laws. (Flanzenbaum, Direct, Tr. 355:8 - 356:15, 360:2 - 361:13; see Bulk AX A.)

17.2 The findings of the Phase I Investigations and Limited Compliance Reviews fall into three categories: (1) compliance related to

7

health or safety; (2) compliance related to environmental issues; and (3) known or threatened environmental contamination issues. (Flanzenbaum, Direct, Tr. 367:3-14; see Bulk AX A.)

### C. Fairchild Refused to Allow Alcoa to Conduct More Extensive Due Diligence Prior to the Closing.

18. The Phase I Investigations and Limited Compliance Reviews identified numerous environmental, health and safety concerns at the Fastener facilities ranging from amputations due to a lack of required machine guarding, to failure to conduct required air monitoring, to contamination of the soil and groundwater by known carcinogens. (Bulk AX A; AX 123; Flanzenbaum, Direct, Tr. 367:15 - 371:18; Boyt, Direct, Tr. 256:2-18.)

18.1 Mr. Boyt testified about the California sites he visited during the Phase I investigations: "[i]t was clear there were some major risks there we had to be concerned about. There was some of the environmental issues chlorinated organics issue, some safety issues as far as machine guarding lock out tag out. There was some concern about health issue there was some strontium, chromate and some chromic acid and some other issues I was concerned about, as well as dust and noise from the health issue". (Boyt, Direct, Tr. 255:24 - 256:15.)

19. Based on the Phase I findings, Alcoa sought to conduct Phase II investigations at fourteen of the sixteen Fastener facilities prior to the closing. (Holloway, Direct, Tr. 87:25 - 88:9; Flanzenbaum, Direct, Tr. 370:23 - 371:18; see also Boyt, Direct, Tr. 270:20 - 271:14.)

19.1 "Phase II" investigations are intrusive investigations of soil, groundwater and surface water. (Powell, Direct, Tr. 1226:10 - 1227:23; see also Beckford Dep. Tr. 21:17 - 22:1; AX 124.)

19.2 Fairchild did not allow Alcoa to perform Phase II investigations prior to the closing. (Holloway, Direct, Tr. 87:25 - 89:21.) Fairchild was concerned that Alcoa might not close on the transaction after seeing the results of the Phase II investigations. (See Holloway, Direct, Tr. 88:15 - 89:21; AX 4 at FAIR50025600.)

19.2.1 Fairchild's refusal to allow Alcoa to perform Phase II investigations prior to the closing is reflected in §5.3 of the Agreement, which provides that Alcoa "shall not undertake any environmental testing or sampling prior to the Closing Date". (AX 1 § 5.3.)

### D. The Parties Agreed to an Indemnity for "Environmental, Health, Safety and Litigation" Liabilities.

20. In light of the foregoing, the parties agreed that Fairchild would indemnify Alcoa for the cost of investigating and remedying environmental contamination and

8

bringing the Fastener Facilities into compliance with environmental and workplace health and safety laws. (AX 1 §§11.2(a)(iv), 11.6; Holloway, Direct, Tr. 93:22 - 94:7; Hodge, Direct, Tr. 2124:9 - 2125:4; Millett Dep. Tr. 27:18 - 28:9.)

  20.1  Specifically, the parties agreed that Fairchild would indemnify Alcoa for any such costs in excess of an $8.45 million reserve for "environmental, health, safety and litigation" that existed on Fairchild's books at the time of the acquisition and that Alcoa agreed to assume. (AX 1 §11.6(a); AX 7 at FAIR50025598; Holloway, Direct, Tr. 94:10-20, 104:3-11, 113:20 - 114:6; Miller, Direct, Tr. 2356:22 - 2357:15; Flynn, Cross, Tr. 2096:11 - 2097:19.)

  20.1.1  Alcoa requested detailed information concerning items reflected in Fairchild's reserve, but Fairchild declined to provide to Alcoa such information or to explain to Alcoa how it had calculated the reserve. (Holloway, Direct, Tr. 96:23 - 97:13; Boyt, Direct, Tr. 266:8 - 267:6.)

  20.2  At the time, Alcoa estimated that Fairchild's indemnification obligation for environmental, health and safety issues would total between $20 million and $80 million, with a most probable estimate of approximately $40 million.  (Boyt, Direct, Tr. 267:7-17.)

**E.** **Alcoa Required Adequate Funds to be Available to Cover Fairchild's Indemnification Obligation.**

21.  To ensure that funds would be available for Fairchild to honor its indemnification obligation, Alcoa requested, *inter alia*, the creation of an escrow account into which ten percent of the purchase price, or approximately $65 million, would be placed. (AX 7 at FAIR50025593, FAIR50025597; Holloway Direct, Tr. 94:21 - 95:8, 129:12 - 129:25; Boyt, Direct, Tr. 269:2 - 270:4.)

  21.1  The parties agreed upon an escrow of $25 million.  (AX 1 §2.4; AX 247 at Preamble and § 4; Holloway, Direct, Tr. 94:21 - 95:8.)

  21.2  The parties agreed that if the escrow balance were to fall below $25 million at the end of any calendar year during the first five years after the closing, and Alcoa were to owe an Earn-Out payment to Fairchild for that calendar year pursuant to § 2.8 of the Agreement, then Alcoa would deposit into the escrow account the amount of the escrow shortfall from that Earn-Out payment. (AX 247 § 5; see also AX 1 § 2.8.)

  21.3  The parties agreed that Fairchild is obligated to pay Alcoa directly for any §11.6 indemnification claims in excess of the funds available in the escrow account.  (AX 247 § 4(b)(iv); Holloway, Direct, Tr. 95:9 - 96:12, 112:24 - 113:9; Flynn, Cross, Tr. 2093:4 - 2095:14.)

  21.4  To ensure that funds would be available for Fairchild to honor its indemnification obligations above the $25 million in the escrow account,

Alcoa requested, and Fairchild agreed that, for five years after the closing of the transaction:  (1) Fairchild must maintain its corporate existence, (2) Fairchild must not pay dividends, and (3) Fairchild must not liquidate, dissolve or wind up.  (AX 1 § 5.21; AX 7 at FAIR50025599; Holloway, Direct, Tr. 95:19 - 96:12, 132:19 - 133:11.)

F.    **The Parties Agreed that the § 11.6 Indemnity Would Encompass Workplace Health and Safety Issues.**

22.  The Acquisition Agreement provides that Fairchild will indemnify Alcoa for the cost of bringing the Fastener facilities into compliance with laws relating to "workplace health or safety".  (AX 1 §§ 11.6(a), (e)(iv), 3.24(g)(ii)(b).)

1.    **The Agreement Clearly States that Fairchild Will Indemnify Alcoa for Liabilities Based on "Environmental Laws" as Defined by the Agreement.**

22.1  Section 11.6(a) of the Agreement provides that Fairchild will indemnify Alcoa "from and against any and all Fastener Environmental Liabilities in excess of the amount of the reserve for environmental, health, safety and litigation on the Closing Date Balance Sheet".  (AX 1 § 11.6(a).)

22.1.1  Section 11.6(e)(iv) defines "Fastener Environmental Liability" to include "all losses, damages, charges, liabilities, costs, expenses, deficiencies, fines, penalties, claims, demands, actions, suits or proceedings, including reasonable attorneys' and consultants' fees and expenses in connection therewith, and expenses of investigation incurred by [Alcoa] after the Effective Time based on any applicable Environmental Laws existing on the Closing Date in respect of any Fastener Environmental Condition".  (AX 1 § 11.6(e)(iv).)

22.1.2  Section 11.6(e)(iii)(C) defines "Fastener Environmental Condition" to include "any violation or alleged violation of, or noncompliance or alleged noncompliance with, applicable Environmental Law with respect to the Fastener Business that commenced prior to the Effective Time".  (AX 1 § 11.6(e)(iii)(B).)

2.    **The Agreement Explicitly Defines "Environmental Law" to Include Laws Relating to "Workplace Health or Safety".**

22.2  Section 1.46 defines "Environmental Law" to have the meaning set forth in Section 3.24(g)(ii).  (AX 1, §1.46.)

22.3  Section 3.24(g)(ii) defines "Environmental Law" as "any Law of any Government entity, or any binding agreement with any Government entity, relating to (a) pollution or protection of the environment or natural resources, including, without limitation, those relating to cleanup, preservation or reclamation thereof, any Release or threatened Release of

10

Hazardous Materials; or the presence, handling, use, manufacture, distribution, treatment, storage, disposal, or recycling of or exposure to Hazardous Materials, (b) workplace health or safety or (c) exposure of persons or property to Hazardous Materials". (AX 1 § 3.24(g)(ii).)

22.4  Section 1.88 defines "Law" to have the meaning set forth in Section 3.5. (AX 1 §1.88.) Section 3.5 defines "Law" as "any order, writ, injunction, decree, judgment, permit, license, ordinance, law, common law, statute, code, standard, requirement, rule or regulation". (AX 1 § 3.5.)

### 3.  "Workplace Health or Safety" Has a Generally Accepted Meaning that Includes Matters Such as Machine Guarding, Lockout Tagout, Confined Space, and Fall Protection.

22.5  The term "workplace health or safety" has a generally accepted meaning that includes a variety of matters concerning the protection of workers. Such matters may be regulated by federal agencies such as the Occupational Safety and Health Administration ("OSHA"), as well as by comparable state and foreign agencies. (Adams, Direct, Tr. 1571:24 - 1572:12; Guilhem, Direct, Tr. 1699:17 - 1700:6; Lange, Cross, Tr. 3014:10 - 3015:7; Katchen, Cross, Tr. 3171:8-15.)

22.5.1  Robert Adams, a U.S. workplace health and safety expert employed by ENVIRON International Corp. ("ENVIRON"), testified that he had "never heard" the term "workplace health or safety" used in such a way as "to exclude things such as machine guarding" or to be limited to laws "dealing with pollution or environmental contamination". (Adams, Direct, Tr. 1572:13-17, 1580:14-20.)

22.5.2  Michel Guilhem, a European workplace health and safety expert employed by ENVIRON International Corp., testified that workplace health and safety includes matters such as machine guarding, lockout tagout, confined space protection and fall protection. (Guilhem, Direct, Tr. 1699:17 - 1700:6.)

22.5.3  Fairchild's Michael Hodge testified that he also understood "health and safety" matters to refer to those regulated by OSHA, including machine guarding and equipment retrofitting. (Hodge, Cross, Tr. 2220:23-25, 2231:20 - 2232:9.)

22.5.4  Jerome Lange, Fairchild's expert on workplace health and safety in France, agreed that workplace health and safety includes issues such as machine guarding. (Lange, Cross, Tr. 3014:22 - 3015:7.)

22.5.5  Mark Katchen, Fairchild's expert on workplace health and safety in the United States, agreed that workplace health and safety encompasses "mechanical safety issues throughout the workplace". (Katchen, Cross, Tr. 3171:8-15.)

4.     **During Negotiations, Alcoa Rejected Fairchild's Attempts to Limit the Scope of Workplace Health and Safety Liabilities Covered by the Indemnity.**

23.  Fairchild and Alcoa negotiated extensively over the definition of "Environmental Law" that was included in the Acquisition Agreement.  (Miller, Cross, Tr. 2377:4-8; see, e.g., AX 150 at 34-35.)

23.1  On May 6, 2002, Fairchild's transaction counsel proposed rewriting the definition of "Environmental Law" to strike subsection 3.24(g)(ii)(b).  (AX 150 at 34-35; Miller, Cross, Tr. 2395:20 - 2396:2.)

23.1.1  Under Fairchild's May 6, 2002, proposal, "workplace health or safety" would have been excluded from the definition of "Environmental Law", which would have been limited to laws relating to "pollution or protection of the environment or natural resources, including without limitation, any Release or threatened Release, handling, use, manufacture, distribution, treatment, storage, disposal, or recycling of or exposure to, Hazardous Materials".  (AX 150 at 35.)

23.1.2  Alcoa rejected Fairchild's proposal to exclude "workplace health or safety" from the definition of "Environmental Law".  (Miller, Cross, Tr. 2396:3-7.)

23.2  On May 24, 2002, Fairchild proposed rewording the definition of "Environmental Law" as a single sentence, without separately lettered subsections separated by commas and the disjunctive "or".  (AX 151 at 50.)

23.2.1  Fairchild's proposal would have defined "Environmental Law" to include laws "relating to the pollution or protection of the environment or natural resources, including without limitation, workplace health or safety; or any Release or threatened Release of Hazardous Materials, or the presence, handling, use, manufacture, distribution, treatment, storage, disposal, or recycling of or exposure to Hazardous Materials".  (AX 151 at 50; Miller, Cross, Tr. 2398:2-10.)

23.2.2  Under Fairchild's May 24, 2002, proposal, the scope of the "workplace health or safety" laws included in the definition of "Environmental Law" would have been limited to those "workplace health or safety" laws related to "pollution or protection of the environment or natural resources".  (AX 151 at 50; Miller, Cross, Tr. 2398:11-19.)

23.2.3  Alcoa rejected Fairchild's second proposal to limit the scope of the "workplace health or safety" laws included in the Agreement's definition of "Environmental Law".  (Miller, Cross, Tr. 2398:20-23.)

12

5.    **The Parties Clearly Understood the Meaning of Workplace Health and Safety.**

24.  Ms. Holloway testified that the Fairchild indemnity was intended to encompass typical workplace health and safety issues such as those related to machine safety. (Holloway, Direct, Tr. 92:11-17, 99:2-18, 119:6 - 121:23; Holloway, Redirect, Tr. 235:14-22; see also Boyt, Direct, Tr. 260:2 - 262:10.)

a.    **Ms. Holloway's conversations.**

24.1  Ms. Holloway's notes of an April 30, 2002, contract "drafting call" with Alcoa's transaction counsel include a list of items under the heading "Health" that are "included in section 3.24(2) def. of environmental law". (AX 10 at FAIR 50025562.)

24.2  That list includes "OSHA regs" and "lockout tagout" as items encompassed within the "section 3.24(2) def. of environmental law". (AX 10 at FAIR 50025562.)

24.2.1  "Lockout tagout" refers to machine-specific devices and procedures designed to ensure that machines are properly shut down and cannot be restarted accidentally during maintenance or other operations. (Adams, Direct, Tr. 1609:11-1610:21.)

24.3  Ms. Holloway's notes include multiple references to "EHS". (AX 5 at FAIR50025584-85, FAIR50025587-89; AX 9.)

24.4  The term "EHS" was used by both Alcoa and Fairchild during the negotiations, including by Jeffrey Steiner of Fairchild.  (Holloway, Direct, Tr. 84:24 - 85:10, 93:22 - 94:7.)

24.5  Ms. Holloway testified that she did not understand "EHS" to be limited to environmental issues, but rather to encompass health and safety issues such as machine guarding. (Holloway, Direct, Tr. 84:6-23, 99:2-18, 108:4-14.)

24.6  Ms. Holloway's June 7, 2002, notes state: "Most probable EHS: $6.7 mln [without] TCE.  maybe a bit low for machine guarding". (AX 5 at FAIR50025584.)

b.    **The organization of both parties.**

24.7  Prior to the closing, Fairchild and Alcoa both had corporate EHS organizations that handled environmental as well as workplace health and safety issues, such as machine guarding. (Lease, Direct, Tr. 839:2 - 844:10; AX 101 at FC 09443.)

13

24.7.1  In September 2002, prior to the closing, Fairchild's EHS Director for the United States, Anthony Miremadi, delivered an "EHS Integration" presentation to several Alcoa representatives outlining Fairchild's "EHS Management Approach" and what Fairchild described as "Key EHS Initiatives and Issues".  (AX 101.)

24.7.1.1  Mr. Miremadi was known as Fairchild's U.S. "Environmental, Health & Safety Director" well before the acquisition.  (AX 244 at FAIR50008341.)

24.7.2  Mr. Miremadi oversaw a staff that had environmental and health and safety responsibilities.  (AX 101 at FC 09443.)

24.7.2.1  Fairchild's internal EHS organization was structured to distinguish between environmental issues, health issues and safety issues.  (Lease, Direct, Tr. 845:15 - 846:23; AX 101 at FC 09451-53.)

24.7.2.2  Fairchild identified "[p]erchloroethylene replacement at Fullerton - Material / Equip. substitution" and "Pollution Control" as among the "Key EHS Initiatives and Issues" in the "Environmental" category.  (AX 101 at FC 09453; Lease, Direct, Tr. 846:9-23; Hodge, Cross, Tr. 2231:7-19.)

24.7.2.3  Fairchild identified "[m]achine guarding" and "[e]quipment retrofitting" as among the "Key EHS Initiatives and Issues" in the "Safety" category. (AX 101 at FC 094451; Lease, Direct, Tr. 845:15 - 846:3; Hodge, Cross, Tr. 2231:20-2232:9.)

6.    **The Purchase Price Adjustment Negotiation of June 11, 2002 Was Unrelated to the Environmental Indemnity.**

25.  Ms. Holloway participated in negotiations on June 11, 2002, concerning Alcoa's request for an adjustment to the purchase price of the Fastener Business. (Holloway, Direct, Tr. 122:22 - 124:16; see also AX 7 at FAIR50025593-99.)

25.1  Mr. Miller initially testified that he attended the June 11, 2002, meeting, but later conceded that he did not participate in this meeting. (Miller, Cross, Tr. 2453:24 - 2454:2, 2455:23 - 2456:17.)

