CPR INSTITUTE FOR DISPUTE RESOLUTION

THE FAIRCHILD CORP.,

        Claimant-Counter-Respondent,

  - v. -

ALCOA INC.

        Respondent-Counter-Claimant.

CPR File No. G-06-22H

**ALCOA INC.'S MEMORANDUM IN REPLY
TO FAIRCHILD CORP.'S POST-HEARING MEMORANDUM**

Evan R. Chesler
Daniel Slifkin
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
(212) 474-1000

*Attorneys for Respondent-Counter-Claimant
Alcoa Inc.*

Table of Contents

Page

Table of Authorities .................................................................................................... ii

Citation Conventions ................................................................................................. iii

I.    THE CONTRACT PROVIDES THAT "WORKPLACE HEALTH OR
      SAFETY" CLAIMS ARE SUBJECT TO INDEMNIFICATION. ........................3

      A.    Fairchild's Argument Ignores the Contract's Definitions. ..........................3

      B.    The Schedules to the Agreement Do Not Support Fairchild's
            Argument. .................................................................................................4

      C.    The Contract Drafts Do Not Support Fairchild's Interpretation. ................6

      D.    The Parties' Conduct Does Not Support Fairchild's Interpretation............7

      E.    Fairchild's Arguments Concerning "Environmental" Workplace
            Health or Safety Laws Are Inherently Contradictory. ................................9

      F.    Fairchild's No "Meeting of the Minds" Argument Is Meritless. ...............12

II.   THE CONTRACT PROVIDES THAT "INVESTIGATIONS" ARE
      SUBJECT TO INDEMNIFICATION. ..................................................................13

III.  FAIRCHILD HAS REFUSED TO EXERCISE ITS LIMITED
      CONTRACTUAL RIGHTS. .................................................................................15

IV.   FAIRCHILD'S ARGUMENTS CONCERNING THE INDEMNITY TAX
      CREDIT CONTRADICT ITS OWN PRIOR ADMISSIONS. .............................20

Table of Authorities

Page(s)

**Cases**

Cerberus Int'l v. Apollo Mgmt.,
    794 A.2d 1141 (Del. Super. 2002) ................................................................. 13

**Statutes & Rules**

29 C.F.R. § 1910 ................................................................................................. 10, 11

42 U.S.C. § 9601 (2002) ..................................................................................... 14

**Other Authorities**

Restatement (Second) of Contracts § 201 (1981) ............................................. 12

<u>Citation Conventions</u>

The following conventions will be used throughout this Memorandum.

- "AX" for references to Alcoa's arbitration exhibits.

- "Bulk AX" for references to Alcoa's bulk arbitration exhibits.

- "Cl.'s Ex." for references to Fairchild's arbitration exhibits.

- "Alcoa Br." for references to Alcoa's Post-Hearing Memorandum, dated April 16, 2007.

- "Fairchild Br." for references to the Post-Hearing Memorandum of Claimant the Fairchild Corporation, dated April 16, 2007.

- "Fairchild Pre-Hearing Br." for references to the Pre-Hearing Memorandum of Claimant the Fairchild Corporation, dated January 3, 2007.

- "APF" for references to Alcoa's Proposed Findings of Fact and Conclusions of Law, dated April 16, 2007.

- "FPF" for references to the Proposed Findings of Fact and Conclusions of Law of Claimant the Fairchild Corporation, dated April 16, 2007.

- "Alcoa's Reply to FPF" for references to Alcoa's Reply to Claimant Fairchild Corp.'ε Proposed Findings of Fact and Conclusions of Law, dated April 30, 2007.

- "Interim Decision" for references to the Interim Decision on Alcoa's Motion for Partial Summary Judgment, dated December 28, 2006.

- "Tr." for references to the transcript of the hearing conducted from January 8, 2007, through January 12, 2007, and from February 26, 2007, through March 1, 2007.

Fairchild opens its Post-Hearing Brief with accusations about a different dispute, in another forum, concerning an unrelated provision of the Acquisition Agreement on which no evidence was introduced here.  (Fairchild Br. at 1.)  Stripped of the invective and accusations of bad faith, Fairchild never deals with three key facts:

- The parties' Agreement contains an indemnity to Alcoa for millions of dollars of post-closing expenses.

- Fairchild maintained a reserve of $8.45 million for "environmental, health, safety and litigation" to reflect those anticipated expenses, and the parties agreed to set aside an additional $25 million in escrow to reimburse Alcoa for expenses not covered by the reserve.

- Fairchild has refused to apply <u>any</u> of Alcoa's claims either against the $8.45 million reserve or the $25 million escrow.

Even after an arbitral hearing at which the evidence proved that the facilities Fairchild sold Alcoa were polluted by carcinogens, operated without permits, and required employees to work in dangerous conditions, Fairchild remarkably continues to assert that the total actual value of the indemnity Alcoa purchased is zero.

The arguments Fairchild presents in support of that conclusion are demonstrably meritless.  With respect to the Agreement's scope, Fairchild contends that Alcoa's claims for environmental investigations "do not qualify" for indemnification (<u>id.</u> at 22), even though Your Honor has already rejected that argument and issued an Interim Decision holding precisely the opposite (Interim Decision at 2).  Fairchild also contends that Alcoa's claims for machine guarding and other health and safety items do not qualify for indemnification (Fairchild Br. at 9-10), even though the Agreement expressly provides that "workplace health or safety" claims are covered, Fairchild's own witnesses testified that "workplace health or safety" includes at least "machine guarding", and the parol evidence (including the drafts of the Agreement) overwhelmingly indicates that the parties intended the indemnity to cover

those items (AX 1 § 3.24(g)(ii)(b); APF ¶¶ 22.5.3-22.5.5; 23-28.1.4.1).

