# In The Matter Of:

## *THE FAIRCHILD CORPORATION vs. ALCOA CORPORATION vs. ALCOA CORPORATION*

---

**ARBITRATION**
*February 27, 2007*

---

# *MERRILL LEGAL SOLUTIONS*

### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

**ARBITRATION - Vol. 7**

Page 2113

CPR INSTITUTE OF DISPUTE RESOLUTION
-----------------------------------x
In Re
THE FAIRCHILD CORPORATION
                    Claimant,

        -against-

ALCOA CORPORATION,

                    Respondent.

-----------------------------------x

                    Cravath, Swaine & Moore, LLP
                    Worldwide Plaza
                    825 Eighth Avenue
                    New York, New York
                    February 27, 2007
                    9:15 a.m.

B E F O R E :
    JAMES F. STAPLETON, Arbitrator


TAMMEY M. PASTOR, RPR, CLR, Hearing Reporter

---

Page 2114

1          PROCEEDINGS
2   A P P E A R A N C E S :
3
    CAHILL, GORDON & REINDEL LLP
4     Attorneys for FAIRCHILD CORPORATION
        80 Pine Street
5       New York, New York 10005
6
    BY:   ADAM ZUROFSKY, ESQ.
7         TAMMY L. ROY, ESQ.
          ANDREW MADAR, ESQ.
8              -and-
          ELIZABETH RICHMAN, ESQ.
9
10  CRAVATH, SWAINE & MOORE, LLP
      Attorneys for ALCOA CORPORATION
11      Worldwide Plaza
        825 Eighth Avenue
12      New York, New York 10019
13
    BY:   EVAN CHESLER, ESQ.
14        DANIEL SLIFKIN, ESQ.
          STEPHEN E. FRANK, ESQ.
15        JEREMY WINER, ESQ.
               -and-
16        MARCUS J. GREEN, ESQ.
17
18
    ALSO PRESENT:
19
    MEREDITH SHAW, CRAVATH, SWAINE & MOORE, LLP
20  JESSICA SILVERMAN, CRAVATH, SWAINE & MOORE, LLP
    SARA BRAUNER, CAHILL GORDON & REINDEL LLP
21  MARK A. BARTHOLIC, ESQ., ALCOA
22
23
24
25

---

Page 2115

1              MICHAEL HODGE - DIRECT
2          MS. ROY:  We would like to call
3   Michael Hodge as our next witness.
4          MICHAEL HODGE,
5   having been first duly sworn by the Notary
6   Public (Tammey M. Pastor), was examined and
7   testified as follows:
8      DIRECT-EXAMINATION BY MS. ROY:
9      Q.   Can you please state your name for
10  the record.
11     A.   Bartholomew Michael Hodge.
12     Q.   At one point were you employed by
13  the Fairchild Corporation?
14     A.   Yes, I was.
15     Q.   In what capacity?
16     A.   I was an assistant general counsel
17  from 1992 until about 2003, February.  And after
18  that for about a year and a half I worked
19  part-time as a consultant for them.
20     Q.   Let's go back for a moment.  Can
21  you describe your educational background for us.
22     A.   Yes.  I have a BA from Stanford
23  University in 1973.  From there I went to the
24  State University of New York at Buffalo where I
25  got an MA and Ph.D. in English.  I then taught

---

Page 2116

1              MICHAEL HODGE - DIRECT
2   for four years at Virginia Tech and left there
3   to go to law school at University of Virginia
4   graduating with a JD in 1984.
5      Q.   After graduation from law school
6   did you practice law?
7      A.   Yes, I did.
8      Q.   Where did you practice law?
9      A.   First with a smallish firm in
10  Washington D.C. called Collier Shannon Rill &
11  Scott.  I was there for about four years.  Left
12  there to go to another Washington firm which was
13  Crowell & Moring, also for about four years.
14  Then I went in-house at the Fairchild
15  Corporation.
16     Q.   Did you specialize in any area of
17  law during your employment at the law firms you
18  mentioned?
19     A.   Yes.  I was an environmental
20  attorney.
21     Q.   What type of work did that entail?
22     A.   Basically anything dealing with EPA
23  and the statutes that they administered.
24  Earlier on with the law firms did a lot of trade
25  association work in terms of regulatory work

Page 2317

MICHAEL HODGE - RECROSS

1
2    Q.    So even though it is your position
3    that investigations weren't covered at all, you
4    still expected Alcoa to notify you of everything
5    that was going on?
6    A.    Okay, Phase II investigations were
7    not covered under my interpretation. Alcoa was
8    under a general obligation in terms of making
9    claims under the indemnity provision to provide
10   Fairchild with information of investigations
11   that they might conduct, remedial actions they
12   might take, discussions, investigations with --
13   discussions with regulators, so on and so forth.
14   Okay.
15        That was a general information
16   requirement that Alcoa, information provision
17   requirement that Alcoa Corporation had. That's
18   separate from the actual Phase II reports
19   themselves.
20   Q.    If I understand you right you're
21   saying Alcoa had to give all the information
22   about the investigations to Fairchild even
23   though Fairchild wasn't going to pay for them?
24   A.    Yes.
25        MR. SLIFKIN:  I have no further

Page 2318

DONALD MILLER - DIRECT

1
2    questions.
3        MS. ROY:  I have nothing.
4        THE ARBITRATOR:  Thank you very
5    much, Sir. You are excused.
6        (Witness excused.)
7
8        (Luncheon Recess: 1:15 p.m.)
9    A F T E R N O O N   S E S S I O N
10       2:00 p.m.
11       DONALD MILLER,
12   having been first duly sworn by the Notary
13   Public (Tammey M. Pastor), was examined and
14   testified as follows:
15       MR. ZUROFSKY:  Our next witness
16   will be Mr. Donald Miller. Just sort of it has
17   been a couple weeks, if you will recall Mr.
18   Miller is the witness that after your Honor's
19   interim ruling on interim summary judgment
20   motion we sought leave for him to give some
21   evidence surrounding the scope of whether or not
22   it covered health and safety. We will be
23   limiting our examination to those topics per
24   your Honor's direction during the ruling. Other
25   than background and things like that.

Page 2319

DONALD MILLER - DIRECT

1
2    DIRECT-EXAMINATION BY MR. ZUROFSKY:
3    Q.    Mr. Miller, good afternoon. What
4    is your current position of employment?
5    A.    Executive vice president and
6    general counsel of the Fairchild Corporation.
7    Q.    How long have you held that
8    position?
9    A.    I have been executive vice
10   president since 1998 or '7. I have been general
11   counsel since January 3, 1991.
12   Q.    And, to whom do you report?
13   A.    I report to the Chairman and CEO
14   Jeffrey Steiner.
15   Q.    How long have you done business --
16   how long have you known Mr. Steiner?
17   A.    Well, I have been general counsel
18   at Fairchild for 16 years. Before that I was in
19   private law practice for 17 years. And I met
20   Jeffrey Steiner at some point during my private
21   practice and represented him probably for five
22   or six or eight or ten years, I don't recall.
23   Q.    As general counsel and executive
24   vice president what are your responsibilities at
25   the Fairchild Corporation?

Page 2320

DONALD MILLER - DIRECT

1
2    A.    I am the chief legal officer of the
3    Corporation. I am a senior officer and I am
4    involved in all of the transactional work of the
5    company.
6    Q.    Do you have a specialty in
7    transactional work?
8    A.    Yes. M&A.
9    Q.    You are not an environmental lawyer
10   per se?
11   A.    I am not an environmental lawyer.
12   Q.    I assume there are a lot of
13   different legal issues that report up to you,
14   not just environmental type issues; is that
15   right?
16   A.    That's correct.
17   Q.    Have you in connection with your
18   work in transactions, have you been involved in
19   the negotiation of acquisition transactions in
20   the course of your career?
21   A.    Yes, many.
22   Q.    How many would you say
23   approximately?
24   A.    200.
25   Q.    Was one of those transactions the

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com

Page 2321

DONALD MILLER - DIRECT

1  
2   transaction by which Alcoa purchased the
3   Fasteners business from Fairchild?
4       A.   No.
5       Q.   You were not involved in that?
6       A.   That was a disposition. You asked
7   acquisition.
8       Q.   All right. Disposition. Fair
9   enough. You were involved in that transaction?
10      A.   I was.
11      Q.   Why don't you describe your role
12  for me in that transaction if you could.
13      A.   I conducted the negotiations on all
14  issues except for purchase price issues which
15  were handled directly by Jeffrey Steiner. I led
16  the negotiating team in connection with that
17  transaction.
18      Q.   Who else were sort of the key
19  people on Fairchild's end?
20      A.   Jeffrey Steiner, his son Eric
21  Steiner, John Flynn, I, our investment banker
22  Fred Lane and our outside counsel Cahill Gordon.
23      Q.   Fine firm. Who were the primary
24  members you dealt with on the Alcoa side of the
25  transaction?

Page 2322

DONALD MILLER - DIRECT

1  
2       A.   Barbara Jeremiah, Cynthia Holloway,
3   Claire Miller, Peggy Wolff those were the key
4   people with whom I dealt.
5       Q.   Did Alcoa have a large team that
6   negotiated this transaction?
7       A.   Had an enormous team.
8       Q.   Sorry, I didn't hear you.
9       A.   They had an enormous team. They
10  probably had, in connection with the due
11  diligence or in connection with the acquisition,
12  the due diligence teams were in the hundreds of
13  people.
14          The acquisition team, the lawyers
15  alone were in the 20s. And probably in the 40s
16  if you count the ones we couldn't see.
17      Q.   Did you attend, in connection with
18  your work in this transaction, negotiation
19  sessions either in person or on the phone
20  between the parties?
21      A.   Yes. Several.
22      Q.   Several?
23      A.   Yes.
24      Q.   Did that extend over the course of
25  the negotiation of this transaction?

Page 2323

DONALD MILLER - DIRECT

1  
2       A.   Yes.
3       Q.   Were there negotiation sessions
4   that you're aware of now that you did not attend
5   either in person or by phone?
6       A.   Yes.
7       Q.   Were you briefed on those sessions?
8       A.   Yes.
9       Q.   Let's talk a little bit about the
10  acquisition itself. When did you first learn
11  about a possible deal between Alcoa and
12  Fairchild regarding the Fasteners business?
13      A.   We started talking to Alcoa in
14  2000.
15      Q.   2000. Did the negotiations kind of
16  go on and off?
17      A.   They were on and off. Mostly off
18  until much later, until early 2002 when they
19  became more serious.
20      Q.   When would you say the basic terms
21  of the deal started to take shape in?
22      A.   We had pretty much an understanding
23  in the spring of 2002.
24      Q.   Was that around at the same time
25  Alcoa did its due diligence efforts?

Page 2324

DONALD MILLER - DIRECT

1  
2       A.   They then at that point began their
3   subsequent due diligence. They had already done
4   a considerable amount of due diligence before
5   then, but they became more serious in the late
6   spring of '02.
7       Q.   Did that due diligence cover a
8   number of topics?
9       A.   Covered anything and everything
10  they could think of.
11      Q.   Did it cover, for example,
12  environmental matters?
13      A.   Absolutely.
14      Q.   Did it cover matters related to tax
15  issues?
16      A.   Yes.
17      Q.   Did it cover matters related to
18  litigation and legal issues?
19      A.   Yes.
20      Q.   How about customer relationships
21  that the business had with its customers?
22      A.   Yes.
23      Q.   How about financial projections of
24  the business?
25      A.   Yes.

53 (Pages 2321 to 2324)

DONALD MILLER - DIRECT

1
2     Q.    What about did it also cover things
3  like condition of the plants?
4     A.    Yes.
5     Q.    And conditions, say, of the
6  machines in the plants and other equipment in
7  the plants?
8     A.    Yes.  As I told you they had teams
9  of people going into the plants, reviewing
10  anything that they could find, everything was
11  open to them.  Those teams were usually in the
12  20s.
13     Q.    There were a lot of issues we just
14  went through they did due diligence on.  Was
15  there an indemnity in the agreement that covered
16  each of those -- every one of those issues, I
17  should say?
18     A.    There were indemnities in the
19  agreement.  They are pretty clear what they
20  cover.
21     Q.    But they didn't cover every issue
22  that Alcoa did due diligence on?
23     A.    No.
24     Q.    For example, the condition of the
25  plants for example?

