Page 2417

DONALD MILLER - CROSS

2 guarding request, item 5 in Mr. Lease's letter
3 to which you responded was not and never would
4 be indemnified; isn't that so, yes or no?
5     A.    I think this letter speaks for
6 itself.
7     Q.    Yes or no, Mr. Miller?
8     A.    It says two things.  The answer is
9 it cannot be answered with a yes or no.  This
10 says two things, one we question whether all of
11 the items fall within the ambit of the section.
12 But here is why we can't answer it, if you
13 notice you're talking about France, not about
14 the United States.  This is a plant in France.
15        We ask you to provide us with
16 information with respect to what the law is,
17 what the regulations are in France.
18        It is very difficult for us to
19 judge whether or not we may owe you something
20 until we have a complete understanding of
21 everything that is going on.  And we don't know
22 what the law is in France.
23     Q.    When you testified on
24 direct-examination, Mr. Miller, that machine
25 guarding was a completely separate matter, it

Page 2418

DONALD MILLER - CROSS

2 was never covered by the agreement, it was never
3 the subject of your discussions for the
4 indemnity, you didn't say but it might be
5 covered in France; did you?
6     A.    There could have been a citation
7 issued, for instance, with respect to machine
8 guarding we predated the agreement.  That
9 citation could have had a fine and that fine
10 would likely have been our liability.
11     Q.    Did you hear my question, sir?
12     A.    I don't know what the law is in
13 France and that's why we asked for more
14 information.  So the answer is I can't give you
15 yes or no.
16     Q.    You needed Alcoa to tell you what
17 the law in France was when you owned that
18 facility for years before the sale; is that what
19 your testimony is?
20     A.    We needed Alcoa who had possession
21 of all of our records because we sold Alcoa the
22 records, to provide us with a relevant files.
23 That is what this says.
24     Q.    You testified about 20 minutes ago
25 for machine guarding all you need to do is walk

Page 2419

DONALD MILLER - CROSS

2 into the facility, look at the machines and you
3 can see what's there; do you recall that
4 testimony?
5     A.    Talking about United States.
6     Q.    If you walked into a facility in
7 France you couldn't walk around and see what was
8 there?
9     A.    You could.
10     Q.    Did you ever ask or direct any of
11 your personnel to ask to go back and look at any
12 of the facilities in connection with this
13 request for indemnity?
14     A.    I believe that's what this letter
15 says.
16     Q.    You believe it is a request for you
17 to go look at the facility?
18     A.    No.  This is a request for more
19 information which might have been followed up
20 with a request --
21     Q.    Mr. Miller, did you ever ask to go
22 back and visit any of the facilities?
23     A.    I don't know.
24     Q.    Look, you know as you sit there,
25 you know to your toes that you did not intend to

Page 2420

DONALD MILLER - CROSS

2 indemnify for machine guarding but you didn't
3 say that in the letter, you said send me more
4 information; isn't that true?
5     A.    No.
6     Q.    All right.
7     A.    This says --
8     Q.    You answered my question.  You
9 answered my question.
10     A.    But we would not be --
11     Q.    You answered my question.
12        THE ARBITRATOR:  Mr. Miller, just
13 answer his questions, and it will go faster.
14        MR. ZUROFSKY:  Is that a promise?
15     A.    I'd like that.
16     Q.    You do not have any information
17 about lock out and tag out procedures to know
18 whether it is covered by the indemnity or not;
19 isn't that true?
20     A.    I testified I didn't know what lock
21 out or tag out or whatever they are were.  So I
22 guess the answer is I don't have enough
23 information.  It is not a question of having
24 enough information.  I don't even know what they
25 are.  I still don't know.

77 (Pages 2417 to 2420)

DONALD MILLER - CROSS

2  Q.  Mr. Miller, weren't you asked
3  whether you knew if lock out tag out procedures
4  would be covered by the indemnity, the
5  definition of workplace health and safety in the
6  agreement and you said, I'm sorry, I am not
7  familiar enough with them to tell you?
8      A.  Correct.
9  Q.  You stand by that testimony.
10     A.  I do.
11 Q.  You are also not familiar enough
12 with fall protection to know whether it is
13 covered by the indemnity or not; isn't that so?
14     A.  Is that how I testified in --
15 Q.  Yes.
16     A.  Yes.
17 Q.  You are also not familiar enough
18 with electrical protection of equipment to know
19 whether it is covered by the indemnity or not;
20 isn't that so?
21     A.  Yes.  Not my area of life.
22 Q.  Let's look at another excerpt from
23 bulk Exhibit C, your Honor, another one of the
24 letters.  This is from bulk Exhibit C, volume 1.
25     For the record, this is a letter

DONALD MILLER - CROSS

2  dated June 13, 2003 from John Lease to Mr.
3  Hodge.  It has a Bates number in the lower
4  right-hand corner FAIR ending in 038.  It has
5  Bates numbers on the top which is where it
6  appears in volume 1 of bulk Exhibit C beginning
7  at page 35.
8      Do you see that this letter from
9  Mr. Lease to Mr. Hodge relates to the Fullerton
10 facility; correct?
11     A.  Yes.
12 Q.  Would you look at the page that has
13 a number at the top 38, top right-hand corner.
14     A.  Yes.
15 Q.  This is the second page of the
16 attached chart to Mr. Lease's letter?
17     A.  Yes.
18 Q.  Fullerton is in the good old
19 U.S.A.; isn't it?
20     A.  Yes.
21 Q.  The first item on this page is
22 request for indemnification for $58,000 relating
23 to machine guarding; correct?
24     A.  I believe it relates to assessment,
25 but go ahead.

DONALD MILLER - CROSS

2  Q.  Excuse me?
3      A.  I believe this relates to an
4  assessment, to an assessment, a survey of
5  whether or not machine guarding is necessary.
6  Q.  Right.  Okay.  It was your belief
7  then, as it is now, that that was not an
8  indemnifiable expense because the expense
9  related to machine guarding at a U.S. facility
10 which was itself not subject to indemnification;
11 isn't that so?
12     A.  Yes.  But Alcoa has taken the
13 position that assessments are subject to
14 indemnification irrespective of whether or not a
15 defect is ultimately found.
16 Q.  You disagree with that?
17     A.  I sure do.
18 Q.  Yet you didn't write back and say
19 you are not covered, you will never be covered,
20 over my dead body will you be covered, you wrote
21 back and said give us some more information
22 about that; didn't you?
23     A.  Absolutely.  I think that is the
24 right thing to do was to understand what the
25 claim is.  And once you have a full

DONALD MILLER - CROSS

2  understanding, provide an answer.  And, by the
3  way, we've never gotten more information.
4  Q.  Even though it is a claim you
5  already know you are never going to indemnify;
6  right?
7      A.  I think you need the full story
8  before you give a definitive response.  I think
9  that is called being careful in your practice.
10 Q.  Now the next item on that same page
11 relates to the fall control program; right?
12     A.  Yes.
13 Q.  At Fullerton; correct?
14     A.  Correct.
15 Q.  It cites under the regulatory
16 section a number of both Federal and State OSHA
17 provisions; correct?
18     A.  Yes.
19 Q.  As you indicated a few moments ago
20 you don't know enough about fall control to know
21 whether it is covered under the indemnity or
22 not.  My question is when you got this letter
23 from Alcoa, with all of these section citations
24 to OSHA, did you look at them?
25     A.  I believe that someone looked at

Page 2425

DONALD MILLER - CROSS

1    DONALD MILLER - CROSS
2    them, certainly.
3       Q.    You concluded?
4       A.    I did not.
5       Q.    Someone else concluded these were
6    not covered?
7       A.    I don't know what they concluded.
8       Q.    You haven't paid for them; have
9    you?
10      A.    I don't know. I doubt it.
11      Q.    Mr. Miller, wait. Let's just
12    replay that tape. You are under oath, you are
13    the general counsel of the company, do you
14    genuinely mean to testify to this court as of
15    today you don't know whether your company has
16    paid that 58 or $45,000?
17      A.    I don't know absolutely, but I
18    would doubt it very much. And I think
19    consistent with that we asked you to provide us
20    with more information so we would learn what
21    fall protection was and what you meant by it.
22      Q.    You didn't know after owning these
23    facilities and running them all these years,
24    your testimony is Fairchild didn't know what
25    fall protection was?

Page 2426

1    DONALD MILLER - CROSS
2       A.    I didn't know what fall protection
3    was.
4       Q.    I didn't ask you that. I asked is
5    it your testimony that Fairchild did not know
6    what fall protection was in connection with a
7    facility in the Fasteners business having owned
8    and run those facilities at a time when you were
9    the general counsel of the company?
10      A.    I would guess that the people in
11    the agreement who are charged with knowledge and
12    they are specifically listed, did not know what
13    fall protection was. You might take a look at
14    that list of people.
15      Q.    Okay.
16      A.    Because if I didn't know, they
17    didn't know.
18      THE ARBITRATOR: Mr. Chesler, when
19    you refer to A, you're talking about they are
20    authorized to charge against the escrow, is that
21    what you're referring to?
22      MR. CHESLER: Absolutely correct.
23      THE ARBITRATOR: Maybe you can
24    tell me, Mr. Miller, in light of all these
25    requests, some of them must have been

Page 2427

1    DONALD MILLER - CROSS
2    undisputed, why your company hasn't paid for any
3    of them?
4       THE WITNESS: Your Honor, we have
5    paid for some things. Despite what they say.
6    And others we have assumed, we have assumed some
7    liabilities. I really am not familiar with the
8    detail of which ones we assumed and which ones
9    we paid, but we have paid some.
10      Q.    Mr. Miller, other than in
11    connection with assumption of some
12    responsibility for litigation, isn't it true
13    that Fairchild has not either paid or authorized
14    Alcoa to remove from the reserve a dime for any
15    one of the matters covered in the Phase Is,
16    Phase IIs and subsequent notifications; isn't
17    that true?
18      A.    I don't believe that is true. In
19    fact we just paid one for 324,000 Euros, though
20    it is a different kind than that.
21      Q.    So it isn't covered by those
22    documents; correct?
23      A.    One of the ones we just paid. One
24    of the ones we just paid on behalf of Alcoa is
25    324,000 Euros.

Page 2428

1    DONALD MILLER - CROSS
2       Q.    Let's try to be specific. Let's
3    look again at this document you have in front of
4    you, letter from Mr. Hodge -- to Mr. Hodge.
5       A.    Yes.
6       Q.    Isn't it true that Fairchild has
7    not paid for a single one of the indemnification
8    requests attached to this letter?
9       A.    I don't know.
10      Q.    But you don't believe you have; do
11    you?
12      A.    I don't know. You asked me
13    specifically did I believe we have paid for fall
14    protection. My answer was I don't know and I
15    doubt it very much.
16      Q.    Now --
17      A.    The same with respect to machine
18    guarding.
19      Q.    You believe it is the same with
20    respect to every item in this letter; don't you?
21      A.    I will have to review each one
22    individually.
23         I really don't know. But if you
24    look at the first one, "plant 2 in the warehouse
25    have not filed notice of intent to be covered

Page 2429

1           DONALD MILLER - CROSS
2   under California's general storm water permit,
3   the codes for these facilities require they
4   obtain permits." We may have done something
5   about that. But I don't know.
6       Q.    Your testimony is you don't know
7   whether you paid for any of these items;
8   correct?
9       A.    I don't know if any of these items
10  require payment.
11      Q.    That wasn't my question. Obviously
12  you believe virtually nothing requires payment,
13  that is why you haven't paid.
14          My question is do you know whether
15  you have paid for any of these items, yes or no?
16      A.    I disagree with your
17  characterization. The second one I already
18  answered it. I don't know.
19      Q.    In fact, if I showed you every one
20  of John Lease's letter for facility after
21  facility and machine guarding claim and lock out
22  tag out claim and electrical safety claim, one
23  after another and asked you the same question,
24  have you paid for any of these, I take it your
25  answer would be you have no idea?

