UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------- X
THE FAIRCHILD CORPORATION,          :
                                    :     07 Civ. 6185
             Plaintiff,             :
                                    :     **DECISION AND ORDER**
     - against -                    :
                                    :
ALCOA, INC.,                        :
                                    :
             Defendant.             :
---------------------------- X

**VICTOR MARRERO, United States District Judge.**

Petitioner The Fairchild Corporation ("Fairchild") brought this action seeking to vacate, or to reduce by certain tax offsets, an award granted to respondent Alcoa Inc. ("Alcoa") in an arbitration proceeding. Alcoa cross-moves to confirm the award in its entirety. For the reasons discussed below, Fairchild's petition is DENIED and Alcoa's cross-petition is GRANTED.

## I.  BACKGROUND

The parties' dispute arose from an acquisition agreement (the "Agreement") entered into in December 2002 under which Fairchild sold its aerospace fastener business to Alcoa for a purchase price in an amount of approximately $657 million. The Agreement provided that Fairchild would indemnify Alcoa for certain environmental liabilities which, as defined, entailed expenses exceeding an account reserve of $8.45 million for this purpose and were associated with remediation

work required to cure non-compliance with environmental and health and safety laws.  To fund such indemnification payments, the parties agreed to maintain an escrow account of $25 million drawn from the purchase price.  The Agreement included an arbitration clause providing a procedure governed by the Federal Arbitration Act to resolve disputes regarding the validity or amount of any claim for indemnification.

Pursuant to the Agreement, Alcoa submitted to Fairchild, over the period from the closing date in December 2002 through December 2006, more than 200 claims seeking indemnification in a total amount of $16,385,493.92 for costs Alcoa asserted it incurred in connection with qualifying corrective work performed at various facilities it acquired from Fairchild. Fairchild rejected all of Alcoa's claims, contending that: (1) Alcoa had failed to provide adequate documentation that it had actually incurred the expenditures; (2) the claims were not covered by the Agreement or not explicitly ordered by regulatory authorities; (3) Fairchild had not been given adequate notice of the corrective work; and (4) Fairchild was entitled to offsets for certain tax benefits Alcoa would receive in respect of operating losses Fairchild had incurred in connection with portions of the claims in question.

Failing mediation of their disagreements over Alcoa's claims, in July 2005 the parties proceeded to binding

arbitration under the Agreement. Eventually, from a list provided by the International Institute for Conflict Prevention and Resolution, they agreed upon an arbitrator James F. Stapleton (the "Arbitrator"), a former judge of the Connecticut Superior Court.

Alcoa asserts that although it raised objections, as unduly burdensome, to a request by Fairchild that each and every receipt and invoice associated with Alcoa's claims for indemnification be identified individually, Alcoa produced at the hearing, through a live witness who testified about the material, a summary chart itemizing its claims under several categories and the amounts of corresponding expenditures. Alcoa also points to specific documentation that it had already submitted to Fairchild supporting its actual costs. At the close of discovery in December 2006, Alcoa moved for partial summary judgment, which the Arbitrator denied, having found some ambiguities in the relevant provisions of the Agreement as well as other issues of material fact in dispute. The Arbitrator then conducted a hearing over several days during January, February and March 2007, followed by post-hearing briefings.

In the course of these post-hearing proceedings, Fairchild argued that Alcoa had not sufficiently proved the actual costs of $16.3 million for which it sought

indemnification.  In response, Alcoa pointed to evidence on the record that it contends amply supported its claim.  But it then offered to provide to the Arbitrator a copy of the 14 volumes of invoices and receipts documenting its expenditures, materials Alcoa states it had supplied to Fairchild during the course of discovery.  Fairchild objected to Alcoa's offer and the Arbitrator declined to accept the additional material at that point.

The Arbitrator rendered his ruling in an Arbitration Decision and Award (the "Award") issued on June 21, 2007.  The Award rejected Fairchild's position in all material respects. Specifically, the Arbitrator concluded that, with some exceptions, Alcoa's claims for indemnification, including those involving corrective work not required by regulators, was sufficiently supported by the language of the Agreement and related evidence as necessary and reasonable and performed at reasonable cost, and that Fairchild's allegations of Alcoa's violations of the notice provision of the Agreement were unwarranted.  Of the total of $16,385,463.92 that Alcoa had claimed, the Award granted Alcoa damages amounting to $12,455,585.88.   That  sum  reflected  deductions  of $3,303,643.48 for work the Arbitrator found was not indemnifiable because it was either not necessary or commercially reasonable, or not performed at a reasonable

4

cost.  The Award also included credits of $264,106.92 in respect of certain tax benefits Alcoa had received, and an additional $926,565.13 it potentially would receive in this regard.

In full settlement of all claims and counter-claims submitted in the arbitration, and denying all those not expressly granted, the Arbitrator ordered that Alcoa be paid, within 30 days of the Award, the $8.45 million in the reserve account and the balance of $4,005,585.88 from the escrow account.

Claiming that it was due additional tax benefit credits under another provision of the Agreement, Fairchild blocked the release of funds by the escrow agent and wrote to Alcoa proposing further mediation and arbitration proceedings pertaining to this issue.  Fairchild subsequently filed the instant petition to vacate the Award.

## II.  DISCUSSION

### A.  LEGAL FRAMEWORK AND STANDARD OF REVIEW

When Congress adopted the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 et seq., in 1924, it responded to concerns over the complexity, duration, delays and costs of litigation in federal courts, with the attendant adverse effects that unduly prolonged judicial proceedings engendered for litigants, the courts, and society in general.  See H.R.

Rep. No. 68-96, at 2 (1924). In addressing these concerns, the FAA recognized the value of arbitration properly conducted as a means by which parties could "settle their disputes expeditiously and economically." See Hearing on S. 4213 and S. 4214 Before a Subcomm. of the S. Comm. on the Judiciary, 67th Cong. 2 (1923). The statute contemplated an alternative to litigation that would be simpler, faster and less costly for all concerned. As envisioned, this system of dispute resolution would be liberated from many of the onerous demands and constraints associated with legal proceedings in court. See id.; see also S. Rep. No. 68-536, at 3 (1924) (noting that avoiding delays in litigation and "[t]he settlement of disputes by arbitration appeals to big business and little business alike, to corporate interests as well as to individuals."); Scherk v. Alberto-Culver Co., 417 U.S. 506, 511 (1974) (acknowledging that the FAA "reflects a legislative recognition of the 'desirability of arbitration as an alternative to the complications of litigation.'") (quoting Wilko v. Swan, 346 U.S. 427, 431 (1953)).