25.2  Fairchild has not produced any notes from Mr. Miller concerning negotiations on June 11, 2002.  (Miller, Cross, Tr. 2450:5-14.)

25.3  Mr. Miller testified that he did not conduct negotiations concerning "purchase price issues which were handled directly by Jeffrey Steiner".  (Miller, Direct, Tr. 2321:11-17; see also AX 7; Holloway, Direct, Tr. 123:7-25, 128:23 - 129:5.)  Fairchild did not call Mr. Steiner as a witness at the evidentiary hearing.

14

26.  The purchase price reduction Alcoa sought was unrelated to environmental, health or safety issues because those liabilities were covered by the §11.6(a) indemnity. (Holloway, Direct, Tr. 127:5 - 131:21.)

> 26.1  Ms. Holloway's contemporaneous notes from the June 11, 2002, negotiations list the following items under the heading for "Price Adj.": "401K, IT, French"; "Performance"; "Inventory"; "WComp" and "Cash". (AX 7 at FAIR50025593; see also Holloway, Direct, Tr. 123:10 - 127:9.)  By contrast, a reference to "environmental" and the reserve for environmental, health, safety and litigation is listed under a separate heading titled "Indemnification /Escrow/Contingency".  (AX 7 at FAIR50025593.)

> 26.2  Three pages later in those notes, the following items are once again listed under the heading of "Price Adjustments": "Adjustments 401(K)"; "Performance"; "Workers Comp" and "Inventory".  (Id. at FAIR50025596.)  No EHS item of any kind is listed anywhere on this page. (Id.; see also Holloway, Direct, Tr. 127:5 - 129:11.)

### 7.  The Parties Confirmed Their Understanding of the Indemnity Through Their Conduct.

27.  Prior to the acquisition, Alcoa's EHS personnel understood that the Agreement provided for Alcoa to be indemnified for the cost of bringing the Fastener facilities into compliance with workplace health and safety laws, including laws covering machine guarding.  (Boyt, Direct, Tr. 260:2-22, 260:24 - 264:16; Ford Dep. Tr. 20:9 - 21:10; AX 92; Cl.'s Ex. 31.)

> 27.1  Alcoa presented contemporaneous documentary evidence demonstrating that its personnel understood that the indemnity provision was to cover workplace health and safety issues such as machine guarding. (See, e.g., Cl.'s Ex. 31 (dated one month prior to closing).)

> 27.2  Fairchild did not present any contemporaneous documentary evidence showing that its personnel considered items like machine guarding to be excluded from the indemnity.

28.  Since the acquisition, Alcoa's EHS personnel have understood the Agreement to provide that Alcoa is to be indemnified for the cost of bringing the Fastener facilities into compliance with workplace health and safety laws. (Jackson Dep. Tr. 15:7-18.)

> 28.1  Shortly after the closing, Alcoa's Designated Representative to Fairchild, John Lease, sent Fairchild five letters identifying "EHS Non-Compliance Issues and Estimated Corrective Action Costs" at the St. Cosme, Toulouse, Torrance and Fullerton facilities.  (See AX 39; AX 43; AX 46; AX 48; AX 113.)

15

28.1.1  Those letters listed a variety of workplace health and safety issues for which Alcoa sought indemnification, including machine guarding, lockout tagout, fall protection and mobile equipment safety. The letters also included regulatory citations and descriptions of each item, along with a description of Alcoa's proposed response to the condition identified.  (AX 39 at FC 00170; AX 46 at FC 00134-36; AX 48 at FC 00140; AX 113 at FAIR 50000070-71.)

28.1.2  Mr. Miller responded to each of Alcoa's letters by requesting more information, including "background documentation supporting the items and estimated costs summarized in the table". (AX 40 at FC 00168; AX 47; AX 49; AX 117; AX 144.)

28.1.3  Mr. Miller did not respond that these workplace health and safety issues were not indemnifiable.  (AX 40; AX 47; AX 49; AX 117; AX 144.)

28.1.4  Not until January 2005, did Fairchild reject Alcoa's machine guarding claims on the basis that its indemnification obligation was purportedly limited to claims that were somehow "environmental" in nature.  (Cl.'s Ex. 463; Hall, Cross, Tr. 2846:2 - 2848:18.)

28.1.4.1  That January 2005 rejection letter was written by Susan Hall, a lawyer who joined Fairchild more than two years after the acquisition. (Cl.'s Ex. 463; Hall, Direct, Tr. 2734:10-24.)

**G.    The Parties Agreed that the §11.6(a) Indemnity Covered Investigations "In Respect of Any Fastener Environmental Condition".**

29.  § 11.6(e)(iv) defines Fastener Environmental Liabilities to include "expenses of investigation incurred by a Buyer Indemnified Party after the Effective Time based on any applicable Environmental Laws existing on the Closing Date in respect of any Fastener Environmental Condition".  (AX 1 § 11.6(e)(iv).)

29.1  On December 28, 2006, the Arbitrator decided that investigations are indemnifiable under § 11.6 if there was a "reasonable basis" to conduct the investigation. (Interim Decision at 2.)  The Arbitrator rejected "Fairchild's argument that each investigation must be 'required by any Governmental entity'".  (Id.)

30.  Ms. Holloway, Mr. Boyt and Mr. Lease all testified that the parties agreed that the §11.6 indemnity covered investigations conducted after the closing.  (Holloway, Cross, Tr. 153:5 - 154:2; Boyt, Cross, Tr. 300:20-25; Lease, Direct, Tr. 898:18-25.)

30.1  The parties agreed that Fairchild would indemnify Alcoa for the Phase II investigations.  (Holloway, Direct, Tr. 101:2-10; Holloway,

16

Cross, Tr. 153:5-15; Boyt, Redirect, Tr. 334:16-21, 335:19-23; Lease, Direct, Tr. 849:3-7.)

30.2  The parties agreed that Fairchild would indemnify Alcoa for the cost of investigations regardless of whether the investigations uncovered evidence of actual contamination or actual violations of environmental law.  (Holloway, Direct, Tr. 114:7 - 115:11; Lease, Direct, Tr. 898:18-25.)

30.3  The parties agreed that Fairchild would indemnify Alcoa for the cost of investigations regardless of whether the investigations were specifically mandated by a government order.  (Holloway, Direct, Tr. 115:12 - 116:4.)

30.3.1  Ms. Holloway testified that she never would have agreed to an indemnity that only covered investigative or corrective actions that were the subject of a specific government writ or order, as Alcoa could not operate ethically without addressing unsafe conditions.  (Holloway, Direct, Tr. 115:4 - 115:22.)

31.  In its disclosure to its auditors of existing environmental liabilities at the Fastener Facilities as of June 30, 2002, Fairchild included the cost of investigations. (AX 143 at FC 03567; Hodge, Direct, 2235:16-17, 2240:10 - 2241:4.)

1.    **Before and After the Closing, Both Parties Demonstrated Their Understanding that Investigations Were Indemnifiable.**

a.    **Fairchild participated in the planning of the Phase II Investigations.**

32.  Michael Hodge, Fairchild's first Designated Representative to Alcoa under the Agreement, participated in the planning of the Phase II investigations.  (Cl.'s Ex. 440; Hodge, Direct, Tr. 2186:23 - 2187:13; Hodge, Cross, Tr. 2286:16 - 2287:21; Flanzenbaum, Direct, Tr. 388:2-12; see also AX 100.)

32.1  Alcoa provided the Scopes of Work for the Phase II investigations to Fairchild in October of 2002.  (Lease, Direct, 848:6-17; AX 34.)

32.2  Mr. Hodge traveled to Pittsburgh, Pennsylvania to participate in a November 8, 2002, meeting concerning the Phase IIs with Alcoa and ERM, the consultants conducting the investigations.  (Hodge, Direct, Tr. 2186:23 - 2187:10; Flanzenbaum, Direct, Tr. 388:2-12; see also Bulk AX E.)

32.2.1  Minutes of an internal Alcoa discussion immediately prior to the November 8, 2002, meeting with Mr. Hodge state: "Expense of the

17

investigations can be charged against the $8.45 MM Escrow". (AX 22 at FAIR 00094573.)

32.3  Fairchild engaged a consultant, URS, to review at least one of the Phase II Scopes of Work. (AX 22 at FAIR 00094574.)

**b.     Fairchild wrote to Alcoa that Phase II Investigation costs could be indemnifiable.**

33.  In response to Alcoa's claims for indemnification of the Phase II investigation costs, Ernesto Beckford, Fairchild's Deputy General Counsel at the time of the transaction, sent a letter to Alcoa on December 1, 2003, stating that it "may be appropriate for Alcoa to seek reimbursement" for certain Phase II investigation costs. (AX 158 at FC00053; Beckford Dep. Tr. 6:22 - 7:4.)

34.  Almost three months later, on February 26, 2004, Mr. Beckford sent another letter to Alcoa, attaching a chart identifying which portions of the Phase II investigations Fairchild believed "could be subject to indemnification". (AX 32 at FC00296-306.) This chart included a "Y" next to the particular portions of the investigations Fairchild believed "may be appropriate for indemnification". (AX 32 at FC00299.) Mr. Hodge assisted in the preparation of this chart. (Hodge, Direct, Tr. 2206:14-16.)

34.1  The letter also stated that <u>further</u> investigation should be conducted at Torrance, Fullerton, Montbrison, St. Cosme, and Vougy. (AX 32 at 296-306.)

**c.     Fairchild subsequently changed its position.**

35.  Fairchild did not contend that investigations are not covered by the indemnity until more than two years after the acquisition's closing, in a February 25, 2005, letter from Susan Hall, a lawyer who joined Fairchild approximately two years after the acquisition closed. (AX 103 at FC00340-41; Hodge, Cross, Tr. 2285:12 - 2286:15; Hall, Direct, Tr. 2734:18-24.)

35.1  Ms. Hall testified that her contract interpretation is at odds with the understanding of her predecessors who were employed by Fairchild during the negotiation of the Agreement. (Hall, Direct, Tr. 2779:12 - 2780:3; Hall, Cross, Tr. 2829:9 - 2832:17.)

**d.     Alcoa has always operated under the understanding that investigations were covered.**

36.  Shortly after the acquisition, John George, a member of Alcoa's corporate remediation group, was informed by his colleagues familiar with the Agreement that investigations were covered by the indemnity regardless of whether they discovered contamination requiring remediation. (George, Cross, Tr. 701:4-22.)

37. The first invoices that Alcoa submitted to Fairchild for indemnification covered the cost of Phase II investigations. (Bulk AX C 00000061-70.)

37.1 Alcoa has only sought indemnification for investigative costs incurred after the closing. (See Bulk AX C 00023995-00024006.)

2.   **Investigations Are Necessary and Cost-effective Preliminary Steps in the Process of Environmental, Health and Safety Corrective Actions.**

37.2 In order to address contamination, environmental professionals must first engage in investigations to identify and delineate the contamination. (Powell, Direct, Tr. 1231:19 - 1232:11, 1234:21 - 1235:21; Flanzenbaum, Direct, Tr. 372:16 - 373:16; Flanzenbaum, Redirect, Tr. 501:8 - 503:2, 528:16 - 529:3; Hendrix, Dep. Tr. 46:10-12, 51:23 - 52:16.)

37.2.1 Mr. Beckford testified that it was his understanding that a Phase I investigation is conducted "to determine whether there is any evidence that there might be some Environmental contamination, and after that you need a Phase II to determine what it is and what needs to be done". (Beckford, Dep. Tr. 21:2-11.)

37.2.2 The French regulatory methodology for addressing contamination includes progressive investigative steps, including, *inter alia*, an initial diagnostic investigation, a Simplified Risk Assessment, a detailed site investigation and a Detailed Risk Assessment. (Fernandez, Direct, Tr. 1520:8 - 1522:21; George, Direct, Tr. 596:9 - 599:6; e.g., AX 13 at 29-33.)

37.2.3 Investigations to delineate the character and extent of contamination can save millions of dollars by preventing unnecessary remediation costs. (See George, Direct, Tr. 611:9 - 612:18; Fernandez, Direct, Tr. 1537:8-20.)

37.3 Investigations, including compliance and risk assessments, are a necessary part of the process of bringing machine safety measures into compliance. (Adams, Direct, Tr. 1679:18 - 1680:15; Flanzenbaum, Direct, Tr. 371:19 - 372:7; Flanzenbaum Redirect, Tr. 500:6-22.)

37.3.1 Fairchild's witness on workplace health and safety in France, Jerome Lange, testified that it is "mandatory" in France to perform risk assessments for health and safety issues. (Lange, Cross, Tr. 3044:2-13.)

37.4 Mr. Guilhem testified with regard to health and safety compliance assessments: "It is impossible to get anywhere in terms of action taken without having this type of assessment performed which could

19

be a second step after the Phase I assessments." (Guilhem, Direct, Tr. 1726:18 - 1727:7.)

**H.**    **Both Parties Were Aware that There Were Serious Problems at Many of the Fastener Facilities at the Time of the Acquisition.**

38.    Prior to the acquisition, Fairchild maintained an accounting reserve of $8.45 million for "environmental, health, safety and litigation" liabilities at the Fastener Facilities. (AX 1 § 11.6(a); Flynn, Cross, Tr. 2096:11 - 2097:19.)

39.    Prior to the closing of the acquisition, Mr. Hodge drafted a letter to Fairchild's auditors, Ernst & Young, dated August 29, 2002, describing environmental material loss contingencies exceeding $250,000, individually, as of June 30, 2002. (AX 143, at FC 03559.) The letter identified, *inter alia*, material loss contingencies related to the need to phase out a PCE degreaser at the Fullerton, California, facility and transition to another degreasing method (estimated at approximately $1 million); the need to address a non-working septic system and associated contamination at the Stoughton, Massachusetts, facility; and the need to reconfigure and upgrade the plating lines and wastewater treatment plant at the St. Cosme facility in order to meet discharge thresholds (estimated at $1.3 million through the end of 2002). (Id. at FC 03563-03566; Hodge, Cross, Tr. 2235:16-17, 2237:14 - 2241:11.)

40.    During negotiations with Alcoa, Fairchild demonstrated concern that if Alcoa were permitted to do Phase II investigations before the closing, Alcoa would want to cancel the deal. (AX 4 at FAIR50025600; Holloway, Direct, Tr. 88:15-89:21.)

41.    In the summer of 2002, Alcoa provided Fairchild with copies of the Phase I and Limited Compliance Review reports that Alcoa's consultant, ERM, prepared. (Hodge, Direct, Tr. 2170:10-20.) Those reports identified numerous environmental, health and safety issues at the Fastener Facilities, including amputations from lack of proper machine guarding and lockout tagout measures, failure to complete air monitoring, and carcinogenic contamination of soil and groundwater, among others. (Bulk AX A; AX 123; Flanzenbaum, Direct, Tr. 367:15 - 371:18.)

42.    Ms. Holloway's contemporaneous notes from Alcoa's negotiations with Fairchild include information provided by Fairchild about known environmental, health and safety problems at the Fastener facilities at the time of the acquisition:

42.1    Ms. Holloway's June 7, 2002, notes state:  "They know they have groundwater contamination but haven't gone looking for it. w/ exception of City of Industry.  Currently pumping there.  Soil vapor extraction previously"; "St. Cosme $2.8 - 8.0 lot of problems they know about but haven't quantified this".  (AX 5 at FAIR50025584.)  Those notes also state:  "Most probable EHS: $6.7 mln [without] TCE.  maybe a bit low for machine guarding"; and "TCE = almost worst case $30".  (Id.; Holloway, Direct, Tr. 89:25 - 92:10.)

42.2  Ms. Holloway's May 9, 2002, notes containing information about the Fastener Facilities relayed to her by Mr. Boyt state: "used chlorinated solvents", "used cadmium and chromium - some sludge"; and "some expense for machine guarding (amputations, recent OSHA fine)". (AX 2; Holloway, Direct, Tr. 82:12 - 83:4.)

43.  Mr. Adams, the workplace health and safety expert from ENVIRON, relied in part on conversations with former Fairchild employees in reaching his conclusions about the existence of workplace health and safety violations at the Fastener Facilities at the time of the acquisition. (Adams, Cross, Tr. 1636:15-23.)  Mr. Adams was also able to identify violations that existed at the time of the acquisition by looking them up on the OSHA website.  (Adams, Cross, Tr. 1645:23 - 1646:23.)

44.  Peter Nugteren, Alcoa's EHS Manager for Europe, testified: "When I entered the Fairchild facilities I was very badly impressed by the circumstances we found.  I have done in the past many other introductions of new acquisitions and St. Cosme was one of the worst examples I have ever seen."  (Nugteren, Dep. Tr. 300:5-9.)

## V.    ALCOA SATISFIED THE AGREEMENT'S NOTICE AND COMMENT PROVISIONS

### A.    Fairchild Owned and Operated the Fastener Facilities Prior to Their Sale and Had Advance Notice of Many of the Contamination and Compliance Issues in Dispute.

45.  Alcoa provided Fairchild with the Phase I reports, Phase II Reports and other specific correspondence regarding the pre-acquisition condition of the former Fairchild facilities.  (AX 125; AX 161; Hodge, Direct, Tr. 2170:10-13, 2186:11-22, 2205:2-9, 2210:16-24; Hodge, Cross, Tr. 2279:17-24.)  Those reports listed numerous problems, many of which Fairchild was already aware of.  For example:

46.  Prior to the acquisition, Fairchild knew that the wastewater treatment system at St. Cosme was noncompliant because Fairchild had been hiding its true performance from regulators, supplying regulators with falsified data and, in 2001, had itself obtained an estimate of approximately $1.4 million for a compliant system.  (AX 41; AX 42; AX 43; AX 44; Lease, Direct, Tr. 867:7 - 878:20; Miller, Cross, Tr. 2468:15 - 2470:16.)