In addition, Fairchild contends that Alcoa violated Fairchild's "extensive" participation rights by not offering it sufficient notice or an opportunity to comment, and by not allowing it to participate in negotiations with government regulators (Fairchild Br. at 4-6)—even though Fairchild's own witnesses conceded that it neither attempted nor intended to comment on the thousands of pages of plans Alcoa provided, even though the contract provides that Alcoa, not Fairchild, "will conduct and control" all negotiations with government regulators, and even though Fairchild insists that Alcoa's claims are not indemnifiable. (AX 1 § 11.6(c); APF ¶¶ 74, 102.1, 106-108, 111.) As demonstrated in Alcoa's Post-Hearing Brief, Fairchild's conflicting positions are not, in fact, genuine alternative theories for the avoidance of liability. Fairchild's insistence that Alcoa is not entitled to indemnification renders its notice/participation defense meaningless. (See Alcoa Br. at 4, 31-32; infra at 20.)

To take one example, Fairchild refuses to indemnify Alcoa for the cost of replacing a defective wastewater treatment plant at the St. Cosme facility on the basis that Fairchild did not have sufficient notice or an opportunity to comment on that action (see Fairchild Br. at 5-6; FPF ¶ 25 n.4), even though: (1) Fairchild's counsel conceded in his opening statement that Fairchild employees lied to Alcoa and to government regulators in order to cover up the fact that the plant was defective (Tr. 71:14-72:15); (2) Fairchild obtained an estimate for replacing the plant that was virtually identical to what Alcoa spent (AX 44); (3) Fairchild disclosed the anticipated expense to its auditors and in the schedules to the Agreement (AX 143 at FC 3566); and (4) Alcoa notified Fairchild in two letters that it intended to replace the plant (AX 39 at FC 170; AX 45 at FC 145).

2

Contrary to Fairchild's intemperate rhetoric, it is <u>Fairchild</u> that has consistently flouted Alcoa's rights, reneged on its promises and attempted to rewrite the Agreement. And, as we demonstrate below, those conclusions are grounded in the evidence presented.

I.    THE CONTRACT PROVIDES THAT "WORKPLACE HEALTH OR SAFETY" CLAIMS ARE SUBJECT TO INDEMNIFICATION.

   A.    <u>Fairchild's Argument Ignores the Contract's Definitions.</u>

As Alcoa noted in its Post-Hearing Brief, the scope of the Agreement's indemnification provision hinges on the contract's definition of the capitalized term "Environmental Law". (Alcoa Br. at 5.) That term is defined in Section 3.24 of the Agreement to include "workplace health or safety"—a lowercase term for which the contract does not provide a special definition. (<u>Id.</u>) The generally accepted meaning of "workplace health or safety", according to Fairchild's own witnesses, includes matters such as machine guarding and equipment safety. (<u>Id.</u> at 10.)

Fairchild, however, ignores the contract's definition and proposes that the scope of the indemnity should be narrowed to matters relating to "the quality of the air, water, and ground—what most people think of as the environment". (Fairchild Br. at 9-10.) At the same time, Fairchild proposes to apply a special definition of "workplace health or safety" limited to matters that are "environmental" in nature (<u>id.</u> at 10)—which is not what "most people" think (APF ¶¶ 22.5-22.5.5). Fairchild's reading is at odds with basic principles of contract interpretation, which require that capitalized and defined terms be given their contractually defined meaning, and that lowercase, undefined terms be given their ordinary meaning. (Alcoa Br. at 9.) Fairchild proposes exactly the opposite.

In support of its argument that "workplace health or safety" cannot mean what the words say, Fairchild contends that "there is not one reference anywhere else in the

3

Agreement that suggests in any way that non-environmental claims, such as machine guarding, are covered by the indemnity". (Fairchild Br. at 11.) That, however, is untrue. The Agreement refers repeatedly to an $8.45 million "reserve for environmental, <u>health, safety</u> and litigation" against which Alcoa's claims for indemnification must first be applied. (<u>See, e.g.</u>, AX 1 §§ 2.7(a)(vi), 11.2(a)(iv), 11.6(a).) As Your Honor pointed out in the Interim Decision, that name suggests that it "covers a broader scope of 'environmental, health, safety and litigation' matters". (Interim Decision at 3 n.1.) Indeed, as Alcoa noted in its Post-Hearing Brief, the evidence shows that Fairchild itself used the term "environmental, health and safety" to refer, within its own organization, to matters including machine guarding. (Alcoa Br. at 16-18.) Tellingly, Fairchild's brief employs all manner of phrases—the "applicable reserve", the "relevant reserve" and the "reserve (which totaled $8.45 million)"—to avoid calling the environmental, health, safety and litigation reserve by its proper name.[1] (<u>See</u> Fairchild Br. at 12.)

B.   The Schedules to the Agreement Do Not Support Fairchild's Argument.

Fairchild next points to the fact that it did not include machine guarding in Schedule 3.24—in which it purportedly disclosed noncompliances with "Environmental Laws"—but did include "entries about machine guarding" in Schedule 3.16, its general litigation disclosure. (<u>Id.</u> at 11.) That is irrelevant.

<u>First</u>, as Cynthia Holloway testified, the schedules were <u>Fairchild's</u> unilateral disclosures. (Tr. 236:8-17.) Those disclosures were of no consequence to Alcoa because

---

[1] Fairchild now contends that the reserve contains only "environmental" items and that Alcoa knew this at the time of the acquisition. (Fairchild Br. at 12.) But as James Boyt and Cynthia Holloway testified, Alcoa requested information on what was included in the reserve, only to be rebuffed. (APF ¶ 20.1.1.)