DONALD MILLER - DIRECT

1
2     A.    There is no indemnity for the
3  condition of the plant, except for environmental
4  indemnities.
5     Q.    But some were covered by
6  indemnities; right?
7     A.    Some were and some were not.
8     Q.    You just mentioned the
9  environmental indemnity.  I want to talk about
10  that for minute.  What is your understanding of
11  the scope of the environmental indemnity that is
12  in the agreement?
13     A.    It is environmental indemnity.  It
14  covers preexisting environmental conditions.
15  And off-site environmental conditions.  And
16  covers prior dispositions, companies that we
17  were not selling to them that had environmental
18  problems.  I knew environmental as air, water
19  and ground.
20     Q.    I was just going to ask you, what
21  do you mean when you say environmental
22  conditions?
23     A.    Air, water and ground.
24     Q.    Why do you think the indemnity is
25  limited to those items the sort of air water and

DONALD MILLER - DIRECT

1
2  ground items?
3     A.    That is my understanding of what
4  environmental is.
5     Q.    Let's look at the environmental
6  indemnity section.  Tab 1 of your book section
7  11.6 which is on page, your Honor.  Is Bates
8  marked FC 2808 at the bottom right, page 82 of
9  tab 1.
10     THE ARBITRATOR:  Section 11.6?
11     MR. ZUROFSKY:  Yes.
12     Q.    Do you have that, Mr. Miller?
13     A.    I do.
14     Q.    What is the title that section?
15     A.    Seller environmental indemnity.
16     Q.    If you look through this section,
17  we don't need to read every word of it at the
18  moment, are the terms that are used in this
19  section terms you understand to be traditionally
20  associated with issues of air, water and ground?
21     A.    Yes.
22     Q.    For example, if you turn to the
23  next page where definitions, there is use of the
24  word contamination.  Do you see that there
25     A.    I am looking at E, Romanette ii

DONALD MILLER - DIRECT

1
2  Environmental Contamination.
3     Q.    Yes.
4     A.    Yes.  Means "presence, whether
5  known or unknown of any hazardous materials in
6  soil, surface water, groundwater, sediments or
7  other environmental media, including the
8  movement or migration of said hazardous
9  materials in such media."
10     That is pretty typical
11  environmental.
12     Q.    The term hazardous materials there
13  is that again your understanding of a term
14  related to presence of things in the water, air
15  and ground that kind of thing?
16     A.    Yes.
17     Q.    You see also there is a reference
18  to next section E 2v -- sorry, just E, Roman v.
19  The word "Release."  Do you see that there?
20     A.    Sorry E Romanette?
21     Q.    Yes.  E Roman v.  Roman 5?
22     A.    "Release means any releasing,
23  spilling, seeking, leaking, pumping, pouring
24  emitting, emptying, discharging, injecting,
25  escaping, leaching, dumping or disposing of any

Page 2329

DONALD MILLER - DIRECT

1
2 hazardous materials into the environment."
3     Q.    Same question.  Does that suggest
4 the covering issues that relate to air, water
5 and ground?
6     A.    Yes.
7     Q.    How about next definition "Remedial
8 Action," is that something you heard of --
9     A.    Yes, it talks about, I am not going
10 to read the whole thing it talks about CERCLA
11 hazardous materials which we just defined,
12 typical environmental studying and
13 investigations, hazardous material, releases.
14     Q.    Same sort of items; right?
15     A.    Yes.
16     Q.    Are you aware, Mr. Miller, I assume
17 you are aware, are you wear that Alcoa has
18 contended section 11.6 covers indemnity or
19 expenses that Alcoa has incurred for example
20 machine guarding activities, are you aware of
21 that?
22     A.    I am aware they now claim that.
23     Q.    Do you agree with that?
24     A.    I agree that they claim it.  Do I
25 agree it is covered by this section?  No, I

Page 2330

DONALD MILLER - DIRECT

1
2 don't believe it is.
3     Q.    Let's talk about some of the things
4 you were involved with and see how that affects
5 that conclusion.  First I want to talk a little
6 about the negotiations themselves.  You
7 reference you participated in negotiation
8 sessions; right?
9     A.    Yes.
10     Q.    Who would you say would be the
11 prime contacts in those negotiation sessions
12 with respect to -- let me take a step back.
13     Did those negotiation sessions
14 include negotiations about the environmental
15 indemnity we are talking about here?
16     A.    Yes.
17     Q.    Who did you deal with in connection
18 with those negotiations?
19     A.    Cynthia Holloway, Claire Miller,
20 Peggy Wolff.
21     Q.    Alcoa did its, part of its due
22 diligence, did it do as you understand it Phase
23 I investigations?
24     A.    Yes.
25     Q.    Did those Phase I investigations

Page 2331

DONALD MILLER - DIRECT

1
2 include a look into the environmental conditions
3 as you use that term?
4     A.    Yes.  And other things.
5     Q.    What are the other things as you
6 understand it those Phase I investigations
7 looked at that Alcoa did?
8     A.    I understand they looked at things
9 like machine guarding.
10     Q.    Following that due diligence were
11 there further negotiations between Alcoa and
12 Fairchild regarding the terms of the
13 environmental?
14     A.    Yes.
15     Q.    Did there come a point in time when
16 Alcoa following that due diligence came back to
17 you with respect to what they thought should be
18 covered by this environmental indemnity?
19     A.    There were ongoing discussions
20 throughout the period.
21     Q.    I want to turn your attention to
22 tab 2 in your binder.
23     A.    Which is what?
24     Q.    Do you have it there, tab 2.
25     A.    Yes.

Page 2332

DONALD MILLER - DIRECT

1
2     Q.    These are a series of handwritten
3 notes.
4     A.    Yes.
5     Q.    Are these, is this your
6 handwriting?
7     A.    This is my handwriting.
8     Q.    No comments on the penmanship.
9 What do you understand these notes to be?
10     A.    These are notes of a meeting which
11 took place June 10, 2002.  In which I was
12 present, Cynthia Holloway, Claire Miller,
13 Phyllis Brockstein who was their tax lawyer,
14 Mary Amore, who I think was their Alcoa's
15 investment banker, Peggy Wolff, Brian Higgins
16 who was a Skadden lawyer.
17     Q.    This was a meeting following
18 Alcoa's Phase I visits to the facilities; right?
19     A.    Yes.
20     Q.    So I want to just draw your
21 attention down, you have the number of items
22 numbered items here starting at the bottom of
23 page 1 here.
24     THE ARBITRATOR:  Let me ask, Mr.
25 Miller, all the names at the top here are

55 (Pages 2329 to 2332)

Page 2333

DONALD MILLER - DIRECT

2 representatives of Alcoa; is that it?

3    THE WITNESS:  Yes.

4    THE ARBITRATOR:  You were the only

5 one there from Fairchild?

6    THE WITNESS:   John Flynn was

7 probably there.

8    THE ARBITRATOR:  Okay.

9    Q.   In fact was Mr. Flynn there as you

10 understand it, Mr. Miller.

11    A.   Yes.  John Flynn was there.  We may

12 have had outside counsel there.

13    Q.   Looking at these numbers, 1, 2, 3

14 down at the bottom of the page.

15    A.   Yes.  This is a list of what they

16 were saying.  They are explaining what they are

17 saying.

18    Q.   These are notes you're taking

19 during the meeting?

20    A.   Yes.

21    Q.   It says there "preclosing ours,

22 post closing theirs."  Then sort of go past the

23 squiggle mark.  It says particularly "enviro

24 liabilities."

25    A.   Correct.

Page 2334

DONALD MILLER - DIRECT

2    Q.   Do you see the word "enviro" there?

3    A.   I do.

4    Q.   Is that your shorthand for

5 environmental?

6    A.   Those were their words, I am

7 copying their words, environmental.

8    Q.   You used enviro?

9    A.   I shortened it to enviro.

10    Q.   Do you recall them discussing using

11 the term EHS in connection with this?

12    A.   No, I would have written it.

13    Q.   Sorry?

14    A.   No, I would have written it.

15    Q.   In fact anywhere have you had a

16 chance to review your notes from the

17 negotiation?

18    A.   I have.

19    Q.   Is there any mention or reference

20 to the term EHS in your notes?

21    A.   No.  They never mentioned it.  They

22 talked about environmental which I either wrote

23 as environmental or shortened to enviro.  That

24 is what we were talking about.

25    Q.   Look at bullet 2.

Page 2335

DONALD MILLER - DIRECT

2    A.   Yes.

3    Q.   It says "They acknowledge that we

4 had reserves for these enviro liabilities."  Do

5 you see that?

6    A.   I do.

7    Q.   What reserves are being discussed

8 at this point?

9    A.   Reserves for environmental

10 liabilities this has to do with what ultimately

11 became the reserves on the balance sheet and on

12 the final balance sheet.

13    Q.   Those were reserves carried on

14 Fairchild Fasteners books?

15    A.   Fairchild's books.

16    Q.   Those related did -- did those

17 relate to issues affecting ground, air and water

18 as you defined before?

19    A.   Yes.  They are environmental.  That

20 is what they were talking about.  Those were the

21 words they used.  That's why you see

22 environmental.

23    Q.   To your knowledge did you have any

24 discussion or did the reserve in any way

25 include --

Page 2336

DONALD MILLER - DIRECT

2    A.   If you see if you look above also,

3 it is mentioned Chatsworth, enviro liability.  I

4 was copying what they were saying.

5    Q.   That reserve we were just talking

6 about, did it contain items related to things

7 like machine guarding in it?

8    A.   Not that I know of, no.

9    Q.   To your understanding the issues

10 related to air, water and ground?

11    A.   They were environmental.

12    Q.   The next item item 3.

13    A.   Yes.

14    Q.   Phase I assessments?

15    A.   Yes.  They want us to take known

16 environmental liabilities, enviro liabilities.

17    Q.   It says there they want us to take

18 known enviro liabilities, again you don't recall

19 them mentioning EHS at that point; do you?

20    A.   They didn't.  I would have written

21 EHS.  For one thing is shorter it would have

22 been easier to write.  They weren't talking

23 about EHS.  They were talking about

24 environmental.  That is why I wrote enviro.

25    Q.   Next they want to manage the

56 (Pages 2333 to 2336)

DONALD MILLER - DIRECT

1
2  remediation; do you see that?
3      A.    Yes.
4      Q.    Is remediation a term you are
5  familiar with?
6      A.    It is.  It is environmental
7  remediation.
8      Q.    Next item there says "PCE and TCE,"
9  tell me if I am reading the handwriting
10  correctly, "use at St. Cosme and Fullerton want
11  indemnity."
12      A.    Yes.
13      Q.    I want to pause there.  Do you
14  recall Alcoa ever making a request for
15  indemnification related to those issues during
16  this meeting?
17      A.    Yes.
18      Q.    How much did Alcoa estimate it
19  thought those indemnities would amount to?
20      A.    $20 million.
21      Q.    20 million you said?
22      A.    $20 million.
23      Q.    At your deposition do you recall
24  Mr. Slifkin showed you these notes?
25      A.    Yes.

DONALD MILLER - DIRECT

1
2      Q.    He asked you about this, do you
3  recall that?
4      A.    He did.
5      Q.    I believe, we can look at it if you
6  want, I believe you expressed some confusion
7  about which meeting might have been which.
8      A.    I didn't have a great deal of time
9  to prepare for my deposition and I hadn't looked
10  at everything.  I wasn't sure what happened
11  when.  And now I have a better idea.
12      Q.    Since that time have you had a
13  chance to look at some other documents that
14  refreshed your recollection about the discussion
15  at this meeting?
16      A.    Yes.  I looked at three documents
17  in particular.  I looked at John Flynn's notes
18  of the same meeting.  I asked John what they
19  meant.  I looked at Cynthia Holloway's notes.  I
20  looked at my own notes.  And I also looked at
21  the proxy.
22      Q.    The Proxy Statement that was issued
23  by Fairchild?
24      A.    By Fairchild.
25      Q.    Does that Proxy Statement contain

DONALD MILLER - DIRECT

1
2  any sort of chronology of events?
3      A.    It does.  It is called the history
4  of the transaction.
5      Q.    That helped refresh your
6  recollection about this?
7      A.    Sure did.
8      Q.    You mentioned you looked at some of
9  Ms. Holloway's notes.  I want to briefly turn
10  your attention to tab 4 of your book.
11      A.    Yes.  She has beautiful penmanship.
12      Q.    She really does.  You look at this
13  dated June 10, 2002.
14      A.    Yes.
15      Q.    Do you understand this to be
16  Ms. Holloway's notes from that same meeting?
17      A.    Yes.
18      Q.    Focus right on that page there in
19  the middle, there is that sort of squared box.
20      A.    Yes.
21      Q.    She had the term EHS there, do you
22  see that?
23      A.    Next to "litigation/EHS."
24      Q.    Do you see that?
25      A.    I am looking in the square box.