Page 2430

1           DONALD MILLER - CROSS
2       A.    My answer would be we asked for
3   more information and were not provided it. That
4   is what my answer would be.
5       Q.    That would be a nonresponsive
6   answer, sir. My question is would you be able to
7   tell me whether you paid for any of them?
8       A.    Do you pay for bills for which you
9   don't have backup?
10      Q.    Unfortunately in this lawsuit I am
11  the only one that gets to ask you questions.
12  You don't get to ask me questions.
13          Would you try one more time. Are
14  you able to tell me whether your company of
15  which you are general counsel and executive vice
16  president has paid for any of the
17  indemnification claims submitted in all of the
18  Lease letters to Fairchild, do you know?
19      A.    I do not know.
20      Q.    The truth is you believe strongly
21  that for virtually all of them, if not all of
22  them, you haven't paid; isn't that so?
23      A.    I do not know whether the claims we
24  have paid with respect to Fullerton were the
25  subject of Mr. Lease's letters. But I do know

Page 2431

1           DONALD MILLER - CROSS
2   we have paid claims for Fullerton. I believe
3   they have to do with groundwater, which is
4   environmental. It is our responsibility.
5       Q.    Now you testified on direct this
6   afternoon that --
7           THE ARBITRATOR:  It is four
8   o'clock. Do you want to break for recess at
9   this point?
10          MR. CHESLER:  Yes, your Honor.
11          THE ARBITRATOR:  You just don't
12  want to stop, you are so wound up here.
13          MR. CHESLER:  I am having so much
14  fun, your Honor. I will stop whenever you want
15  me to.
16          THE ARBITRATOR:  It is up to you.
17  I thought the court reporter might like a break.
18  Give counsel a chance to check on that.
19          MR. ZUROFSKY:  I will check on
20  that right now.
21          (Recess taken.)
22          MR. CHESLER:  May I proceed, your
23  Honor.
24          THE ARBITRATOR:  Yes.
25          MR. CHESLER:  Thank you.

Page 2432

1           DONALD MILLER - CROSS
2       Q.    Mr. Miller, I want to clear up one
3   or two points about the testimony thus far, then
4   go on to cover several other topics before you
5   finish.
6           First of all, you said several
7   other times you think Fairchild has actually
8   made some payments to Alcoa. Do you recall that
9   testimony?
10      A.    Has made some payments in
11  connection with claims made by Alcoa. Yes.
12      Q.    Now you understand as you, I
13  believe, described to the judge in answer to an
14  earlier question that under the indemnity of
15  11.6 which we are litigating here, until the
16  amount of the 8.4 million reserve is covered,
17  any payments to Alcoa for claims subject to that
18  provision come out of that reserve before
19  Fairchild ever writes an actual check to Alcoa;
20  isn't that right?
21      A.    I'd have to review this section,
22  but there are some liabilities which do not have
23  the benefit of the reserve for which we are
24  liable and which are environmental liabilities.
25      Q.    Let me try it this way: I am going

Page 2433

DONALD MILLER - CROSS

1
2  to represent to you, and if I'm wrong your
3  lawyers will fix it, I will represent to you
4  that there have been repeated answers to
5  questions at this hearing, all of which have
6  said the following:  That under the 11.6
7  indemnification, I am not talking about any
8  other provisions of the agreement, talking about
9  11.6 indemnification we are fighting about here,
10  the first 8.4 million and change of claims that
11  Fairchild allows for indemnity from Alcoa must
12  be satisfied by Alcoa out that reserve, it is
13  only after that reserve has been exhausted that
14  Fairchild would have any obligation to actually
15  write a check for a claim that is honored under
16  11.6.  Do you understand the representation I
17  made?
18      A.    I do understand it.
19      Q.    Just for this purpose accept this
20  representation so we don't get bogged down in
21  your having to read the whole agreement again.
22      A.    Okay.
23      Q.    Isn't it true, sir, that Fairchild
24  has not authorized Alcoa to take any money from
25  that $8.4 million reserve to satisfy any claim

Page 2434

DONALD MILLER - CROSS

1
2  that Alcoa has asserted against Fairchild?
3      A.    I don't know.
4      Q.    You don't know as you sit here that
5  Fairchild has in fact allowed any claims to be
6  paid out of that reserve; do you?
7      A.    I don't know.
8      Q.    The 300,000-odd claim you referred
9  to just before the break, that wasn't a claim
10  Fairchild authorized Alcoa to pay out of the
11  reserve; was it not?  In fact that was a physical
12  check or wire transfer; wasn't it?
13      A.    Yes.
14      Q.    So if it is the case, as I have
15  represented that all claims under this indemnity
16  must first be satisfied out of the $8.4 million
17  reserve before Fairchild must pay any money, if
18  that is true, then the $300,000 or so claim you
19  were just talking about before would not be an
20  11.6 claim; correct?
21      A.    If your representation were
22  correct.  It happens to be false.
23      Q.    Okay.
24      A.    Just look at the last sentence of
25  11.6A.

Page 2435

DONALD MILLER - CROSS

1
2      Q.    If my representation were correct
3  then that payment to which you referred would
4  not be an 11.6 payment; correct?
5      A.    I am not talking about fiction,
6  this is a book which can be easily read, the
7  agreement is very clear that there are some
8  claims which are subject to 11.6 indemnification
9  which are not, do not get the benefit of the
10  deductible.
11      Q.    Let me try it one more time.
12      THE ARBITRATOR:  Does Alcoa need
13  their specific authorization to charge that?
14      MR. CHESLER:  Yes, your Honor.
15      Q.    Let me try one more time, Mr.
16  Miller.  I take it is your testimony you do not
17  know whether Fairchild has paid any claim Alcoa
18  has made for indemnification pursuant to 11.6A;
19  is that correct?
20      A.    No.
21      Q.    That is not correct?
22      A.    No.
23      Q.    So your testimony is you know that
24  Fairchild has paid claims for indemnification
25  under the specific indemnity of 11.6 a?

Page 2436

DONALD MILLER - CROSS

1
2      A.    I know that we have paid claims for
3  indemnification which have environmental --
4  which arose from environmental conditions.
5      Q.    That is not my question, sir. Let's
6  try it again.
7      Is it your testimony that Fairchild
8  has paid any claims for indemnification that
9  Alcoa has made under the specific indemnity
10  provision of 11.6A
11      A.    I don't know is the answer.
12      Q.    That is what I was trying to
13  establish. Thank you. You mentioned before when
14  I showed you the fact that Alcoa was asking in
15  these various letters for indemnification
16  relating to machine guarding and fall control
17  and electrical safety, etc. you didn't know one
18  way or the other. Well for machine guarding you
19  said you did know. But for the others you
20  didn't know one way or the other whether they
21  were covered, you thought, I think the word you
22  used was it was prudent to get the facts before
23  you decided on whether to accept the claim or
24  reject it; correct?
25      A.    Correct.

81 (Pages 2433 to 2436)

DONALD MILLER - CROSS

1
2      Q.    Now, unless a workplace health or
3  safety request is related to an environmental
4  issue, according to you it is not covered by the
5  indemnity; correct?
6      A.    No, I don't think that is correct.
7      Q.    You do believe that workplace
8  health or safety in paragraph 3.24 in the
9  definition of Environmental Law is only
10  workplace health or safety that is related to
11  environmental issues, water, air, ground;
12  correct?
13      A.    Environmental conditions, yes.
14      Q.    So, if Alcoa makes a request for
15  indemnification that relates to a workplace
16  health or safety issue, such as fall protection,
17  it must, according to you relate to an
18  environmental condition in order for it to be
19  within the definition of Environmental Law which
20  in turn is incorporated into the indemnity;
21  correct?
22      A.    I think that's correct.
23      Q.    So it is your position that fall
24  protection, that is not putting up a railing and
25  thereby causing someone to fall off an elevated

DONALD MILLER - CROSS

1
2  space and hit the ground, can be environmentally
3  related; right?
4      A.    No.
5      Q.    In fact you can't even conjure up a
6  situation where somebody falling off a high
7  ladder or off a high platform is going to be an
8  environmental issue; can you?
9      A.    That is why we asked for more
10  information.  If water is percolating up through
11  the floor where it isn't supposed to be and
12  making the floor slippery that might be a
13  situation that might have coverage.  But we
14  wouldn't know that unless you gave us that
15  information.  And I have to tell you if we
16  didn't ask for the information you would be out
17  there asking me today, you rejected these so
18  fast, you didn't even ask to hear what they were
19  about.
20      Q.    Mr. Miller, I heard you on direct
21  speculating about what my client thought or
22  didn't think.  That is probably not a good idea.
23  I can assure you it is a really bad idea to
24  speculate what I am thinking.  So let's just
25  stick to my questions, okay.  It will go a lot

DONALD MILLER - CROSS

1
2  faster.
3      So it is your testimony somebody
4  falling off a high ledge could be an
5  environmental safety issue if they slipped on a
6  puddle of water?
7      A.    No.  That is not what I testified.
8      Q.    If the water percolated up from the
9  ground and they slipped and fell off a high
10  place, then we would be covered under the
11  indemnity?
12      A.    You might be.
13      Q.    Really?
14      A.    I would have to think about that.
15  Depends whether or not it was a solvent that
16  percolated up through the floor.
17      Q.    When would we be covered by an
18  electrical power problem on the machine?
19      A.    I don't know.  I haven't thought of
20  it and I don't understand enough about
21  electrical power problems to give you an answer.
22      Q.    When this letter, I am looking at
23  page 39 of the letter to Mr. Hodge of June 13,
24  2003 which we looked at before the break, when
25  this letter on page 39 said electrical safety is

DONALD MILLER - CROSS

1
2  not in compliance with regulatory requirements,
3  then cited three specific sections of OSHA, your
4  testimony is you don't know what it was
5  referring to; right?
6      THE ARBITRATOR:  It seems pretty
7  clear, Mr. Chesler, in response to your request
8  which had numerous items, some of which might
9  have been covered, some of which not under their
10  analysis, that they simply responded routinely
11  give us more information.  How that relates to
12  the issues before me, I'm not sure.  But that
13  seems pretty clear.
14      MR. CHESLER:  Yes, that is pretty
15  clear.
16      Q.    You recall your testimony on direct
17  EHS was not a term you used?
18      A.    Correct.
19      Q.    You also recall you said you went
20  and looked at some directories at Fairchild and
21  concluded that Mr. Miramadi had a different
22  title from environmental health and safety
23  director; correct?
24      A.    In my corporate directory, yes.
25      Q.    Let's be clear.  Is it your

DONALD MILLER - CROSS

1
2  testimony, sir, because the title in your
3  corporate directory did not say environmental,
4  health and safety director, that he in fact did
5  not have that title anywhere within the
6  Fairchild organization?
7      A.   I couldn't answer that.  I can only
8  toll you what my corporate directory said.  That
9  is how we viewed him at corporate, at the
10  corporate office.
11     Q.   I want to understand what your
12  testimony is and isn't.  So when Ms. Enriquez in
13  Exhibit 244, which we used earlier wrote to the
14  Southcoast Air Quality Management District in
15  California and she copied Mr. Miramadi on her
16  letter to those regulators and identified him as
17  U.S. operations environmental health and safety
18  director under letterhead of Fairchild Fasteners
19  you're not saying to Ms. Enriquez
20  misrepresented to the authorities what Mr.
21  Miramadi's title is; are you?
22     A.   I don't know what she did.  She may
23  have agrandized his position, he may have asked
24  her to do that.  What is the date of letter?
25     Q.   June 14, 2001.