This recognition of the immense public and private benefits of arbitration is reflected in judicial doctrine. Since the inception of the FAA an extensive body of law has developed reaffirming the strong federal policy that favors honoring arbitration agreements and ensuring that the presumed

6

efficiency values of expeditiousness, economy and simplicity in reaching the merits and resolving disputes are safeguarded in arbitration proceedings. See <u>Folkways Music Publishers, Inc. v. Weiss</u>, 989 F.2d 108, 111 (2d Cir. 1993) ("Arbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation."). To these ends, federal courts underscore that arbitration is not intended to incorporate all the procedural rules and niceties that govern legal combat in judicial proceedings. See <u>Tempo Shain Corp. v. Bertek, Inc.</u>, 120 F.3d 16, 20 (2d Cir. 1997) (noting that arbitration "'need not follow all the niceties observed by the federal courts'") (<u>quoting</u> <u>Bell Aerospace Co. Div. of Textron v. Local 516</u>, 500 F.2d 921, 923 (2d Cir. 1974)).

The same judicial attitude imbues the substantial latitude and extensive deference accorded on judicial review to determinations of arbitrators. See <u>Pike v. Freeman</u>, 266 F.3d 78, 86 (2d Cir. 2001) ("Federal court review of an arbitral award is highly deferential...."); <u>Tempo Shain</u>, 120 F.3d at 19 (Arbitrators' awards "are generally accorded great deference under the FAA," and judicial review of arbitration rulings is "narrowly limited."); <u>see</u> <u>also</u> <u>United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.</u>, 484 U.S. 29, 38 (1987)

("[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.").

Consistent with this generally broad application of the FAA, courts have elaborated a body of specific rules designed to capture the essence of the statute's policy and have rigorously applied them to give effect to Congress's underlying purpose. This doctrine reinforces that arbitration proceedings require merely an "'expeditious and summary hearing, with only restricted inquiry into factual issues.'" Legion Ins. Co. v. Insurance Gen. Agency, Inc., 822 F.2d 541, 543 (5th Cir. 1987)(quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 22 (1983)). At bottom, the case law seeks to protect the basic simpler structure of arbitral procedures and the integrity of resulting awards so as to withstand challenge except on the limited grounds the law recognizes. Accordingly, a party seeking to vacate an arbitral award "bears the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law." Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 388 (2d Cir. 2003). A court must grant an order to confirm an arbitral award upon a timely application, absent any of the

specified improprieties.  See 9 U.S.C. § 10.

The statutory grounds establish a high threshold for vacating an arbitration award.  The standard is confined to instances where there is clear evidence of: (1) corruption, fraud, or undue influence in procuring the award; (2) partiality or corruption on the part of the arbitrators; (3) other misconduct by the arbitrators that prejudices the right of any party; or (4) the arbitrators exceeding or imperfectly executing their powers.  See id. § 10(a).  In this Circuit, an award may also be overturned for manifest disregard of the law.  See Wallace v. Buttar, 378 F.3d 182, 189 (2d Cir. 2004). But the Circuit Court has cautioned that this doctrine is "severely limited" and "gives extreme deference to arbitrators."  Id.  (internal quotation marks and citations omitted); see also Folkways Music, 989 F.2d at 111 ("In order to advance the goals of arbitration, courts may vacate awards only for an overt disregard of the law and not merely for an erroneous interpretation.").

Further manifesting the strict doctrinal rules formulated to advance the aims of the FAA, arbitrators are afforded broad discretion to determine whether to hear or not hear evidence, or whether additional evidence is necessary or would simply prolong the proceedings.  See Areca, Inc. v. Oppenheimer & Co., Inc., 960 F. Supp. 52, 55 (S.D.N.Y. 1997) ("[A]rbitrators

9

need not hear cumulative or irrelevant evidence."); <u>Trade & Transp., Inc. v. Natural Petroleum Charterers, Inc.</u>, 738 F. Supp. 789, 792 (S.D.N.Y. 1990), <u>aff'd</u>, 931 F.2d 191 (2d Cir. 1991).    Consistent with the deference due to arbitral decisions, a court reviewing an arbitrator's determination may look at the evidentiary record "<u>only</u> for the purpose of discerning whether a colorable basis exists for the panel's award so as to assure that the award cannot be said to be the result of the panel's manifest disregard of the law." <u>Wallace</u>, 378 F.3d at 193 (emphasis in original).    Therefore, a court may not conduct a reassessment of the evidence or vacate an arbitral award because the arbitrator's decision may run contrary to strong evidence favoring the party seeking to overturn the award.    <u>See id.</u>    Nor do internal conflicts embodied in the arbitrator's decision warrant denying confirmation of an award.    <u>See id.</u> at 190 (<u>quoting</u> <u>Saint Mary Home, Inc. v. Service Employees Int'l Union, Dist. 1199</u>, 116 F.3d 41, 44-45 (2d Cir. 1997)) (noting that "[i]nternal inconsistencies in the [arbitrator's] opinion are not grounds to vacate the award notwithstanding the [movant's] plausible argument that the arbitrator's decision was misguided or our own concerns regarding the arbitrator's conclusion").

By the same token, manifest disregard of evidence is also not a proper ground justifying vacating an arbitrator's award.

See id. at 193 ("'the Second Circuit does not recognize manifest disregard of the evidence as proper ground for vacating an arbitrator's award.'") (citation omitted); Tucker v. American Bldg. Maint., 451 F. Supp. 2d 591, 597 (S.D.N.Y. 2006).  On this point, Second Circuit doctrine counsels that "whatever the weight of the evidence considered as a whole, '[i]f ground for the arbitrator's decision can be inferred from the facts of the case, the award should be confirmed.'" Wallace, 378 F.3d at 193 (quoting Fahnestock & Co., Inc. v. Waltman, 935 F.2d 512, 516 (2d Cir. 1991)).  In short, only the most egregious errors or instances of extreme misconduct cited in the statute that would materially prejudice the rights of a party warrant vacating an arbitral award.  See Pompano-Windy City Partners Inc. v. Bear Stearns & Co., 794 F. Supp. 1265, 1277 (S.D.N.Y. 1992).