47.  Prior to the acquisition, on at least two occasions, government inspectors had notified Fairchild that it needed to install legally required guards on machinery at the St. Cosme facility.  (AX 165 at FAIR 00073726; AX 216 at FAIR 50005297.)

48.  Prior to the acquisition, Fairchild had itself obtained an estimate of approximately $1 million for machine guarding compliance work at St. Cosme.  (AX 95 at FAIR 00073729; Lange, Cross, Tr. 3024:7 - 3026:6.)

49.  Prior to the acquisition, Fairchild was aware that a new hazardous materials storage facility was required for St. Cosme and planned to construct such a facility. (Bulk AX A, Vol. 15 at 14-15.)

21

50. Prior to the acquisition, Fairchild was aware that its permit requirements obligated it to expand and otherwise modify the parking lot at the Toulouse facility. (Bulk AX A, Vol. 14 at 3, 37.)

51. Prior to the acquisition, Fairchild was aware of the need to perform an investigation into threatened contamination at the Montbrison facility. In a Phase II report commissioned by Fairchild in 1999, ERM recommended that Fairchild conduct further soil and groundwater investigations to delineate impacted areas, which Fairchild did not do. (Bulk AX B, Vol. 10 at 6-8.)

52. Prior to the acquisition, Fairchild was aware of OSHA/Cal OSHA noncompliance at the City of Industry (Unruh Avenue) facility because Fairchild was cited and fined for improper lockout tagout procedures following a fingertip amputation in 2001. (Bulk AX A, Vol. 2 at 3.)

53. Prior to the acquisition, Fairchild was aware of ongoing remediation projects at the City of Industry (Temple Avenue) facility that Alcoa would have to continue, and had set aside reserves for those projects. (AX 143 at FC 03565-66; Hodge, Direct, Tr. 2145:24 - 2147:2, 2168:23 - 2169:9; Hodge, Cross, Tr. 2235:16-17, 2237:14 - 2241:11; Lease, Direct, Tr. 914:3-8; Hall, Cross, Tr. 2827:11-15.)

54. Prior to the acquisition, Fairchild was aware of contamination at the Fullerton facility that needed to be addressed through the use of a soil vapor extraction system, and had set aside reserves for that project. (AX 143; Hodge, Direct, Tr. 2150:6 - 2151:2, 2168:23 - 2169:9; Hodge, Cross, Tr. 2236:16-17, 2237:14 - 2241:11; Lease, Direct, Tr. 914:3-8; Hall, Cross, Tr. 2827:11-15.)

55. Prior to the acquisition, Fairchild was aware that regulatory requirements called for the elimination of the type of a degreaser in use at the Fullerton facility and that Alcoa would have to replace it. Although existing regulations required Fairchild to cease the use of the degreaser at Fullerton, Fairchild secured an extension until 2003 to transition away from the banned system, leaving it to Alcoa to complete that project. (AX 137 at A5-1, 13-1; AX 143 at FC 03563; Powell, Direct, Tr. 1253:2 - 1254:12.)

56. Prior to the acquisition, Fairchild was aware that the septic system at the Stoughton facility was inoperable and would need to be upgraded because the septic system had backed up and Fairchild had been pumping out the septic tank monthly. (AX 137 at A11-1; AX 143 at FC 03564; AX 239; Bulk AX A, Vol. 5 at 32; Powell, Direct, Tr. 1257:6-22; Wolff, Cross, Tr. 1990:11 - 1993:5.)

57. Prior to the acquisition, Fairchild was aware that the wastewater at the Hildesheim facility contained fluoride and cadmium concentrations above regulatory limits and that Alcoa would be required to address the problem. Fairchild itself had attempted to repair the wastewater treatment plant and knew its attempts were unsuccessful. (AX 137 at A21-1; Powell, Direct, Tr. 1254:21 - 1255:22.)

58. Prior to the acquisition, regulators ordered Fairchild to comply with the minimum standards for structural earthquake resistance at the City of Industry (Unruh

22

Avenue) facility, and Fairchild knew that Alcoa would be obligated to retrofit the facility to comply with that order.  (AX 83.)

59.  Prior to the acquisition, Fairchild was aware that the levels of contaminants in its rinse-water discharge at the Torrance facility exceeded regulatory limits.  When it owned the facility, Fairchild's employees increased water flow to temporarily dilute contaminant concentrations when regulators arrived to perform sampling.  (Lease, Direct, Tr. 883:18 - 884:17.)

## B.    Alcoa Provided Fairchild With Advance Written Notice of Approximately 90% of Alcoa's Expenditures.

60.  Through the provision of the Phase I reports, the original and revised Scopes of Work for the Phase II investigations, the Phase II reports and other correspondence, Alcoa provided Fairchild with specific advance notice of claims accounting for approximately 90 percent of the total expenditures for which Alcoa now seeks reimbursement.  (AX 125; AX 161; Lease, Direct, Tr. 906:16 - 910:22; 913:13 - 914:2.)

### 1.    Phase I Reports.

61.  Alcoa provided the Phase I reports to Fairchild in the summer of 2002, prior to the closing.  (Hodge, Direct, Tr. 2170:10-20.)

62.  The Phase I reports identified pre-acquisition contamination, actual and threatened pre-acquisition releases of Hazardous Materials into the environment and the need to further investigate environmental contamination at the Fastener facilities.  (See Bulk AX A, Vols. 1 & 2 (City of Industry); Vol. 3 (Fullerton); Vol. 15 (St. Cosme); Vol. 14 (Toulouse); Vol. 11 (Montbrison); Vol. 16 (Vougy); Vol. 6 (Torrance); Vol. 8 (Hildesheim); Vol. 9 (Kelkheim).)

63.  The Phase I reports identified pre-acquisition noncompliance with laws, rules and regulations related to workplace health and safety, and the protection of the environment at the Fastener Facilities.  For example:

64.  The Phase I reports specifically identified the facilities' noncompliance with regulations relating to wastewater, rinse-water, storm-water and septic systems.  (See Bulk AX A, Vol. 5 at 19-21, 32 (Stoughton); Vol. 15 at 21-23 (St. Cosme); Vol. 14 at 37 (Toulouse); Vol. 11 at 26 (Montbrison); Vol. 6 at 4, 26-30, 47-48 (Torrance); Vol. 8 at 30 (Hildesheim).)

65.  The Phase I reports specifically identified the facilities' noncompliance with regulations relating to air emissions, including the need to replace certain degreasing machines.  (See Bulk AX A, Vol. 2 at 2, 39-40 (City of Industry); Vol. 3 at 65 (Fullerton); Vol. 15 at 23-24, 35, 37 (St. Cosme); Vol. 11 at 2, 17-18 (Montbrison); Vol. 6 at 46-47 (Torrance).)

66.  The Phase I reports specifically identified the facilities' noncompliance with regulations relating to the handling and storage of hazardous materials.  (See Bulk AX A,

Vol. 15 at 18, 36, 38 (St. Cosme); Vol. 14 at 32-34, 38 (Toulouse); Vol. 11 at 19, 27 (Montbrison); Vol. 4 at 23 (Simi Valley).)

67.  The Phase I reports specifically identified the facilities' noncompliance with regulations relating to equipment safety, including machine guarding.  (See Bulk AX A, Vol. 1 at 39, Vol. 2 at 40 (City of Industry); Vol. 3 at 52, 71 (Fullerton); Vol. 5 at 25-26, 32 (Stoughton); Vol. 15 at 37 (St. Cosme); Vol. 14 at 31, 38 (Toulouse); Vol. 11 at 27 (Montbrison); Vol. 6 at 37 (Torrance); Vol. 8 at 29-30 (Hildesheim); Vol. 9 at 23 (Kelkheim).)

68.  The Phase I report for City of Industry identified its noncompliance with regulations relating to fall protection.  (See Bulk AX A, Vol. 2 at 31.)

69.  The Phase I report for Toulouse specifically identified its noncompliance with its permit requirements for the parking lot.  (See Bulk AX A, Vol. 14 at 3, 37.)

70.  Fairchild had the opportunity to comment on the Phase I reports.  (Boyt, Direct, Tr. 256:16 - 257:18; Hodge, Cross, Tr. 2241:12 - 2243:2.)

71.  Fairchild did not dispute the findings of the Phase I reports nor offer any substantive comments.  (Hodge, Cross, Tr. 2242:23 - 2245:12.)

## 2.    Phase II Reports.

72.  The original and revised Scopes of Work for the Phase II investigations set forth the plans for conducting those investigations at the Fastener Facilities.  (See Bulk AX E; Flanzenbaum, Direct, Tr. 385:13 - 386:15; 387:2-22.)

73.  Fairchild had the opportunity to comment on the Phase II Scopes of Work and met with Alcoa to discuss them.  (AX 35; Flanzenbaum, Direct, Tr. 388:2 - 389:15; Lease, Direct, Tr. 850:13 - 852:3; Hodge, Cross, Tr. 2278:12 - 2280:14.)

74.  Subsequent to that meeting, Alcoa developed revised scopes of work, which it sent to Mr. Hodge at Fairchild.  (Bulk AX C, Vol. 1 at 00000004-18.)  Alcoa's Mr. Lease informed Mr. Hodge: "Feel free to contact me with any questions regarding these revisions".  (Id.)  Mr. Hodge received those revised scopes of work, but did not provide Alcoa with any comments.  (Hodge, Cross, Tr. 2279-80.)

75.  Fairchild agreed with Alcoa's assessment that Phase II investigations were warranted at fourteen of the Fastener Facilities.  (AX 22 at FAIR 00094577; George, Direct, Tr. 574:22 - 579:16.)

76.  The Phase II reports identified pre-acquisition contamination, actual and threatened pre-acquisition releases of Hazardous Materials into the environment, the need for further investigation of environmental contamination and the need to undertake specific actions to address contamination at the Fastener Facilities.  (See Bulk AX B, Vols. 1 & 2 (City of Industry); Vol. 3 (Fullerton); Vol. 13 (St. Cosme); Vol. 12 (Toulouse); Vol. 10 (Montbrison); Vol. 14 (Vougy); Vol. 5 (Torrance); Vol. 7

(Hildesheim); Vol. 8 (Kelkheim).)  The Phase II reports for each of the French facilities set forth a step-by-step overview of the French regulatory methodology for addressing contamination.  (e.g., AX 13 at 29-33.)

77.  Fairchild had the opportunity to comment on the Phase II reports.  (Hodge, Direct, Tr. 2205:2-17.)

78.  Fairchild agreed that the Phase II reports identified the need for further action to address actual or threatened contamination at several of the Fastener facilities.  (AX 32 at FC 00299-306; Hodge, Cross, Tr. 2293:6 - 2297:20.)

### 3.    Correspondence and Reports.

79.  Other correspondence and reports sent to Fairchild identified the need to address actual and threatened contamination and noncompliance with laws, rules and regulations related to the protection of the environment and to workplace health and safety at the Fastener Facilities, along with advance notice of proposed corrective actions. (See Bulk AX C, Vol. 1 at 00000001, -58-60; Vol. 5 at 4222-23, -4534-35, -4938-39, -4958-59, -5053-54; Vol. 7 at 00007958-59, -8287-88, -8396-97; Vol. 11 at 00012280-81; Vol. 21 at 00023445-46 (City of Industry); Vol. 1 at 00000035-40; -48-55; Vol. 2 at 587-89; Vol. 4 at 2853; Vol. 5 at 00004517-19, -4801-05; Vol. 11 at 00012488 (Fullerton); Vol. 1 at 00000002-3, -19-20, -136-38; Vol. 6 at 6349-51 (St. Cosme); Vol. 1 at 00000032-34; Vol. 6 at 00007209-686; Vol. 21 at 00023943-45 (Toulouse); Vol. 5 at 00004342-44; Vol. 6 at 00005179-80; Vol. 11 at 00012242-43, -12274-79 (Montbrison); Vol. 1 at 00000041-47; Vol. 2 at 587-89; Vol. 7 at 00007881-82, -7932-33, -8284-86, -8392-95; Vols. 8-10 at 00008452-54; Vol. 11 at 00012266-73, -12417-18; Vols. 17-20 at 00019123-24; Vol. 21 at 00023549-50, -23557-724, -23725-930, -23931-35, -24007-108 (Torrance); Vol. 1 at 00000376-78; Vol. 7 at 00007687-89 (Nemesvamos & Kelkheim).) That correspondence is included in Alcoa's Bulk Exhibit C, which comprises 22 four-inch binders[1], including, for example:

80.  On March 4, 2003, Alcoa advised Fairchild in writing, with respect to the St. Cosme facility, of noncompliance with wastewater and air emission permit limits, improper storage of hazardous chemicals and waste, noncompliance with fall control and noise control requirements and noncompliance with machine guarding requirements. (Bulk AX C, Vol. 1 at 00000002-3.)  Alcoa included citations to the relevant regulations, descriptions of the proposed corrective actions and preliminary cost estimates for implementing them.  (Id.)

80.1  After Fairchild responded by requesting further information about the issues at St. Cosme described by Alcoa in the March 4, 2003 letter, on April 8, 2003, Alcoa provided Fairchild more detailed descriptions of each of the noncompliant conditions identified in the March

---

[1] Due to the large volume of Alcoa's Bulk Exhibit C, letters will be included in the joint appendix (and are cited herein) without any large attachments.

4 letter. (Bulk AX C, Vol. 1 at 00000019-20.)

81. On June 13, 2003, Alcoa advised Fairchild in writing, with respect to the Toulouse facility, about the need to upgrade and otherwise modify the parking lot, of noncompliances with the stormwater and wastewater systems with permit and regulatory requirements, noncompliance with permit requirements governing the storage of hazardous materials and air emissions, noncompliance of machines with lockout tagout and guarding requirements and the need to assess compliance with noise and chemical hazard regulations. (Bulk AX C, Vol. 1 at 00000032-34.) Alcoa included citations to the relevant regulations, descriptions of the proposed corrective actions and preliminary cost estimates for implementing them. (Id.)

82. On June 13, 2003, Alcoa advised Fairchild in writing, with respect to the Fullerton facility, about noncompliance with stormwater permitting procedures, improper management of hazardous waste, noncompliance of machines with lockout tagout and guarding requirements, noncompliance with fall control, electrical safety and mobile equipment safety requirements and the absence of required programs relating to confined spaces and fire prevention. (Bulk AX C, Vol. 1 at 00000035-40.) Alcoa included citations to the relevant regulations, descriptions of the proposed corrective actions and preliminary cost estimates for implementing them. (Id.)

83. On June 13, 2003, Alcoa advised Fairchild in writing, with respect to the Torrance facility, of noncompliance with the wastewater discharge permit, noncompliance of machines with lockout tagout and guarding requirements, noncompliance with fall protection requirements and the absence of required programs for electrical safety, respiratory protection, mobile equipment safety and confined spaces. (Bulk AX C, Vol. 1 at 00000041-43.) Alcoa included citations to the relevant regulations, descriptions of the proposed corrective actions and preliminary cost estimates for implementing them. (Id.)

84. On June 16, 2003, Alcoa advised Fairchild in writing that the California Regional Water Quality Control Board ("RWQCB") was seeking to recover its costs associated with the regulatory oversight of work conducted at the Fullerton site concerning past releases of contaminants. Alcoa forwarded to Fairchild the letter from the RWQCB, which describes contamination at the site, orders Alcoa to conduct further investigation and provides an estimate of work to be performed, including the installation of groundwater monitoring wells. (Bulk AX C, Vol. 1 at 48-55.)

85. On September 15, 2003, Alcoa advised Fairchild in writing that, attendant to the closing of the City of Industry (Temple Avenue) facility, alternate arrangements for the discharge from the groundwater treatment system would have to be made and that the pump and treat equipment itself would likely have to be relocated. Alcoa's designated representative to Fairchild, John Lease, wrote to Fairchild that "[i]t would be advisable to have discussions on this matter to resolve any questions and establish a timetable for the transfer of operating responsibility for this system back to The Fairchild Corporation. Please contact me at 412-553-4458 if you would like to set up a meeting for further discussions". (Bulk AX C, Vol. 1 at 00000058-60.)

26

86. On March 9, 2004, Alcoa advised Fairchild that, with respect to the City of Industry facilities, Alcoa planned or had begun to implement corrective actions related to the groundwater remediation system installed by Fairchild at the Temple Avenue site in 1999, the stormwater permit, air emissions, confined spaces, fall protection, mobile equipment safety compliance, lockout tagout and guarding of machines and the handling of investigation-derived waste. (Bulk AX C, Vol. 1 at 00000071-75.)

87. On December 3, 2004, Alcoa advised Fairchild in writing that the results of the survey of lockout tagout procedures at the City of Industry, Fullerton, Stoughton, St. Cosme, Toulouse, Montbrison, Torrance, Simi Valley and Kelkheim facilities revealed noncompliances and that Alcoa intended to continue implementing corrective actions to address them. (Bulk AX C, Vol. 1 at 000000136-38.)

88. On December 20, 2004, Alcoa advised Fairchild in writing that assessments of the guarding of machines at City of Industry, Fullerton, Kelkheim, Stoughton, St. Cosme, Torrance, Simi Valley and Nemesvamos revealed noncompliances and that Alcoa intended to continue implementing required corrective actions to address them. (Bulk AX C, Vol. 1 at 00000376-78.)