Fairchild had agreed to indemnify Alcoa for environmental, health, safety and litigation expenses above $8.45 million—regardless of what it disclosed. (Tr. 236:18-237:9.)

Second, the fact that Fairchild listed four OSHA investigations in Schedule 3.16 demonstrates nothing more than that Fairchild knew that its employees were being injured by inadequately guarded machines. Schedule 3.16 is Fairchild's disclosure of "material claims, actions, suits, proceedings or investigations pending or, to the best knowledge of [Fairchild], threatened". (AX 1 § 3.16.) There is no reason that machine guarding problems other than those for which Fairchild was being investigated or sued would appear on that schedule.

Third, Schedule 3.24 is silent not just with respect to machine guarding, but also with respect to millions of dollars worth of noncompliances with laws relating to the "air, water and ground" of which Fairchild was plainly aware. For example:

- The schedule contains no mention of environmental contamination at Torrance— now the subject of a regulatory consent decree—even though Fairchild knew that there had been multiple solvent spills at the site and that previous remediation efforts were incomplete. (AX 15 at FC 1428-29.)

- The schedule contains no reference to problems with the septic system at Stoughton, even though Fairchild was pumping the nonfunctioning system monthly, in violation of Massachusetts law, and had disclosed to its auditors that the system might need to be closed and that a Phase II investigation would be needed to determine whether it had contaminated the soil or groundwater. (Tr. 1257:6-1258:20; AX 143 at FC 3564; AX 239.)

- The schedule contains no reference to Fairchild's failure to comply with regulations concerning the storage of hazardous materials at St. Cosme, even though Fairchild itself had informed regulators that it intended to construct a new building to comply with those regulations. (Tr. 1065:15-24; Bulk AX A, Vol. 15 at 36.).

Fairchild's breach of its disclosure obligations cannot alter the language of the contract, nor should that breach insulate Fairchild from its obligation to indemnify Alcoa for the cost of correcting the very noncompliances Fairchild failed to disclose. Fairchild should not be permitted to profit from its own omissions.

5

C.     <u>The Contract Drafts Do Not Support Fairchild's Interpretation.</u>

Fairchild's arguments regarding the drafting history are equally unavailing.  Fairchild

portrays its proposal to delete "workplace health or safety" from the definition of

Environmental Law in the May 2, 2002, draft (AX 150 at 34-35) as simply an effort "to

streamline the language" (Fairchild Br. at 20).  Similarly, Fairchild argues that its May 24,

2002, proposal to eliminate alternative subparts from that definition—a change that would

have rendered "workplace health or safety" subordinate to "pollution or protection of the

environment" (AX 151 at 50)—was "in the nature of making the language of the draft more

workable" (Fairchild Br. at 20).  Those unfounded, and frankly implausible, explanations do

not address the fundamental point:  Alcoa explicitly rejected proposals that would have

narrowed the contract's wording to what Fairchild now urges, in favor of the much broader

language that applies.

Fairchild also cites a subsequent draft of the Agreement to suggest that it was

Fairchild's idea to include "workplace health or safety" as a separate subsection of the

definition of Environmental Law.  (Fairchild Br. at 21; Cl.'s Ex. 500.)  That is not true.  The

July draft <u>already</u> included "workplace health or safety" as Section 3.24(g)(ii)(b)—because

Alcoa had previously rejected Fairchild's attempt to remove it.  (Cl.'s Ex. 500 at 41.)  The

fact is that Fairchild has no credible way of denying that it tried to eliminate or limit the

indemnification of health and safety matters—and <u>failed</u>.[2]

_____

    [2] In support of its argument, Fairchild cites testimony of its former Environmental
Counsel, Michael Hodge, who had no involvement in the negotiations with Alcoa; its former
Chief Financial Officer, John Flynn, who had nothing to do with the drafting of Section 3.24;
and its current Environmental Counsel, Susan Hall, who was not even employed by Fairchild
at the time.  (Fairchild Br. at 21; Tr. 2091:5-2092:4, 2224:24-2225:11, 2829:16-22.)
Tellingly, Fairchild ignores the admission of its General Counsel, Donald Miller, that Alcoa
rejected Fairchild's attempt to strike or cabin "workplace health or safety" (Tr. 2395:20-
2398:19), as well as Ms. Holloway's testimony and contemporaneous notes indicating that

    D.    <u>The Parties' Conduct Does Not Support Fairchild's Interpretation.</u>

The remaining parol evidence confirms what the contract structure, language and drafting history establish.  (<u>See</u> APF ¶¶ 23-28.1.4.1.)  Fairchild ignores almost all of that evidence in its brief, including the conduct of its own employees in the months between the contract signing and the closing, as well as in the months after the transaction closed.

Fairchild focuses almost exclusively on a June 10, 2002, meeting at which, according to Fairchild, the parties discussed the findings of the Phase I investigations.  (Fairchild Br. at 13.)  According to Fairchild, "the parties discussed the clean up of chemicals at various facilities and Alcoa requested to be indemnified for that clean up".[3]  (<u>Id.</u>)  Fairchild also contends that Alcoa "identified $20-$40 million in 'Compliance Issues,' but did not seek indemnification for these issues".[4]  (<u>Id.</u>)  That is wrong.