DONALD MILLER - DIRECT

1
2      Q.    To the left of the square box, the
3  first item listed is debt on the top not in the
4  square box, now at the top of the notes?
5      A.    "Debt, worker's comp, OPEB.
6  Product warranty."  I see "EHS.  Unknown" I
7  believe it says "EHS."
8      Q.    Litigation and EHS?
9      A.    Litigation and EHS.
10      Q.    She has that written there.  Again
11  do you recall her using that term during that
12  meeting?
13      A.    She didn't.  If she used it I would
14  have written it.
15      Q.    Let's look at the substance of what
16  is in here.  What are the matters in that box
17  we're talking about, what are the subject
18  matters as best you can tell she has from the
19  notes?
20      A.    These are environmental liabilities
21  she is talking about at various plants.  She is
22  talking primarily about PCE and TCE which was
23  Fullerton and St. Cosme.
24      Q.    You see there TCE, looking halfway
25  down the box, "can use but can't throw in

Page 2341

DONALD MILLER - DIRECT

1
2 groundwater." Do you see that?
3     A.    Yes.
4     Q.    Next line says "indemnity covers
5 known and unknown but time limit is open." Do
6 you see that?
7     A.    Yes.
8     Q.    Next line says "won't dig holes to
9 find this unless we find this. Anything we
10 discover in ordinary course." Do you see that?
11     A.    Yes.
12     Q.    Does this refresh your recollection
13 that these are the topics discussed during that
14 meeting when the indemnity was being addressed?
15     A.    Yes.
16     Q.    Look to the left of that box, it
17 says there "PCE and TCE."
18     A.    Yes.
19     Q.    What is the number below it?
20     A.    "$20 million NPV." Which I believe
21 means net present value.
22     Q.    Are these notes that helped refresh
23 your recollection reflecting on your notes from
24 that same meeting?
25     A.    Yes.

Page 2342

DONALD MILLER - DIRECT

1
2     Q.    Turn if you can in your book one
3 tab earlier to tab 3 -- before we do that. Did
4 Mr. Slifkin show you these notes during your
5 deposition, Ms. Holloway's notes? If you want to
6 look we can look. But do you recall him showing
7 you?
8     A.    I don't recall whether he showed
9 me. No. I don't think he did.
10     Q.    Look at tab 3.
11     A.    Yes. No, he didn't.
12     Q.    Tab 3. Is this another document
13 you reviewed?
14     A.    Yes.
15     Q.    Since your deposition?
16     A.    Yes.
17     Q.    It is an email, the top is an email
18 from Ms. Holloway looks like to herself on what
19 appears to be June 9, the day before the.
20         That meeting; is that right?
21     A.    Yes.
22     Q.    I want to draw your attention to
23 page 4 at bottom there which is Bates FAIR
24 50025537. Do you see that?
25     A.    Yes.

Page 2343

DONALD MILLER - DIRECT

1
2     Q.    If you look at the first entry
3 bottom of the page there is a number 6 it says
4 EHS. Do you see that?
5     A.    Yes.
6     Q.    It reads there "Most probable
7 estimated for cleanup non TCE is 4 million for
8 first two years and 2.5 million per year for 15
9 years for TCE and other related clean-up
10 efforts. Total NPV at 12 percent is 20
11 million."
12         Do you see that, Mr. Miller?
13     A.    I do.
14     Q.    Is that your recollection, does
15 that refresh your recollection as to what was
16 being discussed in terms of the indemnity at the
17 June 10 meeting?
18     A.    Yes.
19     Q.    Does that relate to, going back to
20 your notes at tab 2, we were looking at the
21 second page item 4 on your notes?
22     A.    Yes.
23     Q.    Do you believe you are talking
24 about that issue in item 4 of your notes?
25     A.    Yes.

Page 2344

DONALD MILLER - DIRECT

1
2     Q.    Going back to Ms. Holloway's email,
3 tab 3?
4     A.    Yes.
5     Q.    The next bullet sort of after what
6 I just read to you.
7     A.    This is a completely separate
8 issue.
9     Q.    Let's read it "Most California
10 sites relatively clean operationally but we will
11 need additional expenditures..." yes?
12     A.    "For guarding of machines and
13 general EHS clean-up for California and European
14 operations note almost all of the cost
15 anticipated for the cleanup was included in the
16 valuation analysis."
17     Q.    Do you recall Ms. Holloway or
18 anyone from Alcoa raising that issue in
19 connection with the indemnity discussion that
20 happened the next day on June 10?
21     A.    No. It was unrelated.
22     Q.    Sorry, what?
23     A.    It was unrelated. This is a
24 separate issue.
25     Q.    Back to your notes from June 10

Page 2345

DONALD MILLER - DIRECT

1
2  which is at tab 2. Before we do, should I ask
3  did Mr. Slifkin --
4      A.    Not in connection with
5  environmental. It was not discussed.
6      Q.    Did Mr. Slifkin show you the email
7  we just read during your deposition?
8      A.    No.
9      Q.    Back to tab 2. Second page. After
10 the fourth sort of numbered entry there there is
11 another entry. Okay.
12     A.    Yes.
13     Q.    What does that entry mean?
14     A.    It says "Compliance issues. They
15 will give us a list 20 to $40 million."
16     Q.    Is that something that the Alcoa
17 folks raised during that meeting?
18     A.    Exactly in this form, yes.
19     Q.    Do you have any recollection of
20 them asking for those compliance issues to be
21 covered by the environmental indemnity?
22     A.    No.
23     Q.    Did they ever give you a list of
24 what those items might be?
25     A.    We asked for a list. And they said

Page 2346

DONALD MILLER - DIRECT

1
2  they would give it to us. But we never received
3  it. I assume looking back and comparing it to
4  Cynthia Holloway's notes that this is the
5  guarding of machines, generally EHS clean-up,
6  but which she had already factored into her
7  valuation analysis. That's probably why we
8  never heard back from them again.
9      Q.    The next question I want to ask
10 you, you were not at every, as I think you
11 testified earlier, every negotiation session;
12 right?
13     A.    Correct. I was at most.
14     Q.    What is that?
15     A.    I was at most.
16     Q.    You were at most. Is it possible
17 that Mr. Jeffrey Steiner attended negotiation
18 sessions you were not at?
19     A.    There was probably one.
20     Q.    One. Do you believe that Mr.
21 Steiner would have, if he did brief you about
22 that negotiation session?
23     A.    Absolutely.
24     Q.    Do you believe that Mr. Steiner
25 would have agreed to include in an indemnity

Page 2347

DONALD MILLER - DIRECT

1
2  additional compliance issues of 20 to 40 million
3  and not tell you about it?
4      A.    No. That certainly would not have
5  ever happened.
6      Q.    Do you believe Mr. Steiner would
7  have agreed to cover EHS items using that term
8  that turned out millions and millions of
9  dollars?
10     A.    No. I don't think he even knows
11 what it means.
12     Q.    What what means?
13     A.    EHS.
14     Q.    Did you know what it meant?
15     A.    He certainly never used it in
16 discussion with me. I can't imagine -- no, I
17 didn't know what it meant either.
18     Q.    Was that a term that Fairchild
19 corporate offices used?
20     A.    Never.
21     Q.    We heard some testimony, you were
22 here a little earlier about a gentleman called
23 Tony Miramadi.
24     A.    Yes.
25     Q.    Who was Tony Miramadi?

Page 2348

DONALD MILLER - DIRECT

1
2      A.    He was a plant -- he worked in the
3  plant at Fairchild Fasteners. And he was in
4  charge of environmental matters.
5      Q.    Do you remember you might have seen
6  the document put up during Mr. Hodge's testimony
7  in which Mr. Miramadi wrote that he was EHS
8  director. Do you recall that?
9      A.    I did see that.
10     Q.    Was that his job title according to
11 Fairchild Corporation?
12     A.    Not that I know of.
13     Q.    What was his job title according to
14 Fairchild Corporation log?
15     A.    In our directories he was referred
16 to as environmental safety director.
17 Environmental safety director, no comma, no
18 nothing. Environmental safety director. And I
19 wonder when that chart was published, when he
20 wrote it. Because I would guess that it was
21 much later. By that time certainly the word had
22 gone all through the plants that Alcoa was going
23 to buy the business. Likely he and other
24 employees had researched what position they
25 hoped to get at Alcoa and what Alcoa called such

59 (Pages 2345 to 2348)

Page 2349

DONALD MILLER - DIRECT

1 positions that they wanted. And named it. We
2 wouldn't have been involved in it. We wouldn't
3 have stopped him. We wouldn't have even known
4 about it for that matter.
5 Q. Just so I'm clear, Mr. Miramadi's
6 title in the Fairchild directory was not EHS
7 director?
8 A. No.
9 Q. That is something -- did you have a
10 lot of interaction with Mr. Miramadi?
11 A. I may have met him once, I may
12 never have met him. I may have talked to him on
13 the telephone one or two times. And that was it. I
14 had almost no interaction with him.
15 Q. But you checked on his title in the
16 directory for purposes of this arbitration?
17 A. I did.
18 Q. Do you know if Mr. Miramadi got a
19 job with Alcoa following the acquisition?
20 A. Yes, he did.
21 Q. Do you know what that job was, do
22 you have any recollection?
23 A. I think it was probably

Page 2350

DONALD MILLER - DIRECT

1 environmental, health and safety, but I don't
2 know.
3 Q. Do you understand that Alcoa lumped
4 those functions together as a corporate entity?
5 A. Correct.
6 Q. Let's switch, we talked a little
7 bit about the negotiations that you recall and
8 your recollection of what was discussed. Do you
9 believe Fairchild would have agreed to an
10 indemnity that would have covered things like
11 machine guarding had it been raised?
12 A. No.
13 Q. Why do you say that?
14 A. Well there were specific
15 discussions over what we would warrant and what
16 we wouldn't. What we would represent and what
17 we wouldn't.
18 One of the things that specifically
19 was a subject of discussion was the condition of
20 machines. And we would not agree to represent
21 that our machines were in any particular
22 condition. Machine guarding has to do with
23 those machines.
24 So that's one reason.