DONALD MILLER - CROSS

1
2      A.   Alcoa was already involved with
3  Fairchild at that time.  I can't tell you why
4  she did that or whether or not that was his
5  title at Fairchild Fasteners.  I am telling you
6  what his title was and how we viewed him at the
7  corporate office.
8      Q.   Ms. Enriquez writes this letter to
9  the regulators, identifies herself as
10  environmental health and safety manager.  Is it
11  your testimony she misrepresented her title as
12  well?
13     A.   I have to tell you I never heard of
14  Ms. Enriquez before this.
15     Q.   So you don't know whether she was
16  lying, you don't know whether she inflated Mr.
17  Miramadi's title, but the letter identifies them
18  as environmental health and safety director and
19  manager; correct?
20     A.   I don't know that.
21     Q.   You don't know what the letter
22  says?
23     A.   My testimony was what we viewed him
24  as at corporate.
25     Q.   Okay.  Let's go back and look at

DONALD MILLER - CROSS

1
2  the PowerPoint presentation that Fairchild made
3  to Alcoa about which you testified earlier.
4      MR. ZUROFSKY:   The witness may
5  need a copy.  It was the previous witness.
6      MR. CHESLER:   Right.  It was the
7  previous witness.  This is Alcoa Exhibit 101,
8  your Honor.
9      MR. ZUROFSKY:   Your Honor, while
10 Mr. Chesler is doing that, I just handed counsel
11 a set of the unredacted notes.  We think that is
12 all of them.  We are going to double-check.  It
13 is what we have been able to pull together what
14 I just handed him.
15     THE ARBITRATOR:   All right.
16     Q.   You were in court when this
17 testimony -- this document was the subject of
18 prior testimony today; weren't you?
19     A.   Yes.
20     Q.   Would you turn please to page 9443.
21     A.   I would.
22     Q.   That is headed Fairchild Fasteners
23 EHS Management Approach; correct?
24     A.   Yes.
25     Q.   It identifies Anthony Miramadi as

DONALD MILLER - CROSS

1
2  director EHS, U.S. operations; correct?
3      A.   Yes.
4      Q.   I take it your testimony is in your
5  directory he has a different title?
6      A.   Yes.
7      Q.   But you don't know whether this was
8  an accurate title that was provided to Alcoa in
9  September of 2002 or not; is that right?
10     A.   I don't know if this were an
11 accurate title.  It is certainly not how we
12 viewed him.  I can tell you that this chart
13 implies he was an incredibly important person
14 reporting directly to Olivier Jarrault.  I don't
15 know that was the case.
16     Q.   Do you know it wasn't the case?
17     A.   I can tell you I heard of the top
18 five people at Fairchild Fasteners, maybe the
19 top ten people and talked to them on some
20 regular basis.  I also told you that I'd be
21 surprised if I talked to Anthony Miramadi twice
22 in my life.  I would also guess this was
23 prepared by Anthony Miramadi.
24     Q.   Let me try my question again.
25     A.   I guess I never saw it before.

Page 2445

DONALD MILLER - CROSS

1
2    Q.    Excuse me, but look at the first
3    page.
4    A.    I see.
5    Q.    You forwarded it to Ernesto
6    Beckford and others; didn't you?
7    A.    I did. For them to look at it.
8    Q.    It is your testimony you don't know
9    if you looked at it, you just forwarded it on?
10    A.    I may well have. I was involved
11    with a myriad of issues with Alcoa. All bigger
12    than org charts. It is not the kind of thing I
13    would have spent any time on whatsoever.
14    Q.    Let me try it again.
15    A.    Sure.
16    Q.    Is it your testimony when Fairchild
17    Fasteners told Alcoa that Mr. Miramadi was the
18    director of EHS U.S. operations, that that was
19    untrue, do you know one way or the other?
20    A.    I don't know. I only know how we
21    viewed him at corporate.
22    Q.    Based upon looking at your
23    directory?
24    A.    Correct.
25    Q.    Which hasn't been produced to us.

Page 2446

DONALD MILLER - CROSS

1
2    A.    You are welcome to see it.
3    Q.    Thank you. Look at 9447. When
4    Fairchild told Alcoa in 2002, looking at the
5    bottom of 9447, under Corporate Level EHS Issues
6    Management, routine update of EHS issues with
7    corporate legal counsel, and the corporate
8    claims management team, was that untrue?
9    A.    I don't know. You'd have to ask
10    Michael Hodge. You would have to ask Michael
11    Hodge because he is the management team,
12    corporate legal counsel to whom this refers.
13    And I assume you did ask him.
14    Q.    If you look at page 9451 where it
15    says under the heading Discussion of Key Ehs
16    Initiatives and Issues: Safety. Then among
17    other things specifically lists equipment
18    modification and replacement, full revolution
19    presses and machine guarding, that the
20    representation by Fairchild that those were EHS
21    issues was untrue; is that your testimony?
22    A.    I already told you I don't know.
23    Nor have I read this document before.
24    Q.    By the way, there has been
25    testimony earlier in this hearing that since

Page 2447

DONALD MILLER - CROSS

1
2    last September of 2006 Fairchild has had every
3    piece of paper Alcoa has with respect to machine
4    guarding and other issues?
5    A.    Since when?
6    Q.    Last September. Has Fairchild
7    provided any further comments to Alcoa
8    concerning its position about indemnification of
9    machine guarding claims since last September?
10    A.    When did we commence this
11    arbitration?
12    Q.    Just answer my question, sir.
13    A.    I can't answer it until I know when
14    we commenced the arbitration.
15    Q.    Then your answer is you can't
16    answer it.
17    A.    No. Because that would have been a
18    response.
19    Q.    Thank you. You talked about the
20    fact that Alcoa sought a price adjustment and
21    Mr. Steiner was very unhappy about that and the
22    negotiations broke off. Do you recall that
23    topic generally?
24    A.    Yes. It was the second of four
25    attempts.

Page 2448

DONALD MILLER - CROSS

1
2    Q.    In fact in May of 2002 Fairchild
3    sought a purchase price adjustment; didn't it?
4    A.    May of 2002?
5    Q.    Yes.
6    A.    You mean an increase in the
7    purchase price?
8    Q.    Yes.
9    A.    I don't think so.
10    Q.    Excuse me?
11    A.    I don't remember that.
12    Q.    Would you look back at Exhibit,
13    Alcoa Exhibit 151 you should have up there. The
14    Cahill Gordon letter of May 24, 2002.
15    A.    What is the tab number?
16    Q.    It is not in the tab. I handed it
17    to you as a separate document.
18    A.    A Cahill letter.
19    Q.    May 24, 2002, it is the second
20    round of Cahill comments to the agreement that I
21    showed you.
22    A.    What section?
23    Q.    I am asking to you look at the
24    cover page.
25    A.    I have it.

84 (Pages 2445 to 2448)

Page 2449

DONALD MILLER - CROSS

1
2    Q.    Very first paragraph, number 1,
3    purchase price.
4    A.    Yes.
5    Q.    Your lawyers said to Alcoa in May
6    2002 the purchase price must be adjusted to
7    reimburse parent for loss of nontaxable
8    structure; correct?
9    A.    That was an open issue all along
10   the way. That wasn't something new.
11   Q.    So the answer to my question is,
12   yes, Fairchild sought a purchase price
13   adjustment in May 2002?
14   A.    Fairchild sought, Fairchild had
15   always sought this issue. It was not in May of
16   2002. This was a continuing open issue. That
17   is what that says. It says what we consider to
18   be the major open issues. That had been an open
19   issue from a long time before.
20   Q.    Okay. Let's look at Ms. Holloway's
21   notes. Which you said you looked at to refresh
22   your recollection and she had very nice
23   handwriting; do you recall that?
24   A.    She does. What tab is it, 5 or 6?
25   Q.    I would like you to look at tab 5.

Page 2450

DONALD MILLER - CROSS

1
2    A.    Yes.
3    Q.    Do you have that?
4    A.    I do.
5    Q.    Now I am on the topic of the price
6    adjustment issue you testified to on direct.
7    A.    Yes.
8    Q.    You have not produced any notes of
9    June 11, 2002; have you?
10   A.    I don't know. I thought we had. I
11   don't know.
12   Q.    Why don't you look. You have got
13   the book up there.
14   A.    No. I have not.
15   Q.    Now Ms. Holloway, as reflected in
16   tab 5, has produced notes from that day; hasn't
17   she? They are dated June 11, sir.
18   A.    Yes.
19   Q.    Look at the page with Bates number
20   ending 92.
21   A.    Yes.
22   Q.    Excuse me, 93. You see in the
23   middle of that page which is dated June 11 there
24   is a heading Price Adjustment; correct?
25   A.    Yes.

Page 2451

DONALD MILLER - CROSS

1
2    Q.    It has a series of items underneath
3    it beginning with 401(k), then performance, then
4    inventory, Workmen's Comp, cash; correct?
5    A.    Yes.
6    Q.    And none of the issues listed
7    underprice adjustment is an environmental
8    indemnity issue; is it, sir?
9    A.    I don't think you're correct.
10   Q.    Excuse me?
11   A.    I don't think you're correct.
12   Q.    All right. We will do it the hard
13   way. First one says "401(k), IT French." Right?
14   A.    Yes.
15   Q.    "3.2 times 8 equals 25.6."
16   A.    Right.
17   Q.    That is not an environmental
18   indemnity issue; is it?
19   A.    No.
20   Q.    Next one is "performance, 3 times 8
21   equals 24." That you testified, I believe at
22   your deposition about which was that there was,
23   you said some claim by Alcoa that because your
24   business was down, there should be an adjustment
25   of the price down; correct?

Page 2452

DONALD MILLER - CROSS

1
2    A.    I don't know. But I see 3.8, three
3    times 8 equals 24.
4    Q.    Performance does not relate to an
5    environmental indemnity issue; does it?
6    A.    No.
7    Q.    "Inventory, 15." That doesn't
8    relate to an environmental indemnification
9    issue; does it?
10   A.    What is the one on the right of
11   that?
12   Q.    I am asking you about this list,
13   Mr. Miller.
14   A.    No.
15   Q.    Then "Workmen's Comp 3.5?"
16   A.    Looking to the right, part of this
17   list is what it says on the right.
18   Q.    Mr. Miller, you really have to try
19   to answer my questions. I had a very specific
20   question. The question was does inventory of 15
21   relate to an environmental indemnity, yes or no?
22   Sir?
23   A.    No.
24   Q.    Next one, "Workmen's Comp, 3.5."
25   Does that relate to an environmental indemnity?

85  (Pages 2449 to 2452)

Page 2453

DONALD MILLER - CROSS

1
2     A.    No.
3     Q.    "Cash," does that relate to an
4  environmental indemnity?
5     A.    No.
6     Q.    And above that section at the very
7  top of the page is a separate heading
8  Indemnification/Escrow/Contingency; correct?
9     A.    I don't see that.
10    Q.    At the very top of the page on the
11  second or third line of text, the heading reads
12  Indemnification/Escrow/Contingency.  Doesn't it?
13    A.    Uh-huh.
14    Q.    Under that you see "European tax
15  exposure" issue then "environmental" which says
16  "1.05 plus," it looks like "8 reserves."  Do you
17  see that?
18    A.    Plus reserves.
19    Q.    Yes, plus some character, I don't
20  know what that is in reserves.
21    A.    Uh-huh.
22    Q.    Then there are other items; right?
23    A.    Yes.
24    Q.    Were you at the meeting on June 11,
25  sir?

Page 2454

DONALD MILLER - CROSS

1
2     A.    Yes.
3     Q.    But you have no notes; correct?
4     A.    I think that must be correct.  I
5  don't recall whether we redacted everything from
6  the notes or there were no notes.  I think there
7  were no notes.
8     Q.    All right.  Have you read or did
9  you witness Ms. Holloway's testimony about the
10  conversation that took place on June 11 to which
11  these notes relate?
12    A.    No.
13    Q.    So if her testimony is the price
14  reduction that was discussed was not in fact
15  related to any environmental indemnification,
16  but rather to other issues which are listed on
17  this page, then your testimony is that she is
18  not telling the truth; correct?
19    A.    You lost me, I'm sorry.
20    Q.    If Ms. Holloway's testimony was
21  that the price adjustment discussed on June 11,
22  2002 did not relate to environmental
23  indemnification issues, but instead related to
24  such issues as 401(k) and performance and
25  inventory, then is it your testimony that she

Page 2455

DONALD MILLER - CROSS

1
2  was not telling the truth?
3     A.    I have never said that Cynthia has
4  been lying.  That's crazy.
5     Q.    I didn't ask that.  I am asking you
6  as you sit here today to answer the following
7  question:  If Ms. Holloway has testified under
8  oath that the price adjustments discussion on
9  June 11, 2002 was not related to environmental
10  indemnification, but rather was related to other
11  issues, such as the ones I just named, was she
12  not telling the truth?
13    A.    I don't know whether her list is
14  comprehensive or not.
15    Q.    So the answer is you can't answer?
16    A.    I don't know.
17    Q.    Correct?
18    A.    I don't know.
19    Q.    You don't know.  Okay.  You
20  remember testifying on direct about schedules
21  that Fairchild prepared and sent to Alcoa, Mr.
22  Miller?
23    A.    Excuse me, I just realized you're
24  talking about notes of a meeting that she had
25  with John Flynn and Gene Juris.  You are not

Page 2456

DONALD MILLER - CROSS

1
2  talking about the big meeting on 6/11.  These
3  are her notes of a meeting I never attended.
4     Q.    I asked you a little while ago if
5  you were there.  You said yes.  Do you want to
6  change your testimony you were not there?
7     A.    I was not at this meeting.
8     Q.    That may explain why you don't know
9  what Ms. Holloway is talking about.  Now I want
10  to ask you about a different subject.
11    A.    I don't know if these are her notes
12  of her meeting or her notes or her wish list or
13  anything else.
14    Q.    That is already in the record, sir,
15  the judge will deal with that.
16    A.    It is clear I was not at that
17  meeting.
18    Q.    Thank you.
19    A.    Thank you.
20    Q.    Different subject.
21    A.    Or part of that meeting.
22    Q.    Different subject.  Do you recall
23  testifying on direct about various schedules
24  that Fairchild prepared and sent to Alcoa?
25    A.    Yes.