The same fundamental policy ends are reflected in the absence from the FAA of any requirement that arbitrators be attorneys, or that they provide an explanation for their decision.  See Wallace, 378 F.3d at 190 (acknowledging that "'arbitrators often are chosen for reasons other than their knowledge of applicable law.'") (quoting Duferco, 333 F.3d at 390).

The message implicit in this body of law is uniform and clear.  Arbitration procedures may not embrace all of the

11

meticulous details of due process that govern litigation in court, but they offer greater dispatch.  Arbitral decisions at times may not be scrupulously grounded on fact or law with the same exactitude demanded of judicial rulings, but they should be easier and less costly to procure.  Some arbitration proceedings may admit what may be deemed, by litigation standards, procedural imperfections, but they hold the promise of greater simplicity.  In sum, what the adversaries in arbitration forfeit in rigorous legal safeguards is presumably offset by a larger measure of efficiency.  Overall, therefore, the process embodies a trade-off, a price in degree of certainty that is paid in exchange for less expense and sooner peace of mind to the parties in settling disputes.  In consequence, a central premise of arbitration assumes that when parties commit consensually to resolve disagreements by arbitration, in the interest of achieving their expectations of gains in quicker and more economical resolution, they are entitled to get what they bargained for, and be prepared to accept both the benefits and the risks the system incorporates.  See Saint Mary Home, 116 F.3d at 44 ("When parties to an agreement bargain for an arbitrator's decision, that bargain may not be upset by a court simply because it deems the decision incorrect") (citing Leed Architectural Prods., Inc. v. United Steelworks of Am., Local 6674, 916 F.2d

63, 65 (2d Cir. 1990)).  And it is precisely in giving effect to legitimate expectations of the parties to an arbitral agreement where the overriding goal of the FAA is found.  See Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 219 (1985) (stating that "the purpose behind [the] passage [of the FAA] was to ensure judicial enforcement of privately made agreements to arbitrate.")

B.   ARBITRATOR MISCONDUCT

Fairchild's principal contention in support of its petition to vacate the Award is that the Arbitrator committed serious error by refusing to consider relevant evidence or ignoring evidentiary material with respect to critical matters at issue.  Fairchild rests its argument on the language of FAA § 10(a)(3), which authorizes courts to vacate an award "where the arbitrators were guilty of misconduct ... in refusing to hear evidence pertinent and material to the controversy."  9 U.S.C. § 10(a)(3).  The Court is not persuaded that the Arbitrator's action challenged here constitutes misconduct within the scope of FAA § 10(a)(3).  That provision applies to cases where an arbitrator, to the prejudice of one of the parties, rejects consideration of relevant evidence essential to the adjudication of a fundamental issue in dispute, and the party would otherwise be deprived of sufficient opportunity to present proof of a claim or defense.  The misconduct in that

event amounts to a denial of fundamental fairness in the proceeding, and renders the resulting arbitral decision biased, irrational or arbitrary.  See Home Indem. Co. v. Affiliated Food Distrib. Inc., No. 96 Civ. 9707, 1997 WL 773712, at *4 (S.D.N.Y. Dec. 12, 1997); Areca, 960 F. Supp. at 54.

Here, it is inaccurate to characterize the Arbitrator's action as "refusing" to hear pertinent and material evidence necessary to resolve the issue he decided, and without which Alcoa could not have proved its claims to the Arbitrator's satisfaction. In fact, the Arbitrator, as Fairchild acknowledges, admitted documents containing summaries itemizing the volumes of invoices and receipts that Fairchild contends should have been part of the record during the hearing. In addition, the Arbitrator heard testimony on this subject from John Lease ("Lease"), the Alcoa employee designated as Alcoa's representative for communications with Fairchild pertaining to health and safety projects under the Agreement. In that capacity Lease was responsible for forwarding to Fairchild documentation of project investigations, studies, scope and cost of corrective work, and invoices for payment. He thus demonstrated an adequate foundation of personal knowledge and involvement in the transactions that enabled him to provide relevant evidence.

Lease's appearance as a witness, as Alcoa points out, occupied about 10 hours over two days, including cross-examination. Thus, Fairchild had ample opportunity to contest the adequacy and accuracy of the evidence Alcoa proffered in support of the particular projects and expenditures it claimed, the back-up for which Fairchild had been provided in the course of discovery. Fairchild thus had the information in its possession and could have used it on cross-examination during Lease's presentation.

Lease's testimony referenced an exhibit containing a summary of voluminous documents which he indicated Alcoa had sent to Fairchild and which represented the actual expenditures Alcoa had incurred for studies, investigations and corrective actions underlying its claims for indemnification. (See Transcript of Arbitration Hearing on Jan. 10, 2007 ("Tr."), attached as Ex. J of Declaration of Daniel Slifkin in Support of Alcoa Inc.'s Cross-Petition to Confirm and in Opposition to The Fairchild Corporation's Petition to Vacate Arbitration Award, dated July 17, 2007 ("Slifkin Decl."), at 907-20.) Moreover, insofar as the Arbitrator declined to accept the 14 volumes of additional materials when proffered by Alcoa during post-hearing briefings, his refusal may have been influenced in part by Fairchild's own objection to the introduction of evidence at

that point.

The Arbitrator had opportunity to assess the credibility of the witnesses and the reliability of the evidence, taking into account the record as a whole, including Lease's familiarity with the material, Fairchild's possession of the documents and its ability to cross-examine Alcoa's witnesses. On this basis the Arbitrator was permitted to weigh and credit the evidence in the light of the record as a whole in determining the Award. See Wallace, 378 F.3d at 193 ("[W]hatever the weight of the evidence considered as a whole, '[i]f a ground for the arbitrator's decision can be inferred from the facts of the case, the award should be confirmed.'") (quoting Fahnestock, 935 F.2d at 516). The Award makes clear that the Arbitrator, following a similar approach, considered and accepted or rejected other evidence of costs based on materials in the record, specifying precise amounts derived not from the summaries, but apparently from other testimony and reports of experts. (See, Award at 6-19; Findings of Fact and Conclusions of Law at 7-20). Indeed, relying on the same sources of evidence, the Arbitrator not only approved the amounts of the claims to which Fairchild here objects, but actually reduced the total award Alcoa had requested by a very precise number of $3,303,683.48 in claims he disallowed. (See Award at 21.) From these circumstances it can be properly

16

inferred that the Arbitrator found sufficient evidentiary grounds for his decision in the testimony of Lease and other witnesses, and the documents upon which their presentations relied.  As to the claims he approved, the Arbitrator made a specific finding that "Alcoa has sustained its burden of proof that the expenditures were in fact made in the amounts claimed." (Id.)   For arbitration purposes, this record suffices to justify confirmation of the award.  See Wallace, 378 F.3d at 193.