89. On February 2, 2005, Alcoa sent Fairchild work plans that described in detail the proposed scopes of work for supplemental soil and groundwater sampling, well installation and groundwater testing at the City of Industry (Temple Avenue) site. (Bulk AX C, Vol. 5 at 00004222-23.)

90. On February 25, 2005, Alcoa advised Fairchild in writing that the results of the Simplified Risk Assessment performed for the Montbrison site indicated that a Detailed Risk Assessment would have to be conducted. (Bulk AX C, Vol. 5 at 00004342-44.) Alcoa also provided Fairchild the proposed scope of work and cost estimate for performing that assessment at Montbrison. (Id.)

91. On April 5, 2005, Alcoa sent Fairchild a work plan that described in detail the proposed scope of work for supplemental soil and groundwater sampling to be conducted at the Fullerton site. (Bulk AX C, Vol. 5 at 00004517-19.)

91.1 Three days later, on April 8, 2005, Alcoa forwarded to Fairchild the letter Alcoa received from the RWQCB requesting that Alcoa perform additional subsurface investigations at the Fullerton site. (Bulk AX C, Vol. 5 at 00004801-05.)

92. On December 16, 2005, Alcoa sent Fairchild a work plan describing in detail the proposed scope of work for the installation of offsite groundwater monitoring wells and onsite wells to support vapor extraction at the City of Industry (Temple Avenue) site. Alcoa explained to Fairchild that the work plan was prepared in accordance with a request from the RWQCB. (Bulk AX C, Vol. 5 at 00004938-39.)

93. On June 23, 2006, Alcoa sent Fairchild a work plan describing in detail the proposed scope of work for investigative procedures to be undertaken at the Torrance site pursuant to the Consent Agreement between Alcoa and the California Department of

27

Toxic Substances Control. (Bulk AX C, Vol. 8 at 00008452-54.)

94.   On July 5, 2006, Alcoa sent Fairchild comments from the DRIRE inspector concerning the Detailed Risk Assessment at Montbrison, along with a proposal from Alcoa's consultant to conduct additional work to address the DRIRE inspector's comments. (Bulk AX C, Vol. 11 at 00012242-43.)

### C.   Fairchild Was Otherwise on Notice of the Remaining 10% of Expenditures.

95.   In addition to the claims for which Alcoa provided Fairchild with specific advance notice in writing, the remaining approximately 10% of the expenditures for which Alcoa seeks indemnification consist largely of projects that Fairchild either itself initiated or was ordered by regulators to perform, or that were identical in nature to projects at other facilities for which Fairchild was given specific notice in writing. (AX 125, Lease, Direct, Tr. 910:23 - 912:2.)

## VI.   FAIRCHILD'S ALTERNATIVE "PARTICIPATION" ARGUMENT IS A STRAWMAN: FAIRCHILD NEVER SOUGHT NOR INTENDED TO "PARTICIPATE" IN ALCOA'S ACTIONS

96.   Fairchild rejected every single indemnification claim that Alcoa made against the reserve for environmental, health, safety and litigation under § 11.6(a). (Claimant's Demand for Mediation, dated March 17, 2005, at 1; Lease, Direct, Tr. 914:3-8; Hall, Cross, Tr. 2827:11-15; Miller, Cross, 2433:23 - 2434:22; Beckford, Dep. Tr. 46:19-24.)

### A.   Fairchild Denied Indemnification Responsibility for Projects that Fairchild Had Initiated or Planned During Its Ownership.

97.   Fairchild rejected Alcoa's claim for the cost of Fairchild's consultant, Envirosolve, to continue to operate the groundwater pump and treat system at the Temple Avenue facility that Fairchild had installed. (Hall, Cross, Tr. 2906:21 - 2907:12.)

98.   Fairchild rejected Alcoa's claims for bringing machinery into compliance with French and European regulations at the St. Cosme and Montbrison facilities—projects that Fairchild had planned but not completed. (AX 14 at FC 01887, FC 01894; AX 12 at FC 00844; Lease, Direct, Tr. 914:3-8; Hall, Cross, Tr. 2827:11-15; AX 95; Lange, Cross, Tr. 3024:13 - 3027:3.)

99.   Fairchild rejected Alcoa's claim for bringing machinery into compliance at the California facilities, notwithstanding the fact that Fairchild was aware that machinery at those facilities was non-compliant. (AX 186.)

### B.   Fairchild Denied Indemnification Responsibility for Projects for Which Fairchild Had Set Aside Reserves.

100.   Fairchild denied indemnification responsibility for reconfiguring and upgrading the plating lines and wastewater treatment plant at the St. Cosme facility—a

project for which Fairchild itself had set aside reserves. (Hodge, Direct, Tr. 2168:23 - 2169:5; AX 143 at FC03566; Hodge, Cross, Tr. 2235:16 - 2241:11; Lease, Direct, Tr. 914:3-8; Hall, Cross, Tr. 2827:11-15.)

101.  Fairchild denied indemnification responsibility for addressing PCE contamination with a vapor extraction system at the Fullerton facility—a project for which Fairchild itself had set aside reserves. (AX 143 at FC 03563-64; Hodge, Direct, Tr. 2150:6 - 2151:2, 2168:23 - 2169:9; Hodge, Cross, Tr. 2235:16 - 2241:11; Lease, Direct, Tr. 914:3-8; Hall, Cross, Tr. 2827:11-15.)

102.  Fairchild denied indemnification responsibility for operating the pump and treat system at the City of Industry (Temple Avenue) facility—a project for which Fairchild itself had set aside reserves. (AX 143 at FC 03565-66; Hodge, Direct, Tr. 2145:24 - 2147:2, 2168:23 - 2169:9; Hodge, Cross, Tr. 2235:16 - 2241:11; Lease, Direct, Tr. 914:3-8; Hall, Cross, Tr. 2827:11-15.)

> 102.1  In advance of performing the work, Alcoa sent Fairchild a detailed work plan describing the installation of supplemental groundwater monitoring and extraction wells at the City of Industry (Temple Avenue) site. (AX 172; AX 209; AX 231 at 4; Wolff, Cross, Tr. 1959:15 - 1961:7.) Fairchild offered no comment and instead categorically refused to reimburse Alcoa for any costs associated with carrying out any of the tasks specified in the plan. (AX 172.) Fairchild's environmental expert, however, agreed that, specifically with respect to the installation of the wells at issue, he would have offered the same recommendations that were contained in the work plan. (Wolff, Cross, Tr. 1954:11 - 1959:14.)

## C.    Fairchild Denied Indemnification Responsibility for Projects that Were Specifically Mandated by Government Regulators.

103.  Fairchild denied indemnification responsibility for investigations at the Torrance facility that were mandated by the California Department of Toxic Substances Control. (Hall, Cross, 2888:15 - 2891:20; Cl.'s Ex. 465; Bulk AX C, Vol. 7 at FAIR50000097-139; AX 167.)

104.  Fairchild denied indemnification responsibility for replacing the TCE degreaser and removing a water cooling system at St. Cosme, even though those actions were required by a February 1998 ministerial order and the facility's permit incorporating that order. (Shofstall, Cross, Tr., 2689:24 - 2692:19, 2694:4 - 2695:20.)

105.  Fairchild denied indemnification responsibility for complying with an order from the City of Industry Department of Public Works to bring the City of Industry (Unruh Avenue) facility into compliance with an earthquake hazard reduction requirement. (AX 83; Adams, Direct, Tr. 1627:14 - 1629:16.)

**D.**    **Fairchild Informed Alcoa that It Would Categorically Reject the Vast Majority of Alcoa's Projects.**

106.  Ms. Hall informed Alcoa that Fairchild would categorically reject any request for indemnification of investigations or assessments.  (AX 103 at FC 00340-41; Hall, Cross 2839:19 - 2842:10.)

107.  Ms. Hall informed Alcoa that Fairchild would categorically reject any request for indemnification of workplace health or safety claims such as those relating to machine guarding, confined space and fall protection.  (Hall, Direct, 2812:21 - 2813:19; see, e.g., Cl.'s Ex. 463; Hall, Direct, 2805:16 - 2806:22; Cl.'s Ex. 464; Hall, Direct, 2814:21 - 2816:17.)

107.1  Ms. Hall testified that even if she had been given specific advance notice of machine guarding work at the Simi Valley location, she would have rejected that claim, like all other workplace health and safety claims, based on her contention that machine guarding is not an indemnifiable Fastener Environmental Liability under the Agreement. (Hall, Direct, Tr. 2895:3-15.)

108.  Ms. Hall testified that, regardless of the notice provided, Fairchild would have rejected all of Alcoa's proposed projects—save one for remediation at City of Industry—as either workplace health and safety liabilities that Fairchild contends are not indemnified as a matter of contract, or as assessments that Fairchild contends are not indemnified as a matter of contract.  (Hall, Cross, Tr. 2842:11-20.)

108.1  Claimant's Exhibit 455, which Ms. Hall used to explain Fairchild's purported basis for rejecting Alcoa's claims, contains all of Alcoa's indemnification claims pursuant to § 11.6(a) as of September 30, 2006, except for the cost of the Phase II investigations. (Cl.'s Ex. 455.)

**E.**    **Fairchild's Limited Assumption of Litigation and Settlement Responsibilities for Matters Existing Before the Closing Are Irrelevant to this Dispute.**

109.  Any Fairchild assumption of litigation defense and responses to settlement notices are not claims applicable against the reserve and escrow under § 11.6(a) and are not implicated by this arbitration.  (AX 1 § 11.6(a).)

109.1  Fairchild assumed responsibility for a payment of $2,096 for a settlement related to the investigation and clean-up of the Gibson Environmental Site in Bakersfield, California.  (Cl.'s Ex. 506.)  Notice of the settlement offer was sent to the Torrance facility on May 10, 2004. (Bulk AX C 00000115-00000135.)

109.2  Fairchild assumed responsibility for responding to the General Notice Letter from EPA Region IX to Potentially Responsible Parties for the Casmalia Disposal Site in Santa Barbara County, California,

received by the Fullerton facility on April 28, 2003. (Cl.'s Ex. 505; Bulk AX C 00000021-00000031.)

110.  To the extent Alcoa has submitted indemnifiable litigation claims to Fairchild that are applicable to the reserve under § 11.6(a), Fairchild has not, to date, acknowledged its responsibility to indemnify Alcoa for those claims.

110.1  On March 19, 2007, Alcoa notified Fairchild that it had resolved a lawsuit, 36 Former Employees v. Mecaero, for € 424,483. (Letter from M. Bartholic to D. Miller, dated March 19, 2007.)  The value of the claim in U.S. dollars as of March 19, 2007 was $564,477.49.

110.2  The Mecaero claim was disclosed by Fairchild in Schedule 3.16 of the Acquisition Agreement. (Cl.'s Ex. 421 at FC 05238.)  In that disclosure, Fairchild estimated the value of the claim as $445,000. (Id.) Pursuant to §11.2(a)(iv) of the Agreement, the claim is applicable against the reserve for environmental, health, safety and litigation. (AX 1 § 11.2(a)(iv).)

110.3  On March 23, 2007, Fairchild acknowledged receipt of Alcoa's claim, but requested additional information about the resolution of the lawsuit. (See Email of C. Abbud to M. Bartholic dated March 23, 2007.)  Alcoa provided the requested information on April 9, 2007. (See Email of M. Bartholic to C. Abbud dated April 9, 2007.)  Fairchild has, to date, not agreed to indemnify Alcoa for the Mecaero litigation.

**F.      Fairchild Has Never Demonstrated Any Willingness to Evaluate Proposed Corrective Actions or Suggest Alternatives.**

111.  Fairchild has had every relevant document in Alcoa's possession concerning ongoing and future projects subject to the § 11.6(a) indemnity for more than six months, yet to this day Fairchild has provided no substantive comments on any of the projects Alcoa has conducted or plans to conduct. (See Miller, Cross, Tr. 2446:24 - 2447:18; Scheduling Order #2 at 1.)

112.  Alcoa's Interrogatory No. 12 asked Fairchild to explain in how any Fastener Environmental Condition could have been remediated or otherwise resolved at materially lower cost. (Resp't Alcoa's Interrogatory No. 12.)  Fairchild objected to the interrogatory and refused to answer it. (Claimaint Fairchild's Answer to Interrogatory No. 12.)

112.1  Fairchild has not offered any evidence that it was willing, at any time, to propose alternative options for corrective actions.

113.  After the closing, Fairchild never sought to visit any of the Fastener facilities to evaluate what corrective actions should be taken, never sought to access documents maintained at the plant level, and never sought to speak with Alcoa personnel familiar with conditions at the facilities. (Hall, Cross, Tr. 2858:12 - 2859:14; see also Miller, Cross, 2419:21-23.)

31

113.1 Mr. Miller testified that machine guarding "is the kind of thing you could walk into the plant, look at the machines, count the machines and see instantly whether or not they had machine guards." (Miller, Direct, Tr. 2361:24 - 2362:6.)

113.2 Jerome Lange, one of Fairchild's health and safety experts, testified that it is "absolutely not possible" to evaluate alternative health and safety costs without conducting an on-site visit. (Lange, Cross, Tr. 3004:9-19; see also Shofstall, Cross, Tr. 2672:15 - 2674:21.)

113.3 Mark Katchen, Fairchild's U.S. health and safety expert, testified that a site visit is important in assessing whether machinery is in compliance with regulations. (Katchen, Cross, Tr. 3176:17 - 3177:5.)

### G. Alcoa Is Obligated Under the Agreement to Act Promptly in Addressing Environmental Liabilities and Accordingly Could Not Wait to Take Action.

114. Alcoa has an obligation under § 11.6(e)(iv) to respond promptly to any Fastener Environmental Condition so as not to exacerbate the problem: "In addition, to the extent that the Buyer contributes to or exacerbates a Fastener Environmental Condition as a result of its actions or omissions, including, without limitation, its unreasonable failure to mitigate any violation or noncompliance with applicable Environmental Law, any material increase in losses, damages, charges, liabilities, costs or expenses resulting from said exacerbation or failure to mitigate shall not be a Fastener Environmental Liability." (AX 1 § 11.6(e)(iv).)

## VII. ALCOA'S ACTIONS WERE COMMERCIALLY REASONABLE AND RESULTED IN NO ADVERSE EFFECT TO FAIRCHILD'S INDEMNIFICATION OBLIGATION

### A. Fairchild Presented No Evidence of Quantifiable Adverse Effect Due to Any Purported Lack of Opportunity to Comment on Alcoa's Proposed Responses.

115. Alcoa's Interrogatory No. 9 requested that Fairchild "specify how and to what extent (in dollar terms, if appropriate) Fairchild's rights and obligations under the Acquisition Agreement have been adversely affected, if at all, by the purported absence of prompt notice." (Resp't Alcoa's Interrogatory No. 9.)

115.1 Fairchild objected and responded, in relevant part: "To the extent that the effect of Alcoa's conduct on Fairchild's rights may be quantifiable, in dollar terms or otherwise, Fairchild further objects to Interrogatory No. 9 as premature prior to the close of discovery and the exchange of expert reports. Fairchild reserves the right to amend its response to this Interrogatory following its receipt of Alcoa's answers to Fairchild's Interrogatory No. 1 and the completion of discovery in this Action, including the exchange of expert reports." (Claimant Fairchild's

Answer to Interrogatory No. 9.)  Fairchild did not amend its Answer to Interrogatory No. 9.

116.  Alcoa's Interrogatory No. 12 requested that Fairchild "explain in detail the basis for [its] assertion, if any, that [a] Fastener Environmental Condition could have been remediate[d] or otherwise resolved at materially lower cost".  (Resp't Alcoa's Interrogatory No. 12.)

116.1  Fairchild responded, in relevant part:  "To the extent that Fairchild determines to perform such an analysis for any expense claimed by Alcoa, Fairchild further objects to Interrogatory No. 12 as premature prior to the close of discovery and the exchange of expert reports.  Fairchild reserves the right to amend its responses to this Interrogatory following its receipt of Alcoa's answers to Fairchild's Interrogatories and the completion of discovery in this Action, including the exchange of excerpt reports".  (Claimant Fairchild's Answer to Interrogatory No. 12.)  Fairchild did not amend its Answer to Interrogatory No. 12.

117.  Fairchild's experts did not systematically evaluate each of Alcoa's claims:

117.1  Robert Shofstall, Fairchild's expert on "environmental investigation and remediation in France", testified that he did not review every project or claim for contamination in France, but rather only looked at examples.  (Shofstall, Direct, Tr. 2576:20 - 2577:7; see also Cl.'s Ex. 317.)  Mr. Shofstall was therefore asked to merely give his "general impression" as to environmental compliance issues at the French facilities.  (Shofstall, Direct, Tr. 2575:11 - 2576:6.)

117.2  Mr. Katchen testified that he was not giving an opinion on any specific action that Alcoa took.  (Katchen, Direct, Tr. 3188:2-4; see also Cl.'s Ex. 482.)

117.3  Mr. Lange testified that his assignment was to opine on the general process Alcoa pursued to obtain cost effective solutions to health and safety compliance actions, not to pass judgment on the compliance of a facility or the reasonableness of specific actions taken by Alcoa.  (Lange, Direct, Tr. 2937:23 - 2938:3, 3016:7-25; see also Cl.'s Ex. 471.)