<u>First</u>, in support of its contention that Alcoa did not seek indemnification for health and safety issues, Fairchild refers to notes taken by its General Counsel, Donald Miller.  (<u>See</u> Fairchild Br. at 13; Cl.'s Ex. 418 at FC 12223.)  Yet those notes do not state that Alcoa relinquished any indemnity claim.  Rather, they reveal that Alcoa expressly discussed a $20-$40 million estimate for "compliance issues", which encompass health and safety in each of

---

both parties understood "workplace health or safety" to encompass OSHA regulations (APF ¶¶ 24.1-24.6; Tr. 119:6-121:23).

[3] Notably, Fairchild thus concedes that, in the context of addressing the Phase I findings, the parties discussed contamination.  Yet Fairchild also contends that it should be excused from <u>any</u> indemnification obligation because it was not able to "participate" in the work Alcoa performed.  (Fairchild Br. at 4-9.)  Accordingly, Fairchild argues, for purposes of attempting to <u>narrow</u> the indemnity, that the parties specifically discussed remediation, even as it argues, for purposes of attempting to <u>escape</u> the indemnity, that it had no idea remediation was contemplated and could not comment on it.

[4] Tellingly, Fairchild's contention is inconsistent with its argument that the indemnity <u>does</u> extend to health and safety compliance issues that are "environmental" in nature.

the Phase I reports. (See Cl.'s Ex. 418 at FC 12223; Bulk AX A.) Fairchild does not,

because it cannot, explain why—in the course of a discussion about indemnification—Mr.

Miller would have written down a dollar range only for the item Fairchild purportedly did not

expect to pay. Nor does it explain why that estimate appears in the middle of a page that

begins with a reference to contamination and ends with a reference to "litigation" and the

size of Fairchild's "reserves". The answer is obvious: Mr. Miller's notes identify the issues

for which Fairchild agreed to indemnify Alcoa—contamination first, then "compliance

issues", and then litigation—and conclude with a reference to Fairchild's reserve for those

issues: what the contract calls the "environmental, health, safety and litigation" reserve. (Id.;

see also AX 1 § 11.6(a).)

    Second, Fairchild contends that the parties discussed not just the Phase I findings but

also Alcoa's request for a purchase price adjustment. (Fairchild Br. at 13, 15-16.) In support

of that contention, Fairchild relies on the testimony of Messrs. Miller and Flynn. (Id.) Yet

both those witnesses testified that they were not involved in purchase price negotiations. Mr.

Miller testified that those issues "were handled directly by Jeffrey Steiner". (Tr. 2321:11-

15.) Similarly, Mr. Flynn testified that "[i]n negotiating the price of the transaction it was the

Chairman of the Fairchild Corporation Jeffrey Steiner who sat and negotiated with the

principals, senior executives at Alcoa". (Tr. 2027:2-5.)

    Third, while Fairchild focuses on the June 10 meeting, it ignores a meeting the next

day at which the purchase price was discussed. (See Alcoa Br. at 15-16.) Mr. Miller

conceded that he did not attend that meeting, and Fairchild did not produce for testimony

Mr. Steiner, who did. (See id.) Yet as Ms. Holloway (who did attend the June 11 meeting)

testified, it was at that meeting that the parties discussed a price adjustment to reflect a

variety of performance, inventory, 401(k) and other issues related to Fairchild's earnings. (See id.) Ms. Holloway testified, and her notes confirm, that the adjustment was unrelated to environmental, health and safety matters, or to the indemnity intended to address those matters. (APF ¶¶ 26-26.2.)

Fairchild also dismisses as too "anemic" to warrant a response evidence concerning its conduct after the Agreement was signed. (Fairchild Br. at 18.) As Alcoa pointed out in its Post-Hearing Brief, that evidence demonstrates that, contrary to Mr. Miller's testimony, Fairchild itself used the term "EHS", or "environmental, health and safety"—the same term used in the contract to identify Fairchild's $8.45 million reserve—and understood it to encompass matters such as machine guarding.[5] (Alcoa Br. at 16-18.) The evidence also shows that after the transaction closed, Mr. Miller responded to Alcoa's indemnification claims for machine guarding and other workplace health and safety matters by requesting more information about them. (Id. at 18-20.) Fairchild does not even attempt to explain why its General Counsel wanted more information about claims he purportedly always believed were not indemnifiable—the very claims for which he earlier wrote down a dollar figure that he contends he did not expect to pay.

E.    Fairchild's Arguments Concerning "Environmental" Workplace Health or Safety Laws Are Inherently Contradictory.

Fairchild's suggestion that "workplace health or safety" laws can be limited to laws that are somehow "environmental" in nature—even aside from rewriting the Agreement and

---

[5] The July draft of the Agreement cited in Fairchild's brief further undermines Mr. Miller's testimony that the parties did not use the term "EHS" during the negotiations. (Tr. 2339:21-2340:14, 2347:6-20.) The term "EHS/Litigation Reserve" appears in that draft in reference to what is described in the final Agreement as the reserve for environmental, health, safety and litigation. (See Cl.'s Ex. 500 at 80.)

ignoring the parol evidence—also makes no logical sense.  Under Fairchild's proposal,

Section 3.24(g)(ii)(b) of the Agreement is either surplusage, or it refers to laws that exist only

in the imagination.  Both interpretations violate common sense, as well as the hornbook rule

that a contract should, if possible, be read so that none of its provisions is rendered redundant

or illusory.  (Alcoa Br. at 8-9.)