Page 2351

DONALD MILLER - DIRECT

1 Q. What else?
2 A. The second is there would have been
3 a cost associated with updating those items.
4 And that cost would have been a significant
5 cost. And we had already told Alcoa that we
6 would not bear that extent of a cost.
7 Q. Are you aware that Alcoa in this
8 arbitration indicated that machine guarding
9 alone might cost $15 million on what it wants to
10 do?
11 A. I am. We certainly wouldn't have
12 accepted that.
13 Q. Let's talk about that for minute.
14 You said there was associated cost. How would
15 there be a cost associated?
16 A. With machine guarding?
17 Q. Yes, if Fairchild agreed to
18 indemnify them for machine guarding.
19 A. Because those machines were in use
20 and in flux and some apparently didn't have
21 machine guarding. Although they may have at one
22 time. It would have cost money to fix them, put
23 them back on.
24 Q. In your view if Fairchild had

Page 2352

DONALD MILLER - DIRECT

1 agreed to that indemnity would that have an
2 effect on the purchase price of the acquisition?
3 A. In effect it would have dropped the
4 purchase price by the amount of what it cost to
5 repair those machines.
6 Q. That money would have come out of
7 Fairchild's pocket?
8 A. Correct. By the way, they didn't
9 even want us to fix them.
10 Q. They didn't want you to fix the
11 machines?
12 A. No.
13 Q. How do you say that?
14 A. Well, first of all there is a huge
15 number of representations, there are pages of
16 representations in the agreement. Into place
17 had they asked us to represent the condition of
18 the machinery. Because it wasn't part of the
19 deal.
20 Secondly, if you look in what we
21 were allowed to do and what we were not allowed
22 to do between signing and closing, we were not
23 allowed to expend capex, capital expenditures of
24 more than $500,000. If they are saying it is

Page 2353

DONALD MILLER - DIRECT

1  $15 million, we could hardly have made a debt in
2  machine guarding. But it wasn't. It was never
3  part of the deal.
4      Q.   Let's talk about, I want to follow
5  up on the question I asked just minute ago about
6  reduction in the purchase price. Let's talk a
7  little bit about that issue.
8          Back to sort of the June 10, June
9  11 time frame.
10     A.   Yes.
11     Q.   In connection with that there was
12 also a meeting on June 11, you understand that
13 to be the case?
14     A.   Yes. '
15     Q.   In connection with those meetings
16 did Alcoa ask for a reduction in the purchase
17 price of the deal?
18     A.   They did. They had promised that
19 they wouldn't do that. That they were doing
20 their due diligence. At the end of their due
21 diligence they would either buy or not. They
22 came back and said, gee, we have found $75
23 million of problems, we want that reduced off
24 the purchase price.

Page 2354

DONALD MILLER - DIRECT

1      THE ARBITRATOR:  When was this
2  discussion?
3          THE WITNESS:   They prefaced it by
4  telling the professionals on June 10 that was
5  the reduction they were going to be looking for.
6          We then had a meeting with the
7  senior, two senior people, Jeffrey Steiner and
8  Barbara Jeremiah on the 11th in which they
9  presented their demands for reduction in the
10 purchase price of $75 million. Which later
11 became in the meeting -- sorry.
12     Q.   Finish the question.
13     A.   Which later in the meeting became
14 66.
15     Q.   What was Fairchild's reaction to
16 Alcoa's demand of that kind of purchase price
17 reduction?
18     A.   Jeffrey Steiner our Chairman was
19 very disturbed. He said there was no way that I
20 would ever agree to a 50 or $100 million
21 reduction in the purchase price. You're wasting
22 your time. I won't agree to it. It is my
23 recollection that when Barbara Jeremiah insisted
24 that that was the scope, he said thank you and

Page 2355

DONALD MILLER - DIRECT

1  he got up and he left.
2      Q.   If you turn to tab 5 of your
3  binder.
4      A.   Yes.
5      Q.   Looks like that same nice
6  penmanship.
7      A.   I know it is easy to see.
8      Q.   See there it says 6/11/02?
9      A.   Yes.
10     Q.   I want to turn your attention to
11 the page which at the lower right-hand corner is
12 fair 50025597. Do you see that?
13     A.   Yes.
14     Q.   Do you see there, I guess there is
15 a comment, second comment down says Jeffrey?
16     A.   "Jeffrey won't give us a 50 or 100
17 million reduction not one chance in a million
18 will he," parentheses he, "agree."
19     Q.   Is that what you were just
20 referring to that discussion?
21     A.   Absolutely. He left.
22     Q.   Was the fact that -- did
23 negotiations break off at that point?
24     A.   Yes.

Page 2356

DONALD MILLER - DIRECT

1      Q.   Was that fact communicated --
2      A.   Well, when you say at that point,
3  negotiations between him and Barbara Jeremiah
4  broke off at that moment. When he left she
5  left. Some of the professionals stayed on and
6  looked at each other for a while, tried to think
7  if there was some way to bridge this. Then we
8  all parted within ten minutes after that.
9      Q.   Was it in your mind the deal was
10 pretty much off at that point?
11     A.   The deal was off at that point if
12 that was what Alcoa was going to insist upon.
13     Q.   Is that fact reflected in the Proxy
14 Statement you reviewed?
15     A.   Yes.
16     Q.   So we are talking here about not
17 one chance in a million between 50 and 100
18 million reduction. Let's talk a little bit
19 about the math here, okay, Mr. Miller?
20     A.   Yes.
21     Q.   So on June 10 Alcoa came to you as
22 we saw in your notes and asked for 20 million in
23 indemnity; correct?
24     A.   Correct.

61 (Pages 2353 to 2356)

Page 2357

DONALD MILLER - DIRECT

1
2    Q.    That was to cover environmental
3    items as you understood it?
4    A.    Yes.
5    Q.    Same items covered by the reserve?
6    A.    Same items that were covered by the
7    reserve.
8    Q.    How much was the reserve?
9    A.    8.45, I believe.
10   Q.    Was there a difference of opinion
11   between the parties as to how much those
12   liabilities were going to cost?
13   A.    We carried those liabilities at
14   8.45 because in good faith we believed that's
15   what it would cost.
16   Q.    Did you expect when -- let me --
17   A.    We certainly didn't expect them to
18   cost $40 million, no.
19   Q.    Did Fairchild, however, eventually
20   agree in the Acquisition Agreement to indemnify
21   Alcoa for the PCE, TCE type clean ups that we're
22   talking about?
23   A.    Yes. I believe that was always the
24   understanding. That we were responsible for
25   this.

Page 2358

DONALD MILLER - DIRECT

1
2    Q.    Did you believe it was going to be
3    20 million in exposure?
4    A.    No.
5    Q.    It was just a matter of figuring
6    out how it plays out in the future and how much
7    it would cost?
8    A.    Correct.
9    Q.    Let's put that to the side at this
10   meeting. They also asked for, I think you
11   testified 75 million in purchase price
12   reduction?
13   A.    Initially which became 66 I
14   believe.
15   Q.    Did the parties eventually agree on
16   purchase price reduction?
17   A.    Yes.
18   Q.    How much?
19   A.    Really they split the 66. About
20   33.
21   Q.    Do you recall in your notes at June
22   10 Alcoa also raised an issue about 20 to 40
23   million for compliance issues, do you recall
24   that?
25   A.    Yes.

Page 2359

DONALD MILLER - DIRECT

1
2    Q.    I think you testified they never
3    gave you the list of those issues; correct?
4    A.    They never gave us a list of the
5    issues.
6    Q.    If compliance issues were included
7    in the indemnity, did you tell me earlier you
8    believe that would be the effect of having a
9    purchase price discounts?
10   A.    Absolutely.
11   Q.    What would be the total purchase
12   price, net purchase price discounts if you
13   included those compliance issues and the 33
14   million that eventually was agreed to?
15   A.    It would put it way in excess of
16   the 50 that Jeffrey walked out over. It would
17   be essentially $75 million right there.
18   Q.    Which Mr. Steiner walked out on?
19   A.    He walked out. He wouldn't accept.
20   None of us would have accepted it. It was just
21   out of the question.
22   Q.    The deal was off at that point?
23   A.    The deal would have been off.
24   Q.    That is a fact disclosed in the
25   Proxy Statement?

Page 2360

DONALD MILLER - DIRECT

1
2    A.    That is a lot of money. That is
3    over 10 percent of the entire purchase price.
4    Q.    Is that a reason why you feel the
5    machine guarding issues were not included in the
6    indemnity?
7    A.    They never were. That was an issue
8    which they threw out. They were trying to come
9    up with, I think, I can only tell you what I
10   think, they were trying to come up with the
11   highest number they could then bargain down.
12   Hold these things over our heads.
13   Q.    In light of that --
14   A.    I don't think they were ever
15   serious about that but I don't know.
16   Q.    In light of that, Mr. Miller, in
17   light of your experience in the negotiations, is
18   there any chance in your mind Fairchild would
19   have agreed to indemnify Alcoa on top of the
20   PCE, TCE cleanup for tens of millions of dollars
21   in things like machine guarding expenses?
22   A.    No. For that matter it would have
23   been covered entirely differently had we.
24   Q.    Why do you say that?
25   A.    Because it would have had to do,

Page 2361

DONALD MILLER - DIRECT

1
2 been put into a representation as to the
3 condition of the machinery. It had nothing to
4 do with environmental. It had to do with
5 something separate.
6      Q.    Let's talk about that for minute.
7 Environmental at the time of this agreement were
8 unknown in terms of what their scope was going
9 to be in the future; right?
10     A.    Unknown in terms of how extensive
11 they were or what they were. But we all knew
12 they were air, water and ground.
13     Q.    Alcoa, did Alcoa request to do
14 Phase II investigations in connection with its
15 due diligence?
16     A.    Yes, they did.
17     Q.    What did you understand was going
18 to be the scope of those Phase II investigations
19 in terms of subject matter?
20     A.    They were going to have to do with
21 air, ground and water. They were not going to
22 have to do with, quote, machine guarding or
23 things of that nature.
24     Q.    Alcoa did not ask for any more due
25 diligence about machine guarding and those types

Page 2362

DONALD MILLER - DIRECT

1
2 of issues in connection with this transaction?
3      A.    No. It is the kind of thing you
4 could walk into the plant, look at the machines,
5 count the machines and see instantly whether or
6 not they had machine guards.
7      Q.    In your experience negotiating
8 transactions and this transaction, are those
9 types of items things that are subject usually
10 to indemnities when there are known items?
11     A.    Please repeat the question.
12     Q.    In your experience negotiating
13 acquisition transactions and including your
14 experience in this transaction are those types
15 of items items where you say you can walk into
16 the plants and see what is going on, are those
17 usually covered by indemnities or are they
18 sometimes covered otherwise?
19     A.    They are covered usually by
20 representations and warranties which are backed
21 up by indemnities. They are not covered by
22 indemnities alone.
23     Q.    Is there a representation and
24 warranty with respect to machine guarding --
25     A.    Absolutely not. --

Page 2363

DONALD MILLER - DIRECT

1
2      Q.    Let me finish my question -- - with
3 respect to the state of the machine guarding at
4 the facilities?
5      A.    No. Absolutely not. We weren't
6 warranting the condition of the machinery. Some
7 of it was old and some of it was new.
8      Q.    Let's talk about what you were
9 representing, if you look at the Acquisition
10 Agreement.
11     A.    Yes.
12     Q.    Section 3.24, please.
13          Your Honor, that is on page 39 of
14 tab 1 of Mr. Miller's binder.
15     A.    Yes.
16     Q.    You see 3.24?
17     A.    Yes.
18     Q.    First line says -- title of that
19 section is what?
20     A.    Environmental Matters.
21     Q.    It says there "Except as set forth
22 on Schedule 3.24."
23     A.    Yes.
24     Q.    Subsection A, is that a
25 representation and warranty by Fairchild?

Page 2364

DONALD MILLER - DIRECT

1
2      A.    Yes it is.
3      Q.    What is the representation and
4 warranty being made there?
5      A.    "Fairchild has obtained all
6 licenses, permits, authorizations approvals and
7 consent of governmental entities, which are
8 required under applicable environmental law and
9 necessary for it to conduct its business, as it
10 is now carried out. "That is the essence of it.
11     Q.    Let me paraphrase and see if you
12 agree is the essence regarding compliance with
13 Environmental Laws as a defined term?
14     A.    Yes.
15     Q.    If something was, if there was in
16 the aggregate looking at the bottom of the page,
17 if the aggregate of material problem --
18     A.    Actually, I don't think what you
19 said is not correct. This is not -- this is a
20 representation we have obtained the licenses and
21 permits to operate everything.
22     Q.    If you look down a couple, perhaps
23 I shouldn't have cut you off from reading. If
24 you look down near the bottom of that section, I
25 guess four or five lines up from the top, it

63 (Pages 2361 to 2364)

Page 2365

DONALD MILLER - DIRECT

1
2  says the words "and with all applicable
3  Environmental Laws." Do you see that?
4      A.   Yes.
5      Q.   Maybe it makes sense I will read
6  the sentence you tell me if we should resist it
7  the each. "Each of such environmental permits
8  is in full force and effect and each of the
9  sellers and transferred Fasteners subsidiaries
10 is in compliance with the terms and conditions
11 of each such environmental permits and with all
12 applicable Environmental Laws. "
13     A.   Yes.
14     Q.   Is that a representation --
15     A.   Yes. You were right the first
16 time.
17     Q.   That is why we read it. That is
18 the representation by Fairchild that --
19     A.   Uh-huh.
20     Q.   Would you expect then given this
21 representation and warranty if there was an
22 exception to that representation it would be
23 listed on Schedule 3.24?
24     A.   Yes.
25     Q.   Let's look at Schedule 3.24. I am

Page 2366

DONALD MILLER - DIRECT

1
2  going to look at, first one I want you to look
3  at is on tab 7 of your binder. Do you see it
4  there, Mr. Miller?
5      A.   Yes.
6      Q.   It says Schedule 3.24 entitled
7  Environmental Matters?
8      A.   Yes.
9      Q.   Is there any mention in this about
10 machine guarding non-compliance for example?
11     A.   No.
12     Q.   What are the subject matters that
13 are addressed in this schedule?
14     A.   Environmental matters.
15     Q.   By that you mean?
16     A.   I mean air, water, ground.
17     Q.   Are these the same items generally
18 speaking that are also contained in the reserve?
19     A.   Yes.
20     Q.   Generally speaking.
21     A.   Generally speaking, yes.
22     Q.   Okay.
23     A.   Except for litigation matters.
24     Q.   Was this schedule, if you know,
25 attached to the signed agreement in July?