86  (Pages 2453 to 2456)

Page 2457

DONALD MILLER - CROSS

2  Q.  You agree it was Fairchild that
3  prepared those schedules; right?
4      A.  Fairchild prepared the first draft,
5  sent them to Alcoa for review, asked them and
6  were directed to send them to Alcoa for review.
7  They were reviewed by probably 25 Alcoaans and
8  another 20 lawyers for Alcoa.
9      Q.  Mr. Miller, you may not be hearing
10 my question, so I am going to repeat it.  My
11 question is was it Fairchild that sent those
12 schedules to Alcoa?  That is a simple question.
13 It is worthy of a simple answer.  Yes or no?
14     A.  I am sorry, it is not worthy of a
15 simple answer.
16     Q.  All right, then you have done it?
17     A.  Because there are multiple drafts.
18 Which ones were sent to and which ones were sent
19 back, which ones were commented on.  To which
20 ones are you referring, the very, very first
21 draft?  Fairchild prepared the very, very first
22 draft.  That's right.  Very first draft.  If
23 that is your question, that is the answer.
24     Q.  Mr. Miller, the effect of
25 disclosing an item on a schedule was to retain

Page 2458

DONALD MILLER - CROSS

2  outside of an indemnity the liability with
3  Fairchild, that was the purpose of the schedule;
4  wasn't it?
5      A.  Please repeat that.
6      Q.  Wasn't the purpose of the schedule
7  to identify items for which the obligation, the
8  liability would remain with Fairchild and be
9  carved out of an indemnity?
10     A.  Look, if a particular schedule
11 would have been incomplete, save for the
12 identification of a matter, Fairchild would not
13 have allowed that matter not to be on the
14 schedule.
15     MR. CHESLER:  Your Honor, can I
16 please have a direction to the witness to answer
17 the question.
18     THE ARBITRATOR:  Let's simplify
19 it.  I think you can answer it.  Would you
20 repeat the question.
21     Q.  Yes.  If an item was not
22 included -- excuse me, if an item was included
23 on the schedule, was the purpose of that to take
24 that item out from under the indemnity and leave
25 the burden or liability with Fairchild; yes or

Page 2459

DONALD MILLER - CROSS

2  no?
3      A.  No.  Not necessarily.
4      Q.  All right.
5      A.  Now may I answer the question?
6      Q.  No.  You can do that on redirect.
7      THE ARBITRATOR:  He wants to
8  proceed with his questions.  Your lawyer can ask
9  you all the questions you want.  Provided he
10 finished by five o'clock.
11     MR. ZUROFSKY:  I was going to say
12 your Honor, not five o'clock.  12 minutes.
13     MR. CHESLER:  Believe me your
14 Honor, I would like to go a lot faster.
15     THE ARBITRATOR:  Yes.  Go ahead.
16     Q.  Let's look at 3.14.
17     THE ARBITRATOR:  What tab?  This is
18 tab 1.
19     A.  I think he is looking in the
20 agreement.
21     Q.  Tab 1 in the white binder.
22     A.  Okay.  3.14.
23     Q.  3.14.
24     THE ARBITRATOR:  This is section
25 3.14 of the agreement.

Page 2460

DONALD MILLER - CROSS

2  MR. CHESLER:  Your Honor, give me
3  minute.  I want to make sure I get to the right
4  place.
5      THE ARBITRATOR:  I think the
6  schedules, if you are talking schedules are
7  listed under later tabs in this book.
8      MR. CHESLER:  I found the section
9  I want to take the witness to.
10     Q.  Mr. Miller, go to section 11.2,
11 please, on page 2803 which is also page 77.
12     A.  Section what.
13     Q.  11.2 headed Indemnification.
14     A.  Yes.
15     Q.  On page 77 which bears Bates
16 numbers 2803.
17     A.  Yes.
18     Q.  You see under 11.2 A.  Are you with
19 me, your Honor?
20     THE ARBITRATOR:  Yes.
21     Q.  It says "Subject to sections 11.1,
22 3, 4 and 5, each of the sellers will jointly and
23 severally indemnify" etc., "defend and hold
24 harmless," etc., "The transferred --" sorry,
25 "the transferred subsidiaries, the buyers' other

DONALD MILLER - CROSS

1
2  affiliates and their respective directors, etc.
3  from and against any and all indemnifiable
4  losses resulting to, resulting from or arising
5  out of" then there is a list of sections; right?
6      A.   Right.
7      Q.   Now if you go to iv on the next
8  page, which is one of that list.
9      A.   It says subject to 11.6?
10     Q.   Yes. It says, "A, subject to 11.6"
11 the 11.6 is the environmental indemnity section;
12 correct?
13     A.   Uh-huh.
14     Q.   That is a yes?
15     A.   Yes.
16     Q.   "The Fastener Environmental
17 Liabilities and B, all litigation matters
18 arising out of or resulting from the conduct of
19 the Fasteners business to the Effective Time,
20 including the litigation matters set forth on
21 section 3.16, in all cases for purposes of both
22 clause A and B, to the extent the amount of
23 damages thereof exceed the amounts of the
24 reserve for environment, health, safety and
25 litigation on the closing date balance sheet."

DONALD MILLER - CROSS

1
2  Right?
3      A.   Yes.
4      Q.   What was the effect of including a
5  matter on Schedule 3.16 in terms of who was
6  responsible for the costs associated with it?
7      A.   It would make the party that
8  included the matter liable for the matters which
9  were set forth in that schedule to the extent
10 they exceeded the reserve.
11     Q.   Okay. Now go to section 3.14 B.
12     A.   Yes.
13         MR. CHESLER:  Your Honor, it is on
14 page 36 which bears Bates number 2762.
15     Q.   You see the 3.14B says "Except as
16 set forth on schedule 3.14B, the Fasteners
17 business is being and since June 30, 2001 has
18 been conducted in material compliance with all
19 applicable laws of all government entities
20 relating to the operation, conduct or ownership
21 of the Fasteners business, provided that no
22 representation or warranty is made in this
23 section 3.14B with respect to Environmental
24 Laws."  Correct?
25     A.   Uh-huh.

DONALD MILLER - CROSS

1
2      Q.   Now, it is your position, is it
3  not, that this representation about 3.14B does
4  not include any environmental matters, as you
5  defined the term; correct?
6      A.   I don't know.
7      Q.   You don't know one way or the
8  other?
9      A.   I don't know because I need to see
10 the schedule.
11     Q.   All right.  If you can't answer,
12 you can't answer.
13     A.   I know one thing --
14     Q.   You answered the question, Mr.
15 Miller.  You may know lots of things I am not
16 particularly interested in hearing, just confine
17 yourself to my questions, please.
18         If it had come to your attention,
19 sir, while you were the general counsel of
20 Fairchild that one of your facilities had
21 excessive amounts of potentially toxic
22 substances, that is beyond legal limits in the
23 waste water flowing out of the facility, would
24 you have regarded that something as something
25 Fairchild should promptly remedy?

DONALD MILLER - CROSS

1
2      A.   I would regard it as something that
3  Fairchild should promptly investigate.
4      Q.   Now, it is true, is it not, that
5  back in March of 2003 Alcoa wrote to Fairchild
6  and said that St. Cosme, previously your
7  facility was not in compliance with regulatory
8  requirements for waste water; isn't that true?
9      A.   I don't know.
10     Q.   You don't know?
11     A.   I don't recall.
12     Q.   All right.  Let's look at the March
13 4, 2003 document.  That is letter from Mr. Lease
14 to Mr. Hodge which I gave you as a lose exhibit
15 early on in your examination.
16     A.   I see it.
17     Q.   You have that?
18     A.   Yes.
19     Q.   If you look on the back page, item
20 1, it says under Issue Description,
21 "non-compliance with waste water permit
22 conditions and regulatory requirements for waste
23 water discharge and hazardous chemical release
24 prevention."  Do you see that, sir?
25     A.   Yes, I do.

88  (Pages 2461 to 2464)

Page 2465

DONALD MILLER - CROSS

1          DONALD MILLER - CROSS
2    Q.   Then there are citations to
3 regulatory provisions.
4    A.   Yes.
5    Q.   Then other information under
6 Corrective Actions and Estimated Amounts.  Do
7 you see all that?
8    A.   I do.
9    Q.   And the response that came back was
10 one of the we need more information letters;
11 correct?
12    A.   Yes.
13    Q.   So, in response to that Alcoa sent
14 another letter on April 8th, 2003.  Do you
15 recall that?
16    A.   I don't.
17    Q.   Let me show you that document.
18 This is from bulk Exhibit C, your Honor as well
19 volume 1, beginning on page 19 of that volume.
20 If you look at the backside of this document,
21 sir, you will see that Alcoa has added a middle
22 column, issue and regulatory background; do you
23 see that? For the first item there are five
24 different entries, the first of which reads "The
25 facility waste water discharge is routinely

Page 2466

DONALD MILLER - CROSS

1          DONALD MILLER - CROSS
2 noncompliant with the numerical limitations for
3 several parameters." Then cites what they are.
4 "In its operating permit which was issued in
5 1986."
6       Do you see that?
7    A.   Uh-huh.
8    Q.   In response to this letter
9 Fairchild sent another letter saying we need
10 more information?
11    A.   Right. You're talking about a
12 liability which he estimates at that point is
13 about $4.6 million.
14    Q.   You asked for more information;
15 correct?
16    A.   All the information he provided is
17 contained in these four little boxes? And do you
18 think we needed more information?
19       MR. CHESLER:  Your Honor, may I
20 have -- I didn't ask the witness why he refused
21 to pay us. I asked if he had refused to pay us.
22       MR. ZUROFSKY:  That is not what
23 you asked him.
24    A.   No, you didn't.  You said and you
25 sent back a request for more information.

Page 2467

DONALD MILLER - CROSS

1          DONALD MILLER - CROSS
2    Q.   I said did you?
3       THE ARBITRATOR:  I think he said
4 he did; isn't that correct?
5       THE WITNESS:   Yes, absolutely.
6       MR. CHESLER:  Before the rest of
7 it he did.
8    Q.   Again, I will tell you there has
9 been testimony at this hearing that since last
10 fall Fairchild has had all of the paper, every
11 piece of paper that Alcoa has with respect to
12 this and the other facilities, but particularly
13 St. Cosme. As you sit here today, sir, as
14 executive vice president and general counsel of
15 Fairchild, are you prepared to admit that
16 Fairchild should reimburse Alcoa for the costs
17 associated with the waste water, excess waste
18 water problem at St. Cosme?
19    A.   No.
20    Q.   You've heard, I take it, because
21 you were in the room for part of the it, that
22 Alcoa discovered once it acquired the facility
23 that St. Cosme was keeping two sets of books of
24 the waste water discharge, one which it showed
25 to the regulators and the other which in the

Page 2468

DONALD MILLER - CROSS

1          DONALD MILLER - CROSS
2 words of the employees, showed the actual
3 levels.  You have heard about that?
4    A.   I didn't hear about it in the
5 courtroom, but I have heard about that.
6    Q.   I take it your answer no to my
7 prior question that Fairchild is not prepared
8 even now to pay for the indemnification is an
9 answer you stand by even in light of the
10 testimony about two sets of books being kept at
11 St. Cosme; correct?
12    A.   My answer is that this is now
13 before the judge.  The judge will decide.  And
14 we will abide by exactly what the judge decides.
15    Q.   Now, are you aware that while the
16 facility at St. Cosme was owned by Fairchild,
17 Fairchild obtained a cost estimate for replacing
18 the waste water treatment facility?
19    A.   I am not aware of that.
20    Q.   Let me show you Exhibit 44.  And
21 there is an English translation that follows the
22 French toward the back.  I would like you to
23 turn to the page that ends 859, sir. You see
24 there is an indicative budget there?
25    A.   Yes.