Fairchild's FAA § 10(a)(3) argument here is thus not that, as petitioner, it was precluded by the Arbitrator from presenting evidence critical to supporting its case.  Rather, Fairchild takes issue with the Award because the Arbitrator refused to accept a post-hearing submission proffered by Alcoa to which Fairchild itself then objected.  Fairchild's argument therefore poses a logical dilemma insofar as it rests on FAA § 10(a)(3).  On the one hand Fairchild charges misconduct on the part of the Arbitrator for "refusing" to accept evidence Alcoa proffered that Fairchild contends was relevant and material to prove the expenditures Alcoa claimed, and without which Fairchild would be substantially prejudiced.  On the other, Fairchild defends its objection to Alcoa's presentation of the evidence during the post-hearing proceeding as "entirely proper" because the material was then being offered

17

directly to the Arbitrator after the hearing. (Petitioner's Memorandum of Law in Further Support of Its Petition to Vacate Arbitration Award and in Opposition to Alcoa's Cross-Petition to Confirm ("Pet. Reply"), dated July 24, 2007, at 5.) In other words, Fairchild's position faults the Arbitrator for refusing to hear evidence while at the same time implicitly conceding that it was proper for Arbitrator to reject consideration of Alcoa's submission at that point because the hearing had closed.

Fairchild's response to this apparent contradiction is that the Arbitrator should have denied Alcoa's claims for lack of proof, or else force Alcoa to submit the evidence properly by reopening the proceeding, presumably despite Fairchild's recorded objection. But the Arbitrator had another course he properly chose to pursue. Because the Arbitrator had been presented evidence concerning the issue of Alcoa's actual expenditures in the form of the other documents and live testimony, the record was not entirely devoid of proof sufficient for arbitration purposes to support acceptance of Alcoa's claims. The Arbitrator could have fairly relied upon such other evidence as a whole to justify a confirmable decision. <u>See Wallace</u>, 378 F.3d at 193. As such, at that point in the proceeding the Arbitrator could properly have declined to consider the additional material and rejected it

as cumulative.   See Areca, 960 F. Supp. at 55.  In essence,
Fairchild's argument on this point actually narrows to a
challenge to the sufficiency of the evidence that the
Arbitrator did weigh and chose to credit in reaching his
decision.   The case law makes clear, however, that an
arbitrator has discretion to admit or reject evidence and
determine what materials may be cumulative or irrelevant.  See
id.; Trade & Transport, 738 F. Supp. at 792.  Moreover, an
arbitration award cannot be overturned solely on the ground of
manifest disregard of evidence.  See Wallace, 378 F.3d at 193;
Fahnestock, 935 F.2d at 516; Tucker, 451 F. Supp. 2d at 597.

     The Court is also not persuaded that the other actions of
the Arbitrator that Fairchild challenges as serious errors are
sufficiently egregious to warrant invalidating the Award.
Fairchild points to three examples of such alleged serious
errors.   First, it asserts that the Arbitrator entirely
ignored evidence Fairchild introduced to address a dispute
concerning certain claims Alcoa submitted that related to
guarding potentially dangerous machines, and that Alcoa
regarded as pertaining to "workplace health or safety" as
defined in the Agreement.  Fairchild points to a statement in
the Award in which the Arbitrator notes that Fairchild did not
present any contemporaneous evidence supporting its position
that it considered those expenditures as excluded from

19

indemnity.    But,    as    Alcoa    responds,    the    Arbitrator specifically addresses evidence that Fairchild submitted in the form of two schedules pertaining to this claim, and that the Arbitrator apparently chose not credit that evidence as convincing on the issue.  (<u>See</u> Award at 4.)  To the extent any statements in the Arbitrator's decision may be at odds on this point,  such  internal  inconsistency,  as  discussed  below  in connection with Fairchild's next argument, does not suffice to overturn an award.  <u>See</u> <u>Saint Mary Home</u>, 116 F.3d at 44-45.

Second,  Fairchild  attacks  the  Award  as  inconsistent insofar as the Arbitrator denied some of Alcoa's claims on the ground that the expenditures were made to comply with Alcoa's own  internal  standards  without  demonstrating  whether  any portion  of  the  project  was  required  apart  from  those standards,  and  that  he  nonetheless  upheld  other  items Fairchild had challenged on similar grounds.  On this question Alcoa  notes  that  during  the  hearing  it  presented  evidence indicating that its standards coincided with those required by law,  and  that  the  Arbitrator,  having  reviewed  each  claim, accepted  some  and  rejected  others.    Thus,  while  Fairchild portrays  the  ruling  as  embodying  inconsistencies,  at  bottom Fairchild's challenge basically reflects not an invalidating flaw  in  the  Award,  but  yet  another  instance  of  Fairchild's quarrel  with  the  Arbitrator's  factual  findings,  which  not  a

sufficient justification to reverse an arbitral decision. <u>See</u>
<u>Wallace</u>, 378 F.3d at 192-93; <u>Saint Mary Home</u>, 116 F.3d at 44
("When an 'arbitrator[] explain[s his] conclusions ... in
terms that offer even a barely colorable justification for the
outcome reached, confirmation of the award cannot be prevented
by litigants who merely argue, however persuasively, for a
different result.'") (<u>quoting</u> <u>Andros Compania Maritima, S.A.</u>
<u>v. Marc Rich & Co., A.G.</u>, 579 F.2d 691, 704 (2d Cir. 1978)
(alterations in original)).  Moreover, even if on this point
the Arbitrator's ruling were deemed inconsistent, by itself
that deficiency would not suffice as grounds for vacating the
Award.  <u>See</u> <u>Saint Mary Home</u>, 116 F.3d at 44-45.