117.4  Fairchild did not offer any expert opinion concerning (1) Alcoa's environmental compliance claims in the United States and Germany, (2) Alcoa's workplace health and safety compliance claims in Germany or Hungary or (3) Alcoa's responses to contamination issues outside of the United States and France.  (See Cl.'s Ex. 317 at 2; Cl.'s Ex. 466 at 2; Cl.'s Ex. 471 at 3, 6; Cl.'s Ex. 482 at 1; Wolff, Direct, Tr. 1802:4-15; Shofstall, Cross, Tr. 2626:22 - 2627:9; Lange, Direct, Tr. 2937:10 - 2938:23; Katchen, Direct, Tr. 3090:11-25.)

118. Jerome Lange, Fairchild's expert on workplace health and safety in France (specifically machine guarding, lockout tagout, fall protection and confined space), offered no quantifiable evidence of adverse impact to Fairchild in his 14-page report and testimony on workplace health and safety in France. (Cl.'s Ex. 471.)

118.1 Mr. Lange testified that he performed no calculations of potential cost savings from alternative approaches to workplace health and safety projects. (Lange, Cross, Tr. 3009:3-8.)

118.2 Mr. Lange testified that he saw evidence that Alcoa acquired machinery from Fairchild that was noncompliant with French law, but he could offer no opinion that any of Alcoa's machine guarding work in France was in excess of French legal requirements. (Lange, Cross, Tr. 3016:7 - 3017:9.)

118.3 Mr. Lange informed Fairchild's counsel that it would not be feasible to evaluate alternative health and safety costs without visiting the Fastener Facilities. (Lange, Cross, Tr. 3004:9-19.)

118.3.1 Fairchild's counsel defined Mr. Lange's scope of work to exclude visits to the Fastener Facilities in France, even though Mr. Lange lives only 20 kilometers from the Toulouse facility. (Lange, Direct, Tr. 3004:9-22, 3007:22 - 3008:8, 3009:3-13; Cl.'s Ex. 471 at 6.)

119. Mark Katchen, Fairchild's expert on health and safety in the United States, offered no quantifiable evidence of adverse impact to Fairchild in his 3-page report and testimony. (Cl.'s Ex. 482.)

119.1 Mr. Katchen testified that he was not aware of any specific action that Alcoa took that was in excess of OSHA or California OSHA regulations, including regulations concerning machine guarding, fall protection, confined space and other types of workplace health and safety actions. (Katchen, Cross, Tr. 3218:4-14.)

119.2 Mr. Katchen testified that he was not offering an opinion on the range of actions that Alcoa could have taken with respect to any specific machine. (Katchen, Direct, Tr. 3188:5-18.)

119.3 Mr. Katchen testified that he was not offering an opinion as to whether Alcoa could have taken a different approach for any specific machine. (Katchen, Direct, Tr. 3188:9-14.)

119.4 Mr. Katchen testified that he was not offering an opinion as to whether any particular project that Alcoa undertook could have been accomplished more cost-effectively. (Katchen, Direct, Tr. 3188:15-18.)

119.5  Mr. Katchen testified that he was not offering an opinion on the commercial reasonableness of amounts Alcoa is claiming for indemnification. (Katchen, Direct, Tr. 3194:7-10.)

119.6  Mr. Katchen testified that he did not visit the Fastener Facilities because it was not within the scope of his assignment. (Katchen, Direct, Tr. 3091:18 - 3092:2; Katchen, Cross, Tr. 3177:13-21.)

119.6.1  However, Mr. Katchen agreed that a site visit is standard to assess machine safety compliance. (Katchen, Cross, Tr. 3176:17-12.)

119.6.2  Alcoa continues to address machine guarding noncompliances. (Katchen, Cross, Tr. 3091:18 - 3092:2; 3178:7-25; Jackson, Dep. Tr. 65:2-18; Lease, Cross, Tr. 1115:8-10; Adams, Direct, Tr. 1599:8-16.) Accordingly, Mr. Katchen could have evaluated noncompliances and Alcoa's corresponding proposed corrective actions during a site visit. (See Katchen, Cross, Tr. 3178:7-25; Jackson, Dep. Tr. 65:2-18; Lease, Cross, Tr. 1115: 8-10; Adams, Direct, Tr. 1599:8-16.)

119.7  Mr. Katchen testified that although his report discussed the *potential* for Alcoa's chosen consultant to have a conflict of interest, he was not aware of any actual conflict of interest that affected any of the work done at the Fastener Facilities. (Katchen, Direct, Tr. 3218:23 - 3219:19; see Cl.'s Ex. 482 at 2.)

120.  Michael Wolff, Fairchild's expert on environmental contamination in the United States, offered no evidence of quantifiable adverse impact to Fairchild in his 8-page expert report and testimony. (See Cl.'s Ex. 466.) By contrast, Mr. Wolff confirmed the reasonableness of many of Alcoa's actions:

120.1  Mr. Wolff agreed that follow-on investigations at the Torrance facility were plainly needed in light of the Phase II results, and could not identify any excessive work performed at Torrance. (Wolff, Cross, Tr. 1928:6-9, 1988:16 - 1989:3.)

120.2  Mr. Wolff testified that aspects of Alcoa's work plan for groundwater monitoring and extraction wells at the City of Industry (Temple Avenue) site "was very similar to what I would have done". (Wolff, Cross, Tr. 1954:19 - 1956:6.)

121.  Mr. Shofstall, Fairchild's expert on "environmental investigation and remediation in France", offered no quantifiable evidence of adverse impact to Fairchild in his 12-page expert report and testimony. (See Cl.'s Ex. 317.)

121.1  Mr. Shofstall testified that Alcoa's actions were those of a good corporate citizen. (Shofstall, Cross, Tr. 2631:8-12.)

121.2  Mr. Philippe Barbier of BG Consulting, who performed

follow-on investigations at the St. Cosme and Toulouse facilities, testified that a French facility "has to show that he is a good 'citizen' to the administration". (Barbier, Dep. Tr. 63:4-12.)

**B.**     **Fairchild Offered No Evidence that Alcoa's Consultants Were Not "Reasonably Acceptable", but Rather Attested to Their Good Reputations.**

122.  Mr. Katchen explicitly testified that he was not giving an opinion on the reasonableness of Alcoa's chosen consultants. (Katchen, Cross, Tr. 3193:21 - 3194:1)

123.  Mr. Wolff, testified that Alcoa's hired consultants, ERM and Mission Geoscience, both have good reputations. (Wolff, Cross, Tr. 1934:16 - 1935:2.)

123.1  Fairchild had previously employed ERM for itself. (Flanzenbaum, Direct, Tr. 352:9-16; see also AX 14 at FC 01889.)

124.  Mr. Shofstall, Fairchild's expert on "environmental investigation and remediation" in France, testified that Alcoa's consultants, ERM, Mission Geoscience and BG Consulting, are all reputable firms, and that the field and laboratory subcontractors that those consultants chose for Alcoa projects are also reputable entities. (Shofstall, Cross, Tr. 2635:15 - 2637:3.)

**C.**     **Alcoa's Experts Systematically Determined that Alcoa's Corrective Actions Were Performed in a Commercially Reasonable Manner.**

125.  Experts from ENVIRON International Corporation ("ENVIRON"), a leading consultant in the fields of public health, environmental science and engineering, and health and safety, concluded that all of Alcoa's actions, including investigations and assessments, taken in response to Fastener Environmental Conditions were conducted in a commercially reasonable manner. (AX 137 at V-2.)

125.1  "ENVIRON evaluated each action undertaken by Alcoa to address Fastener Environmental Conditions at the Fastener facilities, the basis or rationale for that action, the applicable regulatory driver (or 'Environmental Law' as defined in the Acquisition Agreement) as of the Closing Date, and the costs (Fastener Environmental Liabilities) incurred by Alcoa to implement the action." (AX 137 at III-I, Attachments 1-25.)

125.2  Dr. Robert Powell of ENVIRON testified: "[W]e assessed whether the work that had been done was commercially reasonable. In other words, was it an appropriate response to the right issues and were the costs in line with what I would expect these things to normally cost." (Powell, Direct, Tr. 1207:14-19.)

36

**D.     Alcoa Took Considerable Care to Ensure that Its Corrective Actions Were Performed in a Cost-Effective Manner.**

**1.     Alcoa Instructed Its Employees to Address Indemnifiable Liabilities as Though Alcoa Would Bear the Costs.**

126.  Alcoa's Jim Boyt testified that his instruction with respect to all Fairchild indemnity-related projects was to run them just as if Alcoa were paying for them.  (Boyt, Direct, Tr. 277:2-15.)

**2.     Alcoa Created a Unique System to Track Indemnifiable Expenditures and Ensure They Were Appropriate.**

127.  Alcoa created a special system, named the "Project Approval Request" ("PAR") process, to track all indemnifiable EHS costs to ensure that work done "under the corrective action process was in fact justified for reimbursement from the escrow fund that was set up with Fairchild".  (Lease, Direct, Tr. 952:5 - 954:7; see also Ford, Dep. Tr. 64:14 - 65:8, 65:19 - 66:10.)  The process required a facility to prepare a proposal, or PAR, to address a Fastener Environmental Condition.  (Lease, Direct, Tr. 952:5 - 954:7.)  The proposal would then undergo a technical and regulatory review by the business unit and business unit management team that oversees that facility.  (Id.; see also Jackson, Dep. Tr. 32:19-34:8.)  Only after the proposal was approved by the business unit could the action be taken.  (Lease, Direct, Tr. 953:11-15.)

127.1  Ken Ford, Alcoa's former Director of Environmental, Health and Safety, testified:  "Alcoa was not in this to try to make money off your client.  Alcoa was in it to fix non compliance issues of which there were many, many compliance issues at virtually every facility that were clearly identified by outside and inside experts and the whole idea of this process was to track those costs and do it efficiently and not to just throw something over the transom a dollar figure so the idea of this whole process is to document and do it appropriately."  (Ford, Dep. Tr. 122:13-24.)

**3.     Alcoa Leveraged Master Service Agreements and Competitive Bidding Practices.**

128.  Alcoa's procedures for engaging consultants includes using either competitive bidding or Master Service Agreements to ensure that Alcoa receives favorable rates.  (Lease, Direct, Tr. 1097:23 - 1098:10; see also Barbier, Dep. Tr. 8:23 - 9:19; Ford, Dep. Tr. 49:21-23, 50:2-8; Millett, Dep. Tr. 22:8-20.)

128.1  Alcoa's Master Service Agreements are pre-negotiated contracts that define standard procedures for working with particular consultants and contractors and establish favorable rates for Alcoa. (George, Direct, Tr. 557:17 - 558:12; see also Flanzenbaum, Direct, Tr. 351:21 - 352:8.)

128.1.1  Mark Jackson, Director of Environmental, Health & Safety for Alcoa Fastening Systems, testified that "you couldn't touch" the rates Alcoa has obtained through Alcoa's Master Service Agreements through a process that did not involve an Alcoa Master Service Agreement.  (Jackson, Dep. Tr. 68:2-17.)

128.1.2  Mr. Katchen, Fairchild's expert, testified that he has never read Alcoa's Master Service Agreements.  (Katchen, Cross, Tr. 3192:15 - 3193:7.)

128.1.3  Mr. Lange, Fairchild's expert, testified that he had never seen the Alcoa Master Service Agreements and does not know their substance.  (Lange, Direct, Tr. 3039:8-12, 3042:13-16.)

129.  Mr. Lange testified that there was evidence Alcoa employed competitive bidding for several projects, including the purchase of air monitors, the installation of a fire alarm system, and burden and loading assessments for mobile equipment.  (Lange, Cross, Tr. 3039:13 - 3042:16, 3043:19-25; see also AX 200; AX 202; AX 203; AX 204; AX 205; AX 207; AX 208.)

130.  Mr. Katchen testified that his opinion regarding Alcoa's use of competitive bidding was based solely on his review of the documents he received from Fairchild's counsel.  (Katchen, Direct, Tr. 3179:2-7; 3188:21 - 3189:2; 3193:9-13.)

130.1  Mr. Katchen never spoke to Alcoa employees to investigate what projects were competitively bid.  (Katchen, Cross, Tr. 3181:11-19.)

130.2  Mr. Katchen testified that Alcoa competitively bid a machine guarding project at Stoughton.  (Katchen, Direct, Tr. 3117:17 - 3118:11.)

### E.    There Was a Reasonable Basis to Conduct Phase II Investigations at Fourteen of the Fastener Facilities.

131.  The Phase I Investigations uncovered evidence of actual or threatened contamination warranting Phase II investigations at fourteen of the sixteen facilities at which Phase I investigations were performed.  (Flanzenbaum, Direct, Tr. 384:8 - 385:12; Bulk AX A.)

131.1  Alcoa, with the advice of ERM, determined that Phase II investigations were not necessary at the Nemesvamos, Simi Valley and Bardon facilities.  (Flanzenbaum, Direct, Tr. 384:8-18; George, Direct, Tr. 562:12 - 563:3.)

131.2  Jeffrey Flanzenbaum of ERM testified, "We had issues of unknown issues potential environmental threats from releases of petroleum product or chlorinated solvents.  At various locations.  As I indicated before, we haven't figured out how to see underground yet.  So we

38

recommended investigations to assess whether there was indeed or not any contamination". (Flanzenbaum, Direct, Tr. 528:16 - 529:3.)

131.3  Dr. Powell testified that in his expert opinion all of the Phase II investigations that Alcoa conducted were necessary.  (Powell, Direct, Tr. 1235:22 - 1236:5.)

131.4  Mr. Fernandez, Principal of ENVIRON, testified that under the French regulatory methodology, because the Phase I Reports identified evidence of potential contamination, Alcoa was required to verify the existence or absence of contamination through Phase II type investigations. (Fernandez, Direct, Tr. 1525:22 - 1526:16, 1520:8-17, 1522:22 - 1523:6.)

131.5  Mr. Shofstall, Fairchild's expert on "environmental investigation and remediation in France", agreed that it was reasonable to conduct the Phase II investigations in light of the Phase I results. (Shofstall, Cross, Tr. 2629:21 - 2630:15.)

131.6  Mr. Wolff, Fairchild's expert on environmental contamination in California, agreed that Alcoa's approach to conducting the Phase II investigations based on the findings of the Phase I investigations is a standard approach in the industry.  (Wolff, Cross, Tr. 1925:4 - 1926:8.)

131.7  Fairchild's Mr. Hodge was involved in the planning of the Phase II investigations and never objected to their being conducted.  (See supra ¶ 32; George, Direct, Tr. 575:7-9, 579:3 - 580:8; AX 22 at FAIR00094577.)

132.  The Phase II investigations confirmed the presence of VOC, SVOC, TPH, and/or Heavy Metals contamination at each of the facilities where a Phase II investigation was conducted.  (AX 124; Flanzenbaum 392:10 - 397:3; Bulk AX B.)

132.1  "VOCs" are "volatile organic compounds" such as the carcinogenic chlorinated solvents PCE and TCE.  (Flanzenbaum, Direct, Tr. 394:6-20; AX 124.)  "SVOCs" are "semi-volatile organic compounds" such as PCBs.  (Flanzenbaum, Direct, Tr. 394:25 - 395:11; AX 124.) "TPH" refers to "total petroleum hydrocarbons" which encompass a wide range of petroleum contaminants.  (Flanzenbaum, Direct, Tr. 395:12-18; AX 124.)  "Heavy Metals" include cadmium, chromium and arsenic. (Flanzenbaum, Direct, Tr. 395:19-24; AX 124.)

133.  Had Alcoa ignored the evidence of actual and threatened contamination reported in the Phase I reports, contamination could have migrated and expanded, posing a greater threat to human health and increasing the difficulty and cost of remediating the problem.  (Flanzenbaum, Direct, Tr. 519:12 - 521:6; see also Guilhem, Direct, Tr. 1753:13-25.)

F.    **The Phase II Investigations Were Performed in a Commercially Reasonable Manner.**

134.  Dr. Powell testified that the scopes of the Phase II investigations that Alcoa conducted were reasonable and conducted according to standard methodology.  (Powell, Direct, Tr. 1236:6 - 1237:12, 1230:2-8.)  He testified that the Phase II investigations were tailored to specific issues at each site and that the cost fell within the normal range for such investigations.  (Id.)

135.  Mr. Shofstall, Fairchild's expert on "environmental investigation and remediation in France", agreed that the scopes of work for all of the Phase II investigations in France were reasonable.  (Shofstall, Cross, Tr. 2634:8 - 2635:10.)

136.  Mr. Shofstall agreed that the combined cost of the fourteen Phase IIs was within normal bounds.  (Shofstall, Cross, Tr. 2637:10-23.)

137.  Mr. Fernandez testified that, in his expert opinion, the Phase II investigations conducted in France were done in a reasonable manner and at a reasonable cost.  (Fernandez, Direct, Tr. 1526:17-24, 1528:2-9.)

138.  Alcoa's Mr. Boyt directed Alcoa personnel that Alcoa's "focus will be on being cost-effective in performance of the Phase IIs" and that they should "not engag[e] in any extraneous data collection or 'fishing expeditions'".  (AX 93 at FAIR00093786; Boyt, Direct, Tr. 274:10 - 276:2.)  Mr. Boyt testified about the Phase IIs:  "I was concerned to make sure that we let the science and data determine what needed to be looked at.  If there was a chemical risk that warranted looking at it, that's fine.  If there was something that didn't have that risk associated with it, I did not want to be spending money looking at it."  (Boyt, Direct, Tr. 276:2-8.)