  First, Fairchild proposes to read Section 3.24(g)(ii)(b), "workplace health or safety",

as duplicative of subsection (a), concerning "pollution or protection of the environment or

natural resources" and subsection (c), concerning "exposure of persons or property to

Hazardous Materials".  As we have noted, however, those subsections are written as

disjunctive alternatives that encompass three largely distinct categories of laws:  laws

intended to protect the natural world from contamination by Hazardous Materials (subsection

(a)); laws intended to protect the health and safety of workers in the workplace (subsection

b)); and laws intended to protect individuals and their real and personal property from

exposure to Hazardous Materials (subsection (c)).  (Id. at 7-8.)  Fairchild would treat those

subsections as overlapping to the point of redundancy.  For example, Fairchild points to

Subpart Z of 29 C.F.R. § 1910, entitled "Toxic and Hazardous Substances", and contends

that it is encompassed by subsection (b) because it relates to "exposure to hazardous

materials in the workplace" (Fairchild Br. at 18-19)—even though such laws are specifically

covered by subsection (c), relating to the "exposure of persons or property to Hazardous

Materials".  (AX 1 § 3.24(g)(ii)(c).)  Fairchild would thus render subsection (b) superfluous.

  Second, to the extent Fairchild has attempted to identify types of "workplace health or

safety" claims that, under its interpretation, are not already covered by subsections (a) or (c),

it is unable to point to a single one of Alcoa's claims that is sufficiently "environmental" to

qualify for indemnification.  That became clear at the hearing, when Mr. Miller testified that claims for "fall protection" might be environmental if a solvent, bubbling up from the ground, caused an employee to slip and fall from a high place.  (Tr. 2438:5-13, 2439:3-16.) Fairchild now rejects even that (bizarre) scenario, stating flatly that "fall protection matters" have "no possible relationship to environmental matters" and "are not included within the scope of the indemnity".  (Fairchild Br. at 19.)

Instead, Fairchild now argues in its Post-Hearing Brief that the types of "environmental" workplace health and safety laws it has in mind may be found listed under Subparts G and J of the table of contents to 29 C.F.R. § 1910.  (Id. at 18; FPF ¶¶ 79-80.)  At the same time, however, Fairchild rejects actions listed under those very subheadings in its Proposed Findings of Fact and Conclusions of Law, contending that they are, in fact, not subject to indemnification.  (Id. at 18.)  Thus, while the table of contents lists, under Subparagraph J, "[p]ermit-required confined spaces" and "[t]he control of hazardous energy (lockout/tagout)", Fairchild categorically rejects Alcoa's confined space and lockout/tagout claims on the basis that they do not "relate to environmental issues".  (See Cl.'s Ex. 498 at 3; FPF ¶¶ 79-80.)

Fairchild's confusion—created by its after-the-fact effort to avoid liability at all cost—is understandable.  Notwithstanding the argument in its brief that lockout/tagout claims may be considered "environmental" because of where they appear in the table of contents to 29 C.F.R. § 1910, Fairchild notes in its Proposed Findings that lockout/tagout claims are, in fact, related to machine safety—specifically, "the de-energizing of equipment in order to perform maintenance or repairs".  (FPF ¶ 79.)  That, of course, is not unlike machine guarding, which Fairchild describes as relating to "the protection or guarding of an employee

11

from potential injury while a machine is in operation". (Id. ¶ 77.) Fairchild cannot credibly

argue that lockout/tagout claims are indemnifiable but machine guarding claims are not. Yet

it is clear that it is Fairchild's desire to distinguish machine guarding—which represents the

bulk of Alcoa's health and safety claims—that is driving its implausible effort to draw

illusory distinctions.

     F.     <u>Fairchild's No "Meeting of the Minds" Argument Is Meritless.</u>

Since the hearing, Fairchild has come up with yet another new argument, contending

that no matter what Alcoa understood, the contract says or the parol evidence confirms,

Fairchild "never believed" that it was obligated to indemnify Alcoa for machine guarding.

(Fairchild Br. at 16.) That is irrelevant (as well as incredible).

     <u>First</u>, Fairchild cites the Restatement (Second) of Contracts, which provides:

> "Where the parties have attached different meanings to a promise or
> agreement or a term thereof, it is interpreted in accordance with the meaning
> attached by one of them if at the time the agreement was made . . . that party
> had no reason to know of any different meaning attached by the other, and the
> other had reason to know the meaning attached by the first party."

(See Restatement (Second) of Contracts § 201(2)(b) (1981); Fairchild Br. at 17.) The term at

issue is "workplace health or safety". The evidence is undisputed that Alcoa has always

understood that term to encompass machine guarding. (See, e.g., Tr. 92:22-93:6, 244:20-

245:16, 264:9-16, 312:14-19.) Fairchild plainly knew that was Alcoa's understanding—and

machine guarding was discussed in the Phase I reports Alcoa provided to Fairchild. (APF ¶¶

41, 67.) Indeed, according to Mr. Miller, Fairchild employees even mirrored Alcoa's use of

the term "EHS" to curry favor with their prospective employer. (Tr. 2348:13-2349:5; APF

¶¶ 24.7.1-24.7.2.3.) Those employees also represented to Alcoa that Fairchild considered

machine guarding to be a key health and safety issue. (Tr. 2231:20-2234:3.) There is thus no

evidence that Alcoa had reason to know that Fairchild purportedly attached a narrower

12

meaning to the term "workplace health or safety".  The evidence proves just the opposite.

Second, what Fairchild in fact appears to be asserting is that it made a mistake.  But that is irrelevant.  Under Delaware law, a party asserting a "unilateral mistake" has the heavy burden of demonstrating "by clear and convincing evidence that the parties came to a specific prior understanding that differed materially from the written agreement".  Cerberus Int'l v. Apollo Mgmt., 794 A.2d 1141, 1151-52 (Del. Super. 2002).  Fairchild does not even attempt to—and plainly cannot—meet that burden.