Page 2367

DONALD MILLER - DIRECT

1
2      A.   Yes, it was.
3      Q.   If you turn to the next tab you see
4  it again says Schedule 3.24 environmental
5  matters but the top says Revised Disclosure
6  Schedule dated 12/3/02?
7      A.   Yes, Fairchild was required to
8  update its schedules.
9          THE ARBITRATOR:   Which tab are you
10 on?
11         MR. ZUROFSKY:   Tab 8. We did tab
12 7 was the July 1, we are looking now at the
13 revised one.
14     Q.   Sorry, Mr. Miller?
15     A.   Between the time of the signing of
16 the agreement and the closing Fairchild was
17 required to update its schedules for any new
18 matters and Alcoa had the right to disallow
19 changes to the schedules and had various
20 remedies if there were changes to the schedules
21 this is a schedule that was the final schedule,
22 revised disclosure schedule that was delivered
23 at the closing 12/3/02 and accepted by Alcoa.
24     Q.   You are referring to Claimant's
25 Exhibit 307 at tab 8?

Page 2368

DONALD MILLER - DIRECT

1
2      A.   Yes.
3      Q.   Any mention in that document of
4  issues like machine guarding?
5      A.   No, it wouldn't belong there.
6      Q.   At this time is it your
7  understanding Alcoa already had estimates of
8  millions of dollars of expenditures on machine
9  guarding issues?
10     A.   Yes.
11     Q.   Coming back to the agreement at tab
12 1. I want to turn your section B of 3.24.
13     A.   If you notice there is a subsection
14 of this called Environmental Claims.
15     Q.   Yes.
16     A.   Nothing in there about machine
17 guarding.
18     Q.   Let's look. You are talking about
19 tab 8 now?
20     A.   7 and 8.
21     Q.   I want to address Environmental
22 Claims back in the agreement which is subsection
23 3.24 B at tab 1. Do you see it is another
24 representation by Fairchild is that right, Mr.
25 Miller?

DONALD MILLER - DIRECT

1
2    A.    Yes, it is.
3    Q.    Again the opening to the section is
4  "except as set forth on Schedule 3.24." Then in
5  subsection B there are no Environmental Claims;
6  right?
7    A.    Correct.
8    Q.    An Environmental Claim is defined
9  in section G there, subsection G.
10   A.    Yes.
11   Q.    Do you understand it to mean
12  Environmental Claim means claim made pursuant to
13  defined term Environmental Law?
14   A.    Yes.  You see they talk about
15  cleanup costs, response costs, natural resources
16  damages, property damages, personal injuries
17  pursuant to Environmental Law.  That is very
18  typical environmental language.
19   Q.    Again; if there was a claim,
20  quote/unquote Environmental Claims in defined
21  terms that had been made pursuant to
22  Environmental Law again it would be something
23  you would expect to be disclosed on section
24  3.24?
25   A.    Yes.  Absolutely.

DONALD MILLER - DIRECT

1
2    Q.    In terms of machine guarding were
3  there however claims made against Fairchild at
4  the time of the acquisition regarding machine
5  guarding issues?
6    A.    Yes.
7    Q.    Which schedule did they appear on,
8  Mr. Miller?
9    A.    The Litigation Schedule 3.24.
10   Q.    You mean 3.24.  Look at tab 9.  I
11  think you might have said the wrong section?
12   A.    Sorry.  3.16.
13   Q.    That is tab 9; right?
14   A.    Yes.  Tab 9, 3.16.
15   Q.    Is that the general litigation
16  matter schedule?
17   A.    Yes.
18       THE ARBITRATOR:  Which tab is
19  that?
20       MR. ZUROFSKY:  Sorry, tab 9 your
21  Honor.
22   Q.    There are, are there not, machine
23  guarding claims listed on this schedule; right,
24  Mr. Miller?
25   A.    Yes.  I know they are.  I am

DONALD MILLER - DIRECT

1
2  looking for it.
3    Q.    I will draw your attention to it.
4    A.    Yes.
5    Q.    If you want to flip through, page
6  192 of the document, I believe  -- actually that
7  may not be right.
8    A.    That's not right.
9    Q.    Sorry, 193 of the document which is
10  Bates FC 233.  Do you see the title there OSHA?
11   A.    OSHA investigation cases.
12   Q.    Those are related to machine
13  guarding at least some of them as you understand
14  it?
15   A.    Yes.  Look at number 2 "Rebecca
16  Grechman lost her index finger."
17   Q.    That appears on Schedule 3.16
18  general litigation; right?
19   A.    Uh-huh.  I know some of these are
20  machine guarding.
21   Q.    Turn back to tab 1 in your binder,
22  the Acquisition Agreement.  Sorry.  Are you
23  finish with your answer?
24   A.    Look at number 1, Sylvia Lenart we
25  were fined $18,000 for inadequate machine

DONALD MILLER - DIRECT

1
2  guarding.  That is where those cases belong.
3    Q.    At this time, however, did you
4  understand Alcoa had estimates for millions of
5  dollars in machine guarding expenses that they
6  were planning on spending?
7    A.    When you said at this time you mean
8  at the time the schedules were delivered?
9    Q.    The time of the acquisition.
10   A.    Absolutely.
11   Q.    Back to tab 1 we were on section
12  3.24.  We were, I believe on page 40 of the
13  agreement.  Again there are a series of
14  representations here, Mr. Miller.
15   A.    Yes.
16   Q.    Do any of them relate to, as you
17  understand it, things like machine guarding?
18   A.    No.
19   Q.    Turn to the definition of --
20   A.    Had there been a machine guarding
21  representation it would have been very clear, it
22  would have said all machines are in good and
23  safe operating condition except as set forth in
24  Schedule 3.24 X.  No such schedule.
25   Q.    Was it your understanding machines

65  (Pages 2369 to 2372)

Page 2373

DONALD MILLER - DIRECT

1
2  were sold on an as is basis?
3      A.    Of course.
4      Q.    Like other equipment in the plants?
5      A.    Like other equipment in the plants.
6      Q.    Turn to the definition of
7  Environmental Law now in subsection G.
8      A.    Yes.
9      Q.    You're familiar with this?
10     A.    I am.
11     Q.    What do you understand the term
12 Environmental Law to cover?
13     A.    It covers environmental laws
14 pertaining to air, ground and water.
15     Q.    When you say air, ground, water, I
16 want you to draw attention to subsection B.
17     A.    Yes.
18         THE ARBITRATOR:   What page are you
19 on?
20         MR. ZUROFSKY:   Sorry, your Honor,
21 page 41 of tab 1.
22     A.    3.24 G Romanette ii.
23     Q.    There is a definition of
24 Environmental Law it says any law related to,
25 there is three subparts, do you see that, Mr.

Page 2374

DONALD MILLER - DIRECT

1
2  Miller?
3      A.    I do.
4      Q.    First one is pollution or
5  protection of the environment; right?
6      A.    Yes.
7      Q.    Second one says "workplace health
8  or safety" do you see that?
9      A.    I do.
10     Q.    What do you understand that to be
11 covering?
12     A.    This is a definition of
13 Environmental Law in an environmental matters
14 section. This has to do with dangerous
15 conditions which could hurt or workers.
16 Dangerous environmental conditions which could
17 hurt our workers. Heavy metals, percolation of
18 vapors through the subslabs of the building.
19 Things like that.
20     Q.    Mr. Miller, I understand you are
21 not an environmental expert, but do you
22 understand there are laws in fact that have
23 specific application to the workplace that deal
24 with those kind of issues like vapors and
25 whatnot?

Page 2375

DONALD MILLER - DIRECT

1
2      A.    Yes.
3      Q.    I notice here it doesn't say under
4  B, workplace health or safety it doesn't say
5  related to environmental matters.  It doesn't
6  have those words in B.  Does that change your
7  view?
8      A.    No.  I know what this meant.  This
9  is an environmental matters section.  It has to
10 do with environmental laws.  That was what the
11 deal was.  This had to do with the environment.
12     Q.    Again, Mr. Miller, at any point in
13 any discussions, negotiations you had, was there
14 any moments or time when Alcoa asked Fairchild
15 to indemnify them for machine guarding expenses
16 and the like?
17     A.    No.  That is what -- look, this is
18 very frustrating to me.  I was there.  I was
19 there through the negotiations.  To say these
20 little words tucked in the middle of an
21 Environmental Law section, these two words which
22 is a subsection to environmental matters
23 section, has to do with machine guarding when
24 they could have said in 93 other places that we
25 were responsible for machine guarding and the

Page 2376

DONALD MILLER - CROSS

1
2  condition of machinery is just very frustrating
3  to me.  I will say no more.
4      Q.    I'm done on that, Mr. Miller.
5  Thank you very much.
6         THE ARBITRATOR:   Do you have any
7  questions, counsel?
8         MR. ZUROFSKY:   I am assuming he
9  says yes.
10        MR. CHESLER:   A few your Honor.
11 CROSS-EXAMINATION BY MR. CHESLER:
12     Q.    Good afternoon, Mr. Miller.
13     A.    Hello, Evan.  How are you?
14     Q.    It is your testimony you were
15 involved in the negotiation of the scope of the
16 definition of Environmental Law; is that
17 correct?
18     A.    Yes.
19     Q.    And in fact you recall that there
20 were several drafts of this agreement that went
21 back and forth between the law firms
22 representing the parties; correct?
23     A.    Yes.
24     Q.    And your company was represented by
25 the Cahill firm and Alcoa was represented by the

66 (Pages 2373 to 2376)

Page 2377

DONALD MILLER - CROSS

1    DONALD MILLER - CROSS
2 Skadden firm; correct?
3    A.    Yes.
4    Q.    You testified at your deposition
5 that the definition of Environmental Law, which
6 you just talked about on direct-examination was
7 the subject of bargaining.  Do you recall that?
8  ,  A.    Yes.
9    Q.    I want you to go back to the
10 agreement again if you would.  I think you have
11 it in front of you.
12    A.    I do.
13    Q.    Let me use the copy, there are so
14 many of these floating around I may have a
15 different copy in my book.  I don't want to get
16 you confused or me confused on the pages.
17    A.    Give me a section number I won't
18 get confused.
19    Q.    Excuse me?
20    A.    If you give me a section number, it
21 will be less confusing for me.
22    Q.    All right.  I will try to do that
23 let's first look at 11.6A
24    A.    Yes.
25    Q.    That is the basic indemnification

Page 2378

1    DONALD MILLER - CROSS
2 section isn't it?
3    A.    Yes, it is.
4    Q.    If you look at 11.6A I take it you
5 would agree with me the defined term for which
6 my client was indemnified is Fastener
7 Environmental Liabilities, three capital
8 letters; correct?  It is about halfway through
9 the paragraph on page 2808.
10    A.    Yes.
11    Q.    Yes?
12    A.    Yes.
13    Q.    You know from your vast experience
14 when a term is capitalized in a contract, that
15 typically means it is a term of art that has a
16 specific definition; right?
17    A.    Yes.
18    Q.    Would you turn with me then to
19 11.6E, little iv.  Which appears on page 2810,
20 Bates stamp page.  You have that?
21    A.    I do.
22    Q.    That is the definition of Fastener
23 Environmental Liabilities which is what it is we
24 are indemnified for; correct?
25    A.    It is a definition of Fastener

Page 2379

1    DONALD MILLER - CROSS
2 Environmental Liabilities.
3    Q.    If you go down in the text eight or
4 ten lines talking about what Fastener
5 Environmental Liabilities means, it says "all
6 losses, damages" and this long list of words
7 there.  You go down about four or five lines it
8 says "Based on any applicable Environmental Laws
9 existing on the closing date in respect of any
10 Fastener Environmental Condition. "Correct?
11    A.    Yes.
12    THE ARBITRATOR:   You are looking
13 at Roman numeral?
14    MR. CHESLER:   iv, your Honor.
15 Beginning six lines into that paragraph, the
16 definition of Fastener Environmental Liabilities
17 refers to "any applicable Environmental Laws
18 existing on the closing date in respect of any
19 Fastener Environmental Condition." Are you with
20 me, your Honor?
21    THE ARBITRATOR:  Yes.
22    Q.    Just to keep this chain of
23 provisions together, Mr. Miller, we start with
24 the general indemnification provision which
25 refers to Fastener Environmental Liabilities.