89 (Pages 2465 to 2468)

Page 2469

DONALD MILLER - CROSS

1
2     Q.    By the way, you can see if you
3  haven't already looked in the English
4  translation at page 855, this is from March 28,
5  2001 from Hytec to Fairchild Fasteners.  You can
6  see in the first sentence of text on that page
7  it relates to St. Cosme.
8     A.    Yes.
9     Q.    At that time Fairchild owned the
10 facility; correct?
11    A.    Yes.
12    Q.    Now go back to 859 you see there is
13 an estimate from the consultants hired by
14 Fairchild.
15    A.    A million dollars.
16    Q.    It is actually 880,000 Euros.
17    A.    A million dollars.
18    Q.    When you add in the tax it comes to
19 a little over a million Euros, which I will
20 represent to you in today's dollars is about 1.4
21 million.
22    A.    Okay.
23    Q.    1.4 million.  Now, if you go back
24 to the April 8 letter --
25    A.    Yes.

Page 2470

DONALD MILLER - CROSS

1
2     Q.    -- which we just looked at a few
3  minutes ago from Mr. Lease to you about St.
4  Cosme.
5     A.    Right.
6     Q.    If you do the math for the third
7  item, you don't even have to do the math, just
8  look at it, third item says "the facility waste
9  water discharge non-compliant with the numerical
10 limitations in the operating permit."
11         Then it says "upgrade/replace waste
12 water treatment plant."  Do you see that item?
13    A.    Yes.
14    Q.    The estimate for that is 1.5
15 million; correct?
16    A.    Yes.
17    Q.    Have you also learned, sir, of
18 testimony here at the hearing that the Torrance
19 facility while it was owned by Fairchild turned
20 up the volume of rinse water in order to dilute
21 the discharge of contaminants when the LA County
22 inspectors were on the site?
23    A.    No.
24    Q.    You haven't been told about that?
25    A.    No.

Page 2471

DONALD MILLER - CROSS

1
2     Q.    I take it that is not something you
3  would have countenanced had you known about it;
4  would you not?
5     A.    I would not, of course not.
6     Q.    In fact if the effect of turning up
7  the rinse water to dilute the discharge was to
8  make it appear that the discharge was below
9  acceptable limits, that is something you would
10 want to correct; isn't it?
11    A.    If the purpose of it was to
12 mislead, it absolutely would have been corrected
13 had I known about it.  If that was the purpose.
14 I have no idea.  I am not an environmental
15 lawyer.  I have no idea whether or not it
16 happened, and B its purpose.  I can tell you if
17 the purpose of it was to mislead I would have
18 stopped it immediately.
19    Q.    With respect to St. Cosme, if there
20 were in fact two sets of books, and the effect
21 of keeping two sets of books was to keep from
22 the knowledge of the regulators that the waste
23 water discharge was in excess of legal limits,
24 and masked the fact that the treatment facility
25 had to be replaced, if that hadn't been done,

Page 2472

DONALD MILLER - CROSS

1
2  the need to replace that facility would have
3  happened while you owned the plant; wouldn't it?
4     A.    Again, I don't know.  If the
5  purpose of keeping a second set of books was to
6  mislead as opposed to use a different method of
7  calculation or for some other reason with which
8  I am not familiar, I would not have allowed it.
9  I would have stopped it immediately.
10    Q.    That wasn't my question, sir. If
11 the effect of keeping two sets of books at St.
12 Cosme about waste water is to delay the point at
13 which the regulators came to know the waste
14 water treatment facility was already failing to
15 keep the contaminants below required levels,
16 then stopping that practice would have notified
17 the regulators of the need to replace that
18 facility while you owned it; isn't that right?
19    A.    Not necessarily.  It depends when
20 the volume of effluents increased, it might have
21 been after.  However, I already told you, had we
22 known about it, had I known about it, I would
23 have stopped it.
24    Q.    Yes.  You told me.
25    A.    And we would have made a full

MERRILL LEGAL SOLUTIONS
(800) 325-3376        www.MerrillCorp.com

Page 2473

DONALD MILLER - CROSS

1  disclosure on top of it.
2      Q.    If the regulators had said to you
3  what they since said to my client, which is
4  that's not properly treating the waste water,
5  you must replace the facility, then you would
6  have done that; wouldn't you?
7      A.    If it had been on our watch, we
8  would have taken whatever action our consultants
9  advised us was necessary to correct the problem.
10     Q.    But you refused to pay my client
11 for taking exactly the same action when it
12 happened on their watch; correct?
13     A.    I don't know whether it is the same
14 action.
15     Q.    Okay.
16     A.    We asked you for more information.
17     Q.    How about Temple Avenue, the City
18 of Industry. Are you familiar with the fact
19 that Fairchild installed a groundwater pump and
20 treat system there?
21     A.    No.
22     Q.    So you're not therefore familiar
23 with the fact you declined to reimburse my
24 client for running exactly the same system as

Page 2474

DONALD MILLER - CROSS

1  you already installed?
2      A.    Not familiar with it at all.
3      Q.    Okay. Give me one moment, your
4  Honor?
5          MR. CHESLER:  I have no further
6  questions.
7          MR. ZUROFSKY:  I will try to be
8  brief, your Honor. One of the issues I do think
9  we should try to finish Mr. Miller tonight
10 because Mr. Chesler is out tomorrow morning.
11         MR. CHESLER:  Yes.
12         MR. ZUROFSKY:  I am going to try
13 to get through it. I do probably think it is a
14 good idea in light of that.
15         THE ARBITRATOR:  You have other
16 witnesses for tomorrow?
17         MR. ZUROFSKY:  We certainly do.
18         THE ARBITRATOR:  Mr. Slifkin can
19 examine. We will do Mr. Shofstall.
20         MR. SLIFKIN:  I can do him.
21         MR. ZUROFSKY:  We will let you
22 know the sequence after that tonight after we
23 break.
24     RE-DIRECT EXAMINATION BY MR. ZUROFSKY:

Page 2475

DONALD MILLER - REDIRECT

1      Q.    Mr. Miller, we heard a lot of
2  volume on cross, but I want to get back to the
3  facts.
4          Let's start with this:  Do you
5  recall when Mr. Chesler asked you about your
6  notes from the June 10 meeting, they are found
7  at tab 2?
8      A.    Yes.
9      Q.    He asked you about the difference,
10 the different entries of number 4, number 5 on
11 the second page of tab 2?
12     A.    Yes.
13     Q.    Do you recall he asked you with
14 respect to number 4?
15     A.    Yes.
16     Q.    Which says PCE and TCE. You said
17 St. Cosme and Fullerton wants indemnity.
18     A.    Yes.
19     Q.    He asked you there is no number
20 listed there, no dollar amounts; right?
21     A.    Not on my notes.
22     Q.    Not on your notes; right?
23     A.    Yes.
24     Q.    You said you should have written it

Page 2476

DONALD MILLER - REDIRECT

1  down?
2      A.    I should have written it down,
3  sure. I see it on other people's notes.
4      Q.    Let's look at some of those notes.
5  Turn to tab 6. Do you recognize that
6  handwriting?
7      A.    John Flynn.
8      Q.    John Flynn?
9      A.    Uh-huh.
10     Q.    He was CFO at the time?
11     A.    Yes. He was at the meeting.
12     Q.    Do you see there it says 6/10/2002?
13     A.    I do EPA, indemnity 20 million.
14     Q.    It doesn't say 20 to 40 does it?
15     A.    No. It says 20.
16     Q.    Going back to your notes at tab 2.
17     A.    Okay.
18     Q.    They did discuss and give you some
19 detail on item 4 PCE and TCE at St. Cosme?
20     A.    20 million. I didn't put it down.
21     Q.    You recall when we looked at
22 Ms. Holloway's email her notes those were the
23 same references to 20 million?
24     A.    Yes. Same thing she was talking

Page 2477

DONALD MILLER - REDIRECT

1    about.
2        Q.    Number 5 it says there they will
3    give us a list of 20 to 40 million; right?
4        A.    Yes.
5        Q.    They did not give you a list?
6        A.    No, they never did.
7        Q.    You didn't know what was in those
8    items?
9        A.    I never knew what was in those
10   items.
11       Q.    Mr. Chesler asked you whether or
12   not you should have written down the number for
13   number 4.  But you did write down the words
14   "want indemnity" correct?
15       A.    Correct.
16       Q.    Is that kind of information you
17   want to record in your notes when they ask for
18   indemnification?
19       A.    Yes.
20       Q.    Look at number 5.  Did you write
21   want indemnity for number 5?
22       A.    No.  I didn't.
23       Q.    Do you think you would have written
24   down if they were asking for 20 to 40 million

Page 2478

DONALD MILLER - REDIRECT

1    indemnity that they wanted it?
2        A.    Absolutely.
3        Q.    Let's finish up with the compliance
4    issues?
5        THE ARBITRATOR:  What does that
6    mean 20 to 40 million?
7        THE WITNESS:  They were throwing
8    up a bunch of numbers, your Honor.
9        MR. CHESLER:  I can't hear the
10   witness, your Honor.
11       THE ARBITRATOR:  He needs to hear
12   you.  My question is what do you understand that
13   20 to 40 million that is adjustment of the
14   purchase price or what we were they looking for?
15       THE WITNESS:  They were looking
16   for adjustments of the purchase price.  They
17   were trying to throw up as many liabilities and
18   problems they possibly could think of so we
19   would be really happy that the purchase price
20   was only coming down by 50 million or 60 million
21   or 40 million.
22       Q.    You understood that to be part of
23   the negotiation; right, Mr. Miller?
24       A.    Yes.

Page 2479

DONALD MILLER - REDIRECT

1        Q.    They never gave you the list?
2        A.    No.
3        Q.    Do you believe there is any chance
4    Fairchild would have agreed to an indemnity for
5    20 to 40 million if it didn't know what items it
6    was indemnifying for?
7        A.    Absolutely not.  Steiner walked out
8    when we talked about purchase price reduction
9    that high.  Then you see our modus operandi when
10   we ask for indemnification we ask for details so
11   we know what it is we are paying for.
12       Q.    Mr. Chesler took you through
13   Ms. Holloway's notes dated 6/11 that had break
14   down, you he will recall of some items at tab 4,
15   sorry tab 5?
16       A.    Yes.
17       Q.    He pointed you to Bates stamp
18   number that end in 592.  Sorry 593.  I think he
19   did.
20       A.    That is a meeting I wasn't at.
21       Q.    The page 593; right?
22       A.    Yes.
23       Q.    Two things.  He took you through
24   the list on the left-hand side.  Was there also

Page 2480

DONALD MILLER - REDIRECT

1    discussion as you recall -- you weren't at this
2    meeting; right?
3        A.    I wasn't.
4        Q.    There is the reference there
5    "environmental to close locations."  Do you see
6    that?
7        A.    Yes.
8        Q.    Is that what you were referring to
9    when he asked you if there was any reference to
10   environmental indemnity?
11       A.    That is exactly what I was
12   referring to.
13       Q.    This is a list of items listed
14   under heading Price Adjustments?
15       A.    Yes.
16       Q.    Is it your understanding in
17   connection with these meetings on 6/10 and 6/11
18   time frame that Alcoa was seeking to lower the
19   purchase price absolutely, looking to get a
20   better deal?
21       A.    Yes a,bsolutely.
22       Q.    They listed for you a number of
23   items; right?
24       A.    Yes.