Finally, Fairchild contends that the Arbitrator
disregarded admissions Alcoa allegedly made that it breached
Fairchild's rights under the Agreement by not providing
Fairchild with adequate prior notice of indemnification
claims, and yet the Award fully credited Alcoa with respect to
claims for which Alcoa had not provided such notice.  On this
point as well, Fairchild's contention is contradicted by
specific language in the Award.  The Arbitrator considered
this matter and concluded that the items in question
represented projects that Fairchild itself had initiated or
that were identical to others for which Fairchild was given
written notice, and that to the extent Fairchild did not

21

receive adequate notice it had suffered no resulting harm or damage.  (See Award at 16-17) (noting that "Fairchild has failed to produce evidence that, except as otherwise noted in this Award, any technical violation of its participation rights has resulted in adverse consequences or caused it any specific damage .... To the extent that there are technical violations of Fairchild's right to notice and participation under the environmental indemnity provisions of the Agreement, Fairchild suffered no harm or damages as a result.")  Because the Arbitrator considered the issue and offered a colorable justification for his ruling, there is no basis to support a finding of sufficiently serious error to justify vacating the award on this ground.  See Wallace, 378 F.3d at 193; Saint Mary Home, 116 F.3d at 44.

C.    RES JUDICATA

Fairchild further argues that Alcoa is not entitled to any disbursement until the Award is reduced, in accordance with § 11.3(e)[1] of the Agreement, by the amount of any tax savings Alcoa has realized in respect of the projects for which it sought indemnification in the arbitration proceeding. According to Fairchild, the offsets it has a right to claim under this provision represents a distinct dispute subject to

---

[1]  Section 11.3(e) provides in pertinent part that: "... the amount of any Indemnifiable Loss for which indemnification is provided under this Article XI shall be net of ... (ii) any Tax Benefit actually realized as a result of such Indemnifiable Loss."  Agreement § 11.3(e).

22

the arbitration provisions of the Agreement that could not have been raised until the Award determined which claims were indemnifiable, and that accordingly the question was not before the Arbitrator for resolution, nor was it the subject of discovery, hearing testimony or briefing.  Fairchild thus contends that § 11.3(e) must be read to provide that the tax savings adjustment does not apply until after a decision has been rendered determining that Alcoa is entitled to indemnification and identifying the specific projects and actual expenses Alcoa incurred in that regard.   Though Fairchild acknowledges that the Award did recognize certain reductions for other tax credits due Fairchild, it argues that those adjustments derived from § 11.8,[2] a different provision of the Agreement Fairchild contends is not dependent on the identity and nature of the expense claimed.

Alcoa responds that the claims and issues the parties fully arbitrated encompassed the entire scope of their

---

[2]  Section 11.8 provides in pertinent part that:

> The Sellers' indemnification obligations under Section 8.5 and this Article XI shall be credited by the net cumulative amount of (1) any Tax Benefits recognized by the Buyer ... resulting from the actual utilization in any Tax period beginning after the Closing Date by the Buyer ... of any French or German net operating loss of a Transferred Fastener Subsidiary organized in France or Germany...that the Buyer... carry forward from a Tax period ending on or before the Closing Date and that may no longer be subject to possible disallowance by any French or German Taxing Authority minus (ii) any such Tax Benefit amounts that have previously been used to reduce any of the Sellers' indemnification obligations.

Id. § 11.8

dispute, including both whether Alcoa was entitled under §
11.6 to payment for the projects it claimed qualified as
Indemnifiable Losses, and the amounts of the actual costs
Alcoa paid for work the Arbitrator recognized as performed
validly under the Agreement. Alcoa argues that the
Arbitrator's determination is unequivocal in that it places no
condition on the disbursement of the amount awarded, that the
Arbitrator did hear evidence concerning credits Fairchild was
entitled to receive against the Award deriving from certain
other Tax Benefits Alcoa realized, and in fact reduced the
Award to reflect such adjustments. In consequence, Alcoa
maintains that to the extent Fairchild had a full and fair
opportunity during the course of the arbitration to raise any
other issue regarding additional tax credits applicable but
failed to do so, Fairchild is now barred by the doctrine of
res judicata from reopening the proceeding to resolve any such
question.

The Court is not persuaded by Fairchild's position on
this point. The parties' underlying dispute raised a discrete
global issue subject to resolution as a legal, procedural and
evidentiary unit: the total amount of any Indemnifiable Losses
that Alcoa was entitled to recover from Fairchild under § 11.6
of the Agreement from among the environmental liabilities
Alcoa claimed it had actually incurred in respect of all of

24

the specific projects on which it performed corrective work pursuant to the Agreement during the period from 2003 to 2006. That presumably is a finite number determinable in a single arbitration proceeding by application of all of the Agreement's relevant provisions. The Agreement created a means by which the parties could resolve disputes arising from their rights and obligations, a forum in which Alcoa could argue its case as to which particular qualifying environmental projects it undertook during the time in question, when and where each project was performed, how much it actually expended, and on what substantive basis under the terms of the Agreement Alcoa was entitled to claim indemnification by Fairchild for such liabilities.

At the same time, the Agreement's mediation and arbitration procedure afforded Fairchild with a corresponding opportunity to contest the validity of the entire body of claims Alcoa asserted, both under the general principles of the Agreement, and as to the specific projects and expenses actually incurred, in whole or in part. This provision also enabled Fairchild to affirmatively assert its contractual rights to adjustments of any recovery awarded to Alcoa by the amount of any recognized credits the Agreement permitted Fairchild to claim. Accordingly, during the arbitration Fairchild itself initiated to resolve its challenges to

Alcoa's claims, Fairchild had an appropriate occasion to raise the full extent of its rights under the terms of the Agreement to tax offsets, from whatever provision derived, so as to reduce any liability to Alcoa the Arbitrator found arising from the entirety of the claims at issue in the proceeding. In fact, Fairchild did assert entitlement to offsets under § 11.8 for Alcoa's realized and prospective Tax Benefits and the Arbitrator recognized the credit.  On this basis the Award was reduced by €200,081 in respect of Tax Benefits Alcoa obtained for fiscal year 2003, €545,802 for 2004 and €146,336 for 2005, even though the Award acknowledged that the adjustments pertaining to 2004 and 2005 were contingent upon a future event, insofar as subject to potential tax disallowances by January 1, 2008 and January 1, 2009, respectively. (See Award at 18-19.)

      In response to why it did not similarly assert claims for any Tax Benefit reductions it may be due under § 11.3(a), Fairchild argues that that provision relates to a separate section of the Agreement, that the parties had no reason to believe they had a dispute regarding § 11.3(e) offsets because "by its terms" that provision does not apply until after a determination has been made pursuant to § 11.6 that Alcoa is entitled to indemnification and that it actually incurred indemnifiable expenses, and hence Fairchild maintains that it

is not until then that the amount of any Tax Benefits Alcoa realized from such losses could be calculated. (Pet.'s Mem. at 7.) The Court finds nothing in the plain language of the Agreement supporting an interpretation that the computation of the net indemnification to adjust for Tax Benefits arising under § 11.3(e) must be separately resolved in an entirely new mediation or arbitration proceeding pursuant to the Agreement only after a decision has been made regarding the validity of indemnification claims asserted under § 11.6.