138.1  Mr. Boyt also challenged Alcoa's John George and ERM's Jeffrey Flanzenbaum "to squeeze every dollar spent" on the Phase II investigations.  (AX 93 at FAIR00093786.)  Mr. Boyt testified:  "I think they should be very conscious of how they spent money and how they investigated.  I think it was important we did the job the right way but be very cost conscious."  (Boyt, Direct, Tr. 276:17 - 277:6.)

139.  ERM was forced to absorb significant costs associated with performing the Phase IIs that Alcoa believed were either unwarranted or should otherwise not be the responsibility of Alcoa (and ultimately, Fairchild).  (Flanzenbaum, Direct, Tr. 406:24 - 408:21; see also George, Direct, Tr. 584:18 - 586:6, AX 23.)

140.  Alcoa conducted the Phase II investigations as it would any Phase IIs that were not indemnified by another party.  (George, Direct, Tr. 569:22 - 570:10; George, Redirect, Tr. 795:25 - 796:4; see also AX 20 at FAIR00093488.)

G.    **The Phase II Results Warranted Further Investigation at Ten Facilities, and Those Investigations Were Performed in a Commercially Reasonable Manner.**

1.    **Fairchild Agreed that Further Investigation Should Be Conducted.**

141.   On February 26, 2004, Mr. Beckford sent a letter to Alcoa attaching a chart indicating at which facilities Fairchild believed "there should be further investigation" based on the results of the Phase II investigations. (AX 32 at FC 00296-306.)  According to Mr. Beckford's letter, further investigation should be conducted at Torrance, Fullerton, Montbrison, St. Cosme, and Vougy. (AX 32 at 299-306.)

142.   Dr. Powell testified that for each of the facilities he reviewed (all of the non-French facilities), each follow-on investigation and action was a logical progression from the Phase II results and "thoughtfully planned, executed and was commensurate with the scope of the problem they identified". (Powell, Direct, Tr. 1242:19 - 1244:2; see AX 137 at A2-1 to A2-3.)  Dr. Powell testified that the costs for these actions were within a commercially reasonable range. (Powell, Direct, Tr. 1242:19 - 1243:15.)

2.    **The French Regulatory Methodology Requires Progressive Investigative Steps.**

143.   The French regulatory methodology for addressing contamination includes progressive investigative steps, including, *inter alia*, an initial diagnostic investigation, a Simplified Risk Assessment ("SRA" or "ESR"), a detailed site investigation, and a Detailed Risk Assessment ("DRA" or "EDR"). (Fernandez, Direct, Tr. 1520:8 - 1522:21; George, Direct, Tr. 596:9 - 599:6; e.g., AX 13 at FAIR 00033322-26; AX 56 at FAIR00032290-93.)  If a threat to human health or the environment is identified, an SRA is conducted to determine whether further action may be warranted. (Fernandez, Direct, Tr. 1530:18 - 1531:12; 1553:9 - 1554:12; 1555:9 - 1556:5; George, Direct, Tr. 596:9 - 599:6; AX 13 at FAIR 00033324-25; Barbier, Dep. Tr. 91:11-25; Nugteren, Dep. Tr. 166:2-18.)  If the SRA results classify a site as "Class 1", then a DRA must be conducted. (Fernandez, Direct, Tr. 1520:8 - 1522:12; Shofstall, Direct, Tr. 2596:25 - 2597:11; Barbier, Direct, Tr. 1531:24 - 1533:2.)  The results of the DRA determine whether remediation, continued monitoring, or no further action is required. (Fernandez, Direct, Tr. 1531:24 - 1533:2.)

143.1  Mr. Fernandez testified that industrial sites such as the Fastener Facilities must follow the French methodology in addressing contamination "because it has been promulgated by [French Ministry of Environment] circulars and because it is the only one in existence.  There are no other methodology to be followed in France than the one that has been published by the Ministry of Environment". (Fernandez, Direct, Tr. 1522:13 - 1523:6.)

143.2  Mr. Fernandez testified that to address the contamination

41

identified in the French Phase II investigations, "Alcoa just followed the French methodology for doing such work". (Fernandez, Direct, Tr. 1520:8-17; see also George, Redirect, Tr. 796:13-19.)

**a.    The results of the Phase II Investigations at four of the five French facilities warranted SRAs, which were performed in a commercially reasonable manner.**

144.  The contamination discovered by the Phase II investigations at St. Cosme, Toulouse, Montbrison and Vougy required that an SRA be conducted at each of those sites. (AX 137 at A2-2 to A2-3; Bulk AX B, Vols. 13, 12, 10, 14; Bulk AX C 00004342; Cl.'s Ex. 457; see also Fernandez, Direct, Tr. 1528:24 - 1529:16; 1530:18 - 1531:12; 1553:9 - 1554:12; 1555:9 - 1556:5; George, Direct, Tr. 596:9 - 599:6; AX 13 at FAIR 00033322-25.)

144.1  An SRA was not conducted at the Marignier, France, facility because the Marignier Phase II investigation results did not warrant one. (Bulk AX B, Vol. 9; Fernandez, Direct, Tr. 1529:5-16.)

145.  Robert Shofstall, Fairchild's expert, agreed that the follow-on investigations at the French sites were reasonable given the results of the Phase II investigations. (Shofstall, Cross, Tr. 2630:2-15.)

**b.    The results of the SRAs at three of the five French facilities warranted DRAs, which were performed in a commercially reasonable manner.**

146.  The SRAs for St. Cosme, Montbrison and Toulouse classified those facilities as "Class 1", requiring DRAs. (AX 137 at A2-2; Fernandez, Direct, Tr. 1534:4-1535:17; Cl.'s Ex. 457; see also Fernandez, Direct, Tr. 1529:17-1530:7; Fernandez, Direct, Tr. 1553:9 - 1554:12; 1555:9 - 1556:5; George, Direct, Tr. 596:9 - 599:6; AX 13 at FAIR 00033322-25.)

146.1  A DRA was not performed at the Vougy facility because the SRA results did not warrant one. (Fernandez, Direct, Tr. 1529:22 - 1530:7; Shofstall, Direct, Tr. 2598:4-16.)

146.2  Robert Shofstall agreed that it was a good idea to conduct the SRA and DRA at the Montbrison site. (Shofstall, Direct, Tr. 2598:17-21, 2599:12-24.)

147.  The DRAs at St. Cosme, Montbrison and Toulouse were performed in a "comprehensive, reasonable manner" and at reasonable costs. (Fernandez, Direct, Tr. 1533:3-18.)

147.1  Alcoa undertook a competitive bidding procurement for the DRAs at St. Cosme and Toulouse in which it evaluated five firms to ensure that Alcoa "moved forward with potentially significant field investigation"

in the most cost-effective manner. (George, Direct, Tr. 602:10 - 603:11.)

147.2 Mr. Philippe Barbier of BG Consulting, the consulting firm who performed the DRAs at St. Cosme and Toulouse, testified that Alcoa extensively negotiated with BG over the cost to perform the DRAs. (Barbier, Dep. Tr. 8:23 - 9:2, 20:3 - 16.)

147.3 Mr. Shofstall testified that the cost for the St. Cosme and Toulouse DRAs were reasonable. (Shofstall, Cross, Tr. 2638:20 - 2639:17.)

<strong>c.    Alcoa was able to achieve cost-effective monitoring resolutions at St. Cosme and Montbrison based on the results of the DRAs.</strong>

148. The results of the DRA at St. Cosme allowed Alcoa to demonstrate to the local authorities that the significant chlorinated solvent contamination at the St. Cosme site did not pose an off-site risk to human health or the environment because the contamination was naturally captured. (AX 130; George, Direct, Tr. 606:4 - 610:23; Fernandez 1534:4 - 1535:8.) As a result, Alcoa was able to negotiate an agreement with the local authority, the DRIRE, whereby only continued monitoring is required. (George, Direct, Tr. 632:14-21; Fernandez 1534:4 - 1535:8; AX 137 at A2-2.)

148.1 The DRIRE has subsequently required further investigation and characterization of neighboring streams at St. Cosme. (AX 137 at A2-2.)

149. The DRA at Montbrison determined that chlorinated solvent contamination was migrating off site, posing a threat to a nearby canal that is used for drinking water. Alcoa has therefore been required by the local authority to monitor the contamination. (AX 137 at A2-2; AX 58; George, Direct, Tr. 621:21 - 623:5; Fernandez, Direct, Tr. 1536:8-21.)

149.1 Further investigation may be required at the Montbrison site as the sources of contamination have not yet been adequately identified. (George, Direct, Tr. 623:6-21.)

<strong>3.    The Phase II Results at the German Facilities Required Further Investigation and Sampling, Which Were Performed in a Commercially Reasonable Manner.</strong>

150. The Kelkheim Phase II investigation identified the presence of chlorinated solvents and other contaminants, requiring the installation of monitoring wells to characterize the extent of the contamination. (AX 137 at A2-2; Bulk AX B, Vol. 8; Powell, Direct, Tr. 1247:4-11.)

150.1 Dr. Powell testified that the "monitoring only" result that Alcoa was able to achieve for the Kelkheim facility "is the most cost

43

effective remedy possible to achieve in these kinds of contamination circumstances". (Powell, Direct, Tr. 1247:21-24.) Dr. Powell testified that "they looked at the right problem, they did a reasonable proportionate study, they came to [a] very cost effective remedy" at Kelkheim. (Powell, Direct, Tr. 1247:25 - 1248:2.)

151. The Phase II investigation at Hildesheim identified chlorinated hydrocarbon contamination in groundwater, requiring further sampling to characterize the extent of the contamination. (AX 137 at 2-3, Bulk AX B, Vol. 7.)

### 4.  The Phase II Results at the California Facilities Identified Contamination that Required Further Actions, Which Were Performed in a Commercially Reasonable Manner.

152. The Torrance Phase II investigation identified significant contamination by chlorinated solvents that required supplemental investigation to delineate the problem. (AX 137 at A2-1; Bulk AX B, Vol. 5.)

152.1  Dr. Powell testified that the post-Phase II work performed at the Torrance site was necessary and performed in a commercially reasonable manner. (Powell, Direct, Tr. 1240:13-20.) Dr. Powell testified that, given the Phase II results, "Alcoa was in for a long haul of investigation and [eventually] remediation to deal with this problem. It is a pretty serious contamination problem they found. There was no way under the regulatory programs in California they simply could have stopped." (Powell, Direct, Tr. 1231:10-18, see also id. at 1228:5-18, 1234:21 - 1235:21.)

152.2  Mr. Wolff, Fairchild's expert on environmental contamination in the United States, agreed that further work was necessary at the Torrance site based on the results of the Phase II investigation. (Wolff, Direct, Tr. 1928:6-9.)

152.3  Mr. Wolff testified that he could not identify any particular excessive action taken at the Torrance facility. (Wolff, Direct, Tr. 1988:16 - 1989:3.)

152.4  Dr. Powell also testified that, at Torrance, "there had been a number of underground tanks that had been removed over the years because of known leaks. Looking at the records of those tank closure project it was apparent the clean-up had not been completely successful in removing all the contamination. At one level there was a concern there would remain contamination in the underground tank areas that had not been fully resolved." (Powell, Direct, Tr. 1228:5-18.)

152.5  Dr. Powell testified that, at Torrance, "Eventually they are going to have to remove all of the sources from the soil above the water table. They are going to have to control and begin to reduce amounts of

contamination that reached groundwater. They will very likely have to do extensive investigation of the aquifer around the Torrance facility to determine how widespread this problem has become. The problem with these solvents when they reach groundwater they don't stay put. Groundwater is constantly moving. Once they begin to dissolve in water they are going to move and form what we call a plume of contamination. We know from investigations they have done thus far the contamination has reached property line at fairly high concentrations. That says to me as a hydrogeologist it is going well beyond the property line at this point. How far we don't know. They will have to eventually do investigations that define how big this problem is and begin to plan for removal of it from the aquifer." (Powell, Direct, Tr. 1234:21 - 1235:21.)

153. The California Department of Toxic Substances (DTSC) also required Alcoa to enter into a Consent Agreement to further delineate and monitor the soil and groundwater contamination at Torrance that the DTSC identified in a 2005 investigation it conducted to verify results of an Environmental Assessment Checklist submitted by Fairchild in 1996. (Bulk AX C 00007881, -83, -96-97; Bulk AX C 00007932, -34-35; Bulk AX C 00008452.)

153.1 Alcoa was informed by the DTSC that if it did not enter into the "consent" agreement with the DTSC, the DTSC would "issue an unilateral order demanding the site be remediated in a timely fashion". (AX 167 at FAIR 00079704.)

154. The Fullerton Phase II identified contamination including chlorinated solvents requiring further investigation to delineate the extent of soil and groundwater contamination. (AX 137 at A2-1; Bulk AX B, Vol. 3; AX 59 at FAIR50022475.)

154.1 The Fullerton Phase I reported: "Chlorinated solvents have been documented to be present in the soil underlying the PCE and [TCE] degreaser systems. No remediation of the impacted soil has occurred. No evaluation of groundwater has occurred. Effective 20 May, 2002 Fairchild authorized their environmental consultant to begin discussion with the Los Angeles Regional Water Quality Control Board (RWQCB) about possible remediation and further investigation of the impacted soil." (Bulk AX A, Vol. 3 at 4.)

155. The City of Industry (Unruh Avenue) Phase II investigation confirmed the presence of chlorinated solvent contamination in the site's groundwater. (Bulk AX B, Vol. 2 at ES-2, 25.) Because the concentration of contamination was greater in samples of groundwater that had passed through the site, further investigation was required to determine if an on-site source was contributing to the contamination. (AX 137 at A2-1; Bulk AX B, Vol. 2 at ES-2; Flanzenbaum, Direct, Tr. 515:12 - 518:14.)

156. The City of Industry (Temple Avenue) Phase II investigation identified far greater concentrations of chlorinated solvents in the site's soil than Fairchild's consultant

had previously isolated, requiring supplemental soil and groundwater testing to determine the extent of the contamination and to improve upon the remediation efforts initiated by Fairchild. (AX 137 at A2-1; Powell, Direct, Tr. 1245:9-16; AX 104; AX 54; AX 228.)

> 156.1 The California Regional Water Quality Control Board subsequently required additional soil and groundwater testing and monitoring at the City of Industry (Temple Avenue) facility. (AX 137 at A2-1; AX 209.)

**H.     Alcoa's Corrective Actions Concerning Contamination Have Been Performed in a Commercially Reasonable Manner.**

157. The meeting minutes of a November 8, 2004, meeting between Alcoa's John Lease, John George, and Sandy Harvey, and ERM's Jeffrey Flanzenbaum, state: "We resolved that we would take the same approach to management of Fairchild remediation liabilities as [Alcoa's remediation group] currently employs at locations where Alcoa is financially responsible – i.e., we will define a range of outcomes from most cost-effective to reasonable worst case and will drive to complete the remediation as cost-effectively as possible". (AX 22 at FAIR00094574; see also George, Direct, Tr. 577:16 - 578:17.)

158. Dr. Powell testified that all remedial action undertaken by Alcoa was "thoughtfully planned, executed and commensurate with the scope of the problem they identified", and that the costs for those actions were all within a commercially reasonable range. (Powell, Direct, Tr. 1242:19 - 1244:2; AX 137 at V-1 to V-2.)

159. Thus far, Alcoa has undertaken clean-up efforts at the City of Industry (Temple Avenue) site, and has installed a hydraulic containment system at Toulouse:

> 159.1 At the City of Industry (Temple Avenue) site, Alcoa continues to operate a remediation system that Fairchild installed. (AX 137 at A2-1; Hall, Cross, Tr. 2906:21 - 2907:6; Wolff, Cross, Tr. 1935:25 - 1936:20, 1937:3-9; 1949:5-16.)

>> 159.1.1 Alcoa employed Fairchild's consultant, Envirosolve, to operate this remediation system for months following the acquisition. (Hall, Cross, Tr. 2906:21 - 2907:6.)

>> 159.1.2 Soil samples revealed that the chlorinated solvent contamination at the Temple Avenue site was greater than Fairchild's consultants had identified, requiring Alcoa to expand the soil vapor extraction system that Fairchild had installed. (Powell, Direct, Tr. 1245:9-16.)

> 159.2 The DRA at Toulouse determined that significant chlorinated solvent contamination was migrating off-site, posing a risk to a neighboring hotel swimming pool and garage. (AX 129; George, Direct, Tr. 616:15 - 621:20; Fernandez, Direct, Tr. 1535:9 - 1536:7.) Alcoa has addressed this by using the existing wells at the site to operate a hydraulic containment

system, which essentially contains the contamination by pumping the groundwater. (AX 137 at A2-2; George, Direct, Tr. 620:20 - 621:20; Fernandez, Direct, Tr. 1535:9 - 1536:7; Barbier, Dep. Tr. 84:24 - 85:25; Cl.'s Ex. 470.)

159.2.1  Monitoring of this contamination is also required. (AX 137 at A2-2; AX 221.)

159.2.2  Robert Shofstall, Fairchild's expert on environmental investigation and remediation in France, testified that if Fairchild told him that it wanted to act responsibly and as quickly as possible to address this carcinogenic contamination at the Toulouse facility, and if Fairchild were willing to spend the money necessary to achieve that objective, he would agree with Alcoa's choice to pursue the hydraulic containment system. (Shofstall, Cross, Tr. 2641:10-15; 2650:4-25; see also Cl.'s Ex. 470.)