Third, the "factual" support on which Fairchild's "meeting of the minds" argument purports to rely is the same evidence on which the rest of its argument relies.  As we have demonstrated, that evidence is of no help to Fairchild.  (See supra at 4-9.)

II.  THE CONTRACT PROVIDES THAT "INVESTIGATIONS" ARE SUBJECT TO INDEMNIFICATION.

Fairchild's effort to evade the indemnity extends to investigations of environmental contamination—even though Your Honor has already rejected Fairchild's argument based on the plain language of the Agreement.  Fairchild continues to argue that the cost of the Phase II investigations is not indemnifiable because those investigations constituted "due diligence"—even though the transaction had already closed—and that the cost of the follow-on investigations is not indemnifiable because those investigations were not required by any government entity.  (Fairchild Br. at 22-23.)  Fairchild's arguments are meritless.

As Your Honor has already noted, the Agreement "gives Alcoa the authority to conduct investigations where there is a reasonable basis to do so".  (Interim Decision at 2.)  It does not require that "each investigation must be 'required by any Governmental entity'".  (Id.)  Alcoa will not rehearse again its arguments in support of that conclusion, save to note that the contract specifically defines "Fastener Environmental Liability" to include post-

13

closing "expenses of investigation".  (AX 1 § 11.6(e)(iv).)  Moreover, while Fairchild now

focuses on the Agreement's definition of "Remedial Action", that provision also supports

Alcoa's position.  It defines the term to include "'remedial action' as such term is defined in

CERCLA and its analogous state Laws" and investigations as a precondition to any

government-required clean-up.  (Id. at § 11.6(e)(vi).)  CERCLA, in turn, defines remedial

action to include "actions consistent with permanent remedy . . . in the event of a release or

threatened release of a hazardous substance into the environment, to prevent or minimize the

release of hazardous substances so that they do not migrate".  (42 U.S.C. § 9601(24) (2002).)

The CERCLA definition expressly includes "any monitoring reasonably required to assure

that such actions protect the public health and welfare and the environment".  (Id.)  The

Agreement thus provides, in two places, that Alcoa is to be indemnified for the cost of post-

closing investigations.  In addition, as Alcoa has noted, the parol evidence demonstrates that

Fairchild understood that to be the case.  (Alcoa Br. at 21-24.)  The evidence shows that:

(1) Fairchild was consulted on the planning of the Phase IIs; (2) Fairchild acknowledged its

responsibility to indemnify Alcoa for at least a portion of that cost; (3) Fairchild encouraged

Alcoa to conduct follow-on studies; and (4) Fairchild only changed its position after it hired a

new Environmental Counsel who disagreed with the position of her predecessors.  (Id.)

     Whatever Fairchild calls them, the Phase IIs were post-closing investigations.

Similarly, Fairchild's contention that the follow-on investigations were voluntary is

irrelevant, and does not affect Alcoa's indemnification rights.[6]

---

[6] Fairchild asserts that those investigations were "done by Alcoa for its own purposes, including its desire to unearth any and all potential issues within the five-year time period for filing claims under the Agreement".  (Fairchild Br. at 23.)  Fairchild misses the point.  The Agreement both covers investigations and provides that Alcoa is liable "to the extent that [it] contributes to or exacerbates a Fastener Environmental Condition as a result of its actions or

14

III.    FAIRCHILD HAS REFUSED TO EXERCISE ITS LIMITED CONTRACTUAL
         RIGHTS.

Fairchild's argument that Alcoa violated Fairchild's purportedly "extensive rights to

participate in actions that may lead to indemnification" (Fairchild Br. at 4) is meritless.  As

Your Honor has concluded, the terms of the contract "generally impose obligations on Alcoa

to provide notice and an opportunity for Fairchild to participate in the planning of actions

which could lead to environmental indemnity liability".  (Interim Decision at 4.)  "Whether

they are called 'conditions precedent' or not, these provisions impose obligations on Alcoa

for the material breach of which it might be barred from recovery of some part or all of its

claims."  (Id.)  The evidence presented at the hearing shows that Alcoa has not, in fact,

breached any notice obligations to Fairchild—much less materially.  Instead, Alcoa provided

Fairchild with tens of thousands of pages of correspondence, reports, work plans, estimates

and receipts as part of a good faith effort to respond to Fairchild's unreasonable and

unrelenting demands for information to which it was not entitled and which it never intended

to use.[7]  At the same time, the evidence shows that Fairchild continues to assert broad

participation rights it does not have, while refusing to exercise the limited rights that it does.

First, far from the "extensive" participation rights it now claims, Fairchild's rights

_____

omissions, including, without limitation, its unreasonable failure to mitigate any violation or
noncompliance with applicable Environmental Law".  (AX 1 § 11.6(e)(iv).)  It thus not only
permits Alcoa to conduct investigations to define the scope of contamination as quickly as
possible, but requires that Alcoa do so to avoid liability for pre-existing contamination.

[7] John Lease, Alcoa's Designated Representative to Fairchild, testified with respect to
one such demand: "I didn't respond to every line item in every letter.  There was a lot of
correspondence and lot of information flowing.  If I missed that point you can blame me for
that.  But, frankly, the fact is these issues on site were known to Fairchild.  They were
noncompliance issues that needed to be resolved.  It was clear we had a process in place to
identify them as noncompliance and verify them [and] we were going to go forward to fix
this issue because it was a liability to our company as long as it remained unresolved."  (Tr.
1091:20-1092:7; see also Alcoa's Reply to FPF ¶¶ 26-27.)