Page 2380

1    DONALD MILLER - CROSS
2 Now, we gone to the definition of that term and
3 that definition in turn uses two terms of art,
4 Environmental Laws and Fastener Environmental
5 Condition; does it not?
6    A.    Yes it does.
7    Q.    Now let's look at the immediately
8 preceding section 11.6 E iii which appears on
9 2809.
10    A.    Right.  It speaks to environmental
11 contamination.  Threatened environmental
12 contamination.
13    Q.    Excuse me, Mr. Miller, you need to
14 wait until I ask a question, if you don't mind.
15 Then you need to answer my questions.  This is
16 cross, not direct.  Okay.
17 So E iii defines the term Fastener
18 Environmental Condition one of the two terms of
19 art which you need to understand in order to
20 complete the definition of Fasteners
21 Environmental Liability which we just looked at;
22 right?
23    A.    Yes.
24    Q.    Fastener Environmental Condition,
25 if you go down to subpart capital C, because

Page 2381

DONALD MILLER - CROSS
1
2 there is a series of clauses that define this
3 term, if you look at capital C, which is five
4 lines up from the bottom of the page, you see
5 that one of the definitions, components of the
6 definition is "Any violation or alleged
7 violation of, or non-compliance or alleged
8 non-compliance with applicable Environmental
9 Law." Right? Is that correct?
10     A.   You correctly read C.
11     Q.   So I think we established, I hope
12 you will agree with me, if you are trying to
13 wind through these provisions to understand
14 Fasteners Environmental Liability, the term of
15 art in the indemnification clause, you go to
16 Fastener Environmental Liabilities definition
17 and that in turn defines two terms Fasteners
18 Environmental Condition which we just looked at
19 and also Environmental Law; correct?
20     A.   Yes.
21     Q.   So now we have seen two of those
22 provisions, each refers to both sub iii and sub
23 iv each refers to Environmental Law.  That term
24 of art is defined in the agreement in a subpart
25 of 3.24 which you looked at on

Page 2382

DONALD MILLER - CROSS
1
2 direct-examination; correct yes?
3     A.   Yes.
4     Q.   Let's look at page 2767 of the same
5 agreement because that is the definition of
6 Environmental Law which is referred to in all
7 these other provisions.
8     A.   Sorry, would you give me the
9 section number.
10     Q.   Section number is 3.24G as in
11 George, little ii.  I will wait for minute so
12 the judge can get there.  Are you there, your
13 Honor?
14     THE ARBITRATOR:  Yes.
15     Q.   So all of those sections take us to
16 this term of art, Environmental Law.  This is
17 the section you were talking to Mr. Zurofsky
18 about a few moments ago; correct?
19     A.   Yes.
20     Q.   It is your testimony that the
21 reference to sub, in subsection little b as in
22 boy of this particular section which defines
23 Environmental Law, the words of which are
24 "Workplace health or safety" is only workplace
25 health or safety that is related to

Page 2383

DONALD MILLER - CROSS
1
2 environmental issues, ground, air and water,
3 that is your testimony; correct?
4     A.   Yes.
5     Q.   Now subpart A, you would agree with
6 me, little a in that same section talks about
7 environmental issues, pollution or protection of
8 the environment or natural resources; correct?
9     A.   Yes.
10     Q.   And subpart C also refers to
11 environmental issues, exposure to hazardous
12 materials; correct?
13     A.   Yes.
14     Q.   Now you would agree with me,
15 wouldn't you, under your reading of this
16 definition any workplace health or safety issue
17 that you say are the only issues covered under
18 the indemnity would either involve pollution or
19 protection of the environment or natural
20 resources or would involve exposure of persons
21 or property to hazardous materials; wouldn't it?
22     A.   There is an overlap, but no.  The
23 answer is no.
24     Q.   The answer is no.  Okay.
25     A.   A overlaps --

Page 2384

DONALD MILLER - CROSS
1
2     Q.   You answered my question.  There is
3 an overlap; correct?
4     A.   Yes.
5     Q.   So it is your testimony that in
6 this section little a, little b, little C are
7 not separate mutually exclusive provisions, they
8 overlap in this section of the agreement;
9 correct?
10     A.   This pertains to environmental
11 matters.  All of the sections you pointed out
12 use the word environmental.  Environmental, if
13 you look at the definitions in section 11.6E the
14 definitions are environmental action.  Talks
15 about cleanup, governmental response costs,
16 natural resource damages, property damage.
17     If you look under Environmental
18 Contamination, it talks about hazardous
19 materials in soil, surface water, groundwater,
20 sediments or other environmental media.
21     Q.   Mr. Miller --
22     A.   I am not done.
23     Q.   No, you are done because you have
24 to answer my questions and not make speeches.
25     THE ARBITRATOR:  Just minute,

68 (Pages 2381 to 2384)

Page 2385

DONALD MILLER - CROSS

1  
2  please. He does have to answer your questions,
3  Mr. Chesler, but I think he can elaborate on
4  them.
5       MR. CHESLER:  Excuse me, your
6  Honor.
7       THE ARBITRATOR:  Are you
8  maintaining he did not answer your question?
9       MR. CHESLER:  I do indeed.
10      THE ARBITRATOR:  Then rephrase
11  your question.
12      MR. CHESLER:  I will reask the
13  same question because he didn't answer it.
14      THE ARBITRATOR:  Yes.
15   Q.   Do you agree with me, sir, yes or
16  no, that under your interpretation of 3.24
17  subsections little a, little b and little c
18  overlap they are not mutually exclusive?
19   A.   There is some overlap with respect
20  to certain matters.
21   Q.   Thank you. Now --
22   A.   Now may I finish.
23      THE ARBITRATOR:  You want to
24  elaborate on that, Mr. Miller?
25      THE WITNESS:   On that question,

Page 2386

DONALD MILLER - CROSS

1  
2  no. I'm sorry.
3       MR. CHESLER:  That is the same
4  question I asked before.
5   Q.   Now, isn't it in fact the case,
6  sir, that Fairchild, during the negotiations of
7  this very section sought to have subpart B
8  stricken entirely?
9   A.   I don't specifically recall.
10   Q.   Okay. Let me see if I can refresh
11  your recollection. Let me show you what we have
12  marked for identification as Alcoa Exhibit 150.
13      MR. ZUROFSKY:  Your Honor, I am
14  going to object to this exhibit. I will tell
15  you what it is. It is actually a pretty serious
16  one. If you recall your Honor we asked for
17  negotiation documents related to the drafting of
18  the agreement. We had a back and forth before
19  your Honor before the hearing started.
20      One of the things that was told to
21  us well we will give you negotiation documents
22  we are not giving you drafts, we presume people
23  have drafts, whatever. That is something where
24  it was left but from that date until now we
25  never at the deposition there never been

Page 2387

DONALD MILLER - CROSS

1  
2  introduced drafts of these agreements, there is
3  no Bates stamp on this. It has never been
4  produced to us before.
5       Mr. Slifkin was referring to trial
6  by ambush yesterday. Mr. Miller was not deposed
7  about these drafts, Mr. Miller has not had a
8  chance to review these drafts or any notice they
9  might be coming to him. This is inappropriate
10  and objectionable.
11      MR. CHESLER:  May I respond, your
12  Honor. If your Honor looks at the document you
13  will see this supposed ambush is based upon a
14  document prepared and sent by Cahill Gordon &
15  Reindel, the lawyers who just objected. There
16  is no surprise here.
17      This is their own document with
18  their own comments on it. We can't surprise
19  them on cross-examination with their own
20  document unless they haven't prepared their
21  witness. This came from them to us. It has
22  nothing to do with any comments going back from
23  us to them. Which is the subject counsel is
24  referring to. And in fact they withdrew that
25  request. At least as I learned how to

Page 2388

DONALD MILLER - CROSS

1  
2  cross-examine, witnesses your Honor, you impeach
3  them with their own documents, not what we spent
4  a week listening to during our case showing
5  witnesses documents they never seen before, that
6  they hadn't written or received.
7       This is their document from their
8  counsel with their comments. And it is flatly
9  inconsistent with the testimony this witness
10  gave under oath within the last hour. I have an
11  absolute right respectfully to cross-examine him
12  with it and impeach his credibility.
13      MR. ZUROFSKY:  The problem we have
14  with, quite frankly, now I just remembered, I
15  remembered on that phone call when we were in
16  front of you I said, fine, we will assume drafts
17  from the files, which you will let us know if
18  you are going to use them. That is something I
19  discussed on that phone call with your Honor. I
20  remember this because we specifically asked to
21  know about what negotiation documents were going
22  to come.
23      My problem is not that this is a
24  document we may or may not have had, my problem
25  is the fact Mr. Miller was deposed on these

69 (Pages 2385 to 2388)

Page 2389

DONALD MILLER - CROSS

1
2  topics, Mr. Miller specifically addressed this
3  issue, counsel is springing it on us right now
4  without any chance to have Mr. Miller review it
5  or other documents which may in fact show other
6  things that may fall in this category. That is
7  my problem with it.
8          This is something we totally
9  anticipated and in fact are now getting
10  surprised in terms of the fact they may do this
11  and ask for it now we are getting surprised with
12  it.
13          MR. CHESLER:  My colleague just
14  defined cross-examination. We have no
15  obligation to tell a witness at his deposition
16  what we intend to do on cross-examination. At
17  least as I understand the process. That is
18  usually the last thing you do at a deposition.
19          This is their document from their
20  own lawyers with their own letterhead of their
21  comments. It is inconsistent with what the
22  witness has testified.
23          THE ARBITRATOR:  The witness said
24  he didn't recall whether there had been any such
25  effort.

Page 2390

DONALD MILLER - CROSS

1
2          MR. CHESLER:  No, your Honor, it
3  is inconsistent with his definition of 3.24. I
4  can't make the point and argue it to you, your
5  Honor, unless I can conduct my
6  cross-examination.
7          MR. ZUROFSKY:  In light of these
8  circumstances, if you are going to allow it, I
9  strenuously object to allowance of this
10  particularly because we were very clear
11  documents would be part of production, it would
12  be told to the other side that was the universe
13  of issues, we were all very clear.
14          If your Honor is going to allow I
15  want to reserve the right there are other draft
16  that might or might not be relevant here, I
17  would like to have the right to have Mr. Miller
18  answer some questions on redirect with respect
19  to those drafts if your Honor is going to allow
20  this.
21          THE ARBITRATOR:  In responding to
22  document requests, was there any statement
23  either party would produce documents that were
24  already in possession of other party?
25          MR. ZUROFSKY:  What Mr. Slifkin

Page 2391

DONALD MILLER - CROSS

1
2  said we are not going to produce drafts. When
3  we asked for negotiation documents he said we
4  are not going to produce drafts because they are
5  in the files of each other party. We said fine,
6  with the condition we would know about it
7  beforehand. I recall that.
8          I don't remember if it was in
9  conversation with your Honor. I did say fine,
10  we don't want to get surprised we want to know.
11          MR. SLIFKIN:  It is certainly
12  true, your Honor, we had that conversation, the
13  first part of the conversation that Mr. Zurofsky
14  mentioned. We weren't going to exchange with
15  each other the stuff that was already in each
16  other's files. The stuff we already exchanged
17  where the parties were negotiating the
18  agreement.
19          In fact that is a point raised on
20  their motion to compel where we had a conference
21  call before your Honor Mr. Zurofsky said that is
22  a very good point we are not going to exchange
23  stuff we already got. We agreed not to do that.
24          Of course there was no agreement we
25  would tell them what is already in their file.