92 (Pages 2477 to 2480)

Page 2481

DONALD MILLER - REDIRECT
1
2    Q.    Including these particular items?
3    A.    Yes.
4    Q.    Eventually.  And other things?
5    A.    Later in the day, yes.
6    Q.    They threw out the compliance?
7    A.    Right.
8    Q.    Did Fairchild, as you understand
9    it, ask for detail about what the price
10   adjustments items were that Alcoa was seeking?
11   A.    No.
12   Q.    Was it eventually negotiated?
13   A.    It was negotiated subsequently.  It
14   was agreed to be essentially half of what they
15   wanted.  We split the baby.
16   Q.    You understood that took care of
17   all open issues at the time; right?
18   A.    Absolutely.
19   Q.    You never got a list for compliance
20   issues?
21   A.    We never did and never heard about
22   it again, and it went away.
23   Q.    Let's change gears --
24   A.    I don't know what happened to it.
25   Never heard about it again.

Page 2482

DONALD MILLER - REDIRECT
1
2    Q.    The idea again to parallel your
3    notes about 4 and 5, you said -- strike that.
4           Mr. Chesler then took you through
5    or I think at the beginning took you through a
6    series of drafts.  You will recall we had debate
7    about whether or not those had been provided
8    before and all the rest of it?
9    A.    Yes.
10   Q.    He showed you two drafts.  I want
11   to take you through some of that.  They were
12   dated in May, do you recall that first one May 6
13   and May 24?
14   A.    Yes.
15   Q.    When Mr. Chesler was asking you
16   some questions he said, well, did your counsel
17   look to strike out of the language the term
18   workplace health and safety; do you remember
19   that?
20   A.    Yes.
21   Q.    Let me ask you first and foremost
22   on this issue the following: Which is there was
23   a lot of drafting back and forth of the language
24   of the agreement; correct?
25   A.    Yes.

Page 2483

DONALD MILLER - REDIRECT
1
2    Q.    Comments back and forth?
3    A.    Yes.
4    Q.    Including striking some things out,
5    grammar changes, moving things around as the
6    agreement got formulated?
7    A.    Yes.  By the way, I am not even
8    sure it was intended to be stricken.  There
9    appears to be something else that may have been
10   added there.  I can't even tell.
11   Q.    I will take you there those notes
12   in a second.  I want to ask you a question
13   before we get there.  That question is this: Do
14   you recall any substantive discussion about
15   expanding the term of Environmental Law to
16   include things like machine guarding?
17   A.    No.
18   Q.    Do you believe the changes to this
19   section were sort of drafting changes?
20   A.    Absolutely.
21   Q.    Let's look at the first one that
22   Mr. Chesler showed you which was the May 6.
23   A.    Yes.
24   Q.    I believe the page he was looking
25   at is page 35.

Page 2484

DONALD MILLER - REDIRECT
1
2    A.    They are not numbered.
3    Q.    Actually 35 doesn't have a number.
4    But 34 does.
5    A.    34 has a number.  35 doesn't.
6           MR. CHESLER:  You can't see it is
7    under the writing.
8    Q.    You see 35 there?
9    A.    I do.  I see the page that would
10   have been 35.
11   Q.    You see how there is, if you look
12   through this, it combines everything into one,
13   there is no breakdown of subsections; right?
14   A.    Correct.
15   Q.    No, that A, B, C format we seen in
16   the final agreement is not here; correct?
17   A.    Correct.
18   Q.    Is this as you understand it an
19   attempt by your counsel to just put everything
20   in one definition?
21   A.    Yes.
22   Q.    It includes, for example, pollution
23   and all the stuff we see here; right?
24   A.    Yes.
25   Q.    Did you understand that to be a

DONALD MILLER - REDIRECT

1    change striking out the concept of workplace,
2    health and safety or just included this in a
3    broader?
4        A.    The latter.
5        MR. CHESLER:  Your Honor, can we
6    have the witness' testimony and not counsel's
7    please.  Object to the leading.
8        MR. ZUROFSKY:  Your Honor, I will
9    ask for some leniency with respect to these
10   drafts considering we did not have a chance.
11       THE ARBITRATOR:  He answered the
12   question.  I will allow that.  Why don't we
13   proceed and try to answer the question.
14       MR. ZUROFSKY:  Fair enough, your
15   Honor.  I want to make sure Mr. Miller has
16   ability to go through these drafts because he
17   had not had the chance beforehand.
18       MR. CHESLER:  As is often the case
19   on cross-examination, your Honor.
20       Q.    Next thing I want to introduce
21   another draft that comes later.
22       THE ARBITRATOR:  When it gets
23   after five o'clock I allow a little more
24   leniency.

DONALD MILLER - REDIRECT

1        MR. ZUROFSKY:  I will make sure to
2    save it for five o'clock.
3        MR. CHESLER:  You have been doing
4    it all day long.
5        MR. ZUROFSKY:  You should read
6    your transcript with Mr. Lease.
7        THE ARBITRATOR:  All right,
8    gentlemen.
9        MR. ZUROFSKY:  We are going to
10   mark this 500.
11           (Claimant's Exhibit 500 was
12   marked.)
13       MR. CHESLER:  Do you have a prefix
14   in front of it?
15       MR. ZUROFSKY:  Claimant's 500.
16       Q.    Mr. Miller, do you have Claimant's
17   500 in front of you?
18       A.    I do.
19       Q.    This is Skadden, Arps, Slate,
20   Meagher & Flom's draft, let me ask you, Mr.
21   Miller see the top SASMF do you know who that
22   is?
23       A.    Yes Skadden, Arps, Slate, Meagher &
24   Flom.  Skadden, Arps, Slate something.

DONALD MILLER - REDIRECT

1        Q.    Do you see that?
2        A.    Yes.
3        Q.    Page, I guess we excerpted here,
4    look on the third page of this exhibit.
5        A.    I see it.
6        Q.    Definition of Environmental Law.
7    See that?
8        A.    Yes.
9        Q.    Right?
10       A.    Yes.
11       Q.    You see there is now -- let's take
12   a step back.  The drafts Mr. Chesler showed you
13   were before the June 10 meeting we talked about?
14       A.    Correct.  This is subsequent.
15       Q.    This is subsequent; correct?
16       A.    Yes.
17       Q.    This is after Alcoa has come back
18   and asked for that indemnity of 20 million.
19       A.    Right.
20       Q.    Environmental Law four subsections;
21   right?
22       A.    Yes.
23       Q.    Can you read subsection B.
24       A.    Workplace Health Or Safety.

DONALD MILLER - REDIRECT

1        Q.    That is the same subsection B we
2    see in the final agreement a couple weeks later?
3        A.    Yes.
4        Q.    If you look at D what does that
5    say?
6        A.    "The health, safety or
7    environmental aspects of the presence, handling,
8    use, manufacture, distribution, treatment,
9    storage, disposal or recycling of exposure to
10   hazardous materials."
11       Q.    That is July 2; right?
12       A.    Uh-huh.
13       Q.    Let me hand up 501.
14           (Claimant's Exhibit 501 was
15   marked.)
16       Q.    501.  Do you see it there, Mr.
17   Miller?
18       A.    Yes.
19       Q.    It says "Fairchild comments" on the
20   top right?
21       A.    Yes.
22       Q.    I want you to turn to --
23       A.    Right.
24       Q.    -- third page.

Page 2489

1    DONALD MILLER - REDIRECT
2        A.    Got it.
3            MR. CHESLER:  Your Honor, so we
4    are clear on the record, I want to make sure the
5    apples and oranges is clear here.  The two
6    documents I used were from Fairchild's counsel.
7    Which they had.  So there was no surprise.
8    These are theirs which we don't have.
9            MR. ZUROFSKY:  Your Honor, in
10   anticipation of this issue there is an email
11   dated, which I can introduce as 502 if you like
12   which someone from our side references the July
13   3 markup that was sent to Alcoa.  Even though
14   this particular copy that happened to be in our
15   files doesn't have the cover, it is quite clear
16   this markup was sent to Alcoa.
17           MR. CHESLER:  Assuming there was
18   only one markup on that date, your Honor.  I
19   have no idea.
20           MR. ZUROFSKY:  With that caveat
21   that's fine.  This is a draft with Fairchild's
22   comments.  I can introduce this email if you
23   want to see it.
24           MR. CHESLER:  I stand on my
25   objection, your Honor.  You will just rule on it

Page 2490

1    DONALD MILLER - REDIRECT
2    I suppose.
3            THE ARBITRATOR:  It is dated that.
4    Are you having this marked?
5            MR. ZUROFSKY:  This is marked as
6    502.
7               (Claimant's Exhibit 502 was
8    marked.)
9            MR. ZUROFSKY:  It is Joshua
10   Teitelbaum who I will also represent was my
11   roommate in law school and is a very trustworthy
12   guy.  He is referring to the July 3 markup sent
13   to the same people.
14           MR. CHESLER:  I don't want to
15   interrupt your reading, I was just asking for
16   permission to respond.
17           THE ARBITRATOR:  Go ahead.
18           MR. ZUROFSKY:  Your Honor, Mr.
19   Chesler introduced those documents.  He said we
20   have everything in the file.  We assume they
21   have this, too.  Obviously that was what the
22   deal was.
23           MR. CHESLER:  I am on a different
24   point which maybe counsel's roommate understands
25   but he doesn't.  "Enclosed please find 21

Page 2491

1    DONALD MILLER - REDIRECT
2    replacement pages to our July 31 markup."
3    That suggests it is some excerpt
4    from a markup.  This document is like 100 pages
5    long.  I have no idea what the attachments to
6    this was.  This is not the same thing.  We were
7    showing a Cahill cover letter with the entire
8    document sent from his law firm.  I object.
9            MR. ZUROFSKY:  Do you want me to
10   respond?
11           THE ARBITRATOR:  Go ahead.
12           MR. ZUROFSKY:  The response is
13   this:  This is an issue we discussed earlier.
14   The deal was we would not exchange drafts
15   because we assumed everything was in each
16   other's files.  The only question now is whether
17   or not there is reason to believe -- they have
18   no ground to stand on saying it doesn't happen
19   to be in our files.  I don't know what they kept
20   in their files.
21           The only question that is relevant
22   whether or not there is reason to believe this
23   document was sent to them and therefore under
24   our agreement which you recall Mr. Slifkin got
25   up and said was his proposal there is reason to

Page 2492

1    DONALD MILLER - REDIRECT
2    believe it is in their files.  I am showing Mr.
3    Teitelbaum's email that says these are
4    replacement pages.
5            THE ARBITRATOR:  I am going to
6    overrule it.  It refers to the comments July
7    3rd, replacement pages to our July 3rd markup.
8        Q.    Mr. Miller, the exhibit I just
9    handed to you 501, see it there?
10       A.    I do.  Yes.  Environmental Law
11   page.
12       Q.    Turn to Environmental Law, third
13   page in.
14       A.    Yes.
15       Q.    These are comments from Fairchild;
16   right?
17       A.    Yes.
18       Q.    What does Fairchild suggest in the
19   definition of Environmental Law to be added?
20           THE ARBITRATOR:  Let me see if I
21   can find the page.
22           MR. ZUROFSKY:  Third page in
23   Exhibit 501, which is July 3rd.  Should be third
24   page in, not including the cover page there is
25   the definition of Environmental Law about

Page 2493

DONALD MILLER - REDIRECT

1 two-thirds down. Do you see it, your Honor?
2 THE ARBITRATOR: No. I have it
3 the third page including the cover.
4 Q. There is that section of
5 Environmental Law again?
6 A. Is it 501 or 502 you're talking
7 about? It is 502.
8 Q. 501 is the email. It is the one
9 with July 3rd in the upper right. Definition of
10 Environmental Law. You see how previously there
11 was that four structure, ABCD we looked at the
12 day before?
13 A. Yes.
14 Q. This is Fairchild's comments
15 looking to change that to be what does it say?
16 A. It says "The environment or natural
17 resources including without limitation those
18 relating to the clean-up, preservation or
19 reclamation thereof." Then it says "any release
20 or threatened release of hazardous materials,
21 the presence, handle, use, manufacture,
22 distribution, treatment, storage, disposal and
23 recycling or exposure to hazardous materials or
24 B, workplace health and safety."