Fairchild does not convincingly explain why from a reading of the text such a construction must govern the application of § 11.3(e) but not of § 11.8, the provision Fairchild did invoke to avail itself of other Tax Benefit reductions. Fairchild distinguishes the provisions by merely stating, in conclusory terms, that one is dependent on the identity and nature of the expenses and the other is not. The Court does not discern any ground for a difference in treatment compelled as between Tax Benefit offsets under § 11.3(e) and § 11.8. The language of the two provisions is substantially similar. Both provisions are contained in Article XI of Agreement, which is entitled "Indemnification." Both relate to credits Fairchild is entitled to assert to reduce any indemnity obligation it may owe Alcoa for environmental liabilities pursuant to § 11.6. Both provisions

permit offsets with regard to any "Tax Benefit" Alcoa has realized in connection with its claims for indemnification. The term "Tax Benefit" is not defined specifically in relation to either § 11.3(e) or § 11.8, but uniformly in § 1.132 of the Agreement, where it is described as the "Tax savings attributable to <u>any</u> deduction, expense, loss, credit or refund to the indemnified party... <u>when</u> <u>incurred</u> <u>or</u> <u>received</u> ...." (Agreement § 1.132 (emphasis added).)

Thus, there is no basis to draw from the definition of "Tax Benefit" a viable distinction that a Tax Benefit credit pursuant to § 11.8 could be determined and allowed, whether fully realized or prospective, during the course an arbitration proceeding adjudicating claims for indemnification, as occurred here, but an offset permitted under § 11.3(e) cannot be asserted and calculated until <u>after</u> the right to indemnification has been resolved. In either case, the wording of the definition indicates that the Tax Benefit accrues when the associated transaction is "incurred or received." (<u>Id.</u>) Substantively, the principal difference between the two provisions relates to the source of the tax savings asserted. In respect of § 11.3(e) the Tax Benefit may be realized by Alcoa as a result of a claimed Indemnifiable Loss for qualifying environmental work performed, while in the case of § 11.8 the savings arise out of actual utilization of

French or German operating losses Alcoa obtained from
Fairchild and carried forward under the Agreement. Both
simply provide that the amount of indemnification Fairchild is
obligated to pay must be reduced by the amount of any such
realized or recognized Tax Benefit. Applying the same
analytical method and pertinent evidentiary support that the
Arbitrator employed to determine Tax Benefits offsets due
Fairchild under § 11.8, based both on Alcoa's actual and
contingent tax savings, the Arbitrator, had the matter been
presented, could similarly have formulated an appropriate
means to further reduce the Award by additional tax savings
Alcoa already had realized prior to 2006, or potentially could
subsequently obtain, by reason of the project expenses for
which it claimed indemnification.

On the basis of these considerations the Court concludes
that Fairchild had sufficient opportunity to raise its claim
regarding the § 11.3(e) Tax Benefit offset issue during the
parties' arbitration. That proceeding was conducted to
adjudicate all indemnification claims and defenses arising
under the Agreement that were then outstanding. Because
Fairchild could have and should have raised any remaining
claims or defenses relating to Tax Benefit credits that may
have required additional adjustment of the total amount of
Award, but failed to do so, Fairchild's claim to any further

reduction of the Award to which it may otherwise have been entitled arising from Alcoa's Tax Benefits is now barred by application of res judicata rules.  See Horphag Research Ltd. v. Henkel Corp., No. 00 Civ. 0438, 2004 WL 117601 (S.D.N.Y. Jan. 26, 2004); Evangelical Alliance Mission/Nihon Domei Kirisuto Kyodan v. Lockman Found., No. 95 Civ. 7214, 1995 WL 688958, at *4 (S.D.N.Y. Nov. 21, 1995).

Res judicata applies in federal court litigation to bar assertion of claims that were adjudicated or could have been raised in a previous arbitral proceeding.  See Pike, 266 F.3d at 90 ("'[A] party to arbitration cannot voluntarily engage in the arbitration of the issues submitted to the arbitrator and then attack the award on grounds not raised before the arbitrator.") (quoting United Food and Comm. Workers, Local 400 v. Marval Poultry Co. Inc., 876 F.2d 346, 352-53 (4th Cir. 1989)).  In Pike, the Second Circuit articulated the principles governing application of res judicata.  To establish preclusion under the doctrine, a litigant must demonstrate that the previous action involved an adjudication on the merits of a dispute between the same parties and that "the claims asserted in the subsequent action were, or could have been, raised in the prior action."  Id. at 91 (quoting Monahan v. New York City Dep't of Corr., 214 F.3d 275, 284-85 (2d Cir. 2000) (citing Allen v. McCurry, 449 U.S. 90, 94

(1980))).  A determination of whether a claim not raised in the previous action could have been raised, "'depends in part on whether the same transaction or connected series of transactions is at issue, and whether the same evidence is needed to support both claims.'"  Id. (quoting Interoceanica Corp. v. Sound Pilots, Inc., 107 F.3d 86, 90 (2d Cir. 1997)).  Moreover, whether two actions arise from the same claim or transaction may be ascertained by whether "'the underlying facts are "related in time, space, origin or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage."'"  Id. (quoting Interoceanica, 107 F.3d at 90 (quoting Restatement (Second) of Judgments § 24(b))).  In further elaborating on the test of whether a claim "could have been" raised in the previous action, the Circuit Court noted that the proper inquiry is whether "the claim was sufficiently related to the claims that were asserted in the first proceeding that it should have been asserted in that proceeding."  Id. (emphasis in original)

Here, the Tax Benefit offset claim or defense Fairchild raised after the Award was rendered arose from the same transaction or series of transactions between the parties -- the universe of Alcoa's outstanding claims for indemnification pursuant to § 11.6 of the Agreement.  Essentially the same

evidence is necessary to support both claims: documentation of Alcoa's expenditures with respect to remediation work performed as to each environmental project for which it sought and was awarded recovery, and of any Tax Benefits Alcoa received resulting from the Indemnification Losses it claimed in the arbitration. These claims are interrelated in time, space and origin, and form a convenient trial unit. Substantively, they all stem from the terms of the same subject of the Agreement, which is contained in Article 11. They involve the same body of projects encompassing the corrective work for which Alcoa claimed the indemnification adjudicated by the Award. To that extent, the claims are sufficiently related to form a convenient trial unit and thus should have been asserted in the same arbitration proceeding. Moreover, it better conforms to the parties' reasonable expectations, as well as business understanding and practice under an arbitration agreement, that sufficiently related claims be adjudicated in a single arbitral proceeding, rather than waiting for an award to be rendered on the issue of underlying liability and then recommence the process under a separate arbitration to resolve any reductions of that obligation in respect of any offsets due in respect of Tax Benefits. Such a procedure would be equivalent to adjudicating liability and damages sequentially in separate

court trials of independent successive lawsuits relating to the same underlying facts.