I.    **The Environmental, Health & Safety Compliance Actions Taken by Alcoa Were Performed to Bring the Facilities into Compliance with Applicable Regulations at Commercially Reasonable Costs.**

160.  Through a systematic review of every environmental, health and safety compliance-related action taken by Alcoa, ENVIRON determined that all but three of those actions were performed to bring the Fastener facilities into compliance with legal environmental, health or safety standards. (AX 137 at V-1 to V-2, VI-1 to VI-2, Attachments 3-25.) ENVIRON identified the applicable Environmental Law driving each action and determined that all of Alcoa's actions were performed in a commercially reasonable manner. (AX 137 at V-2, Attachments 3-25.)

160.1  Mr. Guilhem testified that, in his opinion, the following projects at St. Cosme were not actions required by an environmental, health or safety regulation:  1) the smoking facility project, 2) the pedestrian forklift traffic organization project and 3) the traffic compliance project. (AX 137 at VI-1; Guilhem, Direct, Tr. 1729:2 - 1730:18.)  Although the two interrelated traffic projects were taken to correct legal noncompliances, Mr. Guilhem opined that Alcoa's chosen solutions went beyond what was required by law. (Guilhem, Direct, Tr. 1729:19 - 1730:13.)

1.    **The Fastener Facilities Were out of Compliance with Environmental, Health and Safety Laws.**

161.  Alcoa's John Lease testified that the Limited Compliance Reviews and Compliance Gap Analyses "identified noncompliance gaps in just about every area within EHS.  That included environmental compliance, air, water, waste water, solid and hazardous waste, management.  As well as chemical substance reporting.  We identified gaps in health areas, including industrial hygiene, monitoring and exposures.  We also identified gaps in workplace safety areas such as machine guarding, confined space, fall protection and so forth." (Lease, Direct, Tr. 858:2-19; see also Ford Dep. Tr. 93:15 - 94:7; Bulk AX B; Bulk

47

AX C 00000002-3, -19-20, -32-34, -38-43; AX 52; AX 112; AX 113; AX 210; Cl.'s Ex. 52.)

161.1 Mr. Shofstall, Fairchild's expert, testified that he has no basis to disagree with ERM's findings in the Phase I Reports that the Fastener facilities were not in compliance with applicable environmental laws at the time of the acquisition. (Shofstall, Cross, Tr. 2678:19 - 2679:7.)

## 2.    Fairchild offered no evidence that Alcoa's compliance actions were performed in excess of legal requirements.

162. Mr. Lange, Fairchild's expert on health and safety in France, testified that "the question was not to me to evaluate the compliance of Alcoa activities". (Lange, Cross, Tr. 3016:16-17.)

163. Mr. Katchen, Fairchild's expert on health and safety in the United States, similarly testified that he could not give an opinion on whether Alcoa's actions were or were not taken to correct noncompliances with law. (Katchen, Cross, Tr. 3182:5-16.)

164. Mr. Wolff, Fairchild's expert on contamination issues in the United States, testified that he was not opining at all on compliance with environmental laws. (Wolff, Cross, Tr. 1914:12-14.)

165. Mr. Shofstall, Fairchild's expert on environmental compliance issues in France, testified that "you cannot do an environmental compliance assessment without having really visited the site. To really understand the story that goes behind a particular subject you really have to see it". (Shofstall, Cross, Tr. 2673:21 - 2674:5.) Mr. Shofstall did not, however, visit any of the Fastener sites. (Shofstall, Cross, Tr. 2530:23-24.)

166. Fairchild did not offer any expert testimony on environmental compliance actions in the United States or Germany, health and safety compliance actions in Hungary, or either category of compliance actions in Germany. (See Cl.'s Ex. 317 at 2; Cl.'s Ex. 466 at 2; Cl.'s Ex. 471 at 3, 6; Cl.'s Ex. 482 at 1; Wolff, Direct, Tr. 1802:4-15; Shofstall, Cross, Tr. 2626:22 - 2627:7; Lange, Direct, Tr. 2937:10 - 2938:23; Katchen, Direct, Tr. 3090:11-25.)

167. Fairchild offered no evidence that any of Alcoa's internal health and safety standards are materially different than corresponding government regulations.

167.1 Mark Katchen, Fairchild's expert witness on health and safety in the United States, testified that he did not perform a detailed side-by-side comparison of any of the Alcoa standards and their corresponding OSHA and Cal/OSHA standards, including those for fall protection, lockout tagout and mobile equipment. (Katchen, Cross, Tr. 3215:18 - 3216:23; see also Katchen, Cross, Tr. 3217:2-12; Cl.'s Ex. 211.)

168. There is no material difference between internal Alcoa standards and their corresponding regulatory standards:

48

168.1  Mr. Boyt testified that Alcoa's health and safety standards are not significantly different from applicable OSHA standards. (Boyt, Direct, Tr. 340:3-22.) Mr. Boyt testified that Alcoa standards are generally simplifications of applicable OSHA regulations, which can be fifty to sixty pages long. (Id.)

168.2  Mr. Adams testified that Alcoa workplace health and safety standards are generally in line with the relevant requirements of California and federal law. (Adams, Direct, Tr. 1583:11 - 1584:12.) Mr. Adams testified that any differences between the Alcoa standards and government regulations are generally "programmatic in nature". (Id.)

168.3  Mr. Jackson, an Alcoa EHS director, testified that the Alcoa standard for lockout tagout is identical to the OSHA standard. (Jackson, Dep. Tr. 138:17-24.) Mr. Jackson also testified that any difference between all of the relevant Alcoa standards and their corresponding OSHA standards is "so trivial it's not worth mentioning". (Jackson, Dep. Tr. 143:4-8.)

168.4  Mr. Guilhem testified that he was not able to identify any differences of substance between the Alcoa standards he reviewed, including those for machine guarding, fall prevention, confined space entry and others, and the corresponding European regulations. (Guilhem, Direct, Tr. 1702:25 - 1703:13.)

168.5  Jerome Lange, Fairchild's expert on health and safety in France, testified that the definition of "confined space" in Alcoa internal standards is comparable to that commonly understood by health and safety experts and to his own definition of the term. (Lange, Cross, Tr. 3059:16 - 3061:19; Cl.'s Ex. 478.)

169.  Mr. Katchen testified that ANSI standard B11.19 4.1.1.2.2, cited in a proposal for machine guarding work at Alcoa, is not a legal requirement. (Katchen, Direct, Tr. 3123:25 - 3124:8, 3126:15 - 3127:3, 3127:10 - 3130:4, 3147:11 - 3149:22; see also Cl.'s Ex. 47 at FAIR50001798.)

169.1  However, when confronted on cross examination with a section from California's occupational safety and health law, Mr. Katchen conceded that this ANSI standard is identical in substance and language to the corresponding California legal requirement. (Katchen, Cross, 3213:4 - 3214:7; AX 264.)

169.2  ANSI standards are standards promulgated by the American National Standards Institute. (Katchen, Direct, Tr. 3126:21-23.)

169.2.1  Mr. Ford, a global environmental manager at Alcoa, testified that, "[i]n a lot of cases ANSI standards are OSHA consensus standards so you just can't say that if it's an ANSI standard it's not an OSHA standard . . . . [Y]ou can't unilaterally say that an ANSI standard is

not enforced by OSHA because OSHA under the general duty clause and other regulations can adopt industry consensus standards if they want and cite you under those if they determine it's appropriate". (Ford, Dep. Tr. 110:8-12, 110:25 - 111:13.)

170.  Mr. Adams testified that none of the health and safety compliance work performed by Alcoa in the United States was performed in excess of legal requirements. (Adams, Direct, Tr. 1634:2-9.)

### 3.    Representative Measures Taken to Correct Noncompliances in a Commercially Reasonable Manner.

171.  ENVIRON determined that: "Fastener Environmental Conditions existed at several Fastener facilities as of the December 3, 2002 Closing Date due to noncompliances, alleged noncompliances, violations or alleged violations of Environmental Laws developed by applicable Government entitities with regard to workplace health and safety or exposure to Hazardous Materials, as defined by the Acquisition Agreement." (AX 137 at V-1.)  ENVIRON further determined that "[t]he actions undertaken by Alcoa while mitigating and addressing the Fastener Environmental Conditions identified . . . were conducted in a commercially reasonable manner". (Id. at V-2.)  For example:

#### a.    Machine safety.

172.  Fairchild was out of compliance with machine safety regulations, including machine guarding, lockout tagout and workplace risk assessment requirements, at multiple facilities.  (See, e.g., AX 137 at A4-1, A6-1, A8-1, A10-1, A14-1, A16-1, A18-1, A22-2, A24-1; Bulk AX A, Vol. 3 at 52, 71; Bulk AX A, Vol. 5 at 32; Lease, Redirect, Tr. 1363:5 - 1365:25, 1364:20-25; Lange, Cross, Tr. 3024:13 - 3029:25; AX 95; Bulk AX C, Vol. 1 at 00000136-37, 00000376-77.)

172.1  Mr. Katchen testified that the Phase I Reports described machine safety noncompliances, including some that had resulted in amputations.  (Katchen, Cross, 3183:15 - 3184:23.)

173.  Mr. Adams testified that all of Alcoa's work to correct machine safety noncompliances at the United States facilities was required by OSHA or Cal/OSHA. (Adams, Direct, Tr. 1598:5-9, 1621:25 - 1622:19, 1630:22 - 1631:25, 1632:2 - 1634:9.)

173.1  Mr. Adams visited Fastener Facilities to observe the facilities and talk to personnel about existing noncompliances and corrective measures taken to fix previous noncompliances.  (Adams, Direct, Tr.1584:14 - 1588:16.)

173.2  Mr. Katchen testified that he had no basis to disagree with Mr. Adams' evaluations of the machines or the corrective actions performed upon them.  (Katchen, Cross, Tr. 3204:4 - 3205:5.)

174. Mr. Adams testified that all of the costs that Alcoa incurred to correct machine safety noncompliances at the United States facilities were commercially reasonable. (Adams, Direct, Tr. 1617:6-18, 1600:2-22, 1612:12 - 1613:10, 1627:2-13, 1631:5-25, 1632:2 - 1633:4.)

174.1 Mr. Adams testified that there is not a wide range of options to comply with machine safety regulations. (Adams, Direct, Tr. 1597:13 - 1598:22, 1612:12-25.)

174.2 Mr. Adams testified that he was "quite impressed" with the limited costs incurred to correct the lockout tagout noncompliances at the Torrance facility, stating, "I don't think I could have done it for that price". (Adams, Direct, Tr. 1615:20 - 1616:4.)

174.3 Mr. Katchen testified that he had no basis to disagree with Mr. Adams' conclusion that none of the costs submitted were for work in excess of regulatory standards. (Katchen, Cross, Tr. 3205:2-15.)

175. Mr. Guilhem testified that Alcoa's approach to machine safety noncompliance corrective actions in Europe consisted of "basic engineering solutions", not "deluxe solutions". (Guilhem, Direct, Tr. 1724:10-22.)

176. Mr. Nugteren, Alcoa's EHS manager in Europe, testified that machine guarding work performed in Europe was done to correct legal noncompliances. (Nugteren, Dep. Tr. 148:5 - 149:9, 198:19 - 199:19.)

177. Mr. Lange, Fairchild's expert, agreed that he saw no machine guarding work in excess of regulatory requirements. (Lange, Cross, Tr. 3016:21 - 3017:9.)

b.  **Mobile equipment, electrical safety, fall protection, combustion safety, etc.**

178. Many of the Fastener facilities suffered from similar noncompliances in areas including mobile equipment, electrical safety and fall protection. (See, e.g., AX 137 at Attachments 4, 6, 8, 10, 12, 14, 16, 18, 20, 22; Adams, Direct, Tr. 1617:19 - 1619:7, 1621:25 - 1622:14, 1627:2-9, 1631:5-25.)

178.1 The Torrance facility alone had approximately 1700 instances of noncompliance with electrical safety regulations at the time of the acquisition. (Adams, Direct, Tr. 1616:5 - 1617:18; AX 137 at A4-2.)

179. Mr. Adams testified that all of Alcoa's work that he reviewed, including work related to mobile equipment, electrical safety, and fall protection regulations, was required by OSHA or Cal/OSHA, and that the costs Alcoa incurred were commercially reasonable. (Adams, Direct, Tr. 1605:5-14, 1608:17-25, 1617:19 - 1619:16, 1621:25 - 1622:19, 1627:2-13, 1631:5-25, 1632:2 - 1634:9.)

51

180. Mr. Guilhem concluded that, with three exceptions, all of the European work that he reviewed, including work related to mobile equipment, electrical safety, and fall protection regulations, were required by applicable regulations and performed in a commercially reasonable manner. (Guilhem, Direct, Tr. 1704:9-16.)

180.1 Mr. Guilhem testified, for example, that the work Alcoa performed to correct fall protection noncompliances at St. Cosme was required by law and performed in a commercially reasonable manner. (Guilhem, Direct, Tr. 1717:20 - 1718:14.)

180.1.1 Mr. Lange testified that he had no knowledge of Alcoa implementing any fall protection measures at the French facilities in excess of French law. (Lange, Cross, Tr. 3064:10-15.)

### c.  Additional noncompliances of note.

### (i)  City of Industry

181. The City of Industry Department of Public Works sent an order to Fairchild in late 2000, instructing it to comply with earthquake hazard reduction regulations or "your building may be ordered vacated or demolished". (AX 83; Adams, Direct, Tr. 1628:2 - 1629:9.) Fairchild did not undertake the work necessary to comply with this regulation when it owned the facilities, requiring Alcoa to undertake corrective actions. (Adams, Direct, Tr. 1629:10-16; AX 137 at A8-2; AX 138.)

181.1 Mr. Adams testified that costs that Alcoa incurred to comply with this earthquake hazard reduction regulation were reasonable. (Adams, Direct, Tr. 1629:21 - 1630:8.)

### (ii)  Torrance

182. In conducting its Rapid Integration Analysis at the Torrance facility, Alcoa discovered that under Fairchild's ownership, facility personnel had routinely diluted the discharge from the plating line operation while the Los Angeles County Sanitation District was on site to sample the wastewater, making it appear as though the discharge concentration was within the facility's permit limits, when, in fact, it was not. (Lease, Direct, Tr. 883:18 - 884:17.) Accordingly, Alcoa was required to correct this noncompliance. (AX 137 at A3-1.)

### (iii)  Fullerton

183. Prior to the acquisition, the South Coast Air Quality Management District required facilities such as the Fullerton plant to eliminate the use of PCE degreasing systems. Under Fairchild's ownership, the Fullerton facility was unable to meet the regulatory deadline for doing so, and therefore petitioned for an extension to 2003 to complete the project. As a result, when Alcoa acquired the facility from Fairchild, it had to complete this transition to non-PCE degreasing. (Powell, Direct, Tr. 1253:2 - 1254:12; AX 137 at A5-1, 13-1.)

184. Prior to the closing, on November 13, 2002, the California Regional Water Quality Control Board notified the Fullerton facility of a "Failure to Comply with the General Permit for Stormwater Discharges Associated with Industrial Activities", requiring corrective action by Alcoa after the closing. (AX 188; AX 137 at A5-1.)

### (iv) Stoughton

185. The septic tank at the Stoughton facility had ceased working under Fairchild's ownership, and Fairchild therefore resorted to pumping the septic tank monthly to ship the waste off site. (Powell, Direct, Tr. 1257:6-22; AX 137 at 11-1.) Such frequent pumping of a septic tank is not permitted under the applicable Massachusetts regulation, 310 CMR 15.303, and Alcoa was therefore required to upgrade the septic system to comply with Massachusetts' regulatory specifications. (Wolff, Cross, Tr. 1990:11 - 1993:5; AX 239; Bulk AX A, Vol. 5 at 32.)

185.1 Mr. Wolff testified that he was unaware of these Massachusetts regulations when he rendered his opinion concerning Alcoa's septic system work at the Stoughton facility. (Wolff, Cross, Tr. 1991:9 - 1992:7; see also AX 466 at 7-8.)

### (v) St. Cosme

186. Fairchild's fire alarm system at the St. Cosme facility was so out of compliance with French regulations that it required a person to remain in a burning building pressing the fire alarm button in order for the alarm to continue to sound. (Guilhem, Direct, Tr., 1727:8 - 1728:25.) Alcoa was consequently required to replace the fire alarm system to bring it into compliance with French regulations and did so in a commercially reasonable manner. (Id.)

187. At the time of the acquisition, the TCE degreasing system at St. Cosme was out of compliance with regulations. (AX 137 at A13-1; Guilhem, Direct, Tr. 1732:4 - 1733:23.) Alcoa determined that the cost-effective course of action was to replace the degreaser with an alkaline washing machine. (Guilhem, Direct, Tr. 1733:8 - 1733:23.)

187.1 Fairchild's expert, Robert Shofstall, testified that the cost Alcoa incurred to replace the degreaser at St. Cosme "is pretty much what I'm used to seeing". (Shofstall, Cross, Tr. 2695:21 - 2696:3.)

187.2 Mr. Shofstall testified that Alcoa's expenditures for secondary containment under degreasing equipment at St. Cosme were designed to bring the facility into compliance with French regulations. (Shofstall, Cross, Tr. 2698:13-24.)

188. Mr. Shofstall testified that the costs Alcoa incurred to address the water cooling system at St. Cosme did not surprise him. (Shofstall, Cross, Tr. 2696:4-12.)