15

are, in fact, discrete and defined. Section 11.6(c) is a long provision that begins by providing that Alcoa "will conduct and control all Remedial Action and negotiations with any Government entity in respect of all Fastener Environmental Conditions that are subject to indemnification". (AX 1 § 11.6(c).) It affords Alcoa control over the consultants it uses, so long as they are "reasonably acceptable" to Fairchild. (Id.) It also lists certain specific and limited sources of information to which Fairchild is entitled—including site visits and, in certain circumstances, documents. Finally, it states that Fairchild is entitled to a "reasonable opportunity to comment on [Alcoa's] proposed response to a Fastener Environmental Condition". (Id.) That one sentence, however, cannot rewrite the rest of the section—it neither expands the information Fairchild receives nor limits Alcoa's control rights.

Similarly, Section 11.6(d) provides that Fairchild is entitled to notice of any conditions "in respect of which" it may have an indemnification obligation, but that any violation of that right "shall not affect the rights of [Alcoa] except to the extent that such failure to give prompt notice adversely affects the rights and obligations of [Fairchild]". (Id. § 11.6(d).) Not surprisingly, Fairchild's brief makes no mention of Alcoa's rights, or of the limitations on its own. Fairchild simply ignores the Agreement's requirement that it produce evidence of an adverse effect, contending that Alcoa should be denied indemnification "irrespective of whether Fairchild can demonstrate specific and quantifiable harm". (FPF ¶ 55.) That, however, is not what the contract provides.

Second, the evidence shows that Alcoa complied with its obligations by providing Fairchild with specific notice of claims totaling approximately 90 percent of the $16.385 million Alcoa spent through September 30, 2006. (See Alcoa Br. at 24-25; APF ¶¶ 60-94.) That notice comprised a bookcase full of documents concerning Fastener Environmental

16

Conditions and Alcoa's proposed responses to those conditions. (See id.) As Alcoa has noted, many of those conditions were things Fairchild already knew about. (APF ¶¶ 45-59.) Some, such as machine guarding, were issues about which Fairchild told Alcoa. (Alcoa Br. at 16-18.) Others, such as the City of Industry remediation, were projects Fairchild initiated. (See APF ¶¶ 97, 159.1.) Alcoa also demonstrated that the 10 percent of its claims for which it did not provide specific notice, by facility, were identical in nature to claims about which it did notify Fairchild or concerned issues about which Fairchild was on notice through its own actions. (See Alcoa Br. at 30; APF ¶ 95.) And virtually all of that notice related to matters for which Fairchild insists that Alcoa was not, in any event, entitled to be indemnified.

In response to that evidence, Fairchild simply asserts, without more, that Alcoa's notice was inadequate. For example, Fairchild contends that the Phase I reports were "generic and lack crucial information about Alcoa's proposed responses". (Fairchild Br. at 6.) Yet Fairchild concedes, in the same brief, that its representatives met with Alcoa one month before the Acquisition Agreement was signed to review the findings of those Phase I investigations, that they "discussed the clean up of chemicals at various facilities", and that Alcoa "identified $20-$40 million in 'Compliance Issues'". (Id. at 13.) Similarly, Fairchild asserts, without more, that the Phase II reports "do not even contain suggestions (no matter how generic) for potential actions". (Id. at 7.) Yet Fairchild ignores the discussion of follow-on investigations in those reports, including, for example, a step-by-step overview of the French methodology for addressing contamination in each of the reports for the French facilities—the exact methodology Alcoa ultimately followed at those facilities. (See, e.g., APF ¶¶ 76, 143, 143.2.) Fairchild also ignores the five letters Alcoa sent in early 2003 describing workplace health and safety conditions at the largest Fastener facilities, along with

17

Alcoa's proposed responses to those conditions. (<u>See</u> APF ¶¶ 80-83.) And it ignores the

dozens of letters and follow-on reports that Alcoa sent to Fairchild subsequently. (<u>See, e.g.</u>,

APF ¶¶ 79, 85-94.) Fairchild cannot credibly argue that Alcoa denied it notice and an

opportunity to comment in the face of the tens of thousands of pages of notice it received.

<u>Third</u>, Fairchild has repeatedly attempted to assert "participation" rights it does not

have, even as it has refused to exercise the limited rights it does. For example, Fairchild

contends in its Proposed Findings that its "extensive" participation rights include the right,

under Section 5.3 of the contract, to require that Alcoa "cause its representatives . . . to

consult as reasonably requested . . . on a regular basis . . . to discuss the ongoing operations

of the Fastener Business including . . . environmental matters". (FPF ¶ 6.) Yet that

provision, contained in Section 5.3(a) of the Agreement, imposes <u>pre-closing</u> obligations on

<u>Fairchild</u>, not on Alcoa. (AX 1 § 5.3(a).) Fairchild's use of partial quotes and ellipses to

mask that fact is a blatant attempt to claim Alcoa's rights as its own. Similarly, Fairchild

objects that Alcoa "unilaterally negotiated" with regulators concerning issues at St. Cosme

and Torrance. (<u>See</u> FPF ¶¶ 61-62.) As noted, however, that is precisely what the Agreement

entitles Alcoa to do. (AX 1 § 11.6(c).)