Page 2392

DONALD MILLER - CROSS

1
2  We assume they would look at their file and see
3  what there is in their files with their
4  letterhead.
5          THE ARBITRATOR:  I will allow the
6  document to be introduced. There was agreement
7  documents in your possession would not have to
8  be produced again.
9          MR. ZUROFSKY:  On that point, your
10  Honor, one response, if I might. We actually
11  made that point. Alcoa, insisted for example,
12  with correspondence between Ms. Hall and Mr.
13  Lease, we actually made that point, you guys
14  already have the correspondence. They said no,
15  no, no, we want your copies.
16          We produced from our production
17  those documents. That is something they
18  insisted on. I don't think Mr. Slifkin's
19  characterization is entire fulsome.
20          THE ARBITRATOR:  You may have done
21  that in that case. In this case there was no
22  understanding you were going to exchange drafts.
23  I am going to allow it. You may examine him
24  further.
25          MR. CHESLER:  Thank you, your

70 (Pages 2389 to 2392)

Page 2393

DONALD MILLER - CROSS

1      DONALD MILLER - CROSS
2  Honor.
3              (Alcoa Exhibit 150 was
4  marked.)
5      Q.    Mr. Miller, would you turn to page
6  35 of the draft agreement, please. That has a
7  printed or typed page 35 at the bottom.
8   , A.    Yes.
9      Q.    Do you have it, sir?
10     A.    I do.
11     Q.    Sorry, I couldn't hear you?
12     A.    Yes, I do.
13     Q.    Thank you. By the way, you see on
14  the very first page of this document, the cover
15  letter from the Cahill firm?
16     A.    Yes.
17     Q.    It says "Enclosed please find our
18  preliminary comments to the May 2 draft of the
19  Acquisition Agreement." Do you see that, sir?
20     A.    Would you read the next paragraph,
21  please.
22     Q.    No. Not right now. You can do
23  that on redirect if you like. Do you see the
24  paragraph to which I directed your attention?
25     A.    Sorry, you're taking this out of

Page 2394

DONALD MILLER - CROSS

1      DONALD MILLER - CROSS
2  context. I believe you will be misleading the
3  court.
4              THE ARBITRATOR:  You have to just
5  answer his questions, Mr. Miller. I can read
6  it. I just read it.
7              THE WITNESS:   Thank you, I'm
8  sorry.
9      Q.    Now would you answer my question.
10     A.    Yes.
11     Q.    The answer is yes?
12     A.    Yes, I will answer your question.
13  What was the question?
14     Q.    The question was do you see that on
15  in the first sentence of your lawyer's letter it
16  says "Enclosed please find our preliminary
17  comments to the May 2 draft of the Acquisition
18  Agreement?"
19     A.    Those are Cahill's comments.
20     Q.    Now let's go back to page 35.
21     A.    Yes.
22     Q.    35 has among other things on it, a
23  draft with comments of section 3.24G ii, the
24  definition of Environmental Law; correct?
25     A.    Yes.

Page 2395

DONALD MILLER - CROSS

1      DONALD MILLER - CROSS
2      Q.    The subpart B workplace health or
3  safety is stricken; correct?
4              THE ARBITRATOR:  I'm sorry, you're
5  looking at page?
6              MR. CHESLER:  35. They are
7  numbered at the bottom, your Honor.
8              THE ARBITRATOR:  I see it.
9              MR. CHESLER:  It is almost
10  obscured by someone's handwritten note.
11             THE ARBITRATOR:  What section are
12  you looking at?
13             MR. CHESLER:  I was direct the
14  witness' attention to 3.24 G ii, the portion at
15  the very top of that same page.
16             THE ARBITRATOR:  Okay.
17             MR. CHESLER:  Do you have that,
18  sir?
19             THE ARBITRATOR:  Yes.
20     Q.    My question, Mr. Miller, do you see
21  that subpart B workplace health or safety is
22  stricken?
23     A.    Yes.
24     Q.    Now, the date of this particular
25  set of comments is May 6, 2002; correct?

Page 2396

DONALD MILLER - CROSS

1      DONALD MILLER - CROSS
2      A.    Yes.
3      Q.    Obviously that comment of striking
4  subsection B was not accepted because subsection
5  B is in the final agreement as we just saw;
6  correct?
7      A.    Correct. Although maybe the reason
8  was -- but go ahead.
9      Q.    Let's see what another round of
10  comments after that comment was not accepted
11  looks like.
12             (Alcoa Exhibit 151 was
13  marked.)
14     Q.    I want you to look now at what we
15  have marked as Alcoa Exhibit 151 for
16  identification.
17             You see, Mr. Miller, 151 begins
18  with a letter from the Cahill firm dated May 24,
19  2002. Do you see that, sir?
20     A.    Yes.
21     Q.    I'd like you to turn to page, these
22  are handwritten numbers on this draft at bottom,
23  page 50.
24     A.    Yes.
25     Q.    You see the first full paragraph on

71 (Pages 2393 to 2396)

1       DONALD MILLER - CROSS
2   page 50 is a draft of 3.24 G ii; correct?
3       A.    Yes.
4       Q.    You see in this particular version
5   it says "Environmental Law means any law of any
6   government entity or any binding agreement with
7   any government entity, relating to,"the comment
8   says, "the pollution or protection of the
9   environment or natural resources, including
10  without limitation workplace health or safety
11  or" then it goes on to talk about release
12  hazardous materials.
13      A.    Yes.
14      Q.    First trying to eliminate
15  subsection B all together, that obviously didn't
16  fly. This draft from Cahill defines
17  Environmental Law as "any law from any
18  government entity relating to pollution or
19  protection of the environment, including without
20  limitation workplace health or safety."
21  Correct?
22      A.    No.
23      Q.    That is not what it says? I will
24  withdraw the question if you say no. I will try
25  it again.

1       DONALD MILLER - CROSS
2       Does this draft, the draft of May
3   24, 2002 define Environmental Law as any law of
4   any government entity or binding agreement with
5   any government entity relating to the pollution
6   or protection of the environment or natural
7   resources, including without limitation, two
8   subordinate clauses, the first of which is
9   "workplace health or safety," yes or no?
10      A.    Yes.
11      Q.    Now had Alcoa, represented by the
12  Skadden lawyers, accepted this version of the
13  comments from your side, then I take it you
14  would agree with me that workplace health or
15  safety would have been a subordinate clause to
16  pollution or protection of the environment;
17  wouldn't it? Yes or no.
18      A.    That is certainly an
19  interpretation.
20      Q.    This is not the version of that
21  definition which survived to the final agreement
22  either; is it no?
23      A.    No.
24      Q.    In fact as we looked at in tab 1 of
25  your book that you used on direct-examination,

1       DONALD MILLER - CROSS
2   the version of the definition that made it to
3   the final agreement has a subpart A which deals
4   with "pollution or protection of the
5   environment," then a comma, subpart B,
6   "workplace health or safety" and then the word
7   "or," subpart C, "exposure of persons or
8   property to hazardous material." That is the
9   way that paragraph is actually structured;
10  correct?
11      A.    Yes. That is the compromise
12  language.
13      Q.    And, in fact, in fact each of the
14  other provisions of the agreement throughout the
15  agreement where a section has subparts separated
16  by commas and letters, is characterized by those
17  subparts being mutually exclusive of each other;
18  isn't that so?
19      A.    No.
20      Q.    It is not? Okay. Let's look, for
21  example, at subsection 9.1 B, if you would.
22  That is on page 2798 is the Bates number in tab
23  1 of your direct exam book.
24      A.    9.1.
25      Q.    B. The section on termination do

1       DONALD MILLER - CROSS
2   you see that?
3       A.    Yes.
4       THE ARBITRATOR:    What page is it
5   on?
6       MR. CHESLER:    2798, your Honor, is
7   the Bates number, tab 1 of the direct book.
8       Q.    There subpart B has three sections
9   to it, each one is numbered separately i, ii and
10  iii; correct?
11      A.    Yes.
12      Q.    They are separate nonoverlapping
13  provisions that make up subpart B of 9.1; aren't
14  they?
15      A.    I have to think very seriously
16  about that over a long period of time.
17      Q.    We don't want to take that much
18  time.
19      A.    You might want to look at 9.2 A
20  Romanette ii. Because those two do overlap.
21      Q.    Again, Mr. Miller, you and your
22  lawyer can do what you wish on redirect. I
23  appreciate it if you would answer my questions.
24      A.    Thank you.
25      Q.    Thank you. We can go through many

DONALD MILLER - CROSS

2 provisions with mutually exclusive sections but
3 we will leave that for post trial briefing.
4        When we asked you at your
5 deposition whether you recalled having
6 conversations with the Alcoa people,
7 Ms. Holloway and the others involved from Alcoa
8 about section 3.24 G ii, the definition of
9 Environmental Law --
10    A.    Yes.
11    Q.    -- you testified you didn't recall
12 having such conversations with them about it.
13 Do you recall that?
14    A.    Would you repeat the question,
15 please.
16    Q.    Yes. When you were asked at your
17 deposition whether you recalled having had
18 conversations with the Alcoa representatives
19 about the definition of Environmental Law in the
20 agreement, you said you did not recall having
21 such conversations, do you recall that?
22    A.    Yes. But I subsequently refreshed
23 my recollection by looking at the notes.
24    Q.    You believe you had conversations
25 with them about the meaning of this section?

DONALD MILLER - CROSS

2    A.    About the meaning of this section?
3    Q.    Yes. That was my question about
4 the words of the definition of the Environmental
5 Law in the agreement?
6    A.    Of course.
7    Q.    You believe you did?
8    A.    Yes, environmental meant
9 environmental, water, air and ground.
10    Q.    But you didn't recall that at your
11 deposition; correct? You didn't recall speaking
12 to them about the words of the definition?
13    A.    I don't remember. I don't remember
14 what I said with respect to that issue.
15    Q.    Okay. I want to ask you about the
16 notes that you wrote and commented about. I
17 just want to see which tab. I would like to
18 direct your attention to tab 2 in your book.
19    A.    Yes.
20    Q.    These are your notes you say you
21 took on June 10, 2002; correct?
22    A.    Yes.
23    Q.    These are notes of a meeting, as
24 you testified on direct-examination, that took
25 place with a number of Alcoa people, the names

DONALD MILLER - CROSS

2 of whom you listed at the top of the first page
3 behind tab 2; correct?
4    A.    Yes.
5    Q.    Yet you would agree with me the
6 notes as produced to us from that day are
7 heavily redacted; correct? So if you look, for
8 example on page 1224.
9    A.    Parts of the notes are redacted.
10    Q.    Let's look at 12224, but for the
11 date and the name Phi, the entire page is
12 redacted; isn't it?
13    A.    Yes.
14    Q.    These are notes you took at a
15 meeting with my clients; right?
16    A.    Yes.
17        MR. ZUROFSKY:  Your Honor, just
18 to, when we were talking about producing
19 documents for Mr. Miller you will recall we
20 asked you to have Mr. Miller be allowed to be a
21 witness. You said yes. They had to depose him.
22        I specifically raised the issue --
23 I don't know where counsel going from this -- I
24 said we are going to redact from the notes
25 because of potential privilege issues.  We don't