Page 2494

DONALD MILLER - REDIRECT

1 Q. Is it Fairchild's comments to
2 introduce the B clause, workplace health or
3 safety that once again appeared in the final
4 draft?
5 A. Yes.
6 Q. That was a solution -- I will take
7 a step back, there was B workplace health and
8 safety in the Skadden draft then there was D,
9 another reference to health and safety there.
10 A. Yes.
11 Q. Was it Fairchild's comments to
12 combine those two as you read this?
13 A. Yes.
14 Q. Now at any point in time, Mr.
15 Miller, did you authorize your counsel or anyone
16 at Fairchild to ever agree to include machine
17 guarding to be covered by definition of
18 Environmental Law?
19 A. Absolutely not. I already
20 testified that would have been covered by
21 representation.
22 THE ARBITRATOR: You answered the
23 question.
24 Q. Moving topics. I want to clear one

Page 2495

DONALD MILLER - REDIRECT

1 thing up because there was significant amount of
2 time spent by Mr. Chesler on this idea of
3 whether or not you knew items had been paid or
4 not been paid. Mr. Miller, do you recall that?
5 A. I do.
6 Q. Is it your day-to-day job to
7 monitor the claims made by Alcoa under the
8 agreement?
9 A. I receive them. I am listed as a
10 signatory -- I mean as the recipient. I pass
11 them on to others when I receive them.
12 Q. You don't check in every day?
13 A. I do not.
14 Q. You made reference to payments at
15 the Fullerton plant.
16 A. Yes.
17 Q. What were you talking about?
18 A. I know we made some payments with
19 respect to environmental matters at Fullerton.
20 I don't recall what they were about.
21 Q. This is Claimant's 434 previously
22 introduced. Do you recognize this document?
23 A. A letter from Susan Hall.
24 Q. Turn to the second page.

Page 2496

DONALD MILLER - REDIRECT

1 A. Yes.
2 Q. Top of the second page says
3 notwithstanding the foregoing?
4 A. Fairchild is conditionally prepared
5 to undertake the defense of the lawsuit. The
6 condition the sites are in fact former Fairchild
7 Fasteners facilities. And we have retained a
8 law firm to defend the case.
9 Q. What do you understand this to be
10 the lawsuit about?
11 A. This is an agreement to assume a
12 particular liability which is an environmental
13 liability.
14 Q. You're not, when Mr. Chesler asked
15 you questions about assuming liabilities was
16 this one of the items you were referring to?
17 A. Yes.
18 Q. You recall he asked you whether
19 that is under 11.6 or some other section, do you
20 recall that?
21 A. I do. I said I don't remember.
22 Q. Is the I don't remember the fact
23 you just didn't know if this was under 11.6 or
24 another?

96 (Pages 2493 to 2496)

Page 2497

DONALD MILLER - REDIRECT
1
2    A.    Correct.
3    Q.    Let's turn to 11.6A in the
4  agreement: Do you recall some questions about
5  whether or not the reserve had to be attacked
6  first before checks --
7    A.    Yes.
8    Q.    You were making some comments about
9  provided that at the end of section 11.6A
10   A.    Yes.
11   Q.    What were you talking about?
12   A.    "Provided any claims for
13 indemnification related to discontinued ops or
14 preclosing off-site disposal location shall not
15 be subject to any deductible for amounts in the
16 reserve." That was the very point that he was
17 saying I should assume there were no exceptions
18 to 11.6. And here it is. Right before you.
19 There is the exception.
20         I wondered whether or not that was
21 at 11.6 claim which was not subject to the
22 deductible.
23   Q.    Again, your answers were just based
24 upon you were not sure what category these
25 things fell into?

Page 2498

DONALD MILLER - REDIRECT
1
2    A.    Correct.
3    Q.    There also was significant amount
4  of time spent on this question of the reactions
5  Fairchild responses to machine guarding claims,
6  do you recall that?
7    A.    Yes.
8    Q.    Mr. Chesler showed you some St.
9  Cosme letters and whatnot?
10   A.    Yes.
11   Q.    Let's talk about that. Do you
12 recall receiving a series of these gap analysis
13 letters in beginning of 2003 from Mr. Lease?
14   A.    Not specifically.
15   Q.    Let's look at one of them. The one
16 you have, Mr. Chesler sent you about Fullerton.
17   A.    Yes.
18   Q.    It should be --
19   A.    I got it.
20   Q.    -- on your stack there. I am
21 looking for the exhibit number.
22   A.    I have got it.
23   Q.    Do you recall Fairchild received
24 series of letters --
25   A.    C volume 1 of 22.

Page 2499

DONALD MILLER - REDIRECT
1
2    Q.    Yes, that one. Do you recall
3  Fairchild received a series of letters about
4  some facilities?
5    A.    Yes.
6    Q.    Mr. Chesler asked you about machine
7  guarding and your response to it.
8    A.    Yes.
9    Q.    Another facility, did you also
10 receive a letter about Torrance?
11   A.    Yes.
12   Q.    And Toulouse?
13   A.    Yes.
14   Q.    They contained similar machine
15 guarding entries?
16   A.    Yes.
17   Q.    So Mr. Chesler asked you whether or
18 not, asked you did you respond by saying not
19 over my dead body, you answered --
20   A.    No.
21   Q.    But you did, let's introduce, this
22 has been previously introduced as 117.
23   A.    It says we don't think we're liable
24 but send us more information.
25       THE ARBITRATOR:  Do you have the

Page 2500

DONALD MILLER - REDIRECT
1
2  letter for that?
3       MR. ZUROFSKY:  That was for St.
4  Cosme. I won't go through all four, I promise.
5    Q.    Were you attempting in this letter
6  to give a claim by claim by claim analysis of
7  whether or not things --
8    A.    No.
9    Q.    Look at this paragraph in the first
10 instance.
11   A.    Yes. "The letter in table lacks
12 sufficient specificity to satisfy the notice
13 requirements under 11.6."
14   Q.    "In light of the foregoing
15 Fairchild is unable to determine, and in any
16 event disputes." Do you see that?
17   A.    Yes. Whether any of the items
18 listed in the table fall within the ambit of
19 11.6.
20   Q.    Does that indicate to you in fact
21 you did dispute these things would fall?
22   A.    Yes. Of course.
23   Q.    One other, 503 is January 31, 2005.
24       (Claimant's Exhibit 503 was
25 marked.)

97 (Pages 2497 to 2500)

DONALD MILLER - REDIRECT

1
2      A.    Yes.
3      Q.    Mr. Miller, do you see there this
4  is the letter from Ms. Hall?
5      A.    "Has failed to demsonstrate that
6  the guarding requirement of the the state of
7  foreign equivalents of Fastener Environmental
8  Liabilities as defined in the Acquisition
9  Agreement."
10     Q.    Is that consistent with your view
11 the OSHA regulations we are talking about for
12 machine guarding are not?
13     A.    Yes.  That is consistent.
14     Q.    That that been Fairchild's
15 consistent response every time we got a machine
16 guarding claim?
17     A.    That has always been our response
18 we are not responsible for machine guarding.
19     Q.    Mr. Chesler asked you why didn't
20 you write to Mr. Lease and say over my dead body
21 you are never going to get paid.
22     A.    Because that is not the right way
23 for a lawyer to respond.
24     Q.    Was this the beginning of the
25 relationship, right after the acquisition

DONALD MILLER - REDIRECT

1
2  between the parties when you first got these
3  letters, the first gap letters?
4      A.    No.
5      Q.    I am confusing you, not Ms. Hall's
6  letters.  I am talking about the letters we
7  talked about earlier.
8      A.    Yes.
9      Q.    At the beginning of a relationship
10 do you want to say over my dead body to the
11 person on the other side?
12     A.    No.  It is looking for trouble.  It
13 is not the correct way to treat your counsel on
14 the other side.
15     Q.    How did in fact Alcoa respond to
16 all these requests for additional information
17 did they say to you you got enough?
18     A.    Never gave us anything.
19     Q.    Did they tell you they were going
20 to give you information?
21     A.    Absolutely.  They said we are going
22 to give you the information then stalled it.
23 These binders which he points to, the horse was
24 already out of the barn by then.  They already
25 done all the remediations, already chosen the

DONALD MILLER - REDIRECT

1
2  methods, they already paid, they already done
3  everything.  Then they sent us the binders to
4  tell us how they did it and how much we owed
5  them.
6      Q.    Is that one of the reasons you
7  believe Fairchild has not -- is contesting a
8  number of the claims in this case?
9      A.    Yes.  They never talked to us.
10 Never gave us information, we asked for it over
11 and over again.
12     Q.    I have a couple more topics, Mr.
13 Miller.  Then I am done.  Switch back to
14 Ms. Holloway's notes on 6/11.  You remember the
15 questions Mr. Chesler asked you about the
16 reserve?
17     A.    Yes.
18     Q.    The reserve was related to
19 environmental items as you defined that term?
20     A.    Yes.
21     Q.    Look at tab 5.
22     A.    Right.
23     Q.    Four in, four pages in.
24     A.    Yes.  It says Barbara and Jeffrey
25 at the top.

DONALD MILLER - REDIRECT

1
2      Q.    Halfway down the page.
3      A.    This is the meeting I attended.
4      Q.    You believe there are two meetings
5  on 6/11?
6      A.    I think she must have had a
7  preliminary meeting with John Flynn and Gene
8  Juris.
9      Q.    So this is the reserve being
10 discussed?
11     A.    Yes.
12     Q.    You see there is a reference ENV
13 and lit reserve?
14     A.    Yes.
15     Q.    Is that what the reserve was
16 referred to?
17     A.    Yes.
18     Q.    There is a reference to EHS over
19 there as well.  Do you recall her mentioning the
20 term EHS?
21     A.    No.  Never did.
22     Q.    One other thing Mr. Chesler asked
23 you about was the price reduction.
24     A.    Yes.
25     Q.    Do you recall that?

Page 2505

DONALD MILLER - REDIRECT
2    A.    Yes.
3    Q.    He asked you whether or not there
4  was any price reduction related to environmental
5  indemnification issues.  Do you recall that?
6    A.    Yes.
7    Q.    Let's clean this up.  So Alcoa came
8  to you on June 10 and said they anticipate $20
9  million in environmental liabilities; correct?
10   A.    Correct.
11   Q.    Then they asked for another 75
12  million or so in price reduction?
13   A.    Yes.
14   Q.    They also, did they not, identify
15  other items they didn't necessarily put in the
16  price reduction but things they found in the due
17  diligence?
18   A.    Correct.
19   Q.    What was Fairchild's response to
20  the request -- 75 million was the number; right?
21   A.    Started at 75.  Went down to 66.
22   Q.    Did Fairchild really care, did it
23  care more about how much money was coming off
24  the top or what was the items that were going to
25  be accounting for that money?

Page 2506

DONALD MILLER - REDIRECT
2    A.    We were interested in how much they
3  were going to try to knick us for.  Knick is a
4  funny word when you are talking about so much
5  money.  That is what we were interested in.
6    Q.    They were asking for 75 million;
7  right?
8    A.    Initially 75.
9    Q.    Eventually you agreed to?
10   A.    33.
11   Q.    After Mr. Steiner made the comments
12  about not one chance in a million of 50 to 100?
13   A.    Correct.
14   Q.    Now, in addition to the 20 million
15  related to the PCE and TCE clean-up there was 20
16  to 40 million in compliance issues?
17   A.    Yes.  The deal was over right then
18  and there.
19   Q.    The deal was over right then and
20  there?
21   A.    Right.
22   Q.    The deal was over in fact when they
23  asked for 75 you walked out?
24   A.    Right.
25   Q.    That is what is in the Proxy

Page 2507

DONALD MILLER - REDIRECT
2  Statement about the history of the deal?
3    A.    Right.  It would have been much more
4  had the 20 to 40 been in.
5          THE ARBITRATOR:   When did you
6  compromise on the 33?
7          THE WITNESS:   After we walked out
8  of the meeting I took my investment banker
9  aside, I would guess Alcoa did the same with
10  theirs.  I said to him now is when you earn your
11  keep.
12          Over the next few weeks the
13  investment bankers talked, they were interested
14  in getting the deal done.  They had their own
15  reasons for that.  They talked.  They felt out
16  their clients where there might be some give and
17  take.  They ultimately resolved the issue
18  halfway, split it, 33.
19   Q.    The gross number that was being
20  asked for; right?
21   A.    Correct.
22          THE ARBITRATOR:  When was the
23  number agreed upon approximately?
24          THE WITNESS:   June 28.
25   Q.    Is that your recollection?