The cases Fairchild cites in opposition to the application of res judicata are not on point. In <u>Pike</u>, the court found that the doctrine does not bar claims that are unrelated in time or origin to claims already adjudicated. <u>See</u> 266 F.3d at 91. But in that case the claims at issue were distinct in that one arose out of the underlying breach of contract claim resolved in arbitration and the other was predicated on a claim for indemnification of the costs of the arbitration and litigation that did not arise until after the award was granted and court action was actually prosecuted. But, based on what this Court has determined above, the circumstances prevailing here are distinguishable. Fairchild's right to Tax Benefit offsets actually realized by Alcoa arose, as defined under the terms of § 1.132 of the Agreement, as of the date when Alcoa actually "incurred or received" its claimed tax savings from the Indemnifiable Losses. That event presumably occurred in connection with Alcoa's tax filings in respect of the years the losses were incurred -- during 2003 to 2006 -- and not at some indefinite time after June 2007 in other words, after the arbitration Award for indemnification Alcoa claimed had been determined and the parties had concluded another round of arbitration and

potential litigation.

For the same reason, Katz v. Feinberg, 167 F. Supp. 2d 556 (S.D.N.Y. 2001), aff'd, 290 F.3d 95 (2d Cir. 2002), is inapposite. The setoff claim asserted there was entirely unrelated to the claim previously resolved by arbitration. One arose from a dispute that went to arbitration regarding the valuation of a company's net worth under a purchase agreement, while the other pertained to a setoff of the amount of a claim relating to litigation expenses arising under a separate part of the parties' agreement. Here the Tax Benefit offset claim or defense arising from § 11.3(e) was not independent of Fairchild's underlying liability to indemnify Alcoa for the same set of environmental liabilities. These claims are no more separate and independent than were the § 11.8 offsets for Tax Benefits that were adjudicated in the arbitration proceeding and for which the Award was adjusted in Fairchild's favor. Moreover, there is no indication in Katz that any issue regarding res judicata was raised before the court, and the court did not address any such question. Noting that the parties were already involved in a separate arbitration pertaining to the setoff, the court simply declined to become enmeshed in the dispute. See id. at 572.

D.    ADDITIONAL CONSIDERATIONS

This proceeding may serve as a prime study of failed

34

expectations in the case of a much heralded public policy reform gone awry, and an instance of the best of intentions frustrated by the worst in execution.  In particular, it illustrates how the spirit and promise of a beneficial innovation in the administration of justice can be undermined by the attempts of litigants incrementally to reimpose upon the legal system the burdens of procedural trappings that changes in the law were meant to relieve in order to simplify and expedite the resolution of private disputes, by these means returning the law to the unsatisfactory point that prompted those major improvements in the first place.  These reasons prompt the Court to add some additional considerations further elaborating on the context that informs and frames this ruling.

In the discussion above, the Court expressed what, in purest terms, was conceived of the theory of the FAA when enacted, and its promise.  What appears to have become the reality in many arbitration actions, is quite another thing, a development at odds with the procedural reform Congress envisioned in adopting the statute.  As exemplified by the action now before the Court, an arbitration proceeding today is often not a true alternative method of dispute resolution.  Rather, procedurally it has evolved into a fully encrusted homunculus of litigation, in essence a full-scale bench trial

by another name in another forum. More and more, arbitral proceedings, guided by adaptations of the Federal Rules of Civil Procedure, are now encumbered and prolonged with extensive discovery, multiple depositions, interrogatories and exchange of documents that, page for page, amass an evidentiary record every tome as voluminous as that produced in comparable trials in court. As in litigation, this preparatory work may be preliminary to dispositive motions, pre-hearing briefings, hearings no less complex and lengthy than trials that frequently are conducted before arbitrators who are former judges or equivalents, followed by post-hearing briefings with proposed findings of fact and conclusions of law, and arbitration decisions that commonly are as properly detailed and thoroughly analyzed as any judicial opinion.

The action at hand offers a case in point. During the arbitration proceeding which spanned over 18 months, both parties were represented by counsel from two of this county's most preeminent firms. The scope of discovery was lengthy and extensive. By Alcoa's account, it lasted over seven months; the parties deposed over two dozen witnesses in the United States, France and Hungary, and Alcoa alone produced about 200,000 pages of documents in response to Fairchild's interrogatories and discovery requests and in support of Alcoa's claims for indemnification. The arbitration hearing,

presided over by a former state court judge, required almost two weeks -- possibly as long as or longer than a full bench trial of the dispute would have occupied. The Arbitrator, after issuing an interim decision denying Alcoa's motion for partial summary judgment,[3] considered pre-hearing memoranda[4] and heard testimony from 18 witnesses, including nine experts, and admitted into evidence more than 250 exhibits.[5] Following the hearing, the parties engaged in two rounds of briefings and submitted proposed findings of fact and conclusion of law, all of which filled in excess of 300 pages, supplemented by thousands of pages of deposition designations. The Arbitrator's Award was issued in a written opinion containing 22 pages of decision and 24 pages of findings of fact and conclusion of law.

Pursued with such expansive procedures and to such vigorous lengths, arbitration proceedings bear the hallmarks of courtroom battles in every material respect, and then some. The parallel is especially reflected in cases where, as here, the losing party subsequently seeks to vacate the arbitration award or challenges its confirmation on the ground that the

---

[3] Alcoa's motion comprised 58 pages. (See, Ex. I of Slifkin Decl.)

[4] Fairchild's pre-hearing memorandum comprised 78 pages. (See Ex. 22 of Roy Aff.).