189. Alcoa's work to replace the wastewater treatment plant at St. Cosme was similar in nature and cost to a proposal Fairchild obtained in 2001. (Guilhem, Direct,

Tr. 1737:8 - 1738:8; see also AX 44; Miller, Cross, 2468:15 - 2470:16.)

189.1 Mr. Shofstall agreed that the wastewater treatment plant project at St. Cosme was a straightforward situation in which Alcoa was addressing a noncompliance. (Shofstall, Cross, Tr. 2680:21 - 2682:13.)

### (vi)    Toulouse

190. Mr. Shofstall testified that Alcoa's actions taken with respect to nitrates in the wastewater at the Toulouse facility was an example of Alcoa addressing a noncompliance. (Shofstall, Cross, Tr. 2682:14-25; see also AX 137 at A15-1.)

191. The parking lot at the Toulouse facility was out of compliance in multiple ways with the facility's permit, requiring Alcoa to undertake corrective actions. (AX 137 at A15-1; Guilhem, Direct, Tr. 1705:4 - 1708:15.)

191.1 Operating permits in France are regulated under the environmental code, specifically the IPCE, a French acronym for "installations classified for protection of the environment". (Guilhem, Direct, Tr. at 1705:18 - 1706:13; AX 137 at A15-1.) Operating permits also implicate health and safety requirements, such as access to the plant for emergency vehicles. (Guilhem, Direct, Tr. 1706:23 - 1707:16.)

191.2 Mr. Shofstall opined that the majority of the work performed on the Toulouse parking lot falls in the health and safety category. (Shofstall, Cross, Tr. 2683:10-18.) Mr. Shofstall also testified that the Toulouse facility's operating permit contains requirements concerning the facility's parking lot. (Shofstall, Cross, Tr. 2685:21 - 2687:13.)

191.3 Mr. Lange testified that lighting of the parking lot is a safety issue in France regulated by the work code. (Lange, Cross, Tr. 3069:16-20.) Mr. Lange also testified that he had no knowledge of the lighting circumstances in the Toulouse parking lot at the time of the acquisition. (Lange, Cross, Tr. 3069:21-24.)

191.4 Mr. Lange testified that the health and safety of the workers in a facility could be in peril if a facility has only one entrance and it is blocked when an emergency vehicle needs to respond to a fire or explosion. (Lange, Cross, Tr. 3071:3-8.)

### (vii)    Montbrison

192. The Montbrison facility was not in compliance with its permit requirement to separate its wastewater from stormwater discharges, and Alcoa was therefore required to install separate sewers for wastewater and stormwater. (AX 137 at A17-2; Guilhem, Direct, Tr. 1713:4-19; Nugteren, Dep. Tr. 34:9-35:7.)

### (viii)  Hildesheim

193.  Prior to the acquisition, the wastewater at the Hildesheim facility contained fluoride and cadmium concentrations above regulatory limits, and the facility's attempts, under Fairchild's ownership, to repair the wastewater treatment plant to prevent those exceedances were unsuccessful.  When Alcoa acquired the facility, it was required to fix the wastewater treatment plant to bring fluoride and cadmium concentrations into compliance with regulatory limits.  As part of this effort, Alcoa was forced to ship the noncompliant wastewater offsite for treatment while it performed the corrective action. (Powell, Direct, Tr. 1254:21 - 1255:22; AX 137 at A21-1.)

### J.    There Was a Reasonable Basis to Conduct All of the Compliance Assessments or Investigations that Alcoa Conducted.

194.  ENVIRON identified a reasonable basis for each of the environmental compliance and health and safety compliance assessments Alcoa conducted. (AX 137 at Attachments 3-25.)

195.  Once the existence of a noncompliance is generally identified, corrective action often cannot be implemented without investigation or assessment to determine the exact nature and extent of the noncompliance.  (Cf. Flanzenbaum, Direct, Tr. 370:25 - 371:10; see AX 137 at V-1 to V-2.)

195.1  Mr. Guilhem testified: "It is impossible to get anywhere in terms of action taken without having this type of assessment performed which could be a second step after the Phase I assessments." (Guilhem, Direct, Tr. 1726:18-21.)

195.2  Investigations, including risk assessments, are a necessary part of the process of bringing machine safety measures into compliance. (Adams, Direct, Tr. 1679:18 - 1680:15; see also Flanzenbaum Redirect, Tr. 500:6-22.)

195.2.1  Mr. Lange testified that it is "mandatory" in France to perform risk assessments for health and safety issues and then to identify an action plan to address noncompliances.  (Lange, Cross, Tr. 3044:2-14.)

195.3  Mr. Katchen testified that to assess compliance concerning machine safety, a compliance audit is generally performed, which involves visiting the site to evaluate the physical status of each machine and to review documentation pertaining to the machinery.  (Katchen, Cross, Tr. 3176:5 - 3177:12.)

195.3.1  Mr. Katchen testified that the risk assessments performed at Torrance and Fullerton were done to determine what corrective measures were necessary.  (Katchen, Direct, Tr. 3152:24 - 3153:13.)

195.4  Dr. Powell testified that the first step in correcting an environmental noncompliance such as a wastewater discharge exceedance is to bring in an engineer to investigate the problem, isolate its source and determine an effective solution.  (Powell, Direct, Tr. 1250:14 - 1251:12.)

196.  Performing assessments or investigations at specified intervals is also required to be in compliance with certain regulations.  (See, e.g., AX 137 at A4-2, A7-1, A13-2, A14-3, A15-2, AX 14 at FC01887; Flanzenbaum, Direct, Tr. 377:22 - 378:25.)

## VIII.  ALCOA HAS SPENT A TOTAL OF $16,385,463.92 ON FASTENER ENVIRONMENTAL LIABILITIES THROUGH SEPTEMBER 30, 2006 AND WILL HAVE TO SPEND MUCH MORE TO ACHIEVE HEALTH AND SAFETY COMPLIANCE AND ENVIRONMENTAL COMPLIANCE AND REMEDIATION

197.  Alcoa's spending on Fastener Environmental Liabilities totaled $16,732,416.92 through September 30, 2006.  (Bulk AX C, Vol. 22 at 00023995-24006.)

197.1  Alcoa has received subsidies of $346,953.00 from the French government.  (Bulk AX C, Vol. 22 at 00024005.)

197.2  Alcoa's out-of-pocket expenditures on Fastener Environmental Liabilities currently total $16,385,463.92 through September 30, 2006.  (Bulk AX C, Vol. 22 at 00024005.)

198.  Alcoa continues to spend money on Fastener Environmental Liabilities. Much of Alcoa's ongoing work involves the exact same projects, such as machine guarding and the investigation and remediation of environmental contamination, that are at issue in this arbitration. (Bulk AX C, Vol. 22 at 00023995; see, e.g., Jackson, Dep. Tr. 65:2-18; Lease, Cross, Tr. 1115:8-10; Adams, Direct, Tr. 1599:8-16; Bulk AX C, Vol. 22 at 00023943-23990; Bulk AX C 00023931-23935.)

199.  Fairchild has, to date, rejected every one of Alcoa's claims for indemnification of out-of-pocket expenses under § 11.6(a).  (Bulk AX C, Vol. 22 at 00023995-24006; Lease, Direct, Tr. 914:3-8; Hall, Cross, Tr. 2827:11-15; Beckford, Dep. Tr. 46:19-25; Claimant's Demand for Mediation, dated March 17, 2005, at 1.)

200.  On March 19, 2007, Alcoa notified Fairchild that it had resolved a lawsuit, 36 Former Employees v. Mecaero, for € 424,483.  (Letter from M. Bartholic to D. Miller, dated March 19, 2007.)  The value of the claim in U.S. dollars as of March 19, 2007 was $564,477.49.  The claim was identified in Schedule 3.16 of the Acquisition Agreement. (Cl.'s Ex. 421 at FC 05238.)  Pursuant to §11.2(a)(iv) of the Agreement, it is applicable against the reserve for environmental, health, safety and litigation.  (AX 1 § 11.2(a)(iv).)

200.1  The reserve has therefore been reduced from $8,450,000 to $7,885,522.51.  (See AX 1 at §§ 11.2(a)(iv); Miller, Direct, 2357:8-9.)

IX.    **FAIRCHILD IS ENTITLED TO A CREDIT OF € 200,081 AGAINST ITS INDEMNIFICATION OBLIGATIONS**

201.  Alcoa and Fairchild agreed that, to the extent Alcoa was able to derive tax benefits based on tax losses incurred by Fairchild prior to the acquisition, Alcoa would provide Fairchild with a credit against its indemnification obligation in the amount of those benefits.  (Holloway, Direct, Tr. 134:4-10.)

201.1  Alcoa and Fairchild also agreed that, in order to protect Alcoa against the possibility that it would credit Fairchild with a tax benefit that was later disallowed by the relevant tax authority, Alcoa would only provide Fairchild with a credit against its indemnification obligation after such time as the tax losses Alcoa had utilized were no longer subject to audit and possible disallowance.  (Holloway, Direct, Tr. 134:11-17; Rutschmann, Direct, Tr. 1457:3-24.)

202.  Fairchild's former French subsidiaries were members of a consolidated tax group under French law.  (Rutschmann, Direct, 1461:23 - 1463:8; AX 99 at 4.)

202.1  Alcoa's French tax expert, Yves Rutschmann of the law firm Bredin Prat, in Paris, testified that under French law, the tax returns of corporations that are members of a consolidated tax group may be audited at both the individual level and at the group level for any given tax year.  (Rutschmann, Direct, Tr. 1463:13-1464:9.)

202.1.1  Mr. Rutschmann testified that, under French law, the statute of limitations for tax audits is ordinarily three years from the date in which the loss was incurred.  (Rutschmann, Direct, Tr. 1457:25 - 1458:9; AX 99 at 7-8.)

202.1.2  Mr. Rutschmann testified that, under French law, if a tax loss is utilized to obtain a tax benefit, and that loss has not previously been conclusively audited, the statute of limitations is extended until the end of the third year following the year in which the tax benefit was obtained.  (Rutschmann, Direct, Tr. 1458:18 - 1459:3; AX 99 at 7-8.)

203.  As of December 3, 2002, the total net operating losses incurred by Fairchild's former French subsidiaries and available for Alcoa to carry forward for tax purposes was € 5,812,170.  (Rutschmann, Direct, Tr. 1472:21 - 1473:7; AX 99 at 3.)

203.1  Fairchild's former French subsidiaries were audited at the level of the individual subsidiary for most of the tax years in which the losses available for Alcoa to carry forward were incurred.  (Rutschmann, Direct, Tr. 1467:14-24; Flynn, Cross, Tr. 2060:24 - 2061:5.)

203.1.1  However, two of Fairchild's former French subsidiaries, FFES and Transfix, were not audited at the individual level for the fiscal

2002-2003 tax year. (Rutschmann, Direct, Tr. 1467:14-24; Flynn, Direct, Tr. 2061:24 - 2062:4, 2064:19-23.)

204. The consolidated tax group of which Fairchild's former French subsidiaries were members was not audited for any of the tax years in which the losses available for Alcoa to carry forward were incurred. (Rutschmann, Direct, Tr. 1467:25 - 1468:7.)

204.1 John Flynn, Fairchild's former CFO, confirmed that the consolidated tax group has not been audited for these relevant years. (Flynn, Cross, Tr. 2105:6-10, 2107:19 - 2107:25.)

205. Alcoa has, to date, actually utilized net operating losses of €2,605,000. (Rutschmann, Direct, Tr. 1473:13-16; AX 99 at 3.)

205.1 Based on the losses it utilized, Alcoa obtained a tax benefit of €200,081 in the fiscal 2003 tax year, €545,802 in the fiscal 2004 tax year, and €146,336 in the fiscal 2005 tax year. (AX 99 at 3.)

205.2 Mr. Rutschmann testified that, under French law, the losses utilized by Alcoa to obtain a tax benefit in fiscal 2003 were no longer subject to audit or possible disallowance under French law as of January 1, 2007. (Rutschmann, Direct, Tr. 1474:12-19; AX 99 at 3.)

205.3 Based on the exchange rate applicable on January 1, 2007, the value of Alcoa's benefit in U.S. dollars was $264,106.92.

206. Under French law, the losses utilized by Alcoa to obtain tax benefits in 2004 and 2005 remain subject to audit and possible disallowance until January 1, 2008, and January 1, 2009, unless they are audited prior to those dates. (Rutschmann Tr. 1474:20 - 1475:4; Flynn, Cross, Tr. 2108:3-5; AX 99 at 3.)

## ALCOA'S PROPOSED CONCLUSIONS OF LAW

1. The Acquisition Agreement provides that Alcoa is entitled to indemnification for, inter alia, expenses incurred in connection with laws relating to workplace health or safety. (AX 1 § 3.24(g)(ii)(b).) That indemnification is not limited to claims that are "environmental" in nature. It includes (but is not limited to) claims for items such as machine guarding and equipment safety, fall protection, electrical safety and confined space compliance. (See supra ¶¶ 22-28.)

2. As previously set forth in the Interim Decision on Alcoa's Motion for Partial Summary Judgment, the Acquisition Agreement provides that investigations into Environmental Contamination or threatened Environmental Contamination, violations or alleged violations of, or noncompliance or alleged noncompliance with, applicable Environmental Laws are indemnifiable. (See supra ¶¶ 29-37.)

3. There were Fastener Environmental Conditions that existed at the Fastener facilities at the time of the closing. (See supra ¶¶ 38-79, 172, 178.)

58

4.  Alcoa's responses to those Fastener Environmental Conditions were commercially reasonable.  (See supra ¶¶ 118-21, 125-28, 131-40, 143-47, 152-160, 170, 173-77, 179-81, 187-90, 194-96.)

    4.1  Alcoa's investigations and corrective actions were performed in a commercially reasonable manner.  (See supra ¶¶ 118-21, 125-28, 131-40, 143-47, 152-159, 160, 170, 173-77, 179-81, 187-90, 194-96.)

    4.2  Alcoa did not contribute to or exacerbate any Fastener Environmental Conditions that existed at the Fastener facilities at the time of the closing.  (See supra ¶¶ 118-21, 125-28, 131-40, 143-47, 152-159, 160, 170, 173-77, 179-81, 187-90, 194-96.)

5.  Alcoa provided Fairchild with adequate notice of Fastener Environmental Conditions and an opportunity to comment on Alcoa's proposed response to those Conditions.  (See supra ¶¶ 45-95.)

    5.1  Alcoa made its environmental personnel and consultants reasonably available to Fairchild.  (See supra ¶¶ 70, 73-74, 77, 79-94.)

    5.2  Alcoa provided Fairchild with a reasonable opportunity to comment on Alcoa's proposed response to Fastener Environmental Conditions.  (See supra ¶¶ 45-95, 111.)

    5.3  Alcoa did not unreasonably refuse to incorporate Fairchild's comments concerning Alcoa's response to Fastener Environmental Conditions.  (See supra ¶¶ 112-13.)

    5.4  With respect to Remedial Actions, Alcoa provided Fairchild with reasonable access to the Fastener facilities and copies of all non-privileged information.  (See supra ¶¶ 84, 86, 89, 91-94.)

    5.5  With respect to Remedial Actions, Alcoa selected consultants and contractors that were reasonably acceptable to Fairchild.  (See supra ¶¶ 123-24.)

6.  Fairchild was not adversely affected by any failure by Alcoa to provide Fairchild with prompt notice of a Fastener Environmental Condition or Environmental Action.  (See supra ¶¶ 96-108, 111-13, 115-96.)

7.  Alcoa has submitted valid claims for indemnification under Section 11.6 totaling $16,385,463.92 to date.

    7.1  Fairchild has not agreed to indemnify Alcoa for any of those claims.  (See supra ¶¶ 96, 199.)

    7.2  On March 19, 2007, Alcoa notified Fairchild that it had settled a lawsuit that was identified in Schedule 3.16 of the Acquisition Agreement

in the amount of $564,477.49. Pursuant to § 11.2(a)(iv) of the Agreement, this amount is applicable against the reserve, thereby reducing the amount of the reserve from $8,450,000 to $7,885,522.51. (See supra ¶¶ 110, 200.)

7.3  Fairchild is entitled to a credit against its indemnification obligation in the amount of $264,106.92, as Alcoa received a tax benefit in such amount that is no longer subject to disallowance under French law. (See supra ¶¶ 6, 201-06.) This amount is credited to the reserve, thereby increasing it from $7,885,522.51 to $8,149,629.43.

8.  Alcoa is entitled to be paid from the escrow the amount of its claims that exceed the reserve. Alcoa therefore is entitled to $8,235,834.49 to be paid from the escrow account. (See supra ¶¶ 4, 20, 197, 200.)

9.  Alcoa is entitled to an order requiring Fairchild to return $8,235,834.49 to the escrow account. (See supra ¶ 21.)

10.  Alcoa's work to address Fastener Environmental Conditions is ongoing and Alcoa continues to incur Fastener Environmental Liabilities. (See supra ¶ 198.) Alcoa is entitled to complete the environmental and workplace health and safety actions that are reasonably necessary to address the Fastener Environmental Conditions it has identified, and to be indemnified by Fairchild for the cost of those actions without further proceedings under Section 11.7 of the Agreement.

April 16, 2007

CRAVATH, SWAINE & MOORE LLP

by _____

Evan R. Chesler
Daniel Slifkin
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Alcoa Inc.*