Fairchild has also continued to request additional information to which it is not

entitled. For example, in response to the first letters Alcoa sent concerning machine guarding

and other health and safety issues, Fairchild requested "any assessments, reports, legal

analyses, or cost analyses prepared by or for Alcoa and any other documentation which

support the various findings". (<u>See, e.g.</u>, AX 47 at FC 97-98.) The contract entitles Fairchild

to <u>none</u> of those documents. Instead, as Alcoa has noted, it provides that Fairchild is entitled

to certain, specific documents only in the limited context of "Remedial Actions to be taken in

respect of . . . Environmental Actions"—i.e., clean-ups and investigations required by legal

proceedings or regulatory order. (See Alcoa Br. at 27-28; AX 1 § 11.6(c).) None of the

actions for which Fairchild has requested additional documentation meets the specific

definition of "Remedial Actions to be taken in respect of . . . Environmental Actions". (See

FPF ¶¶ 88-89.)

 Moreover, even aside from the plain language of Section 11.6(c), the level of detail

Fairchild purports to require is unreasonable under any reading of the contract. For example,

Fairchild's counsel displayed at the hearing a box of documents containing the machine-by-

machine engineering specifications for machine guarding at a single Alcoa facility. (Tr.

1009:25-1011:24.) Fairchild appears to contend that it was entitled to those operational

documents—maintained by Alcoa at the plant level—for each of the thousands of corrective

actions taken at each Fastener facility. Yet Fairchild does not, because it cannot, point to any

language in the Agreement that entitles it to such detail. Nor, of course, does Fairchild have

any legitimate need for it. As Mr. Miller testified, for example, machine guarding "is the

kind of thing you could walk into the plant, look at the machines, count the machines and see

instantly whether or not they had machine guards". (Tr. 2361:24-2362:6.) Had Fairchild

truly wanted to comment on Alcoa's actions—rather than simply create roadblocks to

indemnification—that is what it would have done. Indeed, if Fairchild's interest were

genuine, it would have exercised its contractual right to visit the facilities and see the

conditions (again) for itself.

 The evidence is uncontested, however, that Fairchild never attempted to exercise any

of the "participation" rights to which it is actually entitled under Section 11.6(c). (See Alcoa

Br. at 28-31.) No one from Fairchild has ever called Alcoa to inquire about its claims, or

asked to speak with Alcoa's contractors or consultants, or sought to send Fairchild's consultants to the sites—even though the Agreement provides Fairchild with each of those rights.  (Id.)  To this day, Fairchild has not offered a single substantive comment on any of Alcoa's actions, even though it has, for months, had all the relevant documents in Alcoa's possession and a team of experts on retainer to evaluate them.  (Id.)

Fourth, and perhaps most importantly, as Alcoa has noted, Fairchild's witnesses conceded that Fairchild never intended to comment on Alcoa's actions, or to indemnify Alcoa for its claims, regardless of the notice Fairchild received.  (See id. at 31-32.)  The reason for Fairchild's silence is clear:  any comment Fairchild offered would undermine its principal argument that Alcoa's claims are outside the scope of the indemnity.  Having refused to exercise its opportunity to comment because it intended to argue that Alcoa was not entitled to indemnification, Fairchild cannot now rely on a purported lack of "participation" to deny Alcoa the indemnity for which it bargained and paid.

IV.    FAIRCHILD'S ARGUMENTS CONCERNING THE INDEMNITY TAX CREDIT CONTRADICT ITS OWN PRIOR ADMISSIONS.

In its Pre-Hearing Brief, Fairchild requested that any award to Alcoa either be delayed until Alcoa voluntarily submits to—indeed provokes—a tax audit in France, or made subject to a refund to reflect tax credits for which Fairchild is not now eligible.  (See Fairchild Pre-Hearing Br. at 79-80.)  In its Post-Hearing Brief, however, Fairchild makes a new demand:  that any award be immediately reduced to reflect Tax Benefits that Fairchild asserts Alcoa is likely to obtain in the future.  (See Fairchild Br. at 32-34.)

Section 11.8 is clear:  Fairchild is entitled to a credit against its indemnification obligation for Tax Benefits that are "recognized by" Alcoa and that result from "the actual utilization" of net operating losses incurred by Fairchild in France or Germany "that may no

longer be subject to possible disallowance by any French or German Taxing authority". (AX 1 § 11.8.) Fairchild would ignore the words "recognized by" and "actual utilization", and claim credit for benefits it contends Alcoa may be "reasonably expected" to derive "over the coming years". (Fairchild Br. at 34.) That is not permitted.

Fairchild contends that the standard for determining whether losses are "subject to possible disallowance" is not whether those losses are subject to audit—the only mechanism by which they might be disallowed—but rather whether "there [are] possible grounds for disallowance". (Id. at 33 (emphasis added).) But in responding to Alcoa's Interrogatory No. 13, which requested that Fairchild "[e]xplain in detail the basis for [its] assertion, if any, that any tax benefits recognized by Alcoa in France are no longer subject to possible disallowance by any French taxing authority", Fairchild stated that "the years in which the pre-Closing losses were recognized by Fairchild have been audited by the French tax authorities and are now closed". (See Claimant Fairchild's Objections and Answers to Resp't Alcoa's First Set of Interrogs. at 12-13 (emphasis added).) At the hearing, however, Mr. Flynn conceded that Fairchild's French tax group was not, in fact, audited for the relevant years, and that, as a result, "[t]here can theoretically be an audit at the group level". (APF ¶204.1; Tr. 2107:19-2108:5.) Fairchild's belated attempt to change the standard to suit the facts must be rejected.

April 30, 2007                              CRAVATH, SWAINE & MOORE LLP,

                                            by  *[signature]*

                                                Evan R. Chesler
                                                Daniel Slifkin
                                                Worldwide Plaza
                                                825 Eighth Avenue
                                                New York, NY 10019
                                                (212) 474-1000

                                            *Attorneys for Alcoa Inc.*