DONALD MILLER - CROSS

2 have time for full review anything that relates
3 to this particular issue.  Your Honor said that
4 is exactly what we should do. That is what we
5 did.  I don't know where counsel going with
6 this.  That is a result of your ruling, your
7 Honor.
8        MR. CHESLER:  Where I am going, I
9 have no idea what is in these redactions.  This
10 witness has come forward and offered testimony
11 about what supposedly was said at a meeting.  He
12 offered his contemporaneous notes, apparently to
13 support that.  I think they have a serious sword
14 and shield at issue problem.
15        THE ARBITRATOR:  Do you have any
16 objection to giving him the unredacted notes?
17        MR. ZUROFSKY:  I have to look at
18 it.  The problem is there is other items taken
19 we haven't done a privilege review.  Mr. Miller
20 is the general counsel, it was something done on
21 the basis --
22        THE ARBITRATOR:  I know there was
23 a discussion about whether he would be allowed
24 to testify.  It was in that context we were
25 limiting his testimony to certain subject

73 (Pages 2401 to 2404)

Page 2405

DONALD MILLER - CROSS
2 matters. You said there were a lot of things in
3 there that didn't relate to that subject matter
4 you wanted to redact.
5        MR. ZUROFSKY:  Right.
6        THE ARBITRATOR:  I said that would
7 be fine. I don't think there would be any
8 question of attorney-client privilege, it would
9 be at a meeting of which there were six or eight
10 representatives of Alcoa present.
11        MR. ZUROFSKY:  There are potential
12 work product issues we would need to look like
13 and things like that.
14        THE ARBITRATOR:  Do you want to
15 take the afternoon recess and look at them? I
16 think in light of this gentleman's testimony he
17 ought to be able to see all the notes unless
18 there is some legitimate attorney-client
19 privilege issue you want to keep out.
20        MR. ZUROFSKY:  That is fine. I
21 will have to look. I am not quite sure if I
22 have a clean set of them. I will have to look
23 for them. I am certainly happy to take a look.
24 I will let you know as soon as we can.
25        THE ARBITRATOR:  Do you want to

Page 2406

DONALD MILLER - CROSS
2 continue at this point?
3        MR. CHESLER:  I will continue on
4 some other issues.
5        THE ARBITRATOR:  We will take that
6 the afternoon recess.
7        MR. CHESLER:  Are we taking the
8 recess now?
9        THE ARBITRATOR:  I thought you
10 were going to continue for a while. Let them
11 look. Maybe at quarter to 4, or whatever.
12    Q.    Let me ask you some questions about
13 the notes we did get, since your counsel is
14 going to look at the ones we didn't get. Would
15 you look at the first page of tab 2, please.
16    A.    Yes.
17    Q.    You testified at some length about
18 the different numbered items that begin on the
19 middle of that page, do you recall that, Mr.
20 Miller?
21    A.    Yes.
22    Q.    The first item relates to what you
23 define as environmental matters; correct?
24    A.    "Preclosing ours, post closing
25 theirs, particularly environmental liabilities

Page 2407

DONALD MILLER - CROSS
2 or unassumed properties."
3    Q.    Yes, I can read it, too. My
4 question is does the first item refer to what
5 you define as environmental matters?
6        THE ARBITRATOR:  The first item
7 below the number?
8        MR. CHESLER:  Yes, the one
9 numbered 1 with the parentheses below the line.
10    A.    I don't know because it says
11 "particularly." I think the answer is yes.
12    Q.    You think the answer is yes?
13    A.    Yes. I may have to change it as we
14 go along. I have to see.
15    Q.    You think the answer is yes, but
16 you may have to change it?
17    A.    Yes.
18    Q.    The second item relates again to
19 what you understand to be environmental matters;
20 correct?
21    A.    Yes.
22    Q.    The third one relates to what you
23 understand to be environmental matters; correct?
24    A.    Yes.
25    Q.    The fourth one relates to what you

Page 2408

DONALD MILLER - CROSS
2 understand to be environmental matters; correct?
3    A.    Yes.
4    Q.    Your testimony is the fifth one
5 doesn't; correct?
6    A.    Correct.
7    Q.    According to that fifth item, Alcoa
8 said to Fairchild at that meeting that there
9 were compliance issues for which they would give
10 you a list and it would be between 20 to $40
11 million; correct?
12    A.    Yes.
13    Q.    Other than the little math piece
14 down at the bottom of that second page relating
15 to the reserves the 20 to $40 million number is
16 the only dollar figure presented on these two
17 pages of your notes; isn't that right?
18    A.    Yes.
19    Q.    So when they went through all the
20 matters you say are environmental, they made no
21 mention of any money, because if they had you
22 would have written it down; correct?
23    A.    I might have. I should have.
24    Q.    You should have. It is not here;
25 is it?

Page 2409

DONALD MILLER - CROSS

1    DONALD MILLER - CROSS
2    A.    No.
3    Q.    The only matter for which there is
4  any money written down is the item for which you
5  claim everybody understood there was no
6  indemnity; right? Is that correct?
7    A.    There was no indemnity for those
8  compliance matters.
9    Q.    The answer to my question is yes,
10 that's correct?
11    A.    The answer is there was no
12 indemnity for those compliance issues.
13    Q.    Let me try again.  The only item --
14    A.    Look, it is very hard to answer
15 your question because we asked for a list.  Who
16 knows -- and never received it.  Would some of
17 those things have been covered if which
18 ultimately saw the list or were they covered if
19 we saw the list, who knows? We never saw the
20 list.
21    Q.    Oh, really.  So some compliance
22 issues might actually have been under the
23 indemnity?
24    A.    I have no idea, depends what they
25 called compliance issues.

Page 2410

DONALD MILLER - CROSS

1    DONALD MILLER - CROSS
2    Q.    As you said before Ms. Holloway's
3  notes actually used the phrase EHS in them, on
4  the same da;y, didn't they?
5    A.    But she didn't use that phrase at
6  meeting.
7    Q.    Mr. Miller, you have to try harder
8  to answer my questions.  My question was
9  Ms. Holloway's notes of the meeting on the very
10 same day reflect the phrase or the term EHS;
11 don't they?
12    A.    Yes.  But not a phrase --
13    Q.    You answered my question, Mr.
14 Miller, the answer was yes.
15    In your notes for the same day, the
16 same meeting, the only item that has any dollar
17 figure affixed to it except for the math at the
18 bottom of that reserves is the compliance issues
19 item that says 20 to $40 million; correct?
20    A.    First of all, the  --
21    Q.    Is that correct, sir?
22    A.    No.
23    Q.    It is not correct?
24    A.    No.
25    Q.    All right.  The document will speak

Page 2411

DONALD MILLER - CROSS

1    DONALD MILLER - CROSS
2  for itself.  The judge can decide whether that
3  answer was accurate or not.  In the same set of
4  notes for the same day --
5    A.    You refer to except for the numbers
6  at the bottom.  The numbers at the bottom have
7  to do with environmental liabilities.  That is
8  what the reserve was for.
9    Q.    I excepted that from my question.
10 You understood that -- withdrawn.
11    Look at item number 4 on 12223.
12 Item numbered 4.  That says "PCE and TCE use at
13 St. Cosme and Fullerton want indemnity." Right?
14 That is what it says?
15    A.    Yes.
16    Q.    Even as early as June 10, 2002
17 before there's even a signed agreement Alcoa
18 told you they wanted to be indemnified for
19 potentially hazardous substances that had been
20 in use in two of the facilities then owned by
21 Fairchild; correct?
22    A.    Yes.  That is also reflected in 1,
23 2, and 3.
24    Q.    In fact Alcoa has requested
25 indemnity in connection with the cleanup of PCE

Page 2412

DONALD MILLER - CROSS

1    DONALD MILLER - CROSS
2  and TCE at St. Cosme and Fullerton and Fairchild
3  has refused to pay a dime; isn't that true? Is
4  that true?
5    A.    No.
6    Q.    Not true.  Okay.
7    A.    Fairchild has paid for Fullerton.
8    Q.    A pause does not mean you should
9  continue answering unless I have another
10 question.
11    MR. ZUROFSKY:  I, believe your
12 Honor, he is actually answering the question.
13 If you listen to what Mr. Miller said.  He says
14 he has paid for Fullerton.
15    Q.    You believe you have?
16    A.    Yes.
17    Q.    I take it you are referring to the
18 price adjustments?
19    A.    No.
20    Q.    Apparently there is more than one.
21 Let me ask you about the price adjustments.  No,
22 before I do that, I want to go to the topic of
23 machine guarding.
24    Now, Alcoa has sent a number of
25 letters to Fairchild in which Alcoa has asked to

75 (Pages 2409 to 2412)

Page 2413

DONALD MILLER - CROSS

1          DONALD MILLER - CROSS
2  be indemnified for the costs associated with
3  machine guarding at various facilities; correct?
4      A.    Yes.
5      Q.    Fairchild's response in each
6  instance has been essentially we need more
7  information; correct?
8      A.    In some instances, yes. In others
9  we denied liability.
10     Q.    Well, I can show you the letters if
11 we want to take the time. But on no less than
12 three separate occasions in response to three
13 separate letters from Mr. Lease, each asking for
14 machine guarding indemnification at different
15 facilities, Fairchild has responded we need more
16 information before we can respond to your
17 request; isn't that so? Is that so?
18     A.    We would not answer in a knee jerk
19 way. Is that your question?
20     Q.    No.
21     A.    We would want to know what you are
22 talking about before we gave you a definitive
23 answer.
24     Q.    It is your position that my client
25 is not indemnified for machine guarding, was

Page 2414

1          DONALD MILLER - CROSS
2  never indemnified for machine guarding and
3  absent an order from the judge in this matter
4  you have no intention of paying for any costs
5  associated with machine guarding; isn't that
6  true?
7      A.    You confuse machine guarding and
8  environmental.
9      Q.    No.
10     A.    You may well confuse machine
11 guarding with something else which is covered.
12     Q.    Let's do this the long way then.
13 Let's look at what has been previously marked as
14 a document in bulk Exhibit C, volume 1, which I
15 am going to show the witness. We have marked
16 this. It says C volume 1 of 22, your Honor. It
17 is the letter which I will identify for the
18 record.
19         Do you see, Mr. Miller this is a
20 letter from John Lease to your colleague, then
21 colleague, Mr. Hodge dated March 4, 2003?
22     A.    Uh-huh.
23     Q.    I would look at the back of the
24 page, please.
25     A.    Right.

Page 2415

1          DONALD MILLER - CROSS
2      Q.    You have the backside of the
3  document?
4      A.    I do.
5      Q.    If you look down in the chart, item
6  number 5 it says "Machine guarding does not meet
7  regulatory requirements." Do you see that, sir?
8      A.    Yes.
9      Q.    That is pretty clear it was machine
10 guarding, nothing to do with your definition of
11 environmental; right?
12     A.    Correct.
13     Q.    In fact it cites the labor code as
14 the regulatory citation in the second column;
15 correct?
16     A.    Yes.
17     Q.    Now, it is your testimony, is it
18 not, that as of March 4, 2003 when this letter
19 was sent to you, it was Fairchild's position
20 that machine guarding that does not meet
21 regulatory requirements was not covered by the
22 indemnity in the Purchase Agreement; correct?
23     A.    Yes.
24     Q.    Let's look at Alcoa Arbitration
25 Exhibit 40. This is your response to that

Page 2416

1          DONALD MILLER - CROSS
2  letter; is it not?
3      A.    Yes.
4      Q.    Is that your signature?
5      A.    Yes, it is.
6      Q.    You say "We received your letter."
7      A.    Correct.
8      Q.    "Our initial review based upon our
9  previous understanding of environmental issues
10 at St. Cosme leads us to question whether all
11 the items listed in the table to your letter
12 attached to your letter do fall within the ambit
13 of 11.6 and 2, whether the estimated costs in
14 that table are justified."
15     A.    Yes.
16     Q.    "So that we may more fully
17 consider these issues, please provide us with
18 specific and complete background documentation
19 supporting the items and costs provided in the
20 table. We will respond further as appropriate"
21 etc. Right?
22     A.    Yes.
23     Q.    You knew, according to your
24 testimony, the day you signed this letter that
25 Fairchild's position was that the machine