Page 2508

DONALD MILLER - REDIRECT
2          THE ARBITRATOR:  That is the
3  number that went into the document.
4          THE WITNESS:   If I look in the
5  proxy, I can tell you in one second.
6          THE ARBITRATOR:  That is the
7  number that went into the written contract when
8  it was finally signed in July?
9          THE WITNESS:  Yes.  Yes.
10   Q.    Another set of questions Mr.
11  Chesler asked you was purposes --
12   A.    June 28 is correct.
13   Q.    The purposes of the schedule, do
14  you recall that?
15   A.    Yes.
16   Q.    Purpose of Schedule 3.24?
17   A.    Yes.
18   Q.    You testified on direct-examination
19  a little bit about how it works when there is an
20  indemnity.
21   A.    Yes.
22   Q.    Is it a two step process; how does
23  it work?
24   A.    There has to be a claim, there has
25  to be sufficient information.  Has to be an

99 (Pages 2505 to 2508)

Page 2509

DONALD MILLER - REDIRECT

1    DONALD MILLER - REDIRECT
2  opportunity to cure.
3    Q.    I am actually asking, I apologize,
4  an inartful question. You mentioned before the
5  term there would be representation then there
6  would be indemnity?
7    A.    Yes. Let me give you an example.
8  If there is a representation that we are in
9  compliance with the law, you don't simply omit
10  and you know you're not, you don't simply omit
11  that answer that you're not in compliance in the
12  schedule. You would put it in one way or the
13  other. It was Mr. Chesler's point if you omit
14  it, right, then if you omit it, you're
15  responsible for it. But that isn't the way it
16  works. You add it into the schedule.
17          Then you add an asterisk on to it
18  or you cover it in the agreement and say
19  irrespective of the inclusion of this
20  representation of this exception on the
21  schedule, Fairchild is still responsible for
22  that compliance.
23          To completely leave it off the
24  schedule would be fraud.
25    Q.    Representations you would expect if

Page 2510

DONALD MILLER - REDIRECT

1    DONALD MILLER - REDIRECT
2  you were going to have indemnity of some sort
3  there be representations in an Acquisition
4  Agreement related to that topic?
5    A.    Absolutely.
6    Q.    There were representations in this
7  agreement related to environmental matters?
8    A.    Pages and pages.
9    Q.    Related to environmental matters,
10  too?
11    A.    Yes.
12    Q.    Section 3.24 we looked at. Any
13  mention of machine guarding there?
14    A.    There is no mention of machine
15  guarding.
16    Q.    Another point --
17    A.    It is a big number.
18    THE ARBITRATOR:  No question
19  pending. Proceed counsel, your last question,
20  would you.
21    MR. ZUROFSKY:  I have two
22  questions, if I can bargain for two.
23    Q.    Mr. Chesler -- this one is
24  a minor one, Mr. Chesler asked you about it
25  twice, about since September of 2006 Fairchild

Page 2511

DONALD MILLER - RECROSS

1    DONALD MILLER - RECROSS
2  had all this information. Do you recall that?
3    A.    Yes.
4    Q.    Fairchild filed briefs in this case
5  stating its position on those claims; right?
6    A.    Yes.
7    Q.    Let me close with this, Mr. Miller,
8  has there ever been any doubt in your mind as to
9  whether or not Fairchild agreed to cover items
10  like -- totally nonenvironmental items like
11  machine guarding?
12    A.    No.  No doubt at all. Those are
13  environmental sections.
14    MR. ZUROFSKY:  Thank you, Mr.
15  Miller.
16    RE-CROSS-EXAMINATION BY MR. CHESLER:
17    Q.    Thank you, your Honor. Mr. Miller,
18  the notes that Ms. Holloway produced, would you
19  look at those again, please.
20    A.    Yes.
21    Q.    Tab 5.
22    A.    Yes.
23    THE ARBITRATOR:  I take it those
24  are also her notes at tab 4. Same writing.
25    MR. CHESLER:  They are, your Honor

Page 2512

DONALD MILLER - RECROSS

1    DONALD MILLER - RECROSS
2  from a different day.
3    THE ARBITRATOR:  The prior day.
4  Right.
5    MR. CHESLER:  I am interested in
6  June 11.
7    THE ARBITRATOR:  All right.
8    Q.    The notes relating to the price
9  adjustments that I referred you to during
10  cross-examination appear on page 593; correct?
11    A.    Yes.
12    Q.    On the immediately preceding page,
13  592 whose names did Ms. Holloway write at the
14  top of the page?
15    A.    Barbara comments and Jeffrey's
16  comments.
17    Q.    Jeffrey refers to Mr. Steiner.
18    A.    Yes.
19    Q.    Barbara refers to?
20    A.    Barbara Jeremiah.
21    Q.    She was from Alcoa; correct?
22    A.    Correct.
23    Q.    On the immediately preceding page
24  there is no reference to Mr. Flynn or Mr. Juris;
25  is there?

Page 2513

```
 1        DONALD MILLER - RECROSS
 2     A.    Correct.
 3     Q.    On the immediate following page,
 4  594 she again wrote Barbara and Jeffrey; didn't
 5  she?
 6     A.    Those are their positions.
 7     Q.    Did she write the names Barbara and
 8  Jeffrey?
 9     A.    Yes.
10     Q.    So they appear on the page right
11  before this one and on the page right after this
12  one; correct?
13     A.    Yes.
14     Q.    I ask you again, sir, if
15  Ms. Holloway has testified under oath that the
16  purchase price adjustment discussed on June 11
17  did not relate to the environmental
18  indemnification issues, are you testifying that
19  she lied?
20     A.    I believe she was mistaken.
21     Q.    You believe you were not at the
22  meeting to which her notes refer; isn't that
23  correct?
24     A.    I was at the meeting which she
25  refers to the Barbara and Jeffrey.
```

Page 2514

```
 1        DONALD MILLER - RECROSS
 2     Q.    But you believe you were not at the
 3  meeting, the content of which is reflected on
 4  page 593; isn't that your testimony?
 5     A.    Let's put it this way, I certainly
 6  didn't hear all of that. She says John Flynn
 7  and Gene Juris were present.
 8     Q.    She says that on page 591; correct?
 9     A.    Correct.
10     Q.    You didn't hear all of that
11  referring to the contents on 593; correct?
12     A.    Correct.
13     Q.    Thank you. About the drafts these
14  two drafts which your counsel showed you one
15  dated July 2, the other dated July 3. Do you
16  have those?
17     A.    Yes.
18     Q.    Both of them have the words
19  "workplace health or safety" preceded by a
20  letter; correct?
21     A.    Yes. B.
22     Q.    And in fact in the draft marked
23  500, do you have that one?
24     A.    Which one is that?
25     Q.    500 is the July 2 draft.
```

Page 2515

```
 1        DONALD MILLER - RECROSS
 2     A.    Is that the one given to me by Mr.
 3  Zurofsky?
 4     Q.    Yes. The one that has the Skadden
 5  initials at the top of the first page.
 6     A.    Yes.
 7     Q.    In that one if you look at the one
 8  that has the draft of 2.4G ii in it, that one
 9  has one section B with the words workplace
10  health or safety and then a separate proposed
11  section letter D that says the health, safety or
12  environmental aspects and goes on; correct?
13     A.    Yes.
14     Q.    Thank you. With respect to this
15  money that, I should say with respect to the
16  litigation obligation you assumed which is
17  discussed in Exhibit 434, do you have that one,
18  sir, you were just shown that by Mr. Zurofsky?
19     A.    What is it you are looking for?
20     Q.    I am referring to Exhibit 434,
21  Claimant's 34 sticker at the bottom. It is a
22  letter from Susan Hall to John Lease dated June
23  9, 2005.
24     A.    Yes. I have it.
25     Q.    That is the one that says on the
```

Page 2516

```
 1        DONALD MILLER - RECROSS
 2  second page "Notwithstanding the foregoing
 3  Fairchild is conditionally prepared." Do you
 4  have that?
 5     A.    Yes.
 6     Q.    As you sit here today, sir, you
 7  don't know if that is an obligation covered by
 8  the indemnity of 11.6A; do you?
 9     A.    I think it is one that falls into
10  the exception at the bottom, but I'm not sure.
11     Q.    You're not sure; correct?
12     A.    Correct.
13     Q.    Look at 11.2 A Roman little vii
14  please. It appears on page 78 which corresponds
15  to Bates number 2804?
16     A.    11.2.
17     Q.    A little vii.
18     A.    I got it. "Any third-party claim
19  arising --"
20     Q.    I didn't ask you to read it into
21  the record.
22     A.    Is that the one?
23     Q.    That is the one.
24     A.    Thank you.
25     Q.    This is in the indemnification
```

101 (Pages 2513 to 2516)

DONALD MILLER - RECROSS

1  DONALD MILLER - RECROSS
2 section I showed you earlier, do you recall we
3 talked about this general section earlier 11.2?
4     A.    Yes.
5     Q.    You see 11.2 A vii refers to
6 indemnification for any third-party claim
7 arising from or related to any current or former
8 business, etc., it goes on, including
9 discontinued operations, etc. etc. Preclosing
10 off-site disposal litigations, etc.?
11     A.    Yes.
12     Q.    Next question I want you to look at
13 503, please, sir. You just looked at that a few
14 moments ago your counsel marked it. A letter
15 from Susan Hall to John Lease dated July 31,
16 2005?
17     A.    A letter from Susan January 31,
18 2005?
19     Q.    Yes, sir.
20     A.    I have it.
21     Q.    That is the letter that begins in
22 the second paragraph "First Alcoa has failed to
23 demonstrate that the guarding requirements of
24 OSHA 1910.212" etc., "Is a Fastener
25 Environmental Liability." Right?

1  DONALD MILLER - REDIRECT
1 does not meet regulatory requirements."
2     A.    Uh-huh.
3     Q.    What is the very first section of
4 OSHA that was cited way back in June of 2003?
5     A.    1910.212.
6     Q.    The same one which 18 months later
7 you informed my client meant that this was not a
8 Fastener Environmental Liabilities; right?
9     A.    Correct.
10     MR. CHESLER: I have no further
11 questions, your Honor.
12     MR. ZUROFSKY: One question.
13     THE ARBITRATOR: It is time to go
14 home.
15 RE-DIRECT EXAMINATION BY MR. ZUROFSKY:
16     Q.    That last point, prior to
17 Ms. Hall's response 18 months later, had you
18 sent a letter on Fullerton saying you disputed
19 the claim?
20     A.    Yes.
21     MR. ZUROFSKY: That's it.
22
23  (Time Noted 5:52 p.m.)
24
25

1  DONALD MILLER - RECROSS
2     A.    Correct.
3     Q.    Now, I want you to look back, I
4 showed you a letter that is dated a year and a
5 half earlier. It is the January 13, 2003 letter
6 from Mr. Lease to Mr. Hodge relating to
7 Fullerton. Find that for me, please.
8     For the record, your Honor, it is
9 the letter that has Bates number 325 in the
10 upper right-hand corner bulk Exhibit C volume 1.
11     A.    I have it.
12     Q.    Do you have it?
13     A.    I do.
14     Q.    Now if you look at the page
15 numbered 38 which is in the middle of that chart
16 Mr. Lease provided. Do you have page 38?
17     A.    38 is the letter.
18     Q.    38 in the top right-hand corner,
19 sir, bunch of zeros ending 38.
20     A.    I have it.
21     Q.    You see that is part of the chart
22 attached to Mr. Lease's letter from June 13,
23 2003. Do you have it, sir?
24     A.    Yes.
25     Q.    The first item is "machine guarding

1  DONALD MILLER - REDIRECT
2  C E R T I F I C A T E.
3
4 STATE OF NEW YORK  )
5     : ss.
6 COUNTY OF NEW YORK  )
7
8     I, TAMMEY M. PASTOR, a Registered
9 Professional Reporter, Certified LiveNote
10 Reporter and Notary Public within and for the
11 State of New York, do hereby certify that the
12 foregoing proceedings were taken before me on
13 February 27, 2007;
14     That the within transcript is a true
15 record of said proceedings;
16     That I am not connected by blood or
17 marriage with any of the parties herein nor
18 interested directly or indirectly in the matter
19 in controversy, nor am I in the employ of the
20 counsel.
21     IN WITNESS WHEREOF, I have hereunto
22 set my hand this ____ day of _____,
23 2007.
24     _____
25 TAMMEY M. PASTOR, RPR, CLR