[5] One such exhibit alone comprised Alcoa's project studies and investigations compiled in 22 volumes of materials in three-inch binders. (See Tr. at 904-05.)

decision was not sufficiently supported by even more of the formalities of litigation.  Needless to say, when it plays out in this manner, arbitration is stripped of its meaning and intended value as a substitute for litigation.  It not only deprives the parties of the contractual expectations of a simpler, quicker and more economical means of adjudicating disputes for which they bargained and by which they agreed to be bound, but also loses much of its presumed public and private worth to the judicial system and society as a whole.

The flip side of this observation raises a basic question.  If parties are not prepared to abide by the acknowledged limitations of the rules of arbitration as reflected in the statute, judicial doctrine and practice, why enter into arbitration agreements in the first place, rather than accepting to be bound by arbitral awards, and then challenging an unfavorable decision on the ground that the process was flawed insofar as it lacked all of the expanded and more rigorous legal protections associated with judicial proceedings? It doubly defeats the purpose of arbitration and undermines its social benefits if parties insist upon transforming what was contemplated as expeditious summary proceedings into ever more complex legal warfare that amounts to little more than litigation thinly disguised, and then, on review of an award, to fault the system because it still falls

short of judicial actions and to seek the court's blessing to impose stricter rules to bring the process even closer into line as a procedural imitation of litigation.  In a metaphor from another art form, those who want a portrait capturing tone and details with highest precision should look to the work of a photographer or realist, not an impressionist, a Rembrandt rather than Van Gogh.  Analogously, arbitration was designed to embody a fair impression of a reasonable means to achieve a just result with minimal technicality, and not an exact reproduction of the most robust judicial due process with every sinew and bone on display.

This trend and the significant concerns it raises have been noted by courts and commentators.  See Odfjell ASA v. Celanese AG, 328 F. Supp. 2d 505, 507 (S.D.N.Y. 2004) ("Arbitration, which began as a quick and cheap alternative to litigation, is increasingly becoming slower and more expensive than the system it was designed to displace...."); Thomas O. Main, ADR: The New Equity, 74 U. Cin. L. Rev. 329, 392-97 (2005); Kimberlee K. Kovach & Lela P. Love, Mapping Mediation: the Risks of Riskin's Grid, 3 Harv. Negotiation L. Rev. 71, 90-91 (1988); Murray S. Levin, The Role of Substantive Law in Business Arbitration and the Importance of Volition, 35 Am. Bus. L.J. 105, 159 (1997).  Mindful of these considerations, in applying governing law and principles in the action at

hand, the Court denies of Fairchild's petition to vacate the Award, and grants of Alcoa's cross-petition to confirm.  See B.L. Harbert Int'l, LLC v. Hercules Steel Co., 441 F.3d 905, 907 (11th Cir. 2006) ("The laudatory goals of the FAA will be achieved only to the extent that courts ensure arbitration is an alternative to litigation, not an additional layer in a protracted contest. If we permit parties who lose in arbitration to freely relitigate their cases in court, arbitration will do nothing to reduce congestion in the judicial system; dispute resolution will be slower instead of faster; and reaching a final decision will cost more instead of less."); Nat'l Ass'n of Broadcasters v. Librarian of Congress, 146 F.3d 907, 921 (D.C. Cir. 1998) ("If parties to arbitration could freely relitigate their complaints in the courts, arbitration would cease to be a method to achieve prompt resolution of conflict, but would instead become a new layer of review, and a new cause for delay.") (quoting Office & Prof'l Employees Union, Local 2 v. Washington Metro. Area Transp. Auth., 724 F.2d 133, 137 (D.C. Cir. 1983)).

Here, as summarized above, the parties engaged in extensive arbitration proceedings that, except for the label placed on the action, in almost every material respect match the process they would have followed had they sought in the first instance to adjudicate their dispute in this Court.

Fairchild now faults the Arbitrator with a charge of misconduct for not creating and weighing a record of evidence that, as exhaustive and detailed as it already was, would have encompassed every bit and piece of evidence that would have been compiled and demanded for a judicial trial of the dispute.  What Fairchild seeks to do is effectively to render arbitration proceedings even more the mirror image of full-scale litigation.  Fairchild's proposition finds no support in applicable case law, and insofar as it embodies a retrogressive procedural effect on the administration of justice this Court cannot countenance it.  For a ruling in Fairchild's favor would subvert the policy goals of the FAA to a point that, had the sponsors of the statute foreseen it, they may have been prompted to say: "Surely, this is not what we had in mind."

E.    ATTORNEY'S FEES AND PREJUDGMENT INTEREST

Alcoa asks the Court for an award of attorney's fees and prejudgment interest.  It argues that such relief is justified because the Award was unambiguous, that Fairchild has not raised any good faith argument against the validity of the Award or for refusing to abide by the Arbitrator's decision, and thus that enforcement of the Award in this Court should have been unnecessary.  The Court denies Alcoa's request.  Though the Court finds no merit in Fairchild's position,

losing arguments, even if decidedly tenuous, are not necessarily frivolous, or equate to evidence of bad faith or other forms of the extreme misconduct that warrant sanctions under Federal Rule of Civil Procedure 11. Fairchild had a right under the Agreement to challenge the confirmation of the Award, and its doing so does not mean that its refusal to pay immediately should be held against it. By the same token, insofar as Alcoa's request for prejudgment interest is predicated upon Fairchild's barring the escrow agent from releasing any of the funds held in that account, such relief is unwarranted given the unresolved issue of whether Fairchild is entitled to offsets for the Tax Benefits in question. Whatever business or other financial reason Fairchild may have had for not honoring the Award promptly, the Court finds no clear and convincing evidence of bad faith in Fairchild's raising of this issue after the award.

### III.  <u>ORDER</u>

For the reasons stated above, it is hereby

**ORDERED** that the petition of petitioner The Fairchild Corporation ("Fairchild") (Docket No. 1) to vacate the arbitration award (the "Award") at issue in this action rendered in favor of respondent Alcoa Inc. ("Alcoa") is DENIED; and it is further

**ORDERED** that the cross-petition of Alcoa (Docket No. 4)

42

to confirm the Award is GRANTED; and it is finally

**ORDERED** that Fairchild pay the Award in full in accordance with its terms within ten (10) calendar days of the date of this Order.

The Clerk of Court is directed to close this case.

**SO ORDERED.**

Dated:    New York, New York
          14 September 2007

                                        VICTOR MARRERO
                                          U.S.D.J.

43